APPEAL,GARN,LC−1,TRANSF,VJASSIGN

# U.S. District Court
## U.S. District Court for the Northern District of Oklahoma (Tulsa)
## CRIMINAL DOCKET FOR CASE #: <u>4:09−cr−00043−SPF</u>−2
### *Internal Use Only*

Case title: USA v. Springer et al                           Date Filed: 03/10/2009

Other court case number:  23−966 Supreme Court of the United    Date Terminated: 04/28/2010
                                 States

Related  Case:  4:21−cv−00361−SPF−CDL

---

Assigned to: Judge Stephen P
Friot

Appeals court case numbers:
'10−5057 (#348)' '10th Circuit',
22−5000 (#725) 10th Circuit,
22−5113 (#756) 10th Circuit,
24−5133 (#817) Tenth Circuit

**Defendant (2)**

| | | |
|---|---|---|
| **Oscar Amos Stilley**<br>*TERMINATED: 04/28/2010* | represented by | **Oscar Amos Stilley**<br>7103 RACE TRACK LOOP<br>FORT SMITH, AR 72916−9241<br>479−384−2303<br>Email: oscarstilley@gmail.com<br>PRO SE<br><br>**Charles Robert Burton , IV**<br>Burton Law Firm PC<br>15 E 5TH ST STE 4022<br>TULSA, OK 74103−4347<br>918−607−4891<br>Email: RobtBurton@aol.com<br>*TERMINATED: 04/27/2010*<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Public Defender or Community Defender Appointment*<br><br>**Terry Lee Weber**<br>Weber & Assoc PC<br>320 S BOSTON STE 825<br>TULSA, OK 74103<br>918−582−1910<br>Fax: 918−582−2015<br>Email: Terry.Weber@morelaw.com<br>*TERMINATED: 04/03/2009* |

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA or Other Appointment*

**Trevor Lee Reynolds**
Tulsa Law Group PC
1700 SOUTHWEST BLVD
TULSA, OK 74107
918–584–4724
Email: trevor@tlreynolds.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA or Other Appointment*

| **Pending Counts** | **Disposition** |
|---|---|
| 18 USC 371: Conspiracy to Defraud the United States (1) | 4/8/2010 Sentencing: BOP 60 months; SR 3 years; Restitution $776,280; SMA $100; 11/21/22 SR REVOCATION: 3 months; SR: 33 months; Remainder of Restitution. 11/13/2024 Revoc Hrg: BOP 24 months; NO SR. |
| 26 USC 7201: Tax Evasion and 18 USC 2 (3–4) | 4/8/2010 Sentencing: BOP 60 months each count, consecutive to Ct 1; SR 3 years each count; SMA $100 each count. 11/21/22 Revocation Hrg: BOP 3 months each count; SR 33 months. 11/13/2024 Revocation Hrg: BOP 24 months each count; NO SR. |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| None | |

---

**Plaintiff**

| **USA** | represented by | **Charles Anthony O'Reilly** |
|---|---|---|
| | | DOJ–Tax |
| | | 150 M Street N.E. |

Room 2–404
Washington, DC 20002
202–616–0115
Fax: 202–514–9623
Email: charles.a.o'reilly@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Government Attorney*
*(local,state,federal)*

**Jeffrey Andrew Gallant**
United States Attorney's Office (Tulsa)
110 W 7TH ST STE 300
TULSA, OK 74119–1013
918–382–2715
Fax: 918–560–7938
Email: Jeff.Gallant@usdoj.gov
*TERMINATED: 10/15/2024*
*LEAD ATTORNEY*
*Designation: Government Attorney*
*(local,state,federal)*

**Kenneth P Snoke**
United States Attorney's Office (Tulsa)
110 W 7TH ST STE 300
TULSA, OK 74119–1013
918–382–2700
Fax: 918–560–7946
Email: ken.snoke@usdoj.gov
*TERMINATED: 06/08/2010*
*LEAD ATTORNEY*
*Designation: Government Attorney*
*(local,state,federal)*

**Stephanie Noel Ihler**
DOJ–USAO
110 W. 7th Street
Ste 300
Tulsa, OK 74119
918–703–7615
Email: stephanie.ihler@usdoj.gov
*TERMINATED: 10/25/2024*
*LEAD ATTORNEY*
*Designation: Government Attorney*
*(local,state,federal)*

**Vani Singhal**
U.S. Attorney's Office
110 W. 7th Street
Suite 300
Tulsa, OK 74119
918–382–2700

Email: vani.singhal@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Government Attorney*
*(local,state,federal)*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/10/2009 | 2 | INDICTMENT by USA as to Lindsey Kent Springer (1) count(s) 1, 2, 3−4, 5−6, Oscar Amos Stilley (2) count(s) 1, 3−4 (pll, Dpty Clk) (Entered: 03/10/2009) |
| 10/14/2009 | 199 | RESPONSE (Re: 134 NOTICE ) by Oscar Amos Stilley (With attachments) (Stilley, Oscar) Modified on 10/15/2009 to change text to reflect correct event and change link (sac, Dpty Clk). (Entered: 10/14/2009) |
| 11/16/2009 | 245 | JURY VERDICT as to Lindsey Kent Springer (1) Guilty on Count 1,2,3−4,5−6 and Oscar Amos Stilley (2) Guilty on Count 1,3−4 (pll, Dpty Clk) (Entered: 11/17/2009) |
| 04/28/2010 | 338 | JUDGMENT AND COMMITMENT by Judge Stephen P Friot, entering judgment as to Oscar Amos Stilley (pll, Dpty Clk) (Entered: 04/28/2010) |
| 07/12/2010 | 399 | TRANSCRIPT of Proceedings (Unredacted) of Sentencing held on 04/21/2010 before Judge Stephen P Friot (Court Reporter: Tracy Washbourne) (Pages: 1 to 210). NOTICE RE REDACTION OF TRANSCRIPTS: A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may view the transcript at the court public terminal at no charge or may purchase a copy from the court reporter. (Re: 336 Minutes of Sentencing, Striking/Terminating Deadline(s)/Hearing(s), 340 Notice of Appeal to Circuit Court) as to Lindsey Kent Springer, Oscar Amos Stilley (sam, Dpty Clk) Modified on 10/15/2010 to remove transcript access restriction (a−hc, Dpty Clk). (Entered: 07/12/2010) |
| 07/12/2010 | 400 | TRANSCRIPT of Proceedings (Unredacted) of Sentencing held on 04/22/2010 before Judge Stephen P Friot (Court Reporter: Tracy Washbourne) (Pages: 211 to 390). NOTICE RE REDACTION OF TRANSCRIPTS: A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may view the transcript at the court public terminal at no charge or may purchase a copy from the court reporter. (Re: 336 Minutes of Sentencing, Striking/Terminating Deadline(s)/Hearing(s), 340 Notice of Appeal to Circuit Court) as to Lindsey Kent Springer, Oscar Amos Stilley (sam, Dpty Clk) Modified on 10/15/2010 to remove transcript access restriction (a−hc, Dpty Clk). (Entered: 07/12/2010) |
| 07/12/2010 | 401 | TRANSCRIPT of Proceedings (Unredacted) of Sentencing held on 04/23/2010 before Judge Stephen P Friot (Court Reporter: Tracy Washbourne) (Pages: 391 to 469). NOTICE RE REDACTION OF TRANSCRIPTS: A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may view the transcript at the court public terminal at no |

| | | |
|---|---|---|
| | | charge or may purchase a copy from the court reporter. (Re: 336 Minutes of Sentencing, Striking/Terminating Deadline(s)/Hearing(s), 340 Notice of Appeal to Circuit Court) as to Lindsey Kent Springer, Oscar Amos Stilley (sam, Dpty Clk) Modified on 10/15/2010 to remove transcript access restriction (a–hc, Dpty Clk). (Entered: 07/12/2010) |
| 11/04/2021 | 719 | ORDER by Judge Stephen P Friot , ruling on motion(s)/document(s): #701 dismissed, #702 dismissed, #705 granted, #707 granted, denying certificate of appealability (Re: 707 MOTION to Dismiss Defendant Oscar Stilley's Motion to Stay Proceedings and for Determination of Who is the Lawfully Authorized Judge on this Case , 705 MOTION to Dismiss Defendants Verified Motion under 28 U.S.C. § 2255 as Untimely and in Violation of Local Rules , 701 MOTION to Vacate/Set Aside/Correct Sentence under 28 U.S.C. 2255 , 702 MOTION Disclose co–defendant's address, show authority for Friot to preside, 30 day stay of proceedings ) as to Oscar Amos Stilley (alg, Dpty Clk) (Entered: 11/04/2021) |
| 11/04/2021 | 720 | JUDGMENT by Judge Stephen P Friot *dismissing defendant Oscar Amos Stilley's Motion to Vacate Sentence*, entering judgment as to Oscar Amos Stilley (alg, Dpty Clk) (Entered: 11/04/2021) |
| 06/06/2022 | 732 | DECISION from Circuit Court dismissing the Appeal (Re: 725 Notice of Appeal to Circuit Court, ) as to Oscar Amos Stilley (lmt, Dpty Clk) (Entered: 06/06/2022) |
| 08/24/2022 | 733 | TRANSFER by Judge Stephen P Friot of Jurisdiction of Probationer or Supervised Releasee to District of OKWD as to Oscar Amos Stilley (blc, Dpty Clk) Modified on 8/24/2022 to edit docket text to remove additional Order event language (blc, Dpty Clk). (Entered: 08/24/2022) |
| 08/25/2022 | 734 | NOTICE to USDC WD/OK of a Transfer of Jurisdiction of Probation/Supervised Release (Prob–22) as to Oscar Amos Stilley. Your case number is: 22–cr–357–F–1. Docket sheet and documents attached. The finance office will transmit the bond. If you require a financial ledger and/or certified copies of any documents, please send a request to CM–ECFIntake_oknd@oknd.uscourts.gov. If you wish to designate a different email address for future transfers, send your request to InterDistrictTransfer_TXND@txnd.uscourts.gov. as to Oscar Amos Stilley (sc, Dpty Clk) (Entered: 08/25/2022) |
| 09/11/2022 | 735 | MOTION to Clarify *and disclose authority for Judge Friot to preside* by Oscar Amos Stilley (Stilley, Oscar) (Entered: 09/11/2022) |
| 09/20/2022 | 736 | ORDER by Judge Stephen P Friot , ruling on motion(s)/document(s): GRANTED IN PART and DENIED IN PART (as fully set out in this order) (Re: 735 MOTION to Clarify *and disclose authority for Judge Friot to preside* ) as to Oscar Amos Stilley (LLG, Chambers) (Entered: 09/20/2022) |
| 11/03/2022 | 737 | ORDER by Judge Stephen P Friot *Jurisdiction over dft is accepted and assumed by this court from and after the date of entry of this order. This order shall have the same effect as a Probation form 22 Transfer of Jurisdiction.* as to Oscar Amos Stilley (LLG, Chambers) (Entered: 11/03/2022) |
| 11/16/2022 | 741 | MOTION for initial appearance in revocation proceedings by Oscar Amos Stilley (Stilley, Oscar) (Entered: 11/16/2022) |
| 11/16/2022 | 742 | ORDER by Judge Stephen P Friot , ruling on motion(s)/document(s): denying (Re: 741 MOTION for initial appearance in revocation proceedings ) as to Oscar Amos |

| | | Stilley (LLG, Chambers) (Entered: 11/16/2022) |
|---|---|---|
| 11/20/2022 | 744 | MOTION for Appointment of Counsel *Robert Burton IV, as standby counsel only, with included brief* by Oscar Amos Stilley (Stilley, Oscar) (Entered: 11/20/2022) |
| 11/20/2022 | 746 | MOTION to Quash *summons and strike other documents from OKWD, and dismiss for lack of jurisdiction, with included supporting brief* by Oscar Amos Stilley (Stilley, Oscar) (Entered: 11/20/2022) |
| 11/20/2022 | 747 | MOTION early PSR *with included supporting brief* by Oscar Amos Stilley (Stilley, Oscar) (Entered: 11/20/2022) |
| 11/20/2022 | 748 | MOTION for Discovery *with included supporting brief* by Oscar Amos Stilley (Stilley, Oscar) (Entered: 11/20/2022) |
| 11/20/2022 | 749 | MOTION for a true and correct record *with included supporting brief* by Oscar Amos Stilley (Stilley, Oscar) (Entered: 11/20/2022) |
| 11/23/2022 | 752 | JUDGMENT AND COMMITMENT by Judge Stephen P Friot , entering judgment (re: revocation proceedings) as to Oscar Amos Stilley (LLG, Chambers) (Entered: 11/23/2022) |
| 12/08/2022 | 755 | NOTICE of Change of Address as to Oscar Amos Stilley (ll, Dpty Clk) (Entered: 12/08/2022) |
| 12/08/2022 | 756 | NOTICE OF APPEAL to Circuit Court (Re: 752 Judgment and Commitment, Entering Judgment (re: revocation proceedings) ) as to Oscar Amos Stilley (ll, Dpty Clk) (Main Document 756 replaced on 12/8/2022 to show "forms" notation) (ll, Dpty Clk). (Entered: 12/08/2022) |
| 12/13/2022 | 760 | ORDER by Judge Stephen P Friot , ruling on motion(s)/document(s): denied (Re: 750 MOTION to Clarify *and modify conditions of supervised release, with included supporting brief* ) as to Oscar Amos Stilley (LLG, Chambers) (Entered: 12/13/2022) |
| 11/04/2024 | 804 | MOTION for Appointment *of Standby Counsel* by Oscar Amos Stilley (Stilley, Oscar) (Entered: 11/04/2024) |
| 11/04/2024 | 805 | MOTION to Vacate/Set Aside *Judgment, Docket #752* (Re: 752 Judgment and Commitment, Entering Judgment (re: revocation proceedings) ) by Oscar Amos Stilley (Stilley, Oscar) (Entered: 11/04/2024) |
| 11/05/2024 | 808 | MOTION Motion for True and Correct Record by Oscar Amos Stilley (Stilley, Oscar) (Entered: 11/05/2024) |
| 11/05/2024 | 809 | MOTION to Vacate/Set Aside *Judgment Docket 338* (Re: 338 Judgment and Commitment, Entering Judgment ) by Oscar Amos Stilley (Stilley, Oscar) (Entered: 11/05/2024) |
| 11/05/2024 | 810 | MOTION to Dismiss Indictment/Information/Complaint *Docket 792 Sealed Petition/Criminal Complaint* (Re: 2 Indictment ) by Oscar Amos Stilley (Stilley, Oscar) (Entered: 11/05/2024) |
| 11/13/2024 | 816 | MINUTES of Proceedings – held before Judge Stephen P Friot: Supervised Release Revocation Final Hearing held on 11/13/2024 , Sentencing held on 11/13/2024 , ruling on motion(s)/document(s): #804, 805, 808–810, 815 denied, striking/terminating deadline(s)/hearing(s) as to Oscar Amos Stilley (Re: 808 MOTION Motion for True and Correct Record , 810 MOTION to Dismiss |

| | | |
|---|---|---|
| | | Indictment/Information/Complaint *Docket 792 Sealed Petition/Criminal Complaint*, <u>805</u> MOTION to Vacate/Set Aside *Judgment, Docket #752*, <u>804</u> MOTION for Appointment *of Standby Counsel*, <u>815</u> MOTION to Disqualify Judge Stephen P. Friot *For Bias and Interest and the Appearance of Same*, <u>809</u> MOTION to Vacate/Set Aside *Judgment Docket 338* ) (Court Reporter: J Golemboski, L Griffin) (pll, Dpty Clk) (Entered: 11/13/2024) |
| 11/13/2024 | <u>817</u> | NOTICE OF APPEAL to Circuit Court (Re: <u>816</u> Minutes of Supervised Release Revocation Final Hearing,,,, Minutes of Sentencing,,,, Ruling on Motion(s)/Document(s),,,, Striking/Terminating Deadline(s)/Hearing(s),,, ) as to Oscar Amos Stilley (cjb, Dpty Clk) (Entered: 11/14/2024) |

*FILED*

MAR 1 0 2009

Phil Lombardi, Clerk
U.S. DISTRICT COURT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

Case No. 09 CR 043 JHP

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| **Plaintiff,** ) | **INDICTMENT** |
| ) | **[18 U.S.C. § 371, Conspiracy to** |
| **v.** ) | **Defraud the United States;** |
| ) | **26 U.S.C. § 7201, Tax Evasion;** |
| **LINDSEY KENT SPRINGER,** ) | **26 U.S.C. § 7203, Failure to File** |
| **OSCAR AMOS STILLEY,** ) | **Tax Return]** |
| ) | |
| **Defendants.** ) | |

## THE GRAND JURY CHARGES:

### GENERAL ALLEGATIONS

At all times relevant to this Indictment:

1.     **LINDSEY KENT SPRINGER** ("Defendant **SPRINGER**") was a resident of the City of Kellyville, in the Northern District of Oklahoma.

2.     Defendant **SPRINGER** used the name Bondage Breakers Ministry to solicit and receive money. Defendant **SPRINGER**'s stated purpose for Bondage Breakers Ministry was "to get rid of the Internal Revenue Service."

3.     **OSCAR AMOS STILLEY** ("Defendant **STILLEY**") was an attorney residing in Fort Smith, Arkansas.

1

4.    Defendant **STILLEY** maintained an Arkansas IOLTA Foundation Trust Account ("IOLTA account") at Arvest Bank; an IOLTA account is an interest-bearing account used to hold client funds.

5.    Defendants **SPRINGER** and **STILLEY** each earned income in various ways, including assisting individuals being investigated and prosecuted for federal tax violations. Defendant **SPRINGER** referred individuals to Defendant **STILLEY**, and provided assistance on many of these cases.

6.    Defendant **SPRINGER** last filed an individual income tax return with the Internal Revenue Service in the late 1980's.

7.    Defendant **STILLEY** last filed an individual income tax return with the Internal Revenue Service in the late 1980's.

## COUNT ONE
## [18 U.S.C. § 371]

8.    General Allegations paragraphs 1 through 7 are incorporated as if fully set forth herein.

### OBJECT OF THE CONSPIRACY

9.    Beginning in or about 2000, and continuing until on or about January 15, 2009, within the Northern District of Oklahoma, and elsewhere, Defendants **SPRINGER** and **STILLEY**, and others, both known and unknown to the Grand Jury, unlawfully and knowingly combined, conspired, confederated, and agreed together to defraud the United States by impeding, impairing, obstructing, and defeating the lawful government functions

2

of the Internal Revenue Service, an agency of the United States, in the ascertainment, computation, assessment, and collection of revenue, that is, federal individual income taxes.

## MANNER AND MEANS OF THE CONSPIRACY

The object of the conspiracy was to be accomplished, and was accomplished, through the following manner and means:

10. Defendants **SPRINGER** and **STILLEY** would and did use Defendant **STILLEY**'s IOLTA account to conceal Defendant **SPRINGER**'s income, assets, and personal expenses;

11. Defendant **SPRINGER** would and did use Defendant **STILLEY**'s credit card to pay Defendant **SPRINGER**'s personal expenses;

12. Defendants **SPRINGER** and **STILLEY** would and did use cashier's checks, money orders, cash, and other means to avoid creating the usual records of financial transactions and to conceal Defendant **SPRINGER**'s income;

13. Defendants **SPRINGER** and **STILLEY** would and did knowingly misrepresent the source and nature of Defendant **SPRINGER**'s income to Internal Revenue Service employees, the Grand Jury, and the Department of Justice; and

14. Defendants **SPRINGER** and **STILLEY** would and did refrain from filing forms with the Internal Revenue Service, including Forms 1040 and 1099.

3

## OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY

In furtherance of the conspiracy and to effect the object thereof, Defendants **SPRINGER** and **STILLEY**, and others known and unknown to the Grand Jury, committed the following overt acts, among others, in the Northern District of Oklahoma and elsewhere:

15.    On or about September 16, 2005, Defendant **SPRINGER** told Internal Revenue Service employees that all funds he receives are gifts and donations, that he does not have any income, and that he does not provide any services for payment.

16.    On or about January 20, 2006, Defendant **STILLEY** stated to Internal Revenue Service employees that people give money to Defendant **SPRINGER** for his ministry, and expect no services in return.

17.    On or about March 9, 2006, Defendant **STILLEY** provided the Grand Jury with a document titled "RESPONSE TO SUBPOENA" stating that "LINDSEY SPRINGER does not charge for his services," and purporting to list "any money paid, given, transferred, or provided to LINDSEY SPRINGER for any purpose."

18.    On or about June 24, 2003, Defendant **STILLEY** caused to be deposited a check for $112,500 into his IOLTA account.

19.    On or about June 30, 2003, Defendant **STILLEY** caused to be written a check for $14,359 from his IOLTA account to Defendant **SPRINGER**.

20.    On or about July 21, 2003, Defendant **STILLEY** caused to be written a check for $35,000 from his IOLTA account to Defendant **SPRINGER**.

21.     On or about July 31, 2003, Defendant **STILLEY**, using funds from his IOLTA account,  purchased a $37,000 cashier's check for Defendant **SPRINGER**.

22.     On or about July 31, 2003, Defendant **SPRINGER** used the $37,000 cashier's check to purchase a Chevrolet Corvette.

23.     On or about November 6, 2003, Defendant **STILLEY** caused $375,059.90 to be transmitted to his IOLTA account.

24.     On or about November 7, 2003, Defendant **STILLEY** caused three cashier's checks payable to Defendant **SPRINGER** in the amount of $20,000 each to be issued from his IOLTA account.

25.     On or about  November 7, 2003, Defendant **STILLEY** purchased $18,000 in money orders for Defendant **SPRINGER** using funds from his IOLTA account.

26.     On or about August 8, 2005, Defendant **SPRINGER** sent an email to a third person containing the account number, routing number, and name of Defendant **STILLEY**'s IOLTA account.

27.     On or about August 11, 2005, Defendants **SPRINGER** and **STILLEY** caused $192,000 to be transmitted to Defendant **STILLEY**'s IOLTA account for Defendant **SPRINGER**.

28.     On or about August 15, 2005, Defendant **STILLEY** caused $166,000 to be transmitted from his IOLTA account for the purchase of a motor home titled in the name of Defendant **SPRINGER** and his wife.

5

29.    On or about August 18, 2005, Defendants **SPRINGER** and **STILLEY** caused $58,000 to be transmitted to Defendant **STILLEY**'s IOLTA account for Defendant **SPRINGER**.

30.    On or about August 26, 2005, Defendant **STILLEY** caused $5,560 to be transmitted from his IOLTA account to Oklahoma Truck and Trailer Sales for the purchase of a trailer titled in the name of Defendant **SPRINGER**.

31.    On or about September 1, 2005, Defendant **STILLEY** caused $25,813 to be transmitted from his IOLTA account to Lexus of Tulsa for the purchase of a Lexus titled in the name of Defendant **SPRINGER** and his wife.

32.    On or about September 19, 2005, Defendant **STILLEY** purchased two $10,000 cashier's checks payable to Defendant **SPRINGER** with funds from Defendant **STILLEY**'s IOLTA account.

33.    On or about November 9, 2005, Defendant **STILLEY** purchased a $10,000 cashier's check payable to Defendant **SPRINGER** with funds from Defendant **STILLEY**'s IOLTA account.

34.    On or about November 29, 2005, Defendant **STILLEY** purchased a $9,000 cashier's check payable to Defendant **SPRINGER** with funds from Defendant **STILLEY**'s IOLTA account.

35.     On or about December 9, 2005, Defendant **SPRINGER** caused $50,000 he earned from the sale of a motor home to be transmitted to Defendant **STILLEY**'s IOLTA account.

36.     On or about May 2, 2006, Defendant **STILLEY** caused to be written a $1,993.56 check from his IOLTA account to Defendant **SPRINGER**.

37.     On or about July 25, 2006, Defendant **STILLEY** caused to be deposited a $175,000 check in his IOLTA account.

38.     On or about August 3, 2006, Defendant **STILLEY** caused to be written a $25,000 check from his IOLTA account to Bondage Breakers Ministry.

39.     On or about January 15, 2009, Defendant **SPRINGER** represented that he earned no income and that the  money he received was given "without any expectation for anything from anybody."

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
### [26 U.S.C. § 7201]

40.    General Allegations paragraphs 1, 2, 5, and 6 are incorporated as if fully set forth herein.

41.    From on or about January 1, 2000, and continuing to on or about January 15, 2009, within the Northern District of Oklahoma and elsewhere, Defendant **SPRINGER** had and received taxable income, and upon that taxable income there was a substantial income tax due and owing. Well knowing and believing the foregoing facts, Defendant **SPRINGER** did willfully attempt to evade and defeat the individual income taxes due and owing by him to the United States of America for the calendar year 2000, by failing to file a United States Individual Income Tax Return as required by law, and by committing various affirmative acts of evasion, including:  receiving income in a fictitious name; directing individuals to write "donation" or "gift" on checks that were payment for services; directing individuals to pay for services by cashier's check; using a check-cashing business to cash checks; using money orders, cash, and other means to avoid creating the usual records of financial transactions and to conceal his income;  making false statements to agents and employees of the Internal Revenue Service; and, otherwise concealing and attempting to conceal from all proper officers of the United States of America his true and correct income.

All in violation of Title 26, United States Code, Section 7201.

8

## COUNT THREE
**[26 U.S.C. § 7201 and 18 U.S.C. § 2]**

42.     General Allegations paragraphs 1 through 7 are incorporated as if fully set forth herein.

43.     From on or about January 1, 2003, and continuing to on or about January 15, 2009, within the Northern District of Oklahoma and elsewhere, Defendant **SPRINGER** had and received taxable income, and upon that taxable income there was a substantial income tax due and owing.   Well knowing and believing the foregoing facts, Defendants **SPRINGER** and **STILLEY** did willfully attempt to evade and defeat the individual income taxes due and owing by Defendant **SPRINGER** to the United States of America for the calendar year 2003, by failing to file a United States Individual Income Tax Return as required by law, and by committing various affirmative acts of evasion.   Defendant **SPRINGER** committed the following affirmative acts of evasion:  directing individuals to make checks payable to Bondage Breakers Ministry; using a check-cashing business to cash checks; and accepting collectible coins as payment for services.  Defendants **SPRINGER** and **STILLEY** committed, and aided and abetted the commission of, the following affirmative acts of evasion:  using Defendant **STILLEY**'s IOLTA account; using Defendant **STILLEY**'s credit card to pay Defendant **SPRINGER**'s personal expenses; using cashier's checks, money orders, cash, and other means to avoid usual records and to conceal income; making false statements to agents and employees of the Internal Revenue Service; and,

9

otherwise concealing and attempting to conceal from all proper officers of the United States of America Defendant **SPRINGER**'s true and correct income.

All in violation of Title 26, United States Code, Section 7201 and Title 18, United States Code Section 2.

## COUNT FOUR
### [26 U.S.C. § 7201 and 18 U.S.C. § 2]

44.    General Allegations paragraphs 1 through 7 are incorporated as if fully set forth herein.

45.    From on or about January 1, 2005, and continuing to on or about January 15, 2009, within the Northern District of Oklahoma and elsewhere, Defendant **SPRINGER** had and received taxable income, and upon that taxable income there was a substantial income tax due and owing.  Well knowing and believing the foregoing facts, Defendants **SPRINGER** and **STILLEY** did willfully attempt to evade and defeat the individual income taxes due and owing by Defendant **SPRINGER** to the United States of America for the calendar year 2005, by failing to file a United States Individual Income Tax Return despite earning income of sufficient amount to require the filing of an individual income tax return, and by committing various affirmative acts of evasion.  Defendant **SPRINGER** committed the following affirmative acts of evasion:  directing individuals to make checks payable to Bondage Breakers Ministry; and using a check-cashing business to cash checks.  Defendants **SPRINGER** and **STILLEY** committed, and aided and abetted the commission of, the following affirmative acts of evasion:  using Defendant **STILLEY**'s IOLTA account; using Defendant **STILLEY**'s credit card to pay Defendant **SPRINGER**'s personal expenses; using cashier's checks, money orders, cash, and other means of payment to avoid usual records and to conceal income; making false statements to agents and employees of the Internal Revenue

11

Service; and, otherwise concealing and attempting to conceal from all proper officers of the United States of America Defendant **SPRINGER**'s true and correct income.

All in violation of Title 26, United States Code, Section 7201, and Title 18, United States Code Section 2.

## COUNT FIVE
**[26 U.S.C. § 7203]**

46.    General Allegations paragraphs 1, 2, 5, and 6 are incorporated as if fully set forth herein.

47.    During the calendar year 2002, Defendant **SPRINGER** had and received gross income in excess of $7,700.  By reason of such gross income, he was required by law, following the close of the calendar year 2002 and on or before April 15, 2003 to make an income tax return to the Internal Revenue Service Center, at Austin, Texas, to a person assigned to receive returns at the local office of the Internal Revenue Service at Tulsa, Oklahoma, or to another Internal Revenue Service office permitted by the Commissioner of Internal Revenue, stating specifically the items of his gross income and any deductions and credits to which he was entitled. Well knowing and believing all of the foregoing, he did willfully fail, on or about April 15, 2003, in the Northern District of Oklahoma and elsewhere, to make and file an income tax return.

All in violation of Title 26, United States Code, Section 7203.

## COUNT SIX
## [26 U.S.C. § 7203]

48.     General Allegations paragraphs 1, 2, 5 and 6 are incorporated as if fully set forth herein.

49.     During the calendar year 2004, Defendant **SPRINGER** had and received gross income totaling in excess of $15,900.  By reason of that gross income, he was required by law, following the close of the calendar year 2004 and on or before April 15, 2005 to make an income tax return to the Internal Revenue Service Center, at Austin, Texas, to a person assigned to receive returns at the local office of the Internal Revenue Service at Tulsa, Oklahoma, or to another Internal Revenue Service office permitted by the Commissioner of Internal Revenue, stating specifically the items of his gross income and any deductions and credits to which he was entitled.  Well knowing and believing all of the foregoing, he did willfully fail, on or about April 15, 2005, in the Northern District of Oklahoma and elsewhere, to make and file an income tax return.

All in violation of Title 26, United States Code, Section 7203.

DAVID E. O'MEILIA
UNITED STATES ATTORNEY

CHARLES A. O'REILLY
Trial Attorney, Tax Division
United States Department of Justice

KENNETH P. SNOKE
Assistant United States Attorney

A TRUE BILL

/s/ Grand Jury Foreperson
Grand Jury Foreperson

14

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

UNITED STATES OF AMERICA                                                    PLAINTIFF

v.                                        **Case No. 09-CR-043 SPF**

**LINDSEY KENT SPRINGER,**
**OSCAR AMOS STILLEY**                                                    DEFENDANT

**RESPONSE TO 404(b)**

Comes now **OSCAR AMOS STILLEY**[1] by limited special appearance, and

not a general appearance, and for his response to 404(b) [docket 134] states:

1.      The government has given notice of intent to present proof of the

following matters relevant to Stilley

    Stilley's income 2000 to present.

    Stilley's tax filing history 1981-2008.

    Stilley's litigation history.

    Stilley's involvement in criminal tax trials and investigations.

    Stilley's practice of law, including suspensions, sanctions, and

    disbarment proceedings.

---

[1]      It is presumed that the plaintiff is master of his own complaint.  This
complaint is styled in the name of "**UNITED STATES OF AMERICA**" as opposed to
the people thereof, or any grand jury.  Plaintiff, whoever that may actually be,
named **OSCAR AMOS STILLEY** as a Defendant.  Therefore, **OSCAR AMOS
STILLEY** has appeared specially and limited, challenging jurisdiction, to
defend against the charges to the extent required so to do by the law.

Page 1 of  17

2.      The Court granted leave to Oscar Stilley to file a response to the

government's notice of intent to use 404(b) evidence, no later than

October 14, 2009, together with the orders concerning suspension

pending disbarment.

3.      The following exhibits are attached for the purpose of advising the

court concerning the professional conduct matters referenced by the

government.

    1.      Condensed partial transcript of December 2007 hearing on

disbarment.

    2.      Order 12-27-09 directing the commencement of disbarment

proceedings

    3.      Front page of transcript from disbarment liability hearing, and

condensed pages 141-147, or 558 to 584 by original pagination.

    4.      June 08 disbarment order, from committee, directing disbarment

proceedings.

    5.      Condensed partial transcript of June 08 hearing at CPC.

    6.      Ligon's brief to the special judge in the disbarment case.

7.      Any mention of the disbarment, suspension, or disciplinary matters

would almost certainly embroil the parties in a lengthy dispute over due

process issues in proceedings in Arkansas and perhaps other courts as well.

8.    There is no valuable information to balance against this waste of time.  The information concerning the professional discipline matters would serve only to unfairly paint Oscar Stilley as a bad person, which is expressly prohibited by the rules.

9.    The presentation of any testimony whatsoever from Mark Zokle would all but guarantee a lengthy battle in which Oscar Stilley attempts to clear his name while the government attempts to smear it.

10.    Except with respect to litigation history[2] reasonably related to this case, for example the Patterson litigation, or litigation demonstrating facts relevant to show the pattern and practice of a party to this litigation with respect to matters relevant to this litigation, none of the above matters are properly admissible against Oscar Stilley under 404(b).

WHEREFORE, Defendant Oscar Stilley respectfully requests that the Court prohibit the government from mentioning or causing the mention of anything about any suspension or other professional discipline matters

---

[2]    "Litigation history" is intended to encompass involvement in tax investigations and trials.  The terms seem to denote essentially the same thing.

related to of Oscar Stilley, or presenting any testimony at all, without the

prior consent of the Court; that the Court bar all testimony about any

other 404(b) matters, except with respect to the litigation history of Oscar

Stilley concerning federal tax litigation arguably related to the issues in this

case; and such other relief as may be appropriate whether or not

specifically prayed.

Respectfully submitted,

By:_____/s/ Oscar Stilley_____
Oscar Stilley, Attorney at Law
7103 Race Track Loop
Fort Smith, AR 72916
(479) 996-4109
(866) 673-0176 Fax
oscar@oscarstilley.com

## CERTIFICATE OF SERVICE

I, Oscar Stilley, by my signature above certify that I have this
October 14, 2009, caused the Plaintiff to be served with a copy of this
pleading by CM/ECF to: Kenneth P. Snoke, United States Attorney's Office,
110 W 7th Street, Suite 300, Tulsa , OK 74119-1013, ken.snoke@usdoj.gov;
Charles A O'Reilly, US Dept of Justice, PO Box 972, Washington , DC 20044,
email charles.a.o'reilly@usdoj.gov . Also by email to Lindsey K. Springer at
Gnutella@mindspring.com .

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA                                                PLAINTIFF


v.                                    Case No. 09-CR-043 SPF


LINDSEY KENT SPRINGER,

OSCAR AMOS STILLEY                                                      DEFENDANT


<u>                        BRIEF IN SUPPORT OF RESPONSE TO 404(b)</u>

The government has given notice of an intent to use evidence of certain matters, pursuant to Rule 404(b).  This Court has graciously invited a response by October 14, 2009.

The professional discipline matters threaten to greatly increase the time necessary for trial, confuse the issues, and generally divert the proceedings from the central issue, same being whether one or more of the defendants are guilty of the charged offenses.

The orders of suspension are included as exhibits hereto.  In order to provide an understanding of the filed orders, certain portions of transcript are

Page 5 of  17

included.   These show the extent to which any of the accusations in the professional discipline matters relate to federal criminal tax matters.

As Exhibit 3 will show, some of these counts include accusations that Stilley attempted to relitigate matters from Arkansas disciplinary actions in federal cases involving criminal tax matters.

Stilley did in fact attack the Arkansas proceedings, in the face of reciprocal suspension show cause orders.  Undersigned will set forth his reasons and let the Court decide if we should rehash these matters yet again in this litigation.  It is clear that the government is not pleased with the vigorous defense offered up by Stilley on behalf of persons accused of tax offenses.

Stilley maintains that if any attack is permitted it should be permitted only as to the original proceedings in Arkansas.  It is hardly fair to expect the jury to understand what amounts to an 8 year assault on the professional integrity of Stilley, in many different venues, but for the most part either alleging bad acts in Arkansas, or relating to the findings of such alleged bad acts.

For example, in the 8th Circuit Stilley was told that my show cause pleadings and record were by far the most voluminous ever provided by an attorney.  Here is the entirety of the 8th Circuit's order, entered "at the direction of the court:"

> Having considered the response to this court's order to show cause filed by Mr. Stilley, it is hereby ordered that Oscar A. Stilley be suspended from the practice of law before this court until such time as he provides this court with verification of his reinstatement to the bar of the Supreme Court

of Arkansas.

If the Court permits any attack (which will certainly bring a vigorous counterattack) it should be limited to the underlying claimed offense, and the proceedings directly related thereto. Venturing down a hall of mirrors involving accusations on accusations, appeals and counter accusations, the finer points of the procedural rules of professional conduct, all laced with the legal framework which protects attorneys, is a virtual recipe for confusion.

At the very least this Court should require the government to prove their allegations of bad acts outside the presence of the jury, sufficiently that *this* Court is satisfied that the minimum requirements of due process were satisfied.

Stilley would be pleased to brief the Court on due process caselaw if such should be requested. Such is not herein briefed, partly in the interest of brevity, and partly because the due process violations are so egregious that the man on the street would readily recognize that constitutional violations have occurred.

There were two complaints[3] heard by the Arkansas Supreme Court Committee on Professional Conduct, (CPC) both of which resulted in a disbarment proceedings with a suspension pending disbarment. Excerpts from the first[4] include the following, beginning at page 87:

---

[3]     Relating to the disbarment proceedings. There is also a six month suspension already served, for language in a brief claimed to be critical of government officials.

[4]     In re Oscar Stilley, Arkansas Supreme Court Committee on Professional Conduct (CPC) 06-067.

87

9     MR. STILLEY:  Can I speak just a little bit
10  more?
11     MR. HODGES:  **No, sir.**  I'm going to rule on
12  your motion for a directed verdict and we're
13  going to move on.  I'm going to rule that it's
14  denied and for the reasons that the Petitioner
15  has stated and given a prima facia case in the
16  Complaint and also under Sections 11 and 17 of
17  the rules, professional conduct rules.  With
18  regard to our procedure, we have the right to
19  institute grounds for discipline.  So anything
20  else you have in the way of motion or objection
21  Mr. Stilley; otherwise, I suggest you call your
22  first witness for your case in chief.
23     MR. STILLEY:  Now, are you ruling -- are you
24  ruling against the constitutional challenge on
25  the position that -- and it's Respondent's

88

1  position that the power to take away a
2  government-issued license cannot be delegated to
3  a non-governmental entity.
4     MR. HODGES:  **No, sir** --
5     MR. STILLEY:  Are you ruling that that is
6  not --
7     MR. HODGES:  **No, sir**, I'm denying your
8  motion for a directed verdict.
9     MR. STILLEY:  Including the constitutional
10  challenge?
11     MR. HODGES:  **No, sir.**  I'm denying your
12  motion for a directed verdict.  Now, call your
13  first witness.
14     MR. STILLEY:  Well, I'm asking for a ruling
15  on the constitutional challenge because in
16  Middlesex versus Gardner states -- says I'm
17  entitled to a ruling on constitutional
18  challenges, and that's what this is.
19     MR. HODGES:  **No, sir.  I'm not going to give**
20  **you a ruling on that today,** and I suggest you
21  call your first witness.

22    MR. STILLEY:  **Can I get a ruling later?**
23    MR. HODGES:  **No, sir**.  I'm telling you call
24   your first witness, Mr. Stilley.
25    MR. STILLEY:  I'm not through.

89

1    MR. HODGES:  -- your case in chief.
2    MR. STILLEY:  That was my first motion.
3   I've got a whole slew of motions here to go down
4   the list.
5    MR. HODGES:  You've given your Motion for
6   Interim -- Interim Relief based on a Motion for a
7   Directed Verdict, so let's move on.  **We're not**
8   **governed here by the Arkansas Rules of Civil**
9   **Procedure, except for your one rule on discovery.**
10   **That's Rule 30.  So let's move on.**  Call your
11   first witness, Mr. Stilley.
12    MR. STILLEY:  Move to dismiss on the grounds
13   that there is no proof, no proof in the record
14   whatsoever, that -- as to Page 5 of 48 of the
15   response that the Respondent, Oscar Stilley, had
16   actually brought or defended the proceedings that
17   was signed by Buck and Robbie Jones.
18    MR. HODGES:  That's part of your motion for
19   a directed verdict, Mr. Stilley.  It was denied
20   and let's ask for your first witness.  Your case
21   in chief is now in play.
22    MR. STILLEY:  **Your Honor, I have not made a**
23   **record that the Arkansas Supreme Court will even**
24   **look at or consider with respect to my Motion for**
25   **Summary Judgment.  I just got started.**  Now, if

90

1   we want to just talk forever and then go back and
2   ask for a ruling line by line, I'll do it any way
3   that the Chair wants it done.
4    MR. HODGES:  **Mr. Stilley, I'll give you a**
5   **chance to proffer all those motions at the end of**
6   **the case today.  You'll have a chance to proffer**
7   **those for the record for the appeal.**  Now, call
8   your first witness, sir.
9    MR. STILLEY:  Your Honor, Matthews versus

Page 9 of  17

10  Eldridge says that due process requires that the
11  litigant be entitled to be heard in a reasonable
12  time and a reasonable manner; and the folks over
13  here, the Arkansas Supreme Court say, If you want
14  to preserve the record, you have to make your
15  motion at the close of, in this case, the
16  Petitioner's case.  You've got to make it then.
17  If you don't make it then, it's waived.  And I'm
18  not going to make it difficult.  It's not going
19  to be hard.
20      MR. HODGES:  **If you choose to make those**
21  **motions, you can do so in a proffer at the end of**
22  **the case.**
23      MR. STILLEY:  **You're telling me that you're**
24  **not going to hear or consider motions for**
25  **directed for specific reasons for the gross total**

91
1  **failure of proof on a number of issues?**
2      MR. HODGES:  <u>**No, sir.**</u>  You've already made
3  your motion for a directed verdict.  Let's call
4  your first witness and move on with your case,
5  Mr. Stilley.  It's now 1:30.  You were the
6  person, sir, who has asked for additional time.
7  We've given it to you.  You and your defense have
8  not called one witness as of 1:30 this afternoon.
9  Now, call your first witness, Mr. Stilley.
10      MR. STILLEY:  Your Honor, I have given
11  scant, scant minutes to one tiny little part of a
12  motion, and I certainly wouldn't have shut my
13  mouth and asked for a ruling except for the
14  purpose that I thought it would be easier for
15  this Court to do things in a meaningful way.
16  Take little chunks of it.  I'm trying --
17      MR. HODGES:  **Mr. Stilley, I've given you a**
18  **chance to proffer any evidence that you have with**
19  **respect to these motions at the end of the day.**
20  Now, call your first witness.
21      MR. STILLEY:  Can I have two weeks to
22  make --
23      MR. HODGES:  **No, sir, you will be able to**
24  **proffer those at the end of the day with the**
25  **court reporter.**  Call your first witness.

(Emphases added)

The "proffer" procedure amounted to being told to set forth my legal arguments after the hearing panel left the room, to the court reporter. At about the time the court reporter concluded taking down my legal argument in the empty room, the panel came back to announce a decision to institute disbarment proceedings and a suspension pending disbarment.

A suspension pending disbarment is not an appealable order. The referral for disbarment starts a new procedure, with a new case number, in the Arkansas Supreme Court. The proceedings below are at that time concluded.

Thus the offer to allow me to make my arguments to the court reporter by way of proffer was for purposes of due process analysis altogether meaningless. Those constitutional arguments were never heard and never will be heard.

There will never be so much as a pretense of consideration of those legal arguments. Whether the same or similar constitutional arguments will be considered by the Arkansas Supreme Court remains to be seen.

In the subsequent proceeding, CPC 2007-062, I was denied the right to conduct depositions of the accusing judges based on their status as a judge, even though the custom and practice in Arkansas up to that time was to require judges to testify concerning their own accusations. In fact there are references in published caselaw concerning such testimony at CPC proceedings.

In CPC 07-062 Stilley objected to being required to testify since none of his

accusers were required to give testimony, at deposition or otherwise.   To his surprise he was successful.  Stark Ligon, the Executive Director of the Arkansas Supreme Court Committee on Professional Conduct, then tried to present documentary evidence,  to which Stilley successfully objected.

Consider first that at Exhibit 5 page 25 Mr. Ligon observes the undeniable fact that no evidence had been presented, saying:

> 8 MR. LIGON: Madam Chairman, I'd like to
> 9 interpose an objection. First of all, with due
> 10 respect, the Chair has ruled. It's denied on
> 11 Reconsideration, and what I think I'm hearing
> 12 really sounds more like a Motion for a Directed
> 13 Verdict at the close of the state's case. **I mean,**
> **14 there isn't any proof** unless somehow we're arguing
> 15 Petitioner's Number One (1).
> (Emphasis added)

No one, certainly not Stilley, was arguing that Petitioner's Number 1, consisting solely of the accusing documents, constituted proof of any sort.

Later at page 46 you will see:

> 8 JUDGE KELLY: The Office of Professional
> 9 Conduct will now present its case in chief.
> 10 MR. LIGON: I call Oscar Stilley to the
> 11 witness stand.

Thereafter at page 57 you will see that Mr. Ligon presented no evidence whatsoever.  Oscar Stilley successfully resisted being called as a witness, and successfully resisted the admission of any documentary evidence

Page 12 of  17

whatsoever.   The documents were proffered only.

Mr. Ligon rested his case with **nothing** for the panel to consider

except the accusations of the complaint, and "proffers" that Stilley

essentially wasn't even supposed to have the right to speak to.   Yet the

panel unanimously voted to institute disbarment proceedings!  (Page 86)

Despite the lack of evidence the panel determined that Stilley had

violated ethical rules and referred me for disbarment, also imposing a

second suspension pending disbarment.   How a suspended lawyer can

again be suspended was not explained.

The proposed findings after the liability phase of the disbarment trial

are submitted as Exhibit 4.   The special judge directed the parties to:

> ...Do an introduction with what you
> 5 believe the general picture is, that is the
> 6 overall facts that have been presented here
> 7 first.
> 8 And then, second, take each count
> 9 individually, that's Counts 1 through 23, I
> 10 believe in the -- in the original Petition, and
> 11 then 24, 25 and 26 in the Amended Petition and
> 12 **then put in what you believe supports the proof**
> 13 as to each allegation or does not support the
> 14 proof in your situation, Mr. Stilley. And when
> 15 you're dealing with each one, you can make your
> 16 argument then as to whether or not there's just
> 17 not any proof to support it. That will be
> 18 preserving for the record your opportunity to say
> 19 this should be dismissed. **Do that first.**

Page 13 of  17

20 MR. STILLEY: Sure
(Emphasis added)

The government is invited to examine this document and see if they

can find one single citation to the record throughout this document, up

through the end of paragraph 42 of the proposed findings of fact, dealing

with count 32 of a 32 count complaint.   Undersigned submits that it does

not exist.

You will see a reference to a trial exhibit on page 15, for paragraph

43.   Reference to the trial transcript is first seen on the next page at

paragraph 45.   Both these references are *after* the paragraph by

paragraph recitation to the record ordered by the special judge.

"PD" and "FAPD" references are references to the petition for

disbarment and amended petition for disbarment.  Don't be confused by

those citations.  These are citations to accusations, not to any proof at

trial.

In light of these facts, it is plain that every proceeding leading up to

or constituting the disbarment trial is so flagrantly unconstitutional that no

reasonable person could deny it.  You may note the absence of the

actual order of the special judge, a very lengthy document.   Here's what

the special judge said about his powers:

23 MR. STILLEY: Very good. And one other
24 question I wanted to ask, and I certainly don't
25 want to be presumptuous here, but would the Court
Page 583
1 think it might be appropriate to make a motion to
2 ask that the suspension pending disbarment be
3 dissolved at this point in time?
4 THE COURT: I don't think that's a matter I
5 can handle, is it?
6 MR. STILLEY: Well, if that's --
7 THE COURT: I'm going to do this. I'm going
8 to say that's outside of my prerogative, because
9 that's a matter that's up to the justices of this
10 court.

This being said, it hardly seems appropriate to pile on and enlarge

the record with this document.  If the government thinks it is important

undersigned will promptly provide it for the consideration of the

government, and for their own filing if they feel the need.

The government got Mark Zokle to testify in the disbarment trial of

Oscar Stilley, and then pretended that Zokle "volunteered" to go to

Arkansas to testify.  His testimony was procured in the same manner as

other people involved in this case, by a combination of the carrot and the

stick.

The discovery shows an enormous amount of information related to

Zokle's case.  Zokle discharged Stilley at a certain point in time and

entered a plea.  For some reason it appears that Zokle determined that he

should inform the Ohio court of the sexual adventures of Zokle and Mr.

Thomas Baird, his larcenous CPA.  There was a court document related to

sexual misconduct involving minors, which may or may not be factually

supported.

Zokle's testimony simply opens up a Pandora's box.  There is little or

no information Zokle might provide  concerning the actual charges

against the parties.  The best way to deal with these issues is to bar the

testimony of Mark Zokle altogether.

WHEREFORE, Defendant Oscar Stilley respectfully requests that the Court

prohibit the government from mentioning or causing the mention of

anything about any suspension or other professional discipline matters

related to of Oscar Stilley, or presenting any testimony at all, without the

prior consent of the Court; that the Court bar all testimony about any

other 404(b) matters, except with respect to the litigation history of Oscar

Stilley concerning federal tax litigation arguably related to the issues in this

case; and such other relief as may be appropriate whether or not

specifically prayed.

Respectfully submitted,

By: _____/s/ Oscar Stilley_____
Oscar Stilley, Attorney at Law
7103 Race Track Loop
Fort Smith, AR 72916
(479) 996-4109
(866) 673-0176 Fax
oscar@oscarstilley.com

**CERTIFICATE OF SERVICE**

I, Oscar Stilley, by my signature above certify that I have this October 14, 2009, caused the Plaintiff to be served with a copy of this pleading by CM/ECF to: Kenneth P. Snoke, United States Attorney's Office, 110 W 7th Street, Suite 300, Tulsa , OK 74119-1013, ken.snoke@usdoj.gov; Charles A O'Reilly, US Dept of Justice, PO Box 972, Washington , DC 20044, email  charles.a.o'reilly@usdoj.gov . Also by email to Lindsey K. Springer at Gnutella@mindspring.com .

BEFORE THE SUPREME COURT COMMITTEE ON PROFESSIONAL CONDUCT


IN RE:  Oscar Stilley, Respondent
Arkansas Bar ID # 91096
CPC Docket No. 2006-067




\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

HEARING EXCERPTS

TAKEN:  December 14, 2007

HENRY HODGES, CHAIRPERSON

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

A P P E A R A N C E S




APPEARING ON BEHALF OF THE PETITIONER:

        MR. STARK LIGON
        Office of Professional Conduct
        Justice Building, Room 110
        625 Marshall Street
        Little Rock, Arkansas

APPEARING PRO SE:

        MR. OSCAR STILLEY
        701 South 21st Street
        Fort Smith, Arkansas 72901

Ligon V. Stilley                              Excerpts of 12/14/07 Hearing

Page 81

1       (Beginning of excerpts.)
2       MR. LIGON:  That's the only witness that I
3   now stand -- Petitioner rests.  Excuse me.  I'm
4   sorry.  There is an -- I've got 2 in.  I rest.
5       MR. HODGES:  Mr. Stilley, we're ready for
6   your case in chief, sir.
7       MR. STILLEY:  Well, that was quick, and I
8   presume that you would be expecting some motions
9   from me, and I won't disappoint you.
10      MR. LIGON:  This is Petitioner's 2, which I
11  now have marked.
12      MR. STILLEY:  I want to make certain motions
13  for judgment as a matter of law on various
14  different grounds and I'll try to break this up
15  and make it reasonably easy for the Chair of the
16  panel to understand exactly what is requested,
17  the reasons for the request and give the Chair a
18  chance to make such ruling as the Chair deems
19  appropriate.  And the Chair certainly will know
20  that in each and every instance, without asking
21  further, that I do want, consistent with the
22  nature of this proceeding, reasons -- stated
23  reasons for the rulings that are made.
24      Let me start that we first established from
25  the start of this proceeding that this is not a

Page 82

1   governmental entity, and I would respectfully
2   move to dismiss any part of this proceeding that
3   would potentially result in the suspension of the
4   license of Oscar Stilley and here's why.  The
5   license to practice law has been granted by the
6   Arkansas Supreme Court.  Clearly that's a
7   governmental entity.  Nobody contends it's not.
8   It's one of the three branches of government.
9   It's the head of one of the three branches of
10  government.  It is a license -- the license to
11  practice law is a license granted by a
12  governmental entity.  In this case it's
13  stipulated by everybody, conceded in writing and
14  otherwise, that the committee on professional
15  conduct is not a governmental entity.  Now,
16  certainly I can understand that a governmental
17  entity could say, Shame on you, reprimand,
18  caution, don't do that again.  We've all got free
19  speech rights.  Why not?  But on what authority
20  would a non-governmental entity have the right to
21  take away a license granted by the government.
22  Let's stop and think about this.  There's all
23  kinds of governmental entities and there's
24  non-governmental entities.  Most of the
25  non-governmental entities would be, for example,

Page 83

1   corporations, associations, et cetera.  Would a
2   corporation, for example Tyson, have the right to
3   pick out a lawyer and suspend their license.  I
4   would respectfully submit to you, couldn't be
5   done.  It's not legal.  Only the government could
6   take away that license.  And since we're here
7   before an admittedly non-governmental body, it
8   wouldn't be proper.  It wouldn't be legal.  It
9   wouldn't be authorized for this body to suspend
10  the license; and if the Chair of the panel takes
11  exception to that, I will like to know the basis
12  for it and where and how a non-governmental body
13  got the power to suspend the license of an
14  individual to practice law.
15      MR. HODGES:  Are you asking for a motion for
16  a directed verdict?  Is that what you're asking
17  for, Mr. Stilley?
18      MR. STILLEY:  Yes.  A limited directed
19  verdict, not as to reprimands, not as to cautions
20  or other things, but as a motion for directed
21  verdict and dismissal of all the case as relates
22  to a potential suspension of the license.
23      MR. HODGES:  Yeah.  Mr. Ligon, would you
24  like to respond, please?
25      MR. LIGON:  It sounds like the limited scope

Page 84

1   of the directed verdict motion, Mr. Chair, is
2   that Section 11 of the procedures, 11 Sub D and
3   11 Sub E should not be applied as written.
4   Eleven Sub D says, "If a majority of the panel
5   votes to caution, reprimand or suspend an
6   attorney."  So if I understand it, it sounds like
7   his motion, the thrust of it, would be that --
8   "or suspend" would not be within the capacity of
9   the panel in a public hearing setting, and then
10  Sub E breaks out, "If a majority of the panel
11  votes to disbar."  So it also sounds like he's
12  making the same argument with regard to the
13  option of initiating disbarment.
14      Now, Section 17(b) of the procedures talks
15  in terms of serious misconduct, and section --
16  Subsection C of 17 talks about lesser misconduct,
17  so it also appears that serious misconduct has to
18  be found before the committee, through a panel,
19  can either suspend or disbar.  So it also sounds
20  like Mr. Stilley is saying that -- or moving that
21  the committee is not authorized to find serious
22  misconduct, which has to be a predicate finding
23  or basis for a sanction of the suspension of any
24  length or initiation of disbarment proceedings.
25  I think it's premature and improper at this time,

2 (Pages 81 to 84)

Page 85

1  one, because he's not gone to the evidence, to
2  the proof that's been introduced into the record
3  through all the exhibits admitted so far.
4      Secondly, it sounds to me as if he's making
5  some type of -- although he doesn't phrase it in
6  these terms -- some type of constitutional
7  challenge to either the authority of the
8  committee to sanction a lawyer or the authority
9  of the committee to sanction through either a
10 suspension or initiation of disbarment. I'm not
11 aware of there having been a pled constitutional
12 challenge to these, and I think there's a
13 presumption that the procedures are
14 constitutional as written and as applied or as
15 promulgated then as applied, and I guess the
16 other -- the other thing is I want to go back to
17 a statement that was made on the record this
18 morning. The statement in a letter, which he
19 showed me, but which I do not believe is part of
20 the record of the proceedings, and maybe it
21 should be so that the context could be clearly
22 seen, that is a standard letter that is written
23 in response to an FOIA request made to the
24 committee for the committee's files or records or
25 things like that. I think it should be clear

Page 86

1  that a term "governmental entity" or "not a
2  governmental entity," the context within which
3  that term is used can be very significant, and I
4  would submit that it is here because not being a
5  governmental entity for purposes of application
6  or non-application of the Arkansas Freedom of
7  Information Act is an entirely different question
8  or issue from whether or not this committee, the
9  Arkansas Supreme Court Committee on Professional
10 Conduct, is what type of entity it is for
11 attorney discipline purposes as opposed to
12 Freedom of Information Act purposes.
13     MR. STILLEY: Well, let's just move -- since
14 it's already in the docket and it's already going
15 to be on the record on appeal, let's just make
16 this part of the record, this letter. I'm more
17 than happy for the Chair of the panel and, as far
18 as that goes, all of you to take a look at it and
19 see what the context is. I didn't see anything
20 in this letter saying, Well, for the purposes of
21 the FOI then we're not a governmental entity, but
22 maybe for some other purposes we are a
23 governmental entity. I didn't see anything of
24 that nature. And I think it would be appropriate
25 that we -- could we get somebody to make copies

Page 87

1  of that so we can pass those out and let
2  everybody see it, let everybody see what we're
3  talking about, and then we can make a ruling
4  based on a careful consideration and reading of
5  the exact words.
6      MR. HODGES: You can do that in your case in
7  chief, Mr. Stilley. And as far as your motion
8  for a directed verdict --
9      MR. STILLEY: Can I speak just a little bit
10 more?
11     MR. HODGES: No, sir. I'm going to rule on
12 your motion for a directed verdict and we're
13 going to move on. I'm going to rule that it's
14 denied and for the reasons that the Petitioner
15 has stated and given a prima facia case in the
16 Complaint and also under Sections 11 and 17 of
17 the rules, professional conduct rules. With
18 regard to our procedure, we have the right to
19 institute grounds for discipline. So anything
20 else you have in the way of motion or objection
21 Mr. Stilley; otherwise, I suggest you call your
22 first witness for your case in chief.
23     MR. STILLEY: Now, are you ruling -- are you
24 ruling against the constitutional challenge on
25 the position that -- and it's Respondent's

Page 88

1  position that the power to take away a
2  government-issued license cannot be delegated to
3  a non-governmental entity.
4      MR. HODGES: No, sir --
5      MR. STILLEY: Are you ruling that that is
6  not --
7      MR. HODGES: No, sir, I'm denying your
8  motion for a directed verdict.
9      MR. STILLEY: Including the constitutional
10 challenge?
11     MR. HODGES: No, sir. I'm denying your
12 motion for a directed verdict. Now, call your
13 first witness.
14     MR. STILLEY: Well, I'm asking for a ruling
15 on the constitutional challenge because in
16 Middlesex versus Gardner states -- says I'm
17 entitled to a ruling on constitutional
18 challenges, and that's what this is.
19     MR. HODGES: No, sir. I'm not going to give
20 you a ruling on that today, and I suggest you
21 call your first witness.
22     MR. STILLEY: Can I get a ruling later?
23     MR. HODGES: No, sir. I'm telling you call
24 your first witness, Mr. Stilley.
25     MR. STILLEY: I'm not through.

3 (Pages 85 to 88)

Ligon V. Stilley                          Excerpts of 12/14/07 Hearing

Page 89

1    MR. HODGES: -- your case in chief.
2    MR. STILLEY: That was my first motion.
3  I've got a whole slew of motions here to go down
4  the list.
5    MR. HODGES: You've given your Motion for
6  Interim -- Interim Relief based on a Motion for a
7  Directed Verdict, so let's move on. We're not
8  governed here by the Arkansas Rules of Civil
9  Procedure, except for your one rule on discovery.
10  That's Rule 30. So let's move on. Call your
11  first witness, Mr. Stilley.
12    MR. STILLEY: Move to dismiss on the grounds
13  that there is no proof, no proof in the record
14  whatsoever, that -- as to Page 5 of 48 of the
15  response that the Respondent, Oscar Stilley, had
16  actually brought or defended the proceedings that
17  was signed by Buck and Robbie Jones.
18    MR. HODGES: That's part of your motion for
19  a directed verdict, Mr. Stilley. It was denied
20  and let's ask for your first witness. Your case
21  in chief is now in play.
22    MR. STILLEY: Your Honor, I have not made a
23  record that the Arkansas Supreme Court will even
24  look at or consider with respect to my Motion for
25  Summary Judgment. I just got started. Now, if

Page 90

1  we want to just talk forever and then go back and
2  ask for a ruling line by line, I'll do it any way
3  that the Chair wants it done.
4    MR. HODGES: Mr. Stilley, I'll give you a
5  chance to proffer all those motions at the end of
6  the case today. You'll have a chance to proffer
7  those for the record for the appeal. Now, call
8  your first witness, sir.
9    MR. STILLEY: Your Honor, Matthews versus
10  Eldridge says that due process requires that the
11  litigant be entitled to be heard in a reasonable
12  time and a reasonable manner; and the folks over
13  here, the Arkansas Supreme Court say, If you want
14  to preserve the record, you have to make your
15  motion at the close of, in this case, the
16  Petitioner's case. You've got to make it then.
17  If you don't make it then, it's waived. And I'm
18  not going to make it difficult. It's not going
19  to be hard.
20    MR. HODGES: If you choose to make those
21  motions, you can do so in a proffer at the end of
22  the case.
23    MR. STILLEY: You're telling me that you're
24  not going to hear or consider motions for
25  directed for specific reasons for the gross total

Page 91

1  failure of proof on a number of issues?
2    MR. HODGES: No, sir. You've already made
3  your motion for a directed verdict. Let's call
4  your first witness and move on with your case,
5  Mr. Stilley. It's now 1:30. You were the
6  person, sir, who has asked for additional time.
7  We've given it to you. You and your defense have
8  not called one witness as of 1:30 this afternoon.
9  Now, call your first witness, Mr. Stilley.
10    MR. STILLEY: Your Honor, I have given
11  scant, scant minutes to one tiny little part of a
12  motion, and I certainly haven't have shut my
13  mouth and asked for a ruling except for the
14  purpose that I thought it would be easier for
15  this Court to do things in a meaningful way.
16  Take little chunks of it. I'm trying --
17    MR. HODGES: Mr. Stilley, I've given you a
18  chance to proffer any evidence that you have with
19  respect to these motions at the end of the day.
20  Now, call your first witness.
21    MR. STILLEY: Can I have two weeks to
22  make --
23    MR. HODGES: No, sir, you will be able to
24  proffer those at the end of the day with the
25  court reporter. Call your first witness.

Page 92

1    MR. STILLEY: Your Honor, look, you're
2  asking me to waste my time on things when I have
3  not gotten a ruling from you on the various
4  reasons that the case -- that the Petitioner has
5  not proved his case. If I can take this down, if
6  we can scratch this down to what Oscar really
7  needs to -- needs to oppose, then I can use my
8  time effectively to the things that I've not
9  gotten rid of.
10    MR. HODGES: Call your first witness,
11  Mr. Stilley.
12    MR. STILLEY: You're absolutely totally not
13  going to listen to reasons that particular items
14  of this is -- there's no proof from which a
15  reasonable body of a fact finder can find a
16  violation?
17    MR. HODGES: You've made your motion for a
18  directed verdict. This Court has -- this case --
19  tribunal, this committee has ruled on it, so call
20  your first witness, Mr. Stilley.
21    MR. STILLEY: I'm making a motion for the
22  recusal of the Chair of the panel for the
23  following reasons. One, when there was motions
24  made for -- to quash various subpoenas, this
25  Chair was told that there was -- there was

4 (Pages 89 to 92)

Ligon V. Stilley                                    Excerpts of 12/14/07 Hearing

Page 93

1  responses expected, responses expected today or
2  tomorrow, and the Chair of the panel made a
3  choice to make rulings immediately knowing that a
4  response could be expected and very soon.
5      MR. HODGES:  Your motion's denied.
6      MR. STILLEY:  I'm not through making the
7  motion.
8      MR. HODGES:  Yes, sir, you have.  Your
9  motion is denied for me to recuse, and so let's
10  call your first witness, Mr. Stilley, and put on
11  your defense.
12     MR. STILLEY:  You're not going to let me
13  make the rest of the motion?
14     MR. HODGES:  No, sir. I'm not.  And it's
15  time for you to put on your defense.  If you have
16  a defense here today to the complaint that's been
17  filed against you, the disciplinary rules that
18  Mr. Ligon has laid out, then you need to present
19  your case now.
20     MR. STILLEY:  I object.
21     MR. HODGES:  Call your first witness.
22  Mr. Stilley.
23     MR. STILLEY:  I object to the entire
24  proceedings as a violation, a violation of the
25  constitutional right to due process, the right to

Page 94

1  be heard, Middlesex and all the other things that
2  I've been talking about, I want to make it clear
3  for the record that I object to the whole thing.
4  It was broken down.  I can't even make my record.
5  I object to that, and I'll call my first witness,
6  which is Marschewski.
7      (End of first portion of excerpt and
8  beginning of second portion starting with
9  Page 182.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 182

1      MR. HODGES:  Is your case in chief closed?
2  Are you finished with your case in chief,
3  Mr. Stilley?  Do you have any other evidence to
4  offer?
5      MR. STILLEY:  That's all I got, Your Honor.
6      MR. HODGES:  Any closing statements by
7  either of you?
8      MR. LIGON:  How about rebuttal?  We've got
9  eight minutes.
10     MR. HODGES:  All right.  Rebuttal and
11  surrebuttal.  Recall Mr. Stilley.
12     MR. STILLEY:  I've got a proposal -- I've
13  got a proposal.  Can we -- can we -- because you
14  told me earlier -- I want -- I want you to make
15  your motion on this directed verdict.  You can
16  make it later.  Well, we're running a little
17  short on time.  How about we take two months, let
18  me do the briefing.  I can get the record and
19  everything --
20     MR. HODGES:  No, sir.  Mr. Stilley, I don't
21  mean to interrupt you but what I said was that
22  you could proffer your comments at the end of the
23  hearing, and that's what you can do, if you would
24  like, with the court reporter while we're
25  deliberating, if you would like; and then also

Page 183

1  after we render the decision, if you're still --
2  proffer your testimony, then you can continue
3  that after we render our decision, but that's the
4  way you need to proffer whatever objections you
5  have, whatever questions or witnesses you feel
6  like you should have offered.
7      MR. STILLEY:  It's kind of -- it's kind of
8  worthless to me to go ahead and spend money with
9  the court reporter when I know good and well
10  you're not going to hear it.  You won't even know
11  it happened.  How about we let me --
12     MR. HODGES:  No, sir, that's what a proffer
13  is all about.  We won't hear it, but the
14  appellate court will.
15     MR. STILLEY:  I've heard proffer for
16  evidence.  I understand proffer for evidence, but
17  this is a motion.  I've never heard of a proffer
18  of the motion because the whole reason for a
19  motion to the Arkansas Supreme Court is because
20  you might change somebody's mind.
21     MR. HODGES:  No, sir.  We're going to hear
22  rebuttal and then surrebuttal.  Go ahead,
23  Mr. Ligon, if you have rebuttal.  And I would
24  like to keep it short because we're going to be
25  out of here.  I'm not going to have you have

Ligon V. Stilley                                    Excerpts of 12/14/07 Hearing

Page 184

1  closing statements.
2      MR. LIGON:  I understand.  If I may re-call
3  Mr. Stilley in rebuttal.
4      MR. HODGES:  Please take the witness stand
5  Mr. Stilley.  May Judge Marschewski be released?
6      MR. STILLEY:  He can go.
7      MR. HODGES:  Thank you, Judge.  Safe trip
8  home.  You're still under oath, Mr. Stilley.
9      (End of second portion of excerpt and
10 beginning of thir portion starting with
11 Page 192.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 193

1  his case and there's nobody else in the room,
2  none of the panel, anyway, in the room.
3      Nonetheless -- and since this is -- seems to
4  Oscar Stilley not to be in a meaningful time and
5  a meaningful manner, I'm going to try to
6  articulate this as concisely as I possibly can to
7  explain what -- what would have been presented if
8  Oscar Stilley had gotten the chance.
9      Well, let's start with this allegation that
10 Oscar Stilley had equivocated or whatever he did
11 with respect to testimony about his role in Buck
12 Jones' pro se Complaint.  There's no testimony
13 that Oscar Stilley made any false statements.
14 Never was any testimony to that effect.  And I
15 would respectfully submit that we can't just
16 assume that it's false statements.  We heard
17 Mr. Marscheski say that there were certain things
18 said in a letter, and it wasn't so, that cast
19 dispersions on Mr. -- or Judge Marscheski and say
20 this was a deliberate thing on your part.  Any
21 witness, there's going to be some variation in
22 testimony, and unless there is an intentional
23 material falsehood, that's just part of
24 litigation, and I don't see any evidence from
25 which a reasonable finder of fact could find that

Page 192

1      MR. HODGES:  We're concluded, Mr. Stilley.
2  We'll be back after we deliberate to render a
3  decision.
4      (The committee panel exits the proceedings.)
5      (The following proceedings were held outside
6  the hearing of the committee panel.)
7      MR. STILLEY:  The first thing I would say is
8  that the only people in this room is Oscar
9  Stilley, Stark Ligon and the court reporter.  And
10 as I tried to explain to the Chair of the panel,
11 the whole purpose for making a motion of this
12 nature is to give the decider an opportunity to
13 rule.  And I understand that sometimes we have
14 witnesses put on proffer of testimony that may
15 not be heard by the judge generally when the
16 judge already has at least some good idea about
17 what's going to be said.
18      This process that we're involved in here
19 I've never heard of it before.  I highly object
20 to it.  I think that it violates due process for
21 Oscar Stilley to be forced to stand here and
22 explain why he thinks certain parts of the
23 complaint should be dismissed, that there was
24 inadequate evidence to force Oscar Stilley to put
25 on his case after Oscar Stilley's already put on

Page 194

1  Oscar Stilley said anything in his testimony that
2  was not the truth.  And that doesn't even get us
3  to the question of was it an intentional
4  falsehood.  We don't have proof that any of this
5  was false.
6      The response to this Complaint, the Answer
7  to the Amended complaint is in the docket.  It is
8  part of the record that the panel takes back to
9  help it as it determines the case.  There's been
10 an Answer to the Amended Complaint prepared and
11 filed by Oscar Stilley, and it raises most of the
12 objections that are laid forth in here.  What I
13 would say is that there's been no evidence on any
14 of these issues sufficient to go forward and
15 require the Defendant to put on some proof, and I
16 say this by way of example.  You've got the
17 allegation of a violation of res judicata saying
18 there were many orders that had ruled on the
19 illegality of the tax challenge in the Sebastian
20 County Property Tax Litigation.  But when it came
21 to asking the witness, the witness can't identify
22 any such order.  But not only does Oscar Stilley
23 not get a chance to make his motion before the
24 presentation of his case, he gets no opportunity
25 to make a motion after the case and say, Hey, you

6 (Pages 184 to 194)

Ligon V. Stilley                                    Excerpts of 12/14/07 Hearing

Page 195

1  know, you've not proven your case. You don't
2  have evidence to this. Here's what the witness
3  said. There's not enough evidence from which
4  that you can even go back and deliberate. You
5  have to have something to start with and then you
6  can decide. Oscar Stilley has been deprived of
7  the opportunity to make the argument or to make
8  the motions, and Oscar Stilley had another motion
9  that he wanted to make and that is, I wanted to
10 say I want a distinct ruling on distinct counts
11 or paragraphs of this complaint, and the reason
12 for that is in the previous panel decision,
13 instead of going paragraph by paragraph so Oscar
14 Stilley can really see what's going on there, we
15 just kind of had a run-on of a two- or three-page
16 paragraph, huge paragraphs, maybe not two and
17 three pages, but huge paragraphs and then at the
18 end saying Oscar basically was a bad guy, so
19 we're going to get him. And I wanted to ask
20 Mr. Hodges, the panel chairman, to take this
21 piece by piece, don't just lump it together, take
22 it piece by piece and say what your findings are,
23 make a distinct, direct, reasoned order: Here's
24 the evidence that we find. And even if they're
25 not going to say, This is the evidence that we

Page 196

1  find that supports finding that Oscar Stilley
2  violated this rule, at least I wanted to ask and
3  say, Do it by paragraph. Do it so we can see
4  what's going on so I can know what I have
5  actually been found liable for and what I've been
6  found to have done that constitutes a violation
7  of ethics.
8      Now, if you go through the rest of the
9  Complaint -- I could go through line by line, but
10 this is not the procedure that's authorized by
11 the Arkansas Supreme Court. There is no chance
12 that I'm going to influence anybody's mind.
13 There's no chance that I'm going to change the
14 outcome. My position is that there is not enough
15 evidence, no facts, to show the elements of any
16 of these other allegations. They're all -- they
17 just all fall short.
18     Furthermore -- and I just incorporate
19 everything that I've said since it's going to be
20 in the record anyway, everything oral, everything
21 in writing, as my basis for saying we don't have
22 any rulings, we don't have any facts, we don't
23 have any basis for Oscar Stilley to have to go
24 forward and put on his defense case and try to
25 show this panel that Oscar Stilley did not

Page 197

1  violate the rules of ethics. He's not been a bad
2  lawyer. He has not done anything to deserve
3  punishment, and he certainly hasn't committed
4  anything that possibly be considered an act of
5  serious misconduct. That's all I've got to say.
6      (End of excerpts.)

Page 198

1
2          C E R T I F I C A T E
   I, DEBORAH J. WORTHINGTON, Certified Court
   Reporter in and for the State of Arkansas, do hereby certify
   that the foregoing proceedings were taken by me
3  stenographically and was thereafter reduced to typewritten
   form by me or under my direction and supervision; that the
4  foregoing transcript is a true and accurate record of the
   testimony given to the best of my understanding and ability.
5
6
7      I FURTHER CERTIFY that I am neither counsel for,
   related to, nor employed by any of the parties to the action
8  in which this proceeding was taken; and, further, that I am
   not a relative or employee of any attorney or counsel
9  employed by the parties hereto, nor financially interested,
   or otherwise in the outcome of this action; and that I have
10 no contract with the parties, attorneys, or persons with an
   interest in the action that affects or has a substantial
11 tendency to affect impartiality, that requires me to
   relinquish control of an original deposition transcript or
12 copies of the transcript before it is certified and
   delivered to the custodial attorney, or that requires me to
13 provide any service not made available to all parties to the
   actions.
14
15
16

17          _____
            Deborah J. Worthington, C.C.R.
            LS Certificate No. 362
18
19
20
21
22
23
24
25

## BEFORE THE SUPREME COURT COMMITTEE ON PROFESSIONAL CONDUCT
## PANEL B

IN RE:  **OSCAR AMOS STILLEY**
    Arkansas Bar ID # 91096
    CPC Docket No. 2006-067

### FINDINGS AND ORDER

The formal charges of misconduct upon which this Findings and Order is based were developed from information provided to the Committee by Judges G. Thomas Eisele and James Marschewski, and attorney Walton Maurras. The information related to the actions of Oscar Amos Stilley, an attorney practicing primarily in Fort Smith, Sebastian County, Arkansas. After a ballot vote decision by Panel A was communicated to Mr. Stilley, he requested a public hearing, which was conducted before Panel B on December 14, 2007.

Three grievances (from Judge Eisele, Judge Marschewski and Walton Maurras) were combined in the Formal Complaint, because each was a related complaint arising from essentially the same matters and conduct. On or about November 15, 2006, Respondent was served with a First Amended Formal Complaint, to which he filed a Response. The general outline and history of these matters is set out in Judge Eisele's Memorandum Opinion filed May 18, 2005, in USDC No. CIV-04-2225, Oscar Stilley v. James Marschewski et al., (Western District of Arkansas), which is attached as an exhibit to the First Amended Complaint.

Prior to October 2000, Mr. Stilley had been involved as litigation counsel in Oxford v. Perry, 340 Ark. 577, 13 S.W.3d 567 (2000) (Oxford II) and Elzea v. Perry, 340 Ark. 588, 12 S.W.3d 213 (2000), both affirmed on appeal against his clients. On October 10, 2000, he filed Parker v. Perry (in Sebastian Circuit), a class action for taxpayers alleging illegal exaction of taxes under Amendment 59, and including WestArk Community College (with Walton Maurras

as counsel) as a defendant. On October 12, 2000, the Arkansas Supreme Court decided <u>Stilley v. Henson</u>. On March 1, 2001, the Court affirmed <u>Stilley v. Hubbs</u>, 344 Ark. 1, 40 S.W.3d 209 (2001), a case involving an election issue on a local tax. Sanctions were imposed on Stilley by the Arkansas Supreme Court for a frivolous appeal, after the same issue had been decided on October 12, 2000, in <u>Stilley v. Henson</u>, 342 Ark. 346, 28 S.W.3d 274 (2000). An Order to Show Cause for sanctions was issued to Stilley. On March 19, 2001, Mr. Stilley non-suited <u>Parker v. Perry</u> in Sebastian Circuit. On March 22, 2001, in a Supplemental Opinion in <u>Stilley v. Hubbs</u>, Rule 11 sanctions against Mr. Stilley of $2,000.00 in attorney's fees were awarded to appellees.

On March 19, 2002, Stilley refiled <u>Parker v. Perry</u> in Sebastian Circuit, as CV-2002-276. On September 18, 2002, summary judgment was granted against Stilley's clients in <u>Parker v. Perry</u>. On October 4, 2002, the trial court (Judge Marschewski) ordered Rule 11 sanctions of $14,421.16 and $2,196.81 against Mr. Stilley in <u>Parker v. Perry</u>.

On February 20, 2003, the Arkansas Supreme Court affirmed <u>Jones v. Double "D" Properties, Inc</u>, ("Jones I") 352 Ark. 39, 98 S.W.3d 405 (2003) against Mr. Stilley's clients. On November 20, 2003, the Court affirmed <u>Parker v. Perry</u>, 355 Ark. 97, 131 S.W.3d 338 (2003), on the basis of *res judicata*, holding <u>Parker</u> involved the same claims and complaint as in <u>Oxford II</u> and <u>Elzea v. Perry</u>. On January 23, 2004, the Mandate was entered in <u>Parker v. Perry</u>.

On July 27, 2004, Mr. Llewellyn filed a Notice of Non-Compliance on Mr. Stilley on the Rule 11 sanctions of $14,421.16 for his client, the Fort Smith School District (FSSD), from the ruling on October 4, 2002, in <u>Parker v. Perry</u>. On August 2, 2004, for UA-Fort Smith (UA-FS) (formerly WestArk), Mr. Maurras filed a Motion to Enforce Sanctions of $2,196.81 on Mr. Stilley from the October 4, 2002, Order in <u>Parker v. Perry</u>. On September 2, 2004, Judge

Marschewski held a hearing in <u>Parker v. Perry</u> on the Rule 11 sanctions motions. On September 22, 2004, Judge Marschewski entered an Order in <u>Parker v. Perry</u> to supervise Stilley's compliance with his court's sanctions Order. Mr. Stilley was to report under seal all his cases and clients, and deposit all funds he received from any source into registry of court clerk.

On October 5, 2004, a Complaint was filed in USDC No. Civ-04-2220, <u>Jones v. Double "D" Properties, Inc. et al.</u> by Mr. and Mrs. Jones acting "pro se," but the Complaint was substantially drafted and prepared by Oscar Stilley for the Joneses. The new Complaint alleged illegal exaction of property taxes, illegal sale of home, unethical conduct by Arkansas Supreme Court, etc.

On October 13, 2004, UA-FS filed a Motion for Contempt based on the September 22, 2004, Order in <u>Parker v. Perry</u>, and on October 15, 2004, the FSSD filed a similar Motion for Contempt the same Order. On October 18, 2004, Mr. Stilley appealed Judge Marschewski's September 22, 2004, Order in <u>Parker v. Perry</u> to the Arkansas Supreme Court, lodged as No. 05-13 on January 3, 2005.

On October 10, 2004, Mr. Stilley filed No. Civ-04-2225, Oscar Stilley versus Judge Marschewski, Mr. Llewellyn, FSSD Board members, and the Arkansas Supreme Court Justices in the United States District Court for the Western District, and the case was eventually assigned to Judge Eisele. On October 26, 2004, Mr. Stilley sent Judge Marschewski a letter asking why Stilley should not report the judge to the Committee for Model Rule 8.3 (criminal conduct) violations. On October 29, 2004, Judge Marschewski sent his complaint on Mr. Stilley about this matter to the Committee.

On November 10, 2004, Mr. Stilley executed criminal Warrant Information forms at the office of the Sebastian County Prosecuting Attorney for James Marschewski, Walton Maurras, and James Llewellyn, Jr, essentially alleging Judge Marschewski was attempting to compel Mr. Stilley to pay more than 25% of his earnings to a judgment. No criminal charges were filed against any of the three.

On November 19, 2004, Mr. Stilley filed his complaint on Judge Marschewski with the Arkansas Judicial Discipline Commission, and filed a motion for recusal by Judge Marschewski, citing pending United States District Court litigation involving Stilley and Judge Marschewski. Also on November 29, Mr. Stilley filed grievances against Judge Marschewski, Mr. Maurras, and Mr. Llewellyn with the Committee.

On January 3, 2005, Mr. Stilley lodged the appeal record in No. 05-013, Stilley v. UA-FS, an appeal from Judge Marschewski's Order of September 22, 2004, in Sebastian County Circuit Court No. CV-2002-276. This appeal was dismissed without prejudice on February 10, 2005, as a non-appealable order.

On January 14, 2005, at Judge Marschewski's hearing on contempt action against Mr. Stilley in CV-2002-276, Stilley acknowledged that he helped Buck Jones prepare the Complaint in USDC No. Civ-04-2220 (Jones II). On January 18, 2005, Judge Marschewski entered judgment holding Stilley in contempt in CV-2002-276, Parker v. Perry. for his noncompliance with the Court's Order of September 22, 2004.

On March 1, 2005, Buck Jones was deposed in USDC No. Civ-04-2220 by Maurras and Llewellyn. On March 8, 2005, Mr. Stilley failed to appear for his deposition in USDC No. Civ-04-2220. On March 11, 2005, Mr. Maurras filed an objection in USDC CV-04-2220 (Jones v.

Double "D") to Mr. Stilley's entry of appearance as counsel for Buck Jones. On April 8, 2005, Judge Eisele filed his Memorandum Opinion and Order of Dismissal in No. Civ-04-2220, Jones v. Double "D". On May 2, 2005, Mr. Stilley filed the Notice of Appeal in USDC No. Civ-04-2220 (Jones v. Double "D") to the Eighth Circuit Court of Appeals, docketed there as No. 05-2242 on May 6, 2005. On May 5, 2006, the Eighth Circuit, in No. 05-2242, affirmed the appeal of USDC CV-04-2220 (Jones v. Double "D"). On June 13, 2006, the Eighth Circuit, in No. 05-2242, denied the petition for rehearing en banc in Jones v. Double "D". On June 20, 2006, the Mandate issued in No. 05-2242.

On May 18, 2005, Judge Eisele issued his Memorandum Opinion in USDC Civ-04-2225 (Stilley v. Marschewski et al.), referring Mr. Stilley to the Committee for action. On June 15, 2005, Mr. Stilley filed his Notice of Appeal in USDC No. Civ-04-2225 (Stilley v. Marschewski et al.) to the Eighth Circuit, and it was docketed there as No. 05-2816. On May 26, 2006, the Eighth Circuit, in No. 05-2816, affirmed the imposition of Federal Rule 11 sanctions on Stilley. On June 9, 2006, Mr. Stilley filed his petition for rehearing en banc in No. 05-2816 (Stilley v. Marschewski et al.). The motion was denied and his attempt to seek certiorari to the United States Supreme Court was denied by order issued January 16, 2007.

Upon consideration of the First Amended Complaint and attached exhibit materials, the Response to it, and other matters before it, including exhibits and testimony of witnesses at the hearing, and the Arkansas Model Rules of Professional Conduct, Panel B of the Arkansas Supreme Court Committee on Professional Conduct, with Searcy Harrell, Jr. sitting in place of J. Michael Cogbill, who recused, unanimously finds:

A. Mr. Stilley's conduct violated Model Rule 3.1 in that he assisted Robbie and Buck

Jones, who had been his clients in a similar, if not identical, and unsuccessful action in the state court, in preparing a Complaint that was filed in federal court as USDC No. Civ-04-2220, alleging, among other claims, a "RICO" (Racketeer Influenced and Corrupt Organizations) Act violation, a claim Judge Eisele specifically found was frivolous, a decision affirmed on appeal to the Court of Appeals for the Eighth Circuit. Model Rule 3.1 provides that a lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law.

B. Mr. Stilley's conduct violated Model Rule 3.3(a)(1) in that at a hearing on January 14, 2005, on a contempt citation against him in Sebastian Circuit CV–2002-276-VI, <u>Parker v. Perry</u>, he was asked if he prepared the federal court case Complaint filed *pro se* by Buck and Robbie Jones as USDC No. Civ-04-2220 on October 5, 2004, and he responded, as shown by the testimony at pages 41-62 of the transcript. The relevant point was that the federal suit was a re-litigation of the same issues that had already been litigated unsuccessfully by Mr. Stilley for the Joneses, through appeal, in the state courts, a material fact for the state court's inquiry at that time. His answers show that when asked "did you type it," he at first stated that "he worked on it." (Page 43) When asked if anyone else,  particularly Buck and Robbie Jones, typed on the Complaint, he responded "I do not have personal knowledge of that." (Page 44) Later he admitted he typed "a lot of it." (Page 45) When asked "Did Buck Jones write any part of this complaint," Mr. Stilley responded, "This is Buck  Jones's complaint." When asked, "Did Buck Jones (or Robbie Jones) type any part of this complaint," he responded to both forms of the question, "Not to my knowledge." (Page 46) When asked, "Did you prepare the complaint," Mr.

Stilley responded, "I assisted Mr. Buck Jones materially in the preparation of that complaint."

(Page 55) When asked, "Did Mr. Jones write any words on a piece of paper that ended up in that

complaint," he responded, "He didn't do any of the typing at all." (Page 58) Buck Jones was

deposed on March 1, 2005, and selected portions of his deposition show he clearly thought Mr.

Stilley was his attorney and representing him in this lawsuit at the time it was prepared and typed

in Mr. Stilley's office, with major input from Mr. Stilley, both on factual matters and legal issues.

Mr. Jones stated he knew before the preparation and filing of this federal suit that Mr. Stilley had

previously filed state court suits on the same illegal exaction issue and had lost each suit. Mr.

Stilley's equivocation under oath in response to repeated questions on the same point, the

responsibility for actually preparing the later federal case complaint at issue, demonstrates a lack

of the candor, even a false statement, to the tribunal that is required and expected of attorneys as

officers of the court, on a matter that was material. Model Rule 3.3(a)(1) provides that a lawyer

shall not make a false statement of material fact or law to a tribunal.

        C. Mr. Stilley's conduct violated Model Rule 3.4(c) in that he participated in the writing

of a *pro se* Plaintiff's complaint for his clients in October 2004, well after the Arkansas Supreme

Court had referred him to the Committee on Professional Conduct for his conduct and brief,

stricken by that Court by Per Curiam Order delivered May 17, 2002, in No. 2002-284, White v.

Priest. This referral served as the basis for Committee Case No. CPC 2002-077 served on him in

July 2002. As a result of the Court's referral on May 17, 2002, by the Complaint in CPC 2002-

077, and certainly by the action of Panel A, Mr. Stilley was clearly put on notice well before

October 2004, that such strident, disrespectful, and intemperate language was not proper for an

attorney to use in pleadings before or about any Court. Specifically, (1) Mr. Stilley assisted his

clients, the Joneses, in preparing a *pro se* Plaintiff's Complaint, which they filed on October 5,

2004, as USDC No. Civ-04-2220 in the United States District Court for the Western District of

Arkansas, containing language which Mr. Stilley either prepared, or ratified, that was clearly

intemperate, contemptuous, and disrespectful of the Justices of the Arkansas Supreme Court

individually and as a Court, and accused them of not being a "'competent tribunal,' as that term

is used by the Eighth Circuit Court of Appeals," action by him constituting a breach of the

obligation of his oath of office as an attorney-at-law, due to his general tone of disrespect for the

attorney code of ethics; (2) Mr. Stilley assisted his clients, the Joneses, in preparing a *pro se*

Plaintiff's Complaint, which they filed on October 5, 2004, as USDC No. Civ-04-2220 in the

United States District Court for the Western District of Arkansas, containing language which Mr.

Stilley either prepared, or ratified, that was clearly intemperate, contemptuous, and disrespectful

of the Justices of the Arkansas Supreme Court individually and as a Court, and accused them of

being a Court that has "rendered it impossible for the Plaintiffs to obtain due process concerning

the claims made herein, in any state court," action by him constituting a breach of the obligation

of his oath of office as an attorney-at-law, due to his general tone of disrespect for the attorney

code of ethics; (3) Mr. Stilley assisted his clients, the Joneses, in preparing a *pro se* Plaintiff's

Complaint, which they filed on October 5, 2004, as USDC No. Civ-04-2220 in the United States

District Court for the Western District of Arkansas, containing language which Mr. Stilley either

prepared, or ratified, that was clearly intemperate, contemptuous, and disrespectful of the Justices

of the Arkansas Supreme Court individually and as a Court, and accused them of "wilfully and

knowingly deprived the Plaintiffs of due process and a competent tribunal," action by him

constituting a breach of the obligation of his oath of office as an attorney-at-law, due to his

general tone of disrespect for the attorney code of ethics; (4) Mr. Stilley assisted his clients, the Joneses, in preparing a *pro se* Plaintiff's Complaint, which they filed on October 5, 2004, as USDC No. Civ-04-2220 in the United States District Court for the Western District of Arkansas, containing language which Mr. Stilley either prepared, or ratified, that was clearly intemperate, contemptuous, and disrespectful of the Justices of the Arkansas Supreme Court individually and as a Court, and accused them of "corruptly and fraudulently refused to consider and fairly adjudicate said claim for the payment of the full amounts of the sale price of the Plaintiffs' family home, motivated by passion and prejudice against counsel at that time retained by the Plaintiffs, one Oscar Stilley," action by Mr. Stilley constituting a breach of the obligation of his oath of office as an attorney-at-law, due to his general tone of disrespect for the attorney code of ethics; (5) Mr. Stilley assisted his clients, the Joneses, in preparing a *pro se* Plaintiff's Complaint, which they filed on October 5, 2004, as USDC No. Civ-04-2220 in the United States District Court for the Western District of Arkansas, containing language which Mr. Stilley either prepared, or ratified, that was clearly intemperate, contemptuous, and disrespectful of the Justices of the Arkansas Supreme Court individually and as a Court, and alleged, "said Defendants [the Justices] continued to sit on the case, and perverted judgment against the Plaintiffs herein, depriving them of a competent tribunal and of an honest and impartial arbiter of the dispute," action by Mr. Stilley constituting a breach of the obligation of his oath of office as an attorney-at-law, due to his general tone of disrespect for the attorney code of ethics; (6) Mr. Stilley assisted his clients, the Joneses, in preparing a *pro se* Plaintiff's Complaint, which they filed on October 5, 2004, as USDC No. Civ-04-2220 in the United States District Court for the Western District of Arkansas, containing language which Mr. Stilley either prepared, or ratified, that was clearly

intemperate, contemptuous, and disrespectful of the Justices of the Arkansas Supreme Court individually and as a Court, and sought compensatory and punitive damages against the individual Justices, "for having wilfully and knowingly deprived Plaintiffs of due process and a competent tribunal in the cases stated in the body of the complaint," action by Mr. Stilley constituting a breach of the obligation of his oath of office as an attorney-at-law, due to his general tone of disrespect for the attorney code of ethics; (7) Mr. Stilley assisted his clients, the Joneses, in preparing a *pro se* Brief in Support of Plaintiffs' Response to the Various Motions to Dismiss or for Summary Judgment, which they filed on or about January 11, 2005, in Civ-04-2220 in the United States District Court for the Western District of Arkansas. The Brief contained language which Mr. Stilley either prepared, or ratified, that was clearly intemperate, contemptuous, and disrespectful of the trial court, the Honorable James Marschewski, where it accused him of presiding over a case involving Westark College (now UA-FS) despite a clear conflict of interest, apparently Parker v. Perry, action by Mr. Stilley constituting a breach of the obligation of his oath of office as an attorney-at-law, due to his general tone of disrespect for the attorney code of ethics; (8) Mr. Stilley assisted his clients, the Joneses, in preparing a *pro se* Brief in Support of Plaintiffs' Response to the Various Motions to Dismiss or for Summary Judgment, which they filed on or about January 11, 2005, in Civ-04-2220 in the United States District Court for the Western District of Arkansas. The Brief contained language which Mr. Stilley either prepared, or ratified, that was clearly intemperate, contemptuous, and disrespectful of the trial court, the Honorable James Marschewski, where it accused him of having "demonstrated a total disregard of judicial ethics," (page 20), action by Mr. Stilley constituting a breach of the obligation of his oath of office as an attorney-at-law, due to his general tone of disrespect for the

attorney code of ethics; (9) Mr. Stilley assisted his clients, the Joneses, in preparing a *pro se* Brief in Support of Plaintiffs' Response to the Various Motions to Dismiss or for Summary Judgment, which they filed on or about January 11, 2005, in Civ-04-2220 in the United States District Court for the Western District of Arkansas. The Brief contained language which Mr. Stilley either prepared, or ratified, that was clearly intemperate, contemptuous, and disrespectful of the trial court, the Honorable James Marschewski, where it accused him of having "knowingly and wilfully entered an illegal order against Oscar Stilley," (page 21), action by Mr. Stilley constituting a breach of the obligation of his oath of office as an attorney-at-law, due to his general tone of disrespect for the attorney code of ethics; (10) Mr. Stilley assisted his clients, the Joneses, in preparing a *pro se* Brief in Support of Plaintiffs' Response to the Various Motions to Dismiss or for Summary Judgment, which they filed on or about January 11, 2005, in Civ-04-2220 in the United States District Court for the Western District of Arkansas. The Brief contained language which Mr. Stilley either prepared, or ratified, that was clearly intemperate, contemptuous, and disrespectful of the trial court, the Honorable James Marschewski, where it accused him of having "failed to disclose material facts showing a conflict of interest," (page 21), action by Mr. Stilley constituting a breach of the obligation of his oath of office as an attorney-at-law, due to his general tone of disrespect for the attorney code of ethics; (11) Mr. Stilley assisted his clients, the Joneses, in preparing a *pro se* Brief in Support of Plaintiffs' Response to the Various Motions to Dismiss or for Summary Judgment, which they filed on or about January 11, 2005, in Civ-04-2220 in the United States District Court for the Western District of Arkansas. The Brief contained language which Mr. Stilley either prepared, or ratified, that was clearly intemperate, contemptuous, and disrespectful of the trial court, the Honorable James

Marschewski, where it accused him of having been "UAFS's semi-secret agent Marschewski engaged to fight their battles for them," (page 25), action by Mr. Stilley constituting a breach of the obligation of his oath of office as an attorney-at-law, due to his general tone of disrespect for the attorney code of ethics. Model Rule 3.4(c) requires that a lawyer shall not knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists.

D. Mr. Stilley's conduct violated Model Rule 8.4(d) in that (1) by his letter of October 26, 2004, he threatened Circuit Judge James Marschewski with criminal prosecution if he did not rule in a certain manner or take certain action requested by Mr. Stilley in Sebastian Circuit Case No. CV-2002-276, Parker v. Perry. When Judge Marschewski failed to act as Mr. Stilley demanded, on November 10, 2004, Mr. Stilley caused a document entitled "Warrant Information," apparently obtained from the Sebastian County Prosecuting Attorney's Office, to be filled out against him, and others, and to be then transmitted to the Judge by means of the Motion Mr. Stilley filed November 19, 2004. Mr. Stilley attempted to use criminal process to coerce a favorable result in a civil court action in which he had an interest, a misuse of the court system and the criminal justice system; (2) by his letter of October 26, 2004, Mr. Stilley threatened Judge Marschewski with the filing of a complaint against him with "the judicial authorities," presumably the Arkansas Judicial Discipline and Disability Commission, if he did not take certain action requested by Mr. Stilley, or decline to take action unfavorable to him, in Sebastian Circuit Case No. CV-2002-276, Parker v. Perry. Judge Marschewski promptly sent the letter to the Arkansas Judicial Discipline and Disability Commission, as a self-report, which, on information and belief, did not result in any charges or action against the Judge. Mr. Stilley

attempted to use the judicial disciplinary system to coerce a favorable result in a civil court action in which he had an interest, a misuse of the judicial discipline system, and prejudicial to the administration of justice; (3) as shown as an attachment (Exhibit 5) to his Motion For Recusal filed November 19, 2004, Mr. Stilley followed through on his October 26, 2004, threat to Judge Marschewski with the filing of a complaint against him with the Committee on Professional Conduct, if he did not take certain action requested by Mr. Stilley, or decline to take action unfavorable to him, in Sebastian Circuit Case No. CV-2002-276, <u>Parker v. Perry</u>. Mr. Stilley attempted to use the attorney  discipline system to coerce a favorable result in a civil court action in which he had an interest, a misuse of the judicial discipline system, and prejudicial to the administration of justice; (4) by his letter of October 26, 2004, Mr. Stilley threatened attorney Walton Maurras with the filing of a grievance against him with the Committee on Professional Conduct if he did not back off prosecuting a motion to show cause for contempt against Mr. Stilley in Sebastian Circuit Case No. CV-2002-276, <u>Parker v. Perry</u>. When Mr. Maurras failed to act as Mr. Stilley demanded, on or about November 19, 2004, he filed a grievance against Mr. Maurras with the Committee. Mr. Stilley attempted to use the attorney disciplinary system to coerce a favorable result in a civil court action in which he had an interest, a misuse of the attorney discipline system, and prejudicial to the administration of justice; (5) by his letter of October 26, 2004, Mr. Stilley threatened attorney James M. Llewellyn, Jr. with the filing of a grievance against him with the Committee on Professional Conduct if he did not back off prosecuting a motion to show cause for contempt against Mr. Stilley in Sebastian Circuit Case No. CV-2002-276, <u>Parker v. Perry</u>. When Mr. Llewellyn failed to act as he demanded, on or about November 19, 2004, Mr. Stilley filed a grievance against him with the Committee. Mr.

-13-

Stilley attempted to use the attorney disciplinary system to coerce a favorable result in a civil court action in which he had an interest, a misuse of the attorney discipline system, and prejudicial to the administration of justice; (6) in <u>Parker v. Perry</u>, Sebastian Circuit Case No. CV-2002-276, as recited in his Judgment filed January 18, 2005, Judge Marschewski sanctioned Mr. Stilley in September 2002, for violation of Rule 11 by Mr. Stilley filing a lawsuit that was barred by the principles of *res judicata*, the statute of limitations, and the voluntary payment rule. He assessed sanctions of fees incurred by the Fort Smith School District ($14,421.16) and the University of Arkansas at Fort Smith ($2,196.81) against Mr. Stilley. By Judgment issued January 18, 2005, Judge Marschewski later held Mr. Stilley in civil contempt, sentenced him to jail, and fined him (suspended on conditions), having found that Mr. Stilley had failed to comply with his order; (7) Mr. Stilley violated Rule 11 by filing a lawsuit barred by several legal doctrines, and assisting clients in filing, *pro se,* a subsequent lawsuit in federal court in October 2004,  <u>Jones v. Double "D" Properties et al.</u> (Jones II), that was exactly the same cause of action that resulted in his being sanctioned by Judge Marschewski in September 2002; (8) Mr. Stilley's failure to comply with the order for sanctions caused the Circuit Court of Sebastian County to have to expend unnecessary and limited time and resources on matters in which Mr. Stilley caused or assisted; (9) on October 19, 2004, Mr. Stilley filed suit against Judge Marschewski, Justices Robert Brown, Tom Glaze, Donald Corbin, Annabelle Clinton Imber, Jim Hannah and Ray Thornton, in their official and individual capacities, and others, as No. Civ-04-2225 in United States District Court for the Western District. This case was eventually the subject of a Memorandum Opinion and Order of Dismissal by Judge G. Thomas Eisele filed May 18, 2005. His Opinion and Dismissal was affirmed by the Court of Appeals for the Eighth Circuit (No. 05-

2816) on May 26, 2006. Judge Eisele particularly found the "RICO" claim the Joneses and Mr. Stilley alleged to be disturbing and frivolous. He sanctioned Mr. Stilley for this conduct by striking the RICO claim from the Amended Complaint, assessed against Mr. Stilley the costs and attorney's fees of UA-FS, to be determined after further pleadings, referred the matter and Mr. Stilley to the Committee on Professional Conduct, and directed the clerks of both federal districts in Arkansas to not accept for filing any complaint tendered by Mr. Stilley naming as parties any of at least twenty-nine (29) individuals or entities identified in an exhibit to his Opinion. Judge Eisele's decision was affirmed on appeal. Mr. Stilley's conduct and frivolous claim in this matter resulted in the unnecessary use of court, party, and attorney time and resources, conduct prejudicial to the administration of justice; (10) on October 19, 2004, Mr. Stilley filed suit against Judge Marschewski, the University of Arkansas at Fort Smith (UA-FS), and others, as No. Civ-04-2225 in United States District Court for the Western District. This case was eventually the subject of a Memorandum Opinion and Order of Dismissal by Judge G. Thomas Eisele filed May 18, 2005. His Opinion and Dismissal was affirmed by the Court of Appeals for the Eighth Circuit (No. 05-2816) on May 26, 2006. Judge Eisele found that Mr. Stilley challenged Judge Marschewski's award of sanctions against him in the earlier state court version of the *Jone*s litigation and lost on appeal. He found Mr. Stilley then filed the federal suit, contending UA-FS breached federal law, statutory and constitutional, when it attempted to collect the state-court judgment. He found Mr. Stilley sued UA-FS "for an improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation" to UA-FS, in violation of Fed. R. Civ. P. Rule 11(b)(1). His decision was affirmed on appeal. Mr. Stilley's conduct and improper purpose in this matter resulted in the unnecessary use of court,

-15-

party, and attorney time, money, and resources, conduct that is prejudicial to the administration

of justice. Model Rule 8.4(d) requires that a lawyer shall not engage in conduct that is prejudicial

to the administration of justice.

E. Mr. Stilley's conduct, as detailed herein, is found to be "serious misconduct" as

defined in Section 17.B of the Supreme Court's Procedures Regulating Professional Conduct of

Attorneys at Law.

**WHEREFORE**, it is the decision and order of the Arkansas Supreme Court Committee

on Professional Conduct, acting unanimously through its authorized Panel B, that

**DISBARMENT PROCEEDINGS BE INITIATED** against the Arkansas law license of

**OSCAR AMOS STILLEY**, Arkansas Bar ID# 91096, for his conduct in this matter. The Panel

further unanimously finds that Mr. Stilley's law license be placed on interim suspension effective

on the date this Findings and Order is filed of record with the Clerk of the Arkansas Supreme

Court, during the pendency of disbarment proceedings.

                                        ARKANSAS SUPREME COURT COMMITTEE
                                        ON PROFESSIONAL CONDUCT - PANEL B


                              By: _____
                                        Henry Hodges, Chair, Panel B


                              Date: _____

Page 1

IN THE SUPREME COURT OF THE STATE OF ARKANSAS

STARK LIGON, Executive Director,              PETITIONER
Supreme Court Committee on
Professional Conduct
                          NO. 08-73

OSCAR AMOS STILLEY                            RESPONDENT
Arkansas Bar ID #91096


*************************************************************

BEFORE:

        The Honorable John R. Lineberger, Special Judge

                    Evidentiary Hearing

                 TAKEN:  December 8, 2008

                  Volume 1 of 3 Volumes

*************************************************************
                 A P P E A R A N C E S

APPEARING ON BEHALF OF THE PETITIONER:

            MR. STARK LIGON
            Office of Professional Conduct
            Justice Building, Room 110
            625 Marshall Street
            Little Rock, Arkansas 72201

APPEARING PRO SE:

            MR. OSCAR STILLEY
            701 South 21st Street
            Fort Smith, Arkansas 72901

Stark Ligon V. Oscar Stilley                    Hearing Dec. 8, 9 & 10, 2008

Page 558

1   precise purpose of eliciting testimony to support your claim
2   that Judge Marschewski had made false statements or had lied
3   at the hearing on January 14, 2005; is that correct?
4   A   Can you refresh my recollection on the dates or tell
5   me, what's the number of the exhibit?
6   Q   This is a real -- Mr. Stilley, I'm not going to argue.
7   You have lived with this matter for years now, certainly
8   since the fall of 2004.  You are bright, you are one of the
9   most intelligent lawyers with whom I have ever dealt.  I
10  will repeat the question.  It is a very simple question in
11  my mind for anybody who has lived with this as much as you
12  have and as much as I have.  On March 14, 2007, was there a
13  hearing in what we call Parker versus Perry at which you
14  were present in front of Judge Stephen Tabor in Sebastian
15  County?
16  A   Beg your pardon?  Say that again.
17        MR. LIGON:  Your Honor, I am through.
18        THE COURT:  All right.
19        MR. LIGON:  I am through.
20        THE COURT:  All right.
21        MR. STILLEY:  I'm sorry.  I didn't mean --
22  I'm not doing something on purpose.
23        THE COURT:  Well, do you have any
24  surrebuttal?
25        MR. STILLEY:  If he's through -- but, I

Page 559

1   mean, I'm sorry.  I didn't mean to -- I found it
2   now, and I could say.  But if he's through, I'm
3   through.  I mean, it's his case.
4         THE COURT:  Do you have anything else?
5         MR. STILLEY:  No.  I think the record
6   sufficiently reflects what the facts are.
7         THE COURT:  Thank you.
8         MR. STILLEY:  I apologize for not being able
9   to get to it quickly.
10        THE COURT:  You may step down.  Call your
11  next witness.
12        MR. LIGON:  I rest, Your Honor.  Excuse me.
13  Petitioner rests.
14        THE COURT:  All right.  Mr. Stilley, you
15  indicated you had some motions you wanted to make
16  when the Petitioner's rested.
17        MR. STILLEY:  Yes.  Thank you, Judge.  Would
18  it please the Court if I could make that from
19  here.
20        THE COURT:  That's fine.
21        MR. STILLEY:  And would you like me to
22  stand?
23        THE COURT:  That's fine.  Just keep your
24  seat.
25        MR. STILLEY:  Thank you, Judge.  Your Honor,

Page 560

1   I have a Motion for Judgment as a Matter of Law.
2   Well, scratch that.  I forgot to ask.  Does the
3   Court have any questions that the Court would
4   like to ask?
5         THE COURT:  No, sir, I don't have any
6   further questions.
7         MR. STILLEY:  Thank you, Judge.  I have a
8   Motion for Judgment as a Matter of Law, and I
9   would ask the Court's pleasure, if the Court
10  would be willing to treat the Motion to Dismiss,
11  the Motion for Summary Judgment and briefs as
12  part of this motion for a Judgement as a Matter
13  of Law as if set forth word for word.  I would
14  like to also go through the items one by one so I
15  can kind of flesh things out.  But if I could
16  have that treated as restated in this proceeding,
17  I would appreciate it.
18        THE COURT:  All right, sir.  You may.
19        MR. STILLEY:  Thank you, Judge.  Okay.
20  Let's start with Count 1 -- let me ask this.
21  Would the Court prefer I take it as group and get
22  a ruling or would the Court prefer I go through
23  all the counts and then let the response be had
24  later?  What's the Court's pleasure on that?
25        THE COURT:  Well, we probably ought to do

Page 561

1   them one by one --
2         MR. STILLEY:  I think that's a great idea.
3         THE COURT:  -- when we get into it because
4   it would be easier for me to follow, and I'm sure
5   it would be easier for Mr. Ligon to follow.
6         MR. STILLEY:  On Count 1, that is an
7   allegation that Oscar Stilley violated Model Rule
8   3.1 which provides that a lawyer shall not bring
9   or defend a proceeding unless there is a basis
10  for doing so that is not frivolous.  And that's
11  the pertinent part.  The problem with this
12  Complaint or this count the first problem is that
13  this matter was not signed by Oscar Stilley.  It
14  was not Oscar Stilley's pleading, and I'll just
15  tell you where I'm at so we can kind of keep up
16  with this thing.  I'm looking at my response to
17  the original Petition for Disbarment and I'm on
18  Page 13 of that and I set this out here --
19  scratch that, Judge.
20        Could I also ask the Court to treat the
21  responses to the Petition for Disbarment and the
22  Supplemental Petition for Disbarment as set forth
23  word for word as part of the Motion for Judgment
24  as a matter of law?
25        THE COURT:  To the extent that they were

Stark Ligon V. Oscar Stilley                    Hearing Dec. 8, 9 & 10, 2008

Page 562

1   admitted into evidence, you may.
2        MR. STILLEY:  Actually they weren't, so --
3        THE COURT:  I believe some of -- I'm looking
4   at -- what's marked as Exhibit A was introduced
5   into evidence.
6        MR. STILLEY:  If that includes it, then I
7   think we're home free.
8        THE COURT:  Do you have any objections if
9   there's -- I don't know how to phrase this.  It's
10  got to be in evidence, I think, in order for you
11  to argue it now.
12       MR. STILLEY:  Well, I don't have --
13       THE COURT:  It's got to be in evidence for
14  me to consider it, I believe, now.
15       MR. STILLEY:  Sure.  I understand that.  I
16  don't disagree.
17       THE COURT:  Let's do that.
18       MR. STILLEY:  Sure.  I can say it.  Here's
19  the question.  How can Rule 3.1 apply to a lawyer
20  who didn't sign or file the pleadings?  Mr. Ligon
21  has been put on notice of this.  Although this
22  may not have been introduced into evidence, it
23  was a response.  It was placed in the case file,
24  so he knows, it's no secret to him.  He's had his
25  chance to research the law and come up with a

Page 563

1   case, some kind of authority to say that a lawyer
2   can be punished on a basis of this rule despite
3   the fact that the lawyer did not sign or file the
4   pleadings.
5        THE COURT:  Didn't you acknowledge that you
6   assisted in the preparation of the document?
7        MR. STILLEY:  Sure did.  And that's a great
8   point.  Let me explain that.  Your Honor, I
9   objected to lots of evidence based on the hearsay
10  rule.  I pretty much lost nearly all the time.
11  While I may disagree, I highly respect that, but
12  that leaves us with a record with a lot of
13  information in it.  One of those is -- I think
14  it's 15.  Let's see if we can find it.
15       THE COURT:  Let me tell you what may be more
16  helpful if y'all are willing to do this.  As both
17  of you are well aware, my role is a little
18  different in this proceeding than it is if I'm
19  setting for a circuit judge.  My role here is to
20  sit as a finder of the fact, to write conclusions
21  as to those findings and to make a
22  recommendation, if proper, to the Supreme Court.
23  The Justices of the Supreme Court are the
24  ultimate fact finders of all of it.  They're the
25  ones that's going to make the decision.  It's not

Page 564

1   like me making a decision as circuit judge and
2   the decision is final unless appealed and is
3   final until reversed.  That's not the situation
4   here at all.  The Justices of the Supreme Court
5   are going to make the ultimate decision
6   regardless of what I have to say or do.  And in
7   looking at the proceedings, as we've already
8   said, that under Section 13, Disbarment
9   Proceedings, Subsection B says, The Judge shall
10  first hear all evidence relevant to the alleged
11  misconduct and shall make a determination as to
12  whether the allegations have been proven.  Upon
13  the finding of misconduct, the judge shall then
14  hear evidence relevant to the appropriate
15  sanction.
16       As I've said earlier, the rules provide for
17  bifurcated proceedings, that is if requested.
18  And actually you don't even have to request it.
19  The rule says that I'm to make some findings as
20  to whether or not the Petitioner has proven one
21  or more allegations.  I would like for you
22  lawyers to do this, if you feel it appropriate.
23  I would like for you to each prepare findings of
24  what your proposed findings of fact are as to the
25  allegations, and I would like you to do it in

Page 565

1   this fashion.  I would like for you to address an
2   introduction, as you've done, Mr. Ligon, in the
3   Petition for Disbarment and in the First Amended
4   Petition.  Do an introduction with what you
5   believe the general picture is, that is the
6   overall facts that have been presented here
7   first.
8        And then, second, take each count
9   individually, that's Counts 1 through 23, I
10  believe in the -- in the original Petition, and
11  then 24, 25 and 26 in the Amended Petition and
12  then put in what you believe supports the proof
13  as to each allegation or does not support the
14  proof in your situation, Mr. Stilley.  And when
15  you're dealing with each one, you can make your
16  argument then as to whether or not there's just
17  not any proof to support it.  That will be
18  preserving for the record your opportunity to say
19  this should be dismissed.  Do that first.
20       MR. STILLEY:  Sure.
21       THE COURT:  But then put in -- alternatively
22  put in what you think the facts support what your
23  position on that point is and then I want you to
24  deal with the overall fitness issue in the
25  Amended Petition and I'm looking particularly at

142 (Pages 562 to 565)

Page 566

1  A through I, those points raised there.  And then
2  put -- give me your side of the case, what you
3  think I ought to find as the facts on each of
4  those.  And after I get both those proposed
5  findings, I can make a decision from that.
6      Now, I want to be sure that the record
7  reflects that I want to preserve your opportunity
8  for your Motion to Dismiss and that you're doing
9  so by doing this.  And I think it would be better
10  instead of you having to thumb through all those
11  different documents now and make your motion,
12  that you have a chance to sit down and reflect on
13  it in your office or your home or wherever and
14  then put it together.
15      Now, I want to put a deadline on it.  As you
16  lawyers know, I try to follow deadlines.  How
17  much time do each of you believe it will take you
18  to do this?
19      MR. LIGON:  Your Honor, the Petitioner's
20  perspective two -- two situations to be aware of.
21  I know that the Court is going to request the
22  transcript of the reporter, and for the Court's
23  benefit, and I think it would be of equal benefit
24  to the parties to have the benefit of that as we
25  try and do this certainly for accuracy purposes,

Page 567

1  so I would -- I would ask that we be given a
2  reasonable period of time after the transcript of
3  this hearing is available.
4      The other thing is because of a deadline
5  which will not be extended for me in Woodson
6  Walker Supplemental Abstracting Brief, which is
7  due December 30, I honestly do not feel I have
8  any time between now and January 1st to devote to
9  this to take care of that issue, which had to be
10  put off to take care of this issue.
11      THE COURT:  Miss Debbie, do you know of
12  approximately how much time it will take to
13  prepare the transcript, approximately when you
14  could have it ready, taking into account we've
15  got the holidays coming.
16      THE REPORTER:  Five weeks.
17      THE COURT:  Five weeks.  All right.
18      THE REPORTER:  I think that's what we did
19  with the other one.  Five or six but this a
20  little shorter.
21      THE COURT:  Well, I'm not rushing you.
22      THE REPORTER:  I know it.  And we do have
23  the holidays.
24      THE COURT:  Yeah.  Mr. Ligon, will you do an
25  order for what we're doing right now?

Page 568

1      MR. LIGON:  Yes, sir.
2      THE COURT:  All right.
3      MR. LIGON:  Circulate it and send it to both
4  Mr. Stilley and you for a review?
5      THE COURT:  Yes, sir.  Five weeks.  Let's
6  see where that will put us today is December the
7  10th.
8      MR. LIGON:  Judge, it sounds like with the
9  holidays intervening we're really talking about
10  around February the 1st before the reporter can
11  get a chance to get it to us.
12      THE REPORTER:  That's what I was kind of
13  thinking.
14      THE COURT:  Is it agreeable to both of you
15  if we start the time running then from February
16  1st?  That is you won't have a chance to start on
17  your proposed findings, I take it, until on or
18  about February 1st.
19      MR. LIGON:  Well, Your Honor, work could be
20  done but for accuracy -- for accuracy, I would
21  hesitate to try and do something and then all of
22  a sudden have the transcript show up and find out
23  that my memory or my notes were not accurate.
24  That's -- that's not good form for a lawyer.  So
25  if the reporter maybe -- the way to do it is to

Page 569

1  make it -- well, okay.  February -- Monday -- the
2  first Monday -- first business day in February of
3  '09 is Monday, the 2nd.
4      THE COURT:  Monday, the 2nd, you're right.
5      MR. LIGON:  So, Your Honor, may I suggest
6  that if the transcript has been filed by Monday,
7  February the 2nd, then maybe the Court can direct
8  some time frame based on that event for us to
9  achieve your directives.
10      THE COURT:  Well, give me a notion or an
11  idea of how much time you two feel like you need.
12  You know I'll try to work with you now.  Whenever
13  you start moving later for additional time, I can
14  get pretty stubborn.
15      MR. LIGON:  Right.  Well, Your Honor, let me
16  go ahead and bite the bullet.  I think this is
17  called an attorney filing for a Request for Leave
18  From the Court.  Your Honor, in this room on
19  February 3 through 5, I'm scheduled to basically
20  do this again with the hell cat from northeast
21  Arkansas, and so you know -- you know what I'm
22  going to have to be dealing with to be ready for
23  that one.
24      THE COURT:  I do.
25      MR. LIGON:  I'm sorry.  That was my term,

143 (Pages 566 to 569)

Stark Ligon V. Oscar Stilley                    Hearing Dec. 8, 9 & 10, 2008

Page 570

1    and that was unfair.  A certain attorney and I
2    from northeast Arkansas have a date here starting
3    February the 3rd.  And then on -- let me make
4    sure I've got it -- give you the correct dates.
5    On the 10th through the 14th of February I'm
6    already booked for our national organization's
7    meeting in Boston.  So for all practical purposes
8    counting that hearing and being out of state, I'm
9    pretty much going to be out of commission until
10   February the 15th.  So if I could beg -- if I
11   could beg consideration that I would have to
12   cancel or move something or work harder than a 63
13   year old man can to get much done of quality
14   work.
15       THE COURT:  How about March 15?
16       MR. LIGON:  Sounds good.
17       THE COURT:  Is that enough time?
18       MR. LIGON:  Yes.
19       THE COURT:  Mr. Stilley, let me listen to
20   you now.  Do you have some conflicts?
21       MR. STILLEY:  Actually, Judge, I was just
22   wondering if it might be satisfactory to the
23   Court to let him make his proposal first.  And
24   the reason for that being is that he might look
25   at some of this and concede, Well, I didn't chin

Page 571

1    the bar on this particular count and that way
2    maybe we could cut the issues down.
3        THE COURT:  I would rather you both submit
4    them at the same time and then I'm going to give
5    you a short time for rebuttal.
6        MR. STILLEY:  Okay.  So we're both --
7        THE COURT:  Both of you are going to have
8    the same deadlines.
9        MR. STILLEY:  Okay.
10       THE COURT:  And the deadline right now
11   setting on this is March 15th.
12       MR. STILLEY:  March 15th?
13       MR. LIGON:  Your Honor, March the 15th is a
14   Sunday.  Monday, March 16th?
15       THE COURT:  Yeah, Monday, March 16.  Do you
16   have any problems coming up that will delay you
17   from doing it by the 16th of March?
18       MR. STILLEY:  I don't think there will be
19   any problem at all with that.  This is just a
20   deadline it has to be done by.
21       THE COURT:  Yes, sir.  And I would urge you,
22   you know, if some way Miss Debbie got this to you
23   earlier than that, you could start on it earlier.
24   I'm not asking you to wait around until the 16th
25   to submit it, but do it by the -- now, in the

Page 572

1    event you don't get the transcript by the 2nd of
2    February we're -- I'll move the time back so that
3    you do have enough time to get this done.
4        Again, I want to be clear what I'm after.  I
5    want you to address each individual charge, that
6    is each individual count and each individual
7    allegation under the Fitness to Practice Law and
8    you set out under that, Mr. Ligon, individual
9    cases, I believe, for each one, so you'll be
10   addressing individual cases on that point.  And
11   that will keep us focused on -- I want us to stay
12   focused on the pleadings because I've tried not
13   to run into a Price problem where I'm considering
14   matters in this cases that shouldn't be
15   considered until the next phase, if there is a
16   next phase and that way we keep on point on that.
17       If I've let something in here that I
18   shouldn't have let in on this part of it, you can
19   point that out to me and say that's not involved
20   with Count 1 or 2 or whatever it is.  Y'all
21   understand that?  But I would like to have -- to
22   start with, I would like to have just set out
23   general statements of fact as you see them and
24   then, Mr. Stilley, be sure, though, you preserve
25   your motion --

Page 573

1        MR. STILLEY:  Sure.
2        THE COURT:  -- first, but after you preserve
3    it, set out the rest of it because as I say, I'm
4    not the final -- finally deciding it.  Whatever
5    we do with this is going to be reviewed by the
6    Supreme Court and they're going to be make the
7    ultimate decision.  I'm going to try to present
8    the facts as you've established them here.
9        MR. LIGON:  Your Honor, one other point to
10   make sure we do it the way that you're
11   anticipating.  In the opening section of the
12   document that we're to eventually have to you by
13   March 16, you've called it an introduction or a
14   statement in which we present the overall facts.
15       THE COURT:  Yes, sir.
16       MR. LIGON:  May it be constructed in the
17   nature of a closing argument, if you will, which
18   attempts to summarize all the evidence related to
19   the charges?
20       THE COURT:  Yes, sir, that will be fine to
21   do it that way but I just want to be sure,
22   though, you address each individual charge and
23   don't do a -- just take them and lump them all
24   together when you're doing it.  That will give me
25   a chance to hopefully make some sense out of each

Page 574

1    individual one.  Is that agreeable if we do it
2    that way?
3        MR. STILLEY:  I prefer that.  I like that
4    idea.
5        MR. LIGON:  And, Your Honor, I'll have a
6    draft of the proposed order to each of you before
7    close of business tomorrow, if that's acceptable.
8        THE COURT:  At this point I don't know
9    whether we're going to have a second round or
10   not, but I think we ought to talk about if we do.
11   We'll have -- I suppose both of you want to be
12   heard on matters at that time if we do have.
13       MR. STILLEY:  Oh, certainly.
14       THE COURT:  Is that correct?
15       MR. LIGON:  Yes.  And, Your Honor, let me go
16   ahead and project a little bit down the road.
17   Recognizing the Price precedent which we have out
18   there and the challenges that it presents and
19   then relating the Mark Zokle matter, which hit
20   our office for the first time around the middle
21   of November, under the category of Overall
22   Fitness, if hypothetically another Mark Zokle or
23   something that we thought was relevant and of
24   enough serious nature were to appear in the next
25   30, 60 or 90 days, then I guess Petitioner's

Page 575

1    options are to sit on it is one option and save
2    it and go do something else with it.  If this
3    sounds like anything anybody has read or heard
4    from Price on, I apologize, but I'm not giving up
5    yet.  Hopefully we'll get some guidance.  Then
6    that could be the subject matter of an entirely
7    separate and new independent disciplinary
8    complaint.
9        On the other hand, if we give prompt notice
10   and as much information as we have to Mr. Stilley
11   of a new matter that comes in -- say it comes in
12   next week or the week after, such as the Michael
13   Greene matter -- was done in the Michael Greene
14   matter, then I guess the question comes to
15   Petitioner's perspective, Do we try and bring
16   those matters in here under overall fitness?  Do
17   we just say, No, don't bring them anywhere near
18   this proceeding and take them up later in another
19   case number, potentially subjecting Mr. Stilley
20   to the -- let's see.  What did he call it?
21       THE COURT:  Well, let me --
22       MR. LIGON:  Anyway --
23       THE COURT:  Let me read the rule and this is
24   what I perceive in doing.  And I'm referring now
25   to Section 13(b) starting with the second --

Page 576

1    yeah, second sentence, Upon the finding of
2    misconduct, the judge shall hear all evidence
3    relevant to appropriate sanction to be imposed,
4    including evidence related to the factors listed
5    in Section 19 and the aggravating and mitigating
6    factors set out in the American Bar Association's
7    Model Standards of imposing lawyer sanctions.
8    And there's a citation after that.  So what I
9    think that section is saying is that we come back
10   in here and it's kind of like a criminal
11   proceeding where you bifurcate things and the
12   jury's heard evidence to start with and they go
13   out and make a decision as to whether the
14   person's guilty or innocent.  And then if they
15   find guilt, you can back in, and each side is
16   given an opportunity to put on aggravating and
17   mitigating circumstances, whatever they may have
18   at that point.  And my interpretation is this:
19   If I do find that there has been misconduct,
20   we'll gather again and each of you can put in
21   pretty much anything you want to put in showing
22   aggravating or mitigating situations.  I would --
23   Mr. Stilley asked earlier if something like that
24   happened, he would like Mr. Ligon then to do
25   the charge.  I'm not going to direct you to do

Page 577

1    that.  I would urge you, though, to exchange any
2    information that may be available to you at that
3    time sometime prior to the hearing.  But if that
4    sort of hearing comes along, I'm not going to
5    wait very long to set it.  I'll set it pretty
6    quickly because I'll have to prepare all those
7    findings and conclusion and so forth dealing with
8    everything.  And then I get them filed of record
9    so the Supreme Court can take it up.  I mention
10   that only for this reason.  If I find there has
11   been misconduct, I want you to be prepared for a
12   hearing quickly and you need to be working on
13   your aggravating and mitigating circumstances,
14   even, you know, before we finish this up and
15   think about it because you know what they are.
16   Both or you know what they are.  We'll know what
17   they are at that time.  And I would hope --
18   although I'm not going to require you to exchange
19   that information before we come into the hearing,
20   I hope you would.  I hope you would make each
21   other known what you're going to put on at that
22   time.  The reason I say I'm not going to direct
23   you to do it is because I take it that if there's
24   a mitigating circumstance that comes up in the
25   middle of the hearing, you're not barred from

Page 578

1    putting it on, Mr. Stilley.  Or you find out
2    about it the day before and it's in your favor,
3    you want to get it into the record.  And I think
4    it would be wrong for me to say, Well, you didn't
5    exchange it, although it is a fact that can help
6    you.
7         I think you're entitled to put it on and I
8    think you're entitled to the same thing,
9    Mr. Ligon, in your case.
10        So I'm just asking you both to be as fair
11   with each other as you can before you come in
12   here, and if it is available, make it known.  But
13   if another case comes up in the meantime, as you
14   suggested a minute ago, and you want to use it in
15   this, I think you can in that sort of proceeding.
16   I think if you wanted to use it in some other
17   fashion, that's your call.  That's not me, but I
18   just -- that's my understanding, Gentlemen, of
19   the requirements of the rule.  If I'm wrong, tell
20   me about it.
21        MR. LIGON:  Thank you, Your Honor.
22        MR. STILLEY:  Your Honor, here's the request
23   I would make.  The request I would make would be
24   that Mr. Ligon be required to state his theory on
25   matters where he has knowledge so that we do not

Page 579

1    get into another situation of Mr. Zokle where
2    that I cross-examined Mr. Zokle thinking we had a
3    plain vanilla fee dispute and when I got done, I
4    was shocked to find out that wasn't it at all.
5         THE COURT:  Well, I don't really think
6    that's necessary because he's going to present it
7    to me and I've got to decide whether that's an
8    aggravating circumstance myself or whether your
9    offer is a mitigating circumstance itself, so
10   I'll just have to make that judgment call when it
11   comes along.
12        MR. STILLEY:  Okay.  For the record, I just
13   want to make it clear that my -- the basis for my
14   request is In re:  Ruffalo, United States Supreme
15   Court case where they said that a lawyer was
16   entitled to know the specific -- well, they said
17   the precise basis for the conduct -- claim of
18   misconduct before the testimony started and I
19   would presume at the earliest reasonable time is
20   that's the point the U.S. Supreme Court was
21   making, and I would suggest that even if Ruffalo
22   didn't say it, it's a matter of fairness that you
23   don't leave somebody to possibly believe that a
24   certain matter is an issue when that's really not
25   the matter.

Page 580

1         THE COURT:  Well, that's not a point I'm
2    deciding, though, in this phase.  I'm not
3    considering that in this phase.
4         MR. LIGON:  Your Honor, one procedural
5    matter, because I want to make sure I know -- if
6    the Court could share with us how the Court will
7    deal with this.  The testimony of Mark Zokle and
8    exhibits that came in through his testimony, of
9    course, it's clear you have now made a proffer
10   and have reserved them for use, if any, in any
11   possible sanctions hearing stage.  I interpret
12   that to mean that if we do get to a sanction
13   stage and the Petitioner offers Mr. Zokle's
14   transcribed testimony in which he was subjected
15   to all the cross-examination and examination
16   Mr. Stilley desired to, that it will not be
17   necessary for the Petitioner to bring Mr. Zokle,
18   assuming he's free to travel, back down here
19   again to repeat his testimony.
20        THE COURT:  That's true.  You will not.
21        MR. LIGON:  Thank you.
22        THE COURT:  Yes, sir.
23        MR. STILLEY:  I would reserve my objection
24   to the fact that before I did the
25   cross-examination, I didn't know what the

Page 581

1    accusation was, couldn't ask the right questions.
2    Very sensitive to Mr. Zokle's time and his needs
3    but I just object to using this when the
4    cross-examination was certainly not what would
5    have been done if the true facts had been known.
6         THE COURT:  Your motion is noted of record.
7    Whatever you put on here that I have not accepted
8    as evidence in this proceeding certainly can be
9    accepted in the next stage, if there is one.  Any
10   other questions or anything else either of you
11   would like to make at this time?  Yes, sir.
12        MR. STILLEY:  Your Honor, I have two or
13   three here.  What's the custom on the transcript?
14   Do I need to pay in order to get -- if I want to
15   get an electronic transcript, do I need to pay
16   the --
17        THE COURT:  You better ask -- what's the
18   rule?
19        THE REPORTER:  Do you want me to say this on
20   the record?
21        THE COURT:  Yes, ma'am.
22        THE REPORTER:  A copy will be at the Supreme
23   Court Clerk's office.  A hard copy will be down
24   there and all the exhibits will be down there.
25   It's my understanding you can go down there and

Page 582

1   check it out or review it or whatever.  If you
2   want to purchase an electronic copy, it's the
3   same as buying a copy.  It's like paying for a
4   full copy.  It's not like you're just paying for
5   the disk.
6       MR. STILLEY:  Okay.  I understand.
7       THE REPORTER:  Thank you.
8       MR. STILLEY:  There is also the issue of --
9   on this May 16 deadline -- and I'm not saying
10  it's going to be --
11      THE COURT:  March 16.
12      MR. STILLEY:  Yes, March 16 deadline.  I'm
13  not saying that it's going to be a last-minute
14  filing, but if it did turn out to be that way, is
15  it considered timely filed if I can email it to
16  you in PDF?
17      THE COURT:  Yes, sir.
18      MR. STILLEY:  Very good.
19      THE COURT:  Yes, sir.  That's understood.
20      MR. LIGON:  Yes, Your Honor.
21      THE COURT:  Either of you, I will allow
22  that.
23      MR. STILLEY:  Very good.  And one other
24  question I wanted to ask, and I certainly don't
25  want to be presumptuous here, but would the Court

Page 583

1   think it might be appropriate to make a motion to
2   ask that the suspension pending disbarment be
3   dissolved at this point in time?
4       THE COURT:  I don't think that's a matter I
5   can handle, is it?
6       MR. STILLEY:  Well, if that's --
7       THE COURT:  I'm going to do this.  I'm going
8   to say that's outside of my prerogative, because
9   that's a matter that's up to the justices of this
10  court.
11      MR. STILLEY:  Okay.  Okay.  I just wanted to
12  check.  Thank you, Judge.
13      THE COURT:  Yes, sir.  Anything further?
14      MR. STILLEY:  I don't have anything further.
15      THE COURT:  Well, Gentlemen, I appreciate
16  your courtesies.
17      MR. STILLEY:  Thank you, Judge.
18      MR. LIGON:  Thank you, Your Honor.
19      THE COURT:  Court will be in recess.
20      (The hearing concluded at 3:58 p.m. December
21  10, 2008.)
22
23
24
25

Page 584

1            C E R T I F I C A T E
2       I, DEBORAH J. WORTHINGTON, Certified Court
    Reporter in and for the State of Arkansas, do hereby certify
3   that the witnesses were duly sworn prior to the taking of
    testimony as to the truth of the matters attested to and
4   contained therein; that the testimony of said witness was
    taken by me stenographically and was thereafter reduced to
5   typewritten form by me or under my direction and
    supervision; that the foregoing transcript is a true and
6   accurate record of the testimony given to the best of my
    understanding and ability.
7
8       I FURTHER CERTIFY that I am neither counsel for,
    related to, nor employed by any of the parties to the action
9   in which this proceeding was taken; and, further, that I am
    not a relative or employee of any attorney or counsel
10  employed by the parties hereto, nor financially interested,
    or otherwise in the outcome of this action; and that I have
11  no contract with the parties, attorneys, or persons with an
    interest in the action that affects or has a substantial
12  tendency to affect impartiality, that requires me to
    relinquish control of an original transcript or copies of
13  the transcript before it is certified and delivered to the
    custodial attorney, or that requires me to provide any
14  service not made available to all parties to the actions.
15
16
17          _____
             Deborah J. Worthington, C.C.R.
18           LS Certificate No. 362
19
20
21
22
23
24
25

# SUPREME COURT OF ARKANSAS
# OFFICE of PROFESSIONAL CONDUCT

**Stark Ligon, Executive Director**
**Nancie M. Givens, Deputy Director**
**Michael E. Harmon, Senior Staff Attorney**
**Gwendolyn L. Rucker, Staff Attorney**
**Fax: (501) 376-3438**
**WATS: 1-800-506-6631**

**Justice Building, Room 110**
**625 Marshall Street**
**Little Rock, AR 72201-1054**
**Phone: (501) 376-0313**

June 23, 2008

Mr. Oscar A. Stilley
Attorney at Law
7103 Racetrack Loop
Fort Smith, AR 72916

Re:    CPC Docket No. 2007-062, Judicial Complaint

Dear Mr. Stilley:

Enclosed is a copy of the Findings & Order from the Committee Panel from your <u>de novo</u> hearing on June 20, 2008.

Sincerely,

Diane Sledge
Administrative Assistant

(12.I, Rev.1-01-02)

Encl.

## BEFORE THE SUPREME COURT COMMITTEE ON PROFESSIONAL CONDUCT
## PANEL B

IN RE:   **OSCAR A. STILLEY**
Arkansas Bar ID #91096
CPC Docket No. 2007-062

Received

JUN 2 3 2008

Arkansas Supreme Court
Committee on Professional Conduct

### FINDINGS AND ORDER

The formal charges of misconduct upon which this Findings and Order is based were developed from information directed to the Committee by Circuit Judge Stephen Tabor of Fort Smith on May 8, 2007. The information related to the conduct in court proceedings of, and non-compliance with various court orders by, Respondent Oscar A. Stilley, an attorney practicing primarily in Fort Smith, Arkansas. Respondent was served with a formal complaint. After a ballot vote decision by Panel A was communicated to Mr. Stilley, he requested a public hearing, which was conducted before Panel B on June 20, 2008. Regular Panel B members Michael Cogbill, Henry Hodges, and Barry Deacon were not available for the hearing. Reserve Panel members William P. Watkins, III, of Rogers and Joe A. Polk of Little Rock served for the hearing.

As a result of an Order by then-Circuit Judge James Marschewski in <u>Parker v. Perry</u>, Sebastian Circuit No. CV-2002-276, on January 18, 2005, Mr. Stilley was found in contempt and sentenced to thirty (30) days in jail and a fine of $50.00 a day until he complied with the provisions of the orders of that court. On September 14, 2006, the Arkansas Supreme Court affirmed the Circuit Court judgment in <u>Stilley v. Fort Smith School District</u>, No. 05-666, 367 Ark. 193. The Opinion gives a summary of the history of the matter up to that date. A petition for

rehearing was denied on October 26, 2006. The Mandate issued and the matter was back before the Sebastian Circuit Court in CV-2002-276, <u>Parker v. Perry</u>. In the interval, Judge Marschewski was appointed a United States Magistrate Judge in Fort Smith and Stephen Tabor was appointed in his place as a Circuit Judge in Sebastian County.

Judge Tabor issued the Order directing Mr. Stilley to report to jail on February 15, 2007, to begin serving the sentence imposed by Judge Marschewski in January 2005. Mr. Stilley surrendered, but was permitted to serve his sentence on day-time "work release," which allowed him to work in his law office by day and spend nights in jail. On March 2, 2007, Mr. Stilley filed for a Writ of Habeas Corpus in federal court in Fort Smith, docketed as 07-CV-2020, and styled <u>Stilley v. Tabor</u>. Mr. Stilley sought a "stay" of his State jail sentence while his federal habeas action was proceeding. The motion for "stay" was denied by United States Magistrate Judge Bryant, and then by the District Court on March 13, 2007. Mr. Stilley was released from jail and, on April 23, 2007, filed a Motion to Withdraw Petition in his federal "habeas" case. The federal court entered Judgment dismissing that case on May 16, 2007. Lengthy documents related to the federal "habeas" action are omitted here as not being essential to this Complaint.

Hearings were conducted in this matter on March 14, 2007 (by Judge Tabor), March 22, 2007, (by Judge Cox), and March 26, 2007 (by Judge Tabor). Judge Tabor then entered his Order on March 26, 2007, finding Mr. Stilley in contempt and remanding him to jail without eligibility for "work-release," and subject to the terms set out in the Order.

On May 2, 2007, Judge Tabor conducted another hearing in <u>Parker v. Perry</u>. He then referred this matter to this office. At the March 14, 2007, hearing Judge Tabor clearly informed Mr. Stilley that matters that settled in the 2006 appeal would not be relitigated in further

proceedings in <u>Parker v. Perry</u>. While Judge Tabor was unavailable and out of state after the March 14, 2007, hearing, on March 15, 2007, in direct defiance of Judge Tabor's orders, Mr. Stilley caused subpoenas and deposition notices to be issued to compel the appearance of certain persons and officials, including Judge Marschewski, at depositions Mr. Stilley planned to take on March 23, 2007, in <u>Parker v. Perry</u>, Sebastian Circuit No. CV-2002-276, for the purpose of relitigating issues that were already decided and settled in the 2006 state appeal. Judge Fitzhugh granted a motion quashing several of the depositions. Judge Cox heard the motion to quash these subpoenas on March 22, 2007. After Judge Cox ruled that the subpoenas would be quashed, Mr. Stilley withdrew his subpoenas in open court. Judge Tabor's "referral" letter details specific complaints he makes against Mr. Stilley, arising out of these events, including (1) Stilley's non-compliance with court orders to pay money sanctions and (2) by his attempting to relitigate matters settled by court rulings and appeals, in direct defiance of Judge Tabor's directives to not pursue such matters when Stilley had subpoenas issued and served on several witnesses for their depositions to pursue the settled matters that were not to be relitigated.

No live testimony was offered by either side at the hearing. Mr. Stilley declined to testify. Upon consideration of the formal complaint and attached exhibit materials, the response to it, and other evidence before it, and the Arkansas Model Rules of Professional Conduct, Panel B of the Arkansas Supreme Court Committee on Professional Conduct finds:

A. The Panel unanimously finds that Mr. Stilley's conduct violated Rule 3.4(c) in that in direct defiance of Judge Tabor's directives from the bench at the hearing on March 14, 2007, Mr. Stilley had subpoenas and deposition notices issued on March 15, 2007, to compel certain witnesses, including Judge Marschewski, to attend depositions to be conducted by Mr. Stilley for

the purpose of attempting to relitigate issues already settled in the appeal in <u>Parker v. Perry</u>. This action had no substantial purpose other than to burden those third persons who were subpoenaed, including Dr. Beran, Judge Marschewski, Judge Jim Spears, Mayor Ray Baker, and Sam Sicard. Arkansas Rule 3.4(c) requires that a lawyer shall not knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists.

B. The Panel unanimously finds that Mr. Stilley's conduct violated Rule 4.4(a) in that in direct defiance of Judge Tabor's directives from the bench at the hearing on March 14, 2007, Mr. Stilley had subpoenas and deposition notices issued on March 15, 2007, to compel certain witnesses, including Judge Marschewski, to attend depositions to be conducted by Mr. Stilley for the purpose of attempting to relitigate issues already settled in the appeal in <u>Parker v. Perry</u>. This action had no substantial purpose other than to burden those third persons who were subpoenaed, including Dr. Beran, Judge Marschewski, Judge Jim Spears, Mayor Ray Baker, and Sam Sicard. These persons were required to obtain counsel and file motions to quash the subpoenas. Arkansas Rule 4.4(a) requires that, in representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person.

C(1). The Panel unanimously finds that Mr. Stilley's conduct did not violate Rule 8.4(d) on the charge that in his letter published March 30, 2007, in the Southwest Times Record, he asserted that Judge Marschewski and the Sebastian County Circuit Court gave him the choice between "stealing client funds and breaching client confidences, or 30 days jail,..." and that he chose the latter. Arkansas Rule 8.4(d) provides that it is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice.

Page 4 of 6

C(2). The Panel unanimously finds that in the hearing on March 14, 2007, Mr. Stilley stated that he intended to put on witnesses "who will testify that Judge Marschewski lied when he said he was not represent.... [cut off by the Court]" By this statement, Mr. Stilley engaged in conduct that is prejudicial to the administration of justice by accusing a judge of lying in a legal proceeding, and especially where the same allegation was part of the issues on appeal in a case, Stilley v. Fort Smith School District et al., that had been decided adversely to Mr. Stilley on September 14, 2006. Arkansas. Rule 8.4(d) provides that it is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice.

D. Mr. Stilley's conduct, as detailed herein, is found to be "serious misconduct" as defined in Section 17.B of the Supreme Court's Procedures Regulating Professional Conduct of Attorneys at Law.

**WHEREFORE**, it is the decision and order of the Arkansas Supreme Court Committee on Professional Conduct, acting unanimously through its authorized Panel B, that **DISBARMENT PROCEEDINGS BE INITIATED** against the Arkansas law license of **OSCAR AMOS STILLEY**, Arkansas Bar ID# 91096, for his conduct in this matter. The Panel further unanimously finds that Mr. Stilley's law license be placed on interim suspension effective on the date this Findings and Order is filed of record with the Clerk of the Arkansas Supreme Court, during the pendency of disbarment proceedings. The Office of Professional Conduct is authorized to add or supplement the pending disbarment action against Mr. Stilley, No. 08-73, arising from Committee action in December 2007 with the additional charges found here.

ARKANSAS SUPREME COURT COMMITTEE
ON PROFESSIONAL CONDUCT - PANEL B

By: _Valerie L. Kelly_____

Valerie L. Kelly, Chair, Panel B

Date: _June 23, 2008_____

**IN THE SUPREME COURT OF ARKANSAS**

———————————* * * * * * * * * *

STARK LIGON, EXECUTIVE DIRECTOR,
COMMITTEE ON PROFESSIONAL CONDUCT          PETITIONER

vs.                  Case No. CPC 2007-062

OSCAR STILLEY                RESPONDENT

———————————* * * * * * * * * *

BE IT REMEMBERED that on the 20th day of June, 2008, before the HONORABLE JUDGE VALERIE KELLY, Special Law Judge, at the Justice Building, 625 Marshall, Room 101, Little Rock, Arkansas at 10:20 a.m., the above styled Claim came on for Hearing and Testimony and was introduced as follows:

<u>APPEARANCES</u>:

      Joe Polk, Board Member
      John Rush, Board Member
      Sylvia Orton, Board Member
      Bill Watkins, Board Member
      Rose Marie Word, Board Member

      MR. STARK LIGON
      Attorney at Law
      625 Marshall, Room 110
      Little Rock, Arkansas 72201

        *** On Behalf of the Petitioner ***

      MR. OSCAR STILLEY

        *** Pro Se ***

<u>COURT REPORTER:</u>  Linda Parker

**LINDA PARKER CERTIFIED COURT REPORTER**
**1-501-847-9448**

---

2

T A B L E   O F   C O N T E N T S

———————————INDEX OF WITNESSES

                                  Page No.

Opening Statement by the Honorable Valerie Kelly,
  Special Law Judge  . . . . . . . . . . . . . . . . .  5

INDEX OF EXHIBITS

Respondent's Exhibit Number One (1)
  Motion to Dismiss Complaint . . . . . . . . . . . . 88
Petitioner's Exhibit Number One (1)
  Complaint . . . . . . . . . . . . . . . . . . . . . 89
Proffered Petitioner's Exhibit Number Two (2)
  Attorney's Oath . . . . . . . . . . . . . . . . . . 90
Proffered Petitioner's Exhibit Number Three (3)
  Motion for Admission Pro Hac Vice
  dated April 20, 2006 . . . . . . . . . . . . . . . . 91
Proffered Petitioner's Exhibit Number Four (4)
  U.S. District Court -- Eastern
  District of Tennessee, case #06-cv-63 . . . . . . .  92
Proffered Petitioner's Exhibit Number Five (5)
  U.S. District Court -- Western
  District of Arkansas (Fort Smith),
  case #06-mc-42 . . . . . . . . . . . . . . . . . . . 93

**LINDA PARKER CERTIFIED COURT REPORTER**
**1-501-847-9448**

---

3

Proffered Petitioner's Exhibit Number Six (6)
  Motion for Admission Pro Hac Vice
  filed 6/7/08 . . . . . . . . . . . . . . . . . . . . 94
Proffered Petitioner's Exhibit Number Seven (7)
  E-mail Exchanges dated July 12, 2006
  Between Stark Ligon and Oscar Stilley . . . . . . . . 95
Proffered Petitioner's Exhibit Number Eight (8)
  Motion to Enforce Sanctions and Attached
  Documents filed 8/14/04 . . . . . . . . . . . . . . . 96
Proffered Petitioner's Exhibit Number Nine (9)
  Order filed 10/4/02 . . . . . . . . . . . . . . . . . 97
Proffered Petitioner's Exhibit Number Ten (10\
  Order of the Court filed 9/22/04  . . . . . . . . . . 98
Proffered Petitioner's Exhibit Number Eleven (11)
  Judgement filed 1/18/05 . . . . . . . . . . . . . . . 99
Proffered Petitioner's Exhibit Number Twelve (12)
  Pacer Documents from the United States
  District Court, District of Nevada,
  case number 06-cr-00376 Consisting
  of a Pro Hac Vice Application and
  attached Documents . . . . . . . . . . . . . . . . . 100
Proffered Petitioner's Exhibit Number Thirteen (13)
  Pacer Documents from the United States
  District Court, District of Arizona,
  Orders and other Documents . . . . . . . . . . . . . 101

**LINDA PARKER CERTIFIED COURT REPORTER**
**1-501-847-9448**

---

4

Proffered Petitioner's Exhibit Number Fourteen (14)
  Opinion Delivered June 21, 2007
  in case number 06-972 . . . . . . . . . . . . . . . 102
Petitioner's Exhibit Number Fifteen (15)
  CPC 2007-062 . . . . . . . . . . . . . . . . . . . . 103

**LINDA PARKER CERTIFIED COURT REPORTER**
**1-501-847-9448**

**Page 5**

```
 1              P R O C E E D I N G S
 2         JUDGE KELLY:  This Hearing will come to
 3    order.  Today is the 20th day of June, 2008.  This
 4    is a public Hearing in the case of Respondent
 5    Attorney Oscar Stilley, Case No. CPC 2007-062,
 6    conducted pursuant to Section 11 of the Arkansas
 7    Supreme Court procedures regulating professional
 8    conduct of attorneys at law.  This case is being
 9    recorded by Certified Court Reporter, Linda S.
10    Parker.  The Office of Professional Conduct is
11    represented by Executive Director, Stark Ligon.
12    The Respondent Attorney, Oscar Stilley, is present
13    and is not represented by Counsel.  A copy of this
14    Hearing document that I am now reading from has
15    been provided to both Counsel.
16         I am Valerie Kelly, the panel lead
17    chairperson.  The panel members today are to my
18    left, Joe Polk, John Rush, Sylvia Orton, Bill
19    Watkins, and Rose Marie Word.  Panel member
20    Watkins is sitting in place of regular panel B
21    member Michael Cottonfield who has recused from
22    sitting on this case.  Panel member Polk is
23    sitting in place of regular panel B member Barry
24    Beagan who has recused from sitting on this case.
25         A valid decision was made by another panel
```

**LINDA PARKER CERTIFIED COURT REPORTER**
**1-501-847-9448**

**Page 6**

```
 1    and communicated in writing by the Respondent
 2    Attorney who has filed a timely request for this
 3    public Hearing.  This is a de novo Hearing.  This
 4    panel does not know the outcome or result of the
 5    ballot vote.  This panel will make a new decision
 6    based on the evidence presented today.  In advance
 7    of this Hearing the panel members received copies
 8    of the Complaint, response, and any rebuttal filed
 9    in this case for review prior to this Hearing.
10    The procedures provide that all of these documents
11    were made available to the Respondent Attorney
12    prior to the ballot vote stage of this case.
13    Theses documents are collectively now made a part
14    of the Hearing records as Exhibit One (1).  Mr.
15    Ligon, do you have Exhibit One (1)?
16         MR. LIGON:  Yes, Madam Chair.  I've got a
17    couple of extra.  It appears all the members have
18    it.  I had given Mr. Stilley a copy to put on his
19    desk.  I had one marked as Petitioner's One (1),
20    but it's basically the pleadings packet, the
21    Complaint response and then a one page rebuttal
22    from Judge Tabor, which at this time I will offer
23    into evidence as Petitioner's Exhibit One (1).
24         JUDGE KELLY:  Do you have any objection, Mr.
25    Stilley?
```

**LINDA PARKER CERTIFIED COURT REPORTER**
**1-501-847-9448**

**Page 7**

```
 1         MR. STILLEY:  What are we looking at?
 2         MR. LIGON:  Just for the record the copy I
 3    had was page numbered by a machine in the lower-
 4    right corner.  The ones you had did not come
 5    through too clearly due to multiple copies, so the
 6    one I'm tendering to the Reporter in addition to
 7    that has been newly machine numbered in the bottom
 8    center of the page.  Unless there's an objection,
 9    I move the admission of Petitioner's One (1) and
10    to leave it with the Reporter.
11         JUDGE KELLY:  Mr. Stilley?
12         MR. STILLEY:  Just a minute, if I may.  I
13    object to the transcript on the grounds that there
14    was an attempt made by Oscar Stilley to do
15    depositions of the accuser and these depositions
16    have not been allowed.
17         JUDGE KELLY:  Mr. Ligon, do you have any
18    response?
19         MR. LIGON:  The depositions were issued at
20    Mr. Stilley's request by our office, its
21    administrative function to the extent, I believe -
22    - I'm not sure which transcript that Mr. Stilley
23    is speaking of.  I need to ask if it's Judge Tabor
24    so that I don't go spending your time talking
25    about irrelevant judges who are not a part of this
```

**LINDA PARKER CERTIFIED COURT REPORTER**
**1-501-847-9448**

**Page 8**

```
 1    Motion.
 2         MR. STILLEY:  It's all transcripts because...
 3         MR. LIGON:  Madam Chairperson and members of
 4    the panel, to the extent that there are
 5    transcripts in here of Hearings that I think were
 6    conducted by Judge Tabor and by Judge Cox, I don't
 7    recall if there was a Hearing conducted by Judge
 8    Fitzhugh.  I believe that covers two.  Then those
 9    subpoenas were issued and if they were served,
10    those judges filed Motions to Quash.  Mr. Stilley
11    responded to them.  The Chair ruled and quashed
12    his Motions for three of them for depositions
13    prior to the Hearing and the only one I'm aware of
14    served before the Hearing was on Judge Tabor, and
15    that was likewise quashed earlier this week.  And
16    I think the only thing I can really say is they
17    are official actions as opposed to any private
18    mental impressions they had or on the record in
19    the transcripts and in the orders that are signed
20    by those judicial officers.
21         MR. STILLEY:  May I reply to that?
22         JUDGE KELLY:  Yes.
23         MR. STILLEY:  When you look back at the past
24    history of this body, you see other judges have
25    come in to give testimony, and they have given
```

**LINDA PARKER CERTIFIED COURT REPORTER**
**1-501-847-9448**

1  depositions, and I haven't seen any good reason
2  that we would not allow these depositions in this
3  matter.  I furthermore don't know the reason we
4  would allow these transcripts to come in without
5  the assistance of being able to confront the
6  accuser and establish the necessary facts to put
7  this into context.  I have not heard anything from
8  the Executive Director that would lead me to
9  believe these are proper by themselves.
10      MR. LIGON:  Madam Chairperson, just limit it
11  to rebuttal to what Mr. Stilley just said.  I
12  would submit there is a difference between a
13  judicial officer who voluntarily comes to a
14  Hearing with or without subpoena, or voluntarily
15  gives a deposition, and one who decides not to
16  voluntarily come.  To the extent that that has
17  happened in other cases, different cases have
18  different facts.  In this case the record speaks
19  for itself in regard to any judicial officers
20  whose name or word or order appears in Exhibit One
21  (1) and the actions whether voluntary or
22  involuntary.
23      MR. STILLEY:  Can I speak to that?  This is a
24  quasi criminal proceeding and we've heard the
25  Executive Director say, "Well, there's a

1  difference if the Judge voluntary shows up."  We
2  all know we have a long history of compulsory
3  process to produce witnesses.  That's a lot at
4  stake in this.  It's an important procedure.
5      JUDGE KELLY:  Mr. Stilley, could you speak
6  louder?
7      MR. RUSH:  I can't understand what you're
8  saying at all.
9      MR. STILLEY:  I'm sorry.  I'm sorry.  I speak
10  too softly.  Are we picking up on this device
11  here?
12      JUDGE KELLY:  That's for the Court Reporter.
13      MR. STILLEY:  This is a quasi criminal
14  procedure.  The public perception is very
15  important.  And Mr. Ligon has argued that there's
16  a difference between a Judge who wants to come and
17  a Judge that doesn't want to come.  I have not
18  heard any citation of authority.  That appears to
19  be a brand new concept with no support in the law.
20  This is too important of a proceeding to tell only
21  one class of people, judges, "You get to show up
22  and testify if you want to, but if you don't, then
23  you can make the accusations and we'll protect you
24  and we won't let anybody else force you to be
25  confronted about your accusations."  We know what

1  the Arkansas constitution says.  You don't give
2  special privileges.  It sounds pretty much like a
3  special privilege to me.  It is a special
4  privilege, it is prejudicial to the rights of
5  individuals, in this case the rights of the
6  Respondent.  On these grounds it seems very clear
7  to me, you can't let these transcripts come in.
8  No confrontation.  No right to cross examine.  No
9  right to clarify.  It's hearsay just coming in
10  without a good basis and in a manner that would be
11  prejudicial to the rights of the Respondent.
12      MR. LIGON:  Mr. Stilley asked for a citation.
13  In Committee Case 2002-077, Mr. Stilley had
14  requested, and our office issued, subpoenas I
15  think for a deposition, if I remember correctly,
16  five years ago for the Arkansas Supreme Court.
17  The Court, in a written communication to me,
18  quashed those subpoenas.  That case went through
19  the Committee on appeal with the Arkansas Supreme
20  Court.  It certainly was not reversed or in any
21  way that I know of was there a comment in that
22  Court's opinion that indicated what Mr. Stilley
23  says to be the law.  He was denied the right in
24  that case to subpoena certain judicial officers.
25  To my recollection he also filed a certain

1  petition with the Arkansas Supreme Court and that
2  was denied, and so I offer that as the -- I don't
3  have the Arkansas Supreme Court case number right
4  in front of me, but it was the one that billed to
5  the Committee 2002-077.
6      MR. STILLEY:  Your Honor, If you'd indulge me
7  I'd like to respond to that.  The only citation
8  that we've got is the citation to a previous case.
9  That case is still alive to the extent there's a
10  suspensed Respondent.  At this point in time the
11  six month suspension is about halfway through.
12  Judge Hendren, the Chief Justice of the Eastern
13  and Western District of Arkansas, issued an
14  opinion on a show cause order which indicated --
15  he didn't actually -- he said it was unnecessary
16  to do the full due process analysis, but he did
17  say that not every violation of due process arose
18  to constitutional dimensions.  Well, surely we're
19  not going to take the... Surely we're not going
20  to rely on an order of that nature and say,
21  "Because of this order of this nature, we're not
22  going to" -- that becomes a real law and we didn't
23  hear anything about any case law from anywhere
24  else.
25      And we had the Judges who issued that order

13

```
1    and quashed their subpoenas despite the fact that
2    they wouldn't chair the panel.  Nobody claimed
3    that they were.  They were the ones that had the
4    matter on appeal.  When you look at the table of
5    the contents or table of authorities, Mr. Ligon's
6    brief didn't have the section that Respondent
7    Oscar Stilley raised in that case.  The Arkansas
8    Supreme Court did not address that specific
9    argument that this particular section required the
10   chair of the panel to consider the cite of this,
11   not to mention the fact that we had an order that
12   was issued without notice, without being heard,
13   without anything -- I mean, if anybody here can
14   make an argument that that's due process, I'd like
15   to hear it.  The fundamental basic essence of due
16   process is the right to notice and the opportunity
17   to be heard at a reasonable time, in a reasonable
18   manner.  There was no opportunity to be heard
19   there.  Surely we're not going to take that as a
20   sole authority to say, "Hey, we can let this in
21   Respondent doesn't have a right to confront unless
22   the Judge wants to."
23        JUDGE KELLY:  Mr. Stilley, your objection is
24   going to be overruled.  The packet will come in as
25   Exhibit One (1).
```

14

```
1         (WHEREUPON, Petitioner's Exhibit Number One
2    (1) was marked and appended on page 88.)
3         JUDGE KELLY:  The initial notice letter
4    scheduling this public Hearing notified the
5    parties to this case that the Hearing would be
6    scheduled for no more than two hours unless a
7    timely request was received and granted to allow
8    additional time for this Hearing.  A request for
9    additional time was timely received and the chair
10   has granted additional time to allow a total of
11   five hours for this Hearing.  From the order dated
12   June 6, 2008 this Hearing will proceed as follows:
13   We will have a Hearing from 10:00 a.m. to 12:00
14   noon, a lunch from 12:00 noon to 1:00 p.m., and
15   the Hearing will proceed from 1:00 p.m. to 4:00
16   p.m.  Mr. Stilley, the Chair will take note that
17   we did start this morning at 10:24 rather than
18   10:00.
19        MR. STILLEY:  Thank you, Your Honor.  Let me
20   say this.  I certainly do not want to waste this
21   Court's time so I'll try to get to the issues and
22   I'm sure Mr. Ligon will too and we'll try to get
23   this done as soon as possible.  I don't see a
24   reason that we would -- that the late start would
25   have a bearing.
```

15

```
1         JUDGE KELLY:  At the end of the Hearing the
2    panel shall go into executive session closed to
3    all the panel members to deliberate on and decide
4    this case and determine what disciplinary action,
5    if any, should be taken.  The public Hearing will
6    then be resumed and the panel shall announce its
7    findings and decision immediately and in open
8    session.  The votes of the individual panel
9    members shall be announced if the decision is not
10   unanimous.  If a majority of the panel votes to
11   caution, reprimand, or suspend a Respondent
12   Attorney, the Office of Professional Conduct will
13   prepare, with the advise and consent of the panel,
14   the Findings and Order which will be signed by the
15   panel Chair and filed with the Supreme Court clerk
16   as a public record.  A copy of the Findings and
17   Order will be properly provided by mail to the
18   Respondent Attorney and any Counsel.  Pursuant to
19   Section 12 of the procedures on appeal, if either
20   the Respondent Attorney or the Executive Director
21   of the Office of Professional Conduct are agreeing
22   by the action of this panel at this public
23   Hearing, either party may appeal to the Arkansas
24   Supreme Court by filing written notice of appeal
25   with the Office of Professional Conduct within
```

16

```
1    thirty days after the filing of this panel's
2    written action, with the Findings and Order with
3    the clerk of the Arkansas Supreme Court.  This
4    panel may stay the effective date of any panel
5    action pending to the Arkansas Supreme Court.
6    Section 12(a) of the procedures provides that
7    there shall be no appeal by Respondent Attorney of
8    a panel's decision to file an action for
9    disbarment pursuant to Section 13 of the
10   procedures.  Are there any preliminary matters to
11   be addressed to the Chair or any individual panel
12   member before presentation of evidence in the
13   public Hearing?
14        MR. LIGON:  Not from our office.
15        JUDGE KELLY:  Any preliminary matters, Mr.
16   Stilley?
17        MR. STILLEY:  Yes, Your Honor, I happen to
18   have a preliminary matter.  I'm sure you read the
19   Motion to Dismiss the claim.  I'll have to get a
20   ruling on certain statements that I believe to be
21   accurate statements of law, and one is truthful
22   statements are privileged under the first
23   amendment.  I'd like a ruling on that.
24        JUDGE KELLY:  I don't understand.
25        MR. STILLEY:  The allegation is that truthful
```

17

1    statements are privileged under the first
2    Amendment, and I would like a ruling from the
3    Chair of the panel that that's correct, that's a
4    correct statement of the law.
5        MR. POLK:  Do we have a copy of that Motion?
6        MR. STILLEY:  Your Honor, in that case, I
7    would just like to take a really short recess and
8    let everybody see a copy.  Can we do that?  I
9    don't think we're going to run out of time.
10       JUDGE KELLY:  Response, Mr. Ligon?
11       MR. LIGON:  It's in the original file which I
12   sent to the Board.  If you have two minutes we'll
13   reproduce a copy here today.
14       JUDGE KELLY:  We'll take a brief break.  We
15   can go off the record.
16               (Off the record)
17       JUDGE KELLY:  Are we ready to go back on the
18   record?
19       MR. STILLEY:  The Respondent is.
20       JUDGE KELLY:  Will this be an exhibit to the
21   Hearing?
22       MR. STILLEY:  Sure.
23       MR. LIGON:  May I suggest, Madam Chairman,
24   that it be Respondent's One (1)?
25       JUDGE KELLY:  I have the Motion to Dismiss

18

1    Complaint which will be marked as Respondent's
2    Exhibit One (1).
3        (WHEREUPON, Respondent's Exhibit Number One
4    (1) was marked and appended on page 89.)
5        MR. STILLEY:  Okay.  If we might proceed, the
6    position is that truthful statements are
7    privileged under the First Amendment, which by
8    privilege, what I'm trying to say is that a person
9    cannot be punished for truthful statements.  I'd
10   like to get a ruling on whether or not the panel
11   agrees with that statement.
12       JUDGE KELLY:  Do you have a response, Mr.
13   Ligon?
14       MR. LIGON:  Madam Chair, not being a mind
15   reader my guess is that first item in
16   Respondent's One (1) is a setup and a lead-in to
17   basically rearguing the issues that were in
18   Committee 2006-067, the Judge Marschewski case,
19   which is already been before this panel back on
20   December 14, 2007.  Also, I think it would really
21   depend on the statement, and I believe that's
22   asking -- this statement the way it's phrased, is
23   asking for an advisory opinion on a
24   (unintelligible) statement without the facts to
25   support it and therefore it's improper.  Also I

19

1    would note that under the procedures the panel
2    Chair has already with this Motion, denied it, but
3    also my sense tells me it's an attempt by Mr.
4    Stilley to reargue with six people and see if he
5    can get a different result.
6        MR. STILLEY:  Your Honor, may I respond to
7    that?
8        JUDGE KELLY:  Yes.
9        MR. STILLEY:  The Executive Director is
10   correct in the acknowledging and suggesting that
11   there might be a problem with 06-067.  That
12   doesn't mean that we have a right or a reason to
13   violate the First Amendment.  Again, obviously
14   it's not Respondent that's bringing that up at
15   this point in time, it's the Executive Director.
16   The Executive Director is saying, "Oh, that's
17   seeking an advisory opinion," but without
18   statements in this case, and everybody knows what
19   those statements are, they are in the Complaints.
20   Obviously what the Respondent is seeking is a
21   ruling with respect to the statements that are
22   alleged to be punishable in this matter.  In fact,
23   it's not requesting the advisory opinion.  That is
24   requesting enough information in order to proceed
25   intelligently.

20

1        The Chair of the panel has probably noticed
2    that there's not been a request for
3    reconsideration.  However, to the extent that
4    there has, the Respondent would respectfully ask
5    for reconsideration with reason.  The original
6    Order in signing this Motion simply denied the
7    Motion.  It didn't state the reasons why.  Without
8    a statement of the reasons why, it's not
9    practical.  It's not possible to effectively ask
10   the Court to reconsider and to give consideration
11   of error.  In this case we have statements.  Mr.
12   Ligon has not alleged that they are -- he's not
13   alleged falsity.  So when there is a request to
14   say that truthful statements are privileged under
15   the First Amendment, obviously the Executive
16   Director knows this is a problem.
17   Presumably we're going to try this matter on the
18   basis of the Complaint.  However, when you look in
19   the brief, the brief says Gentile versus State Bar
20   of Nevada, there is no question that speaks
21   critical of the exercise of the state's power lies
22   at the very center of the First Amendment.  Nevada
23   seeks to punish the dissemination of information
24   relating to alleged governmental misconduct, which
25   only last time we described as speech which has

21

1    traditionally been recognized as lying at the core
2    of the First Amendment citing Butterworth versus
3    Smith, 1990 U.S. Supreme Court case.  Now I don't
4    need to give you all the numbers on this.  They
5    are in the brief, but more importantly when you
6    look at a case in 1995, just five years later, in
7    Florida Bar versus Went for It, Inc., the court,
8    the high court, said "Speech by professionals
9    obviously has many dimensions.  There are
10   circumstances in which we will accord speech by
11   attorneys on public issues and matters of legal
12   representation the strongest protection our
13   Constitution has to offer.  See, e.g., Gentile
14   Versus State Bar of Nevada."  That is central to
15   all the speech that Oscar Stilley is alleged to
16   have spoken for which there is an attempt to
17   punish Oscar Stilley.
18          Now, if the Executive Director wants to try
19   to say that this speech is not speech critical of
20   the exercise of the state's power, sure, he could
21   say that.  He's not said that.  He couldn't
22   reasonably say that.  We all know that.  So we've
23   got U.S. Supreme Court cases saying that we're
24   going to give this type of speech the strongest
25   protection that the Constitution has to offer.

22

1    Now, let's stop and think about what that means.
2    What that means is that if it's possible to punish
3    Oscar Stilley for such truthful speech, it's
4    possible to punish anybody else for the same
5    speech.  And what that means is that the First
6    Amendment no longer protects any speech that is
7    deemed too critical of the government.  If the
8    judicial branch can be thus protected, then why
9    not the executive branch?  Why not the legislative
10   branch?  Why not administrative agencies?  You can
11   protect them all if you can protect them against
12   critical speech, but there's a problem.  The First
13   Amendment to the Constitution says "You can't do
14   that.  Sorry.  That won't work."
15          On the following page, page 3 of 5, in
16   Garrison versus Louisiana says -- well, let me
17   move on down to Standing Committee versus Yagman,
18   cites the United States Supreme Court case, and it
19   says, "Truth is an absolute defense."  And in the
20   bold print it says, "Moreover, the disciplinary
21   body bears the burden of proving falsity."  In
22   order to protect the First Amendment at all, we
23   have to first come to this very first conclusion,
24   truthful statements are privileged under the First
25   Amendment.  That is, they are not punishable in

23

1    any court, tribunal or otherwise.  Truthful
2    statements are protected.
3          Now let's go back just a little bit here in
4    Garrison versus Louisiana.  It says, "The First
5    and Fourteenth Amendments embody our 'profound
6    national commitment to the principle that debate
7    of public issues should be uninhibited, robust,
8    and wide-open, and that it may well include
9    vehement, caustic, and sometimes unpleasantly
10   sharp attacks on government and public
11   officials.'"  When you look at this, there's
12   only one conclusion that you can come to.
13   Truthful speech is protected in the case of an
14   attempt to sanction a lawyer just as it's
15   protected for everybody else.  That's the ruling
16   that Oscar Stilley is asking for.  It seems like a
17   slam dunk, but I'd like to hear it because without
18   knowing, without knowing what the rules are before
19   the proceeding starts, how can anyone protect
20   their rights?  I'd like to show you case law on
21   that, but if you don't tell the attorney what the
22   basis for punishment is before the proceeding
23   starts, then that clearly violates due process.
24          JUDGE KELLY:  Mr. Stilley, the Chair
25   previously has denied your Motion to Dismiss the

24

1    Complaint, and I am going to take that argument
2    you just made as a Motion for Reconsideration of
3    the Chair's previous ruling, and the Chair will
4    deny your Motion to Reconsider, so your Motion to
5    Dismiss the Complaint is denied.
6          MR. STILLEY:  There's two different Motions.
7    We've got the Motion to Dismiss the case, but
8    we've also got the Motion for a ruling, a ruling
9    to the effect that truthful statements are
10   privileged under the First Amendment.  Unless
11   there is some reasonable basis for saying this
12   case law is not accurate or other case law has
13   overruled it, it will only make sense that we go
14   off on this slightly different question and that
15   the Chair of the panel rule yes, that it's true.
16   Truthful statements are privileged from punishment
17   before this tribunal or any other pursuant to the
18   First Amendment.
19          JUDGE KELLY:  Okay, Mr. Stilley, that
20   statement that you are reading is part of your
21   entire Motion to Dismiss the claim.  The Chair is
22   not going to go through each paragraph of the
23   Complaint and give you a ruling.  The ruling in
24   general is that your Motion to Dismiss is denied
25   and I do believe we need to move on.  Can we move

25

```
1    on now?
2        MR. STILLEY:  Well, that's one Motion.  I've
3    got another Motion to make.  That is a Motion for
4    a ruling that the Executive Director bears the
5    burden of proof of falsity of any statements
6    alleged to be punishable.  Now, we've got a little
7    difficultly there I recognize...
8        MR. LIGON:  Madam Chairman, I'd like to
9    interpose an objection.  First of all, with due
10   respect, the Chair has ruled.  It's denied on
11   Reconsideration, and what I think I'm hearing
12   really sounds more like a Motion for a Directed
13   Verdict at the close of the state's case.  I mean,
14   there isn't any proof unless somehow we're arguing
15   Petitioner's Number One (1).
16       JUDGE KELLY:  Do you have any response to
17   that, Mr. Stilley?  But as I said before, if you
18   are now on paragraph 3 of your Motion to Dismiss,
19   then the Chair's ruling is that the Chair is not
20   going to go through whichever particular
21   paragraphs you choose and give you an individual
22   ruling on it.  Your Motion to Dismiss and the
23   Motion to Reconsideration, they are both denied.
24       MR. STILLEY:  The Respondent respectively
25   requests a statement of the reason.  It doesn't
```

26

```
1    have to be fancy, but Respondent needs to know
2    reasons because if the reasons are understood,
3    then maybe we can make this go faster.  Also, it
4    would be of assistance to provide some sort of due
5    process because the Respondent needs to know the
6    basis for the denial, the reason, rather than just
7    "You lose."
8        JUDGE KELLY:  Well, the Chair considered your
9    argument and found it had no merit and denied your
10   Motion to Dismiss, so I think we need to move on.
11   It's denied, it's without merit, and that's what
12   we're going to proceed with today.
13       MR. STILLEY:  Could we have a vote of the
14   panel?  Can we take a vote?
15       JUDGE KELLY:  Mr. Ligon, do you have any
16   argument on the proposal to take a vote of the
17   panel on this matter?
18       MR. LIGON:  Section 8(b), Bravo, disciplinary
19   proceedings, I would argue that any disputes
20   concerning discovery or other matters are to be
21   determined by the Chair of the panel.  We would so
22   submit that a ruling has been made, and Mr.
23   Stilley should make his record and whatever he
24   needs to do with it later.
25       MR. STILLEY:  Your Honor, when Respondent
```

27

```
1    made a similar argument to Judge Hendren, Judge
2    Hendren said that this particular provision only
3    applied to discovery dispute.  This is not a
4    discovery dispute, this is a live Hearing.  So it
5    would seem to me to make sense where the
6    Respondent has no way of knowing the reason for
7    losing, that we let the rest of the panel put
8    their wisdom forth for us too.
9        JUDGE KELLY:  Mr. Stilley, your preliminary
10   Motion to Dismiss is denied.  If at the end of the
11   conclusion of evidence you want to do what is in
12   effect a Motion for Directed Verdict, the whole
13   panel will consider -- that will be considered at
14   that time.  I think at this time we need to
15   proceed with the Hearing.
16       MR. STILLEY:  Okay, let me make sure I
17   understand this correctly.  The was for a directed
18   verdict, and the entire panel will...
19       JUDGE KELLY:  I misspoke.  We'll address that
20   issue at the end of the Hearing, but I think that
21   the procedure is that if the Chair rules, if the
22   Chair rules on a Motion for Directed Verdict...
23       MR. STILLEY:  Well, but once again, it's not
24   very helpful to not know exactly what the rules
25   are, not know for example, I mean, on the next
```

28

```
1    thing here, where's the burden of proof?  With the
2    Respondent not knowing, who bears the burden of
3    proof?  How can the Respondent adequately protect
4    his rights if the Respondent thinks the burden of
5    proof is on the Director, and if after the Hearing
6    he discovers to his chagrin that the burden of
7    proof was on the Respondent, see, it's too late
8    then.  So I would respectfully request a ruling on
9    who bears the burden of proof of falsely giving
10   statements alleged to be punishable.
11       MR. LIGON:  Madam Chairperson, Section 7 of
12   the procedures...
13       MR. RUSH:  Speak up so I can hear you.
14       MR. LIGON:  Section 7 of the procedures, sub
15   c, Charlie, says "The burden of proof in
16   proceedings to seek discipline is on the Executive
17   Director."  7 sub b, Bravo, says that "The
18   standard of proof is a preponderance of the
19   evidence."  I think that answers questions at this
20   stage of the Hearing.
21       MR. STILLEY:  Well, if that's the case, then,
22   it seems to be a simple thing for this Chair to
23   rule that the Executive Director bears the burden
24   of proof of falsity of any statements alleged to
25   be punishable.
```

29

```
1      MR. POLK:  Move on.  It's been answered, man.
2      MR. STILLEY:  Well, now, I'd like...
3      MR. RUSH:  She's ruled.
4      MR. STILLEY:  Okay, so that is then correct
5   that the Executive Director bear the burden of
6   proof of any falsity of any statements alleged to
7   be punishable.
8      MR. POLK:  It's been answered.
9      MR. STILLEY:  And that is...
10      MR. POLK:  It's been answered.
11      MR. RUSH:  She denied the Motion.
12      MR. WATKINS:  Mr. Stilley, the rules of
13   procedure will govern this Hearing.  They've just
14   been read to you.  That's the answer.
15      MR. STILLEY:  Well...
16      MR. POLK:  If you don't understand them, get
17   a lawyer.
18      MR. STILLEY:  Your Honor...
19      MR. WATKINS:  I think it would behoove you to
20   obey the rulings of this Hearing.
21      MR. STILLEY:  Well, I...
22      MR. WATKINS:  To understand a ruling has been
23   made and continue to try to reargue is not going
24   to get you very far.
25      MR. STILLEY:  There's no attempt to reargue,
```

30

```
1   there's...
2      MR. WATKINS:  There's been a continuous
3   attempt to reargue, Mr. Stilley.  The ruling has
4   been made.
5      MR. STILLEY:  There's only an attempt to make
6   sure there's a clear understanding of the nature
7   of the ruling.
8      MR. WATKINS:  You've practiced as an attorney
9   for sixteen or seventeen years.  You understand
10   how it works.  A ruling has been made and you need
11   to stop while you have the opportunity.
12      MR. STILLEY:  I'm just asking for the Chair
13   or the Director to make it clear so that later on
14   the Respondent doesn't say the ruling is one thing
15   when that's not really what the ruling was.
16      JUDGE KELLY:  Mr. Stilley...
17      MR. WATKINS:  The ruling was that your Motion
18   was denied.
19      JUDGE KELLY:  What Mr. Hodges...
20      MR. WATKINS:  The rules control this body and
21   the burden of proof lies with the Executive
22   Director, if that answers your question.
23      MR. WATKINS:  Well...
24      MR. WATKINS:  There are no further grounds
25   for your question.
```

31

```
1      MR. STILLEY:  There are further grounds, and
2   that is proof of falsity.  I think that's where
3   the fight is at and I'd like a ruling on it.
4      JUDGE KELLY:  Okay, Mr. Stilley, your Motion
5   has been denied.  The Motion for Reconsideration
6   has been denied.  Are there any other preliminary
7   matters that you have for the panel to address
8   before we start?
9      MR. STILLEY:  Certainly, and that is I'd like
10   a ruling from the Chair of the panel that no act
11   is punishable is a violation of a court ordered
12   unless the conduct violates an explicit command.
13      JUDGE KELLY:  Mr. Stilley, it appears to me
14   that once again you are going paragraph by
15   paragraph through your Motion to Dismiss the
16   Complaint.  The Complaint as a whole has been
17   denied.  The Chair is not going to go through and
18   give you an individual ruling on each individual
19   paragraph, so I do believe that we need to -- are
20   there any other preliminary matters that have
21   nothing to do with your Motion to Dismiss?
22      MR. STILLEY:  Your Honor, what I would say
23   in response to that is that the filing of the
24   Motion to Dismiss the claim would not preclude any
25   motions that might seem related to that or that
```

32

```
1   the language here might jog somebody's
2   recollection.  I'm just trying to get rulings on
3   this so that I know how to proceed.  I'm not
4   trying to be disrespectful of this court in any
5   way.
6      JUDGE KELLY:  Mr. Ligon, do you have any
7   argument on the issue of whether Mr. Stilley is
8   entitled to have a paragraph by paragraph ruling
9   on his Motion to Dismiss Complaint?
10      MR. LIGON:  Madam Chair, I believe that's
11   been the discretion of the panel Chair.  Again, I
12   would reiterate, the way some of these items 1-8
13   on the first page of Respondent's One (1), Motion
14   to Dismiss Complaint, for instance #4, which talks
15   about "any explicit command of Judge Tabor," I
16   would -- if we can get into the evidentiary
17   portion of the case -- and I will say I'm
18   contemplating calling Mr. Stilley as a witness in
19   our case in chief -- then there is a transcript
20   which is Exhibit J, Juno, a Hearing of May 2, 2007
21   in which Mr. Stilley was present before Circuit
22   Judge Tabor, that I think needs to serve as a
23   factual basis before anybody can make an informed
24   judgement on that particular point in the Motion.
25      JUDGE KELLY:  Mr. Stilley, there's not any
```

33

```
 1          more argument on that particular issue.  Do you
 2     have any other preliminary matters that you need
 3     addressed before we get started?
 4          MR. STILLEY:  Yes.  I move to dismiss the
 5     entire charge because there's inadequate
 6     information, an inadequate charge in order to
 7     effectively defend the charge.
 8          JUDGE KELLY:  Do you have any response, Mr.
 9     Ligon?
10          MR. LIGON:  Madam Chair, I'm looking at
11     Petitioner's One (1) and each separate rule
12     violation is set forth with a specific factual
13     basis that goes with it and the rule that's
14     alleged to have been violated immediately
15     following that factual allegation, and we would
16     just submit that it is sufficiently detailed that
17     any Respondent Attorney should be on fair notice
18     as to the factual allegation and the specific rule
19     which they are alleged to have violated.
20          JUDGE KELLY:  Do you have a brief reply, Mr.
21     Stilley?
22          MR. STILLEY:  Yes, a brief reply, but there's
23     also a right to know the legal basis for the
24     charge too.
25          JUDGE KELLY:  So is that your only reply?
```

34

```
 1          MR. STILLEY:  That's my reply.
 2          JUDGE KELLY:  Then your Motion to Dismiss the
 3     charge will be denied.  Are there any other
 4     preliminary matters?
 5          MR. STILLEY:  Yes.  It's my understanding
 6     that an attorney can be punished based on
 7     proceedings and certain circumstances.  I'd like
 8     to request a ruling that anybody thinks that that
 9     line might be crossed, that that would be brought
10     to the attention of the Respondent to allow an
11     opportunity for corrected action.
12          JUDGE KELLY:  Do you have any response, Mr.
13     Ligon?
14          MR. LIGON:  No.
15          JUDGE KELLY:  We will move on.
16          MR. LIGON:  Madam Chair, I do have a citation
17     if I could get it into the record.  Previously I
18     had mentioned a Committee case, CPC 2002-077, the
19     appellate case number was 06-972 Arkansas Supreme
20     Court opinion delivered June 21, 2007.
21          JUDGE KELLY:  Is that all of the preliminary
22     Motions?
23          MR. LIGON:  Yes.
24          JUDGE KELLY:  Counsel, with the Office of
25     Professional Conduct going first, please identify
```

35

```
 1          for the record and the panel any live witnesses
 2     you anticipate presenting in this Hearing.
 3          MR. LIGON:  Only the Respondent, Oscar
 4     Stilley.
 5          JUDGE KELLY:  Do you have any witnesses, Mr.
 6     Stilley?
 7          MR. STILLEY:  Respondent has been denied
 8     opportunity to call any other witnesses that he
 9     had chosen to call so there are no witnesses that
10     Respondent has been able to produce.
11          JUDGE KELLY:  Okay.  At this time, would the
12     Court Reporter please swear in Mr. Stilley?
13          COURT REPORTER:  Would you raise your right
14     hand, please sir?  Do you swear or affirm the
15     testimony to be the truth, the whole truth, and
16     nothing but the truth?
17          MR. STILLEY:  I do.
18          COURT REPORTER:  Thank you, sir.
19          JUDGE KELLY:  Are there any additional
20     exhibits to be offered into the record of the
21     Hearing at this time?
22          MR. LIGON:  Only through the witness, Mr.
23     Stilley.
24          JUDGE KELLY:  Counsel, you may offer brief
25     opening statements at this time, if you wish,
```

36

```
 1          starting with Mr. Ligon.
 2          MR. LIGON:  Thank you, Madam Chair.  Members
 3     of the panel, I'll try to be very brief.  In your
 4     packet, Petitioner's One (1), after you get past
 5     the Complaint, you should find on page 11 on the
 6     lower right, the Opinion of the Supreme Court of
 7     Arkansas No. 05-666, Stilley versus Fort Smith
 8     School District.  I only point this out to you
 9     because literally the first page and the
10     conclusion of the paragraph at the top of the
11     second page, I believe, give a factual and timed
12     framework within which these charges in this case
13     are based.  Now, the discussion and the other
14     exhibits you see may range far afield from that,
15     and I wanted to ask you to concentrate on that.
16     There are essentially two issues here.  The
17     proceeding, which in Sebastian Circuit Court
18     stated as Civil 2002-276 started under then
19     Circuit Judge, James Marschewski.  Sometime in
20     late 2006, early 2007, Judge Marschewski became
21     United States Federal Magistrate Judge.  At that
22     point Stephen Tabor was appointed to Judge
23     Marschewski's vacant judgeship.  He picked up his
24     docket and I'll link it up as to Judge Tabor
25     became presiding Judge over the case that involves
```

37

1      Mr. Stilley and was lead to Judge Tabor's referral
2   here.
3      If you would write down a couple of dates in
4   sequence, I think these will help frame what I see
5   as the case.  On October 4, 2002 Judge Marschewski
6   issued an Order, and he ordered Mr. Stilley to pay
7   sanctions to FSSD, that's Fort Smith School
8   District, round it off, I'll call it Fourteen
9   Thousand Two Hundred Twenty-One Dollars
10  ($14,221.00), and to the University of Arkansas at
11  Fort Smith, UAFS, Twenty-One Hundred and Ninety-
12  Six Dollars ($2196.00), for a total of roughly
13  Sixteen Thousand Six Hundred Dollars ($16,600.00).
14  I think the proof produced in the record and today
15  will show that Mr. Stilley voluntarily made an
16  agreement and paid Two Hundred Dollar ($200.00)
17  per month monthly payments only to UAFS and made
18  four of those before he stopped making the
19  payments with the one that was due July 1, 2004.
20  No payments that I'm aware of are shown in the
21  records as having been made on the sanction
22  obligation to Fort Smith School District.  Roughly
23  in August 2004 the attorneys for both of those two
24  parties, UAFS and FSSD, brought the matter back to
25  the attention of the court by filing some type of

38

1   pleading, either a Motion to Enforce, a Notice of
2   Non-Compliance, or whatever.  They got the matter
3   back before Judge Marschewski.  There were two
4   Hearings in September 2004.  As a result of that,
5   Judge Marschewski issued an Order.  If you'll
6   write down September 22, 2004 is the Order, and
7   let me give you the brief history on that Order.
8      Mr. Stilley eventually appealed that
9   September 22, 2004 Order.  The Supreme Court
10  docket number is 05-13, and that case was
11  dismissed February 2, 2005 as not being a final
12  appealable Order.  Things rocked along.  Judge
13  Marschewski sets another Hearing which is held on
14  January 14, 2005.  If you'll write that date down.
15  As a result of that Hearing Judge Marschewski
16  enters an Order early the next week on January 18,
17  2005.  That Order is appealed eventually by Mr.
18  Stilley as Supreme Court case number 05-666 and
19  the Supreme Court affirmed the trial court on
20  September 14, 2006, which is the opinion you see
21  attached to Petitioner's One (1).
22     Now, once that appeal was filed and a mandate
23  issued in 05-666, which was on February 12, 2007,
24  and Judge Tabor, newly on the bench in place of
25  Judge Marschewski, enters an Order dated February

39

1      13, 2007 and basically executes or implements
2   these sanctions which have been ordered by Judge
3   Marschewski that basically stayed pending the
4   appeal of 05-666.  Mr. Stilley goes to jail under
5   kind of a work release.  I think he goes in in the
6   early evening and gets out in the morning.  He's
7   able basically to go to work, I think the records
8   will show.  There is a -- on March 2, 2007, the
9   next date to write down, Mr. Stilley files a
10  federal habeas corpus action in federal court in
11  Fort Smith.  On March 9, 2007 the federal
12  magistrate files a report recommending denial of
13  habeas relief.  The next critical date, March 14,
14  2007, Judge Tabor has another Hearing for Mr.
15  Stilley, and the transcript speaks for itself,
16  especially in talking about attempting to
17  relitigate settled issues.  Now, relitigating
18  settled issues means a claim by Mr. Stilley made
19  January 18, 2005 and subsequent pleading and
20  filing and Judge Marschewski made a false
21  statement or something like that at the January
22  18, 2005 Hearing.  Judge Marschewski should have
23  corrected his mistake, recused, and I think the
24  argument by Mr. Stilley would be that made Judge
25  Marschewski's Order of January 18, 2005 an invalid

40

1   Order because Judge Marschewski should have not
2   presided and not entered the Order.  I'll move
3   along very quickly.
4      Running throughout all this are the money
5   sanctions that were ordered by Judge Marschewski
6   October 4, 2002 and the non-compliance with and/or
7   non-payment of those sanctions for many years by
8   Mr. Stilley.  Then the second thrust of the
9   sanctions, if you will, against Mr. Stilley, arise
10  from his action, if I understand it correctly
11  based on the records, on March 15, 2007, which is
12  the day after Judge Tabor's Hearing.  Judge Tabor
13  announces, "I'm leaving the state and going to
14  Houston to tend to my sick father."  And kind of
15  words that I think any reasonable person would
16  recognize, "Don't do anything while I'm gone."  I
17  think he reset the Hearing, a continuation for
18  March 26, 2007.  Anyway, the day after the
19  Hearing, Mr. Stilley has a number of subpoenas
20  issued in the case for individuals and the primary
21  purpose, I won't say the sole purpose, but the
22  primary purpose was for attempting to depose these
23  individuals to establish Judge Marschewski lied
24  about serving on a UAFS or Westark Committee back
25  in 2001 or 2002.  Judge Fitzhugh, in Judge Tabor's

41

1 absence, quashed his subpoenas and then there's a
2 Hearing March 22 before Judge Cox. He is about to
3 quash other subpoenas then he grants Mr. Stilley's
4 last minute Motion to withdraw so all subpoenas go
5 away. Judge Tabor gets back on March 26, holds
6 the Hearing, finds there's no compliance, no
7 payments, orders Mr. Stilley jailed again for
8 contempt. Finally there is a Hearing on May 2,
9 2007, which is Exhibit J, and it appears that
10 within that is our statements by Mr. Stilley to
11 the effect, and I'll point this out as we get into
12 proof, to the effect of "I've listened to my
13 friends and I want to stop this and what can we
14 do, Judge, to get all this conflict resolved?"
15 Now, interestingly enough, the issue, one of
16 the issues is Mr. Stilley's dogged determination
17 to attempt to relitigate the issues with regard to
18 his allegations about, if you will, judicial
19 misconduct by Judge Marschewski, that are dealt
20 with in the Opinion September 14, 2006 in Stilley
21 versus Fort Smith School District. Now, look for
22 the record of payment or non-payment, non-
23 compliance with the money sanctions orders over
24 those years since October 2002 and look at Mr.
25 Stilley's relitigating or attempting to relitigate

42

1 old settled issues and also I think there will be
2 evidence produced that will show a most unusual
3 attempt to use a Tennessee lawsuit to put a
4 deposition of Judge Marschewski on a issue totally
5 unrelated to the Tennessee lawsuit.
6 JUDGE KELLY: Any opening statement, Mr.
7 Stilley?
8 MR. STILLEY: Yes. Your Honor, it seems to
9 me that this is a long opening statement speaking
10 about a lot of issues that really don't have
11 anything to do with what we're here for. We're
12 here for basically two sorts of accusations. One
13 is an accusation that Oscar Stilley violated some
14 Order of Judge Tabor. Respondent looked at it
15 very carefully and tried very carefully to get
16 someone to say or to show some specific Order,
17 some specific requirement that was set out by
18 Judge Tabor that was alleged to be violated. That
19 hasn't been forthcoming. There's also been the
20 attempt to punish based on statements, which as I
21 said earlier, are not alleged to be false. They
22 are alleged to be, I guess you would say,
23 uncomplimentary to some judicial officials because
24 I've already argued this morning, that is
25 protected. That is constitutionally protected

43

1 conduct. And I mean, you can talk about a lot of
2 other things, sure, but those other things really
3 don't have anything to do with what we're here on.
4 And the defense, obviously, on the issue of the
5 alleged violation of the Order is hey, let's see
6 the specific language that said, "Mr Stilley,
7 don't do A, don't do B, don't do C." When that
8 sort of language is laid out, it's going to be
9 obeyed. The Respondent may not like some orders,
10 but when the orders are laid out then they are
11 obeyed. There is not any such Order in this case.
12 No one has attempted to lay that out. No one has
13 attempted to say, "Here it is. It's a specific
14 direct command and you disobeyed it."
15 Now, let's move on to the speech. The speech
16 is -- I mean, it's not basically false. Without
17 an allegation of falsity there can be no proof of
18 falsity. So the only way Oscar Stilley can be
19 punished for this speech is to say that the
20 Executive Director has no burden of proof to prove
21 falsity. Falsity is not required and we're going
22 to punish on the basis of this speech anyway. The
23 U.S. Supreme Court says you can't do that. I know
24 Mr. Ligon has already alluded to 06-067. The fact
25 that something was done at another time doesn't

44

1 mean that it's legal to do the same thing again.
2 If a person has violated the supreme law of the
3 land, the thing to do is to stop, don't do it
4 again. This would be a great time to start. As I
5 told this panel, if there's some reason Oscar
6 Stilley is misreading this, if this is not the
7 law, make a reason ruling. Show the reason, maybe
8 be persuasive, but there's been no reason ruling.
9 There's been no basis for saying that the case law
10 cited by Oscar Stilley is not correct. It is
11 correct. The only thing we were asking, the
12 Respondent was asking, is just follow the law.
13 What would need to be done in order to follow that
14 law is to dismiss these charges, the charges of
15 having used language that was displeasing to
16 certain judges without alleging any falsity of it.
17 There's a couple of things in Mr. Ligon's
18 opening that I think merit comment. My
19 recollection or my notes here say that Mr. Ligon
20 says, "Any reasonable person, basically, would
21 recognize the tenor of what was said." That's not
22 the rule. That's not the rule for punishing
23 someone for violating an Order. The rule for
24 punishing someone for violating an order is
25 direct, unequivocal language, either permitting

45

```
1    conduct or requiring conduct.  That is the only
2    type of conduct that can result in punishment for
3    violating a court order.
4         As to the Fitzhugh and Cox subpoenas, or the
5    quashing by these two judges, the Fitzhugh Order
6    was entered before the Respondent was aware that
7    there was a Motion to Quash.  Now how can that
8    comply with due process?  The very essence of due
9    process is the right to be heard in a meaningful
10   time and meaningful manner.  When you don't have
11   any Hearing at all, surely that can't be
12   compliance.  We don't have to belabor the point
13   here, but -- and also there's a suggestion that
14   there was a second jail sentence for not paying
15   the money that was required.  Actually UAFS filed
16   a Motion that said, this, this, and this.  All
17   those amounts were added up and there was a
18   certified check from Arvest Bank that was taken
19   and presented to UAFS.  The only way that I can
20   see that there was any basis for putting Oscar
21   Stilley in jail is taking the money that was in a
22   check to UAFS to pay this debt off, taking that
23   money and using it to pay off the school district,
24   which we were there on the Motion for UAFS.  Now,
25   let's get a fixed amount of money.  Under those
```

46

```
1    circumstances why do we even want to talk about
2    that?  It's not the accusation.  It's kind of
3    beside the point.  Let's look at where the fight's
4    at.  Let's go there.  And at the end, certainly
5    I'm still requesting that this panel issue a
6    reason opinion and say the reason for its ruling
7    rather than simply saying "You lose."  Thank you.
8         JUDGE KELLY:  The Office of Professional
9    Conduct will now present its case in chief.
10        MR. LIGON:  I call Oscar Stilley to the
11   witness stand.
12        MR. STILLEY:  Object on the grounds that the
13   Judges have the prerogative to choose whether or
14   not to testify and the Arkansas Constitution says
15   that there will be no special privileges passed
16   out to a certain group, then there is no basis for
17   requiring Oscar Stilley to testify either.
18        JUDGE KELLY:  Mr. Ligon?
19        MR. LIGON:  I would ask the panel treat that
20   as an implication of Fifth Amendment
21   constitutional rights and any presumptions that
22   arise from it.
23        MR. STILLEY:  I would ask that the panel
24   consider that as an implication of the Fifth
25   Amendment only if the refusal to testify by Mr.
```

47

```
1    Tabor and others is also treated as an implication
2    of the Fifth Amendment.
3         JUDGE KELLY:  Do you have any other
4    witnesses?
5         MR. LIGON:  No, ma'am.  I have substantial
6    proffers that I will need to make when the record
7    is made available by the Chair due to Mr.
8    Stilley's declamation to testify.
9         JUDGE KELLY:  Do you want to make your
10   proffers now?
11        MR. LIGON:  Yes.
12        MR. STILLEY:  What's the ruling on the
13   objection?  None of us has to testify.  Is that
14   correct?
15        JUDGE KELLY:  No.
16        MR. STILLEY:  Thank you.
17        MR. LIGON:  I haven't done a proffer in many,
18   many years.  I don't think I've done one in front
19   of a panel, Madam Chair.  I can do it with the
20   panel here or the panel can go somewhere else and
21   I can do it just with the Reporter and Mr.
22   Stilley.  It will be fairly quick.
23        JUDGE KELLY:  You can go ahead.
24        MR. LIGON:  First is Petitioner's Two (2).
25   If Mr. Stilley had taken the stand I would have
```

48

```
1    offered to him the Attorney's Oath which is on the
2    law license certificate issued by the Arkansas
3    Supreme Court and asked him to identify the
4    Attorney's Oath, and I now proffer it and I will
5    get a photocopy made of it as Petitioner's Two
6    (2).  I can read it if you would like it read into
7    the record.  I'll run make a photocopy and attach
8    it.
9         (WHEREUPON, Proffered Petitioner's Exhibit
10   Number Two (2) was marked and appended on page
11   90.)
12        MR. STILLEY:  Your Honor, we would stipulate
13   with certain reservations and rights and that is -
14   - we stipulate that that is the correct statement
15   of the Attorney's Oath.  The objections that we
16   would have is that this is irrelevant because
17   there are specific provisions that attorneys are
18   charged with.  It's the Code of Professional
19   Conduct.  This is not a specific rule that other
20   lawyers are punished for to the knowledge of
21   Respondent.  Oscar Stilley is the only one that's
22   ever been charged with having violated his oath of
23   office.  It doesn't appear that there was any
24   intention ever by the person that drafted that
25   oath that people could be called in to be charged
```

1  with having violated that oath.  We've got lots of
2  rules that can be used if there's a violation of
3  the rules.  False statements and other things, we
4  all know that those are prohibited, but to say
5  that the Oath of Office is going to be the basis
6  for a sanction up to an including disbarment,
7  that's just seems farfetched.  Judge Hendren said
8  -- well, I'm not going to go down that road, but
9  he said that he thought there was a violation of
10 the spirit of the preamble to the Arkansas Rules
11 of Professional Conduct, which there are a lot of
12 other bad reasons that that's objectionable to.
13 There's a motion pending at this time -- as far as
14 I know there's not been any ruling on it -- but
15 the main thing, the problem that Respondent has
16 with bringing this in is that this is an obvious
17 attempt to punish Oscar Stilley for the times of
18 an oath when apparently nobody else gets punished
19 for it.  There's plenty of good rules.  It's time
20 to think about it.  We had the Griffin case some
21 time back where it said -- the Arkansas Supreme
22 Court said you have to have rules that aren't
23 vague.  What is more vague than the Attorney's
24 Oath?  If the Attorney's Oath is the basis for
25 bringing charges against an attorney, why do we

1  even need more rules?  Why don't we bring the oath
2  every time to everything?  Surely any violations
3  of rules of professional conduct also would be a
4  violation of the Oath, wouldn't they?
5  JUDGE KELLY:  Mr. Ligon, do you have any
6  response to that?
7  MR. LIGON:  Well, Madam Chair, I guess I'm a
8  bit puzzled.  Maybe I misunderstand the nature of
9  a proffer.  I thought a proffer was that I got to
10 show stuff to the Reporter for the record and Mr.
11 Stilley did not get to speak to it.  If he wants
12 to testify, there's the witness stand.  That's my
13 understanding of the process.
14 JUDGE KELLY:  It will be proffered, Mr.
15 Stilley.
16 MR. STILLEY:  If I spoke out of turn, I
17 apologize, but surely there's some point in time I
18 would be able to raise my legal arguments, at
19 least have them on record.
20 MR. LIGON:  Well, Mr. Stilley...
21 MR. WATKINS:  Mr. Ligon can make his proffer
22 and if you have an objection you can note them for
23 the record, and that's that.
24 MR. STILLEY:  Well, that's what I was trying
25 to do is note it for the record.  I trust that I

1  have noted it sufficiently.
2  MR. WATKINS:  Yes.
3  MR. LIGON:  Madam Chair, with just a little
4  bit of indulgence so that mechanically I get
5  everything marked for the Reporter and don't mess
6  her up.  I believe I gave Mr. Stilley a copy of
7  all these without exhibit numbers on them before
8  the Hearing actually started.  I marked as
9  Proffered Petitioner's Three (3) certain documents
10 from the Motion for Admission Pro Hac Vice by
11 Oscar Stilley dated April 20, 2006 in the United
12 States District Court, Eastern District of
13 Tennessee, William Cavitt versus Bob Wills, et al.
14 (WHEREUPON, Proffered Petitioner's Exhibit
15 Number Three (3) was marked and appended on page
16 91.)
17 MS. ORTON:  Are we going to get copies of
18 this?
19 MR. LIGON:  I understand under a proffer you
20 would not be entitled to consider it or to have
21 it.
22 MS. ORTON:  Okay.
23 MR. LIGON:  I proffered as Petitioner's Four
24 (4) the docket and selected attached documents
25 from a pacer search of the United States District

1  Court, Eastern District of Tennessee, case number
2  # 06-cv-63, Cavitt versus Wills.  The difference
3  between Three (3) and Four (4) is that Three (3)
4  is a part of Four (4), and I tender it as
5  Proffered Petitioner's Four (4).
6  (WHEREUPON, Proffered Petitioner's Exhibit
7  Number Four (4) was marked and appended on page
8  92.)
9  MR. STILLEY:  If I might suggest, Your Honor,
10 for purposes of speed, this is not to be
11 considered at the present time.  The Respondent
12 can simply delay any legal objections until such
13 time that there's a possibility of consideration.
14 I think that will protect Respondent's rights
15 without taking a lot of time.
16 JUDGE KELLY:  If you have an objection, after
17 he finishes if you have an objection you can state
18 your objection briefly at that time.
19 MR. STILLEY:  Certainly.  We'll just take all
20 them at once, then.  Correct?
21 JUDGE KELLY:  (Indicated yes.)
22 MR. LIGON:  Just for identification, I marked
23 as Petitioner's Five (5) the United States
24 District Court, Western District of Arkansas, Fort
25 Smith Division, case #06-mc, Mike Charlie - 42,

1    also styled William Cavitt versus Bob Wills, et
2    al.  Included are selected docket number items.
3         (WHEREUPON, Proffered Petitioner's Exhibit
4    Number Five (5) was marked and appended on page
5    93.)
6         MR. LIGON:  Marked for identification is
7    Petitioner's Six (6) as part of a proffer in the
8    United States District Court, Eastern District of
9    Tennessee at Knoxville, the United States of
10   America versus Brett Dirr, D-i-r-r, #08-cr-42,
11   Motion for Admission Pro Hac Vice by Oscar Stilley
12   filed June 7, 2008 and a transcript of a Hearing
13   in that case on June 12, 2008.
14        (WHEREUPON, Proffered Petitioner's Exhibit
15   Number Six (6) was marked and appended on page
16   94.)
17        MR. LIGON:  Petitioner's Seven (7) is
18   proffered consisting of e-mail exchanges dated
19   July 12, 2006 between Stark Ligon and Oscar
20   Stilley.
21        (WHEREUPON, Proffered Petitioner's Exhibit
22   Number Seven (7) was marked and appended on page
23   95.)
24        MR. LIGON:  Marked as Petitioner's Eight (8)
25   and proffered, Motion to Enforce Sanctions, and

1    attached documents, in Sebastian Circuit, Fort
2    Smith District, case number CV-2002-276, styled
3    John Parker versus Jim Perry and others, file
4    stamped August 14, 2004.
5         (WHEREUPON, Proffered Petitioner's Exhibit
6    Number Eight (8) was marked and appended on page
7    96.)
8         MR. LIGON:  Petitioner's Nine (9) proffered,
9    Order, Parker versus Perry case, file stamped
10   October 4, 2002.
11        (WHEREUPON, Proffered Petitioner's Exhibit
12   Number Nine (9) was marked and appended on page
13   97.)
14        MR. LIGON:  Marked for identification as
15   Petitioner's Ten (10) and proffered, Order in the
16   same case, Parker versus Perry case, file marked
17   September 22, 2004.
18        (WHEREUPON, Proffered Petitioner's Exhibit
19   Number Ten (10) was marked and appended on page
20   98.)
21        MR. LIGON:  Marked for identification as
22   Petitioner's Eleven (11) and proffered, same
23   Parker versus Perry case, Judgement file marked
24   January 18, 2005.
25        (WHEREUPON, Proffered Petitioner's Exhibit

1    Number Eleven (11) was marked and appended on page
2    99.)
3         MR. LIGON:  Marked for identification as
4    Petitioner's Twelve (12) and proffered, pacer
5    documents from the United States District Court,
6    District of Nevada, in the case United States of
7    American versus Mark LoBello, L-o-B-e-l-l-o, case
8    number 06-cr-00376, consisting of a Pro Hac Vice
9    application of Oscar Stilley in that case signed
10   July 31, 2007 and attachments that accompany it,
11   fourteen photo pages.
12        (WHEREUPON, Proffered Petitioner's Exhibit
13   Number Twelve (12) was marked and appended on page
14   100.)
15        MR. LIGON:  Marked for identification as
16   Petitioner's Thirteen (13) and made part of the
17   proffer are documents from the pacer service,
18   United States District Court, District of Arizona,
19   case of United States of America versus Dennis
20   Poseley, P-o-s-e-l-e-y, and more particularly the
21   co-Defendant Patricia A. Ensign, E-n-s-i-g-n,
22   Orders and other documents relating to the Pro Hac
23   Vice admission and status of Oscar Stilley for
24   Defendant Ensign.
25        (WHEREUPON, Proffered Petitioner's Exhibit

1    Number Thirteen (13) was marked and appended on
2    page 101.)
3         MR. LIGON:  And Madam Chair, finally, I don't
4    think it's necessary to tender a copy of the
5    Arkansas State Supreme Court Opinion that's
6    published, but I would make part of the proffer
7    the Opinion delivered June 21, 2007 in case number
8    06-972 styled Oscar Stilley versus Supreme Court
9    Committee on Professional Conduct.  That would be
10   our proffer Fourteen (14).
11        (WHEREUPON, Proffered Petitioner's Exhibit
12   Number Fourteen (14) was marked and appended on
13   page 102.)
14        MR. LIGON:  With that, thank you for your
15   patience and courtesy in making my proffer.
16        JUDGE KELLY:  Do you have any type of
17   objections to the proffer?
18        MR. STILLEY:  Well, I would, but I would
19   prefer to wait until the possibility that it might
20   be considered before making those objections
21   rather than take time for something that might
22   remain mute.
23        JUDGE KELLY:  Mr. Ligon, do you have any
24   other evidence for the case?
25        MR. LIGON:  Based on Mr. Stilley's statement,

57

1      I would only offer this as an officer of the
2  Court, I believe there is a basis for the
3  admission into the record of each of the items
4  that I just identified as part of my proffer if
5  Mr. Stilley had been available as a witness.
6  Other than that, based on having no other
7  witnesses and no other proof to present, the
8  Office of Professional Conduct will rest its case
9  in chief.
10     JUDGE KELLY:  Mr. Stilley, do you have
11 anything?  Are you going to make any Motions at
12 this time?
13     MR. STILLEY:  It sounds to me like Mr. Ligon
14 has rested his case.  Is that fair to say?
15     JUDGE KELLY:  Yes, that is fair to say.
16     MR. STILLEY:  I guess I would have a Motion,
17 a couple of Motions to make if it please the
18 Court.
19     JUDGE KELLY:  Yes, you may.
20     MR. STILLEY:  I move for a directed verdict
21 on the grounds that there is no evidence tending
22 to show that the statements alleged in this case,
23 the statements out of which this case arises, are
24 false.  Without proof of falsity, it's not
25 possible to punish the Respondent for those

58

1  statements.  Now, I don't want to bore this panel
2  by stating things that I've already said.  You
3  heard that, and I think everybody has gotten all
4  that.  There is no need to burden the record and
5  take your time for no good reason, but it's very
6  clear that that's what the U.S. Supreme Court
7  said, you've got to have proof of falsity.  There
8  is no proof at all.  Well, and the Executive
9  Director bears the burden for the proof.  The
10 Executive Director even cited to the rules that
11 it's his burden of proof.  He's the one that has
12 to prove it.  So we don't have any proof of this.
13 You have to grant a directed verdict.
14     Now let's look at the other charge, the
15 charge of having violated a specific Order.  We
16 have not even identified the specific Order.  What
17 specific Order was violated?  Nobody said that.
18 Without any evidence that there is a specific
19 Order and that Respondent violated that Order, you
20 have to dismiss that too.  It's very simple.  This
21 whole case needs to go to the wayside.  If you're
22 ready to go home, grant a directed verdict and
23 that's it.  Thank you.
24     JUDGE KELLY:  Mr. Ligon?
25     MR. LIGON:  Yes.  With regard to -- let me

59

1  take them in reverse order if I might.  With
2  regard to Mr. Stilley's allegations, if I
3  understand it correctly, he has not violated a
4  direct explicit Order.  I'm looking here to find a
5  statement that he made.  This is in Exhibit J, at
6  page 111 of your Petitioner's Exhibit One (1).
7  This is the transcript of the Hearing before Judge
8  Tabor, the last one that's part of this record
9  from May 2, 2007.  It appears from earlier pages
10 that Judge Tabor and Mr. Stilley are having a
11 conversation on the record.  At page number 111 of
12 the exhibit, but it would be page 1230 at line 15
13 of the actual transcript itself -- if everybody
14 there wants to follow along with me -- Mr. Stilley
15 appears to state then to Judge Tabor in a contempt
16 Hearing, "What the case law says is that you have
17 to have a definite, distinct Order of the court,
18 in order to hold somebody in contempt for not
19 following that Order."  Then the Court starting at
20 line 19 makes the statement that's there and
21 concludes, "I do not think an Order from the Court
22 has to be in writing."  Mr. Stilley's immediate
23 response starting at line 23, "I did not say that
24 it had to be in writing.  Your Honor, what I'm
25 saying is that it has to be distinct and

60

1  definite...," so anyway, I think by his own words
2  Mr. Stilley there at the opportune moment told
3  Judge Tabor that it doesn't have to be a written
4  Order.
5      And so then what we need to do, and what I
6  invite you to do, is to start at page 102, 108 --
7  108 of Petitioner's One (1), which is page 9 of
8  the May 2, 2007 transcript, and what's recorded
9  here is Judge Tabor -- it's been written someplace
10 -- holding Mr. Stilley's hand and walking him
11 through the transcript of March 15, 2007.  Now, if
12 you would like to follow along -- and I will give
13 you the pages that's going to take you back to the
14 record so you don't have to hunt for it -- the
15 first page, the page numbers I will use might be
16 lower right, page numbers of Petitioner's One (1).
17     We're on 108, line 6.  That refers back to
18 page 30, and all these are from Petitioner's One
19 (1).  On 108 at line 13, that excerpt from the
20 March 14 transcript can be found at page 42.
21 Still on 108 the excerpt that starts at line 22
22 can be found on page 46, all Petitioner's One (1).
23 The next page, 109, the excerpt that starts on
24 line 3 can be found at page 47, Exhibit One (1).
25 Still on 109, the excerpt that starts on line 17

61

```
1    can be found at page 50.  The excerpt that starts
2    at line 23 of 109 can be found on page 51.  Page
3    110, line 4, the excerpt that starts on line 4 of
4    110 can be found on page 52 of the March 14, 2007
5    transcript.  Now, I think at -- well, I think that
6    addressed the definite Order.  Our suggestion
7    would be that if you read the two transcripts, the
8    Judge gave very clear explicit instructions and in
9    fact, he said -- I think somewhere he said "I told
10   you eight times at that March 14, Hearing, don't
11   relitigate, settle the issue," being the quote,
12   "Marschewski lied in the January 14, 2005
13   Hearing."
14       MS. ORTON:  Mr. Ligon, did Judge Tabor find
15   Mr. Stilley in contempt of Court based on the fact
16   in Judge Tabor's opinion Mr. Stilley had violated
17   an Order of the Court because of the findings that
18   you just -- I'm asking...
19       MR. LIGON:  The answer is yes.  I have a copy
20   of the Order filed May 2, 2007, here.
21       MS. ORTON:  So in Judge Tabor's mind he had
22   given Mr. Stilley directions, orders, whatever you
23   want to call it, not to do anything in this case
24   while he was out of town.  And in Judge Tabor's
25   mind when he issued the subpoena, Mr. Stilley had
```

LINDA PARKER CERTIFIED COURT REPORTER
1-501-847-9448

62

```
1    violated the Judge's Order?
2        MR. LIGON:  Uh...
3        MS. ORTON:  Is that correct?
4        MR. LIGON:  I only have one copy of it and
5    it's not part of the record.  With the Chair's
6    permission I'll step over to Mr. Stilley's table
7    so that he can watch as I read the part of the
8    Order of May 2, 2007 signed by Judge Tabor that I
9    believe is responsive to the panel question, the
10   second paragraph, first page of the Order.  "Oscar
11   Stilley is in contempt of this Court for his
12   willful contempt of this Court's Order to not
13   relitigate matters long since decided at trial and
14   on appeal and then follow other terms about the
15   sentence."
16       JUDGE KELLY:  Are you finished, Mr. Ligon?
17       MR. LIGON:  Hopefully that's been responsive
18   to the panel's question.
19       JUDGE KELLY:  Do you have any reply, Mr.
20   Stilley?
21       MR. STILLEY:  Certainly.  The Order is on
22   appeal.  And there's a lot of problems with this
23   Order and one of the biggest ones is there is no
24   evidence whatsoever in that proceeding, and that's
25   one of the things that I've briefed the Arkansas
```

LINDA PARKER CERTIFIED COURT REPORTER
1-501-847-9448

63

```
1    Supreme Court.  I just finished the brief.  I just
2    finished up the reply brief not so long ago.  Now,
3    let's stop and think about this.  If the Arkansas
4    Supreme Court says, "No, that's an error, that's
5    wrong, that's a mistake," where would that put
6    this panel if this panel had been relying on that
7    Order to punish Oscar Stilley?  That's not a good
8    thing.  Now let's stop and think about this.  If
9    it's really a contempt, if it's really punishable,
10   why not allow that specific punishment to suffice.
11   We're here today for a decision on this.  But
12   rather than trying to look underneath this and
13   look for the evidence, if any, if the Executive
14   Director thinks there's any evidence whatsoever to
15   support the finding of contempt, sure, let's see
16   it.  That's the argument in the appeal.
17   Respondent's position is we let the Arkansas
18   Supreme Court deal with that.  We'll let the
19   Arkansas Supreme Court consider and decide those
20   matters and if there's punishment to be dealt out,
21   well, that Order of contempt is sufficient.
22   Otherwise, we've blown the chance of this panel
23   making a finding and having another finding at the
24   Arkansas Supreme Court diametrically opposed.  We
25   don't want that.  It's not a good idea.
```

LINDA PARKER CERTIFIED COURT REPORTER
1-501-847-9448

64

```
1        Now concerning this idea of a definite Order,
2    the issue is not whether the Order is written or
3    oral, that much is very clear and very plain, and
4    when you look over on page 111, starting at line
5    24, and this is Oscar Stilley speaking, "Your
6    Honor, what I'm saying is that it has to be
7    distinct and definite, and later on in this -- let
8    me -- on page 24, you ask, 'Do you have any
9    evidence to indicate that he was ever paid a cent
10   by the University of Fort Smith for anything?'"
11   Now that certainly sounds like a suggestion.
12   "Hey, get your proof first."  And with respect to
13   a distinct and definite Order, we've got a number
14   of different recitations to the record.  If there
15   was one single time, whether there was a definite
16   and distinct Order, surely the Executive Director
17   would go to that definite and distinct command and
18   rely upon that language and say, "Look, here's
19   definite and distinct language ordering Oscar
20   Stilley not to do what he did," but we don't have
21   that.
22       Now let's stop and think about this.  Saying
23   something without saying it definitely and
24   distinctly, whether you say it once, or eight
25   times, or eighty times, it doesn't make it a
```

LINDA PARKER CERTIFIED COURT REPORTER
1-501-847-9448

1      definite and distinct Order in order to punish.

2      You have to have that definite and distinct Order.

3      Therefore, we don't have a basis.  We don't have a

4      basis for finding that the Respondent has

5      committed any violation of the rules of evidence.

6      If Mr. Ligon thinks that this is erroneous and

7      there is some specific language that he wants to

8      hang his hat on, are you going to read it?  Sure,

9      let's hear it.  Let's hear it because your

10     Respondent would like to respond, would like to

11     reply, to show that it was not definite and

12     distinct language.  Thank you.

13         MR. LIGON:  Madam Chair, I will take Mr.

14     Stilley up on his right to exercise his right to

15     respond under Oath as a witness but he's declined

16     that so end of story.  I got in what I could and

17     the rest of it is over there as a proffer plus

18     more if he was a witness.  I understand the rules.

19        JUDGE KELLY:  At this time the Motion for

20     Directed Verdict will be denied.

21        MR. STILLEY:  Is that a denial for both

22     classes of...

23        JUDGE KELLY:  It's the denial to all of it.

24        MR. STILLEY:  Okay.

25        JUDGE KELLY:  It is now a little after 12:00.

1      We are going to take our lunch break until 1:00.

2        (Lunch break 12:00 to 1:00.)

3        JUDGE KELLY:  We're back after the lunch

4     break.  It's now time for the Respondent Attorney

5     to present his case in chief.

6        MR. STILLEY:  Respondent would rest and renew

7     the Motions previously made for a directed verdict

8     dismissal.

9        JUDGE KELLY:  Do you have any comment, Mr.

10     Ligon?

11        MR. LIGON:  Madam Chair, I did a little

12     research during the noon hour because I was trying

13     to understand Mr. Stilley's refusal to testify

14     here without invoking any constitutional rights

15     under the Fifth Amendment.  And it occurred to me

16     that since this is not a criminal proceeding, by

17     rule it's called neither civil nor criminal. I

18     think is what the procedures say, and there was no

19     indication of the constitutional right he had

20     under the Fifth Amendment, which we have a

21     provision to deal with.  I read Section 27, The

22     Courts Procedure to Regulating Professional

23     Conduct for Attorneys at Law, and read, "The

24     following shall be regarded as contempt in the

25     Arkansas Supreme Court," sub b, bravo, "The

1      refusal to testify on matters not privileged by

2      law."  I do not recall any claim of privilege as

3      to any matter.  Therefore, I guess, unless it's

4      timely, I would at least raise the question of

5      whether Mr. Stilley had the right to absolutely

6      refuse to testify here when I called him as a

7      witness in our case in chief or only on those

8      matters under which he could sustain a claim of

9      privilege.  And if the Chair would define merit in

10     my argument, then I would ask to reopen our case

11     in chief briefly to attempt to question him and

12     see whether or not there is a claim of privilege

13     (unintelligible) particular subject matter about

14     which I might inquire.

15        JUDGE KELLY:  Do you have any response?

16        MR. STILLEY:  Yes, the response is that the

17     case is closed.  The Executive Director has rested

18     and the Respondent has rested and there was a

19     Motion for a Directed Verdict as a matter of law,

20     as if restated word for word, and I didn't hear a

21     response to that.  I heard something else.  The

22     Respondent's position is that it is too late for

23     that, the case is over, we're on Motions, and

24     unless the Executive Director has a response, then

25     he should make a response to the Motion that's on

1      the floor.

2        MR. LIGON:  I believe that the Motion is that

3     Mr. Stilley renewed the Motion for a directed

4     verdict, if I understand correctly?

5        JUDGE KELLY:  Yes.

6        MR. LIGON:  I think the record will show that

7     there has been not one iota of change in the

8     record between the time the Court denied the

9     Motion at the conclusion of the Office's case and

10     when he renewed it, so therefore there's no

11     logical reason to grant his Motion now when it was

12     denied the first time.

13        JUDGE KELLY:  The Motion will be denied.  Are

14     there any closing statements?

15        MR. LIGON:  If I might, very briefly.

16     Members of the panel, I ask you to consider these

17     matters which I hope I stated within the record of

18     this proceeding, Judge Marschewski and later Judge

19     Tabor by pleading to the Orders and statements

20     that are memorialized in transcripts which are

21     part of Petitioner's Exhibit One (1) which you

22     have in the record clearly establishing a

23     financial obligation and Order that Mr. Stilley

24     pay certain sums to UAFS and FSSD starting in 2002

25     and continuing through.  There is record of

69

```
1    evidence that some payments at least four Two
2    Hundred Dollar ($200.00) a month payments to UAFS
3    which is in the materials that you have, I
4    believe.  But if not, we'll concede at least that
5    much has been paid.  There is no indication of
6    inability to pay either all or some portion of the
7    balances that were ordered but not paid.
8         Also starting with the Order that was
9    entered, I believe it was, October 4, 2004 after
10   the last of the Hearing in September 2004, I
11   believe there's a statement in the record by Judge
12   Marschewski that to protect the integrity of the
13   Court and recognizing Mr. Stilley's then current
14   possibility to pay these sums, that Judge
15   Marschewski entered that Order on October 4, 2004
16   setting down certain guidelines and obligations
17   reporting disclosure, things like that, that Mr.
18   Stilley would comply with so that his practice,
19   his income, whatever, could be monitored.  There
20   is no evidence in the record that there has ever
21   been any compliance with that portion of that
22   Order from October 4, 2004, if I've got the date
23   right.  In the Hearings on March 14, 2007, March
24   26, 2007 and May 2, 2007 Judge Tabor, Judge -- all
25   three, I believe, were before Judge Tabor.  In
```

70

```
1    fact, I believe there is a direct question and
2    answer of Mr. Stilley arguing compliance with both
3    parts of Judge Marschewski's original Order, the
4    disclosure and the reports that are required to be
5    filed and payments on financial sanctions.  I
6    believe Mr. Stilley very directly says, "No, I'm
7    not complying," and then of course gives an
8    explanation.
9         The other part of the May 2, 2007 Order
10   finding Mr. Stilley in contempt entered by Judge
11   Tabor, after the last of the Hearings that we had
12   in the record, Petitioner's One (1), specifically
13   finds Mr. Stilley in contempt for willfully
14   continuing to attempt to relitigate issues that
15   Judge Tabor had told him over, and over, and over
16   again, " We're not going there."  That's been
17   settled by the Supreme Court ending appeal 05-666
18   decided September 14, 2006 if I recall correctly.
19   Thank you.
20        JUDGE KELLY:  Mr. Stilley?
21        MR. STILLEY:  Certainly.  There are written
22   accusations here.  Honestly I didn't hear anything
23   about the accusations for this closing statement.
24   Well, maybe there is just a tiny bit, but
25   basically we've got allegations here that we
```

71

```
1    should look to as a guide as there's allegations
2    made.  Is there proof to prove that the particular
3    violation that is alleged was committed?  We don't
4    have that.  We don't have that evidence.  It's not
5    here.  So there's no basis for a finding of any
6    violations of rules.  Now, as this panel is well
7    aware, there have been repeated attempts to get
8    recent rulings on the legal issues that have been
9    raised.  The U.S. Supreme Court has demonstrated
10   that it has a great deal of faith in panels such
11   as this as in the case of Middlesex versus Garden
12   State Bar Association saying that "We believe that
13   panels such as this will consider and decide the
14   federal constitutional issues."  In that case
15   there was not an attempt to get a ruling.  In this
16   case there has been an attempt repeatedly to give
17   recent rulings.  Anybody can say, "Denied.  You
18   lose."  That doesn't help at all.  That doesn't
19   consider and analyze whether or not the legal
20   claim that is made is valid or not.  That's what
21   the Respondent is asking for, Your Honor.
22        The heart of this case has to do with speech.
23   I would like to read to you from an article.  This
24   is not presented as evidence, this is presented as
25   a column from Tom Sissom two days ago, June 18,
```

72

```
1    and it ran in the morning news, local news, in
2    Northwest Arkansas, "Individual Rights Outweigh a
3    Majority Vote."  Mr. Sissom starts this off
4    saying, in quotations, "One's right to life,
5    liberty and property, to free speech, to free
6    press, freedom of worship and assembly, and other
7    fundamental rights may not be submitted to vote,
8    but depend on the outcome of no election."  It
9    cites Justice Robert Jackson, U.S. Supreme Court.
10   It goes on to say that "This country has a long
11   uneven record in dealing with non-conformance."
12   It says in the next paragraph, "It's never easy to
13   oppose popular position.  Sanding up for your own
14   opinion or your own personal beliefs is enough for
15   some to, subject you to ridicule, or even imprison
16   you."  The next to the last paragraph, Mr. Sissom
17   in parentheses says, "Struggles to coerce
18   uniformity of sentiment in support of some end
19   fought essential to their time and country have
20   been waged by many good as well as evil men."
21   Jackson wrote in his opinion, "Which was delivered
22   at the height of World War II when pressure for
23   unity and conformity was great."  Now I don't want
24   to read the entire last paragraph, but toward the
25   end of the last paragraph, also in parentheses, as
```

73

```
1          a quote from Jackson, he said these words,
2     "Ultimate futility of such attempts to compel
3     coherence is a lesson of every such effort from
4     the Roman drive to stamp out Christianity as a
5     disturber of its pagan unity, the inquisition as a
6     means to religious and dynastic unity, the
7     Siberian exiles as a means to Russian unity, down
8     to the fast failing efforts of our present
9     totalitarian enemies, those who begin coercive
10    elimination of descent soon find themselves
11    exterminating the descenders.  Compulsory
12    unification of opinion achieves only the unanimity
13    of the graveyard."
14         Those are strong words.  Granted, those are
15    strong words.  One would think that because they
16    were stated or at least at one time stated that by
17    a U.S. Supreme Court Justice they would be
18    protected, but let's stop and think about this.
19    This is really an attack for any violation free
20    speech.  It's a harsh attack on such violations
21    saying that the end, the end product of such
22    transgressions is terrible achieving the only
23    unanimity of the graveyard.  Let's stop and think
24    about this.  If this kind of speech is to be
25    punishable, then where do we stop?  There is no
```

74

```
1     place to stop.
2          If the speech engaged in by your Respondent
3     is punishable, then reasonably speaking, the
4     speech that I have just spoken to you is also
5     punishable.  If the First Amendment doesn't
6     protect the speech of lawyers, it doesn't protect
7     it for anybody because I've already recited U.S.
8     Supreme Court cases saying that the rights of a
9     lawyer are coextensive with the rights of
10    everybody else.  So, if a lawyer can be punished
11    for statements not proven to be false -- in this
12    case not even alleged to be false -- then Mr.
13    Sissom could be punished for the language that he
14    put in this opinion or this column that he wrote.
15    Free speech is what is at stake here.  I'm sure
16    you'll remember the request for a ruling of who
17    has the burden of proof as to falsity.  There
18    wasn't a fight.  There wasn't an argument about
19    whether or not the burden of proof fell on the
20    Executive Director.  That's the rules.  Everybody
21    knows that.  The fight was over the burden of
22    proof as to falsity.  Now I'm respectfully
23    submitting to this panel that there's no
24    allegation, absolutely no proof of any falsity.
25    That being the case it's impossible to impose any
```

75

```
1     punishment upon an attorney uttering such words.
2     Thank you for your attention.  That's all I have.
3          JUDGE KELLY:  Mr. Ligon?
4          MR. LIGON:  Members of the panel, it is not a
5     documentary exhibit, but I read a portion of it to
6     you when Mr. Stilley decided to make sure that I
7     read it correctly.  In the May 2, 2007 Order
8     signed by Judge Tabor in Sebastian Circuit cv-
9     2002-276 Harper versus Perry, which is the long-
10    running underlying litigation that all this is a
11    part of, Oscar Stilley is in contempt of his Court
12    for his willful contempt in his course of order to
13    not relitigate matters long since decided at trial
14    in old appeal.  The appeal was decided September
15    14, 2006 and I recall in 05-666.  So here we are
16    months after Arkansas Supreme Court has settled
17    the issue and... Now the Appellate Court has
18    spoken on the issue of your attempt to call into
19    question Judge Marschewski's impartiality as the
20    trial judge and the issue of whether or not he had
21    some hidden or disqualifying relationship or
22    connection of some kind several years before that
23    with UAFS who was a party to 2002-256.  So Judge
24    Tabor's own words are "I told you not to
25    relitigate those matters that were settled
```

76

```
1     including appeal and you violated my Order."
2          Now the other matter which has nothing to do,
3     that I can tell, with Judge Marschewski, comes
4     from the very first Hearing, I believe it's March
5     14, 2007 that Judge Tabor sat on with Mr. Stilley,
6     "We're not going to relitigate those."  What did
7     Judge Marschewski know and when did he know it?
8     Did he lie or did he not lie?  Those issues are
9     settled.  We're not going there.  It's strictly
10    the sanctions.  What's the status, have you paid
11    them or not?  And then after awhile it became the
12    May 2 Order, "You're just violating my directive
13    not to relitigate that."  I think the case is that
14    simple.  The record is a bit sparser than I would
15    like it to be because quite frankly we stopped on
16    or about May 2, 2007 Hearing because Judge Tabor's
17    referral to us came a week after that.  I would
18    suggest that you go back and look at the pleadings
19    that are here, the transcripts of certainly those
20    three Hearings, and I would contend the direct
21    disobedience of Mr. Stilley on March 15, 2007 to
22    Judge Tabor's oral directives at the Hearing the
23    day before.  And he issued six or eight subpoenas
24    and they were subpoenaed for one reason, and that
25    was to attempt to relitigate what we call the
```

77

```
 1        Judge Marschewski issue.
 2            Now, I think that each of the charges and
 3     counts, rules violations in here is cross
 4     referenced, whether it's necessary or not, in the
 5     Complaint to specific exhibits.  It's not a thick
 6     record and I think if you'll look at what's there
 7     you'll see there's ample evidence here.  It's not
 8     free speech.  It's not free speech.  It is, did a
 9     lawyer, an officer of the Court, disobey what he
10     knew to be valid legal obligations because there
11     were orders that had not been vacated or set aside
12     or undone on appeal and directives from the bench
13     from a valid sitting Judge.  One who does that has
14     to be ready to accept the consequences of being
15     wrong if they act that way.  Thank you.
16            MR. STILLEY:  I do have a question about this
17     Order.  Was this Order actually admitted into
18     evidence?  I don't recall that.
19            JUDGE KELLY:  I don't believe that it was,
20     but he did not state that it had been.  He read
21     parts of it.
22            MR. STILLEY:  I move to strike that part of
23     the record.  Discussing things that are not in the
24     record, I move to strike that.
25            JUDGE KELLY:  Your Motion is overruled.  He
```

78

```
 1        read it at my request.
 2            MR. STILLEY:  Okay, but...
 3            JUDGE KELLY:  Mr. Stilley, the Hearing is now
 4     concluded.  Counsel, Mr. Ligon, do you have your
 5     envelope?
 6            MR. LIGON:  Yes, ma'am.  If I may approach
 7     and confer with Mr. Stilley just a moment.
 8            MR. STILLEY:  I have been presented a list of
 9     prior complaints against Attorney Oscar Stilley,
10     and included in that is CPC 2006-067 which the
11     Executive Director has already indicated would be
12     -- he can correct me if he thinks I'm wrong, but
13     if proof of falsity of statements is required,
14     that is a suspect judgement, it's not legal.  It's
15     not valid.  And on the basis of that I would
16     respectfully submit that this should not be
17     submitted to the Court or considered, or
18     considered by the panel before there's been an
19     opportunity to argue and get ruling that there was
20     a violation of U.S. Constitutional due process in
21     the prior procedure.  It is not something that is
22     raised by Respondent.  It is raised by the
23     Executive Director so it just makes sense.  But
24     before we go down that road, let's have arguments
25     and decide whether or not this is a legal Order to
```

79

```
 1        be considered.
 2            JUDGE KELLY:  Mr. Ligon?
 3            MR. LIGON:  Madam Chair and members of the
 4     panel, that particular entry, Committee case
 5     number 2006-067 concludes with this statement,
 6     "Now 08-73 ending disbarment."  I feel that's an
 7     adequate disclosure that the matter is in some
 8     states before the Court and I would be very
 9     careful because I have not looked in awhile, but I
10     believe there was a Findings and Order from the
11     panel that did have referral and found the charges
12     that were being referred to disbarment.  Now, I
13     think that's right.  I would want to go look.  At
14     least as of shortly after December 14, 2007 that
15     was the status of it.
16            Now, I am certainly going to be the second on
17     here to say after Mr. Stilley, it is not finished.
18     It is a pending disbarment.  It is out of the
19     committee as of January 15 or 16, 2008 whenever we
20     actually violate 08-73 in the Supreme Court.  And
21     I recognize, and I think everybody on the panel is
22     going to take that in its proper context that it
23     is still a work in progress.  I would also point
24     out for the record...  We don't ask for jury
25     instructions here but I guess it would only be
```

80

```
 1        fair to ask and assume that any member sitting
 2     here today who was a member of that panel B on at
 3     the Hearing of December 14, 2007 will give
 4     appropriate weight only to 06-067, understanding
 5     its status as impending disbarment.
 6            MR. STILLEY:  There is another issue we have
 7     to consider on this, and that is that the Chair of
 8     the panel when there was a request made by
 9     Respondent Oscar Stilley for rulings on the
10     federal constitution legal issues, the Chair of
11     the panel said, "I will not consider those or rule
12     on those.  You can make your record and you can
13     take it up on appeal."  The problem with that is
14     that a referral for disbarment is not an
15     appealable Order, and an in-room suspension is not
16     an appealable Order.  That statement was not true
17     and it had to have been known by the Chair of the
18     panel at least by the time that the ruling came
19     back.  And that would surely this proceeding -- or
20     disqualifying this proceeding from being anything
21     that should be considered by this tribunal.  This
22     is the same tribunal.  And there was a request to
23     get a ruling from basically the same
24     constitutional issues in that proceeding as in
25     this proceeding.  There were no rulings on the
```

81

```
 1          constitutional issues, federal constitutional
 2      issues, as in this proceeding, there was a
 3      statement that it could be taken up on appeal.  It
 4      can't be taken up on appeal.  Surely you will not
 5      give any credit to this or consider this as a
 6      matter that might be used for enhancement or for
 7      any purpose in this proceeding.
 8          JUDGE KELLY:  Please note your objection.
 9          MR. STILLEY:  The objection is that what the
10      Chair of the panel said when he said that "I will
11      not consider or rule upon those legal arguments
12      but you can take it up on appeal," that was an
13      untrue statement.  We shouldn't take the results
14      of a proceeding when the Chair of the panel has
15      made a statement that is not true.  I don't think
16      anybody is going to contend that it was a true
17      statement.  Whether it was an intentional untrue
18      statement, we can quibble about that, but clearly
19      that was not arguments that could be considered on
20      appeal.  There's no appeal available.
21          MR. LIGON:  Madam Chair, I think we could
22      frame that statement in a different manner.  06-
23      067, which is now Arkansas Supreme Court 08-73,
24      came through this panel at a Hearing December 14,
25      2007.  The record will show that Henry Hodges, who
```

82

```
 1          is not here today, was the panel Chair, not
 2      yourself.  Now, there was a vote and an Order to
 3      initiate a disbarment.  A disbarment petition was
 4      filed in mid-January of 2008.  Mr. Stilley had the
 5      right and did file a response or an answer to
 6      that.  He has a vehicle there, if he used it --
 7      and I don't remember what he said in that answer.
 8      It's almost in effect a de novo proceeding that
 9      gets filed by disbarment.  So if he had
10      constitutional issues of any kind to raise in that
11      disbarment, his answer in 08-73 are the vehicle in
12      which to raise it.  Now, I tried to limit to the
13      proceeding what I think he was talking about and
14      that was the one that came through here December
15      14, 2007.
16          MS. ORTON:  Madam Chair, was not the result
17      of that proceeding published in a great many
18      newspapers in the state of Arkansas?  Do we not
19      read newspapers?  It's been published in the
20      newspaper, Mr. Stilley, and most of us read the
21      newspaper.  We all know what this panel voted to
22      do in December.  It would be pretty stupid not to
23      have it on our mind.  It doesn't mean it's going
24      to influence our decision in the event that we
25      find that you had violated any of the rules of
```

83

```
 1          conduct.  We are also smart enough to know that
 2      there's no final ruling or adjudication on the
 3      recommendation for disbarment, so relax.
 4          MR. STILLEY:  I'd like to make a Motion then
 5      that we rescind the interim suspension of any
 6      disbarment because if the remedy for Oscar Stilley
 7      is to take up his legal issues during the
 8      disbarment, then Oscar Stilley shouldn't be
 9      punished until those federal constitutional issues
10      have been decided.  That seems only a fair thing
11      for Oscar.  Due process requires -- and I'll wait
12      for a ruling from the Chair -- but due process
13      requires that before a substantial loss takes
14      place, that first there will be the notice or
15      right to be heard, and there will be a reason
16      ruling on those federal constitutional issues.
17      That's what Middlesex says.  Middlesex says, "We
18      have a great deal of faith in the panels and they
19      are going to rule on those things," so let's just
20      not punish Oscar until he's been heard, until he's
21      had a reason, opinion, and ruling addressing those
22      specific issues, take away some of the
23      embarrassment of the previous Chair of the panel
24      for having said something that was not correct.
25          MR. POLK:  We're not willing to say that it
```

84

```
 1          wasn't correct.  You're saying that.
 2          MR. STILLEY:  Well now let's stop and think
 3      about that.  I would like a ruling on this.
 4          MR. RUSH:  You're asking us to ignore a
 5      ruling we've already made?
 6          MR. STILLEY:  Right.  Here's what I'm...
 7          MR. RUSH:  Answer the question.  You're
 8      asking us to ignore our ruling that we've already
 9      made?
10          MR. STILLEY:  Sure.  Let me explain why.
11          MR. POLK:  No, let's just get a ruling on
12      that.
13          JUDGE KELLY:  Mr. Stilley, your Motion to
14      rescind the interim suspension is denied.  We're
15      going to proceed on.  Counsel for the Office of
16      Professional Conduct has privately displayed to
17      Respondent his envelope and the contents described
18      in the prior sanctions of the procedure.  I would
19      add here at this time that during our previous
20      discussion some parts of what is in that history
21      has been disclosed, but the panel will put that
22      aside and not consider it in the deliberations.
23      The envelope has now been sealed and left with the
24      panel Chair for possible examination by the panel
25      only if any violation of a rule is found to be --
```

1   is found by the panel.  At the conclusion of the

2   panel's executive decision, the envelope and

3   contents, whether opened or not, will

4   automatically become the next numbered exhibit in

5   the record of this Hearing.  The panel will now go

6   into executive session to deliberate.  All others

7   are requested to leave the Hearing room at this

8   time.  You will be called in the hallway when the

9   open session is to resume.  This could be at any

10   time.

11     (Deliberations 1:30 - 2:30.)

12   JUDGE KELLY:  The Hearing is now called back

13   into public session.  As to rule violations

14   alleged in the Complaint, the panel finds as

15   follows:  On allegation 81, the vote was

16   unanimous, yes, that there was a violation so it

17   was proven.  With respect to Rule 3.4(c), the vote

18   was a unanimous yes.  With respect to allegation

19   (b1), the vote was a unanimous yes.  With respect

20   to Rule 4.4(a), the vote was a unanimous yes.

21   With respect to allegation c, paragraph (c1), the

22   vote was a unanimous no violation.  With respect

23   to paragraph (c2), the vote was a unanimous vote

24   of yes, there was a violation.  With respect to

25   Rule 8.4(d), the vote was yes, unanimous, there

1   was a violation.  As to sanctions, the panel finds

2   that disbarment proceedings should be initiated

3   and the vote was unanimous.  In finding that

4   disbarment should be initiated with respect to the

5   serious misconduct found, the panel found that for

6   Section 17 paragraphs b4 and 5 were implicated in

7   finding that there was serious misconduct to merit

8   the initiation of disbarment proceedings.  In

9   executive session the panel considered interim

10   suspension, and the vote was unanimous that Mr.

11   Stilley should be put on interim suspension for

12   this case.  Is there a request from the Office?

13   MR. LIGON:  Madam Chair, let me make sure I

14   wrote beside the right rule.  On 81, which is

15   violation of 3.4(c), it was unanimous yes, 6-0.

16   And then on (b1) which is a violation of 4.4(a), I

17   thought I heard 6-0 yes.  And then on (c) a

18   violation of 8.4(d) on one I heard 6-0, no

19   violation, then on (c2), another violation of 8.4,

20   I heard 6-0 yes.  Did I have that correct?

21   JUDGE KELLY:  That's correct.

22   MR. LIGON:  I will then prepare an Order

23   consistent with the panels announced findings and

24   transmit that to Madam Chair early next week.

25   JUDGE KELLY:  Is there a request for cost?

1   MR. LIGON:  No.

2   JUDGE KELLY:  Does Counsel have any other

3   matters to bring before the panel in this case?

4   MR. LIGON:  Not from our Office.

5   JUDGE KELLY:  Mr. Stilley?

6   MR. STILLEY:  Not from Respondent.

7   JUDGE KELLY:  Counsel for the Office of

8   Professional Conduct will now draft a Findings and

9   Order consistent with the directions announced

10   here along with a factual summary of the evidence

11   related to the rules found to have been violated

12   and submitted to the panel Chair for review and

13   approval.  This Hearing is now adjourned.

14 THEREUPON,

15   And there being nothing further, the taking of the

16 Hearing ended at 2:40 p.m. on Friday, June 20, 2008.

17     * * * * * * * * *

22   RESPONDENT'S EXHIBIT NUMBER ONE (1)

89

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22        PETITIONER'S EXHIBIT NUMBER ONE (1)
23
24
25
```

**LINDA PARKER CERTIFIED COURT REPORTER**
**1-501-847-9448**

90

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22     PROFFERED PETITIONER'S EXHIBIT NUMBER TWO (2)
23
24
25
```

**LINDA PARKER CERTIFIED COURT REPORTER**
**1-501-847-9448**

91

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22    PROFFERED PETITIONER'S EXHIBIT NUMBER THREE (3)
23
24
25
```

**LINDA PARKER CERTIFIED COURT REPORTER**
**1-501-847-9448**

92

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22    PROFFERED PETITIONER'S EXHIBIT NUMBER FOUR (4)
23
24
25
```

**LINDA PARKER CERTIFIED COURT REPORTER**
**1-501-847-9448**

93

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22          PROFFERED PETITIONER'S EXHIBIT NUMBER FIVE (5)
23
24
25

**LINDA PARKER CERTIFIED COURT REPORTER**
**1-501-847-9448**

94

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22          PROFFERED PETITIONER'S EXHIBIT NUMBER SIX (6)
23
24
25

**LINDA PARKER CERTIFIED COURT REPORTER**
**1-501-847-9448**

95

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22          PROFFERED PETITIONER'S EXHIBIT NUMBER SEVEN (7)
23
24
25

**LINDA PARKER CERTIFIED COURT REPORTER**
**1-501-847-9448**

96

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22          PROFFERED PETITIONER'S EXHIBIT NUMBER EIGHT (8)
23
24
25

**LINDA PARKER CERTIFIED COURT REPORTER**
**1-501-847-9448**

97

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22        PROFFERED PETITIONER'S EXHIBIT NUMBER NINE (9)
23
24
25

**LINDA PARKER CERTIFIED COURT REPORTER**
**1-501-847-9448**

98

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22        PROFFERED PETITIONER'S EXHIBIT NUMBER TEN (10)
23
24
25

**LINDA PARKER CERTIFIED COURT REPORTER**
**1-501-847-9448**

99

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22        PROFFERED PETITIONER'S EXHIBIT NUMBER ELEVEN (11)
23
24
25

**LINDA PARKER CERTIFIED COURT REPORTER**
**1-501-847-9448**

100

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22        PROFFERED PETITIONER'S EXHIBIT NUMBER TWELVE (12)
23
24
25

**LINDA PARKER CERTIFIED COURT REPORTER**
**1-501-847-9448**

101

PROFFERED PETITIONER'S EXHIBIT NUMBER THIRTEEN (13)

LINDA PARKER CERTIFIED COURT REPORTER
1-501-847-9448

---

102

PROFFERED PETITIONER'S EXHIBIT NUMBER FOURTEEN (14)

LINDA PARKER CERTIFIED COURT REPORTER
1-501-847-9448

---

103

PETITIONER'S EXHIBIT NUMBER FIFTEEN (15)

LINDA PARKER CERTIFIED COURT REPORTER
1-501-847-9448

---

104

**C E R T I F I C A T E**

STATE OF ARKANSAS)

COUNTY OF PULASKI)

I, Linda Parker, a Court Reporter for Pulaski County,
Arkansas, certify that I recorded all of the testimony taken
in the Hearing before the Supreme Court in Arkansas in Case
Number 2007-062, STARK LIGON, Executive Director,
Petitioner; OSCAR STILLEY, Respondent; before the HONORABLE
VALERIE KELLY, Special Law Judge, at the Justice Building,
625 Marshall, Room 101, Little Rock, Arkansas on the 20th
day of June, 2008 and that under my personal supervision
said recording has been reduced to typewriting and that the
foregoing pages are a true and correct transcript of all
evidence heard and proceedings had in said Hearing.

WITNESS MY HAND AS SUCH COURT REPORTER this _____ day
of _____, 2008.

_____

LINDA PARKER, Notary Public CCR #198

Pulaski County, Arkansas

My Commission Expires:

_____

LINDA PARKER CERTIFIED COURT REPORTER
1-501-847-9448

IN THE SUPREME COURT OF THE STATE OF ARKANSAS

STARK LIGON, Executive Director,                                    PETITIONER
Supreme Court Committee on Professional Conduct

     VS.                                                        NO.  08-73

OSCAR AMOS STILLEY                                              RESPONDENT
Arkansas Bar ID #91096

## PETITIONER'S PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW

     Pursuant to the December 10, 2008, verbal order of the Special Judge, this document is simultaneously submitted by March 16, 2009, by Petitioner to the Special Judge and Respondent in paper and electronic formats. Hereafter, "PD" refers to the Petition for Disbarment filed January 16, 2008, and "FAPD" refers to the First Amendment to Petition for Disbarment filed June 27, 2008.

## I. PETITIONER'S PROPOSED FINDINGS OF FACT

     1. Mr. Stilley assisted Robbie and Buck Jones, who had been his clients in a similar, if not identical and unsuccessful action in the state court, in preparing a Complaint that was filed in federal court as No. CIV-04-2220, (PD Ex. I, alleging, among other claims, a "RICO" (Racketeer Influenced and Corrupt Organizations Act) violation, a claim Judge Eisele specifically found was frivolous, (see PD Ex. D, pages 11-12), a decision affirmed on appeal by the Court of Appeals for the Eighth Circuit. (Count 1)

     2. At a hearing on January 14, 2005, on a contempt citation against him in Sebastian Circuit CIV–02-276-VI, Parker v. Perry, Mr. Stilley was asked if he prepared the federal court case Complaint (Ex. FSPSD 1 there, PD Ex. I here) filed pro se by Buck and Robbie Jones as USDC No. CV-04-2220 on October 5, 2004, and Mr. Stilley responded, as shown by the

testimony at pages 41-62 of PD Ex. N. The federal suit was a re-litigation of the same issues that had already been litigated unsuccessfully by Mr. Stilley for the Joneses, through appeal, in the state courts, a material fact for the state court's inquiry at that time. Mr. Stilley's answers show that he at first stated that "you worked on it" (page 43) when asked "did you type it." When asked if anyone else,  particularly Buck and Robbie Jones typed, on the Complaint, he responded "I do not have personal knowledge of that." (Page 44) Later, Mr. Stilley admitted he typed "a lot of it." (Page 45) When asked "Did Buck Jones write any part of this complaint," he responded, "This is Buck  Jones's complaint." When asked "Did Buck Jones (or Robbie Jones) type any part of this complaint," Mr. Stilley responded to both forms of the question, "Not to my knowledge." (Page 46) When asked, "Did you prepare the complaint," Mr. Stilley responded, "I assisted Mr. Buck Jones materially in the preparation of that complaint." (Page 55) When asked "did Mr. Jones write any words on a piece of paper that ended up in that complaint," Mr. Stilley responded, "He didn't do any of the typing at all." (Page 58) Buck Jones was deposed on March 1, 2005, and selected portions of his deposition (PD Ex. O) show he clearly thought Mr. Stilley was his attorney and representing him in the lawsuit at the time it was prepared and typed in Mr. Stilley's office, with major input from Mr. Stilley, both on factual matters and legal issues. Mr. Jones stated he knew before the preparation and filing of this federal suit that Mr. Stilley had previously filed state court suits on the same illegal exaction issue and had lost each suit. Mr. Stilley's equivocation, under oath in response to repeated questions on the same point, as to the responsibility for actually preparing the later federal case complaint at issue demonstrates a lack of the candor, even a false statement, to the tribunal that is required and expected of attorneys as officers of the court, on a matter that was material. (Count 2)

3.  Mr. Stilley assisted his clients, the Joneses, in preparing a *pro se* Plaintiff's Complaint, (PD Ex. I), which they filed on October 5, 2004, as USDC No. CV-04-2220 in the United States District Court for the Western District of Arkansas, containing language which Mr. Stilley either prepared, or ratified, that was clearly intemperate, contemptuous, and disrespectful of the Justices of the Arkansas Supreme Court individually and as a Court, and accused them of not being a "'competent tribunal,' as that term is used by the Eighth Circuit Court of Appeals," (§ 35, page 7), action by Mr. Stilley constituting a breach of the obligation of his oath of office as an attorney-at-law, due to his general tone of disrespect for the attorney code of ethics. (Count 3)

4.  Mr. Stilley assisted his clients, the Joneses, in preparing a *pro se* Plaintiff's Complaint, (PD Ex. I), which they filed on October 5, 2004, as USDC No. CV-04-2220 in the United States District Court for the Western District of Arkansas, containing language which Mr. Stilley either prepared or ratified that was clearly intemperate, contemptuous, and disrespectful of the Justices of the Arkansas Supreme Court individually and as a Court, and accused them of being a Court that has "rendered it impossible for the Plaintiffs to obtain due process concerning the claims made herein, in any state court," (§35, page 8), action by Mr. Stilley constituting a breach of the obligation of his oath of office as an attorney-at-law, due to his general tone of disrespect for the attorney code of ethics. (Count 4)

5. Mr. Stilley assisted his clients, the Joneses, in preparing a *pro se* Plaintiff's Complaint, (PD Ex. I), which they filed on October 5, 2004, as USDC No. CV-04-2220 in the United States District Court for the Western District of Arkansas, containing language which Mr. Stilley either prepared or ratified that was clearly intemperate, contemptuous, and disrespectful of the Justices of the Arkansas Supreme Court individually and as a Court, and accused them of  "wilfully and

knowingly deprived the Plaintiffs of due process and a competent tribunal," (§ 79, page 19),

action by Mr. Stilley constituting a breach of the obligation of his oath of office as an attorney-at-

law, due to his general tone of disrespect for the attorney code of ethics. (Count 5)

6. Mr. Stilley assisted his clients, the Joneses, in preparing a *pro se* Plaintiff's Complaint,

(PD Ex. I), which they filed on October 5, 2004, as USDC No. CV-04-2220 in the United States

District Court for the Western District of Arkansas, containing language which Mr. Stilley either

prepared or ratified that was clearly intemperate, contemptuous, and disrespectful of the Justices

of the Arkansas Supreme Court individually and as a Court, and accused them of "corruptly and

fraudulently refused to consider and fairly adjudicate said claim for the payment of the full

amounts of the sale price of the Plaintiffs' family home, motivated by passion and prejudice

against counsel at that time retained by the Plaintiffs, one Oscar Stilley," (§ 84, page 20), action

by Mr. Stilley constituting a breach of the obligation of his oath of office as an attorney-at-law,

due to his general tone of disrespect for the attorney code of ethics. (Count 6)

7. Mr. Stilley assisted his clients, the Joneses, in preparing a *pro se* Plaintiff's Complaint,

(PD Ex. I), which they filed on October 5, 2004, as USDC No. CV-04-2220 in the United States

District Court for the Western District of Arkansas, containing language which Mr. Stilley either

prepared or ratified that was clearly intemperate, contemptuous, and disrespectful of the Justices

of the Arkansas Supreme Court individually and as a Court, and alleged, "said Defendants [the

Justices] continued to sit on the case, and perverted judgment against the Plaintiffs herein,

depriving them of a competent tribunal and of an honest and impartial arbiter of the dispute," (§

86, pages 21-22), action by Mr. Stilley constituting a breach of the obligation of his oath of office

as an attorney-at-law, due to his general tone of disrespect for the attorney code of ethics. (Count

7)

8. Mr. Stilley assisted his clients, the Joneses, in preparing a *pro se* Plaintiff's Complaint, (PD Ex. I), which they filed on October 5, 2004, as USDC No. CV-04-2220 in the United States District Court for the Western District of Arkansas, containing language which Mr. Stilley either prepared or ratified that was clearly intemperate, contemptuous, and disrespectful of the Justices of the Arkansas Supreme Court individually and as a Court, and sought compensatory and punitive damages against the individual Justices, "for having wilfully and knowingly deprived Plaintiffs of due process and a competent tribunal in the cases stated in the body of the complaint," (PD Ex. I, page 25), action by Mr. Stilley constituting a breach of the obligation of his oath of office as an attorney-at-law, due to his general tone of disrespect for the attorney code of ethics. (Count 8)

9. Mr. Stilley assisted his clients, the Joneses, in preparing a *pro se* Brief in Support of Plaintiffs' Response to the Various Motions to Dismiss or for Summary Judgment, (PD Ex. J), which they filed on or about January 11, 2005, in CIV-04-2220 in the United States District Court for the Western District of Arkansas. The Brief contained language which Mr. Stilley either prepared or ratified that was clearly intemperate, contemptuous, and disrespectful of the trial court, the Honorable James Marschewski, where it accused the Judge of presiding over a case involving Westark College (now UAFS) despite a clear conflict of interest," apparently Parker v. Perry, (PD Ex. J, page 20), action by Mr. Stilley constituting a breach of the obligation of his oath of office as an attorney-at-law, due to his general tone of disrespect for the attorney code of ethics. (Count 9)

10. Mr. Stilley assisted his clients, the Joneses, in preparing a *pro se* Brief in Support of

Plaintiffs' Response to the Various Motions to Dismiss or for Summary Judgment, (PD Ex. J), which they filed on or about January 11, 2005, in CIV-04-2220 in the United States District Court for the Western District of Arkansas. The Brief contained language which Mr. Stilley either prepared or ratified that was clearly intemperate, contemptuous, and disrespectful of the trial court, the Honorable James Marschewski, where the brief accused the Judge of having "demonstrated a total disregard of judicial ethics," (PD Ex. J, page 20), action by Mr. Stilley constituting a breach of the obligation of his oath of office as an attorney-at-law, due to his general tone of disrespect for the attorney code of ethics. (Count 10)

11.  Mr. Stilley assisted his clients, the Joneses, in preparing a *pro se* Brief in Support of Plaintiffs' Response to the Various Motions to Dismiss or for Summary Judgment, (PD Ex. J), which they filed on or about January 11, 2005, in CIV-04-2220 in the United States District Court for the Western District of Arkansas. The Brief contained language which Mr. Stilley either prepared or ratified that was clearly intemperate, contemptuous, and disrespectful of the trial court, the Honorable James Marschewski, where the brief accused the Judge of having "knowingly and wilfully entered an illegal order against Oscar Stilley," (PD Ex. J, page 21), action by Mr. Stilley constituting a breach of the obligation of his oath of office as an attorney-at-law, due to his general tone of disrespect for the attorney code of ethics. (Count 11)

12. Mr. Stilley assisted his clients, the Joneses, in preparing a *pro se* Brief in Support of Plaintiffs' Response to the Various Motions to Dismiss or for Summary Judgment, (PD Ex. J), which they filed on or about January 11, 2005, in CIV-04-2220 in the United States District Court for the Western District of Arkansas. The Brief contained language which Mr. Stilley either prepared or ratified that was clearly intemperate, contemptuous, and disrespectful of the

trial court, the Honorable James Marschewski, where the brief accused the Judge of having "failed to disclose material facts showing a conflict of interest," (PD Ex. J, page 21), action by Mr. Stilley constituting a breach of the obligation of his oath of office as an attorney-at-law, due to his general tone of disrespect for the attorney code of ethics. (Count 12)

13. Mr. Stilley assisted his clients, the Joneses, in preparing a *pro se* Brief in Support of Plaintiffs' Response to the Various Motions to Dismiss or for Summary Judgment, (PD Ex. J), which they filed on or about January 11, 2005, in CIV-04-2220 in the United States District Court for the Western District of Arkansas. The Brief contained language which Mr. Stilley either prepared or ratified that was clearly intemperate, contemptuous, and disrespectful of the trial court, the Honorable James Marschewski, where the brief accused the Judge of having been "UAFS's semi-secret agent Marschewski engaged to fight their battles for them," (PD Ex. J, page 25), action by Mr. Stilley constituting a breach of the obligation of his oath of office as an attorney-at-law, due to his general tone of disrespect for the attorney code of ethics. (Count 13)

14. In his letter of October 26, 2004, Mr. Stilley threatened Judge James Marschewski with criminal prosecution if the Judge did not rule in a certain manner or take certain action requested by Stilley in Sebastian Circuit No. CV-2002-276, Parker v. Perry. When Judge Marschewski failed to act as Mr. Stilley demanded, on November 10, 2004, Mr. Stilley caused a document entitled "Warrant Information," apparently obtained from the Sebastian County Prosecuting Attorney's Office, to be filled out against Judge Marschewski, and others, (PD Ex. G), and to be then transmitted to the Judge by means of the Motion Mr. Stilley filed on November 19, 2004. Mr. Stilley attempted to use criminal process to coerce a favorable result in a civil court action in which he had an interest. (Count 14)

15. In his letter of October 26, 2004, (PD Ex. 2), Mr. Stilley threatened Judge Marschewski with the filing of a complaint against the Judge with "the judicial authorities," presumably the Arkansas Judicial Discipline and Disability Commission, if the Judge did not take certain action requested by Mr. Stilley, or decline to take action unfavorable to Stilley, in Sebastian Circuit No. CV-2002-276, Parker v. Perry. Judge Marschewski promptly sent Mr. Stilley's letter to the Arkansas Judicial Discipline and Disability Commission, as a self-report, (PD Ex. A), which did not result in any charges or action against the Judge. Mr. Stilley attempted to use the judicial disciplinary system to coerce a favorable result in a civil court action in which he had an interest. (Count 15)

16. As shown by an attachment, (PD Ex. A), to his Motion For Recusal filed November 19, 2004, (PD Ex. G), Mr. Stilley followed through on his October 26, 2004, threat to Judge Marschewski with the filing of a complaint against the Judge with the Committee on Professional Conduct, as the Judge did not take certain action requested by Mr. Stilley, or decline to take action unfavorable to Stilley, in Sebastian Circuit No. CV-2002-276, Parker v. Perry. Mr. Stilley attempted to use the attorney  discipline system to coerce a favorable result in a civil court action in which he had an interest. (Count 16)

17. By his letter of October 26, 2004, (PD Ex. A), Mr. Stilley threatened attorney Walton Maurras with the filing of a grievance against Maurras with the Committee on Professional Conduct if he did not back off prosecuting a motion to show cause for contempt against Mr. Stilley in Sebastian Circuit No. CV-2002-276, Parker v. Perry. When Mr. Maurras failed to act as Mr. Stilley demanded, on or about November 19, 2004, Mr. Stilley filed a grievance against him with the Committee, as shown by Ex. 5 to PD Ex. G. Mr. Stilley attempted to use the attorney

disciplinary system to coerce a favorable result in a civil court action in which he had an interest. (Count 17)

18. By his letter of October 26, 2004, (PD Ex. A), Mr. Stilley threatened attorney James M. Llewellyn, Jr. with the filing of a grievance against Llewellyn with the Committee on Professional Conduct if Mr. Llewellyn did not back off prosecuting a motion to show cause for contempt against Mr. Stilley in Sebastian Circuit No. CV-2002-276, Parker v. Perry. When Llewellyn failed to act as Stilley demanded, on or about November 19, 2004, Stilley filed a grievance against him with the Committee, as shown by Ex. 5 to PD Ex. G. Mr. Stilley attempted to use the attorney disciplinary system to coerce a favorable result in a civil court action in which he had an interest. (Count 18)

19. In Parker v. Perry, Sebastian Circuit No. CV-2002-276, as recited in his Judgment filed January 18, 2005, (attached to PD Ex. A), Judge Marschewski sanctioned Mr. Stilley in September 2002, for violation of Rule 11 for filing a lawsuit that was barred by the principles of res judicata, the statute of limitations, and the voluntary payment rule. The Judge assessed sanctions of fees incurred by the Fort Smith School District ($14,421.16) and the University of Arkansas at Fort Smith ($2,196.81) against Mr. Stilley. By Judgment issued January 18, 2005, Judge Marschewski later held Mr. Stilley in civil contempt and sentenced him to jail and fined him (suspended on conditions), having found that Mr. Stilley had failed to comply with the order. (Count 19)

20. Mr. Stilley violated Rule 11, ARCP, by filing a lawsuit barred by several legal doctrines, assisting clients in filing, pro se, a subsequent lawsuit in federal court in October 2004, Jones v. Double "D" Properties et al., that was exactly the same cause of action that resulted in

Mr. Stilley being sanctioned by Judge Marschewski in September 2002. (Count 20)

21.  Mr. Stilley failed to comply with the order of the Circuit Court of Sebastian County in Parker v. Perry and related cases, causing that court to have to expend unnecessary and limited time and resources on matters Stilley caused or assisted to occur. (Count 21)

22. On October 19, 2004, Mr. Stilley filed suit personally against Judge Marschewski, Justices Robert Brown, Tom Glaze, Donald Corbin, Annabelle Clinton Imber, Jim Hannah and Ray Thornton, in their official and individual capacities, and others, as No. CIV-04-2225 in United States District Court in the Western District. This case was eventually the subject of a Memorandum Opinion and Order of Dismissal by Judge G. Thomas Eisele filed May 18, 2005 (PD Ex. D). His Opinion and Dismissal was affirmed by the Court of Appeals for the Eighth Circuit (No. 05-2816) on May 26, 2006 (PD Ex. E).

A. Judge Eisele particularly found the "RICO" claim the Joneses and Mr. Stilley alleged to be disturbing and frivolous. (PD Ex. D, page 12)

B. Judge Eisele sanctioned Mr. Stilley for this conduct by striking the RICO claim from the Amended Complaint (PD Ex. D, page 15), assessing the costs and attorney's fees of UAFS against Mr. Stilley, to be determined after further pleadings, referred the matter and Mr. Stilley to the Committee on Professional Conduct (page 14), and directed the clerks of both federal districts in Arkansas to not accept for filing any complaint tendered by Mr. Stilley naming as parties any of at least twenty-nine (29) individuals or entities identified in an Ex. to the Opinion. Judge Eisele's decision was affirmed on appeal.

C. Mr. Stilley's conduct and frivolous claim in this matter resulted in the unnecessary use of court, party, and attorney time and resources. (Count 22)

23. On October 19, 2004, Mr. Stilley filed suit personally against Judge Marschewski, the University of Arkansas at Fort Smith (UAFS), and others, as No. CIV-04-2225 in United States District Court in the Western District, styled <u>Stilley v. Marschewski et al</u>. This case was eventually the subject of a Memorandum Opinion and Order of Dismissal by Judge G. Thomas Eisele filed May 18, 2005. His Opinion and Dismissal was affirmed by the Court of Appeals for the Eighth Circuit (No. 05-2816) on May 26, 2006 (PD Ex. E).

      A. Judge Eisele found (PD Ex. D, at page 13) that Mr. Stilley challenged Judge Marschewski's award of sanctions against Mr. Stilley in the earlier state court version of the *Jone*s litigation and lost on appeal.

      B. Judge Eisele found Mr. Stilley then filed the federal suit, contending UAFS breached federal law, statutory and constitutional, when it attempted to collect the state-court judgment. Judge Eisele found Mr. Stilley sued UAFS "for an improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation" to UAFS, in violation of Red. R. Civ. P. Rule 11(b)(1). (Page 13) The decision was affirmed on appeal.

      C. Mr. Stilley's conduct and improper purpose in this matter resulted in the unnecessary use of court, party, and attorney time, money, and resources. (Count 23)

24. In direct defiance of Judge Tabor's directives from the bench at the hearing on March 14, 2007, (FAPD Ex. D), Mr. Stilley had subpoenas and deposition notices issued on March 15, 2007, (FAPD Ex. E), to compel certain witnesses, including Judge Marschewski, to attend depositions to be conducted by Mr. Stilley for the purpose of attempting to relitigate issues already settled in the appeal in <u>Parker v. Perry</u>. This action had no substantial purpose other than to burden those third persons who were subpoenaed, including Dr. Beran, Judge Marschewski,

Judge Jim Spears, Mayor Ray Baker, and Sam Sicard. (Count 24)

25. In direct defiance of Judge Tabor's directives from the bench at the hearing on March 14, 2007, (FAPD Ex. D), Mr. Stilley had subpoenas and deposition notices issued on March 15, 2007, (FAPD Ex. E), to compel certain witnesses, including Judge Marschewski, to attend depositions to be conducted by Mr. Stilley for the purpose of attempting to relitigate issues already settled in the appeal in <u>Parker v. Perry</u>. This action had no substantial purpose other than to burden those third persons who were subpoenaed, including Dr. Beran, Judge Marschewski, Judge Jim Spears, Mayor Ray Baker, and Sam Sicard. These persons were required to obtain counsel and file motions to quash the subpoenas. (Count 25)

26. At the hearing on March 14, 2007, (FAPD Ex. D), Mr. Stilley stated that he intended to put on witnesses "who will testify that Judge Marschewski lied when he said he was not represent.... [cut off by the Court]" By this statement, Mr. Stilley engaged in conduct that is prejudicial to the administration of justice by accusing a judge of lying in a legal proceeding, and especially where the same allegation was part of the issues on appeal in a case, <u>Stilley v. Fort Smith School District et al</u>., that had been decided adversely to Mr. Stilley on September 14, 2006, by the Arkansas Supreme Court in No. 05-666, 367 Ark. 193. (Count 26)

27. Arkansas is the only state to have granted Oscar Stilley a license to practice law.

28. On April 21, 2006, at the conclusion of a public hearing in Case No. CPC 2002-077, Panel B announced a decision to suspend Mr. Stilley's Arkansas law license for six months.

29. On May 4, 2006, an Order from Committee Panel B in CPC 2002-077 was filed of record, and provided to Mr. Stilley, informing him of a six month suspension of his Arkansas law license.

30. The May 4, 2006, suspension order in CPC 2002-077 was stayed while Mr. Stilley appealed to the Arkansas Supreme Court in Case No. 06-972. (See 370 Ark. 294)(2007))

31. On July 14, 2006, Mr. Stilley filed a motion for admission *pro hac vice* in the case of USA v. Hamlet Bennett, No. 06-cr-68 in the United States District Court of Hawaii. (FAPD Ex. Supp 8.1) (Count 27)

32. In his Bennett motion, (FAPD Ex. Supp 8.1), Mr. Stilley failed to set out any information about his Arkansas law license disciplinary history to that date. (Count 27)

33. In his Bennett motion, (FAPD Ex. Supp 8.1), Mr. Stilley answered Question 6 under oath as follows, "I am not currently suspended or disbarred in any court." (Count 27)

34. By his response and omissions to the court in Bennett, (FAPD Ex. Supp 8.1), Mr. Stilley knowingly made a false statement of fact to a tribunal for the purpose of obtaining admission *pro hac vice* in the Bennett case. (Count 27)

35. On July 14, 2006, Mr. Stilley filed a motion for admission *pro hac vice* in the case of USA v. Hamlet Bennett, No. 06-cr-68 in the United States District Court of Hawaii. (FAPD Ex. Supp 8.1), falsely answering Question 6 under oath as follows, "I am not currently suspended or disbarred in any court." Mr. Stilley failed to correct his false statement of material fact to a tribunal for the Bennett case, and the true facts were only revealed when the United States of America filed Motion to Disqualify Oscar Stilley on August 11, 2006, in the Bennett case, (FAPD Ex. Supp 8.2). (Count 28)

36. On September 29, 2006, Mr. Stilley applied for admission *pro hac vice* in USA v. Gebauer, USDC (WA) No. 06-cr-122, and he provided that court with an eight-page detailed summary of his Arkansas law license disciplinary matters and sanctions. (FAPD Ex. Supp 10.2)

(Count 29)

37. On August 1, 2007,  Mr. Stilley applied for admission *pro hac vice* in USA v. Lobello, USDC (NV) No. 06-cr-376, and he twice provided that court with an eight -page detailed summary of his Arkansas law license disciplinary matters and sanctions. (FAPD Ex. Supp 11.1 and 11.2) (Count 29)

38. On June 9, 2008, Mr. Stilley applied for admission *pro hac vice* in USA v. Dirr, USDC (TN) No. 08-cr-42, and he failed to provide that court with any current negative information about his Arkansas state and federal law license disciplinary matters and sanctions, (FAPD Ex. Supp 13.1) (Count 29)

39. On June 9, 2008, when Mr. Stilley applied for admission *pro hac vice* in USA v. Dirr, USDC (TN) No. 08-cr-42,

A. He knew at the time that he had been placed on state interim suspension on December 27, 2007,

B. He knew at the time that state disbarment proceedings had been filed against him on January 16, 2008,

C. He knew at the time that the federal courts in Arkansas had suspended him from practicing there on May 1, 2008,

D. He knew at the time that the Eighth Circuit Court of Appeals had suspended him from practicing there on May 2, 2008.

E. His practice status representations to the Dirr court, directly and by knowing omission of material facts, constitute false statements of facts to the Dirr tribunal. (Count 29)

40. On July 14, 2006, Mr. Stilley filed a motion for admission *pro hac vice* in the case of

USA v. Hamlet Bennett, No. 06-cr-68 in the United States District Court of Hawaii. (FAPD Ex. Supp 8.1), which included his answer to Question 6 under oath as follows, "I am not currently suspended or disbarred in any court." By his responses and omissions, Mr. Stilley knowingly engage in conduct involving dishonesty, fraud, deceit or misrepresentation for the purpose of obtaining admission *pro hac vice* in the Bennett case. (Count 30).

41. On June 9, 2008, when Mr. Stilley applied for admission *pro hac vice* in USA v. Dirr, USDC (TN) No. 08-cr-42, he failed to provide that court with any negative information about his Arkansas state and federal law license disciplinary matters and sanctions, (FAPD Ex. Supp 13.1). By his representations to the Dirr court, directly and by knowing omission of material facts related to his law license and practice status , Mr. Stilley engaged in conduct involving dishonesty, fraud, deceit or misrepresentation to the Dirr court. (Count 31).

42. By his repeated attempts to relitigate his Arkansas state license and discipline issues and charges in federal courts in Michigan, Arizona, Hawaii, Tennessee, Washington, Nevada, and Mississippi, Mr. Stilley wasted the time and resources of those courts that could otherwise be put to use on other cases and business of those courts. (Count 32).

43. In Committee case No. CPC 2002-077, Mr. Stilley was sanctioned with a six (6) month Arkansas law license suspension by Committee Findings & Order filed May 4, 2006. (Trial Ex. 141)

44. The six month suspension imposed by the Committee on May 4, 2006, was stayed by order of the Arkansas Supreme court pending the outcome of Mr. Stilley's appeal, No. 06-972, to that court.

45. The Committee license suspension of Mr. Stilley was affirmed by the Arkansas

Supreme Court in No. 06-972 on June 21, 2007, (see 370 Ark. 294), and which suspension became effective on February 26, 2008, as shown by Trial Exs. 91, 141, and 142. (T.143)

46. Mr. Stilley unsuccessfully applied for certiorari to the United States Supreme Court from the decision of the Arkansas Supreme Court rendered June 21, 2007, in No. 06-972.

47. Count 9 as plead does not contain any mention of falsity. (T.39)

48. Mr. Stilley stated he is under criminal investigation by the U. S. Department of Justice in the Northen District of Oklahoma. (T.42-43, 50, 511-512)

49. Mr. Stilley invoked his privilege under the Fifth Amendment when asked if he was married. (T.48, 61)

50. Mr. Stilley stated in open court that the laptop computer he was using at that time belonged to "his wife." (T.68)

51. Mr. Stilley failed to produce at trial any transcript in which Judge James Marschewski admitted that statements made by Judge Marschewski were false. (Trial Ex. 184) (T.64-72, 77, 97-108, 214, 301-304, 411-412 )

52. Mr. Stilley's application for admission *pro hac vice* in the <u>Hamlet Bennett</u> case in federal court in Hawaii was filed on July 19, 2006, (Trial Ex. 53), well after the Committee entered its order of suspension against him on May 4, 2006. (Trial Ex. 141)

53. At the time he applied for admission *pro hac vice* in the <u>Hamlet Bennett</u> case in federal court in Hawaii on July 19, 2006, (Trial Ex. 53), Mr. Stilley's Arkansas law license was in suspended status, with the suspension stayed at his request pending the outcome of his appeal to the Arkansas Supreme Court. (T.111-127)

54. In her Order issued September 12, 2006, in the <u>Hamlet Bennett</u> case in Hawaii, (Trial

Ex. 58), United States Magistrate Judge Kobayashi found that Mr. Stilley had failed to disclose to the court in Hawaii in his admission *pro hac vice* in <u>Bennett</u> that his Arkansas law license had previously been suspended, with the suspension stayed pending appeal. (T.121-122)

55. Mr. Stilley appealed the ruling of Magistrate Judge Kobayashi in <u>Bennett</u> to the district court level, where District Judge Mollway affirmed Judge Kobayashi by order entered September 27, 2006. (Trial Ex. 59) (T.123-126)

56. Mr. Stilley did not further appeal the ruling and order of Judge Mollway disqualifying Mr. Stilley in the <u>Bennett</u> case. (T.124-126)

57. Since the entry of Judge Marschewski's Order of the Court in <u>Parker v. Perry</u> on September 22, 2004, (Trial Ex. 161), Mr. Stilley has not filed any of the case reports which Mr. Stilley was ordered to file. (T.151-154)

58. In her Order Under Seal filed April 20, 2005, in <u>USA v. Ensign</u>, No. CR-03-344, in the United States District Court of Arizona, (Trial Ex. 37), addressing issues of disclosure of disciplinary activities involving Mr. Stilley and his *pro hac vice* admission to represent Ms. Ensign, District Judge Mary Murguia found "that Mr. Stilley was not forthcoming regarding the various matters pending in Arkansas," including any reference by him to any proceedings before the Arkansas Ethics Committee. (T.170-174)

59. In her April 20, 2005, Order Under Seal, Judge Murguia terminated Mr. Stilley's status and privilege to act as lead counsel, legal advisor, and/or consultant for defendant Patricia Ensign. (Trial Ex. 37) (T.174)

60. Mr. Stilley appealed Judge Murguia's ruling in <u>Ensign</u> to the Ninth Circuit Court of Appeals, which affirmed Judge Murguia's position on July 5, 2007, in No. 06-10457. (Trial Ex.

39) (T.174-176)

62. Mr. Stilley issued a subpoena for deposition to Judge James Marschewski in No. 06-mc-042, <u>Cavitt v. Wills</u>, in the Western District of Arkansas, on December 5, 2006, (Trial Exs. 47,49) for the sole purpose of questioning Judge Marschewski about issues from the state case of <u>Parker v. Perry</u>, Sebastian Circuit No. CV-2002-276, and in particular to pursue Mr. Stilley's claim that Judge Marschewski should have recused or been disqualified from sitting as trial judge in the proceedings in <u>Parker v. Perry</u> that involved the claims of the University of Arkansas at Fort Smith against Mr. Stilley in 2004-2005. (Trial Exs. 50-52) (T181-182, 203-212)

63. Mr. Stilley filed a motion for *pro hac vice* admission on October 27, 2003, to appear for defendant Andrew Ouwenga in No. 03-cr-212, <u>USA v. Ouwenga</u>, in the United States District Court for the Western District of Michigan. (Trial Ex. 31) (T.214-216)

64. Mr. Stilley's motion for *pro hac vice* admission to appear for defendant Andrew Ouwenga in No. 03-cr-212, <u>USA v. Ouwenga</u> was denied by Order entered November 5, 2003, by Judge McKeague. (Trial Ex. 31) (T.214-216)

65. Mr. Stilley appealed the decision of Judge McKeague in <u>Ouwenga</u> to a three-judge panel, whose decision was issued January 28, 2004, in an Opinion signed by Chief District Judge Robert Bell,  affirming either Judge McKeague or Judge Quist. (Trial Ex. 32) (T.216-217)

66. Judge Bell and the panel found that, in support of Mr. Stilley's Petition for Admission in <u>Ouwenga</u>, he had submitted two Certificate of Good Standing forms the Arkansas Supreme Court Clerk dated October 2, 2003, and January 12, 2004, which certified "that he [Mr. Stilley] has not had any adverse disciplinary action whatsoever during the past three year period,..." (Trial Ex. 32, page 9) (T.216-218)

67. At the time he obtained and submitted in the Ouwenga case the two Arkansas Certificates of Good Standing, Mr. Stilley had been subjected to the following attorney discipline actions within the three year period before each Certificate:

a. A public "Caution" filed August 14, 2001, in Committee Case CPC 2001-037,

b. A public "Reprimand" filed September 17, 2001, in Committee Case CPC 2001-060,

c. A public "Suspension" by consent filed October 1, 2001, in Committee Case CPC 2001-001, and

d. A public "Reprimand" filed October 17, 2001, in Committee Case CPC 2001-006, none of which he disclosed in his Petition for Admission in the Ouwenga case. (Trial Ex. 32, pages 1-9)

68. Mr. Stilley appealed the three judge panel decision in Ouwenga, (Trial Ex. 32), to the United States Court of Appeals for the Sixth Circuit, which affirmed the lower court by the Opinion filed November 23, 2005, in No. 04-1283. (Trial Ex. 33) (T.217-219)

69. Mr. Stilley applied for certiorari to the United States Supreme Court, in Case No. 05-1576, from the adverse decision his Petition for Admission in Ouwenga at the Sixth Circuit, and the United States Supreme Court denied his petition for certiorari on October 17, 2006. (Trial Ex. 34) (T.218-219)

70. On September 6, 2006, Mr. Stilley executed, and thereafter filed, his three-page Application for Leave to Appear Pro Hac Vice ("PHV Application") in Case No. CR-06-122, USA v. Gebauer in the United States District Court for the Western District of Washington. (Trial Ex. 63) (T.220-226) This Application did not contain any page listing any "Disciplinary Actions" for Oscar Stilley.

71. On November 9, 2006, Mr. Stilley resubmitted his PHV Application in Gebauer, (Trial Ex. 64.B), which Application consisted of the three-page form and a new six page attachment listing the record of "Disciplinary Actions" and history for Oscar Stilley. (Trial Ex. 64.B) (T.221-223, 413-415)

73. In his initial PHV Application in Gebauer, Mr. Stilley failed to disclose to that Court any of his attorney discipline record and history in Arkansas, although the PHV Application form he signed dated September 6, 2006, contained the following statement: "I have not been disbarred or formally censured by a court of record or by a state bar association; and there are no disciplinary proceedings against me except those disclosed by the attached documentation." (Trial Ex. 63)

74. Section 17.D(4) of the Arkansas Supreme Court Procedures Regulating Professional Conduct if Attorneys at Law provides that a reprimand is a severe public censure issued against the lawyer.

75. In Gebauer, pursuant to General Rule 2(d) for the Western District of Washington, the Clerk of the District Court disapproved Mr. Stilley's PHV Application by letter dated December 4, 2006. (Trial Ex. 65) (T.223-224)

76. Mr. Stilley appealed the Clerk's denial of his PHV Application in Gebauer to District Court  Judge Robert Lasnick, who denied Mr. Stilley's appeal in an Order filed January 17, 2007. (Trial Ex. 68) (T.224-226)

77. On July 31, 2007, Mr. Stilley executed, and thereafter filed, his fourteen-page Petition for Permission to Practice in Case ("Petition") in Case No. 06-cr-376, USA v. Lobello in the United States District Court for Nevada. (Trial Ex. 70) (T.220-226) This Petition contains an

eight page listing of "Disciplinary Actions" and Arkansas disciplinary history for Oscar Stilley, a listing very similar to that he attached to Trial Ex. 64.B filed on November 9, 2006, in the Gebauer case in the State of Washington, indicating that after his experience in Gebauer Mr. Stilley knew how to appropriately answer Item 6 of the Nevada Petition. (Trial Exs. 70 & 71) T.249-251)

78. In his Order on Petition for Permission to Practice, filed October 11, 2007, in Lobello, (Trial Ex. 75), United States Magistrate Judge George Foley denied Mr. Stilley permission to practice in Lobello and found, at pages 8-9, "Unlike the circumstances in Bennett and Ensign, Mr. Stilley disclosed the Arkansas order suspending his license to practice in his verified petition to this Court.... The fact that two other federal district courts found that Mr. Stilley was less than candid with them in disclosing the status of his license to practice law is also a factor that this Court may consider, although, again, Mr. Stilley has not engaged in such conduct regarding his application in this Court." (T.251-254)

79. Mr. Stilley appealed Judge Foley's decision to United States District Judge James Mahan, who affirmed the denial of Mr. Stilley's *pro hac vice* admission into Lobello by Order filed December 6, 2007. (Trial Exs. 76-79) (T.254-257)

80. On June 7, 2008, Mr. Stilley filed his Motion for Admission Pro Hac Vice in USA v. Dirr, No. 08-CR-42 in the United States District Court for the Eastern District of Tennessee, attaching thereto a Certificate of good Standing issued June 2, 2008, by the Clerk of the United States District Court for the Central District of Illinois stating he was admitted to practice before the Illinois court on June 2, 2002. (Trial Ex. 88) (T.266-277, 279-284)

81. In his Motion for Admission Pro Hac Vice in USA v. Dirr, Mr. Stilley failed to

disclose to the court there that his Arkansas law license had been suspended in December 2007

(the interim suspension) and again in February 2008 (in No. CPC 2002-077). (Trial Exs. 91,

93.B) (T.266-277, 279-284)

82. In his Motion for Admission Pro Hac Vice in USA v. Dirr, Mr. Stilley failed to

disclose to the court there that disbarment proceedings had been initiated against his Arkansas

law license in January 2009. (Trial Ex. 91) (T.266-277, 279-284)

83. In his Motion for Admission Pro Hac Vice in USA v. Dirr, Mr. Stilley failed to

disclose to the court there that his privilege to practice in the United States District Court for the

Western District of Arkansas, his home federal district, had been suspended on May 1, 2008, in

Case Nos. 08-mc-05 and 08-mc-12. (Trial Exs. 91, 115) (T.266-277, 279-284)

84. In his Motion for Admission Pro Hac Vice in USA v. Dirr, Mr. Stilley failed to

disclose to the court there that his request for a Certificate of Good Standing from the Clerk in

the United States District Court for the Western District of Arkansas, his home federal district,

had been denied on May 1, 2008, as a result of the suspension orders filed in that court on May 1,

2008, in Case Nos. 08-mc-05 and 08-mc-12. (Trial Ex. 89) (T.266-277, 279-284)

85. In his Motion for Admission Pro Hac Vice in USA v. Dirr, Mr. Stilley failed to

disclose to the court there that his privilege to practice in the United States Court of Appeals for

the Eighth Circuit, his home federal circuit, had been suspended on May 2, 2008, in Case No. 08-

9002. (Trial Exs. 91, 118) (T.266-277, 279-284)

86. The judge in USA v. Dirr found that Mr. Stilley had displayed less than the proper

candor required to the Tennessee court in the manner of Mr. Stilley's obtaining the Illinois

Certificate of Good Standing in 2008 and using it with his Motion for Admission Pro Hac Vice

in USA v. Dirr. (Trial Ex. 93.B, page 4) (T.266-277, 279-284)

87. The judge in USA v. Dirr found that Mr. Stilley had displayed less than the proper candor required to the Illinois court in the manner of Mr. Stilley's obtaining the Illinois Certificate of Good Standing in 2008 and using it with his Motion for Admission Pro Hac Vice in USA v. Dirr. (Trial Ex. 93.B, page 4) (T.266-277, 279-284)

88. Because Mr. Stilley did not meet the conditions of the local federal court rule for admission pro hac vice, the judge properly denied Mr. Stilley's Motion for Admission Pro Hac Vice in USA v. Dirr. (Trial Ex. 93.B) (T.266-277, 279-284, 426-431)

89. As of February 10, 2009, Mr. Stilley had an outstanding unpaid obligation of approximately $40,000 to Sebastian County, Arkansas, related to Parker v. Perry. (T.446-449, 461, 515)

90. Mr. Stilley made voluntary personal political contributions totaling $880 in the third and fourth quarters (July-December) of 2007 to a national presidential campaign. (Trial Ex. 169) (T.461-463)

91. By Order filed July 8, 2005, in No. 04-2225, Stilley v. Marschewski et al, United States District Judge Thomas Eisele sanctioned Mr. Stilley by requiring Mr. Stilley to not file any future Complaints in either federal district in Arkansas through July 1, 2007, without obtaining prior approval from Judge Eisele to file a new Complaint. (Trial Ex. 151) (T.476-478)

92. Prior to 1998, as detailed in Stilley v. McBride, 332 Ark. 306 (1998), Mr. Stilley filed a "1983" action in federal court against two Fort Smith police officers. (Trial Ex. 146) (T.439-442)

93. Prior to 1998, as detailed in Stilley v. McBride, 332 Ark. 306 (1998), after filing a

"1983" action in federal court against two Fort Smith police officers, Mr. Stilley filed a request under the Arkansas freedom of information law to the City of Fort Smith to obtain from their personnel files the home addresses of the two police officers for his use in obtaining service of process upon them by mail, instead of by paying a process server, in his federal lawsuit. (Trial Ex. 146) (T.439-442)

94. As detailed in Stilley v. McBride, 332 Ark. 306 (1998), the Arkansas Supreme Court found Mr. Stilley's effort to obtain the officers' home addresses by his request under the Arkansas freedom of information law to the City of Fort Smith was triggered largely by his intent to save a few dollars in serving process. (Trial Ex. 146) (T.439-442)

95. As detailed in Stilley v. McBride, 332 Ark. 306 (1998), the Arkansas Supreme Court found that by the time of his hearing in the state court suit he brought to compel release to him of the officers' home addresses by his request under the Arkansas freedom of information law to the City of Fort Smith, Mr. Stilley had already obtained the officers' addresses and the officers had filed answers in the federal suit. (Trial Ex. 146) (T.439-442)

96. As detailed in Stilley v. McBride, 332 Ark. 306 (1998), the Arkansas Supreme Court found that by the time of his hearing in the state court suit he brought to compel release to him of the officers' home addresses by his request under the Arkansas freedom of information law to the City of Fort Smith, Mr. Stilley had already obtained the officers' addresses, the officers had filed answers in the federal suit, and the federal suit had been dismissed. (Trial Ex. 146) (T.439-442)

97. As detailed in Stilley v. McBride, 332 Ark. 306 (1998), the Arkansas Supreme Court found that in the state court case the officers met their burden of showing the officers' concerns for their personal and family safety and harassment if their home addresses were publicly

disclosed. (Trial Ex. 146) (T.439-442)

## II. PETITIONER'S PROPOSED CONCLUSIONS OF LAW

1. Mr. Stilley's conduct, as set forth in the Exhibits in CPC 2006-067, violated Model

Rule 3.1 in that he assisted Robbie and Buck Jones, who had been his clients in a similar, if not

identical and unsuccessful action in the state court, in preparing a Complaint that was filed in

federal court as No. CIV-04-2220, (PD Ex. I), alleging, among other claims, a "RICO"

(Racketeer Influenced and Corrupt Organizations Act) violation, a claim Judge Eisele

specifically found was frivolous, (see PD Ex. D, pages 11-12), a decision affirmed on appeal

to the Court of Appeals for the Eighth Circuit. (Count 1)

2. Mr. Stilley's conduct violated Model Rule 3.3(a)(1) in that at a hearing on January 14,

2005, on a contempt citation against him in Sebastian Circuit CIV–02-276-VI, Parker v. Perry, he

was asked if he prepared the federal court case Complaint (Ex. FSPSD 1 there, PD Ex. I here)

filed *pro se* by Buck and Robbie Jones as USDC No. CV-04-2220 on October 5, 2004, and Mr.

Stilley responded, as shown by the testimony at pages 41-62 of PD Ex. N. The federal suit was a

re-litigation of the same issues that had already been litigated unsuccessfully by Mr. Stilley for

the Joneses, through appeal, in the state courts, a material fact for the state court's inquiry at that

time. Mr. Stilley's answers show that he at first stated that "you worked on it" (page 43) when

asked "did you type it." When asked if anyone else,  particularly Buck and Robbie Jones typed on

the Complaint, he responded "I do not have personal knowledge of that." (Page 44) Later, Mr.

Stilley admitted he typed "a lot of it." (Page 45) When asked "Did Buck Jones write any part of

this complaint," he responded, "This is Buck  Jones's complaint." When asked "Did Buck Jones

(or Robbie Jones) type any part of this complaint," Mr. Stilley responded to both forms of the

question, "Not to my knowledge." (Page 46) When asked, "Did you prepare the complaint," Mr.
Stilley responded, "I assisted Mr. Buck Jones materially in the preparation of that complaint."
(Page 55) When asked "did Mr. Jones write any words on a piece of paper that ended up in that
complaint," Mr. Stilley responded, "He didn't do any of the typing at all." (Page 58) Buck Jones
was deposed on March 1, 2005, and selected portions of his deposition (Ex. O here) show he
clearly thought Mr. Stilley was his attorney and representing him in this lawsuit at the time it was
prepared and typed in Mr. Stilley's office, with major input from Mr. Stilley, both on factual
matters and legal issues. Mr. Jones stated he knew before the preparation and filing of this
federal suit that Mr. Stilley had previously filed state court suits on the same illegal exaction
issue and had lost each suit. Mr. Stilley's equivocation under oath in response to repeated
questions on the same point, the responsibility for actually preparing the later federal case
complaint at issue demonstrates a lack of the candor, even a false statement, to the tribunal that is
required and expected of attorneys as officers of the court, on a matter that was material. (Count
2)

     3. Mr. Stilley's conduct violated Model Rule 3.4(c) in that he assisted his clients, the
Joneses, in preparing a *pro se* Plaintiff's Complaint, (PD Ex. I), which they filed on October 5,
2004, as USDC No. CV-04-2220 in the United States District Court for the Western District of
Arkansas, containing language which Mr. Stilley either prepared or ratified that was clearly
intemperate, contemptuous, and disrespectful of the Justices of the Arkansas Supreme Court
individually and as a Court, and accused them of not being a "'competent tribunal,' as that term
is used by the Eighth Circuit Court of Appeals," (PD Ex. I, § 35, page 7), action by Mr. Stilley
constituting a breach of the obligation of his oath of office as an attorney-at-law, due to his

general tone of disrespect for the attorney code of ethics. (Count 3)

4. Mr. Stilley's conduct violated Model Rule 3.4(c) in that he assisted his clients, the Joneses, in preparing a *pro se* Plaintiff's Complaint, (PD Ex. I), which they filed on October 5, 2004, as USDC No. CV-04-2220 in the United States District Court for the Western District of Arkansas, containing language which Mr. Stilley either prepared or ratified that was clearly intemperate, contemptuous, and disrespectful of the Justices of the Arkansas Supreme Court individually and as a Court, and accused them of being a Court that has "rendered it impossible for the Plaintiffs to obtain due process concerning the claims made herein, in any state court," (PD Ex. I, §35, page 8), action by Mr. Stilley constituting a breach of the obligation of his oath of office as an attorney-at-law, due to his general tone of disrespect for the attorney code of ethics. (Count 4)

5. Mr. Stilley's conduct violated Model Rule 3.4(c) in that he assisted his clients, the Joneses, in preparing a *pro se* Plaintiff's Complaint, (PD Ex. I), which they filed on October 5, 2004, as USDC No. CV-04-2220 in the United States District Court for the Western District of Arkansas, containing language which Mr. Stilley either prepared or ratified that was clearly intemperate, contemptuous, and disrespectful of the Justices of the Arkansas Supreme Court individually and as a Court, and accused them of, "wilfully and knowingly deprived the Plaintiffs of due process and a competent tribunal," (PD Ex. I, § 79, page 19), action by Mr. Stilley constituting a breach of the obligation of his oath of office as an attorney-at-law, due to his general tone of disrespect for the attorney code of ethics. (Count 5)

6. Mr. Stilley's conduct violated Model Rule 3.4(c) in that he assisted his clients, the Joneses, in preparing a *pro se* Plaintiff's Complaint, (PD Ex. I), which they filed on October 5,

2004, as USDC No. CV-04-2220 in the United States District Court for the Western District of Arkansas, containing language which Mr. Stilley either prepared or ratified that was clearly intemperate, contemptuous, and disrespectful of the Justices of the Arkansas Supreme Court individually and as a Court, and accused them of "corruptly and fraudulently refused to consider and fairly adjudicate said claim for the payment of the full amounts of the sale price of the Plaintiffs' family home, motivated by passion and prejudice against counsel at that time retained by the Plaintiffs, one Oscar Stilley," (PD Ex. I, § 84, page 20), action by his constituting a breach of the obligation of his oath of office as an attorney-at-law, due to his general tone of disrespect for the attorney code of ethics. (Count 6)

7. Mr. Stilley's conduct violated Model Rule 3.4(c) in that he assisted his clients, the Joneses, in preparing a *pro se* Plaintiff's Complaint, (PD Ex. I), which they filed on October 5, 2004, as USDC No. CV-04-2220 in the United States District Court for the Western District of Arkansas, containing language which Mr. Stilley either prepared or ratified that was clearly intemperate, contemptuous, and disrespectful of the Justices of the Arkansas Supreme Court individually and as a Court, and alleged "said Defendants [the Justices] continued to sit on the case, and perverted judgment against the Plaintiffs herein, depriving them of a competent tribunal and of an honest and impartial arbiter of the dispute," (PD Ex. I, § 86, pages 21-22), action by Mr. Stilley constituting a breach of the obligation of his oath of office as an attorney-at-law, due to his general tone of disrespect for the attorney code of ethics. (Count 7)

8. Mr. Stilley's conduct violated Model Rule 3.4(c) in that he assisted his clients, the Joneses, in preparing a *pro se* Plaintiff's Complaint, (PD Ex. I), which they filed on October 5, 2004, as USDC No. CV-04-2220 in the United States District Court for the Western District of

Arkansas, containing language which Mr. Stilley either prepared or ratified that was clearly intemperate, contemptuous, and disrespectful of the Justices of the Arkansas Supreme Court individually and as a Court, and sought compensatory and punitive damages against the individual Justices "for having wilfully and knowingly deprived Plaintiffs of due process and a competent tribunal in the cases stated in the body of the complaint," (PD Ex. I, page 25), action by Mr. Stilley constituting a breach of the obligation of his oath of office as an attorney-at-law, due to his general tone of disrespect for the attorney code of ethics. (Count 8)

9. Mr. Stilley's conduct violated Model Rule 3.4(c) in that he assisted his clients, the Joneses, in preparing a *pro se* Brief in Support of Plaintiffs' Response to the Various Motions to Dismiss or for Summary Judgment, (PD Ex. J), which they filed on or about January 11, 2005, in CIV-04-2220 in the United States District Court for the Western District of Arkansas. The Brief contained language which Mr. Stilley either prepared or ratified that was clearly intemperate, contemptuous, and disrespectful of the trial court, the Honorable James Marschewski, where it accused him of presiding over a case involving Westark College (now UAFS) despite a clear conflict of interest," apparently <u>Parker v. Perry</u>, (PD Ex, J, page 20), action by Mr. Stilley constituting a breach of the obligation of his oath of office as an attorney-at-law, due to his general tone of disrespect for the attorney code of ethics. (Count 9)

10. Mr. Stilley's conduct violated Model Rule 3.4(c) in that he assisted his clients, the Joneses, in preparing a *pro se* Brief in Support of Plaintiffs' Response to the Various Motions to Dismiss or for Summary Judgment, (PD Ex. J), which they filed on or about January 11, 2005, in CIV-04-2220 in the United States District Court for the Western District of Arkansas. The Brief contained language which Mr. Stilley either prepared or ratified that was clearly intemperate,

contemptuous, and disrespectful of the trial court, the Honorable James Marschewski, where it accused him of having "demonstrated a total disregard of judicial ethics," (PD Ex. J, page 20), action by Mr. Stilley constituting a breach of the obligation of his oath of office as an attorney-at-law, due to his general tone of disrespect for the attorney code of ethics. (Count 10)

11.  Mr. Stilley's conduct violated Model Rule 3.4(c) in that he assisted his clients, the Joneses, in preparing a *pro se* Brief in Support of Plaintiffs' Response to the Various Motions to Dismiss or for Summary Judgment, (PD Ex. J), which they filed on or about January 11, 2005, in CIV-04-2220 in the United States District Court for the Western District of Arkansas. The Brief contained language which Mr. Stilley either prepared or ratified that was clearly intemperate, contemptuous, and disrespectful of the trial court, the Honorable James Marschewski, where it accused him of having "knowingly and wilfully entered an illegal order against Oscar Stilley," (PD Ex. J, page 21), action by Mr. Stilley constituting a breach of the obligation of his oath of office as an attorney-at-law, due to his general tone of disrespect for the attorney code of ethics. (Count 11)

12. Mr. Stilley's conduct violated Model Rule 3.4(c) in that he assisted his clients, the Joneses, in preparing a *pro se* Brief in Support of Plaintiffs' Response to the Various Motions to Dismiss or for Summary Judgment, (PD Ex. J), which they filed on or about January 11, 2005, in CIV-04-2220 in the United States District Court for the Western District of Arkansas. The Brief contained language which Mr. Stilley either prepared or ratified that was clearly intemperate, contemptuous, and disrespectful of the trial court, the Honorable James Marschewski, where it accused him of having "failed to disclose material facts showing a conflict of interest," (PD Ex. J, page 21), action by Mr. Stilley constituting a breach of the obligation of his oath of office as an

attorney-at-law, due to his general tone of disrespect for the attorney code of ethics. (Count 12)

13. Mr. Stilley's conduct violated Model Rule 3.4(c) in that he assisted his clients, the Joneses, in preparing a *pro se* Brief in Support of Plaintiffs' Response to the Various Motions to Dismiss or for Summary Judgment, (PD Ex. J), which they filed on or about January 11, 2005, in CIV-04-2220 in the United States District Court for the Western District of Arkansas. The Brief contained language which Mr. Stilley either prepared or ratified that was clearly intemperate, contemptuous, and disrespectful of the trial court, the Honorable James Marschewski, where it accused him of having been "UAFS's semi-secret agent Marschewski engaged to fight their battles for them," (PD Ex. J, page 25), action by Mr. Stilley constituting a breach of the obligation of his oath of office as an attorney-at-law, due to his general tone of disrespect for the attorney code of ethics. (Count 13)

14. Mr. Stilley's conduct violated Model Rule 8.4(d) in that by his letter of October 26, 2004, Mr. Stilley threatened Judge James Marschewski with criminal prosecution if he did not rule in a certain manner or take certain action requested by Stilley in Sebastian Circuit No. CV-2002-276, <u>Parker v. Perry</u>. When Judge Marschewski failed to act as Mr. Stilley demanded, on November 10, 2004, Mr. Stilley caused a document entitled "Warrant Information," apparently obtained from the Sebastian County Prosecuting Attorney's Office, to be filled out against Judge Marschewski, and others, as shown by (PD Ex. G), and to be then transmitted to the Judge by means of the Motion Mr. Stilley filed on November 19, 2004. Mr. Stilley attempted to use criminal process to coerce a favorable result in a civil court action in which he had an interest, a misuse of the court system and the criminal justice system. (Count 14)

15. Mr. Stilley's conduct violated Model Rule 8.4(d) in that by his letter of October 26,

2004, he threatened Judge Marschewski with the filing of a complaint against the Judge with "the judicial authorities," presumably the Arkansas Judicial Discipline and Disability Commission, if the Judge did not take certain action requested by Mr. Stilley, or decline to take action unfavorable to Stilley, in Sebastian Circuit No. CV-2002-276, Parker v. Perry. Judge Marschewski promptly sent Mr. Stilley's letter to the Arkansas Judicial Discipline and Disability Commission, as a self-report, (JD Ex. A), which, on information and belief, did not result in any charges or action against the Judge. Mr. Stilley attempted to use the judicial disciplinary system to coerce a favorable result in a civil court action in which he had an interest, a misuse of the judicial discipline system, and prejudicial to the administration of justice. (Count 15)

    16. Mr. Stilley's conduct violated Model Rule 8.4(d) in that, as shown as an attachment (Ex. 5) to his Motion For Recusal filed November 19, 2004, (PD Ex. G), he followed through on his October 26, 2004, threat to Judge Marschewski with the filing of a complaint against the Judge with the Committee on Professional Conduct, if the Judge did not take certain action requested by Mr. Stilley, or decline to take action unfavorable to Stilley, in Sebastian Circuit No. CV-2002-276, Parker v. Perry. Mr. Stilley attempted to use the attorney discipline system to coerce a favorable result in a civil court action in which he had an interest, a misuse of the judicial discipline system, and prejudicial to the administration of justice. (Count 16)

    17. Mr. Stilley's conduct violated Model Rule 8.4(d) in that by his letter of October 26, 2004, he threatened attorney Walton Maurras with the filing of a grievance against him with the Committee on Professional Conduct if he did not back off prosecuting a motion to show cause for contempt against Mr. Stilley in Sebastian Circuit No. CV-2002-276, Parker v. Perry. When Mr. Maurras failed to act as Mr. Stilley demanded, on or about November 19, 2004, Mr. Stilley

filed a grievance against him with the Committee, as shown by Ex. 5 to PD Ex. G. Mr. Stilley attempted to use the attorney disciplinary system to coerce a favorable result in a civil court action in which he had an interest, a misuse of the attorney discipline system, and prejudicial to the administration of justice. (Count 17)

18. Mr. Stilley's conduct violated Model Rule 8.4(d) in that by his letter of October 26, 2004, he threatened attorney James M. Llewellyn, Jr. with the filing of a grievance against him with the Committee on Professional Conduct if Mr. Llewellyn did not back off prosecuting a motion to show cause for contempt against Mr. Stilley in Sebastian Circuit No. CV-2002-276, <u>Parker v. Perry</u>. When Llewellyn failed to act as Stilley demanded, on or about November 19, 2004, Stilley filed a grievance against him with the Committee, as shown by Ex. 5 to PD Ex. G. Mr. Stilley attempted to use the attorney disciplinary system to coerce a favorable result in a civil court action in which he had an interest, a misuse of the attorney discipline system, and prejudicial to the administration of justice. (Count 18)

19. Mr. Stilley's conduct violated Model Rule 8.4(d) in that in <u>Parker v. Perry</u>, Sebastian Circuit No. CV-2002-276, as recited in his Judgment filed January 18, 2005, (attached to PD Ex. A), Judge Marschewski sanctioned Mr. Stilley in September 2002, for violation of Rule 11 by filing a lawsuit that was barred by the principles of *res judicata*, the statute of limitations, and the voluntary payment rule. The Judge assessed sanctions of fees incurred by the Fort Smith School District ($14,421.16) and the University of Arkansas at Fort Smith ($2,196.81) against Mr. Stilley. By Judgment issued January 18, 2005, Judge Marschewski later held Mr. Stilley in civil contempt and sentenced him to jail and fined him (suspended on conditions), having found that he had failed to comply with the order. (Count 19)

20. Mr. Stilley's conduct violated Model Rule 8.4(d) in that he violated Rule 11, ARCP, by filing a lawsuit barred by several legal doctrines, assisting clients in filing, *pro se,* a subsequent lawsuit in federal court in October 2004, <u>Jones v. Double "D" Properties et al.</u>, that was exactly the same cause of action that resulted in Mr. Stilley being sanctioned by Judge Marschewski in September 2002. (Count 20)

21.  Mr. Stilley's conduct violated Model Rule 8.4(d) in that his failure to comply with the orders for sanctions caused the Circuit Court of Sebastian County to have to expend unnecessary and limited time and resources on matters he caused or assisted to occur. (Count 21)

22. Mr. Stilley's conduct violated Model Rule 8.4(d) in that on October 19, 2004, he filed suit personally against Judge Marschewski, Justices Robert Brown, Tom Glaze, Donald Corbin, Annabelle Clinton Imber, Jim Hannah and Ray Thornton, in their official and individual capacities, and others, as No. CIV-04-2225 in United States District Court in the Western District. This case was eventually the subject of a Memorandum Opinion and Order of Dismissal by Judge G. Thomas Eisele filed May 18, 2005 (PD Ex. D). This Opinion and Dismissal was affirmed by the Court of Appeals for the Eighth Circuit (No. 05-2816) on May 26, 2006 (PD Ex. E). Judge Eisele particularly found the "RICO" claim the Joneses and Mr. Stilley alleged to be disturbing and frivolous. (PD Ex. E, page 12) Judge Eisele sanctioned Mr. Stilley for this conduct by striking the RICO claim from the Amended Complaint (PD Ex. E, page 15), assessing the costs and attorney's fees of UAFS against Mr. Stilley, to be determined after further pleadings, referred the matter and Mr. Stilley to the Committee on Professional Conduct (PD Ex. E, page 14), and directed the clerks of both federal districts in Arkansas to not accept for filing any complaint tendered by Mr. Stilley naming as parties any of at least twenty-nine (29)

individuals or entities identified in an exhibit to the Opinion. His decision was affirmed on appeal. Mr. Stilley's conduct and frivolous claim in this matter resulted in the unnecessary use of court, party, and attorney time and resources, conduct that was prejudicial to the administration of justice. (Count 22)

23. Mr. Stilley's conduct violated Model Rule 8.4(d) in that on October 19, 2004, he filed suit personally against Judge Marschewski, the University of Arkansas at Fort Smith (UAFS), and others, as No. CIV-04-2225 in United States District Court in the Western District. This case was eventually the subject of a Memorandum Opinion and Order of Dismissal by Judge G. Thomas Eisele filed May 18, 2005. His Opinion and Dismissal was affirmed by the Court of Appeals for the Eighth Circuit (No. 05-2816) on May 26, 2006 (PD Ex. E). Judge Eisele found (Page 13) that Mr. Stilley challenged Judge Marschewski's award of sanctions against Mr. Stilley in the earlier state court version of the *Jones* litigation and lost on appeal.  Judge Eisele found Mr. Stilley then filed the federal suit, contending UAFS breached federal law, statutory and constitutional, when it attempted to collect the state-court judgment. Judge Eisele found Mr. Stilley sued UAFS "for an improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation" to UAFS, in violation of Red. R. Civ. P. Rule 11(b)(1). (Page 13) The decision was affirmed on appeal. Mr. Stilley's conduct and improper purpose in this matter resulted in the unnecessary use of court, party, and attorney time, money, and resources, conduct that is prejudicial to the administration of justice. (Count 23)

24. Mr. Stilley's conduct violated Rule 3.4(c) in that in direct defiance of Judge Tabor's directives from the bench at the hearing on March 14, 2007, Mr. Stilley had subpoenas and deposition notices issued on March 15, 2007, to compel certain witnesses, including Judge

Marschewski, to attend depositions to be conducted by Mr. Stilley for the purpose of attempting to relitigate issues already settled in the appeal in <u>Parker v. Perry</u>. This action had no substantial purpose other than to burden those third persons who were subpoenaed, including Dr. Beran, Judge Marschewski, Judge Jim Spears, Mayor Ray Baker, and Sam Sicard. (Count 24)

25. Mr. Stilley's conduct violated Rule 4.4(a) in that in direct defiance of Judge Tabor's directives from the bench at the hearing on March 14, 2007, Mr. Stilley had subpoenas and deposition notices issued on March 15, 2007, to compel certain witnesses, including Judge Marschewski, to attend depositions to be conducted by Mr. Stilley for the purpose of attempting to relitigate issues already settled in the appeal in <u>Parker v. Perry</u>. This action had no substantial purpose other than to burden those third persons who were subpoenaed, including Dr. Beran, Judge Marschewski, Judge Jim Spears, Mayor Ray Baker, and Sam Sicard. These persons were required to obtain counsel and file motions to quash the subpoenas. (Count 25)

26. Mr. Stilley's conduct violated Rule 8.4(d) in that in the hearing on March 14, 2007, Mr. Stilley stated that he intended to put on witnesses "who will testify that Judge Marschewski lied when he said he was not represent.... [cut off by the Court]" By this statement, Mr. Stilley engaged in conduct that is prejudicial to the administration of justice by accusing a judge of lying in a legal proceeding, and especially where the same allegation was part of the issues on appeal in a case, <u>Stilley v. Fort Smith School District et al.</u>, that had been decided adversely to Mr. Stilley on September 14, 2006,  by the Arkansas Supreme Court in No. 05-666, 367 Ark. 193. (Count 26)

27. Arkansas is the only state to have granted Oscar Stilley a license to practice law. On April 21, 2006, at the conclusion of a public hearing in Case No. CPC 2002-077, Panel B

announced a decision to suspend Mr. Stilley's Arkansas law license for six months. On May 4, 2006, an Order from Committee Panel B in CPC 2002-077 was filed of record, and provided to Mr. Stilley, informing him of a six month suspension of his Arkansas law license. This suspension order was stayed while he appealed to the Arkansas Supreme Court in case No. 06-972. On July 14, 2006, Mr. Stilley filed a motion for admission *pro hac vice* in the case of USA v. Hamlet Bennett, No. 06-cr-68 in the United States District Court of Hawaii. (FAPD Ex. Supp 8.1) In his motion, Mr. Stilley failed to set out any information about his Arkansas law license disciplinary history to that date. He also answered Question 6 under oath as follows, "I am not currently suspended or disbarred in any court." By his response and omissions, Mr. Stilley knowingly made a false statement of fact to a tribunal for the purpose of obtaining admission *pro hac vice* in the Bennett case, thereby violating Arkansas Rule 3.3(a)(1). (Count 27)

28. Given the same history of Case No. CPC 2002-077 recited in Conclusion of Law No. 27 (above), on July 14, 2006, Mr. Stilley filed a motion for admission *pro hac vice* in the case of USA v. Hamlet Bennett, No. 06-cr-68 in the United States District Court of Hawaii. (FAPD Ex. Supp 8.1) In his motion, Mr. Stilley failed to set out any information about his Arkansas law license disciplinary history to that date. He also answered Question 6 under oath as follows, "I am not currently suspended or disbarred in any court." Mr. Stilley failed to correct his false statement of material fact to a tribunal, and the true facts were only revealed when the United States of America filed Motion to Disqualify Oscar Stilley on August 11, 2006, in the Bennett case, (FAPD Ex. Supp 8.2), thereby violating Arkansas Rule 3.3(a)(1). (Count 28)

29. On September 29, 2006, when Mr. Stilley applied for admission *pro hac vice* in USA v. Gebauer, USDC (WA) No. 06-cr-122, he provided that court with an eight -page detailed

summary of his Arkansas law license disciplinary matters and sanctions. (FAPD Ex. Supp 10.2) On August 1, 2007, when Mr. Stilley applied for admission *pro hac vice* in USA v. Lobello, USDC (NV) No. 06-cr-376, he twice provided that court with an eight -page detailed summary of his Arkansas law license disciplinary matters and sanctions, (FAPD Ex. Supp 11.1 and 11.2) On June 9, 2008, when Mr. Stilley applied for admission *pro hac vice* in USA v. Dirr, USDC (TN) No. 08-cr-42, he failed to provide that court with any negative information about his Arkansas state and federal law license disciplinary matters and sanctions. (FAPD Ex. Supp 13.1), although he knew at the time that he had been placed on state interim suspension on December 27, 2007, state disbarment proceedings had been filed against him on January 16, 2008, the federal courts in Arkansas had suspended him from practicing there on May 1, 2008, and the Eighth Circuit Court of Appeals had suspended him from practicing there on May 2, 2008. His practice status representations to the Dirr court, directly and by knowing omission of material facts, constitute false statements of facts to the Dirr tribunal, thereby violating Arkansas Rule 3.3(a)(1). (Count 29)

30. Given the same history of Case No. CPC 2002-077 recited in Conclusion of Law No. 27 (above), on July 14, 2006, Mr. Stilley filed a motion for admission *pro hac vice* in the case of USA v. Hamlet Bennett, No. 06-cr-68 in the United States District Court of Hawaii. (FAPD Ex. Supp 8.1) In his motion, Mr. Stilley failed to set out any information about his Arkansas law license disciplinary history to that date. He also answered Question 6 under oath as follows, "I am not currently suspended or disbarred in any court." By his responses and omissions, Mr. Stilley knowingly engaged in conduct involving dishonesty, fraud, deceit or misrepresentation for the purpose of obtaining admission pro hac vice in the Bennett case, thereby violating Arkansas

Rule 3.3(a)(1). (Count 30).

31. On September 29, 2006, when Mr. Stilley applied for admission *pro hac vice* in <u>USA v. Gebauer</u>, USDC (WA) No. 06-cr-122, he provided that court with an eight -page detailed summary of his Arkansas law license disciplinary matters and sanctions. (FAPD Ex. Supp 10.2) On August 1, 2007, when Mr. Stilley applied for admission *pro hac vice* in *USA v. Lobello*, USDC (NV) No. 06-cr-376, he twice provided that court with an eight -page detailed summary of his Arkansas law license disciplinary matters and sanctions. (FAPD Ex. Supp 11.1 and 11.2) On June 9, 2008, when Mr. Stilley applied for admission *pro hac vice* in <u>USA v. Dirr</u>, USDC (TN) No. 08-cr-42, he failed to provide that court with any negative information about his Arkansas state and federal law license disciplinary matters and sanctions, (FAPD Ex. Supp 13.1), although he knew at the time that he had been placed on state interim suspension on December 27, 2007, state disbarment proceedings had been filed against him on January 16, 2008, the federal courts in Arkansas had suspended him from practicing there on May 1, 2008, and the Eighth Circuit Court of Appeals had suspended him from practicing there on May 2, 2008. By his practice status representations to the <u>Dirr</u> court, directly and by knowing omission of material facts, Mr. Stilley engaged in conduct involving dishonesty, fraud, deceit or misrepresentation to the <u>Dirr</u> court, thereby violating Arkansas Rule 8.4(c). (Count 31).

32. By his repeated attempts to relitigate his Arkansas state license and discipline issues and charges in federal courts in Michigan, Arizona, Hawaii, Tennessee, Washington, Nevada, and Mississippi, Mr. Stilley has wasted the time and resources of those courts that could otherwise be put to use on other cases and business of those courts, conduct prejudicial to the administration of justice in those courts, thereby violating Arkansas Rule 8.4(d). (Count 32).

33. Mr. Stilley was given sufficient notice and detail of the charges against him in both petitions for disbarment to enable him to fairly and adequately respond to all charges.

34. Model Rule 3.4(c), the Rule alleged to be violated in Count 9, does not mention, or contain in it as an element, falsity.

35. Count 9 as plead does not contain any mention of falsity.

36. At the time he applied for admission *pro hac vice* in the <u>Hamlet Bennett</u> case in federal court in Hawaii on July 19, 2006, (Trial Ex. 53), Mr. Stilley's Arkansas law license was in suspended status, with the suspension stayed at his request pending the outcome of his appeal to the Arkansas Supreme Court.

37. Actions for disbarment address the overall fitness of an Arkansas lawyer to hold a license to practice law, and Mr. Stilley's lack of candor, non-disclosure, and even misrepresentation to various federal courts in his applications for, or representations as to his disciplinary status, in *pro hac vice* admissions matters negatively impact his overall fitness in a serious, continuous, repeated, and material manner, as shown by the findings related to his participation in the <u>Ouwenga</u>, <u>Ensign</u>, <u>Bennett</u>, <u>Gebauer</u>, <u>Lobello</u>, and <u>Dirr</u> cases.

38. Actions for disbarment address the overall fitness of an Arkansas lawyer to hold a license to practice law. Mr. Stilley's tactics in <u>Stilley v. McBride</u>, 332 Ark. 306 (1998), (Trial Ex. 146), wherein he filed a state court suit to obtain the home addresses of two Fort Smith police officers for his use in obtaining service of process on them in a separate federal lawsuit he had earlier filed, and his continued pursuit of the release of the officers' addresses in state court after his federal lawsuit had been dismissed before the hearing in the state court suit, negatively impact his overall fitness in a serious and material manner, in that the Arkansas Supreme Court stated

that he placed his saving a few dollars on the method service of process on these officers above legitimate concerns for their safety if their home addresses could be obtained or disclosed under the Arkansas freedom of information law.

39. Actions for disbarment address the overall fitness of an Arkansas lawyer to hold a license to practice law, and Mr. Stilley's Arkansas disciplinary record, which includes, among other final disciplinary actions, all since January 2001, one caution, two reprimands, a thirty day suspension and a six month suspension, reflects negatively upon his fitness to hold a law license.

40. Actions for disbarment address the overall fitness of an Arkansas lawyer to hold a license to practice law, and Mr. Stilley's multiple efforts the last several years to relitigate in a number of federal courts outside Arkansas the merits of his Arkansas disciplinary cases demonstrates a lack of willingness to accept the rulings of the Arkansas Supreme Court and disciplinary committee by his challenges to such rulings in improper forums. On this point, this Special Judge adopts the discussion and findings in the Order of the three-judge panel of the United States District Court for the Central District of Illinois issued November 19, 2008, in In re: Oscar Amos Stilley, No. 08-MC-2043. (Trial Ex. 108)

41. Mr. Stilley was not denied the "due process" to which he is entitled by Arkansas case law in Arkansas attorney disciplinary proceedings, (see Stilley v. Supreme Court Comm., 370 Ark. 294, 304-305, 259 S.W.3d 395 (2007)), in any of the disciplinary cases against him in the record of this case.

Respectfully submitted,

ARKANSAS SUPREME COURT
OFFICE OF PROFESSIONAL CONDUCT

_____
Stark Ligon, Executive Director
AR Bar No. 75077
Justice Building, Room 110
625 Marshall Street
Little Rock, AR 72201-1054
501-376-0313, Fax 501-376-3438
stark.ligon@arkansas.gov

CERTIFICATE OF SERVICE

The undersigned counsel certifies that on March _____, 2009, a copy of this pleading was served by United States mail on the person(s) and at the address(es) shown below by placing the same in a United States Postal Service facility with sufficient postage attached to insure first class delivery, and by e-mail PDF service to oscar@oscarstilley.com:

Oscar A. Stilley
Attorney at Law
7103 Race Track Loop
Fort Smith, AR 72916-9241

_____
Stark Ligon

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,     )
                                  )
          Plaintiff,     )
                                  )
v.                               )     Case No. 09-CR-043-SPF
                                  )
LINDSEY KENT SPRINGER,     )
OSCAR AMOS STILLEY,     )
                                  )
          Defendants.     )

## VERDICT

### for Lindsey K. Springer

We, the jury, being duly sworn and upon our oaths, find the defendant Lindsey K. Springer:

**With respect to Count 1 -**

Not Guilty _____     Guilty _____✓_____

**With respect to Count 2 -**

Not Guilty _____     Guilty _____✓_____

**With respect to Count 3 -**

Not Guilty _____     Guilty _____✓_____

**(verdict form continues on next page)**

**With respect to Count 4 -**

Not Guilty _____          Guilty _____ ✓

**With respect to Count 5 -**

Not Guilty _____          Guilty _____ ✓

**With respect to Count 6 -**

Not Guilty _____          Guilty _____ ✓

11/16/09
_____          ████████████████████

**DATE**                              **FOREPERSON**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09-CR-043-SPF |
| | ) | |
| LINDSEY KENT SPRINGER, | ) | |
| OSCAR AMOS STILLEY, | ) | |
| | ) | |
| Defendants. | ) | |

### VERDICT

### for Oscar A. Stilley

We, the jury, being duly sworn and upon our oaths, find the defendant Oscar A. Stilley:

**With respect to Count 1 -**

Not Guilty _____      Guilty _____✓_____

**With respect to Count 3 -**

Not Guilty _____      Guilty _____✓_____

**With respect to Count 4 -**

Not Guilty _____      Guilty _____✓_____

11/16/09
_____
DATE

_____
**FOREPERSON**

AO 245B    (Rev. 09/08) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

<u>NORTHERN</u>    District of    <u>OKLA</u>

**FILED**
Apr 28 2010
Phil Lombardi, Clerk

| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINA** |
|---|---|
| **V.** | |
| OSCAR AMOS STILLEY | Case Number:    09-CR-043-002-SPF |
| | USM Number:    10579-062 |
| | Oscar Amos Stilley, Pro Se |
| | <u>Charles Robert Burton, IV, Standby Counsel</u> |
| | Defendant's Attorney |

## THE DEFENDANT:

[] pleaded guilty to count(s) _____

[] pleaded nolo contendere to count(s) _____
   which was accepted by the court.

[x] was found guilty on counts    One, Three, and Four of the Indictment
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 371 | Conspiracy to Defraud the United States | 1/15/09 | 1 |
| 26 U.S.C. § 7201 and 18 U.S.C. § 2 | Tax Evasion and Aiding and Abetting | 1/15/09 | 3 |
| 26 U.S.C. § 7201 and 18 U.S.C. § 2 | Tax Evasion and Aiding and Abetting | 1/15/09 | 4 |

   The defendant is sentenced as provided in pages 2 through ___6___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

[] The defendant has been found not guilty on count(s) _____

[] Count(s) _____ [] is [] are dismissed on the motion of the United States.

   It is ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the Court and United States Attorney of material changes in economic circumstances.

April 23, 2010
Date of Imposition of Judgment

Signature of Judge

The Honorable Stephen P. Friot, U.S. District Judge
Name and Title of Judge

April 28, 2010
Date

Judgment — Page __2__ of __6__

DEFENDANT:       Oscar Amos Stilley
CASE NUMBER:     09-CR-043-002-SPF

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:     180 months.  Sixty months as to each of Counts One, Three, and Four, all such terms to run consecutively to each other.

[x]    The court makes the following recommendations to the Bureau of Prisons:

   The Court directs the Bureau of Prisons not to incarcerate the defendant with his co-defendant, Lindsey Kent Springer (USM Number 02580-063).

[x]    The defendant is remanded to the custody of the United States Marshal.

[]    The defendant shall surrender to the United States Marshal for this district:

   []    at _____    []  a.m.   []   p.m.   on _____ .

   []    as notified by the United States Marshal.

[]    The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   []    before 12 noon on _____ .

   []    as notified by the United States Marshal.

   []    as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____    to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

DEFENDANT:        Oscar Amos Stilley
CASE NUMBER:      09-CR-043-002-SPF

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of : Three years.  Said term consists of three years as to each of Counts One, Three, and Four.  These terms of supervised release shall run concurrently, each with the others.

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance.  The defendant shall refrain from any unlawful use of a controlled substance.  The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

[]    The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse, but authority to administer drug testing for cause is retained. (Check, if applicable.)

[x]    The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

[x]    The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

[]    The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prison, or any state sex offender registration agency in which he or she resides, works, or is a student, or was convicted of a qualifying offense. (Check, if applicable.)

[]    The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

      If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

      The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

# STANDARD CONDITIONS OF SUPERVISION

1.    The defendant shall not leave the judicial district or other specified geographic area without the permission of the court or probation officer.
2.    The defendant shall report to the probation officer as directed by the court or probation officer and shall submit a truthful and complete written report within the first five days of each month.
3.    The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer.
4.    The defendant shall support the defendant's dependents and meet other family responsibilities (including, but not limited to, complying with the terms of any court order or administrative process pursuant to the law of a state, the District of Columbia, or any other possession or territory of the United States requiring payments by the defendant for the support and maintenance of any child or of a child and the parent with whom the child is living).
5.    The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons.
6.    The defendant shall notify the probation officer at least ten days prior to any change of residence or employment.
7.    The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance, or any paraphernalia related to any controlled substance, except as prescribed by a physician.
8.    The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered, or other places specified by the court.
9.    The defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer.
10.    The defendant shall permit a probation officer to visit the defendant at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer.
11.    The defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer.
12.    The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court.
13.    As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement  (any objection to such notification shall be decided by the district court).
14.    The defendant shall pay the special assessment imposed or adhere to a court-ordered installment schedule for the payment of the special assessment.
15.    The defendant shall notify the probation officer of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay any unpaid amount of restitution, fines, or special assessments.

DEFENDANT:         Oscar Amos Stilley
CASE NUMBER:       09-CR-043-002-SPF

# SPECIAL CONDITIONS OF SUPERVISION

1.  The defendant shall submit his person, residence, office or vehicle to a search, conducted by the United States Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release; failure to submit to a search may be grounds for revocation; the defendant shall warn any other residents that the premises may be subject to searches pursuant to this condition.

2.  The defendant shall abide by the "Special Financial Conditions" previously adopted by the Court, as follows:

    1.  The defendant shall maintain a checking account in the defendant's name and deposit into this account all income, monetary gains or other pecuniary proceeds, and make use of this account for payment of all personal expenses. All other bank accounts must be disclosed to the probation officer.

    2.  The defendant shall not make application for any loan or enter into any credit arrangement, without first consulting with the probation officer.

    3.  The defendant shall disclose all assets and liabilities to the probation officer. The defendant shall not transfer, sell, give-away, or otherwise convey any asset, without first consulting with the probation officer.

    4.  If the defendant owns or maintains interest in any profit or nonprofit entity, you shall, upon request, surrender and/or make available for review, any and all documents and records of said profit or nonprofit entity to the probation officer.

    5.  The defendant shall, upon request of the probation officer, complete a personal financial affidavit and authorize release of any and all financial information, to include income and tax return records, by execution of a Release of Financial Information form, or by any other appropriate means.

3.  The defendant shall abide by the "Special Computer Restriction Conditions" previously adopted by the Court, as follows:

    1.  The defendant shall disclose all e-mail accounts, Internet connections and Internet connection devices, including screen names and passwords, to the probation officer; and shall immediately advise the probation officer of any changes in his or her e-mail accounts, connections, devices, or passwords.

    2.  The probation officer shall have authority to monitor all computer activity, to include all e-mail or Internet connections, to include but not limited to installation of remote monitoring software. Unless waived by the probation officer, the cost of remote monitoring software shall be paid by the defendant.

    3.  The defendant shall not access any on-line service using an alias, or access any on-line service using the Internet account, name, or designation of another person or entity; and report immediately to the probation officer access to any Internet site containing prohibited material.

    4.  The defendant is prohibited from using any form of encryption, cryptography, stenography, compression, password-protected files or other methods that limit access to, or change the appearance of, data and/or images.

    5.  The defendant is prohibited from altering or destroying records of computer use, including the use of software or functions designed to alter, clean or "wipe" computer media, block monitoring software, or restore a computer to a previous state.

    6.  If instructed, the defendant shall provide all personal and business telephone records and credit card statements to the probation officer

4.  While on supervision, the defendant shall cooperate with the IRS in preparing and filing true and correct income tax returns for any tax years since 1987 for which the defendant has not filed a tax return; cooperate with the IRS in civil proceedings to determine accurately his tax liabilities for the same years; establish a payment schedule with the IRS and pay all taxes, interest, and penalties owed in connection with his tax debt according to the payment schedule set by the IRS.

5.  The defendant shall not engage in any activity that would constitute the unauthorized or unlicensed practice of law, nor provide representation or services of any kind, advice, suggestions, or recommendations, whether paid or not, to any person or entity, public or private, other than immediate family members, with respect to any matter relating to federal or state taxation. The defendant will maintain no website that refers to any matter relating to federal or state taxation. The defendant will post no material of any kind on any website that refers to any matter relating to federal or state taxation. The defendant will not file, without the expressed written permission of the Probation Office, any civil action relating to federal income tax.

6.  The defendant shall not work directly or indirectly in any business, profession, or self-employment engaged in the offer, sale, purchase, trade, brokering, solicitation, or similar transactions with respect to any real property, securities or negotiable instruments. The defendant will not engage in telemarketing activities, to include any telephone sales or other such business, campaign, venture, or transaction. The defendant shall maintain employment. All employment must be approved in advance by the Probation Officer. The defendant shall abide by electronic monitoring, curfew requirements, and travel restrictions.

7.  If instructed by the Probation Officer, the defendant shall provide originals or copies of all personal and business telephone phone records and all credit card, checking account and PayPal statements to the U.S. Probation Officer.

8.  The defendant shall report to the Probation Officer the particulars, as specified by the Probation Officer, of all transactions consummated with a check cashing service. These reports shall be made within 10 calendar days after completion of any such transaction. The defendant shall refrain from transacting business with any check cashing service if so directed by the Probation Officer.

9.  The defendant shall disclose all email accounts, Pay Pal accounts, internet connections and communication devises, to include all screen names and passwords. Your use of email, internet connections, or an internet connection service will be restricted and/or monitored by monitoring software and otherwise, with the costs of remote computer monitoring to be paid by the defendant. The defendant will be prohibited from accessing any on-line service using an alias or the internet account, name or designation or another person or entity. The defendant will be prohibited from altering or using any form of encryption or other methods that limit access to, or change, the appearance of data or images. The defendant will be prohibited from altering or destroying records of computer use.

AO 245B    (Rev. 09/08) Judgment in a Criminal Case
          Sheet 5 — Criminal Monetary Penalties.

Appellate Case: 14-5133     Document: 27-1     Date Filed: 01/06/2025     Page: 152

Judgment — Page    5    of    6

DEFENDANT:          Oscar Amos Stilley
CASE NUMBER:        09-CR-043-002-SPF

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $ 300<br>($100 as to each of Counts<br>One, Three, and Four) | $ N/A | $ 776,280 |

[]    The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

[x]    The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| IRS-RACS<br>Attention: Mail Stop 6261<br>Restitution<br>333 West Pershing Ave.<br>Kansas City, Missouri 64108 | | $ 684,653 | |
| Arkansas Department<br>of Finance<br>and Administration Income<br>Tax Administration<br>P.O. Box 3628<br>Little Rock, Arkansas 72203 | | $ 91,627 | |

| **TOTALS** | $ _____ 0 | $ _____ 776,280 | |

[]    Restitution amount ordered pursuant to plea agreement  $ _____

[]    The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

[]    The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    []    the interest requirement is waived for the        []    fine    []    restitution.

    []    the interest requirement for the        []    fine    []    restitution is modified as follows:

\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

Judgment — Page ___6___ of ___6___

DEFENDANT:     Oscar Amos Stilley
CASE NUMBER:   09-CR-043-002-SPF

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

**A**  []  Lump sum payment of $ _____ due immediately, balance due

     []  not later than _____ , or
     []  in accordance with   []  C,   []  D,   []  E, or   [] F below; or

**B**  []  Payment to begin immediately (may be combined with   []  C,   []  D, or   [] F below); or

**C**  []  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
     _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D**  []  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
     _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
     term of supervision; or

**E**  []  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
     imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  [x]  Special instructions regarding the payment of criminal monetary penalties:

     Any criminal monetary penalty is due in full immediately, but payable on a schedule of the greater of $25 quarterly or 50% of income
     pursuant to the Federal Bureau of Prisons' Inmate Financial Responsibility Program while in prison. If a monetary balance remains,
     payment is to commence no later than 60 days following release from imprisonment to a term of supervised release in equal monthly
     payments of $100 or 10% of net income (take home pay),  whichever is greater, over the duration of the term of supervised release
     and thereafter as prescribed by law for as long as some debt remains.  Notwithstanding establishment of a payment schedule, nothing
     shall prohibit the United States from executing or levying upon property of the defendant discovered before or after the date of this
     Judgment.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during
imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial
Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

[]   Joint and Several

     Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount,
     and corresponding payee, if appropriate.

[]   The defendant shall pay the cost of prosecution.
[]   The defendant shall pay the following court cost(s):
[]   The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal,
(5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                FOR THE NORTHERN DISTRICT OF OKLAHOMA

 3

 4   UNITED STATES OF AMERICA,

 5           Plaintiff,

 6   vs.                             Case No. CR-09-43-SPF

 7   LINDSEY KENT SPRINGER and
     OSCAR AMOS STILLEY,
 8
             Defendants.
 9
     ----------------------------
10

11

12

13

14

15              TRANSCRIPT OF SENTENCING PROCEEDINGS

16             BEFORE THE HONORABLE STEPHEN P. FRIOT

17                UNITED STATES DISTRICT JUDGE

18                     APRIL 21, 2010

19                     VOLUME I OF III

20

21

22

23

24

25
```

2

```
 1   APPEARANCES:

 2   FOR THE GOVERNMENT:
                              Mr. Charles Anthony O'Reilly
 3                            U.S. Department of Justice
                              PO Box 972
 4                            Washington, DC 20044

 5                            Mr. Kenneth P. Snoke
                              US Attorney's Office (Tulsa)
 6                            110 W. 7th Street, Ste. 300
                              Tulsa, OK 74119
 7

 8
     FOR DEFENDANT SPRINGER:
 9                            Mr. Lindsey Kent Springer
                              5147 S. Harvard Ave.
10                            Ste. 116
                              Tulsa, OK 74135
11
                              Mr. Robert Scott Williams
12                            Taylor Ryan Schmidt & Van Dalsem
                              1437 S. Boulder Ave., Ste. 850
13                            Tulsa, OK 74119

14   FOR DEFENDANT STILLEY:
                              Mr. Oscar Amos Stilley
15                            7103 Race Track Loop
                              Fort Smith, AR 72901
16
                              Mr. Charles Robert Burton, IV
17                            Burton Law Firm, PC
                              320 S. Boston, Ste. 2400
18                            Tulsa, OK 74103

19
                           EXAMINATION INDEX
20
     BRIAN SHERN
21        DIRECT BY MR. O'REILLY              13
          CROSS BY MR. SPRINGER               39
22        CROSS BY MR. STILLEY               124

23   BRIAN MILLER
          DIRECT BY MR. O'REILLY             173
24        CROSS BY MR. SPRINGER              192

25
```

```
 1              THE COURT:  Good morning.  We're here in Criminal
 2   09-43, United States of America v. Lindsey Kent Springer and
 3   Oscar Amos Stilley for sentencing.
 4       I note that the defendants and their standby counsel are
 5   present.
 6          Government counsel will please give their appearances.
 7              MR. O'REILLY:  Good morning, Your Honor.  Charles
 8   O'Reilly and Ken Snoke for the United States.  Also with us at
 9   counsel table are Special Agent Brian Shern and Saundra
10   Burgess.
11              THE COURT:  Thank you very much.
12       Let me inquire first of the defendants.  I presume that
13   you have had full opportunity to review the presentence report
14   and the addendum as provided by Rule 32; am I right about
15   that?
16              MR. SPRINGER:  Yes, Your Honor.
17              THE COURT:  Mr. Stilley?
18              MR. STILLEY:  Yes, Your Honor.
19              THE COURT:  Very well.  I'm going to, first of all,
20   assure all concerned that I have read all of the filings that
21   are related to sentencing in this case.  Obviously, they are
22   voluminous, but I'm not in any sense complaining about how
23   voluminous the filings are, I know that this is a very
24   important matter to both the government and to the defendants.
25       I have also, because of some of the issues raised by the
```

 1   filings in this case, done a fair amount of reading of the

 2   cases cited and relied upon by the defendants.

 3        So both the government and the defendants may certainly

 4   proceed on the basis that I have read the materials that have

 5   been submitted by both sides.

 6        There are issues that certainly are in controversy, and

 7   I'm fully cognizant of that.  I have sought to inform myself

 8   and prepare myself in every way that I could reasonably

 9   anticipate to address those issues.  I have done a fair amount

10   of analysis of my own.

11        And before we get to the presentations by the parties, let

12   me, perhaps, give you some orientation as to how we will

13   proceed and how I intend to address the matters that are at

14   issue.

15        The defendants in this case stand convicted by a jury of

16   the felony offense of conspiracy to defraud the United States

17   on Count 1; the felony offense of tax evasion on Count 2 as to

18   Mr. Springer; the felony offense of tax evasion on Counts 3 and

19   4 as to both defendants; and the misdemeanor offense of willful

20   failure to file tax returns as to Mr. Springer on Counts 5 and

21   6.

22        Mr. Springer faces a maximum sentence of 22 years in the

23   custody of the Bureau of Prisons.  Mr. Stilley faces a maximum

24   sentence of 15 years in the custody of the Bureau of Prisons.

25        Now, both sides are well aware of the statutory sentencing

1    factors that govern sentencing in this case, but I think it

2    would be appropriate to review those.

3        As we proceed, and certainly in the Court's final

4    evaluation of the matter from the perspective of both sides, I

5    will be mindful of my statutory duty to impose a sentence that

6    is sufficient but not greater than necessary to fulfill the

7    objectives of sentencing under the Sentencing Reform Act.

8        I will certainly take into account the factors mandated by

9    18 United States Code, Section 3553, including the purposes of

10   sentencing set forth in 3553(a)(2), which state the need for

11   the sentence, first, to reflect the seriousness of the offense,

12   to promote respect for the law and to provide just punishment

13   for the offense; secondly, to afford adequate deterrence for

14   criminal conduct; third, to protect the public from further

15   crimes of the defendant; and, fourth, to provide the defendant

16   with needed educational or vocational training, medical care or

17   other correctional treatment in the most effective manner.

18       I will also consider, as set forth in 3553(a), the nature

19   and circumstances of the offense and the history and

20   characteristics of the defendant, the kinds of sentences

21   available, the need to avoid unwarranted sentencing disparities

22   among defendants with similar records who have been found

23   guilty of similar conduct, the advisory sentencing guideline

24   calculation and the relevant guidelines policy statements, and,

25   fifth, the need to provide restitution, all of which I assure

1    the parties I will carefully consider.

2         I'm also mindful of the fact that, under 18 United States

3    Code, Section 3661, no limitation shall be placed on the

4    information concerning the background, character and conduct of

5    a person convicted of an offense which a court of the United

6    States may receive and consider for purpose of imposing an

7    appropriate sentence.

8         Now, it will come as no surprise to anyone to either side

9    of this case, based on the sentencing-related filings, that

10   there certainly is a major point of contention with respect to

11   the scope of the activities of the defendants that may be

12   included in the Court's determination of the defendants'

13   relevant conduct for sentencing guidelines purposes.  That does

14   have some impact on the Court's determination of the amount of

15   the tax loss, among other things.

16        I would point out, however, that the practical

17   significance of this disagreement may be less than might

18   appear, because the Court's determinations under the advisory

19   sentencing guidelines are only one of the factors that the

20   Court will take into account in determining fair, just and

21   lawful sentences in this case.

22        Matters that may be outside of the scope of relevant

23   conduct for guidelines purposes may well be appropriate for

24   consideration as the Court evaluates, for instance, the history

25   and characteristics of the defendants, as required by Section

1   3553, which is a factor independent of the application of the

2   advisory guidelines and may well encompass matters outside of

3   the scope of relevant conduct under the guidelines.

4       Now, some matters that are contested by the defendants are

5   foreclosed by the verdicts of the jury in this case, but there

6   are some factual matters that are very much in issue.

7       The determination of the tax loss for sentencing purposes

8   involve some facts and issues that were not involved in the

9   trial, and I assume that the government is prepared to present

10  evidence to support its contentions as to the tax loss and as

11  to restitution.

12      Some matters of relevant conduct that are addressed in the

13  presentence report and are challenged by the defendants were

14  not involved in the trial.  By way of example only, I will note

15  that matters relating to Dale Hedberg, Ernest Swisher, and Kent

16  Hovind received no mention or, at most, very little mention at

17  trial.

18      Another example is that if the government intends to

19  assert that Mr. Stilley encouraged others to violate the

20  Internal Revenue laws within the meaning of 2T1.9(b)(2), I will

21  need to hear evidence on that, because unless my notes fail me,

22  I recall no evidence on that point at trial, with the possible

23  exception of some relatively weak testimony from Mr. Stilley

24  himself in passing in which he said, in substance, that after

25  he read Mr. Schiff's book, he concluded that he did not owe

 1  income taxes and he tried to persuade other people that he was

 2  correct about that.

 3      Other matters may be more appropriate for argument than

 4  evidence, such as the question of whether Mr. Springer would

 5  receive or should receive an adjustment for abuse of a position

 6  of public or private trust within the meaning of Guideline

 7  Section 3B1.3.

 8      So we have issues as to relevant conduct, tax loss,

 9  criminal source income, use of sophisticated means,

10  encouragement of others to violate the law, aggravating role in

11  the offense, abuse of a position of trust, obstruction of

12  justice, and restitution, perhaps, among other matters.

13      As I have said, and I would ask people to -- all concerned

14  to bear this in mind, since we did have a three-week trial,

15  some of these matters may be more -- at this stage, more fair

16  game for argument than for evidence.

17      One matter that I think also bears mentioning at this

18  point is the Paperwork Reduction Act defense that was asserted

19  at trial, that was asserted primarily, if not entirely, by

20  Mr. Springer.

21      Mr. Springer, you should bear in mind that I have rejected

22  your Paperwork Reduction Act defense as a matter of law and the

23  jury has rejected it as a factual matter.

24      On the willfulness issue, the jury rejected your

25  contention that you relied in good faith on the Paperwork

1  Reduction Act.  Although you can certainly spend your time in

2  these proceedings talking about the Paperwork Reduction Act if

3  you choose to do so, I will assure you that there's nothing

4  that you could say in this sentencing proceeding about the

5  Paperwork Reduction Act that would have an effect on your

6  sentence that you would consider to be beneficial.

7      So with the benefit of these preliminary observations, I

8  will now invite the government to give the Court a concise

9  preview of your intended presentation with respect to both

10  guidelines issues and restitution and any other matters the

11  government may consider relevant under Section 3553.

12          MR. O'REILLY:  Yes, Your Honor.  The United States

13  intends to call both Special Agent Brian Shern and Revenue

14  Agent Brian Miller.  Special Agent Shern will be testifying

15  with respect to additional --

16          THE COURT:  Wait just a minute.  I need to get a

17  writing pad to write on.  I managed to get out here without a

18  pad.

19      You got one handy?

20      Thank you.  You may proceed.

21          MR. O'REILLY:  Special Agent Shern will testify with

22  respect to additional income items, a few with respect to

23  Mr. Springer, because that was the focus of the trial, and then

24  quite a number of income items with respect to Mr. Stilley.

25  Primarily, that will be done in a summary, fairly quick

1  fashion, because we are proceeding by way of a bank deposits-

2  type analysis, where we will have Mr. Shern's testimony that

3  both these individuals were engaged in income-producing

4  activity, which was actually established at trial, and then

5  that these items have the inherent appearance of income.

6      Special Agent Shern will also testify with respect to some

7  specifics regarding some of the individuals who paid monies to

8  both Mr. Springer and Mr. Stilley.

9      With respect to the types of encouragement that --

10 primarily Mr. Stilley we will be focusing on, because I think

11 Mr. Springer's encouragement was adequately addressed at

12 trial.

13     And then with respect to Mr. Miller, his testimony will

14 primarily be to summarize the net consequences of the

15 additional tax -- of the additional income items and then

16 multiply the result by 20 percent, because under the United

17 States Sentencing Guidelines, where a defendant does not file a

18 return and a better estimate is not readily calculable, that is

19 the basis for a tax harm in this case.

20         THE COURT:  What's the percentage again?

21         MR. O'REILLY:  Twenty percent, sir.  Twenty percent

22 of gross income.

23     And with respect to that, Mr. Miller will also state how

24 he came to the state loss -- state loss calculations and also

25 thereby explain what the restitution should be, should the

```
1    Court award restitution.
2            THE COURT:  Is that 20 percent figure set forth in
3    one of the guidelines?
4            MR. O'REILLY:  Yes, Your Honor, it's 2T1.1 -- I can
5    give you the exact cite.
6            THE COURT:  Okay.  2T --
7            MR. O'REILLY:  1.1, Your Honor.  It's under the Notes
8    Number 2, "If the offense involved" --
9            THE COURT:  Okay.  Okay.  You're right.  You're
10   right.  I got confused between that and some other sections.
11           MR. O'REILLY:  The 28 percent, which is a
12   corporation.
13           THE COURT:  There's no need to dwell on that.
14           MR. O'REILLY:  All right.
15           THE COURT:  I got confused, which is not the first
16   time and won't be the last, so I do appreciate that
17   clarification.  Thank you, Mr. O'Reilly.
18       Now, for the defendants, I'm not going to require you to
19   give me a preview of any presentation you may intend to make at
20   this time, because I suspect that probably your intended
21   presentation would be impacted, to some degree, by what
22   transpires as the government proceeds.
23       However, if either defendant has any response at all to
24   the brief preliminary comments that have been made by the
25   government, I'll certainly give you that opportunity.
```

 1          MR. SPRINGER:  Thank you, Your Honor.  I was not

 2    understanding clearly about what Mr. Miller was going to

 3    summarize.  I know he said he was going to summarize something,

 4    but I wasn't sure whether Mr. Miller was going to be

 5    summarizing -- that we should be prepared for a summary of the

 6    taxes at issue at the trial or if Mr. Miller is going to be

 7    summarizing about from 1990 to 2008.  I don't believe that was

 8    clear.  And that was the only issue I had.

 9          THE COURT:  For sentencing purposes, the Court's

10    scrutiny of your tax violations is not limited to those

11    adjudicated at trial, so I anticipate that the government will

12    proceed on that basis.

13          MR. SPRINGER:  Thank you, Your Honor.

14          THE COURT:  Mr. Stilley.

15          MR. STILLEY:  May it please the Court, Your Honor, I

16    just had one -- actually, I guess, you could call it question.

17    I heard you say that Count 1 was a felony, but it would be my

18    contention that it was a misdemeanor and I guess my question

19    would be, if that is still a matter for consideration, and the

20    reason for that being is that the statute itself says that if

21    the underlying offense is a misdemeanor, then the conspiracy

22    itself is also a misdemeanor.  Is that --

23          THE COURT:  It's a felony, Mr. Stilley.  You may be

24    seated.

25       The government may proceed.

```
 1              MR. O'REILLY:  Your Honor, the United States calls
 2   Special Agent Brian Shern.
 3                          BRIAN SHERN,
 4   (WITNESS SWORN)
 5          MR. O'REILLY:  May I approach the witness, Your
 6   Honor?
 7              THE COURT:  You may.
 8              MR. O'REILLY:  May the record reflect that I've put
 9   two exhibit binders in front of Special Agent Shern, copies of
10   which were provided both to the defendants and to the Court per
11   the Court's scheduling order.
12              THE COURT:  Very well.
13                          DIRECT EXAMINATION
14   BY MR. O'REILLY:
15   Q.   Special Agent Shern, with respect to the documents that
16   are in front of you right now -- and I'm going to first ask
17   you:  Were you asked to collect all of the items for which we
18   intended to offer evidence that they were income to the
19   defendants?
20   A.   Yes.
21   Q.   As part of that, were subpoenas -- had subpoenas
22   previously been issued?
23   A.   Yes, they had.
24   Q.   Were those issued to various financial institutions?
25   A.   Yes.
```

BRIAN SHERN - DIRECT BY MR. O'REILLY                    14

```
 1   Q.    Also to Checks Cashed?

 2   A.    Yes.

 3   Q.    Was there also -- were there also subpoenas issued to

 4   PayPal?

 5   A.    Yes, there was.

 6   Q.    At trial, was a summary done of the tax comps for purposes

 7   of trial?

 8   A.    Yes, there was.

 9   Q.    Did that -- do those tax comps that were done for that

10   purpose, for that trial, did that include everything that --

11          THE COURT:  Stand by just a moment while I pull this

12   table over.  I need to pull a table over to -- so I can spread

13   out the exhibit notebooks.

14       You may proceed.

15   Q.    (BY MR. O'REILLY)  Special Agent Shern, do the documents

16   in front of you consist of more income items than were used for

17   purposes of that summary at trial?

18   A.    Yes, they do.

19   Q.    Do they include at least one item from a year prior to

20   2000?

21   A.    Yes.

22   Q.    And do they include items for years after 2005?

23   A.    Yes, they do.

24   Q.    Do they also include a large number of items with respect

25   to Mr. Stilley?
```

BRIAN SHERN - DIRECT BY MR. O'REILLY                    15

1  A.   Yes.

2  Q.   In what is in front of you, government's exhibits that are

3  numbered 3 through 236, were all of those introduced into

4  evidence at trial?

5  A.   Yes.

6  Q.   And just generally speaking, can you describe what

7  Exhibits 3 through 236 are?

8  A.   They are checks written to Mr. Springer or Bondage

9  Breakers Ministries that we obtained pursuant to subpoena to

10 Checks Cashed.

11 Q.   Are there also some items -- some checks that were paid to

12 Mr. Oscar Stilley?

13 A.   Yes.

14 Q.   With respect to all of those items, was there testimony

15 about whether these were, in fact, payments for income?

16 A.   Yes, there was.

17 Q.   For services, I should say.

18 A.   Payment for services, yes.

19 Q.   There's also a set of exhibits, 1001 through 1011.  Do you

20 recall what generally those checks are?

21 A.   Yes.  Those are checks that were not introduced at trial

22 that we obtained.

23 Q.   Were those checks that were made payable either to

24 Mr. Springer or to his -- or for his benefit?

25 A.   Yes.

BRIAN SHERN - DIRECT BY MR. O'REILLY                    16

1  Q.   I'm not going to go through all of those, but with respect

2  to Exhibit 1001, is that a check payable to Dale Hedberg dated

3  August 31st of 1999?

4  A.   Yes, it is.

5  Q.   Is that check endorsed over to Mr. Springer?

6  A.   Yes.  This check was discovered through the subpoena we

7  issued to Checks Cashed and it was signed over -- it's made out

8  to the order of Dale Hedberg, but we found out later that the

9  check was endorsed to Mr. Springer.

10 Q.   How did you find that out?

11 A.   It was included in the records of Mr. Delozier with Checks

12 Cashed provided to us, that -- and he explained that these were

13 checks that Mr. Springer negotiated at his check-cashing

14 business.

15 Q.   Do you know what, if any, relationship there was between

16 Mr. Springer and Mr. Hedberg?

17 A.   Yes.  Mr. Springer assisted Mr. Hedberg with legal

18 services during his trial in Illinois for state tax crimes.

19 Q.   Was Mr. Hedberg represented by counsel?

20 A.   No, he was not.

21 Q.   Did Mr. Springer sit at counsel table with Mr. Hedberg?

22 A.   Yes.

23 Q.   Were there also -- I'm going to ask you about Exhibit

24 1134, which are PayPal records from June 16, 2006, through

25 December 30th of 2009.  And I don't know if you'll have to look

BRIAN SHERN - DIRECT BY MR. O'REILLY                                    17

1    at those or not.  Just generally, what are those?

2    A.    Those are records that we subpoenaed from PayPal that

3    reflect the activity from Mr. Springer's PayPal account,

4    specifically monies that he received from transfers to his

5    PayPal account.

6    Q.    Just generally speaking, what is a PayPal account?

7    A.    It's an Internet payment service where people can send and

8    receive money through an Internet account.  Funds are accessed

9    from checking accounts and credit cards and sent to other

10   parties through PayPal.

11   Q.    I ask you now to draw your attention to -- with respect to

12   each of those items in Exhibits 3 through 236 and 1001 through

13   1011, and including the PayPal items, are there dates

14   associated with each of those items?

15   A.    Yes, there is.

16   Q.    And is that how the -- they were characterized and

17   categorized for purposes of tax computations?

18   A.    Yes.

19   Q.    With respect to the payors or the people that caused the

20   items to be paid to Mr. Springer, have you spoken to all of

21   those people?

22   A.    No.

23   Q.    Have you spoken to a large number of them?

24   A.    Yes.

25   Q.    Are you aware with respect to any of those people you've

1   spoken to of an instance where Mr. Springer had done nothing to

2   benefit that person?

3   A.   No, I'm not aware of that.

4   Q.   I'd ask you now to take a look at what's been marked as

5   1012 to 1133, and could you generally describe for the Court

6   what those items are?

7   A.   Yes.  These are checks that we subpoenaed from various

8   bank accounts of Oscar Stilley.

9   Q.   Were they all accounts held in Mr. Stilley's name?

10  A.   There were a few items that were subpoenaed from

11  Mr. Stilley's wife's account, but the majority were items

12  subpoenaed from accounts in Mr. Stilley's name.

13  Q.   And was one of those the IOLTA account that we heard a lot

14  of testimony about at trial?

15  A.   Yes.

16  Q.   How did you learn to look at Mrs. Stilley's account?

17  A.   Some of the checks, from the witnesses we talked to, at

18  least one, I think there may be a couple more, we, during the

19  course of the investigation, determined that the check was

20  deposited into his wife's account.

21  Q.   And what was the purpose of that check?

22  A.   It was payment for legal services.

23  Q.   Provided by Mr. Stilley?

24  A.   Yes.

25  Q.   Based upon that, with respect to the Exhibits 1012 through

BRIAN SHERN - DIRECT BY MR. O'REILLY                         19

```
 1  1163 -- excuse me -- through 1133, did you determine whether or
 2  not those were payments for Mr. Stilley's legal services?
 3  A.   For every check, we couldn't determine exactly that was
 4  what they were for, but they were payments that were deposited
 5  into accounts.  Some of them might have said "payment for legal
 6  fees" or "retainer."
 7  Q.   Did they have appearances of payments for legal fees?
 8  A.   Yes.
 9  Q.   During the time period in issue -- was this time period
10  2000 through 2008?
11  A.   Yes.
12  Q.   Was Mr. Stilley holding himself out as an attorney?
13  A.   Yes, he was.
14  Q.   And, in fact, for a significant portion of that time, did
15  he, in fact -- was he licensed to practice law?
16  A.   Yes.
17  Q.   With respect to that, are you aware of if at any time
18  Mr. Stilley made any representations to a court that he was
19  authorized to practice law when, in fact, he was not?
20  A.   Yes.
21  Q.   Could you please explain to the Court what you mean by
22  that.
23  A.   I believe in the District of Hawaii and here in the
24  Northern District of Oklahoma, he explained to the court that
25  he was fully authorized to practice law and represent the
```

BRIAN SHERN - DIRECT BY MR. O'REILLY                    20

1   client that was a participant in that matter, and, in fact, he

2   had been under sanctions and under -- in trouble with the

3   Arkansas Bar.

4   Q.   Was he, in fact, suspended pending disbarment or at least

5   suspended by his bar association in the state of Arkansas?

6   A.   Yes.

7   Q.   Yet he was representing to various courts that he was

8   authorized to practice law?

9   A.   That's correct.

10  Q.   Does that include for Mr. Bennett in Hawaii?

11  A.   Yes.

12  Q.   Did that also, to your knowledge, happen in the state of

13  Arizona?

14  A.   I don't recall.

15  Q.   With respect to a Dennis Poseley?

16  A.   I don't recall if that was one of the places.

17  Q.   But there was more than one occasion this happened?

18  A.   Yes.

19  Q.   With respect to the United States' contention that

20  Mr. Stilley encouraged others to violate the Internal Revenue

21  laws, are you aware of any time Mr. Stilley encouraged anyone

22  to violate the Internal Revenue laws?

23  A.   Yes.

24  Q.   Can you please identify the instance or instances.

25  A.   I reviewed the grand jury transcripts of people that

 1  appeared before the grand jury:  James Lake, Eddy Patterson,
 2  and Philip Roberts.
 3      During their grand jury testimony, Mr. Roberts
 4  specifically said that he had had questions about whether or
 5  not there was a law requiring him to file and pay his taxes and
 6  he sought out the advice of Mr. Stilley.
 7  Q.   Let me stop you right there.  Did Mr. Roberts indicate
 8  when he had gone to see Mr. Stilley?
 9  A.   Yes, it was the early nineties.
10  Q.   And what did -- why did Mr. Roberts go to see Mr. Stilley?
11  A.   Because he was seeking advice from a legal expert as to
12  whether or not he was required to file and pay his taxes.
13  Q.   Did Dr. Roberts -- I apologize earlier, I referred to him
14  as "Mr. Roberts" -- did Dr. Roberts indicate what advice or
15  instruction Mr. Stilley gave him?
16  A.   Yes.
17  Q.   What did Dr. Roberts say?
18  A.   He told Mr. Stilley that he was correct in his belief,
19  that he was -- had no liability to file a return and no
20  liability to pay any tax to the United States.
21  Q.   Did Dr. Roberts follow that advice?
22  A.   Yes, he did.
23  Q.   What were the consequences to Dr. Roberts?
24          THE COURT:  Mr. O'Reilly, the witness said "he told
25  Mr. Stilley that he was correct in his belief that he was."

BRIAN SHERN - DIRECT BY MR. O'REILLY                    22

1   Q.   (BY MR. O'REILLY)  Is it your testimony that Dr. Roberts

2   told Mr. Stilley that he was correct in his belief?

3   A.   No, Mr. Stilley told Dr. Roberts.

4          MR. O'REILLY:  I apologize, Your Honor.  I'll try to

5   listen more carefully.

6   Q.   (BY MR. O'REILLY)  With respect to that advice he received

7   at that time, was Mr. Stilley an attorney?

8   A.   Yes.

9   Q.   Did Dr. Roberts follow that advice?

10  A.   No, he did not -- or, yes, he did.  He did not file his

11  taxes or pay his taxes.

12  Q.   Was Dr. Roberts prosecuted for willful failure to file?

13  A.   Yes, he was.

14  Q.   Was he convicted?

15  A.   Yes.

16  Q.   Do you recall how much time he served?

17  A.   I believe it was three years, but I don't recall

18  specifically.

19  Q.   Was it 16 months?  Does that refresh your recollection?

20  A.   Yes, that's right.

21  Q.   Was Dr. Roberts --

22          THE COURT:  Can you clarify when these contacts

23  between Mr. Stilley and Dr. Roberts would have occurred, at

24  least, roughly.  You may have asked, but --

25  Q.   (BY MR. O'REILLY)  Was this discussion -- did this take

BRIAN SHERN - DIRECT BY MR. O'REILLY                           23

1  place in the early 1990s?

2  A.   Yes.  I believe it was 1990 is what the transcript says

3  that he said.

4  Q.   In his grand jury testimony, Dr. Roberts stated he thought

5  it was 1990?

6  A.   Yes.

7  Q.   Were there tax losses associated with respect to

8  Dr. Roberts' failures to file tax returns following his

9  discussion with Mr. Stilley that we have included in our

10 exhibits?

11 A.   Yes.

12 Q.   And are those included in Exhibits 1148 through 1151 for

13 the years 1992 through 1995, respectively?

14 A.   Yes, I believe there's a summary schedule listing all the

15 money attributed from Mr. Roberts.

16 Q.   What are Government's Exhibits 1148 through 1151?

17 A.   Those are the IRS transcripts of account for Mr. Springer

18 and Mr. Stilley and -- I'm sorry -- just 1148 through --

19 Q.   1148 through 1151.

20 A.   Those are the transcripts related to Mr. Roberts.

21 Q.   For Dr. Roberts?

22 A.   Dr. Roberts, yes.

23 Q.   And for the years 1992 through 1995, respectively?

24 A.   Yes.

25 Q.   Was Dr. Roberts -- is Dr. Roberts the only person whom you

BRIAN SHERN - DIRECT BY MR. O'REILLY                          24

1   are aware that Mr. Stilley provided this type of encouragement?

2   A.    No.

3   Q.    Who else?

4   A.    James Lake.

5   Q.    With respect to James Lake, what did -- what encouragement

6   did Mr. Stilley provide to James Lake?

7   A.    Similarly, Mr. Lake had similar views to Mr. Roberts, in

8   that he was seeking the advice of an attorney and legal experts

9   as to whether he was required to file returns, he had questions

10  about that.  And he later hired Mr. Springer and Mr. Stilley

11  and talked to them.  And both Mr. Springer and Mr. Stilley told

12  him that he had no legal requirement to file returns.

13  Q.    When did this discussion occur approximately?

14  A.    Approximately 2000.

15  Q.    With respect to Mr. Lake, is the tax loss attributed to

16  the defendants based upon Mr. Lake's conduct after receiving

17  that advice?

18  A.    Yes.

19  Q.    Did Mr. Stilley and/or Mr. Springer give similar advice to

20  either Eddy or Judith Patterson?

21  A.    Yes, they did.

22  Q.    Please explain what advice was given and -- first of all,

23  when did this occur?

24  A.    The advice to Mr. Patterson?

25  Q.    Yes.

1    A.    It would have been in 2000 as well.

2    Q.    What was the circumstance upon -- under which

3    Mr. Patterson -- was it Mr. Patterson or Mrs. Patterson that

4    received this advice?

5    A.    Mr. Patterson.

6    Q.    What were the circumstances under which Mr. Patterson

7    received this advice?

8    A.    He had been under criminal investigation for tax crimes

9    and other crimes and he was also seeking advice from legal

10   experts as to what to do because of his criminal

11   investigation.

12   Q.    To whom did he turn?

13   A.    Mr. Springer and Mr. Stilley.

14   Q.    What advice or encouragement did Mr. Stilley give

15   Mr. Patterson?

16   A.    Mr. Patterson asked Mr. Springer and Stilley whether or

17   not they filed tax returns and both of them replied, no, we

18   don't file tax returns.

19   Q.    Was there any other encouragement given?

20   A.    I can't recall.

21   Q.    With respect to the tax loss that has been included in the

22   tax computations, does that include tax losses occurring before

23   Mr. Patterson had this conversation with Mr. Springer and

24   Mr. Stilley?

25   A.    No.

BRIAN SHERN - DIRECT BY MR. O'REILLY                              26

1   Q.   Is it just the year 2000?

2   A.   Yes.

3   Q.   With respect to -- oh, let me step back, what is -- is

4   Exhibit 1147 the IRS record of Mr. Patterson's tax liability

5   for the year 2000?

6   A.   Yes.

7   Q.   And with respect to Mr. Lake, is Exhibit 1143 the account

8   transcript or the IRS record of Mr. Lake's tax liability?

9   A.   Yes, it is.

10  Q.   I'm going to ask you now to turn to a Mr. Patrick Turner.

11  Mr. Turner testified at this trial, correct?

12  A.   Yes, he did.

13  Q.   Actually, I think Mr. Turner explained the circumstances

14  under which he transferred $250,000 to Mr. Springer at trial,

15  correct?

16  A.   Yes.

17  Q.   With respect to some of the income items that have been

18  attributed in the government's calculations, specifically with

19  respect to Mr. Swisher, do you recall any discussions you had

20  with Mr. Swisher?

21  A.   Yes, I do.

22  Q.   Was that in the course of your investigation?

23  A.   Yes.

24  Q.   Also in the course of preparing for trial?

25  A.   Yes.

BRIAN SHERN - DIRECT BY MR. O'REILLY                    27

1  Q.   What, if any, relationship did Mr. Swisher have with

2  either of the defendants?

3  A.   Mr. Swisher told me that he had hired Mr. Stilley to

4  represent him with a tax violation that he had been charged

5  with and he had explained that Mr. Stilley had asked him if he

6  could hire Mr. Springer to help with preparing his case for him

7  and Mr. Swisher gave Stilley money so he could hire

8  Mr. Springer --

9             MR. STILLEY:  Objection, hearsay.

10            THE COURT:  Overruled.  Go ahead.

11            THE WITNESS:  Mr. Stilley -- according to what

12  Mr. Swisher told me, Mr. Stilley asked for an amount of money

13  so he could give it to Mr. Springer so Mr. Springer could help

14  them with the case.

15  Q.   (BY MR. O'REILLY)  Did Mr. Swisher tell you that

16  Mr. Stilley asked for a specific amount of money?

17  A.   He just asked -- Mr. Stilley asked Mr. Swisher, hey, I've

18  got this guy who is a really astute legal expert, do you care

19  if I bring him onboard and pay him, and Mr. Swisher agreed.

20  And Mr. Stilley paid Mr. Springer from the money that

21  Mr. Swisher provided Mr. Stilley.

22  Q.   And is that one of the checks that's included in the

23  exhibits we've already referenced?

24  A.   Yes.

25  Q.   With respect to Mr. Hovind -- actually, it's Kent Joe

BRIAN SHERN - DIRECT BY MR. O'REILLY                     28

```
 1   Hovind; is that correct?
 2   A.   Yes.
 3   Q.   Who were the Hovinds?
 4   A.   The Hovinds were a couple from Florida that had been
 5   charged with tax violations.
 6   Q.   What, if any, relationship did the defendants have with
 7   the Hovinds?
 8   A.   Mr. Stilley didn't have any relationship with the Hovinds;
 9   however, Mr. Springer helped them throughout their criminal
10   investigation and trial.
11   Q.   And are there payments from the Hovinds to Mr. Springer
12   that are included in the exhibits?
13   A.   Yes.
14   Q.   Are you familiar with -- if there's been any media or
15   other coverage of this trial?
16   A.   Yes.
17   Q.   What type of coverage are you aware of?
18   A.   Just -- there's been some stuff in the papers and there's
19   also -- a gentleman has a blog that discusses the events that
20   happened during trial.
21   Q.   And was that a blog that was maintained and started at or
22   even before the beginning of the trial and continued through
23   the trial?
24   A.   Yes.
25   Q.   Is it still active?
```

```
 1   A.   Yes.
 2   Q.   Does that blog -- I'm going to ask you to state your
 3   opinion here.  Is there a perceived bias with respect to that
 4   blog?
 5   A.   Yes.
 6   Q.   What is that bias?
 7   A.   That the defendants are innocent and they're just being
 8   wrongly convicted by the government.
 9   Q.   Is there an indication on the blog of how many people have
10   visited that site?
11   A.   Yes.
12   Q.   When did you last check that blog?
13   A.   Yesterday afternoon.
14   Q.   How many visitors had -- did it indicate had visited that
15   blog -- that Web site as of yesterday?
16   A.   It was over 8,100, I believe.
17   Q.   During Mr. Springer's career with respect to not filing
18   tax returns and not paying taxes, has he encouraged others
19   through means other than what was discussed at trial to violate
20   the tax laws?
21   A.   Yes.
22   Q.   How so?
23   A.   Did you say during the years we had under indictment or --
24   Q.   No.
25   A.   Just any -- he assisted Mr. Dingman and Mr. Grady and
```

BRIAN SHERN - DIRECT BY MR. O'REILLY                    30

```
 1  another gentleman named Mr. Robertson with preparing abusive
 2  trust documentation, and also in the words of Mr. Dingman and
 3  Mr. Grady, he had them file frivolous paperwork with the IRS to
 4  unvolunteer from the system.
 5  Q.   When was this?
 6  A.   This was in the early nineties.
 7  Q.   Did Mr. Springer also host a Web site?
 8  A.   Yes.
 9  Q.   What was that Web site?
10  A.   Penaltyprotestor.com.
11  Q.   Dot-com or dot-org?
12  A.   Whether it was com or org, it both arrived at that site.
13  Q.   Okay.  Both?
14  A.   Yes.
15  Q.   Generally describe -- what was the content of that Web
16  site?
17  A.   The Web site had links that took you to both video and
18  audio presentations that Mr. Springer put on, as well as
19  documents from cases that Mr. Springer had been involved with
20  or not involved with, many relating to the Paperwork Reduction
21  Act, and others relating to defenses that had been raised that
22  have been deemed frivolous.
23  Q.   With respect to that Web site, do you have any idea how
24  many people visited it?
25  A.   No.
```

BRIAN SHERN - DIRECT BY MR. O'REILLY                    31

1  Q.   Did some of the individuals you spoke with in the course
2  of your investigation tell you whether or not they had visited
3  the Web site?
4  A.   Yes.
5  Q.   Roughly how many of the people you talked to had, if you
6  recall?
7  A.   I believe I just remember maybe three.  Mr. Turner was the
8  one that developed the Web site.
9  Q.   He was the technical guy?
10  A.   Yes.
11  Q.   In fact, I believe he testified to that, correct?
12  A.   Yes.
13  Q.   Did Mr. Springer also host telephone conference calls?
14  A.   Yes.
15  Q.   Can you describe briefly what those telephone conference
16  calls were.
17  A.   Yes.  Most of them related to the Innovative Financial
18  Consultants case that was out of Phoenix, Arizona.  Basically,
19  it was a trust scam that advised people to put all their assets
20  into trusts to evade paying their taxes.  And once this
21  organization became under investigation, Mr. Springer hosted
22  these conference calls where people who were involved in that
23  organization would call in and he would give them advice.
24  Q.   Do you know how many people participated in the telephone
25  conference calls?

BRIAN SHERN - DIRECT BY MR. O'REILLY                          32

1   A.   Of our witnesses in our trial, there were at least eight

2   or nine, I believe, and they would always -- what they told us

3   was there was always several people on the calls and the calls

4   occurred at least weekly.

5            MR. O'REILLY:  If I may have a moment, Your Honor.

6            THE COURT:  You may.

7            MR. O'REILLY:  Your Honor, at this time there's

8   nothing more from Special Agent Shern from the government.

9            THE COURT:  Cross-examine --

10           MR. O'REILLY:  Your Honor, I apologize.  I don't know

11  if technically I need to do this, but I would move the exhibits

12  referenced into evidence which would be -- do you need me to do

13  that for purposes of sentencing?

14           THE COURT:  The ones that he has referred to, are

15  they ones that were received at the trial?

16           MR. O'REILLY:  Well, there were both those and some

17  new ones.  And if you want, I will move exhibits -- can you

18  tell me what the exhibit numbers are?  From 1101 -- from 1001

19  through -- up to the start of the summaries -- actually, Your

20  Honor, just for ease of purposes, I would move Government's

21  Exhibits 1001 through 1158 -- well, actually, 1156 into

22  evidence.  1157 and 1158 are transcripts of the defendants'

23  testimony; I don't think we need to move those into evidence.

24           THE COURT:  Very well.  Any objection?

25           MR. SPRINGER:  May I have just a moment, Your Honor?

BRIAN SHERN - DIRECT BY MR. O'REILLY                          33

```
1              THE COURT:  You surely may.

2              MR. O'REILLY:  Your Honor, just for clarification,

3    the exhibits that were presented at trial we do not need to

4    admit, correct?

5              THE COURT:  That's true.  Although, if you want, I

6    think it is helpful, to some degree, to have a discrete record

7    for sentencing purposes, so an exhibit that was received at

8    trial need not be readmitted, but I think it would be a good

9    idea if you want me to consider it for sentencing purposes to

10   at least refer to it during these proceedings by exhibit

11   number.

12             MR. O'REILLY:  Then, Your Honor, what I will do is

13   simply, for clarification purposes, go through all the exhibits

14   that we are moving in and are referencing for purposes of our

15   summaries.

16             THE COURT:  First of all, we have an offer pending of

17   1001 through 1156.

18             MR. SPRINGER:  I'm sorry, Your Honor, I'm still on

19   that, I'm still at the same spot I was a second ago.

20             THE COURT:  That's fine.  Just stand by for just a

21   moment.

22             MR. SPRINGER:  I would have an objection --

23             THE COURT:  Just a minute.  Now, before I hear from

24   the defendants, Mr. O'Reilly, the ones you were getting ready

25   to read into the record, are they exhibits you've already made
```

BRIAN SHERN - DIRECT BY MR. O'REILLY                    34

1   a reference to this morning?

2           MR. O'REILLY:  Yes, Your Honor.  They would be

3   Exhibits 3 through 236.  However, that is a -- there are

4   discrete exhibits that we produced in the exhibit books, not

5   all of the Exhibits 3 through 236 are put into evidence -- are

6   being represented at trial because they were not evidence of

7   income that we were -- that you had asked us to do.  I can go

8   through and specifically enumerate --

9           THE COURT:  That's not necessary.  Very well.

10      Now, Mr. Springer, I'll hear you.

11          MR. SPRINGER:  Your Honor, at this time, I do not

12  have an objection to 1001.  I do not have an objection to

13  1134.  I do not have an objection at this time to 1148 through

14  1152.  I do not have an objection to 1143 or 1147.

15      But the remainder of the exhibits that Mr. O'Reilly has

16  now moved into -- or attempting to move into, I don't believe

17  he's laid a foundation for them, they have not been

18  authenticated, they are based upon hearsay of testimony, and

19  they are not relevant, Your Honor, at this point because of

20  those reasons.

21          THE COURT:  Thank you.  Mr. Stilley, any objection?

22          MR. STILLEY:  Your Honor, no further objections, but

23  I join Mr. Springer's.

24          THE COURT:  Very well.

25      Let me digress for just a moment.  I probably should have

1   mentioned this and covered this point a few minutes ago when we

2   had the hearsay objection.  One of the great ironies of federal

3   criminal law is that the Rules of Evidence -- the Federal Rules

4   of Evidence do not apply at sentencing.  I personally am not

5   totally comfortable with throwing all caution to the winds,

6   even though the Rules of Evidence do not apply -- by their own

7   terms, they do not apply at sentencing.  And I do think that is

8   ironic, because very often sentencing is the most consequential

9   stage of a criminal case.

10      The exhibits that have been offered will be received.

11      I will assure the defendants that, to the extent that

12  they're not relevant or to the extent that I am mystified as to

13  where they came from or as to their authenticity, they are not

14  going to have any significant impact and perhaps no impact on

15  my evaluation of the sentencing-related issues.

16      And the same thing applies, for instance, with respect to

17  hearsay.  Hearsay is -- hearsay that would be inadmissible in a

18  jury trial is admissible in this proceeding.  But even though

19  the Rules of Evidence don't apply, the rules of common sense do

20  apply, so the further we get out on that hearsay limb, the less

21  likely it is to have any impact on my evaluation of the matter,

22  even though it's admissible.

23      So I don't expect that the defendants will take great

24  comfort from that explanation, but I think perhaps it's

25  appropriate to give the defendants some assurance that, even

1  though the Rules of Evidence don't apply, to the extent that

2  the Rules of Evidence are based on common experience and common

3  sense, they effectively do apply and they will apply to my

4  evaluation of the issues for sentencing purposes.

5      But the exhibits that have been offered will be received.

6      Mr. O'Reilly, you may proceed.

7  Q.   (BY MR. O'REILLY)  Special Agent Shern, with respect to

8  Government's Exhibits 1012 through 1133 -- which I believe you

9  previously testified were all payments made to Mr. Stilley; is

10 that correct?

11 A.   Yes.

12 Q.   Did the vast majority of those -- are these all checks?

13 A.   I think there's a couple money orders in there, but, yes,

14 most of them are checks.

15 Q.   And with respect to -- did you go through and see whether

16 or not these checks appeared to be payments for legal services?

17 A.   Yes.

18 Q.   How did you do that?

19 A.   I took the checks that appeared -- like, if they said

20 "retainer" or if they were from an individual and it said "for

21 legal services," I took all those checks, and then checks that

22 were deposited into his Interest on Lawyers Trust Account,

23 every one of those checks I included in there, and -- as well

24 as if it was a check that wasn't deposited into his IOLTA

25 account, but I knew that it was from a client, that I know he

```
 1  had provided legal services to in the past, then I included
 2  that.
 3  Q.   How would you know it was from a client for whom
 4  Mr. Stilley had provided legal services?
 5  A.   People that testified in trial or before the grand jury or
 6  people that he was listed on PACER that he had worked a case
 7  with them.
 8  Q.   I'm just going to ask you about a couple of names.  I'm
 9  going to ask what you know.  Are some of the checks that are
10  attributed to both Mr. Springer and to Mr. Stilley in the
11  1001-plus series, are some of those -- and, in fact, some
12  earlier from the trial, are some of those from an individual by
13  the name of Guthrie?
14  A.   Yes.
15  Q.   Who is Mr. Guthrie?
16  A.   I don't know much about Guthrie.  We never interviewed
17  him.  But Mr. Springer had some of his case postings on his Web
18  site, and as well -- I cannot recall for certain, but I think
19  the case may have been listed on PACER as well.
20  Q.   Okay.  With respect to -- did Mr. Stilley receive payments
21  from Mr. Guthrie?
22  A.   I don't remember.  I'd have to look at the exhibits.
23          THE COURT:  Mr. Shern, you testified that
24  Mr. Springer had case postings from Guthrie's case on his Web
25  site?
```

BRIAN SHERN - DIRECT BY MR. O'REILLY                          38

```
1              THE WITNESS:  Yes, Your Honor.
2              THE COURT:  Okay.  Go ahead.
3    Q.  (BY MR. O'REILLY)  Are you familiar with an individual by
4    the name of Palmer?
5    A.   Yes.
6    Q.   Who is Mr. Palmer?
7    A.   Mr. Palmer testified before the grand jury.  We discovered
8    Mr. Palmer because he had written Mr. Springer a few checks,
9    and when he testified -- from what I remember from his grand
10   jury testimony, he's been a supporter of Mr. Springer for a
11   long time and he talked about how Mr. Springer did various
12   legal work for people and helped people out.
13   Q.   I'm going to ask you to look at Government's Exhibit
14   Number 1060.  Is that -- appears to be a small check made
15   payable to Oscar Stilley for 20,000.54 -- should be the top
16   check.
17   A.   Yes, that's a payment, a check written from Todd and
18   Patricia Guthrie.
19   Q.   Does it indicate -- no, the top check -- you're fine,
20   Special Agent Shern.  I apologize.
21   A.   It says "legal fees" in the notation.
22   Q.   Says "legal fees" in the notation?
23   A.   Yes.
24              MR. O'REILLY:  Your Honor, at this time, nothing
25   further with respect to Special Agent Shern.
```

```
 1                THE COURT:  Mr. Springer, cross-examination.
 2                          CROSS-EXAMINATION
 3    BY MR. SPRINGER:
 4    Q.   Good morning, Mr. Shern.
 5    A.   Good morning.
 6    Q.   Mr. O'Reilly referred to you as a special agent, correct?
 7    A.   Yes.
 8    Q.   Special agent for the Secretary of the Treasury; is that
 9    correct?
10    A.   For the Internal Revenue Service.
11    Q.   Internal Revenue Service?
12    A.   Yes.
13    Q.   Not the Secretary of the Treasury?
14    A.   I believe the Internal Revenue Service falls under the
15    Secretary of the Treasury.
16    Q.   Okay.  And you are a delegate of the Secretary of the
17    Treasury; is that correct?
18                MR. O'REILLY:  Objection.  Beyond the scope of direct
19    and relevance.
20                THE COURT:  Overruled.
21                THE WITNESS:  Can you repeat the question, please?
22    Q.   (BY MR. SPRINGER)  Are you a delegate of the Secretary of
23    the Treasury of the United States?
24    A.   Yes.
25    Q.   Okay.  When did you (sic) make you a delegate?
```

BRIAN SHERN - CROSS BY MR. SPRINGER                              40

```
 1   A.   I don't know.
 2          MR. O'REILLY:  Objection, Your Honor; relevance.
 3          THE COURT:  Overruled.  We'll -- I'm going to hear
 4   this for a while, we'll see how much, but it will be
 5   overruled.
 6   Q.   (BY MR. SPRINGER)  When you say "special agent," that's
 7   what you're referring to is you're a delegate of the Secretary
 8   of Treasury; is that correct?
 9   A.   Yes.
10   Q.   Okay.  And --
11   A.   I guess to answer your prior question about -- when I said
12   "I don't know," I would assume I became a delegate whenever I
13   became a special agent.
14   Q.   Okay.  Are you familiar -- scratch that.
15          Is there anybody between you and the Secretary of the
16   Treasury that you get your delegation order to be a special
17   agent from that you know of?
18   A.   I'm not sure I know how to answer that.
19   Q.   Thank you.  If you would turn to Exhibit -- Government's
20   Exhibit Number 134, please -- excuse me -- 1134, please.  Do
21   you remember testifying earlier today with regard to Dale
22   Hedberg -- I'm sorry, 1001, I'm sorry, Your Honor.  I'm sorry.
23   I'm sorry.  I'm sorry.  It's 1001.  I'm sorry, Agent Shern.
24   It's 1001, Exhibit Number 1001.
25          Do you remember testifying earlier about a check written
```

1  to Dale Hedberg for $111,701.50?

2  A.    Yes.

3  Q.    And do you remember testifying earlier that -- you said I

4  helped him during his criminal trial?

5  A.    Yes.

6  Q.    And do you remember about what time of the year and what

7  year that criminal trial was in?

8  A.    I don't remember.

9  Q.    Are you familiar with Mr. Gollihare's presentence report?

10 A.    I've seen it.  I'm somewhat familiar with it.

11 Q.    Would you have -- would 1998 refresh your memory as to

12 when Mr. Hedberg went to trial?

13 A.    Really, without looking at something, I couldn't tell you.

14 Q.    Okay.  Do you remember -- did Mr. Hedberg tell you why he

15 gave a $111,000 check under your testimony to Lindsey

16 Springer?

17 A.    Yes.

18 Q.    What did he say?

19 A.    He said it was -- he actually didn't tell me, we had

20 another agent out of Illinois go interview him.

21 Q.    Okay.

22 A.    And I talked to him on the phone once as well, but he said

23 that it was a donation so that his kids could reap the benefits

24 of your work or something of that nature.

25 Q.    Is it safe to say that this $111,000 check came well after

BRIAN SHERN - CROSS BY MR. SPRINGER                                      42

```
 1  Mr. Hedberg went to trial and even went to prison and came out
 2  of prison; isn't that safe to say?
 3  A.   If he went to trial in '98, I guess it would have been
 4  sometime -- sometime around a year that this check was given
 5  later.
 6  Q.   Did you investigate who Hedberg Declaration Trust Dawn
 7  Jenkins was?
 8  A.   Yes.
 9  Q.   Who was that?
10  A.   She was the trustee of a -- his father died and he
11  inherited this money and she was the trustee and wrote him this
12  check.
13  Q.   Did his father's death have anything to do with him going
14  to trial or me sitting and helping him in his trial?
15  A.   I don't believe it did.
16  Q.   At the time that he had his trial, did you know his dad
17  was going to die?
18  A.   I don't know.
19  Q.   And did Mr. Hedberg ever tell you or the other agent that
20  at any time he owed me any money for sitting at his trial in
21  1998?
22  A.   I don't recall.
23  Q.   Have you seen any evidence of me asking Mr. Hedberg for
24  any money or him giving me any money during his trial?
25  A.   No.  All we have is this check.
```

BRIAN SHERN - CROSS BY MR. SPRINGER                                43

```
 1   Q.   And if I'm understanding you correctly, it is your
 2   position that this check was to pay me for sitting at his table
 3   a year and a half earlier?
 4   A.   Yes.
 5   Q.   Even though it came from his dad's estate when his --
 6   after his dad had died?
 7   A.   Yes.
 8   Q.   And even though he never told anybody he owed me any money
 9   whatsoever?
10   A.   That's correct.
11   Q.   So is it more like it was gratitude?
12   A.   No, I think you probably worked him like you have
13   everybody else.
14   Q.   I asked him for $111,701.50?
15   A.   You probably asked him for something.
16   Q.   I probably did, but you have no evidence that I did; is
17   that correct?
18   A.   Other than this check.
19   Q.   In your tax calculations, did you consider the gross
20   income --
21          MR. O'REILLY:  Objection, Your Honor.  Special Agent
22   Shern did not testify about the tax calculations, he only said
23   that these were used to do them.  Revenue Agent Miller will be
24   testifying about the actual tax calculations.
25          THE COURT:  Mr. Springer, I don't want to narrow
```

BRIAN SHERN - CROSS BY MR. SPRINGER                          44

```
 1   your --
 2          MR. SPRINGER:  He's right.
 3          THE COURT:  Okay.  Go ahead.
 4          MR. SPRINGER:  He's right.
 5   Q.  (BY MR. SPRINGER)  You had mentioned, summary-wise, about
 6   some PayPal exhibits that were contained in these exhibits; do
 7   you remember that?
 8   A.   Yes.
 9   Q.   And I believe they were found at 1148 to 1152.
10          MR. O'REILLY:  Your Honor, that would be, I believe,
11   1133 -- 1134 to 1135 for the record.
12          MR. SPRINGER:  1134, right.  Okay.
13   Q.  (BY MR. SPRINGER)  Did I understand you to say that you
14   didn't contact everybody on these lists, but you had talked to
15   most of them on the list?
16   A.   I don't think I testified about who I contacted with
17   respect to the PayPal stuff.
18   Q.   And that's what I'm trying to clean up here.  When you
19   made testimony earlier that Mr. O'Reilly asked you had you
20   spoke to every one of these people and you said no, who were
21   you referring to when you said that?
22   A.   I think at the time he was talking about the checks that
23   were in the additional exhibits.
24   Q.   Okay.
25   A.   But I can't recall for sure if it was that or --
```

BRIAN SHERN - CROSS BY MR. SPRINGER                    45

1   Q.   Do you remember using the phrase "some benefit," that you

2   said they at least got "some benefit," but you didn't know for

3   sure?

4   A.   Yes, whenever he asked me do you know anybody that didn't

5   -- that you encountered that we were charging these payments

6   that you had done no work for and I said I didn't encounter

7   anybody.

8   Q.   Right.  So as far as you understand, everybody that you

9   spoke to received some benefit from their relationship with

10  me?

11  A.   Yes.

12  Q.   Okay.  And is that testimony what you rely upon to take

13  every dollar that somebody gives me and makes it gross income?

14       MR. O'REILLY:  Objection, Your Honor.  That's a legal

15  conclusion that was covered by the Court's jury instructions.

16       THE COURT:  Overruled.

17       THE WITNESS:  That's one of the factors, yes.

18  Q.   (BY MR. SPRINGER)  So if, for instance, I prayed with them

19  over the phone, would you consider that a benefit?

20  A.   If they gave you money because you prayed with them?

21  Q.   I'm just asking you:  Did you determine whether, in the

22  instance of some benefit, if somebody gave me money, and the

23  only thing I did was pray with them, is that some benefit that

24  converts the money they gave from a gift to gross income, under

25  your understanding?

 1              MR. O'REILLY:  Objection, Your Honor.  Special Agent

 2     Shern's understanding of what's a gift and what's income is not

 3     an issue.

 4              THE COURT:  If your objection had been that he

 5     doesn't have any way of knowing whether the prayers were

 6     answered, that might be another thing.  That will be

 7     overruled.

 8              MR. SPRINGER:  Thank you.

 9              THE WITNESS:  What I testified to was the people that

10     I talked with, I didn't know of any -- with the exception of

11     maybe one that didn't -- you didn't perform some kind of work

12     for, are the ones that you prayed with, I'm not -- without

13     talking to them, I wouldn't know, but -- I wouldn't know.

14     Q.  (BY MR. SPRINGER)  Okay.  You specifically gave testimony

15     about James Lake; do you remember that?

16     A.  Yes.

17     Q.  And you said I counseled him to violate the Internal

18     Revenue laws; do you remember that testimony?

19     A.  Yes.

20     Q.  Do you remember when James Lake was indicted?  Was it

21     2000?

22     A.  I don't remember.

23              MR. SPRINGER:  Your Honor, may I have just a moment,

24     please?

25              THE COURT:  Surely.

1  Q.   (BY MR. SPRINGER)  Could you please turn to Government's

2  Exhibit 675, please.

3  A.   Okay.

4  Q.   Do you see the last notation, number -- excuse me --

5  Number 10, 11 and 13 on the gross income of Lindsey Springer

6  chart?

7  A.   Yes.

8  Q.   Okay.  And do you see the dates over there, 11/7/2000, all

9  the way to 12/27/2000?

10  A.   Yes.

11  Q.   And it's your testimony these monies were given to me,

12  that Mr. Lake hired me to help him in his indictment in his

13  case; is that correct?

14  A.   That's correct.

15  Q.   All right.  And so Mr. Lake had already been indicted,

16  then, at the time that he gave this money; isn't that true?

17  A.   Yes, I believe so.

18  Q.   And it was for, like, 1995, 1996, 1997; isn't that true?

19  Somewhere in the mid-nineties, he had failed to file tax

20  returns, correct?

21  A.   I don't remember for sure, but it sounds about right.

22  Q.   He had failed to file tax returns long before he met

23  Lindsey Springer; isn't that true?

24  A.   Yes, that's correct.

25  Q.   And he had sought the advice of many other people other

BRIAN SHERN - CROSS BY MR. SPRINGER                          48

1  than Lindsey Springer and Oscar Stilley prior to getting

2  indicted, had he not, if you know?

3  A.   I think he was -- he was caught up in some type of trust

4  scam as well.

5  Q.   And so it's your testimony that Lindsey Springer should be

6  tagged for the tax loss for the year 2000 for James Lake

7  because he didn't file a tax return in the year 2000 -- or for

8  the year 2000?

9  A.   I think by you and Mr. Stilley telling him that he was not

10 required to -- that you didn't pay taxes and he's not required

11 to file or pay over tax, that he probably didn't pay the money

12 that he was owed -- that he owed the government.

13 Q.   Now, I know you testified that Mr. Patterson, in 2000, had

14 said that Mr. Stilley and I had told him we didn't file tax

15 returns, but I don't remember you saying Mr. Lake said that

16 Mr. Stilley and I told him that we didn't file tax returns.

17 A.   That may be correct.  I know that you told him in some

18 manner that he was not required to file tax returns.  I don't

19 remember if you and Mr. Stilley told him that you yourselves

20 didn't file tax returns or not.

21 Q.   Okay.

22 A.   But you advised him that he didn't have to.

23 Q.   That was his testimony?

24 A.   Yes.

25 Q.   And then for the years 2000, you testified, I believe,

BRIAN SHERN - CROSS BY MR. SPRINGER                          49

1   that Mr. Lake was found guilty or was -- pled guilty after he

2   hung a jury or something in 2001; isn't that correct, early

3   2001?

4   A.   Yes, he testified about that.

5   Q.   And in his plea agreement in early 2001, wouldn't it have

6   been part of an agreement that he had to file a 2000 tax

7   return?

8           MR. O'REILLY:  Objection; calls for speculation.

9           THE COURT:  Overruled.

10          THE WITNESS:  Typically, that is the case.

11  Q.   (BY MR. SPRINGER)  So there really is no way, is there,

12  Mr. Shern, that Mr. Lake either didn't file a tax return for

13  the year 2000 or acted upon anything that I -- you say I told

14  him with regard to the year 2000 only?

15  A.   I think if he would have hired a reputable attorney, they

16  may have advised him to file and pay his taxes.

17  Q.   As you stand here today, did James Lake not file a tax

18  return for the year 2000 by April 15, 2001?

19  A.   Did he not file?

20  Q.   Did he or did he not?

21  A.   I'm not for certain whether he did or didn't.  I know

22  there was a -- the transcript of his account for 2000 shows a

23  restitution payment of -- and that is what we included in our

24  calculations, I believe.

25  Q.   Restitution payment?

BRIAN SHERN - CROSS BY MR. SPRINGER                    50

```
1    A.    Yes.

2    Q.    Which would be derived from what?  Where would restitution

3    payment come from in the IRS records, if you know?

4    A.    It would have been from his -- the tax violations that he

5    committed.

6    Q.    Would it be from the tax returns that he filed as a

7    condition of his plea agreement?

8    A.    More than likely, yes.

9    Q.    So he did file a tax return for the year 2001, didn't he?

10   A.    I'm not sure if one was filed for him on -- like, often,

11   the IRS will file substitute for returns, I'm not sure without

12   specifically looking at his transcript or his account history

13   whether he did file or did not file.

14   Q.    Do you know if he was ever revoked for not filing a tax

15   return after he pled guilty?

16   A.    I don't know.

17   Q.    Okay.  Is it possible, then, that the amount of money on

18   his transcript came from a tax return that he filed?

19         MR. O'REILLY:  Objection, Your Honor.  Misstates what

20   the document shows, which is no return was filed.

21         THE COURT:  If that's so, then the witness can so

22   testify.  Overruled.

23         THE WITNESS:  Can I look at the actual transcript?

24         MR. SPRINGER:  Uh-huh.

25         THE COURT:  While he's doing that, let me make one
```

```
 1   inquiry.  My reading of Government's Exhibit 675 indicates that
 2   that is intended to summarize income to Mr. Springer and my
 3   reading of the government's tax loss chart in its sentencing
 4   memorandum indicates that, aside from Mr. Springer's own tax
 5   liability and aside from Mr. Stilley's tax liability, the
 6   government seeks to attribute to Mr. Springer tax loss relating
 7   only to Patrick Turner and Eddy Patterson and not Mr. Lake; is
 8   that still the case?
 9              MR. O'REILLY:  May I have a moment, Your Honor?
10              THE COURT:  Surely.
11              MR. SPRINGER:  Your Honor, is that Government's
12   Exhibit 1166 that you're referring to on their new chart?
13              THE COURT:  No, I'm referring to the page 10 of the
14   government's sentencing memorandum.
15              MR. O'REILLY:  Your Honor, the Government's Exhibit
16   675 was what was put into evidence at trial.  The -- what we
17   are attributing to Mr. Springer is summarized on Government's
18   Exhibit 1160, which has a few additional income items.  The --
19   it adds, I believe, 17,000 in income for that year.
20   Specifically, it adds a check that was put into evidence but
21   not discussed at trial from Believers Broadcast Corporation,
22   Ken Geisendorffer, for $5,000.
23              THE COURT:  Okay.  Well, I can tell by looking at
24   1160 that you may not have understood my question.
25              MR. O'REILLY:  Perhaps I did not.
```

```
1              THE COURT:  Mr. Springer asked some questions of

2    Mr. Shern that -- from which I inferred, perhaps, that

3    Mr. Springer thinks that the government is including a tax loss

4    attributable to Mr. Lake in its tax loss calculations for

5    Mr. Springer, and my reading of your sentencing memorandum

6    indicates that, aside from the defendants themselves, the

7    government seeks to attribute tax losses to Mr. Springer

8    relating only to Patrick Turner and Eddy Patterson.  And my

9    question was --

10             MR. O'REILLY:  Actually, Your Honor, in the

11   government's exhibits, which is 1177, we did include the 1,000

12   -- the 176,000 that Mr. Springer is discussing as attributable

13   to him, because Mr. Lake, our theory, is being encouraged by

14   both Mr. Springer and Mr. Stilley to continue to not file a tax

15   return or pay taxes for the year 2000, so Mr. Springer is

16   correct in his understanding of the government's position.

17             THE COURT:  Okay.  Except that I've heard on cross

18   that maybe he may well have filed for 2000.

19             MR. O'REILLY:  I'll try to rehabilitate the witness.

20             THE COURT:  Okay.  Well, proceed.

21   Q.   (BY MR. SPRINGER)  You are certain that Mr. Lake at some

22   point in time pled guilty to some tax-related charge; is that

23   correct?

24   A.   Yes.

25   Q.   And as far as you know, as you stand here today, is
```

BRIAN SHERN - CROSS BY MR. SPRINGER                    53

1   Mr. Lake in full compliance with all the tax laws of the United

2   States?

3   A.   I'm not certain about that.

4   Q.   Were you here when he testified at trial?

5   A.   Yes.

6   Q.   Do you remember him saying he was in compliance?

7   A.   He might have said that, yes.

8   Q.   Thank you.

9        Next is Eddy Patterson.  Isn't it true that Mr. Patterson

10  was indicted in 2003 for tax-related charges from 1995, '96,

11  '97, '98, and '99?

12  A.   I know he was indicted in 2003, but I'm not certain of the

13  years he was charged with.

14  Q.   Is it your testimony that myself and/or Mr. Stilley should

15  be held liable under tax loss calculations because

16  Mr. Patterson did not file a 2000 tax return?

17  A.   Yes.

18  Q.   And it is your testimony because he heard -- he testified

19  that he said he heard me and Mr. Stilley say that we don't file

20  tax returns and that that's the basis by which you claim he did

21  not file a tax return for the year 2000?

22  A.   Yes, I think you specifically told him, after I reviewed

23  his grand jury transcript, that you don't file and you're

24  trying to fight the system and something of that nature and

25  that's why you don't file.

BRIAN SHERN - CROSS BY MR. SPRINGER                              54

```
 1  Q.   So he didn't file in '96, he didn't file in '97, he didn't
 2  file in '98, he didn't file in '99, he testified he met me in
 3  2000, correct?
 4  A.   That's correct.
 5  Q.   So he didn't file in 2000, and all of a sudden, out of
 6  five years of not filing tax returns, you would like to
 7  attribute that the year 2000 is the year that he didn't file
 8  because of me; is that correct?
 9  A.   Yes, because I think that's when he sought the advice of
10  so-called experts and that basically reaffirmed that he was
11  right and that he didn't have to file.  And I think you guys,
12  you and Mr. Stilley, probably reaffirmed that in him, that he
13  didn't have a requirement to file.
14  Q.   Do you remember Mr. Patterson testifying that he did have
15  federal and state income taxes prepared?
16  A.   I don't remember him testifying to that, but I remember --
17  I believe it was Mrs. Hess that did prepare taxes for him.
18  Q.   Do you know who Mrs. Hess is?
19  A.   Yes.
20  Q.   Who is she?
21  A.   She's a CPA.
22  Q.   She also a college professor?
23  A.   Yes.
24  Q.   At TU?
25  A.   Yes.
```

BRIAN SHERN - CROSS BY MR. SPRINGER                          55

1   Q.   Do you know how Mr. Patterson met Mrs. Hess?

2   A.   Yes.

3   Q.   How?

4   A.   You introduced her to him.

5   Q.   Now, if I was telling Mr. Patterson to not file tax

6   returns, why would I introduce Mr. Patterson to Cynthia Hess,

7   who is a CPA college professor tax preparer?

8           MR. O'REILLY:  Judge, we need a time frame for when

9   this introduction was made.

10          THE COURT:  That would help.

11  Q.   (BY MR. SPRINGER)  How did you come to know the name

12  Cynthia Hess?

13  A.   I think it was upon review of the investigation file for

14  Mr. Patterson.

15  Q.   And do you know whether Mrs. Hess -- do you know what Mrs.

16  Hess did for Mr. and Mrs. Patterson?

17  A.   She filed tax returns -- or not filed, she prepared tax

18  returns for them.

19  Q.   Okay.  And do you know whether that occurred before,

20  during or after Mr. Patterson's conviction?

21  A.   I don't recall.

22  Q.   Okay.  Did you know that Mrs. Hess prepared 2000 tax

23  returns for Eddy Patterson and his wife?

24          MR. O'REILLY:  Your Honor, objection, until we have a

25  time frame for when this happened.

BRIAN SHERN - CROSS BY MR. SPRINGER                    56

1              MR. SPRINGER:  I'm getting there.

2              THE COURT:  Overruled.

3              THE WITNESS:  I don't remember if she prepared 2000

4    or not.  I know from what I remember about Mrs. Hess is that

5    she prepared tax returns for Mr. Patterson, I don't recall

6    enough about it really to testify confidently about it.

7    Q.   (BY MR. SPRINGER)  Are you aware that after Mr. Patterson

8    was found guilty that he fired Mr. Stilley and hired

9    Mr. Stephen Knor?

10   A.   Yes.

11   Q.   So isn't it safe to say, then, that Mr. Patterson and Mrs.

12   Patterson learned of Mrs. Hess before they fired Mr. Stilley?

13   A.   Yes.

14   Q.   All right.  So that would be, then, before they were found

15   guilty, now, wouldn't it?

16   A.   Yes.

17   Q.   Okay.  And that -- and they were found guilty on December

18   15, 2003; is that correct?

19   A.   Yes.

20   Q.   Okay.  And are you aware that Lindsey Springer filed a

21   lawsuit against the Richardson law firm over that issue?

22   A.   Yes.

23   Q.   And do you remember in that complaint that there were

24   exhibits attached of tax returns prepared by Cynthia Hess?

25   A.   I don't think I -- I think I may have reviewed the text,

BRIAN SHERN - CROSS BY MR. SPRINGER                    57

1  along with the complaint, but I didn't review the exhibits, so

2  I don't recall.

3  Q.   Do you remember in the complaint that I alleged that I

4  introduced them to Cynthia Hess?

5          MR. O'REILLY:  Your Honor, objection as to relevance;

6  he's already asked and answered.

7          THE COURT:  That's been established.  Sustained.

8          MR. SPRINGER:  All right.

9  Q.   (BY MR. SPRINGER)  Do you remember Mr. Patterson

10 testifying that the same CPA who prepared his corporate tax

11 returns also prepared he and his wife's individual tax returns

12 for every year?

13 A.   I believe that's correct.  I think he had the returns

14 prepared but never did file them.

15 Q.   He filed the state returns, didn't he, but just not the

16 federal?

17 A.   I believe so, yes.

18 Q.   Okay.  So he had access to a CPA who advised him over

19 corporate tax and individual tax every year, even going back to

20 when he stopped filing in 1995; isn't that true?

21 A.   Yes.

22 Q.   But yet I'm the reason why he didn't file a 2000 tax

23 return, right?

24 A.   Yes.

25 Q.   Have you examined his 2000 tax return?

BRIAN SHERN - CROSS BY MR. SPRINGER                    58

1   A.   No, I have not.

2   Q.   Where did you get the $34,000 that is being attributed as

3   tax loss to me?  Where did that number come from?

4   A.   From his transcript of account.

5   Q.   And is the information on the transcript -- what is a

6   transcript of an account?

7   A.   It basically shows, for a certain taxpayer, transactions

8   that have happened to his account with the IRS.

9   Q.   So if he files a tax return it shows up on the transcript?

10  A.   Yes.

11  Q.   Okay.  So how do you know that the information on the

12  transcript wasn't from a tax return that Cynthia Hess prepared

13  that Mr. Patterson signed and filed?

14  A.   I wouldn't be able to tell that from the transcript, but I

15  I can look at the transcript right now and see what it says.

16  Q.   Could you?  And please refer to the exhibit that you're

17  looking at.  I believe it's 1144; is that right?

18  A.   1147.

19  Q.   1147.

20  A.   It doesn't specifically say where the tax return came

21  from.

22  Q.   But it does say "tax return filed," doesn't it?

23  A.   Yes.

24  Q.   If you look at Government's Exhibit 1144 --

25          THE COURT:  That was 1144?

```
 1              MR. SPRINGER:  1144, Your Honor.

 2              THE WITNESS:  Okay.

 3   Q.   (BY MR. SPRINGER)  Do you see at the bottom of 1144, just

 4   above the square where it says "transactions" on it, do you see

 5   right above "processing date," it says, "return due date" or

 6   "return received date," whichever is later, and it says "March

 7   3, 2003"?

 8   A.   Is that on the front?

 9   Q.   On the very first page of 1144, just above the phrase

10   "transactions," which is in a block with two lines around it.

11   It's the second sentence above that.

12   A.   Yes, I see that.

13   Q.   Do you see where it says "March 3, 2003"?

14   A.   Yes.

15   Q.   And wasn't Mr. Patterson and Mrs. Patterson indicted in

16   April of 2003?

17   A.   I don't recall exactly when in 2003.

18   Q.   You do remember they were convicted in December of 2003,

19   right?

20   A.   Yes, I do remember that.

21   Q.   And do you remember that there was a $112,000 check in

22   July of 2003 that Mr. Patterson gave to Mr. Stilley to put in

23   his IOLTA account?  Do you remember that?

24   A.   Yes.

25   Q.   Wasn't the reason why these monies was allegedly being
```

1   given and deposited was to help in his criminal defense?

2   A.   Yes.

3   Q.   Okay.  Now, if you would look again to Government's

4   Exhibit Number 1147 and look at the same spot as you just did

5   on 1144, do you see the day the return was filed for the year

6   2000?

7   A.   What exhibit?  I'm sorry.

8   Q.   I'm sorry, 1147, I'm sorry.  It's -- it's just above the

9   "transaction" square.  Let's start at the top of 1147,

10  Government's Exhibit 1147.  Does it say "account transcript"

11  right there --

12  A.   Yes.

13  Q.   -- at the top?

14       And just below it, to the right, does it say "tax period

15  December 31, 2000"?

16  A.   Yes.

17  Q.   All right.  And is that the same year 2000 that you're

18  referring to when you say I caused Mr. Patterson not to file

19  his 2000 tax return because I told him I wasn't required to

20  file a return?

21  A.   Yes.  And I think for clarification here, I'm pretty

22  positive that the IRS filed this return for him, because if you

23  look further on the transcript, like in the second page --

24  Q.   Okay.

25  A.   -- there's certain notations that say "inquiry for not

BRIAN SHERN - CROSS BY MR. SPRINGER                    61

1   filing -- for non-filing of tax return, penalty for not

2   prepaying tax, penalty for filing tax return after the due

3   date."

4        So, really, without asking a revenue agent or somebody

5   that's more familiar with this transcript, I wouldn't be able

6   to tell you if he filed the return, if somebody else filed the

7   return or if a return was filed for him by the IRS.

8   Q.   Could you look on the second page of Exhibit 1147 and look

9   at the very top notation that's made in the IRS's transcript.

10  And could you please read that.

11  A.   Where at again?  I'm sorry.

12  Q.   At the very top of page 2 of 1147, where it begins with

13  the "460," which is the transaction code number, and then it

14  says, "extension of time to file extended date 8/15/2001" and

15  it's filed on 4/15/2001.

16  A.   Yes.

17  Q.   If Mr. Patterson --

18            THE COURT:  Say again where you are on that.

19            MR. SPRINGER:  I'm on 1147, Your Honor.

20            THE COURT:  Right.

21            MR. SPRINGER:  And page 2 at the very, very top.

22            THE COURT:  Okay.  Okay.  Go ahead.

23  Q.   (BY MR. SPRINGER)  And this document -- this entry says it

24  was entered on 4/15/2001 on the IRS's computer; is that

25  correct?

```
 1   A.   Yes.
 2   Q.   Now, if I had told Mr. Patterson he didn't have to file a
 3   tax return, then why would there be an extension of time to
 4   file a tax return in Mr. Patterson's file?
 5           MR. O'REILLY:  Objection.  Calls for speculation,
 6   Your Honor.
 7           THE COURT:  Overruled.
 8           THE WITNESS:  I have no idea.
 9   Q.   (BY MR. SPRINGER)  Do you know whether the IRS entered
10   files extensions for taxpayers on the last day to file a return
11   every year?
12   A.   No, I don't believe they do.
13   Q.   Thank you.
14       And isn't the second notation on Government's Exhibit 1147
15   on page 2 the same 460 entry, except this time Mr. Patterson is
16   seen on your transcript to be extending the 8/15/2001 due date
17   for the 2000 year return and now he's extending it from 8/15 to
18   October 15, 2001?  Isn't that true, Mr. Shern?
19   A.   Yes.
20   Q.   So even if I did tell Mr. Patterson that I didn't believe
21   I was required to file a return, he didn't act upon it, did
22   he?  Because he's filing extension after extension with the
23   IRS; isn't that true?
24   A.   Rephrase the question.
25   Q.   Did Mr. Patterson not file a 2000 tax return because, as
```

BRIAN SHERN - CROSS BY MR. SPRINGER                          63

1  you said under direct examination, he learned -- out of my

2  lips, I guess -- that I did not file tax returns?

3  A.   I believe that he didn't file -- I believe that the advice

4  you gave him confirmed to him that he didn't have to file a tax

5  return for 2000.

6  Q.   But your testimony in this regard, both as to adding tax

7  loss to Lindsey's -- my numbers also is that I counseled others

8  to violate the Internal Revenue law; isn't that what your

9  testimony was under direct examination?

10 A.   Yes.

11 Q.   And didn't you specifically mention Mr. Patterson?

12 A.   Yes.

13 Q.   Now, you're not saying I told him not to file a 2002 or

14 2003 or 2004 return, are you?

15 A.   No.

16 Q.   Just the 2000 year; isn't that true?

17 A.   Yes.

18 Q.   Okay.  And doesn't this transcript show that he did file

19 extensions with the IRS?

20      MR. O'REILLY:  Objection.  Asked and answered

21 repeatedly.

22      THE COURT:  Sustained.

23      MR. SPRINGER:  Thank you, Your Honor.

24 Q.   (BY MR. SPRINGER)  Now, with regard to Dr. Roberts, you

25 specifically aren't trying to tag Lindsey Springer with tax

1  loss stemming from Dr. Roberts not filing tax returns; is that

2  correct?

3  A.   Correct.

4  Q.   You are trying to tag Mr. Stilley for it because of his

5  early-on relationship with Mr. Roberts, correct?

6  A.   Yes.

7  Q.   Okay.  But you still claim that I counseled Dr. Roberts to

8  violate the Internal Revenue laws, correct?

9  A.   Yes.

10 Q.   And, specifically, you're saying that I counseled

11 Dr. Roberts into what?  What law did I tell Dr. Roberts he

12 needed to violate?

13 A.   You told him that he had no liability to file a tax return

14 or pay taxes.

15 Q.   Okay.  Now, with Dr. Roberts, do you remember the phrase

16 "Ortho/Neuro Medical"?

17 A.   Yes.

18 Q.   Do you remember what that was?

19 A.   Yes; that was his chiropractic practice.

20 Q.   Was it his tax shelter?

21 A.   I don't know.  I know he had a checking account that said

22 "Ortho/Neuro Medical" or whatever it is on his checks.

23 Q.   The money that he gave to me was from Ortho/Neuro Medical;

24 isn't that true?

25 A.   The money he paid you.

BRIAN SHERN - CROSS BY MR. SPRINGER                              65

1  Q.   Right.  The money -- yeah, the money that is in the

2  evidence in this case came from Ortho/Neuro Medical?

3  A.   Most of it.  I think some -- there was a cashier's check,

4  I think, involved too.

5  Q.   Was that out of the Ortho/Neuro Medical account, if you

6  know?

7  A.   I don't recall.

8  Q.   But I had nothing to do with him setting up Ortho/Neuro

9  Medical, did I?

10 A.   I don't know.

11 Q.   Did you ever find any evidence that I did?

12 A.   No.

13 Q.   So as far as Dr. Roberts is concerned, is it only the year

14 2000 that you claim I told him to violate the Internal Revenue

15 laws by not filing a 2000 tax return or was it 1999's tax

16 return or which one was it?

17 A.   I don't remember which particular year.  I think he just

18 said that, when he talked to you and Mr. Stilley, you guys both

19 told him that he didn't have any liability to file a tax return

20 or pay taxes.

21 Q.   Okay.  Now, Dr. Roberts was indicted in 2000, correct?

22 A.   Yes, I believe so.

23 Q.   And the indictment was for years in the mid-nineties,

24 correct?

25 A.   Yes.

BRIAN SHERN - CROSS BY MR. SPRINGER                    66

1  Q.   And it's a fact, is it not, that I -- excuse me, strike

2  that.

3       Do you have any evidence of me knowing Dr. Roberts before

4  December of 1999?

5  A.   I believe that he testified before the grand jury about

6  coming to some of your seminars that you had at a hotel in

7  Tulsa.

8  Q.   Now, are you saying that, when he came to seminars in

9  Tulsa, I told him to violate the Internal Revenue laws or are

10 you saying that when he hired me I told him to violate the

11 Internal Revenue laws?

12 A.   I'm saying that what he said in his grand jury testimony

13 is that I believe after he hired you, you told him that, but

14 I'm not sure what you told him at the seminars.

15 Q.   All right.  So if he met me -- he introduced -- strike

16 that.

17      Isn't it true that he testified he introduced Oscar

18 Stilley and me, that he had a relationship with Oscar and he

19 introduced me to Oscar Stilley?

20 A.   Yes.

21 Q.   And wasn't that in late 1999, around December of 1999, if

22 you remember?

23 A.   Yes.

24 Q.   And isn't it true that in April of 2000 he was indicted

25 for not filing tax returns, misdemeanors, back in the

```
 1  mid-nineties?
 2  A.   I'm not sure of the exact date in 2000, but I know it was
 3  2000, and, yes, it was for the mid-nineties.
 4  Q.   All right.  So -- and then isn't it true that, in June of
 5  2000, he went to trial -- June or July of 2000, he went to
 6  trial and was found guilty?
 7  A.   That sounds right, yes.
 8  Q.   Okay.
 9          THE COURT:  Stand by for just a moment,
10  Mr. Springer.
11      I don't plan to recess for lunch until about 12:15 unless
12  anyone at either table needs a break, then we'll take a break,
13  but, otherwise, I don't plan to recess until about 12:15.
14      You may proceed.
15          MR. SPRINGER:  Thank you, Your Honor.
16  Q.   (BY MR. SPRINGER)  So you're not saying that I'm
17  responsible for why Mr. Roberts didn't file a tax return in the
18  year 2000, correct?
19  A.   No.  I think you're probably a contributing factor, but I
20  can't say that you're responsible for him not filing a tax
21  return.
22  Q.   Is it possible that if he got indicted in April of 2000
23  and he had a lawyer that he had known since 1990 named Oscar
24  Stilley, is it possible that he determined that it would be in
25  his best interest, being indicted, to say nothing to the IRS?
```

```
 1              MR. O'REILLY:  Objection.  Calls for speculation,
 2    plus intrudes on attorney-client privilege.
 3              THE COURT:  Overruled.
 4              THE WITNESS:  Can you repeat that question?
 5    Q.  (BY MR. SPRINGER)  Did you ever ask Dr. Roberts why he
 6    didn't file a tax return on April 15, 2000?
 7    A.  No.
 8              MR. SPRINGER:  Your Honor, may I have one second?
 9              THE COURT:  You may.
10    Q.  (BY MR. SPRINGER)  Did you ever have an interview with
11    Brenda Gray?
12    A.  Yes.
13    Q.  Do you remember who she was?
14    A.  Yes.
15    Q.  What was her relationship with Dr. Roberts?
16    A.  She was his girlfriend.
17    Q.  Okay.  Do you remember her testimony about being in
18    college at Arkansas University and having discussions in class
19    about the tax laws and how complicated they were?
20    A.  I don't specifically recall that exact comment.
21    Q.  Do you remember who introduced Oscar Stilley to
22    Dr. Roberts?
23    A.  No.
24    Q.  You don't know if it was Brenda Gray or not?
25    A.  No.
```

BRIAN SHERN - CROSS BY MR. SPRINGER                69

1  Q.   Okay.  You do know that Oscar Stilley was -- got his
2  college degree and his law degree at the University of
3  Arkansas, right?
4  A.   Yes.
5  Q.   Okay.  Same place Brenda Gray went to college?
6  A.   I don't remember.
7  Q.   That's fine.
8       As far as James Lake goes, do you know how many hours I
9  provided services to Mr. Lake?
10 A.   No.
11 Q.   Do you know how many hours I provided services to Eddy and
12 Judy Patterson?
13 A.   No.
14 Q.   Do you know how many hours I provided service to
15 Dr. Philip Roberts?
16 A.   No.
17 Q.   Do you know how many hours I provided services to
18 Ortho/Neuro Medical?
19 A.   No.
20 Q.   Do you know how many hours I provided services in -- to
21 Dale Hedberg?
22 A.   No.
23 Q.   After the trial, did you ever look into whether or not
24 Mr. Lake was -- hung a jury the first time with a different
25 lawyer and then went back and pled guilty after he hung the

BRIAN SHERN - CROSS BY MR. SPRINGER                70

1    jury?

2    A.    Yes.

3    Q.    Is that true?

4    A.    That's what happened, yes.

5    Q.    It's what happened.  So he did not go to trial with Oscar

6    Stilley?

7    A.    I think he fired him right before the trial started.

8    Q.    Thank you.

9          And he hired another -- or a reputable lawyer, did he not?

10   A.    Yes.

11   Q.    Still went to trial --

12   A.    Yes.

13   Q.    -- right?

14         Hung the jury?

15   A.    That's correct.

16   Q.    And then went and pled guilty?

17   A.    Yes.

18   Q.    Do you remember why he went and pled guilty?  Did he say

19   why?

20   A.    I can't remember for sure why.

21   Q.    Was he threatened with an obstruction of justice charge

22   for lying at the first jury trial?

23   A.    That may have been one of the factors he was looking at.

24   Q.    Which he had another reputable lawyer having him do,

25   correct?

BRIAN SHERN - CROSS BY MR. SPRINGER                          71

```
1   A.   Excuse me?

2   Q.   Strike that.  I'm sorry.  Emotion.

3        Earlier today, you testified about Eddy and Judith

4   Patterson and you mentioned the phrase "2012," but I don't

5   really think you meant to say that.  Do you remember what you

6   were referencing in 2012?

7   A.   No.  I don't remember saying 2012.

8   Q.   Okay.  You also discussed Ernie Swisher.

9   A.   Yes.

10  Q.   And that a week before his trial he was hired by -- or he

11  hired Oscar Stilley to represent him a week before trial?

12  A.   I know he hired Mr. Stilley and that sound -- yes, a week

13  before trial.

14  Q.   And he was indicted not only for tax charges, but didn't

15  he also have a bank fraud charge?

16  A.   Yes.

17  Q.   And the judge acquitted him of that charge after the

18  government closed or rested its case, didn't they -- or didn't

19  he?

20  A.   Yes.

21  Q.   So Mr. Swisher was found not guilty of the felony and

22  guilty of the three misdemeanors; is that right?

23  A.   Yes, that's correct.

24  Q.   And Oscar Stilley is the one that represented him in that

25  trial, correct?
```

1   A.   Yes.

2   Q.   Then you said that Mr. Stilley came to Mr. Swisher and

3   said he, Mr. Stilley, wanted to hire Lindsey Springer to help

4   Mr. Stilley during the trial?

5   A.   That's what Mr. Swisher told me, yes.

6   Q.   Okay.  Do you know whether I was ever told that I was

7   being hired by Mr. Swisher or Mr. Stilley?

8   A.   I don't recall him saying whether or not he told you.  I

9   remember him saying that he worked with you.

10  Q.   Right.  And he gave me money, indirectly, through

11  Mr. Stilley?  He gave me money, right?

12  A.   Yes.

13  Q.   The evidence is clear on that?

14  A.   Yes.

15  Q.   Okay.  Is it your testimony that I counseled Mr. Swisher

16  to violate the Internal Revenue laws?

17  A.   No.

18  Q.   Okay.  And am I responsible for any tax liability

19  associated with Mr. Swisher?

20          MR. O'REILLY:  Objection.  Calls for speculation.

21          THE COURT:  Well, I don't see from anything that I

22  have that the government so asserts.  Is that correct,

23  Mr. O'Reilly?

24          MR. O'REILLY:  Correct.  There's nothing.

25          MR. SPRINGER:  Okay.  Good enough.

BRIAN SHERN - CROSS BY MR. SPRINGER                          73

```
 1              THE COURT:  Quit while you're ahead.  Go ahead.
 2   Q.   (BY MR. SPRINGER)  As far as Mr. and Mrs. Hovind, you
 3   testified that they made payments to me; do you remember that?
 4   A.   Yes.
 5   Q.   Okay.  And do you remember what year that was?
 6   A.   I believe it was 2006 -- 2005 to 2007, but I think most of
 7   them were 2006.
 8   Q.   And the actual money and the transactions that came to
 9   Lindsey Springer were from a ministry, weren't they?
10   A.   Yes.
11   Q.   They weren't specifically from Mr. and Mrs. Hovind, but
12   the underlying theme is that it was for them, correct?
13   A.   It was from them, yes.
14   Q.   Well, it was from a ministry corporation, right?
15   A.   It was from I think the -- what was on the checks was
16   Creations Science Evange --
17   Q.   Evangelism, Inc, right?
18   A.   Yes.
19   Q.   Inc.
20        So a corporation, actually, is the one that gave -- and I
21   think you testified it was $30,000; is that right?  Did you say
22   that?
23   A.   I don't think I --
24   Q.   Said an exact amount?  It's on the list you provided,
25   though, right?
```

BRIAN SHERN - CROSS BY MR. SPRINGER                                    74

```
 1  A.    Yes.
 2  Q.    All right.  And as far as Mr. Swisher goes, do you know
 3  how many hours I worked for Mr. Swisher?
 4  A.    No.
 5  Q.    And as far as the Hovinds, do you know how many hours I
 6  worked for them?
 7  A.    No.
 8  Q.    Do you remember, when you testified at trial, you told the
 9  jury why I was not charged with willful failure to file or tax
10  evasion for the year 2001?
11  A.    Yes.
12  Q.    And what was that reason?
13  A.    Because in the schedules we prepared for trial, the tax
14  loss was minimal for the purposes of trial and so we didn't
15  charge that year.
16  Q.    Isn't it because willful failure to file was beyond the
17  six years and tax evasion required a deficiency -- a
18  substantial tax deficiency and isn't it for that reason that
19  you could not substantiate a substantial tax deficiency that
20  led you not to pursue 2001?
21  A.    Yes.
22  Q.    Okay.
23  A.    For the trial purposes.
24  Q.    And now you're taking the entire gross amount from 2001
25  and you're saying for tax loss purposes we should take 20
```

 1  percent of that number; isn't that true?

 2          MR. O'REILLY:  Objection.  It's what the sentencing

 3  guidelines dictate, not what Special Agent Shern says.

 4          THE COURT:  Well, I think he's -- Mr. Springer is

 5  seeking to ascertain whether that is, in fact, the government's

 6  theory under the guidelines, and for that reason, it's

 7  overruled.  You may answer.

 8          MR. SPRINGER:  And if I may, Your Honor, the actual

 9  guideline goes on to say unless a better number is available

10  and --

11          THE COURT:  Well, I'm not here to hear argument.  I

12  overruled the objection.

13          MR. SPRINGER:  I'm sorry.  Okay.  Got you.

14          THE WITNESS:  Yes, that's correct.

15  Q.  (BY MR. SPRINGER)  And then for 2002, the reason why it

16  was not a tax evasion charge was because there wasn't a tax

17  liability, a deficiency balance, that you could show for that

18  year and that's why it was only a willful failure to file; is

19  that correct?

20  A.   Yes.

21  Q.   And isn't that same true for 2004's charge, which I

22  believe was Count 6?

23  A.   Yes, I believe so.

24  Q.   So there was no charge in 2001 because the tax loss was

25  minimal, and then for 2002 and 2004, which is Count 5 and 6,

1   there was no tax loss and that's why those were not tax evasion

2   charges?

3   A.   That's correct.

4   Q.   But now your testimony is that there should be tax loss

5   for those years; is that correct?

6   A.   Yes.

7   Q.   So -- and is that because -- excuse me.  Strike that.

8        For 2001, you had available information that you seized

9   from the home that I lived in; is that correct?

10  A.   Yes.

11  Q.   You had records, didn't you?

12  A.   Yes.

13  Q.   As a matter of fact, there's quite a large volume of set

14  of records out of my house; isn't that correct?

15  A.   Yes.

16  Q.   And for 2001, you calculated and used those receipts that

17  you found in my home to offset the gross income that you had

18  determined to conclude that there was not enough tax deficiency

19  to warrant a charge of tax evasion, correct?

20        MR. O'REILLY:  Objection.  Asked and answered and

21  relevance.

22        THE COURT:  I think that's been covered,

23  Mr. Springer.

24        MR. SPRINGER:  I was trying to get it a different

25  way, but I'll -- okay.  Very good.

BRIAN SHERN - CROSS BY MR. SPRINGER                    77

1   Q.   (BY MR. SPRINGER)  The same holds true for the year 2002,

2   2004, that how you calculated there was no tax liability is by

3   the receipts and the records that you found during the raid of

4   the home that I live in, correct?

5   A.   There were some other things besides that, but, yes.

6   Q.   For the most part, it came to -- I remember that now,

7   that's right.  You did have some outside source that you gave

8   me credit off of the gross income number, but for the most

9   part, it came from the house, correct?

10  A.   Yes.

11  Q.   Now, for the computations of tax loss for 2001, 2002, and

12  2004, you're just setting all those expenses aside, aren't

13  you?

14  A.   You mean for the purposes of sentencing?

15  Q.   Tax loss at sentencing, yes.

16  A.   Yeah, typically, at trial, you use the most conservative

17  approach, and all we had to document your expenses were the

18  expenditures that we found in the search warrant.  And I

19  believe we gave you numerous expenses that -- like a typical

20  revenue agent would never give a defendant -- or a taxpayer,

21  such as personal expenditures that we could clearly see

22  probably weren't personal, but we weren't comfortable bringing

23  that conclusion forth at trial, so for the purposes of

24  sentencing, we -- because we have such minimal records, you

25  yourself told me that you don't keep records of your ministry

BRIAN SHERN - CROSS BY MR. SPRINGER                    78

1   and your business dealings, and so we don't have a truly

2   accurate source of expense records to apply to your situation,

3   so we just use the sentencing guidelines and did a straight 20

4   percent of gross income.

5   Q.   Did you find copies of cashier's checks, money orders, and

6   the like when you raided my home?

7   A.   Yes.

8   Q.   Are those considered records by you?

9   A.   Yes.

10  Q.   Okay.  So I must have been keeping records, then, correct?

11  A.   You were keeping the actual expenditure records, but you

12  kept no ledgers or journals or anything like that to classify

13  what was business, what was personal.  And many of the money

14  order receipts we found just had straight numbers on them, they

15  didn't have documentation, what the purpose of the expenditure

16  was, and things like that.

17  Q.   So what had not been quantified, but the record itself,

18  the thing to quantify, it was in my house, wasn't it, for the

19  most part?

20  A.   To quantify a number, whether you can make that number out

21  to be a business expense or personal expense and make some type

22  of judgment on what it was, that record was useless for that

23  purpose.

24  Q.   But it was a record of an expense or a record of a

25  transaction that I participated in, correct?

```
1              MR. O'REILLY:  Objection.  Relevance and asked and
2    answered.
3              THE COURT:  Sustained.
4    Q.  (BY MR. SPRINGER)  We met on January 15, correct, 2009?
5    A.  Yes.
6    Q.  And did we spend hours going through each one of those
7    records?
8    A.  Yes.
9    Q.  You mentioned a blog?
10   A.  Yes.
11   Q.  You also mentioned a Web site, PenaltyProtestor.org and
12   com, I believe; is that correct?
13   A.  Yes.
14   Q.  And did you say Mr. Turner was -- you admitted Mr. Turner
15   was the host of that Web site, right?
16   A.  Yes, I think he testified about that.
17   Q.  Okay.  Now, you mentioned a video was on the Web site?
18   A.  Yes.
19   Q.  And what did that -- what was that video of?
20   A.  It was of you speaking somewhere.
21   Q.  Did he ever tell anybody in that video don't go file tax
22   returns or pay taxes?
23   A.  It's been so long since I reviewed it, I don't think you
24   did, but --
25   Q.  Thank you.
```

BRIAN SHERN - CROSS BY MR. SPRINGER                    80

1       Was there actually tax return forms available on

2  PenaltyProtestor.org?

3  A.   Yes, I believe that you referenced the Paperwork Reduction

4  Act and you had those forms on there to support your argument

5  about the Paperwork Reduction Act defense.

6  Q.   What my defense was, correct?

7  A.   Yes.

8  Q.   Okay.  Did you ever find any evidence where I had told

9  somebody not to file tax returns because the forms don't comply

10 with the Paperwork Reduction Act?  And I mean "any" evidence.

11 A.   I don't recall.  I know that Turner brought some of that

12 -- I think he did in his testimony.  He may have -- him or

13 Michael Burt may have brought something up in their testimony

14 about the Paperwork Reduction Act and I just assume that he

15 probably learned it from you, but I don't know.

16 Q.   Isn't it -- is it true -- excuse me.  Strike that.

17      You're trying to hold me liable for taxes for Mr. Turner

18 that he would have owed for 1999, 2000, 2001, and 2002, and

19 2003; is that correct?

20 A.   Yes.

21 Q.   Do you remember when Mr. Turner testified he met Lindsey

22 Springer?

23 A.   I don't remember, but it was after that, after those

24 years.

25 Q.   After that, thank you.

BRIAN SHERN - CROSS BY MR. SPRINGER                              81

1          Do you remember him testifying about the IFC conference
2   calls that you talked about earlier today?
3   A.    Yes.
4   Q.    Okay.  So how is it, then, that you attribute Mr. Turner
5   not filing a tax return or paying tax in '99, 2000, 2001, 2002
6   or 2003 if he didn't even know me?
7   A.    I don't attribute him not filing a tax return to you, just
8   the money that he hid in Mr. Stilley's Interest on Lawyers
9   Trust Account was -- you assisted him in evading the payment of
10  those taxes that he already owed.
11  Q.    Okay.  Isn't it true Mr. Turner went and made a loan at a
12  bank for that money?
13  A.    Yes, he mortgaged both his houses to get the money.
14  Q.    And didn't he say that the reason why he borrowed that
15  money was so if he got indicted he would have money to hire a
16  lawyer and defend himself?
17          MR. O'REILLY:  Your Honor, I'm only objecting because
18  we didn't go into this.  This is beyond the scope of direct
19  because this was fully explored during the trial.
20          THE COURT:  I understand your point.  Frankly, it
21  refreshes my recollection just a little bit.  I do have notes
22  on this from trial, but I'll hear this at least for now.  Go
23  ahead.
24          MR. SPRINGER:  Thank you, Your Honor.
25          THE WITNESS:  I think he did -- he did say that, yes.

BRIAN SHERN - CROSS BY MR. SPRINGER                         82

1  Q.   (BY MR. SPRINGER)  And isn't the theory behind why that

2  was gross income to me was because he was hiring me for

3  services?

4  A.   Yes.

5  Q.   Okay.  And now you're saying that he actually was evading

6  the payment of his taxes by borrowing the money on the house

7  and then sending it for services?

8  A.   I think he was under the impression that he was going to

9  send that money through Stilley's IOLTA account or put it into

10 Stilley's IOLTA account so it would make the appearance that it

11 looked like an attorney retainer and the IRS couldn't seize

12 that money that was owed to them, and then you spent the

13 money.  So on one hand, he was hiding the money, but then you

14 took it and spent it, and so it's -- you assisted him in hiding

15 his income, as well as it's income to you because I think it

16 pretty much was set out in trial and the jury concluded that

17 that was income to you and I don't think anybody ever --

18 anybody ever thought you would pay it back.

19 Q.   Was the loan proceeds to Mr. Turner income to him?

20 A.   Loan proceeds?

21 Q.   Didn't you say he borrowed that 250,000?

22 A.   Yes.

23 Q.   So it's loan proceeds, right?

24 A.   Yeah, that's not income to him.

25 Q.   To him, all right.  You just said it was and I'm just

1  asking --

2  A.   No, it wasn't.  It was --

3  Q.   He wasn't hiding his income, was he?

4  A.   No, he was evading the payment of his taxes.

5          MR. O'REILLY:  Objection.  Argumentative, asked and

6  answered.  The testimony at trial was complete, but this is

7  argument covered with this witness --

8          THE COURT:  Mr. Springer, the government's theory as

9  to Mr. Turner, as I understand it, is not that the deposit into

10 the IOLTA account was evasion of taxes, per se, but that it was

11 -- had the effect of impairing the government's collection

12 ability, so on that basis the objection will be overruled -- I

13 mean, sustained.  We'll go on to the next question.

14     As a matter of fact, how much more do you have on cross?

15         MR. SPRINGER:  Twenty more minutes, probably, 15.

16         THE COURT:  We'll take our lunch break at this time.

17 That clock on the wall is a little fast, but I have 13 minutes

18 after twelve.  We'll resume in one hour.

19     Court will be in recess.

20     (A RECESS WAS HAD.)

21         THE COURT:  Mr. Springer, you may continue.

22 Q.   (BY MR. SPRINGER)  Mr. Shern, what was the reason why you

23 mentioned the exhibits involving the PayPal?  Why did you

24 mention that?

25 A.   Why did I -- I don't remember what the question was asked

BRIAN SHERN - CROSS BY MR. SPRINGER                          84

1    referencing the PayPal.

2    Q.   Are you suggesting that money that was given to me through

3    PayPal is gross income?

4    A.   Yes.

5    Q.   And is that based upon whether or not -- is it based upon

6    whether I did something for the person who gave me that money?

7    A.   I think -- the way I did the PayPal documents was if I

8    could see that you sold something on eBay and got money for

9    that, that stuff was all excluded.  It was just people that I

10   think referenced "thanks for your help" or things that appeared

11   that you had performed some kind of service.

12   Q.   You don't know whether I performed any service for any of

13   the people who gave money to me through PayPal, correct?

14   A.   I'd have to look at the list to see, but there may have

15   been a couple on there that we knew about, but the majority, we

16   didn't know who they were.

17   Q.   Are you including those in your tax loss calculations?

18   A.   I believe so, yes.

19          MR. SPRINGER:  Would you please pull those up.

20          THE COURT:  Mr. Springer, let me give you some

21   guidance.

22          MR. SPRINGER:  Okay.

23          THE COURT:  As a general proposition, the question of

24   whether the funds you received were for services rendered has

25   been resolved against you by the verdicts of the jury and

BRIAN SHERN - CROSS BY MR. SPRINGER                    85

1  you're bound by that.  I'm bound by that.

2      If you want to address specific items as it relates to tax

3  loss determination, then we'll take that one step at a time.

4  But the overarching question of whether the funds that you

5  received over the years that were involved in this case were

6  received by you for services rendered has been conclusively

7  resolved against you by the jury verdict.

8          MR. SPRINGER:  May I ask one point of clarification?

9  The PayPal money was not included within the jury trial, those

10  were not part of the trial, they were never alleged, and they

11  are part of the tax loss calculation as an addition to.

12          THE COURT:  Well, then you need to be specific rather

13  than general in your questions.

14          MR. SPRINGER:  Got you.  Okay.  Just one moment, Your

15  Honor.

16  Q.   (BY MR. SPRINGER)  Mr. Shern, do you remember what exhibit

17  the PayPal receipts were on?

18          MR. O'REILLY:  Your Honor, it's 1134 and 1135.

19  Q.   (BY MR. SPRINGER)  Mr. Shern, if you could look at Exhibit

20  1134.

21  A.   Okay.

22  Q.   Is it your testimony on page 1 of 1134 you considered

23  every one of these transactions through PayPal that were not a

24  part of the grand jury indictment as gross income?

25  A.   Do you care if I refresh my memory with another exhibit?

BRIAN SHERN - CROSS BY MR. SPRINGER                              86

1  Q.   Please.  Which exhibit is it you're going to be looking

2  at?

3  A.   It's the one that the total of all the items we charged

4  you with.

5  Q.   1177, 1178, the last two I got from Mr. O'Reilly.

6  A.   You know what?  I don't believe he charged you with any of

7  the PayPal stuff, I think just Mr. Stilley.

8  Q.   Thank you.  Thank you.

9       Before lunch, you testified about the $250,000 loan that

10 Mr. Turner caused -- obtained and then -- isn't it true that

11 Count 5 alleges that was gross income and then the jury found

12 guilty based upon an allegation that that was gross income to

13 Lindsey Springer?

14        MR. O'REILLY:  Objection.  Compound and confusing.

15 The loan is -- I assume he's referring to the mortgage loan,

16 which would not be what was attributed to anyone's income.

17        THE COURT:  Well, Count -- isn't Count 5 the willful

18 failure to file Count?

19        MR. SPRINGER:  No, it was a tax evasion count.  It's

20 Count 4, Your Honor.

21        MR. O'REILLY:  The year 2005.

22        THE COURT:  Well, the pending question refers to

23 Count 5, which is willful failure to file.

24        MR. SPRINGER:  I'm sorry.  It's Count 4, you're

25 right.  Count 4.

```
1              THE COURT:  Then reask it.
2    Q.   (BY MR. SPRINGER)  Prior to lunch today, you testified
3    that Mr. Turner obtained a loan for $250,000, correct?
4    A.   Yes.
5    Q.   And that it is your position that that $250,000 should be
6    added to a tax loss calculation for Mr. Turner not paying his
7    taxes with that $250,000; is that correct?
8    A.   It's the $250,000 -- on one hand, it's -- we charge it as
9    income to you based on the fact that the jury concluded that
10   you took that money and never had any intention of repaying it
11   or else that tax count wouldn't have come back guilty, so on
12   one hand, it was charged to you for the tax loss associated
13   with that $250,000 -- was charged as income to you during
14   trial.
15        And on the other hand, we're adding the fact that you
16   assisted Mr. Turner in evading his taxes that he owed by
17   helping him transfer that money into the Interest on Lawyers
18   Trust Account, we're charging that to you at sentencing, as
19   well, because you assisted him in the evasion of payment of the
20   taxes that he owed.
21   Q.   And the $250,000 was a loan.  He didn't owe any money on
22   the loan, correct?
23   A.   He owed money on the loan, yes.
24   Q.   Mr. Turner owed money on the loan that he made for
25   $250,000?
```

BRIAN SHERN - CROSS BY MR. SPRINGER                              88

1          MR. O'REILLY:  Objection.  We covered this before

2    lunch and it's simply confusing as to what loan he's talking

3    about, which I think is the source of Special Agent Shern's

4    confusion.

5          THE COURT:  Mr. Springer, you're referring to the

6    mortgage loan made by Mr. Turner to generate the funds that

7    were transferred to the IOLTA account?

8          MR. SPRINGER:  Yes, Your Honor.

9          THE COURT:  It's established that a loan was made,

10   and if a loan is made, then money is owed.  We'll go on to the

11   next question.

12   Q.  (BY MR. SPRINGER)  And so in the tax loss calculation,

13   you're double-dipping on that 250,000; isn't that true?

14   A.   No.  We're charging you with the tax loss associated with

15   the income and we're also charging you with helping Mr. Turner

16   evade the payment of the taxes that he owed.

17        He could have used the money from the loan proceeds to pay

18   his taxes that he owed, but rather than doing that, he

19   transferred the money to Mr. Stilley to make it appear to be a

20   loan retainer so that he would have funds available to use him

21   as counsel if necessary, but instead of the money being used

22   for that purpose, you took it and bought a motor home and a

23   Lexus with it and spent it.

24   Q.   Isn't that -- what you just said -- the reason why Count 4

25   even began as a charge was because the theory you advanced

BRIAN SHERN - CROSS BY MR. SPRINGER                      89

1  before the grand jury and at trial was that that money was
2  gross income to me?
3  A.   Yes, that was the largest part of the income charged to
4  you for that year was that amount.
5  Q.   You said that the jury could not have found me guilty of
6  Count 4 without finding those proceeds were not a loan to me
7  just now; do you remember saying that?
8  A.   Yes.
9  Q.   How did you come to that conclusion?
10  A.   Because they charged --
11        MR. O'REILLY:  Objection, Your Honor, as to
12  relevance.
13        THE COURT:  Sustained.  Mr. Springer, I want you to
14  rest assured I'm well-aware that the funds attributable to that
15  transaction are not the -- is not the only tax liability
16  involved in Count 4.
17        MR. SPRINGER:  Thank you, Your Honor.
18  Q.   (BY MR. SPRINGER)  So Mr. Turner's transaction of $250,000
19  that he borrowed ends up being $500,000 worth of tax loss
20  proposed on -- as far as you're concerned at this sentencing
21  hearing; is that true?
22        MR. O'REILLY:  Objection.  Misstates the testimony
23  and the evidence.
24        THE COURT:  I think it does, but you piqued my
25  curiosity.  We're going to hear it.

BRIAN SHERN - CROSS BY MR. SPRINGER                    90

```
 1              THE WITNESS:  No, the tax loss wasn't $500,000.  The
 2    tax loss based on $250,000 income to you was charged during
 3    trial.  And then Mr. Turner owed close to $250,000 -- it wasn't
 4    exactly $250,000 -- in taxes that were assessed to him that he
 5    did not pay.  He had the ability to pay it when he took out the
 6    mortgage on his homes, but he -- rather than paying the taxes
 7    associated with that, he took the money and transferred it into
 8    Mr. Stilley's Interest on Lawyers Trust Account to make it
 9    appear to be a retainer to Mr. Stilley.
10    Q.   (BY MR. SPRINGER)  To make it appear to be a retainer to
11    Mr. Stilley?  What was it really?
12    A.   Really, it was money you convinced him to give you that
13    you took from him.
14    Q.   Okay.  Are you aware of Mr. Turner repossessing the RV?
15    A.   No, I wasn't aware of that.
16    Q.   Do you remember the testimony at trial there was a lien
17    against the property?
18    A.   Yes.
19    Q.   You mentioned on the blog that there were over 8,000 hits
20    on the blog you mentioned earlier?
21    A.   Yes.
22    Q.   You don't know what percentage of those were page visits
23    or site visits or unique visits, do you?
24    A.   I have no idea.
25    Q.   Could be a very few number of people constantly going
```

BRIAN SHERN - CROSS BY MR. SPRINGER                          91

```
 1  there, couldn't it?
 2  A.    Could be, yes.
 3  Q.    Thank you.
 4        Mr. Dingman and Mr. Grady and Mr. Robertson -- do you
 5  remember mentioning those three names?
 6  A.    Yes.
 7  Q.    Why did you mention them?  What relevance do they have to
 8  this proceeding of sentencing?
 9  A.    I believe that you encouraged them to violate the law.
10  Q.    And do you remember -- what specifically was it that I
11  encouraged them to do that violated the law?
12  A.    You assisted them in setting up trusts in order to evade
13  the payment of taxes, and you also helped them send -- excuse
14  me -- helped them send frivolous documentation to the Internal
15  Revenue Service to try to unvolunteer from the tax system.
16  Q.    Okay.  Do you know -- strike that.
17        To evade taxes, that's a year specific crime, correct?
18  A.    Yeah.
19        MR. O'REILLY:  Objection, Your Honor.  It calls for a
20  legal conclusion.
21        THE COURT:  Overruled.
22  Q.    (BY MR. SPRINGER)  Do you know what year I counseled
23  Mr. Dingman or Mr. Grady to commit tax evasion?
24  A.    It was sometime during the early nineties.
25  Q.    Now, Mr. Robertson, what relevance does he have to your
```

1  testimony about the early 1990s?

2  A.    He was just a name that Mr. -- either Mr. Dingman or

3  Mr. Grady mentioned to me that you had set up similar trusts

4  for him than you did for them.

5  Q.    Do you remember Mr. Dingman testifying about his

6  conviction in Springfield, Missouri?

7  A.    Yes.

8  Q.    Do you remember he worked a special deal out with the IRS

9  where he could go around and talk to people about what had

10  happened to him; do you remember that?

11  A.    Yes.

12  Q.    Do you remember an article that came out that caused me to

13  rise up against the newspaper about?

14  A.    Yes.

15  Q.    Okay.  And wasn't Mr. Robertson one of the deacons in that

16  article?

17  A.    I believe so, yes.

18  Q.    So Mr. Robertson is actually the one who Mr. Grady claimed

19  set him up with those trusts because that's what the article

20  said, isn't it?

21  A.    Mr. Grady told me that you were the one that assisted

22  him.  I don't remember what the article says, but they told me

23  that you were the one that came and you used to travel around

24  the midwest and promote these trusts and you helped them set

25  them up.

BRIAN SHERN - CROSS BY MR. SPRINGER                                    93

1   Q.   In your mind, is there a difference between promoting a

2   trust and setting a trust up?

3   A.   Depends on if the trust is legitimate.  I mean, trusts are

4   set up all the time that are perfectly legitimate, but it's

5   different if your motive is to evade taxes.

6   Q.   Did you ever see any of the trusts that Mr. Robertson set

7   up for Mr. Dingman and Mr. Grady?

8   A.   No.

9   Q.   So you don't know whether they were set up correctly or

10  not; is that correct?

11  A.   No, I'm just going from what they told me.

12  Q.   Okay.  Did they tell you they weren't set up correctly?

13  A.   They just told me that it was -- that you set them up for

14  them and they paid you -- paid Bondage Breakers Ministries a

15  monthly fee to help maintain the trusts.

16  Q.   Did you ever ask to see a copy of those trusts to see what

17  I allegedly set up?

18  A.   I think at one time I did ask, and the records may have

19  been involved in their own trial, and I don't think I ever

20  specifically looked at them.

21  Q.   You mentioned PenaltyProtestor.com and .org.  Did you ever

22  find any documents on PenaltyProtestor.com or .org that were

23  not already public documents in other places, such as court web

24  sites or government web sites in general?

25  A.   I don't believe so.  Almost all the documents there were

BRIAN SHERN - CROSS BY MR. SPRINGER                              94

1   either tax forms or documents of trial proceedings or court

2   orders or motions.

3   Q.   So you don't find anything wrong with putting publicly

4   displayed documents on a Web site, do you?

5   A.   No.

6   Q.   Okay.  Do you remember the testimony of Mr. Burt,

7   Mr. Turner, and Mr. Stumpo?

8   A.   Yes.

9   Q.   Relevant to the conference calls with IFC?

10  A.   Yes.

11  Q.   Do you remember what each one of them told the jury I told

12  everybody on that conference call to do?

13  A.   I think some of them testified that you told them to file

14  their tax returns.

15  Q.   And that IFC had misled them; do you remember that

16  testimony?

17  A.   Yes.

18  Q.   Did you ever interview anybody who attended the IFC

19  conference calls where I advocated to them stay their course,

20  violate the Internal Revenue laws, and continue to use the

21  trust that IFC had set up for them?

22  A.   No.

23  Q.   Thank you.

24       I believe you mentioned a Mr. Todd Guthrie; do you

25  remember that name?

1  A.    Yes.

2  Q.    And there are checks that you've listed that -- where he

3  gave either me or Bondage Breakers Ministry name money; is that

4  correct?

5  A.    I believe so, yes.

6  Q.    Do you know how many hours I worked for him?

7  A.    No.

8  Q.    Just to clarify on Dr. Roberts, for the purposes of the

9  two-point increase for counseling somebody to violate the

10  Internal Revenue laws, do you remember what year Dr. Roberts

11  was required to file a tax return and he didn't file a tax

12  return as a result of what you claim I told him?

13  A.    No, I don't.  He just said that you told him.

14  Q.    And isn't it true, after June of 2000, after he was

15  convicted, eventually he went to jail, right?

16  A.    Yes.

17  Q.    Right.  And the 2000 return wouldn't have been due until

18  at least, under most people's understanding, April 15th of

19  2001; isn't that right?

20  A.    That's correct.

21  Q.    And if Dr. Roberts was in prison, wouldn't that make it a

22  little more difficult for him to file a tax return while he's

23  in jail?

24  A.    Possibly so.

25  Q.    Complicated tax return, not an EZ form, right?

BRIAN SHERN - CROSS BY MR. SPRINGER                              96

```
 1   A.   Yes.
 2   Q.   And do you know, after he got out of jail, who worked with
 3   Dr. Roberts to get all his tax returns prepared and caught up
 4   and current?
 5   A.   No, I don't.
 6   Q.   You don't know whether it's Brian Miller or not?
 7   A.   I know Mr. Miller had some subsequent contact with
 8   Mr. Roberts, but I'm not sure if he's the one that counseled
 9   him on how to file his tax returns and pay over what he owed.
10          MR. SPRINGER:  Your Honor, may I have just one
11   moment?
12          THE COURT:  You may.
13   Q.   (BY MR. SPRINGER)  Would you please turn to Government's
14   Exhibit 1160, please.
15   A.   Okay.
16   Q.   My understanding of 1160 is the little asterisks by the
17   exhibit column means that the income item was included in
18   Lindsey Springer's tax loss computations presented at trial; is
19   that true?
20   A.   Yes.
21   Q.   Does that mean that the very first check at the top,
22   Number 3, was not listed for $5,000 from Believers Broadcast
23   Corporation?
24   A.   Yes, that amount was not charged as income to you during
25   trial.
```

BRIAN SHERN - CROSS BY MR. SPRINGER                    97

```
1   Q.   And why not?
2   A.   I think, towards the end of trial prep, we decided just
3   not to include him as one of our witnesses.
4   Q.   Okay.  And if you would look at the last entry on 1160, it
5   says -- turn to 1157, of course, but it says "cash N/A Various
6   Lindsey Springer, 12,000"?
7   A.   Yes.
8   Q.   Do you remember why that appears on this chart?
9   A.   Yes.  When Mr. Miller was finishing his computations up
10  based on the testimony that he heard at trial, I believe that's
11  the amount that you testified that you received in cash in the
12  mail each particular year and so he charged that amount to
13  you.
14  Q.   Is there any evidence that I did anything for any of those
15  people who gave that $12,000 whatsoever?
16  A.   I think if you take your conduct as a whole throughout the
17  course of this trial, an assumption could be made.  There's no
18  physical evidence linking any of this $12,000 to something that
19  you did, but I think an inference can be made it's probably
20  something you did for somebody, some legal service or advice
21  that you gave to somebody.
22  Q.   Isn't that totally based upon my testimony on the witness
23  stand, that $12,000?
24  A.   Yes.
25  Q.   Did I ever say that I did anything for any of the people
```

BRIAN SHERN - CROSS BY MR. SPRINGER                    98

1   who that amount of money I was just guessing about came from?

2   A.    No.

3   Q.    Will you turn to Government's Exhibit Number 1161,

4   please.

5   A.    Okay.

6   Q.    And the asterisks here also says, at the bottom or in the

7   middle of the page, "income item was included in Lindsey

8   Springer tax loss computations presented at trial," but you

9   didn't present any charges for 2001 at trial, did you?

10          MR. O'REILLY:  Objection.  Relevance to argumentative

11  question.  It simply -- this shows what was presented at trial

12  versus what was not presented as evidence at trial.

13          THE COURT:  Well, as I understand the pending

14  question, he is -- he is challenging that assumption, so I'm

15  going to overrule -- the relevance is marginal, but I'm going

16  to overrule the objection.

17          THE WITNESS:  What was the question again,

18  Mr. Springer?

19  Q.    (BY MR. SPRINGER)  Even though Exhibit 1161 says "income

20  item was included in Lindsey Springer's tax loss computations

21  presented at trial," there was no tax computations for the year

22  2001 presented at trial because there was no charge for 2001;

23  isn't that true?

24  A.    No, that's not entirely true, because Mr. Miller did

25  present the income that we charged you -- or not charged you,

1  but presented at trial for 2001, and I believe he explained why

2  we were not charging that year, but the amounts with the

3  asterisk on them were amounts that were presented at trial, but

4  that doesn't necessarily mean we charge you with any crime for

5  2001.

6  Q.   Right.  The actual asterisk here says "Lindsey Springer's

7  tax loss computations at trial"?

8  A.   Yes.

9  Q.   And you didn't present any tax loss computations at trial

10 for 2001, did you?

11       MR. O'REILLY:  Your Honor, objection.  Government's

12 Exhibit 676 was presented at trial, it is from the year 2001,

13 and it has those items.

14       THE COURT:  Let me take a look at it.  Hold on.  Do I

15 have that in these notebooks?  It doesn't look like it.

16       MR. O'REILLY:  You should, Your Honor.

17       THE COURT:  Never mind, I've got it.

18    Sustained.  Next question.

19 Q.   (BY MR. SPRINGER)  If you would turn to 1162, please.  On

20 the first entry, 1003, Midsummer to Sam Palmer for $10,000 --

21 do you see that entry on 1162?

22 A.   Yes.

23 Q.   Do you know what I did for Sam Palmer?

24 A.   Whenever I talked to Mr. Palmer, he indicated that he just

25 gave you money.  He didn't say you did anything for him.

1    Q.   And if you would go back to 1161, is that the same

2    testimony that he gave with reference to the second to the last

3    item, Number 1002 from Mr. Palmer, again on 1161, it's the

4    second to the last item, from Okemah National Bank, 10,000?

5    A.   Yes.

6    Q.   The fourth item on 1162 from Windhill Management Company

7    Trust for $400, do you know of anything that I did for Windhill

8    Management Company Trust?

9    A.   No.

10   Q.   And then, again, the last entry on 1162, which is number

11   1157, the cash for 12,000, that's the same testimony you gave

12   on the last exhibit about the 12,000.  In fact, wouldn't that

13   be the same for every year, the 12,000 is the exact same

14   source, me, on that witness stand?

15   A.   Yes.

16   Q.   All right.  If you'll turn to 1163, please.  And it's

17   listed -- Exhibit Number 29.  It's in the middle of the page

18   and it's to Guy Francis, if you draw a line across, if that

19   helps, and it send ends up being $3,750.  Do you know anything

20   I did for Guy Francis?

21   A.   Yes.

22   Q.   What did I do?

23   A.   He said that you assisted him with -- I remember from

24   talking to him, he said that you assisted him with matters

25   related to his -- I think it was involvement with IFC.

1  Q.   Did he tell you that I convinced him to go back and file

2  his tax returns?

3  A.   No, he didn't.

4  Q.   But you say it had something to do with IFC?

5  A.   I think so, without looking specifically at --

6  Q.   You just don't know?

7  A.   My memorandum of interview, I don't -- yes, I don't know.

8  Q.   The next entry just below that, which is Exhibit Number

9  30, and it's CR Foundation, Larry Simmons, for $7,500?

10 A.   Yes.

11 Q.   Do you know anything that I did for that money?

12 A.   Yes.  He testified in the grand jury.  I think he

13 testified that he gave you a donation, but we know that he was

14 under criminal investigation as well and he was also involved

15 with IFC, so we don't know specifically what you did for him,

16 but we know that he paid you and that he was involved in IFC.

17 Q.   Have you subsequently found out that he's filed all of his

18 back tax returns?

19 A.   No.

20 Q.   Did you look to see whether Mr. Frances had filed all of

21 his back tax returns?

22 A.   I believe we looked during the trial, but I can't remember

23 whether he had filed or not.

24 Q.   But you do remember I was telling people that -- three

25 people at least at this trial, back in November, testified that

BRIAN SHERN - CROSS BY MR. SPRINGER                    102

1   on those conference calls I was telling everybody to go file

2   their tax returns?

3   A.   Yes, that's correct.

4   Q.   So whether they gave me any money or not, if they went

5   back and filed their tax returns because I told them to do that

6   on the phone, that doesn't change whether they gave me a

7   donation or not, does it?

8   A.   I think the issue here is not whether or not you advised

9   these people, particularly, to file a tax return or not file

10  their tax return, the issue is whether they paid you money and

11  whether it was money for services or money for promoting your

12  cause, but the reason we added these people into these

13  calculations is because they had either problems with the IRS

14  as far as criminal investigations or they've been caught up in

15  IFC and you had some kind of interaction with them and helped

16  and they paid you for it.

17  Q.   They testified before the grand jury, did they not?

18  A.   Mr. Frances -- or, I mean, Mr. Simmons did.

19  Q.   And if I had performed anything in the same level that you

20  presented at trial, wouldn't you know that?

21  A.   Not if they withheld that information from me or from the

22  grand jury.  But based on the fact that they didn't meet you

23  until their troubles with IFC came and all the sudden they're

24  paying you for something.

25  Q.   Couldn't be they just wanted to support me?

BRIAN SHERN - CROSS BY MR. SPRINGER                    103

1  A.   I mean, if it was like a United Way or something, they'd

2  just send the money and they wouldn't have any contact.

3  Q.   What about the judge's instruction about disinterested?

4  Didn't have any expectation?

5         MR. O'REILLY:  Your Honor, objection.  This is

6  argument and it would be appropriate at that time.

7         THE COURT:  Sustained.

8  Q.   (BY MR. SPRINGER)  Third to the last item with a number is

9  1004 -- Exhibit 1004, on Exhibit Number 1163, foreign currency

10 draft from Fabulous Limited and it says "Brian DeMercuiro

11 $3,632"?

12 A.   Yes.

13 Q.   Do you know anything that I did for Brian DeMercuiro?

14 A.   Yes.

15 Q.   What did I do?

16 A.   He participated numerous times on your conference calls

17 and you actually had one-on-one conversations with him about

18 the situation with IFC and what he was supposed to do.  And you

19 actually helped him -- he had that $3,600 tied up in some

20 foreign business unit, I think, overseas -- was tied up in an

21 overseas corporation and he said that you actually helped him

22 retrieve that money and then he paid it to you, basically.

23 Q.   So I helped him get this money and then he gave it to me

24 for helping him get it?

25 A.   I think he gave it to you for helping him get the money,

1  but more -- I think more so you helped him with his situation

2  that he was facing with IFC, because a lot of the people that

3  were involved with IFC had issues, tax problems, that they were

4  trying to overcome, and I think you used that as an opportunity

5  to switch your -- I guess what I'm trying to say is people like

6  Barbara Hodsden and Brian DeMercuiro that were good people that

7  were caught up in this scam were looking for a person that

8  would help set them straight, which they got that out of you.

9      People like Mr. Patterson, Mr. Robertson, and Mr. Lake,

10 they were looking for somebody to tell them what they believed

11 and they -- so what those people, you told them, yeah, you're

12 right in your belief that you don't have to file a tax return,

13 but then you changed your tune when you were helping these

14 other people.  Basically, what I believe is that you told the

15 people what they wanted to hear to get the money from them.

16 Q.   Is it possible that I just didn't want to tell them what

17 they should believe, that that wasn't my call?

18 A.   I think your motive was solely financial.

19 Q.   Is the negative 30,000 at the bottom the Tulsa Sales and

20 Rental check that was given back to Eddy Patterson; is that

21 what that is?

22 A.   Yes.

23 Q.   Okay.  What about the 5,000 in cash that he received,

24 where is it indicated?

25 A.   I'm not sure -- the 5,000 in cash.

BRIAN SHERN - CROSS BY MR. SPRINGER                    105

1   Q.   Remember that came from a $35,000 check?

2   A.   Mr. Patterson told the IRS in an interview that he just

3   paid 30,000 back to you.  I know there was a check to you for

4   35,000, but I don't know about the 5,000 cash.

5   Q.   Isn't the 30,000 actually from the bank to Mr. Patterson's

6   Tulsa Sales and Rental, not back to me?

7   A.   We deducted the $30,000 because he told us in an interview

8   that Mr. Stilley wrote you a check for 35,000, and 30,000 of

9   that was to go back to him.

10  Q.   Which was the cashier's check to Tulsa Sales and Rental,

11  correct, that I provided to you on January 15, 2009, or

12  thereabouts?

13  A.   Yes, I think so.

14  Q.   And then wasn't it my testimony -- unrebutted testimony

15  that -- and Mr. Patterson's too, that I also gave him cash that

16  day, that same day?

17  A.   I don't remember if Mr. Patterson testified to that or

18  not.

19  Q.   You have no evidence to doubt it, though, do you?

20  A.   No.

21  Q.   If you would turn to 1164, please.  The third entry,

22  Exhibit Number 39, is another check from Larry Simmons for

23  $10,000.  Do you see that?

24  A.   Yes.

25  Q.   Okay.  Is it your same testimony that whatever I did with

1   him for the first check, I did the same thing for him with the

2   second check?

3   A.   Yes.

4   Q.   So if I did nothing for him on the first check, I did

5   nothing for him on the second check, right?

6   A.   I don't think -- that's not my belief.

7            MR. SPRINGER:  That's all right.  Strike that, Your

8   Honor, I'm sorry.

9   Q.   (BY MR. SPRINGER)  The second to the last is Number 45.

10  Do you see that exhibit?

11  A.   Yes.

12  Q.   From Charles Looney for $10,500?

13  A.   Yes.

14  Q.   Okay.  And that was not part of your -- the trial, but

15  it's part of this tax loss computation now.  What is it that I

16  did for Charles Looney for $10,500?

17  A.   Mr. Looney's words to me were that you were the sole

18  reason that he only got charged with a misdemeanor versus a

19  felony in his criminal case.

20  Q.   But did I do anything for Mr. Looney?

21  A.   Yes, he said you helped provide his attorneys with

22  assistance.

23  Q.   Who were his attorneys?  Do you know?

24  A.   I don't remember, offhand.

25  Q.   Isn't it true that Mr. Looney was convicted of

BRIAN SHERN - CROSS BY MR. SPRINGER                    107

```
 1  misdemeanors in his case?

 2  A.   Yes.

 3  Q.   And isn't it true --

 4        MR. O'REILLY:  Objection, Your Honor.  Just for

 5  clarification, Mr. Looney was not part of this case.

 6        THE COURT:  In his case, right.

 7        MR. SPRINGER:  I'm sorry.  I'm sorry.  I'm sorry.

 8  Q.   (BY MR. SPRINGER)  Isn't it true that the check Mr. Looney

 9  wrote to me is after his trial and his conviction?

10  A.   I don't know.

11  Q.   Would that be relevant to determine whether or not I did

12  anything for $10,500?

13  A.   In some cases, the timing of the payments would be

14  relevant so it would be one factor to look at, yes.

15  Q.   So if he had already gone through trial and then he met

16  me, how could I be the sole reason why he was found not

17  guilty?

18        MR. O'REILLY:  Objection.  Assumes facts not in

19  evidence.

20        THE COURT:  Sustained.

21  Q.   (BY MR. SPRINGER)  If you would turn to 1165, please.  Is

22  it your testimony that whatever I did for Mr. Looney's

23  Friendship Enterprises on 11/14/2004 is the same thing that I

24  did for the second entry on 1165, which is Exhibit 47 for

25  $13,000?
```

BRIAN SHERN - CROSS BY MR. SPRINGER                    108

```
 1            MR. O'REILLY:  Objection, Your Honor, merely for
 2    clarification.  It was from Miracles Unlimited, not Friendship
 3    Enterprises.
 4            MR. SPRINGER:  I'm sorry.  Miracles Unlimited.
 5            THE WITNESS:  Just to kind of add some factors to the
 6    situation about the timing of payments --
 7    Q.   (BY MR. SPRINGER)  Yeah.
 8    A.   -- oftentimes, Mr. Roberts and Mr. Ouwenga, specifically
 9    talked about how after their conviction you would tell them how
10    the court was wrong and you would continue filing things and
11    helping them post-conviction and you often got money from
12    people afterwards, so really -- I mean, the conviction date is
13    not as relevant as something you could -- you could have been
14    helping them afterwards.  I don't know specifically how you
15    helped them.
16    Q.   You don't know how many hours I worked for Mr. Looney,
17    right?
18    A.   No.
19    Q.   And then the fifth entry down is check number -- excuse
20    me -- Exhibit Number 1005 from AC&R Group?
21    A.   Yes.
22    Q.   Do you know who that is?
23    A.   No.  This was the check that I talked about that I wasn't
24    for certain who it was.  It just went through your -- it was
25    cashed at Checks Cashed.  I can't remember if it's the Phillips
```

BRIAN SHERN - CROSS BY MR. SPRINGER                          109

```
 1  or not.  I'm not sure.
 2  Q.   Okay.  So you don't know if I did anything for AC&R
 3  Group?
 4  A.   No.
 5  Q.   And, again, your same answers on the last entry, on 1165,
 6  under $12,000?
 7  A.   Yeah, about the -- your testimony.
 8  Q.   If you would turn to 1166, please.  There's nothing on
 9  1166 that was ever presented at trial, correct?
10  A.   There were things that we talked about during the trial, I
11  think, for certain witnesses, but none of this was presented as
12  income because we didn't charge 2006.
13  Q.   So just on the first line there -- we're just going to go
14  down quickly -- do you know anything I did for Patrick and
15  Patricia Turner for $1,000 on December 30, 2005, or
16  thereabouts?
17  A.   I know you helped Patrick Turner with his criminal
18  investigation.
19  Q.   But that was back in 2003, right?
20  A.   I don't know that you --
21          MR. O'REILLY:  Objection, Your Honor.  Actually
22  misstates the evidence at trial.  Mr. Turner testified he was
23  still concerned into 2005, which is in part why he transferred
24  $250,000 to hide from the IRS into that --
25          MR. SPRINGER:  If I can object, he just misstated the
```

1  evidence, but on this particular instance, I'm only talking

2  about $1,000 on Exhibit Number 1166.

3          THE COURT:  And your question is what?

4          MR. SPRINGER:  What evidence does he have that I did

5  anything for that $1,000 check from Mr. Turner on December 30,

6  2005, which was after he was told he was no longer under

7  criminal investigation.

8          THE COURT:  Go ahead.

9          THE WITNESS:  I believe Mr. Turner thinks that you're

10 the sole reason why he didn't get indicted, so I think this

11 money probably was money that he gave to you because he thinks

12 that you got him off, per se.

13 Q.  (BY MR. SPRINGER)  So in your testimony, then, he's paying

14 me just endlessly because he thinks I got him off of a criminal

15 charge?

16 A.  That's a possibility or I know that your alleged loan that

17 you had with him, you were having to pay him thousand-dollar

18 payments so this -- I mean, it could be an attempt that you're

19 paying him money trying to disguise it as loan payments and

20 then him paying you back $1,000.  I'm not sure.

21      I wouldn't say, to answer your question, that there's no

22 evidence that you did anything for him, because I think you

23 were actively involved in getting money out of him from the

24 time that you met him.

25 Q.  Wasn't the payments $1,400 a month?

BRIAN SHERN - CROSS BY MR. SPRINGER                                    111

1  A.   I think some of them were 14 -- yeah, I think that's

2  right.

3  Q.   Yeah, 1,400, yeah.

4  A.   Never mind.

5  Q.   The next check, Herbert and Charlene Mott for $10,000.

6  Can you tell me what I did for Herbert and Charlene Mott for

7  10,000?  And then I'll ask the next question.

8  A.   Herbert and Charlene Mott were clients of Mr. Patridge.

9  Mr. Patridge was an insurance agent.  And he faced criminal

10 charges and you -- he said he constantly talked to you and

11 bounced ideas off of you about his criminal case and you did a

12 lot of research for him.

13      Well, he -- instead of paying you directly, he told some

14 of his clients, his insurance clients, to pay you and write

15 "gift" on the check for $10,000, to pay you basically for the

16 help that you were providing to him.

17 Q.   Did Mr. Patridge also testify I never asked him for any

18 money?

19 A.   Yes, I believe he did testify to that.

20 Q.   So then if that was true, then this $10,000 was strictly

21 Mr. Patridge's doing, wasn't it?

22 A.   If that were true, yes.

23 Q.   You believe he lied?

24 A.   Yes.

25      MR. O'REILLY:  Your Honor, objection.  Mr. Patridge

BRIAN SHERN - CROSS BY MR. SPRINGER                                    112

```
 1    did not cash a check.
 2           THE COURT:  I don't remember what that evidence was.
 3    Q.   (BY MR. SPRINGER)  Exhibit Number 50, the third line down
 4    for 5,000 from Mr. Patridge a month and a half later.  Do you
 5    know how many hours I worked for Mr. Patridge?
 6    A.   No.
 7    Q.   The fourth line down, Beach Fire Corporation, Larry
 8    Logsdon.  Do you see that one?
 9    A.   Yes.
10    Q.   For 20,000?
11    A.   Yes.
12    Q.   Do you know how many hours I worked for Mr. Logsdon?
13    A.   No.
14    Q.   Mr. Logsdon testified before the grand jury, didn't he?
15    A.   Yes.
16    Q.   And he testified at trial, didn't he?
17    A.   Yes.
18    Q.   And what did he tell you that I did for him in exchange
19    for this $20,000?
20    A.   I believe he said you were -- you helped him with his
21    matters before the IRS.  I know he had some civil issues with
22    the IRS.  If I remember right, he said that you -- he utilized
23    you as a researcher.  I can't be for certain.
24    Q.   You don't know what I did for Mr. Logsdon, do you?
25    A.   I don't know exactly what you did, no.
```

BRIAN SHERN - CROSS BY MR. SPRINGER                                   113

```
 1   Q.   Okay.  And the next check for 20,000 from Believers
 2   Broadcast Corporation, Ken Geisendorffer, do you know what I
 3   did for that $20,000?
 4   A.   Mr. Geisendorffer, when we talked to him --
 5   Q.   Mr. Geisendorffer -- I'm sorry, is that Ken Geisendorffer?
 6   A.   Yes.  Ken Geisendorffer, his father, according to
 7   Mr. Geisendorffer, what he told us, was his father was actively
 8   involved in going to some of your seminars and he had an issue
 9   where he owned a hotel where he employed transient workers,
10   basically, and he got into an issue with employment taxes with
11   the IRS, and he used to pay you for your assistance in this IRS
12   matter.
13        And when he talked to Mr. Ken Geisendorffer, he told us
14   that you do good work and that's why he paid you.  And then he
15   also said that he was just now settling the issue that he had
16   with the IRS that you were helping him with.
17   Q.   So the statement you made before you said what Ken told
18   you, who told you that?  The one right before you said "and
19   what Mr. Ken Geisendorffer told me."
20   A.   We never talked to Ken's father, the elder Geisendorffer,
21   we just talked to Ken Geisendorffer.
22   Q.   Okay.  So you wouldn't know anything that I would have
23   done for his father because he had a stroke, right?
24   A.   Other than what Ken Geisendorffer told us that you did.
25   Q.   Right.  And did Ken say that he knew in 2006 why his
```

BRIAN SHERN - CROSS BY MR. SPRINGER                                114

1  father would give me money like that?

2  A.   I don't think this was from his father; this was from Ken

3  Geisendorffer.

4  Q.   Did he make you aware that they owned a television

5  station?

6  A.   Yes.

7  Q.   And that they put me on their television station quite

8  frequently?

9  A.   I think I reviewed it -- a VHS tape of one of the

10  presentations that you made on his television station.

11  Q.   And also they put me on the radio, didn't they?

12  A.   I'm not sure.  Probably.

13  Q.   Okay.  Do you know who Le Roy Peaslee is for $250?

14  A.   We never talked to Mr. Peaslee.

15  Q.   Okay.  And then, of course, I presume everything you say

16  about Mr. Patridge is just an ongoing -- you don't know how

17  many hours I worked for him, you don't know what I did, but I

18  did something for him; is that a basic summary?

19  A.   We know a little bit of what you did.  Like I said, he

20  said that you -- he utilized your services as a legal

21  researcher and talked about his case a lot, but other than

22  that, no, we don't know what you did for him.

23  Q.   And the next $5,000 entry from Larry Logsdon, Beach Fire

24  Corporation, same testimony there, don't know what I did for

25  Larry Logsdon other than what he said at trial?

BRIAN SHERN - CROSS BY MR. SPRINGER                                    115

```
 1   A.    Yes.
 2   Q.    Okay.  And then Check Number 1 -- Exhibit Number 135 from
 3   Hamlet Bennett for $25,000, do you know of anything I did for
 4   Hamlet Bennett for $25,000?
 5   A.    When we talked to Mr. Bennett, the first time we talked to
 6   him was right before trial, right before he was to testify at
 7   trial, and he said that he paid you and Mr. Stilley for legal
 8   services.
 9   Q.    Now, he came into this courtroom and he went under oath,
10   didn't he?
11   A.    Yes.
12   Q.    He didn't say that when he was here under oath, did he?
13   A.    I think my recollection is that he did say that, but I'm
14   not positive.
15   Q.    He actually said he gave that as a gift, if you remember
16   correctly?
17   A.    I think he may have testified that you told him to say it
18   was a gift.
19   Q.    Oh, right.  Have you reviewed his transcript before you
20   testified here today?
21   A.    No, I haven't.
22   Q.    And as far as you know, did he ever present to you
23   anything that I did for him?
24   A.    Like I said, when we talked to him, he said that you
25   helped him with his trial, because I think there was --
```

BRIAN SHERN - CROSS BY MR. SPRINGER                           116

 1   Q.   I helped him with his trial; is that what you just said?

 2   A.   Yeah, I think you -- when he talked with us, he said that

 3   he initially hired Mr. Stilley.  I believe he talked to you and

 4   you helped him get in touch with Mr. Stilley.  And then

 5   Mr. Stilley wasn't able to represent him in Hawaii because of

 6   his troubles in the Bar in Arkansas, and so you then introduced

 7   him to Mr. Richey.

 8        And Mr. Stilley, even though he didn't represent him, kept

 9   some of the money, like $75,000 or $50,000, that Mr. Bennett

10   paid Mr. Stilley, and then transferred some more money to you

11   and Mr. Richey.  And I think Mr. Richey ended up representing

12   him in trial.

13   Q.   So if the -- if Mr. Gollihare in his report said that

14   Mr. Bennett contacted Mr. Stilley first and then I wasn't the

15   one who introduced him, then would you be agreeing or

16   disagreeing with that?

17   A.   Without refreshing my memory with the transcript, I

18   couldn't say for sure whether he contacted Mr. Stilley first or

19   contacted you first.

20   Q.   So you don't know?

21   A.   No.

22   Q.   Do you trust Mr. Gollihare, if he did know?

23            MR. O'REILLY:  Objection, whether or not --

24            THE COURT:  Sustained.  We're not going to have any

25   debate back and forth about the reasoning processes -- by way

```
 1  of testimony, at least, about the reasoning processes of the
 2  probation office.
 3              MR. SPRINGER:  Okay.
 4  Q.  (BY MR. SPRINGER)  The next entry, Hamlet Bennett, 45,000,
 5  do you remember where that came from?
 6  A.  Yes, it came from Mr. Bennett.
 7  Q.  Directly?
 8  A.  It came from Mr. Bennett's American Savings Bank account.
 9  I think it was a cashier's check or an official check.
10  "Cashier's check" is what it says.
11  Q.  And the same testimony is he gave me 45,000, said I helped
12  him, but don't know what I did?
13  A.  Yes, you helped him with his case.
14  Q.  Helped him with his case.
15      The next one, from Sam Palmer for $500, Mr. Palmer -- did
16  he tell you that was a gift?
17  A.  I think he said all the money that he gave you was gift or
18  donations.
19  Q.  Same thing with Mr. Guthrie at $500?
20  A.  We never talked to Mr. Guthrie.
21  Q.  Okay.  The next entries are Creation Science Evangelism
22  Ministries, Inc.
23              MR. O'REILLY:  It does not say "Inc." on the check.
24  I think that's a misrepresentation.
25              THE COURT:  Rephrase it, please.
```

BRIAN SHERN - CROSS BY MR. SPRINGER                                    118

```
 1  Q.   (BY MR. SPRINGER)  Creation Science Evangelism Ministries,
 2  Kent Hovind, for $10,000.  Have you talked to Mr. Hovind?
 3  A.   No, I haven't talked to Mr. Hovind, but we did obtain jail
 4  tapes from conversations that you and Mr. Hovind and
 5  Mr. Hovind's wife had.
 6  Q.   And did those tapes reflect that he was paying me for a
 7  service?
 8  A.   No.
 9  Q.   The next one is $5,000 from American Savings Bank, Hamlet
10  Bennett, same testimony as the other two checks, just I helped
11  him, that was it, no hours, no nothing else?
12  A.   Correct.
13  Q.   Okay.  Regents Bank is the next entry from Kent Hovind,
14  10,000, the same testimony that you just gave a minute ago,
15  about listening to the tapes and --
16  A.   Yes.
17  Q.   And then Todd Guthrie, same person, didn't talk to, as you
18  said just a moment ago, on the other 500; is that right?
19  A.   Correct.
20  Q.   Okay.  And then Patrick and Patricia Turner, $900, which
21  is the third to the last entry on 1166, did you ask Mr. Turner
22  what that was for?
23  A.   Specifically the $900, no, I don't believe I did.
24  Q.   And just to be clear about this, you never asked him what
25  the thousand dollars was for on the top of 1166 either, right?
```

BRIAN SHERN - CROSS BY MR. SPRINGER                         119

```
 1   A.   I think it may have came up in his grand jury testimony
 2   and he said it was just -- he said that he donated to a lot of
 3   charities and things and this was just another one of his
 4   donations.
 5   Q.   Is that true?  Does he donate to a lot of charities?
 6   A.   Yes.
 7   Q.   And then Dale and Cheryl Phillips, $7,500.  Did you talk
 8   to them?
 9   A.   No.  I believe we added them in because we -- they may
10   have been one of the cases that you had on your Web site, but
11   I'm not 100 percent sure.
12   Q.   Yeah.  As far as you know, you don't know anything I did
13   for the Phillips, no hours, no nothing?
14   A.   No.
15   Q.   Okay.  And then the various answer again is the same on
16   the last of each entry, the $12,000 came directly from my
17   testimony, correct?
18   A.   Yes.
19   Q.   All right.  If you'll turn to 1167, please, and we'll just
20   clean this up and be done.  Two more.  None of these entries
21   were presented as evidence at trial, correct?
22   A.   No, because 2007 -- that wasn't one of the years we
23   charged.
24   Q.   Now, the --
25              MR. O'REILLY:  Objection, Your Honor.  Just
```

BRIAN SHERN - CROSS BY MR. SPRINGER                          120

```
 1  clarification, Exhibit 58 was referenced during the trial, it
 2  was not included as part of the tax computations at trial.
 3          THE COURT:  So 58 was -- was 58 received at trial?
 4          MR. O'REILLY:  I believe it was part of a different
 5  exhibit at that point, Exhibit 61, which was a whole collection
 6  of checks.  As the Court may recall, I was asking Mr. Turner
 7  about being repaid and I went through a series of checks.  This
 8  is the last one I referenced.
 9          THE COURT:  Proceed.
10          MR. SPRINGER:  Thank you, Your Honor.
11  Q.   (BY MR. SPRINGER)  Exhibit Number 58, which is from
12  Believers Broadcast Corporation for $100,000, did you ask
13  Mr. Geisendorffer why he gave me that check?
14  A.   Yes.
15  Q.   What did he say?
16  A.   He said because you do good work.
17  Q.   I do good work.  Did he tell you what I did for it?
18  A.   No.  Other than the fact that he said he had an IRS matter
19  that you helped him with.
20  Q.   Are you sure it wasn't his dad's IRS matter?
21  A.   From talking to him, I was under the impression that it
22  was related to that hotel, but I'm not sure.
23  Q.   And it was a state issue with not charging sales tax,
24  correct?  That refresh your memory?
25  A.   I thought it was something with employment taxes, but I
```

1  could be wrong.

2  Q.   Yeah, sales tax.  But did he ever say he gave the 100,000

3  to me because of something that I did for him?

4  A.   He just said he gave it to you because you do good work.

5  Q.   Okay.  Could be construed as helping a lot of people,

6  right, "good work"?

7  A.   It could -- yes, it could be.

8  Q.   Patrick Turner, the $400, second entry on Exhibit 1167 for

9  $400, did you ever ask Mr. Turner what that was for?

10  A.   Not that specific amount, no.

11  Q.   Then Exhibit Number 59 and 60, which are two checks from

12  Town & Country Bank to Lindsey Springer for $20,000, do you

13  know what those were for?

14  A.   It would be -- my testimony would be the same as with the

15  hundred-thousand above that.

16  Q.   It was the same as the hundred-thousand, okay?

17  A.   Yes.

18  Q.   Got you.

19       And then, again, the Patrick Turner, 400, 100, and 500,

20  same testimony on those?

21  A.   Yes.

22  Q.   Mr. Turner would say it was a gift.  And you didn't ask

23  him if I did anything to receive these 400, 100, and $500.

24       And then the same testimony would be the same on the

25  12,000?

1  A.    Yes.

2  Q.    Okay.  Am I missing 2008?  You didn't go to 2008.

3            MR. SPRINGER:  Your Honor, may I ask the government a

4  question?

5       (DISCUSSION OFF RECORD)

6            MR. SPRINGER:  No further questions of this witness,

7  Your Honor.

8            THE COURT:  Very well.

9       Before Mr. Stilley cross-examines, I'd like to get --

10 touch one matter by way of clarification.  I'm going to refer

11 to the tax loss chart that was included in the government's

12 trial brief -- or not your trial brief, but government's

13 sentencing memorandum -- showing a federal income tax loss with

14 respect to Mr. Springer -- this is on page 10 -- a little over

15 $413,000.

16      Now, let me -- I'll assure the government that you're not

17 necessarily bound by the revenues that you encompassed by the

18 numbers in your sentencing memorandum, and if you've got

19 exhibits that pick up additional or different items, why,

20 that's permissible.  But, anyway, working from that $413,000

21 number, does that number include any of these $12,000 annual

22 items by way of these small payments that are plugged in on

23 these individual sheets?

24            MR. O'REILLY:  Yes, Your Honor.

25            THE COURT:  The reason I ask is, without deciding

```
1   anything one way or the other, I'm a little -- and I realized
2   as to some years, those $12,000 numbers were also included at
3   trial in the evidence at trial.  I'm -- again, without deciding
4   anything, I'm a little troubled by that in the sense that
5   Mr. Springer did have followers, he did solicit donations
6   and -- for individuals like Mr. Springer in this part of the
7   country, loosely speaking, we're in the land of the small
8   donation, it just comes in when somebody persuades somebody to
9   make a donation.  And so I'm a little concerned about assuming
10  that every dime of those $12,000 that are plugged in each year
11  would be reportable income.  Obviously, not all the evidence is
12  in, and both parties are certainly entitled to have a full say
13  on that score, but I just wanted some clarification as to
14  whether that -- those $12,000 items were also already included
15  in the 400,000 that is -- that shows up on page 10 of your
16  sentencing memorandum.
17          MR. O'REILLY:  Yes, Your Honor.  Just for
18  clarification, our theory is that Mr. Springer ran a business
19  and all the payments to that, that were not actually used for
20  ministerial purposes, basically he kept in his pocket.  First
21  of all, it's gross income, and then how he uses it would be
22  potentially deductible.  That is our theory based on the
23  Court's jury instructions at trial, also our understanding of
24  the law.  He was not a 501(c)(3) corporation.  I can cover this
25  in argument, probably, far better than now.
```

BRIAN SHERN - CROSS BY MR. STILLEY                    124

```
1              THE COURT:  Well, yeah, and there's no need to get
2   any further into it at this point.  That is -- so far as I'm
3   concerned, that is a live issue.  And not to say that there are
4   no other live issues, but that is a live issue.  I just wanted
5   to get that clarification.
6        Mr. Stilley.
7                        CROSS-EXAMINATION
8   BY MR. STILLEY:
9   Q.   Mr. Shern, you realize that the government has the burden
10  of proof in this proceeding to the preponderance of the
11  evidence, correct?
12  A.   Yes.
13  Q.   And that means that you have to have some credible
14  evidence to prove all your propositions, correct?
15  A.   Yes.
16  Q.   You realize that at some points in time during
17  Mr. Springer's cross-examination, you speculated about what
18  might possibly happen for which you had no proof, correct?
19  A.   I would say that some things I said were just speculation,
20  yes.
21  Q.   During this cross-examination, I'd like to ask you about
22  facts that you have either personal knowledge or knowledge on
23  the basis of some fact that would cause it to be a usable fact
24  in this proceeding; is that fair enough?
25  A.   Yes.
```

BRIAN SHERN - CROSS BY MR. STILLEY                                   125

1   Q.   Now, you realize that, under the tax guidelines, when the

2   sentencing guideline manual -- that if there is a more accurate

3   way to determine a tax loss, you use the more accurate method

4   of determining tax loss; is that correct?

5            MR. O'REILLY:  Objection, Your Honor.  This is

6   argument and certainly not suitable for a witness merely

7   providing factual summaries of specific discrete items of

8   income.  He has not provided a tax calculation.

9            THE COURT:  Sustained.

10  Q.   (BY MR. STILLEY)  Can you tell the Court specifically what

11  you did in order to get facts that might allow a calculation

12  more accurate than simply using a 20 percent figure?

13  A.   As I explained to Mr. Springer, the only records of

14  expenditures and expenses that we utilized were those from the

15  search warrant, and in your case, some of the credit card

16  companies that we subpoenaed.

17       We really didn't have any books or ledgers or any kind of

18  financial statements that either one of you guys prepared to

19  determine what your business expenses or anything like that

20  were.

21       So in my opinion, there wasn't adequate information to

22  make an accurate determination of what your expenses were, so

23  the 20 percent method was appropriate in this case.

24  Q.   Sounds to me like you're saying you didn't attempt to get

25  any more accurate information; is that true?

BRIAN SHERN - CROSS BY MR. STILLEY                          126

1  A.   No, that's not true.

2  Q.   Okay.  Tell us the truth about what you did to try to get

3  more accurate information.

4  A.   In relation to Mr. Springer's, he flat-out told us that he

5  didn't maintain any records, and so that was kind of a dead-end

6  with respect to his business expenses.

7       And then as far as yours, we didn't have any books or

8  records from you.  We never did a search warrant.  All we had

9  were records that we subpoenaed.

10 Q.   But, now, the question is:  What efforts did you make to

11 get more accurate information?  And if the answer to that is

12 no, just say no.

13          MR. O'REILLY:  Your Honor, objection.  That's an

14 argumentative question.

15          THE COURT:  Sustained.

16 Q.   (BY MR. STILLEY)  Well, can you then tell us what efforts

17 that you made to try to get the most accurate information

18 possible?

19 A.   Yes.

20 Q.   What was that?

21 A.   Issued subpoenas to all your bank accounts, all your

22 credit cards, talked to witnesses, put people before the grand

23 jury.  Basically, our whole investigation was a process of

24 obtaining information.

25 Q.   Now, there is different methods of getting information to

BRIAN SHERN - CROSS BY MR. STILLEY                                   127

```
 1  determine tax loss, correct?

 2  A.   Yes.

 3  Q.   There is -- there's a method that's called the -- and it's

 4  sometimes used in tax prosecutions -- it's called the "net

 5  worth method," correct?

 6  A.   Correct.

 7  Q.   Now, if you use different methods of determining what tax

 8  loss actually occurred, are all the methods reasonably accurate

 9  as a general rule?

10  A.   Basically, for the purposes of trial, the only burden of

11  proof is to show that there is a tax loss, and so I would say

12  that all those methods have been used in court before, so

13  they're all acceptable methods of proof.

14  Q.   But if they're reasonably accurate, we shouldn't get

15  wildly differing amounts using different methods, correct?

16        MR. O'REILLY:  Objection.  He's, again, attacking a

17  factual witness who is merely presenting discrete items of

18  income.  He has not testified about the tax loss computations,

19  nor do we anticipate having Special Agent Shern testify about

20  that.  But Agent Miller will be testifying about the tax loss

21  computations.

22        THE COURT:  Sustained.  Mr. Stilley, if you've got

23  specific items to address, this is the time to do that, but

24  general debates about the direct versus indirect method and

25  things like that are not helpful.
```

BRIAN SHERN - CROSS BY MR. STILLEY                    128

```
 1              MR. STILLEY:  Sure.
 2              THE COURT:  We'll have the next question.
 3              MR. STILLEY:  Thank you, Judge.
 4   Q.  (BY MR. STILLEY)  Now, you did come out to Oscar Stilley's
 5   house, correct?
 6   A.  Yes.
 7   Q.  And it's a fairly inexpensive house, correct?
 8   A.  Correct.
 9   Q.  Did you see the automobiles nearby?
10   A.  Yes.
11   Q.  They were pretty plain automobiles?
12   A.  Yeah, I think one was an older-model Lexus and then I
13   don't recall what the other ones were.
14   Q.  There was a 1982 Chevrolet pickup, correct?
15   A.  I don't remember.
16   Q.  The automobiles that belonged to Oscar Stilley were very
17   old, correct?
18   A.  I think I do recall seeing some old cars out there, yes.
19   Q.  You didn't see any evidence of a flashy or extravagant
20   lifestyle on the part of Oscar Stilley, did you?
21   A.  When I went out to your house, no.
22   Q.  And you looked at other times as well to see if you could
23   get evidence of that, correct?
24   A.  Get evidence of what?
25   Q.  Living a high lifestyle, because that's part of a criminal
```

BRIAN SHERN - CROSS BY MR. STILLEY                                    129

1   investigation relating to tax, as a general rule, correct?

2   A.    Probably, like, disposition of proceeds and things like

3   that, yes, we do typically in our investigations look at how

4   people spend their money, yes.

5   Q.    And you looked at that in this case, correct?

6   A.    Yes.

7   Q.    So you got a pretty good handle on where Oscar Stilley's

8   money went, correct?

9   A.    Yes, I would say so.

10  Q.    So -- and that included a fairly basic lifestyle,

11  correct?

12  A.    From what I could tell, just from talking with you and

13  seeing what you spent, yeah, there wasn't a lot of flashy cars,

14  you didn't live in a big house, you didn't wear fancy clothes.

15  I mean, that's correct.

16  Q.    Would it be fair to say that the most extravagant

17  expenditure you saw in the records would have been the

18  expenditures for the adoption of kids from Russia?

19  A.    Yes, that would be accurate.

20  Q.    Now, you testified that Oscar Stilley had made a

21  misrepresentation to the Northern District of Oklahoma about

22  his right to practice in the Northern District, correct?

23  A.    Yes.

24  Q.    Are you aware that there was a serious dispute about

25  whether or not Oscar Stilley was entitled to practice when he

BRIAN SHERN - CROSS BY MR. STILLEY                                    130

1   tried to enter his appearance -- were you aware of that?

2   A.   I just remember you tried to enter your appearance and the

3   judge found out that you had had Bar troubles in Arkansas and

4   you weren't allowed to -- you had said that you were able to

5   practice law in that district and you were not, and the judge

6   didn't allow you to represent the client there.

7   Q.   Well, now, you say that Oscar Stilley was not entitled to

8   practice, but you're having to actually speculate on that,

9   correct?

10  A.   I just know --

11           MR. O'REILLY:  Objection.  The record is quite

12  clear:  He was suspended pending disbarment.  He was suspended

13  at that time.

14           THE COURT:  At what point in time are you referring,

15  Mr. Stilley?

16           MR. STILLEY:  I'm referring to the -- the point in

17  time, I believe, would have been -- oh, I think it's about

18  '07.  Don't hold me to that, but it's somewhere just a little

19  ways back like that.  It was on the Green case.

20           THE COURT:  Well, if you can't pin it down any better

21  than that, then it's not persuasive to me.  We'll go on to the

22  next question.

23  Q.   (BY MR. STILLEY)  Are you aware, then, that Oscar Stilley

24  has, at the current time, an appeal to the Tenth Circuit Court

25  of Appeals asking that his license be reinstated because --

```
 1  legal reasons, whereby that Oscar Stilley says that he
 2  continues to this day to have the legal right to practice in
 3  this district?
 4  A.   No, I wasn't aware of that.
 5  Q.   Would that change your mind about the conclusion that
 6  Oscar Stilley had tried to mislead a court?
 7  A.   No.
 8  Q.   You don't have any direct evidence that Oscar Stilley
 9  tried to mislead a court, do you?
10  A.   All I know is what I heard about whenever you tried to
11  make an appearance and you had Bar troubles in Arkansas and you
12  weren't supposed to be practicing law outside because your
13  license was suspended.  That's basically the extent of my
14  knowledge about the whole situation.
15  Q.   Okay.  And isn't it true that one side argued one way and
16  one side argued another?
17          THE COURT:  Excuse me.  Mr. Stilley, there's nothing
18  in this line of questioning that's going to have any impact one
19  way or the other on sentencing.
20          MR. STILLEY:  Can I ask, Your Honor, for the record
21  on why there's a different reason that I'm saying that this
22  Court should not take that into account, but if the Court is
23  not going to take these matters into account, I don't want to
24  ask any questions.
25          THE COURT:  It's time to move on to the next
```

1  subject.

2          MR. STILLEY:  So Hawaii is not in it either?

3          THE COURT:  I'm not concerned about those particular

4  matters for sentencing purposes.

5          MR. STILLEY:  Thank you, Judge.

6  Q.  (BY MR. STILLEY)  You previously gave testimony to certain

7  persons suggesting that perhaps Oscar Stilley had encouraged

8  others to violate the law; is that true?

9  A.  Yes.

10  Q.  What specific laws were you talking about?  And I'd like

11  to get a citation, if you can cite the law that you think is

12  involved.

13  A.  Well, in the case of Mr. Roberts, where you told him he

14  didn't have any liability to file or pay taxes, it would be --

15  26 7203, failure to file, and that would be the law.

16  Q.  Well, isn't it true that really that begs the question,

17  because 7203 simply provides the punishment if a person fails

18  to file a return that is required?

19          MR. O'REILLY:  Objection, Your Honor.  This is simply

20  argumentative and was well-covered at trial.  Mr. Stilley's

21  specious theories have been rejected appropriately by this

22  Court.

23          THE COURT:  Sustained.

24  Q.  (BY MR. STILLEY)  Now, you suggested that there was --

25  that Oscar Stilley said something to Dr. Roberts suggesting

BRIAN SHERN - CROSS BY MR. STILLEY                                    133

1   that he didn't have to pay tax?

2   A.   Yes.

3   Q.   I don't think that's true.  Can you show where you've got

4   that in your transcript?

5   A.   It's the grand jury transcript of Philip Roberts.  If you

6   have a copy of that, I can show you where he says that.

7   Q.   Okay.  Could we maybe take a look at that at a break

8   rather than take a lot of time to look right now?

9   A.   Yeah.

10  Q.   Isn't it true that Oscar Stilley didn't actually advise

11  Dr. Roberts not to file the tax return?

12          MR. O'REILLY:  Your Honor, objection to the number of

13  "nots" that were in that question.  I'm not sure exactly what

14  was asked.

15          THE COURT:  Please rephrase it.

16  Q.   (BY MR. STILLEY)  Isn't it true that the statement that

17  was allegedly made by Oscar Stilley was that he couldn't find a

18  law requiring the making of a return?

19  A.   What I remember from reading the grand jury transcript is

20  Mr. Roberts sought out your advice and you told him he was

21  correct in his assumption, that he has no liability to file a

22  tax return and no liability to pay the tax associated with it.

23  Q.   And the time frame we're talking about there is

24  approximately 1990, correct?

25  A.   Correct.

BRIAN SHERN - CROSS BY MR. STILLEY                                    134

1  Q.   And you realize Oscar Stilley graduated law school in

2  1990, correct?

3  A.   I don't know when you graduated law school.

4  Q.   Did you not get educational records?

5  A.   I don't believe I did get your college transcripts.  I may

6  have -- I don't think I did get those records.

7  Q.   Isn't it true or aren't you aware that Dr. Roberts also

8  filed certain litigation in federal court trying to get answers

9  to his questions?

10  A.   I believe so, yes, I think he testified about that.

11  Q.   Wouldn't it be fair to say, then, that Dr. Roberts wasn't

12  simply relying on what Oscar Stilley said, but was also trying

13  to get an official answer?

14  A.   What he said in the transcript was that he sought out the

15  advice from you because he knew you to be an expert in legal

16  matters and he asked you that question.

17       I know that he had questions about whether or not he

18  should file and pay taxes before he approached you, but I

19  think, from what his testimony says, he asked you because you

20  were an expert in that area.

21  Q.   But do you know the dates or approximate dates when the

22  litigation was filed by Dr. Roberts trying to get answers to

23  his questions in a federal court?

24  A.   No.

25  Q.   It was after he spoke to Oscar Stilley, was it not?

BRIAN SHERN - CROSS BY MR. STILLEY                                    135

```
 1   A.    I don't know.

 2   Q.    Do you know anything about that litigation?

 3   A.    Other than the fact that I think he testified that he

 4   filed some litigation, that's all I know.

 5   Q.    Now, you talked a little bit on Springer's cross-

 6   examination about Mr. Swisher, correct?

 7   A.    Yes.

 8   Q.    Mr. Swisher was not part of the allegations of this

 9   indictment; isn't that correct?

10            MR. O'REILLY:  Objection, Your Honor.  He would be

11   part of the conspiracy to defraud in Count 1.  He was not

12   specified in any count.

13            THE COURT:  Well, I'm -- I have very recently reread

14   the indictment, so I know what the indictment says and does not

15   say, so that will be sustained.

16   Q.    (BY MR. STILLEY)  Did you do any research or make any

17   efforts to find out the scope of the specific agreement that

18   Oscar Stilley allegedly joined?

19   A.    You mean the conspiracy agreement?

20   Q.    Yes, Count 1.

21   A.    Yes.

22   Q.    And what was that?

23   A.    What efforts did I make to determine the agreement?

24   Q.    Yes.

25   A.    Talked to witnesses, looked at records, the whole -- our
```

BRIAN SHERN - CROSS BY MR. STILLEY                    136

1  whole investigation.

2  Q.   Did you get enough information to make a conclusion?

3  A.   A conclusion about what?

4  Q.   About what the specific -- the scope of the specific

5  agreement was that Oscar Stilley allegedly joined?

6  A.   We got enough evidence to prove that there was an

7  agreement, but I don't think there was any specific contract or

8  anything between you and Mr. Springer that you were going to

9  defraud the United States, but I think we proved our evidence

10  in trial to prove that there was an agreement between you and

11  Mr. Springer.

12  Q.   Okay.  So you got enough to say that there was an

13  agreement, but not to say what that specific agreement was,

14  correct?

15       MR. O'REILLY:  Your Honor, objection as to the

16  relevance of his line of questioning.

17       THE COURT:  Sustained.  I think it was either you or

18  Mr. Springer that brought out at trial whether or not it was

19  day one of a conspiracy.  Day one, at least for some purposes,

20  was that day at the Pizza Hut and time is counted from then.

21  And so I've heard all of that at trial.

22       MR. STILLEY:  Your Honor, for the record, can I say

23  what my reasoning is for this?

24       THE COURT:  Surely.

25       MR. STILLEY:  Thank you, Judge.  It's a case called

BRIAN SHERN - CROSS BY MR. STILLEY                                137

1  United States v. Dazey, and I cited it at Docket Entry Number
2  330 on page 2 of 6 on Document 330, in which the Tenth Circuit
3  said that it was important to make particularized findings
4  about the scope of the specific agreement the individual
5  defendant joined.  And my reasoning for asking these questions
6  was to see what facts were there for the Court.
7          THE COURT:  Well, I understand that.  And neither --
8  by the way, I will assure both sides that, for sentencing
9  purposes, the conspiracy period in the indictment is not
10 necessarily the end of the story under Guideline 1B1.3.  There
11 is the matter -- the question of jointly undertaken criminal
12 activity that could begin before the conspiracy period alleged
13 in Count 1, it could continue after the conspiracy period set
14 forth in Count 1.  So to some degree, this is fair game and I'm
15 not going to foreclose you from continuing down this line of
16 questioning within reason.  But it would be helpful to the
17 Court if your questioning would get more specific and address
18 things that -- on which you may at least hope this witness can
19 shed some light.
20      So we'll have the next question.
21          MR. STILLEY:  Thank you, Judge.
22 Q.  (BY MR. STILLEY)  Do you know if there was more than one
23 unlawful conspiracy involved?  Did you see evidence of more
24 than one unlawful conspiracy?
25 A.   I think the conspiracy was just to defraud the United

BRIAN SHERN - CROSS BY MR. STILLEY                            138

1   States.  I think there's just one.

2   Q.   Okay.  So you think there's just one, correct?

3           MR. O'REILLY:  Your Honor, objection as to how many

4   conspiracies Special Agent Shern thinks there are.  Facts

5   coming from this witness are great and they will be helpful to

6   the Court to determine the scope of the conspiracy.  His

7   opinion as to what he believes is not a fact.

8           THE COURT:  Well, does -- let me ask this:  Does the

9   government agree with -- in general, at least, with my comment

10  that I just made a minute ago about Guideline 1B1.1 and the

11  need for sentencing purposes to determine the scope of the

12  jointly-conducted criminal activity to the extent that we are

13  going to hold one defendant accountable for matters that

14  directly relate to the other defendant?

15          MR. O'REILLY:  Absolutely, Your Honor.

16          THE COURT:  Okay.  Well, if that's the case, then why

17  is it not fair game for Mr. Stilley to cross-examine Mr. Shern,

18  the principal factual investigator, as to matters that may bear

19  directly on the Court's determination of the scope of jointly-

20  conducted criminal activity?

21          MR. O'REILLY:  The government has no objection to the

22  questions that delve into the factual basis of that; however,

23  Special Agent Shern's speculations, if you will, as to how many

24  conspiracies there may or may not have been don't get to the

25  factual questions that the Court needs answered to determine

```
 1  that.  And that's the government's position on that.
 2            THE COURT:  Well, I understand.  That question may,
 3  in fact, be a predicate for more specific questioning, and for
 4  that reason, I'm going to overrule the objection.
 5       You may proceed.
 6            MR. STILLEY:  Thank you, Judge.
 7  Q.  (BY MR. STILLEY)  So you said that there was one
 8  conspiracy, correct?
 9  A.   Yes.
10  Q.   Do you know when that conspiracy was made based on your
11  facts that you found?
12  A.   I don't know exactly the date that it was found, but I
13  think it was when you and Mr. Springer got together and decided
14  to represent these various people and have them pay you money
15  for legal representation and take them to trial with their
16  frivolous beliefs.
17  Q.   Okay.  Was that 2003, then?
18            MR. O'REILLY:  Objection, Your Honor.  I think the
19  evidence was they met in '99 and --
20            THE COURT:  Well, the witness has lived this case, so
21  I think he's fully capable of responding.  That's overruled.
22            THE WITNESS:  Mr. Roberts introduced you to
23  Mr. Springer in the first joint case that you guys began to
24  work on, was in 2000, and that would have either been
25  Mr. Roberts or Mr. Lake.  Both of those occurred in 2000.
```

BRIAN SHERN - CROSS BY MR. STILLEY                           140

1   Q.   (BY MR. STILLEY)  So is it your testimony, then, that you

2   believe the conspiracy started in 2000?

3   A.   Yes.

4   Q.   Okay.  But, now, if you look at the indictment, there's no

5   overt acts between 2000 and 2003; isn't that correct?

6   A.   I don't think there is in the indictment.

7            MR. O'REILLY:  Objection.  Relevance.  This was

8   actually covered at trial.  The question of overt acts

9   triggering the statute of limitations was already covered when

10  an overt act was first alleged was not --

11           THE COURT:  Overruled.

12           THE WITNESS:  The question was there any --

13  Q.   (BY MR. STILLEY)  Isn't it true that there weren't any

14  overt acts between 2000 and 2003?

15  A.   Mentioned in the indictment?

16  Q.   Yes.

17  A.   I believe that's correct.

18  Q.   So wouldn't that be a rather odd conspiracy, for somebody

19  to make an agreement to do something unlawful and then take no

20  steps to put it into practice for three years?

21  A.   I think -- just because we didn't specify the overt acts

22  in the indictment doesn't mean that there were none committed

23  before that date.

24  Q.   Do you think that other overt acts were committed before

25  that date?

```
 1   A.   Yes.

 2   Q.   Based on your investigation, can you give us a list of

 3   those?

 4   A.   I think convincing Mr. Lake and Mr. Roberts in 2000 that

 5   their frivolous defenses were valid and going to trial and

 6   getting money from them constitutes one overt act to defraud

 7   the government -- or multiple.  I guess one in Mr. Lake's case

 8   and one in Mr. Roberts' case.

 9   Q.   And so this would be in 2000, correct?

10   A.   Yes.

11   Q.   Okay.  Let's go to the next one.

12   A.   That's all I've got for those.

13   Q.   Okay.  That would still leave us with a gap between 2000

14   and 2003 in which no overt acts were performed, correct?

15   A.   Can I look at the exhibits for the payments in 15 to

16   refresh my memory?

17   Q.   Sure.  Please.

18   A.   I believe you also received money from Mr. Lake and

19   Mr. Roberts in 2001 as well.  And in 2002, the Hawkins.

20   Q.   Anything else?

21   A.   No, for the time period 2000 to 2003.

22   Q.   Now, the 2001 -- what are you saying was the overt act in

23   2001?

24   A.   The fact that you continued to assist Roberts with his

25   obtaining money -- you and Mr. Springer participating together
```

BRIAN SHERN - CROSS BY MR. STILLEY                                    142

```
1   to help obtain money for services from Mr. Roberts.

2   Q.   Are you saying that he simply still owed a bill and

3   because -- that he paid additional on an outstanding debt, that

4   that's an overt act?

5   A.   I think, yes, when you look at the circumstances of how

6   you obtained the money from Mr. Roberts.

7   Q.   Was that a bad way to obtain money from Mr. Roberts -- or

8   Dr. Roberts?

9   A.   I think the legal representation that you gave Mr. Roberts

10  was -- you knew was completely false and it wasn't going to be

11  effective, but yet you still put forward those defenses.

12  Q.   Okay.  So what you're saying, then, is that Oscar

13  Stilley's defense of Dr. Roberts was part of the conspiracy

14  too, correct?

15  A.   Yes.

16  Q.   Well, some of those defenses are classic and well-

17  accepted as being legally proper, correct?

18           MR. O'REILLY:  Objection.  Argumentative and not sure

19  of the relevance at this point.

20           THE COURT:  Why don't you get more specific.

21       That will be sustained.

22  Q.   (BY MR. STILLEY)  Dr. Roberts was entitled to present his

23  good-faith defense; is that correct?

24  A.   Yes.

25  Q.   Do you have any evidence that he presented anything other
```

BRIAN SHERN - CROSS BY MR. STILLEY                              143

1   than his good-faith defense?

2   A.   If I remember right, one of his defenses was there was no

3   requirement to file a tax return.

4   Q.   Isn't it true he said he couldn't find it and honestly

5   didn't believe it?  Isn't that what really took place?

6   A.   Yes, I believe that's correct.

7   Q.   And that's perfectly legitimate, correct?

8   A.   It's -- the good-faith defense, I believe, is a legitimate

9   defense, but before he went to trial, I think you affirmed his

10  belief in something wrong.

11  Q.   Oh, are you talking about the commentary in 1990, ten

12  years previously?

13  A.   Yes.

14  Q.   So -- but surely you don't think commentary ten years

15  previously would be part of the conspiracy, the single

16  conspiracy, do you?

17  A.   I think if you -- if you knew -- offered him advice in

18  1990 and you -- he relied on your advice and then he went to

19  trial in 2000 and you represented that same defense to him

20  through the help of Mr. Springer, yes.

21  Q.   So you think that words uttered by Oscar Stilley ten

22  years -- or approximately ten years before he met Lindsey

23  Springer are, nevertheless, part of a conspiracy with Lindsey

24  Springer?

25  A.   Not with Lindsey Springer, but -- I don't know.

BRIAN SHERN - CROSS BY MR. STILLEY                                    144

1    Q.    How many people were in this single conspiracy?

2    A.    There were several.

3    Q.    Can you give me names?

4    A.    All the people that Mr. Springer asked to put "donations"

5    on checks when they full well know they weren't for donations,

6    people that transferred money into your IOLTA account to try to

7    disguise the payments to Mr. Springer.

8    Q.    Anybody else?

9    A.    Maybe Mr. Delozier for cashing checks that were made

10   payable to a ministry that didn't really exist.  I mean, it

11   existed, but it had no purpose other than disguising payments

12   from clients.

13   Q.    So you think this was a really large conspiracy, correct?

14   A.    Yes.

15   Q.    But none of these people did anything back in 1990,

16   correct?

17   A.    Not that I know of, other than Mr. Roberts.

18   Q.    So an act in 1990 couldn't possibly have been an overt act

19   in support of the conspiracy, correct?

20   A.    Correct.

21   Q.    So we can strike out -- actually, we can strike out

22   Roberts because he presented a legitimate defense, to your

23   knowledge, correct?

24         MR. O'REILLY:  Objection, Your Honor.  That's for the

25   Court to decide.

1          THE COURT:  Sustained.

2   Q.   (BY MR. STILLEY)  Now, you said that Hawkins, in 2002,

3   represented another overt act; is that correct?

4   A.   Yes.

5   Q.   And can you tell us -- well, now, were the Hawkins part of

6   the conspiracy too?

7   A.   Yes.

8   Q.   Now -- and how did they become part of the conspiracy?

9   A.   I believe they made checks out to Bondage Breakers

10  Ministry.

11  Q.   And as soon as they made that check out to Bondage

12  Breakers, they became co-conspirators, correct?

13  A.   Yes, I believe so, because they knew the money wasn't a

14  donation of any kind or a gift to any kind of charitable

15  organization.  The purpose of writing that check to Bondage

16  Breakers Ministries was to hide the fact that it was legal

17  services.

18  Q.   Now that we've discussed the acts that you say were overt

19  acts, can you tell us now what you found based on your

20  investigation that the scope of the specific agreement was?

21       And let me make that more clear.

22          MR. O'REILLY:  Objection.  He has asked and answered

23  that question several times and Special Agent Shern has

24  answered that several times.

25          THE COURT:  Are you asking about the scope of it in

BRIAN SHERN - CROSS BY MR. STILLEY                           146

```
 1  terms of time or subject matter?
 2          MR. STILLEY:  Judge, I did a bad job on that
 3  question.  Can I make that clear what I'm specifically asking
 4  about?
 5          THE COURT:  Proceed.
 6          MR. STILLEY:  I'll back up because I didn't do a good
 7  foundation.
 8  Q.  (BY MR. STILLEY)  Mr. Shern, isn't it true that many
 9  people -- before Oscar Stilley met Lindsey Springer many people
10  had given Bondage Breakers Ministries money?
11  A.  Yes.
12  Q.  So the conspiracy was already going at that time,
13  correct?
14  A.  I don't know that Mr. Springer, with the exception of
15  maybe Ms. Wiggins and Mr. Hedberg, had been able to get money
16  for legal services like he did before he teamed up with you.
17  Q.  Okay.  But, nonetheless, you've already told us that
18  everybody that put all the donors -- everybody that put money
19  in the IOLTA and Delozier were all conspirators and both the
20  donors and Delozier, by your own terms, go far before Oscar
21  Stilley and Lindsey Springer met, correct?
22  A.  Yes.
23  Q.  So it would have had to be an existing conspiracy that
24  Oscar Stilley joined, correct?
25  A.  Yes.
```

BRIAN SHERN - CROSS BY MR. STILLEY                                    147

1  Q.   Okay.  Now, based on your research, what did you determine

2  would be the scope of the specific agreement that Oscar Stilley

3  joined?

4  A.   What do you mean by when you say "scope"?

5  Q.   What did Oscar Stilley agree to do that was wrong, that

6  was illegal?

7  A.   To come in and help Lindsey Springer bilk money from all

8  these clients and to hide it.

9  Q.   Anything else?

10  A.   No.

11  Q.   Now, you check PACER; isn't that true?  You check PACER to

12  check up on Oscar Stilley, right?

13  A.   Yes.

14  Q.   Did you discover that Oscar had been involved in a number

15  of cases representing children who had been abused in boarding

16  facilities?

17  A.   I believe I remember that you were involved in some cases

18  of that nature, yes.

19  Q.   Did you get enough information to realize that Oscar

20  Stilley had invested large amounts of time and money in those

21  cases?

22  A.   I didn't look at the hours or the time that you spent on

23  those cases.

24  Q.   You certainly wouldn't know the precise amount, but could

25  you tell that they were extensive dockets, big dockets, with

1  lots of papers, trials, and things like that?

2  A.   Really, my concern with looking at PACER wasn't to find

3  every legal case that you were involved in, like the scope of

4  the cases and how much you did in those cases.  It was mainly

5  to find cases where you had represented people or Mr. Springer

6  had represented people in these tax -- the witnesses involved

7  in this case.

8  Q.   But as a general rule, an individual would -- or an

9  attorney would be entitled to deduct the investment in cases

10 like that, where that they had lost the money, correct?

11 A.   That's correct.

12 Q.   Now, Mr. Springer asked you if you were a delegate of the

13 Secretary of the Treasury, correct?

14 A.   Yes.

15 Q.   Sounded to me that you just speculated that you were,

16 correct?

17         MR. O'REILLY:  Objection to the relevance on this

18 ground.

19         THE COURT:  Do you have any new ground on this point

20 you're going to cover?

21         MR. STILLEY:  No, but it will be real short.  I'm

22 just trying to get him to admit --

23         THE COURT:  Well, even if it's real short, if it's

24 not new ground, we're not going to go there.

25     Next question.

1   Q.   (BY MR. STILLEY)  Didn't you suggest in Springer's cross-

2   examination that Oscar Stilley is not a reputable attorney?

3   A.   Yes.

4   Q.   Isn't it true that a lot of people think that Oscar

5   Stilley is a reputable attorney?

6   A.   Yes, that's true.

7   Q.   Now, you spoke with a gentleman by the name of Ralph

8   Lewis, correct?

9   A.   Yes, I did.

10  Q.   He's a CPA, correct?

11  A.   Correct.

12  Q.   With many years' experience, right?

13  A.   I believe so, yes.

14  Q.   He did a lot of work for Oscar Stilley, correct?

15  A.   I think on a few cases he worked on tax returns for

16  clients that you represented, if I remember right.

17  Q.   And Oscar Stilley would pay him directly for that, did you

18  notice that?

19  A.   Yes.

20  Q.   Did you take that out of the amounts that you're claiming

21  as tax losses -- or as gross income?  Did you take those

22  amounts out?

23           MR. O'REILLY:  Your Honor, object -- objection.  This

24  witness can only testify as to discrete items of income.

25  Mr. Miller will be testifying in regard to tax computations.

1          MR. STILLEY:  The only thing I want to establish is

2    that he made no efforts to take out monies that were extended

3    directly to a professional on the benefit of the client.  I

4    just want him to acknowledge that he didn't make any attempt to

5    do that.

6          THE COURT:  And this would be things that had you

7    reported the income would have been deductible?

8          MR. STILLEY:  Certainly -- well, it would have never

9    come in my return because the money in the IOLTA was not my

10   property.  It would not have and did not ever hit my personal

11   account.

12         THE COURT:  That's a pretty dubious proposition.  I'm

13   going to overrule the objection and he may answer the question,

14   but this is not persuasive.

15         THE WITNESS:  No, I didn't give you the amounts that

16   you paid or that you paid to have Mr. Lewis do work for you,

17   because, yes, we could have identified various expenditures

18   that you had made that we -- that appeared to be business

19   expenses, but it still wouldn't have got us at an accurate

20   number, and so we used the 20 percent method, because a more

21   accurate way of determining it was -- wasn't available.

22   Q.   (BY MR. STILLEY)  But it wasn't available, really, because

23   you didn't try, correct?

24   A.   No, I don't believe that is true.  I think that we had

25   enough -- we had your bank accounts and your credit card

1  statements and records of your expenditures, but, really,

2  without you confirming whether or not they're business expenses

3  or personal expenses, I don't believe that we could have

4  arrived at an accurate number.

5  Q.   You never asked Oscar Stilley to confirm what were

6  business expenses, did you?

7  A.   No.

8  Q.   And that's common practice.  You do that routinely -- or

9  special agents routinely do that in tax cases, don't they?

10 A.   I wouldn't say "routinely."  We always try to ask, but a

11 lot of times the defendants in our cases won't meet with us and

12 won't provide that information.  We usually do ask, yes.

13 Q.   But you didn't ask Oscar?

14 A.   No.

15 Q.   Now, you also were aware that Oscar Stilley from time to

16 time would write a check to the IRS out of his IOLTA and that

17 check would be negotiated by the IRS in satisfaction of taxes

18 shown on tax returns for specific years, correct?

19 A.   Correct.

20 Q.   You didn't make any allowance for that, did you?

21 A.   No.

22     Can I go back to the previous question about -- we did ask

23 you to provide records to the grand jury.  They weren't

24 all-inclusive records of all your business dealings, but they

25 were records from money that you received from Mr. Springer or

BRIAN SHERN - CROSS BY MR. STILLEY                        152

1    money that you had paid on Springer's behalf.  And we found

2    that you didn't provide all the records during that grand jury

3    appearance and so we had no reason to believe that you would

4    provide truthful business records after the fact to compute

5    your tax loss for this hearing.

6    Q.   You told Oscar Stilley that he was not under criminal

7    investigation, isn't that true, when you asked for those

8    records?

9    A.   Yes.

10   Q.   And you later -- isn't it true that Oscar Stilley first

11   went to the grand jury and gave certain documents?

12   A.   You brought documents when you first appeared before the

13   grand jury here, yes.

14   Q.   Another subpoena was issued, correct?

15   A.   Yes.

16   Q.   And that subpoena -- the purposes of that subpoena was to

17   clarify specifically what the government wanted, correct?

18   A.   Yes.

19   Q.   That subpoena was withdrawn, correct?

20   A.   Yes.

21   Q.   Oscar Stilley cannot be condemned for failing to comply

22   with a subpoena that was withdrawn, can he?

23          MR. O'REILLY:  Your Honor, objection, calls for a

24   legal conclusion.  This was covered at trial.  Mr. Stilley

25   didn't comply with the first subpoena.

BRIAN SHERN - CROSS BY MR. STILLEY                              153

1          THE COURT:  Sustained.

2      Mr. Stilley, if it's of any help to you, I sustained that

3  objection, as much as anything else, because the question was

4  argumentative.  Meandering, argumentative questions at a very

5  high level of generality are not helpful.  If you want to

6  attack specific items, that's how you can move the ball.

7          MR. STILLEY:  Thank you, Judge.  That gives me an

8  idea.

9  Q.  (BY MR. STILLEY)  The government concluded that Oscar

10  Stilley took too hypertechnical an interpretation of the

11  language of the first subpoena, correct?

12  A.  Yes, I would say that's the case.

13  Q.  The purpose of the second subpoena was to remedy that and

14  make it very clear what the government wanted, correct?

15  A.  Yes.

16  Q.  But before the subpoena was withdrawn, Oscar Stilley never

17  indicated any intent to not comply with that new subpoena,

18  correct?

19  A.  Correct.

20          THE COURT:  Mr. Stilley, let me know when you get to

21  a convenient stopping point, we'll take our mid-afternoon

22  break.

23          MR. STILLEY:  This is a good one right here.

24          THE COURT:  Very well.  We'll take a 15-minute

25  break.

BRIAN SHERN - CROSS BY MR. STILLEY                                    154

```
 1        Court will be in recess.

 2        (A RECESS WAS HAD.)

 3            THE COURT:  Mr. Stilley, you may continue.

 4   Q.  (BY MR. STILLEY)  Mr. Shern, Government Exhibits 1168 to

 5   1176 are the government's listings of the -- well, they're

 6   entitled "Gross Income of Oscar Stilley," correct?

 7   A.  Correct.

 8   Q.  And they go by year 2000 to 2008, correct?

 9   A.  Yes.

10   Q.  How long have you had this list available to you?

11   A.  The actual list or the checks that correspond to this

12   list?

13   Q.  The list.  In other words, a summary of what the

14   government is going to claim.

15   A.  I would say maybe three months.

16   Q.  And Oscar Stilley has not been provided a copy of this --

17   these summaries until the deadline for turning over exhibit

18   lists, correct?

19   A.  That's correct.

20   Q.  Was there a particular reason for not telling Oscar

21   Stilley earlier, since it was definitely available?

22   A.  You had all the -- I mean, you had all the records from

23   your IOLTA account and everything handed over in discovery.

24   Q.  Were you aware that Oscar Stilley was complaining about

25   lack of clarity concerning the government's theory?
```

BRIAN SHERN - CROSS BY MR. STILLEY                                     155

```
 1              MR. O'REILLY:  Objection to this line of questioning
 2    of this witness.
 3              THE COURT:  Sustained.
 4    Q.  (BY MR. STILLEY)  Based on Springer's -- your responses to
 5    Springer's cross-examination, you seem to think a trust is
 6    either valid or invalid based on the subjective intent of the
 7    creator's intent; is that true?
 8    A.   Lost you there.
 9    Q.   It sounds like you're saying that if someone creates a
10    trust for legitimate purposes, then it's a legitimate trust,
11    but if they create the same trust for purposes that you deem
12    improper, that it's an illegal trust or a wrongful trust; is
13    that true?
14    A.   I think you have to look at the circumstances surrounding
15    the whole transaction.  Like, if somebody creates a trust for
16    the purpose of evading their taxes and they do, in fact, evade
17    their taxes, then I think it's a wrongful trust.  But trusts in
18    themselves aren't bad, they're useful, but -- does that answer
19    your question?
20    Q.   Pretty close.  But it sounds to me like you're saying
21    whether a trust is legal or illegal depends upon the subjective
22    intent of the trust creator or grantor?
23              MR. O'REILLY:  Objection as to relevance to this line
24    of questioning.
25              THE COURT:  Mr. Stilley, what's your point?
```

1          MR. STILLEY:  My point is he is trying to attribute

2    monies -- losses to the defendants on the grounds of the

3    subjective thoughts of a third person's mind.  And as soon as I

4    get that information, I want to know if he has any information

5    that -- whereby that Oscar Stilley should have known subjective

6    information within such a person's mind.

7          THE COURT:  Are you going to be getting down to some

8    specific instances to address?

9          MR. STILLEY:  Well, I want -- I think I can get him

10   to admit that he doesn't have any such evidence.

11         THE COURT:  Sustained.

12   Q.  (BY MR. STILLEY)  Now, if we could get Government Exhibit

13   1177.  Do you see that exhibit?

14   A.   Yes.

15   Q.   You're saying that -- wait a minute.  I'm sorry.

16         MR. SPRINGER:  It's "tax loss of third parties

17   relevant to Oscar Stilley."  Is that what we have on the

18   screen?

19         MR. O'REILLY:  Page 2.

20         MR. STILLEY:  Page 2.

21         MR. O'REILLY:  Your Honor, if I may, just for

22   clarification.  We had not previously moved these exhibits in,

23   because I was going to have Revenue Agent Miller deal with

24   them, but since both defendants have addressed them quite a

25   bit, the government would move Government's Exhibits 1159

1  through 1177 into evidence at this time.

2          THE COURT:  Any objection?

3          MR. SPRINGER:  May I have one moment, Your Honor?  No

4  objection, Your Honor.

5          THE COURT:  Mr. Stilley?

6          MR. STILLEY:  No objection.

7          THE COURT:  They'll be received.  That's 1159 through

8  1176?

9          MR. O'REILLY:  1177.

10         THE COURT:  1177.  Very well.  They are received.

11 Q.  (BY MR. STILLEY)  Now, the first one, you're saying that

12 Oscar Stilley is responsible for the tax loss of Eddy

13 Patterson, correct?

14 A.  Yes.

15 Q.  Okay.  And, now, that would have to be under relevant

16 conduct, correct?

17 A.  Yes.

18 Q.  Do you know what count that that would have to come from?

19 Would that come from Count 1?

20 A.  I don't believe it relates to any particular count.

21 Q.  Do you have any personal knowledge how this was determined

22 to be potentially relevant conduct?

23 A.  I guess it would relate to the conspiracy count, as far as

24 you and Mr. Springer telling Mr. Patterson that you didn't file

25 returns, and Mr. Springer saying that he didn't file returns,

BRIAN SHERN - CROSS BY MR. STILLEY                          158

1   and because he's fighting the system and doesn't believe in
2   it.  I can't remember the exact testimony of Patterson.
3   Q.   Well, now, I mean, as a matter of general knowledge, most
4   of us realize there's a right to free speech, correct?
5   A.   Yes.
6   Q.   You're not saying that the words uttered to Mr. Patterson
7   were such as to incite any immediate lawless conduct, are you?
8   A.   Not immediate lawless conduct, but I think this is a
9   person that relied on advice from people that are experienced
10  in providing legal and tax advice, and based upon what he
11  learned from what you guys did, he followed that conduct and
12  thought it was okay.
13  Q.   And he had not been filing tax returns for a number of
14  years at that time, correct?
15  A.   Yes, that's correct.
16  Q.   It's not rational to believe that he changed his conduct
17  because of a comment by Oscar Stilley, is it?
18  A.   I guess if you -- if you're doing something wrong for many
19  years and then you decide to hire somebody or talk to somebody
20  that you understand is supposed to be an expert in this issue,
21  to confirm or deny your beliefs in this person that you trust
22  to have knowledge about this advice, tells you that, no, you're
23  right, you don't have to file returns, I believe that can just
24  reaffirm his thoughts that he didn't have to file and I know I
25  don't have to file now because Oscar Stilley and Lindsey

1   Springer don't file and they're experts in this stuff.

2   Q.   Let's make sure we have the facts straight here.  Isn't it

3   true what you said was that Eddy Patterson claimed Oscar

4   Stilley told Eddy Patterson that Stilley didn't file?

5   A.   Yes.

6   Q.   That's all, correct?

7   A.   That's all you told him?

8   Q.   Correct.  In other words, Oscar Stilley didn't say, Eddy

9   Patterson, don't file tax returns; he didn't say that, did he?

10  A.   I don't think he said that in his grand jury testimony,

11  no.

12  Q.   You have no evidence that Oscar counseled -- Oscar Stilley

13  counseled Eddy Patterson to not file a tax return, do you?

14  A.   Other than just telling him that you didn't file and the

15  evidence that you told Lake and Roberts similar things, but we

16  don't have any direct evidence that you told Mr. Patterson not

17  to file his tax returns, no.

18  Q.   And we also don't have any evidence that Patterson changed

19  his actual conduct in any way because of what Oscar Stilley

20  did?

21  A.   No.

22  Q.   Let's go on to James Lake.  James Lake had already been

23  charged before he even contacted Oscar Stilley, correct?

24  A.   Yes.

25  Q.   Oscar Stilley agreed to represent James Lake for a fee,

BRIAN SHERN - CROSS BY MR. STILLEY                        160

1   correct?

2   A.   Yes.

3   Q.   Oscar Stilley did certain work prior to trial on Lake's

4   case, right?

5   A.   Yes.

6   Q.   Oscar Stilley did not try the case, did he?

7   A.   No.

8   Q.   You have no evidence that anything that Oscar Stilley did

9   in his filings pretrial or any of his conduct of the defense

10  that Oscar Stilley did anything to cheat Mr. Lake out of his

11  money, correct?

12  A.   I would feel like I got cheated out of my money if I paid

13  you for legal representation on any matter you represented me

14  on.

15  Q.   Well, now, when we started this cross-examination, I asked

16  that if we can just keep it to the --

17           MR. O'REILLY:  Objection.  He asked a question, he

18  got an answer.

19           THE COURT:  We'll wait for the next question.  Go

20  ahead.

21           MR. STILLEY:  Your Honor, I move to strike.  That's

22  not a responsive answer to the question.  He is speculating

23  about what he might want to do and that's not what the question

24  was.

25           THE COURT:  Overruled.  Next question.

*Tracy Washbourne, RDR, CRR*
United States Court Reporter
U.S. Courthouse, 200 N.W. 4th St.
Oklahoma City, OK 73102 * 405.609.5505

BRIAN SHERN - CROSS BY MR. STILLEY                              161

1  Q.   (BY MR. STILLEY)  You don't have any evidence that Oscar

2  Stilley committed any ethical violation or wrongful acts during

3  representation of James Lake either, do you?

4  A.   I believe Mr. Lake testified that you didn't communicate

5  that he could plead to his charges.  You withheld the fact that

6  he could plead guilty rather than stand trial for his charges.

7  Q.   So you think that Jim Lake said that?

8  A.   Yes.

9  Q.   Jim Lake got another attorney before trial, correct?

10 A.   After he fired you, he got a new attorney, yes.

11 Q.   Did the new attorney withhold the same information from

12 Mr. Lake?

13 A.   No.  The new attorney told him that I can't believe that

14 Mr. Stilley and Mr. Springer didn't actually look at your tax

15 returns at all during your case to determine whether -- what

16 the tax loss was going to be.  They did a horrible job.  They

17 didn't represent the fact that you could have just pled guilty

18 and got probation.  And they were going to take you all the way

19 up to the point of going to trial.  And he ended up doing jail

20 time where he said, if he probably didn't hire you, he could

21 have pled guilty and been done with the matter.

22 Q.   Do you have any personal knowledge that James Lake could

23 have pled guilty earlier in the case and received only

24 probation?

25 A.   The only knowledge I have is what Mr. Lake testified to

BRIAN SHERN - CROSS BY MR. STILLEY                              162

```
 1   before the grand jury and in his interviews with me and during
 2   trial.
 3   Q.   And the government lawyer on that case was perfectly
 4   available to you, was she not?
 5   A.   I could have called her.  I don't remember if I did or
 6   not.
 7   Q.   Vaughn Dunnigan was her name?
 8   A.   No, I didn't talk with her.
 9   Q.   Okay.  So you don't have any personal knowledge about
10   whether this story is true or not, do you?
11   A.   I'm just relying on what Mr. Lake told me.
12   Q.   That's in -- a little bit on the unreliable side too,
13   correct?
14   A.   It's consistent with the other witnesses that we've talked
15   to during the case.
16   Q.   Multiple links of hearsay, isn't it?
17   A.   It's just from him to me.
18            MR. O'REILLY:  I don't understand the question, Your
19   Honor.
20            THE COURT:  Sustained.
21   Q.   (BY MR. STILLEY)  Isn't it true that the information that
22   you're talking to the Court about right now came from Mr. Lake
23   by hearsay in the multiple links of hearsay?
24            MR. O'REILLY:  Your Honor, objection.  Relevance to
25   the question.
```

BRIAN SHERN - CROSS BY MR. STILLEY                                    163

1              THE COURT:  It's clear to me that there's at least

2    one or two layers of hearsay there and that -- that's all I

3    need to know.

4              MR. STILLEY:  Thank you, Judge.

5    Q.   (BY MR. STILLEY)  Now, the next one is Patrick Turner.

6    And you're saying that Oscar Stilley is responsible for tax

7    loss related to Patrick Turner 1999, 2000, 2002, and 2003,

8    correct?

9    A.   Yes.

10   Q.   Those sums of money could have been paid out of the

11   $250,000 if Mr. Turner had made that particular choice,

12   correct?

13   A.   Yes.

14   Q.   You don't have any reason to believe that Oscar Stilley

15   would not have done what Mr. Turner told him to do, do you?

16   A.   Reask that question, please.

17   Q.   You don't have any reason to believe that Oscar would have

18   disregarded an instruction from Mr. Turner to pay the IRS with

19   money that Oscar Stilley held?

20   A.   No.

21   Q.   The rational reason for putting $250,000 in the account

22   would be to have enough money to prepare returns, get

23   everything paid and get everything all cleaned up, correct?

24   A.   Are you asking me if that's why he transferred the

25   $250,000 to you?

BRIAN SHERN - CROSS BY MR. STILLEY                    164

1    Q.   No, I'm asking you if that's the rational basis for

2    putting a substantial amount of money in Oscar Stilley's IOLTA

3    account.

4           MR. O'REILLY:  Calls for speculation; objection.

5           THE COURT:  Sustained.

6    Q.   (BY MR. STILLEY)  Do you know why Mr. Turner put the money

7    in Oscar Stilley's IOLTA account?

8    A.   Factually, no, but I think it's because Springer told him

9    to.

10   Q.   Are you aware that an attorney has to pay out money from

11   an IOLTA account to the person to whom it is -- who is entitled

12   to the money promptly?

13   A.   Yes.

14   Q.   So Oscar Stilley had no choice but to pay the money

15   according to the directive of Mr. Turner, correct?

16          MR. O'REILLY:  Objection.  Calls for speculation.

17          THE COURT:  Sustained.

18   Q.   (BY MR. STILLEY)  You have no evidence that Oscar Stilley

19   even knew Pat Turner in 2003, do you?

20   A.   I don't believe so, no.

21   Q.   You have no evidence that Oscar Stilley knew Pat Turner in

22   2004, do you?

23   A.   No.

24   Q.   Can you tell this Court what Oscar Stilley should have

25   done differently so that he would not be charged with this

BRIAN SHERN - CROSS BY MR. STILLEY                                165

1  substantial sum of money as being relevant conduct?

2  A.   Not helped Mr. Springer hide Mr. Turner's $250,000 by

3  going through your account.  Just walk away from the

4  transaction.

5  Q.   Well, no, that $250,000 is accounted for somewhere else,

6  is it not?

7  A.   What do you mean?

8  Q.   Aren't you double-counting if you treat this as the

9  $250,000?

10  A.   As I explained to Mr. Springer during cross, I don't

11  believe it's double-counting because the $250,000 that Springer

12  took from Mr. Turner was considered income to Mr. Springer,

13  which the tax loss resulting from that income was charged to

14  Mr. Springer.

15       The assistance of you and Mr. Springer helping Mr. Turner

16  to evade the payment of his -- Mr. Turner's taxes, in the

17  amount of whatever these numbers added up are, from Exhibit

18  1152, 1153, 1155, and 1156, which is close to -- and the

19  penalties, which is close to $250,000, we're attributing this

20  amount of money to you and Mr. Springer for helping Mr. Turner

21  evade the payment of his personal taxes.

22       So there's two separate crimes being committed here:  One

23  is tax evasion on the $250,000 that Mr. Springer received as

24  income; and, two, is assisting Mr. Turner in evading the

25  payment of his taxes.

1  Q.   Okay.  Now, I need -- let's break this down just a little

2  bit here.  When Mr. Turner sent the $250,000 to Oscar Stilley's

3  IOLTA account, did that become relevant conduct then?

4  A.   Yes.

5  Q.   And isn't it true that any person who is able to get a

6  copy of your check and see the bank account number and the

7  routing number can actually put money in the account?

8           MR. O'REILLY:  Objection as to relevance of that

9  particular piece of information.

10          THE COURT:  What's your point, Mr. Stilley?

11          MR. STILLEY:  I'm trying to break down when the

12  government's -- in the government's theory that this became

13  relevant conduct.  And what I'm trying to get him to admit is

14  that anybody that gets another person's bank account and bank

15  routing number, which is on the check, can put money in it

16  right away and without the permission of the person who has --

17  who has the bank account.  And then I want to follow up with

18  further questions about when this allegedly became relevant

19  conduct.

20          THE COURT:  Well, are you -- is it your contention

21  that you didn't know that Mr. Turner's money was going into

22  your IOLTA account?

23          MR. STILLEY:  No, I'm not making that contention.  I

24  am making the contention that -- of the same facts that were

25  brought in at trial, that Mr. Turner was interested in my

BRIAN SHERN - CROSS BY MR. STILLEY                    167

1  services, inquired and got the information, put the money in

2  the account.  And what I'm trying to show is that -- well,

3  besides what I just said there, that it couldn't possibly have

4  been a relevant conduct at that point in time, and then I want

5  to go time by time to see exactly when that took place.

6           THE COURT:  Well, I don't know that the pending

7  question goes to that, so the objection will be sustained.

8      Next question.

9  Q.  (BY MR. STILLEY)  So you're saying that the -- just

10  because that the money was wired to Oscar Stilley's account,

11  that became relevant conduct?

12  A.  Yes, because it was yours and Mr. Springer's and

13  Mr. Turner's actions to evade the payment of Mr. Turner's taxes

14  by sending that money to your IOLTA account to make it look

15  like a retainer.

16  Q.  You realize that Mr. Turner intended to utilize Oscar

17  Stilley's services at the time that the deposit was made,

18  correct?

19           MR. O'REILLY:  Objection, Your Honor.  There's

20  actually no evidence of that in this trial.

21           THE COURT:  Why don't you ask him -- if you've got

22  another question, then ask him to assume that.  I don't recall

23  that there is evidence of that.

24  Q.  (BY MR. STILLEY)  Okay.  Let me ask a little more open-

25  ended question.  Do you know why that Mr. Turner sent money --

BRIAN SHERN - CROSS BY MR. STILLEY                                168

```
 1  sent $250,000 to Oscar Stilley's IOLTA account?

 2  A.   Do you want me to tell you what I think Mr. Turner thought

 3  he was doing or what I think the money was?

 4  Q.   No, I want you to say what -- that you can testify about

 5  based on either your personal knowledge or a basis of

 6  information that is credible and reliable that you can

 7  explain.

 8  A.   Well, considering the fact that as soon as the money went

 9  into the account and it was spent, I think Mr. Turner just --

10  he may have thought he was transferring that money over, which

11  I think he testified to as a loan in case a criminal

12  investigation started investigating him and pursuing a criminal

13  prosecution of him, that he was going to hire you to perform

14  services for him.  At the other end, I don't think Mr. Springer

15  had any intention of doing anything but spending that money on

16  himself.

17  Q.   Do you know when the money actually went into the IOLTA

18  account, the 250,000?

19  A.   I could find out by looking at the exhibits.

20  Q.   What exhibit do you need?

21  A.   It would be the -- I believe 2005 gross income of

22  Mr. Springer, Exhibit 1165.  It was the two wire transfers, one

23  for $192,000 and one for $58,000 on -- one was on August 11th

24  of 2005 and the other was August 18th of 2005.

25  Q.   Okay.  Now, where do we go to find out when the money went
```

BRIAN SHERN - CROSS BY MR. STILLEY                    169

```
1   to Oscar Stilley's IOLTA account?  Can you give us a cite for
2   that?
3   A.    Those are the dates.
4   Q.    Now, that's when the money went out.
5   A.    No, that's when the money came in.
6   Q.    Which date, 8/11 or 8/18?
7           MR. O'REILLY:  Objection.  This is simply
8   argumentative.  The documents are actually Exhibits 114, which
9   will indicate exactly what date that it was wired to
10  Mr. Stilley's IOLTA account.  I actually believe that is a copy
11  of -- 114 is a copy of the IOLTA account itself, the statement.
12          THE COURT:  Mr. Stilley, if you can make your point
13  by referring to the transaction documents, that may be helpful.
14          MR. STILLEY:  Your Honor, could I have a moment with
15  Mr. Springer to refresh my recollection?
16          THE COURT:  Surely.
17          MR. STILLEY:  Thank you.
18  Q.    (BY MR. STILLEY)  Do you have any information to suggest
19  that Oscar Stilley would -- should not have believed that the
20  money was a bona fide loan?
21  A.    I think the actions that happened afterwards, where you
22  transferred the money immediately out to purchase a motor home,
23  suggest that you didn't think it was a loan.
24  Q.    Okay.  Do you have evidence that Oscar Stilley -- when did
25  you become aware that there was a security interest that was on
```

BRIAN SHERN - CROSS BY MR. STILLEY                    170

1  file -- that was filed on the motor home?  When did you become

2  aware of that?

3  A.   I don't remember, but I think it might have been whenever

4  we first talked to Mr. Springer.

5  Q.   So that -- you've known about that for a long time,

6  correct?

7  A.   I think so, yes.

8  Q.   Is there any reason or fact that you can show this Court

9  that the Court should think that Oscar Stilley would look at

10 the security interest and think that it was not bona fide?

11 A.   I think the whole circumstances surrounding this case

12 would suggest that you didn't think it was a loan or that --

13 that security interest.

14 Q.   But you can't point to any specific fact, can you?

15 A.   Not specifically, no.

16 Q.   And you haven't made any inquiry, recent inquiry, of

17 Mr. Turner about what has gone on subsequently with respect to

18 the security interest, have you?

19 A.   No.

20 Q.   How long has it been since you've talked to Mr. Turner?

21 Have you talked to him since the trial?

22 A.   No.

23          THE COURT:  Is that a UCC filing?

24          MR. STILLEY:  Yes, it is.

25          THE COURT:  Was it introduced in evidence at the

```
 1  trial?

 2          MR. O'REILLY:  Yes, Your Honor.

 3          THE COURT:  Okay.  I probably need to refresh my

 4  recollection by looking at that.  I don't want to interrupt

 5  now, but if somebody could come up with either an exhibit

 6  citation or an exhibit number citation, or better yet, a copy

 7  of it, that would be helpful, but I don't want to interrupt

 8  your cross-examination.

 9      You may proceed.

10          MR. STILLEY:  Thank you, Judge.

11  Q.  (BY MR. STILLEY)  Let's move on to Dr. Roberts.  Was --

12  and your -- and the government's contention, Mr. Delozier was

13  part of the conspiracy, correct?

14          MR. O'REILLY:  Your Honor, objection.  It misstates

15  his testimony.  It was Special Agent Shern's contention, not

16  the government's.

17          MR. STILLEY:  Beg your pardon.  Let me rephrase

18  that.

19  Q.  (BY MR. STILLEY)  Mr. Shern, in your contention,

20  Mr. Delozier was part of the conspiracy, correct?

21  A.  Yes.

22  Q.  Do you know when he joined the conspiracy?

23  A.  I guess whenever he first started cashing checks in the

24  name of Bondage Breakers Ministry.

25  Q.  And do you know when that took place?
```

BRIAN SHERN - CROSS BY MR. STILLEY                                    172

1   A.   I don't know.  It would have been early, but I don't know
2   a specific date.
3   Q.   Okay.  Do you know for a fact that it came before April
4   15, 1996?
5   A.   I don't know.  I think Mr. Hedberg's check is the earliest
6   record we have from Checks Cashed, so I don't know.  He may
7   have cashed -- I think part of his testimony is he's been
8   cashing checks there for years, but I don't know the exact
9   date.
10  Q.   So it sounds to me like, then, that all of these years on
11  Dr. Roberts were before the conspiracy started in your theory,
12  correct?
13  A.   Yes.
14          MR. STILLEY:  Your Honor, could I have a moment?
15          THE COURT:  Surely.
16          MR. STILLEY:  Thank you.
17      Pass the witness.
18          THE COURT:  Redirect?
19          MR. O'REILLY:  No questions, Your Honor.
20          THE COURT:  You may step down.
21      We'll have the government's next witness.
22          MR. O'REILLY:  Your Honor, the United States calls
23  Revenue Agent Brian Miller.
24          THE COURT:  Very well.
25                         BRIAN MILLER,

BRIAN MILLER - DIRECT BY MR. O'REILLY                        173

```
1    (WITNESS SWORN)

2                         DIRECT EXAMINATION

3    BY MR. O'REILLY:

4    Q.   Good afternoon, Mr. Miller.  How are you today?

5    A.   Doing well, thank you.

6    Q.   I'm going to ask you:  Is part of the evidence that has

7    been introduced for the sentencing, are there a series of IRS

8    account transcripts?

9    A.   Yes, there are.

10   Q.   Could you briefly describe for the Court what those are.

11   A.   They're a record of all the transactions relative to a

12   particular taxpayer's account and activities with the IRS

13   during a particular period.

14           MR. SPRINGER:  Could we have an exhibit on that, Your

15   Honor?

16           THE COURT:  He wasn't referring to any one in

17   particular.

18   Q.   (BY MR. O'REILLY)  I'll just ask you briefly to take a

19   look at Government's Exhibit 1136, which I believe was

20   previously entered into evidence.  Could you describe what that

21   is.  It should have come up on your screen.

22   A.   It's an account transcript from the IRS on the account of

23   Lindsey Springer for the period -- looks like --

24   Q.   The year 1990?

25   A.   1990, yeah.  It's hard to read on my screen.
```

1   Q.   And this reflects all activity on this account as of the

2   date that this was done, which it looks like March 23rd of

3   2010?

4   A.   Correct.

5   Q.   Similarly drawing your attention to exhibit --

6   Government's Exhibit 1137, is that a transcript of account for

7   Mr. Lindsey Springer for the year 1991?

8   A.   Yes, it is.

9   Q.   And, similarly, 11 -- Government's Exhibit 1138 is the

10  transcript account from the IRS for Mr. Lindsey Springer for

11  the year 1992?

12  A.   That's correct.

13  Q.   Government's Exhibit 1139 would be the IRS transcript of

14  account for Mr. Lindsey Springer for the year 1993; is that

15  correct?

16  A.   Yes.

17  Q.   Government's Exhibit 1140, 4-0, is that the IRS transcript

18  of account for Lindsey K. Springer for the year 1994?

19  A.   Yes, it is.

20  Q.   And Government's Exhibit 1141, is that the IRS transcript

21  of account for Mr. Lindsey Springer for the year 1995?

22  A.   Yes.

23  Q.   Did you utilize these exhibits in preparing summaries with

24  respect to the tax computations in this case?

25  A.   Yes, I did.

1  Q.   What was it that you used from these particular exhibits

2  to make the tax loss calculations?

3  A.   Well, I was asked to calculate the amount of tax loss for

4  Mr. Springer and to do that for the years 1990 through 1995.

5  And looking at the first page of this transcript, the account

6  balance amount, for example, in 1995 shows an amount of

7  $20,155.73.

8            THE COURT:  Now, which exhibit are you looking at?

9            THE WITNESS:  1141.

10           THE COURT:  Go ahead.

11           THE WITNESS:  So that reflects the amount of money

12  that is due to the government for that year from Mr. Springer.

13  Q.   (BY MR. O'REILLY)  And does that include interest and

14  penalties?

15  A.   No, the interest and penalties are separate amounts listed

16  immediately below that.

17  Q.   So the account balance is the loss?

18  A.   Yes.

19  Q.   And, similarly, for the other exhibits we looked at, you

20  took simply the tax loss that had been previously assessed

21  against Mr. Springer and added that to your tax loss

22  calculation?

23  A.   That's correct.

24  Q.   Do you know how the IRS reached these calculations?

25  A.   Not specifically, no.  I'm sure they had some basis for

1  calculating income and then computing a tax based on that

2  income.

3  Q.   Do you know if this was, in fact, an assessment that had

4  been made?

5  A.   It is an assessment, yes.

6  Q.   With respect to Government's Exhibit 1142, is that the IRS

7  transcript account for the year 2002 for Mr. Oscar Stilley?

8  A.   Yes, it is.

9  Q.   And does it show an account balance and accrued interest

10  and other items?

11  A.   It does.

12  Q.   With respect to this, do we have independent evidence of

13  income for Mr. Stilley for the year 2002?

14  A.   Yes, we did.

15  Q.   Did we, in fact, use that information in creating the tax

16  loss calculation and not this transcript information?

17  A.   Right.  For purposes of this calculation, we did not rely

18  on the transcript because we thought we might be doubling up or

19  double-dipping, so we used the same formula that we used on all

20  the other years.

21  Q.   Why is it -- do you have a reason to believe that this is

22  a complete and accurate assessment of all of Mr. Stilley's tax

23  obligations for the year 2002?

24  A.   I do not believe that it was, no.

25  Q.   Why not?

BRIAN MILLER - DIRECT BY MR. O'REILLY                    177

1   A.   Because the record we looked at suggested there was a

2   substantial amount of income, substantially more than what was

3   reflected here in this transcript.

4   Q.   Does this transcript reflect adjusted gross income for the

5   year 2002 of $40,373.50?

6   A.   Yes, it does.

7   Q.   And if I can draw your attention to Government's Exhibit

8   1170, I believe.  Is that a compilation of the gross income,

9   based on your calculations, attributable to Mr. Stilley for

10  that same year?

11  A.   Yes, it is.

12  Q.   And is that gross income figure $117,653?

13  A.   Correct.

14  Q.   Are you familiar with the term "bank deposits method of

15  proof"?

16  A.   Yes, I am.

17  Q.   Could you please explain what is the "bank deposits method

18  of proof"?

19  A.   Very simply put, it's a calculation done, taking all the

20  deposits into a bank account, subtracting any transfers or

21  known non-taxable amounts, and treating the net amount of

22  deposits as income to the taxpayer.

23  Q.   Is that, in effect, the methodology you used in

24  calculating the gross income with respect to both defendants in

25  this case?

BRIAN MILLER - DIRECT BY MR. O'REILLY                              178

```
 1  A.   Yes, it is.
 2  Q.   And when you use the bank deposits method of proof, is
 3  that termed an "indirect method of proof"?
 4  A.   It is.
 5  Q.   And is that because it's literally not a specific item,
 6  you don't go and check each individual item to determine
 7  whether or not -- why it was paid?
 8  A.   That's correct.
 9  Q.   What do you do instead?
10  A.   You just rely on the fact that it was deposited into the
11  bank account, which would demonstrate that it was a receipt of
12  funds by the taxpayer, and then you try to verify any
13  non-taxable amount, and then the amount you're left with would
14  be considered income.
15  Q.   Do you also determine whether or not the defendant had a
16  likely source of income?
17  A.   Yes.
18  Q.   And in this case, was that done?
19  A.   Sure.
20  Q.   In fact, we heard quite a bit of evidence at trial about
21  that?
22  A.   That's right.
23  Q.   And so just with respect to Government's Exhibits 1159
24  through 1167, are those your compilations of -- effectively of
25  bank deposits method of proof with respect to Mr. Springer?
```

1   A.   Yes.

2   Q.   Does it also include the cash that Mr. Springer testified

3   he received each year to -- going from 2000 forward?

4   A.   Yes, it does.

5   Q.   You were present throughout the trial, correct?

6   A.   Yes, I was.

7   Q.   And you heard testimony -- all the testimony that was

8   presented?

9   A.   That's correct.

10  Q.   Do you remember testimony being asked about what types of

11  records were found in the search warrant executed at

12  Mr. Springer's home?

13  A.   Yes.

14  Q.   Were any types of ledgers, compilation of income, anything

15  from which anyone could have determined Mr. Springer's likely

16  income, was anything like that found at his home?

17  A.   No, there was not.

18  Q.   Any listing of donations he had received or gifts he had

19  received?

20  A.   Nothing like that at all.

21  Q.   Was there any ledger found itemizing business expenses?

22  A.   No.

23  Q.   With respect to the evidence, have you had a chance to go

24  through all of the evidence that was presented in this case?

25  A.   Yes, I have.

BRIAN MILLER - DIRECT BY MR. O'REILLY                              180

1    Q.    Have you also seen some of the discovery that was obtained

2    during this case?

3    A.    Yes.

4    Q.    Were -- based upon what you've reviewed, is there a way to

5    accurately determine Mr. Springer's income tax -- you know, the

6    income and the expenses and deductions so that an accurate tax

7    return could be prepared from what you've seen?

8    A.    It would be impossible.

9    Q.    Why is that?

10   A.    There's simply no way to know accurately the amounts that

11   Mr. Stilley and Mr. Springer spent in pursuit of their

12   ministry, in the case of Mr. Springer, and the legal practice

13   on the part of Mr. Stilley.

14       You know, in addition, there's no way to know unrelated

15   income, you know, from capital gains from the sale of

16   property.  There's no way to know the -- their itemized

17   deductions, like their contributions and things like that.

18       It would be impossible to come up with an accurate figure

19   for their -- to do an accurate tax return based on the records

20   that we have.

21   Q.    Who would have access to that information, if anyone?

22   A.    Mr. Springer and Mr. Stilley might if they kept those

23   records.

24   Q.    I'm now going to ask you to look at what's in evidence as

25   Government's Exhibits 1168 through 1176.  And are those your

1  bank deposits calculations with respect to the gross income of

2  Mr. Oscar Stilley?

3  A.   Yes, they are.

4  Q.   Is that from the years 2000 through 2008, inclusive?

5  A.   Yes.

6  Q.   And, again, with a number of these items, there was

7  actually testimony at trial; is that correct?

8  A.   That's right.

9  Q.   But, again, not every item was introduced at trial or --

10  and there's not direct specific item income evidence with

11  respect to each of these, correct?

12  A.   Right.  With regard to Mr. Stilley, many of them were not

13  introduced at trial, as a matter of fact.

14  Q.   Under the bank deposits methods of proof, are you

15  comfortable with this calculation of gross income with respect

16  to Mr. Stilley?

17  A.   I'm comfortable it's very close to a gross income figure,

18  yes.

19  Q.   Will you explain why it is you're comfortable with that?

20  A.   Mr. Stilley is obviously a practicing attorney, obviously

21  has income coming in.  Every check or income -- or item

22  deposited that we looked at appeared to be the type of receipt

23  that would be normal for a practicing attorney.

24  Q.   So they had the inherent appearance of income?

25  A.   They did.

1  Q.   Did you also help prepare a schedule that has been

2  exhibited as Government's Exhibit 1177, which reflects the tax

3  loss of third parties that are relevant to each defendant?

4  A.   Yes, I did.

5  Q.   With respect to Mr. -- well, what is -- with respect to

6  Mr. Springer, does it include Dr. Roberts' tax losses for the

7  years 1992 through 1995?

8  A.   No, Dr. Roberts is not included in Mr. Springer's.

9  Q.   Why not?

10 A.   Based on the testimony of Mr. Shern, Mr. Springer was not

11 really involved at that time with Dr. Roberts.

12 Q.   And is that also consistent with the testimony of

13 Dr. Roberts at trial?

14 A.   Yes.

15 Q.   Let's focus on Dr. Roberts for a second.  With respect to

16 these numbers, these -- the tax loss calculations and the

17 penalties and interest column, are those drawn from the earlier

18 exhibits we referenced, the transcripts of account?

19 A.   That's correct.

20 Q.   And is that true with respect to each of the identified

21 taxpayers, Mr. Eddy Patterson, James Lake, and Patrick Turner?

22 A.   Yes.

23 Q.   And, in fact, those exhibits are referenced in the left-

24 hand column, correct?

25 A.   That's right.

BRIAN MILLER - DIRECT BY MR. O'REILLY                                183

1   Q.   So with respect to each of these items, these amounts are

2   drawn from the IRS assessments and records with respect to each

3   taxpayer?

4   A.   According to the IRS records, these individuals currently

5   owe the government these amounts that are listed on these

6   pages.

7   Q.   And yet the tax loss only refers to the tax loss that's

8   due with respect to a specific year?

9   A.   That's correct.

10  Q.   Penalties and interest are what have -- or what may have

11  accrued since then?

12  A.   Right; and continue to accrue.

13       MR. O'REILLY:  If I may have a moment, Your Honor?

14       THE COURT:  You may.

15  Q.   (BY MR. O'REILLY)  Do you have the actual exhibit in front

16  of you, the 1177?

17  A.   Yes.

18  Q.   Okay.  Is there a second page that refers to Mr. Stilley?

19  A.   There is.

20  Q.   Were you asked with respect to each defendant to prepare a

21  summary of tax loss and restitution, as I said, with respect to

22  each defendant?

23  A.   Yes, I was.

24  Q.   And are those what are exhibited and marked for

25  identification as Government's Exhibits 1178-A for Mr. Springer

1   and 1179-A for Mr. Stilley?

2   A.   That's correct.

3         MR. O'REILLY:  Your Honor, be --

4   Q.  (BY MR. O'REILLY)  And are these summaries based upon the

5   evidence that was introduced at trial or was introduced

6   previously today through Special Agent Shern?

7   A.   Yes.

8         MR. O'REILLY:  Your Honor, the government would move

9   Exhibits 1178-A and 1179-A into evidence.

10        THE COURT:  Any objection?

11        MR. SPRINGER:  Not at this time, Your Honor.

12        MR. STILLEY:  No objection.

13        THE COURT:  They'll be received.

14  Q.  (BY MR. O'REILLY)  With respect to the 1178-A, first,

15  please.  With respect to the first set of numbers, are those

16  simply a compilation as to each year for the gross income

17  figures you've attributed to Mr. Springer?

18  A.   Yes.  These are taken straight from the charts that were

19  discussed earlier that listed each specific item of income for

20  the bank deposits.

21  Q.   And so for the years 1999 through 2007, that added up to a

22  total gross income figure of $1,614,309?

23  A.   Yes.

24  Q.   Did that consist primarily, not exclusively, but primarily

25  of checks that were cashed at Checks Cashed?

BRIAN MILLER - DIRECT BY MR. O'REILLY                    185

1   A.   Yes.

2   Q.   And the 20 percent figure that you used for the tax loss

3   calculation, was that derived from the United States Sentencing

4   Guidelines?

5   A.   Yes.

6   Q.   With respect to what's been entitled "Prior Year Tax Loss

7   for the Years 1990 through 1995," does that come from the IRS

8   assessments against Mr. Springer?

9   A.   Yes, those are taken from the transcripts.

10  Q.   The transcripts?

11  A.   Yes.

12  Q.   And those transcripts reflect what were assessed?

13  A.   Yes.

14          MR. SPRINGER:   Transcripts of what?

15          MR. O'REILLY:   The transcripts reflect what was

16  assessed.

17          THE WITNESS:   The transcripts reflect what was

18  assessed by the IRS for those years.

19  Q.   (BY MR. O'REILLY)   And also the penalties and interest?

20  A.   Yes.

21  Q.   And, again, with respect to each of these, there's an

22  exhibit number in the far left column that allows reference to

23  where these figures came from, correct?

24  A.   Correct.

25  Q.   I'm going to actually ask you to jump down a second and

BRIAN MILLER - DIRECT BY MR. O'REILLY                          186

1   look at the estimated state income tax loss, '99 through 2007.

2   A.    Yes.

3   Q.    Could you explain to the Court how you calculated the

4   state income tax loss.

5   A.    We had to back into it, basically.  We took the federal

6   tax loss figure that we computed, reversed that back to a

7   federal taxable income that would have been correspondent to

8   that federal tax, then we used that federal taxable income

9   figure and applied the state income tax rate to that, as would

10  be consistent with the State of Oklahoma income tax law.

11  Q.    Similarly, did you do the same thing with the State of

12  Arkansas for Mr. Stilley?

13  A.    Yes, we did.

14  Q.    So with respect to both of these, it's an estimate of what

15  their state tax loss would be based upon the tax loss computed

16  for the federal tax loss?

17  A.    That's right.

18  Q.    We've already spoken about the third-party tax loss, which

19  was Exhibit 1177, so with respect to the total tax loss of

20  $1,325,522, is that an estimate of just tax loss?

21  A.    That is tax only.

22  Q.    That does not include penalties or interest?

23  A.    That's correct.

24          THE COURT:  Let me ask, Mr. O'Reilly, so that I

25  understand where the government is going with this exhibit, is

BRIAN MILLER - DIRECT BY MR. O'REILLY                    187

1   the $1.325 million number the one that the government would

2   have the Court apply on the -- to the tax table in Guideline

3   2T4.1?

4          MR. O'REILLY:  Yes, Your Honor.

5          THE COURT:  So you're not asking the Court to apply

6   the $1.7 million number to the tax table; is that correct?

7          MR. O'REILLY:  Correct, Your Honor.

8          THE COURT:  Okay.  Go ahead -- the 1.79 is relevant

9   to restitution?

10          MR. O'REILLY:  Restitution, Your Honor.  Also for

11   where within the guideline range the Court would sentence the

12   defendants.

13          THE COURT:  Well, to the extent that we're talking

14   about tax loss, as for guidelines purposes, what would be your

15   authority for me doing anything other than finding the tax loss

16   and then going to 2T4.1?

17          MR. O'REILLY:  I was unclear, Your Honor.  The total

18   tax loss is what drives the base offense level, exclusive of

19   penalties and interest is our position.  However, there is a

20   range of what the Court will reach once it gets to a -- you

21   know, it comes to its determination of what the adjusted

22   offense level is.  Where within that range we think the

23   penalties and interests may bear on the Court's decision on

24   that or whether or not the Court were considering departing,

25   whether or not to do that.  This is really for informational

BRIAN MILLER - DIRECT BY MR. O'REILLY                          188

```
 1   purposes and, again, for restitution purposes.
 2           THE COURT:  Okay.  Because you're -- you're shy of --
 3   the next level is 2-and-a-half million, and I --
 4           MR. O'REILLY:  We're not trying to get there, Your
 5   Honor.  We have no interest in that.
 6           THE COURT:  Okay.  Go ahead.
 7   Q.  (BY MR. O'REILLY)  Similar to Government's Exhibit 1178-A,
 8   did you prepare 1179-A with respect to Mr. Springer?
 9   A.   With respect to Mr. Stilley --
10   Q.   Excuse me, yes, Mr. Stilley.  It's been a long day.  I
11   apologize.
12   A.   Yes, I did.
13   Q.   With respect to Mr. Stilley, we have no tax computations
14   predating the year 2000; is that correct?
15   A.   That's correct.
16   Q.   Do you know why?
17   A.   To my knowledge, there was never any tax assessed for
18   Mr. Stilley in those prior years.
19   Q.   Do you recall, with respect to both defendants, when the
20   evidence indicated they last filed tax returns?
21   A.   I assume maybe early '80s, something like that.  I don't
22   remember for sure.
23   Q.   Sometime in the 1980s?
24   A.   Yes.
25   Q.   To your knowledge, was Mr. Stilley a practicing attorney
```

BRIAN MILLER - DIRECT BY MR. O'REILLY                          189

```
 1  throughout the 1990s?

 2  A.   Yes.

 3  Q.   But we don't know what that tax loss was, do we?

 4  A.   We do not.

 5  Q.   But with respect to the gross income figures that are here

 6  in Government's Exhibit 1179-A, those are derived from the

 7  exhibits that are summarized in 1168 through 1176; is that

 8  correct?

 9  A.   That's correct.

10  Q.   And, again, the 20 percent calculation from the guidelines

11  was used to reach a tax loss calculation?

12  A.   Yes.

13  Q.   Did you have any basis upon which to reach a more accurate

14  calculation of Mr. Stilley's taxes?

15  A.   No, I didn't.

16  Q.   Did Mr. Stilley provide you or the Court with any exhibits

17  supporting any expenses or non-income items?

18  A.   No, he did not.

19  Q.   And then with respect to the other lines on here, they're

20  either pulled from Mr. Springer's 1178-A -- and I do note, just

21  for the record, that it indicates 1178, it should say 1178-A.

22       And, similarly, I believe, on Mr. Springer's, where it

23  says "1179" -- actually, that one actually just has it wrong

24  completely -- I'm sorry, I'm looking at the wrong exhibit.

25  Where it says "1178," it should say -- where it says "1179," it
```

BRIAN MILLER - DIRECT BY MR. O'REILLY                                190

1   should say 1179-A.

2            THE COURT:  What are you --

3            MR. O'REILLY:  I'll draw the Court's attention.  On

4   the seventh line up from the bottom, under the line

5   "co-defendants' federal tax loss," there's an exhibit number

6   1178, which was the original exhibit number.  We had to adjust

7   that to add an "A" to make a correction.

8            THE COURT:  That's understood.

9   Q.  (BY MR. O'REILLY)  And right now, we're referencing 1179-

10  A.  A similar correction needs to be made to 1178-A.

11       What was the nature of the correction that was made with

12  respect to -- that caused us to have to redo these exhibits,

13  Mr. Miller?

14  A.  Mr. Stilley had been assessed some additional tax by the

15  IRS for the year 2002, I believe.  When we reflected further on

16  that, we realized that we may be reporting or asked -- we may

17  be "double-dipping," I guess is the common way to put it, by

18  assessing or calculating the gross income here for 2002 and

19  then us using that prior year tax for 2002 also, so we backed

20  out the previously assessed tax for '02, requiring us to adjust

21  the exhibit a little bit.

22  Q.  So with respect to the information you had that was

23  available to you, are you confident in the calculations that

24  are reflected in Government's Exhibits 1178-A and 1179-A?

25  A.  Yes, I am.

BRIAN MILLER - DIRECT BY MR. O'REILLY                    191

```
 1              MR. O'REILLY:  If I may have a moment, Your Honor.
 2              THE COURT:  You may.
 3              MR. O'REILLY:  Nothing further from the government,
 4    Your Honor.
 5              THE COURT:  I have a couple of questions before we
 6    have cross-examination.
 7         Mr. Miller, this -- we can probably determine this pretty
 8    easily by looking at the previous exhibits, but for which of
 9    these years is there a -- what I referred to a little while ago
10    as a plug-in number of $12,000 a year with respect to
11    Mr. Springer on Exhibit 1178-A representing miscellaneous
12    donations?
13              MR. O'REILLY:  Your Honor, I can actually address
14    that very quickly.  That would be each of the years 2000
15    through 2007.
16              THE COURT:  So --
17              THE WITNESS:  So the gross income figure on Exhibit
18    1178-A for the years 2000 through '07, for each of those years,
19    it includes $12,000.
20              THE COURT:  Okay.  So that's 96,000 total?
21              THE WITNESS:  Yes.
22              THE COURT:  And if we were to back out 96,000 from
23    that total --
24              THE WITNESS:  1,518,000.
25              THE COURT:  -- that would bring you down to -- equals
```

BRIAN MILLER - CROSS BY MR. SPRINGER                    192

1    1,518,000?

2            THE WITNESS:  Correct.

3            THE COURT:  Okay.  Now, push that through down to the

4    bottom line on tax loss.  You got a calculator?

5            MR. O'REILLY:  It would be 18,000 less, Your Honor?

6            THE WITNESS:  How much?

7            MR. O'REILLY:  About 18,000.

8            THE WITNESS:  Twenty percent of 96,000.

9            THE COURT:  Twenty percent --

10           THE WITNESS:  Of the 96,000, right.

11           THE COURT:  Very well.

12       Cross-examination.

13                           CROSS-EXAMINATION

14   BY MR. SPRINGER:

15   Q.   Good afternoon, Mr. Miller.

16   A.   Good afternoon.

17   Q.   If you could turn to 1136, please.  Mr. Miller, have you

18   ever seen an account transcript that looked like Government's

19   Exhibit Number 1136 before this case?

20   A.   I think I've seen them before.

21   Q.   You think you have?

22   A.   I don't remember specifically.  I've looked at a lot of

23   transcripts and been involved in several trials, but --

24   Q.   Usually is it 4340s that show up in a summary record of

25   assessment-type issue?

BRIAN MILLER - CROSS BY MR. SPRINGER                              193

```
 1   A.    I don't know the number.
 2   Q.    You testified that I believe that 1136 through 1141 --
 3   they were all accurate records of the IRS's assessment for 1990
 4   through 1995; do you remember that testimony?
 5   A.    Yes.
 6   Q.    Okay.  They aren't actually assessments, are they?
 7   A.    Pardon me?
 8   Q.    1136 through 1141 are not assessments, are they?
 9   A.    They're a record of the assessment.
10   Q.    Which means there's another record somewhere that is an
11   assessment; is that correct?
12   A.    I guess you could say that, yes.
13   Q.    All right.  And in order for a lien to arise as a matter
14   of law, doesn't the taxpayer have to be given notice and demand
15   for payment for a certain assessed year?
16   A.    I'm not familiar with the collection side of the IRS's
17   operation.
18   Q.    So you're not familiar -- is the account transcript a
19   collection side?
20   A.    The transcript is simply a reflection of the taxpayer's
21   account.  You asked about liens being filed and I don't file
22   liens.  That's our collection division's function.
23   Q.    So if you would turn to page 3 of Exhibit 1136.  Do you
24   see the fourth entry down from the top?
25   A.    Yes.  It says "lien released."
```

BRIAN MILLER - CROSS BY MR. SPRINGER                    194

1    Q.    And what's the date on that, 8/31/2007?

2    A.    That's what it says.

3    Q.    And under an account transcript, if it says "lien

4    release," what does that mean?

5    A.    I have no idea.

6    Q.    So as you stand here today, are you telling this Court

7    that, for the year 1990, there is an outstanding tax liability

8    owed by Lindsey Springer to the United States as reflected in

9    Government's Exhibit Number 1136?

10   A.    That's exactly what I'm saying, yes.

11   Q.    And you don't know what a lien release is?

12   A.    Well, a lien, I assume, would be some sort of contractual

13   hold or claim to a particular asset, possibly, and we may have

14   released a lien.  The release of a lien, in my limited

15   understanding, does not erase a taxpayer's obligation that he

16   owes to the IRS.

17          MR. SPRINGER:  Your Honor, may I ask standby counsel

18   a question?

19          THE COURT:  Sure.  You might start by asking whether

20   he thinks releasing a tax lien releases the underlying tax

21   debt.

22      (DISCUSSION OFF RECORD)

23          MR. SPRINGER:  Your Honor, may I approach the

24   witness?

25          THE COURT:  You may.

BRIAN MILLER - CROSS BY MR. SPRINGER                                195

1          MR. SPRINGER:  For the record, Your Honor, I have

2   presented the witness with Exhibit Number -- Defendants'

3   Exhibit Number 19 -- excuse me -- 18, and it is the fourth page

4   in on Exhibit Number -- Exhibit Number 19, the fourth page in

5   Exhibit Number 19, which is entitled "Certificate of Release

6   Federal Tax Lien."

7          MR. O'REILLY:  We do have an objection.  We did not

8   receive these documents until this morning.  They were due to

9   our office no later than the 14th.

10         THE COURT:  First of all, let me make sure I

11  understand what we're dealing with here.

12         MR. SPRINGER:  The fourth page in, Your Honor.

13         THE COURT:  This is a docket from the Patterson

14  case?

15         MR. SPRINGER:  No, no, come back one exhibit before

16  that.  I have my tab at the end of the exhibit instead of the

17  beginning.  And I'm sorry, Your Honor.  That would be the --

18         THE COURT:  This is a notice of deficiency.

19         MR. SPRINGER:  Okay.  Then go into the fourth page of

20  that.

21         THE COURT:  Okay.  Refresh my recollection,

22  Mr. Springer:  When were your exhibits due under the scheduling

23  order?

24         MR. SPRINGER:  They were due on the 14th, Your

25  Honor.  None of these exhibits the government has not seen.

BRIAN MILLER - CROSS BY MR. SPRINGER                    196

```
 1   And I did the best I could without having to ask for a
 2   continuance, because I was ordered by Judge Kearns to move, and
 3   I did all those things as best I could.  I did give the
 4   government an exhibit list timely and there's no surprise nor
 5   harm done by this statement that they've made.
 6              THE COURT:  So you're offering Exhibit 18 at this
 7   point?
 8              MR. SPRINGER:  I haven't offered it yet.  I'm getting
 9   ready to.
10              THE COURT:  Go ahead.
11   Q.   (BY MR. SPRINGER)  Mr. Miller, on exhibit -- it's actually
12   Exhibit Number 19 and it's page 4 --
13              THE COURT:  Now, wait a minute.  You're going to 19
14   now?
15              MR. SPRINGER:  Actually, Your Honor, what I've done
16   is my exhibit tab is at the end of my exhibit instead of at the
17   beginning.  It's actually -- 19 is the exhibit.  And it was
18   listed that way on my exhibit list.
19   Q.   (BY MR. SPRINGER)  Mr. Miller, page 4 of Exhibit 19, I'm
20   going to read this and then ask you a question from it.  It
21   says, "Certificate of Release of Federal Tax Lien.  I certify
22   that the following named taxpayer under requirements of Section
23   6225 of the Internal Revenue Code has satisfied the taxes
24   listed below and all statutory additions."
25        Do you see that?
```

BRIAN MILLER - CROSS BY MR. SPRINGER                    197

```
1   A.    I see that.
2   Q.    Okay.  And do you see the date by which it is issued from
3   the bottom?
4   A.    Yes.
5   Q.    And does that reflect similarly to Government's Exhibit
6   1136 on the third page, the fourth line, where it says "lien
7   release 8/31/2007"?
8   A.    Say that one more time.  Too many numbers for me to keep
9   up with.
10  Q.    I'm sorry.  Do you remember Government's Exhibit 1136 on
11  page 3, where it says "lien release," and then it has a date
12  entry on your transcript code, 8/31/2007?
13  A.    Yes.
14  Q.    And this date on Defendants' Exhibit Number 19, page 4, is
15  dated August 23, 2007, correct, at the bottom?
16  A.    Yes.
17  Q.    Okay.  And it does say that all taxes have been satisfied,
18  does it not?
19  A.    It says that, yes.
20  Q.    Okay.  And just for reference, in the block just below
21  that, where it says "court recording information," does it --
22  on the tax period, Column B there, do you see that -- there's
23  that kind of tax and then there's "tax period."  Do you see
24  that?
25  A.    Yes.
```

```
 1   Q.   And is it --
 2          THE COURT:  As was the case at trial, before you get
 3   into the substance of an exhibit, it needs to be offered and
 4   received.
 5          MR. SPRINGER:  I'm sorry.  May I have a moment on
 6   that one, Your Honor?
 7          THE COURT:  Surely.
 8          MR. SPRINGER:  Your Honor, I move to admit
 9   defendants' -- page 4 of Defendants' Exhibit 19.
10          MR. O'REILLY:  Objection, Your Honor.  Misrepresents
11   the facts.
12          THE COURT:  Okay.  It's -- it's untimely; that's
13   established.  Page 4 of Exhibit -- of your Exhibit 19 is this
14   one that has a copy of an Exhibit 10 sticker on it?
15          MR. SPRINGER:  Yes, that's from Judge Kearns' court
16   docket.
17          THE COURT:  Okay.  As far as whether it misrepresents
18   the facts or not, I don't know.  I'm not going to off-the-cuff
19   keep it out on that basis.  It's untimely, and I have one
20   question:  Is the government prejudiced, Mr. O'Reilly, in terms
21   of your ability to respond to whatever import this exhibit may
22   have?
23          MR. O'REILLY:  Well, I would be -- the defendant
24   should be required to introduce his entire exhibit if he wants
25   to do that.  First, we need to find out if this witness can
```

1  even authenticate it.

2          THE COURT:  Well, assuming that I receive, then, the

3  entire exhibit, is the government prejudiced by virtue of its

4  untimeliness in terms of your ability to respond to whatever

5  import Mr. Springer may assert these documents have?

6          MR. O'REILLY:  No, Your Honor.

7          THE COURT:  It will be received.

8          MR. SPRINGER:  Thank you, Your Honor.

9          THE COURT:  And that's the entire exhibit, beginning

10 with the one that says "TPC, 23 pages," and then it goes on --

11          MR. SPRINGER:  It says "certificates of release" --

12          THE COURT:  It goes on five pages?

13          MR. SPRINGER:  Yes, five pages.

14          THE COURT:  It will be received.  We'll call that

15 Springer Exhibit 19.  It is received.

16          MR. SPRINGER:  Thank you, Your Honor.

17 Q.  (BY MR. SPRINGER)  Mr. Miller, Government's Exhibit Number

18 1136 says that it is for the tax year -- up at the top, "tax

19 period, December 31, 1990."  Do you see that?

20 A.  Yes.

21 Q.  Okay.  And do you see on Defense Exhibit Number 19, page

22 4, that one of the tax periods where it says it's taking --

23 it's satisfied is the same year, 12/31/1990?

24 A.  Yes.

25 Q.  And do you know why it says "1040-A" on the account

BRIAN MILLER - CROSS BY MR. SPRINGER                    200

1  transcript up there in the top left corner?  Do you see that?

2  A.    I do not know why it says that, no.

3  Q.    And let's see -- and then for Exhibit 1137, that's tax

4  period ending December 31, 1991, correct?

5  A.    Yes.

6  Q.    And do you see December 31, 1991, on that certificate of

7  release, as well, for the year 1991?

8  A.    Yes.

9  Q.    Okay.  And then on 1138, does the same hold true for the

10 December 31, 1992, year, does that same year appear in this

11 release as well?

12 A.    Yes, the same as '93, '94 and '95.  Save a little time.

13 Q.    Thank you.

14       You've worked at the IRS for how many years now?

15 A.    Twenty-three.

16 Q.    And prior to 2000 -- strike that.

17       You are a revenue agent specialist, correct?

18 A.    I was until just a few months ago.  I recently changed

19 jobs.

20 Q.    What are you now?

21 A.    Fraud technical advisor.

22 Q.    So prior to that new job, as a revenue agent -- you've

23 been a revenue agent even before the year 2000, correct?

24 A.    Yes.

25 Q.    And at that -- before 2000, when you worked as a revenue

1   agent, you worked under a district director structure; is that

2   correct?

3           MR. O'REILLY:  Your Honor, objection.  Relevance and

4   beyond the scope.

5           THE COURT:  Overruled at this point.

6           THE WITNESS:  I forget exactly when that change in

7   hierarchy and structure was made.

8   Q.   (BY MR. SPRINGER)  But you did at one time work under a

9   district director, correct?

10  A.   Yes, I did.

11  Q.   And at some point in time, you no longer worked under a

12  district director; is that correct?

13  A.   Yes.

14  Q.   And when that ended, who did you then begin to work under

15  as an agent?

16  A.   During both times, I worked for an individual called a

17  group manager.

18  Q.   Group manager, okay.

19  A.   That part didn't change.

20  Q.   And as far as assessments go, you're familiar with the

21  regulations dealing with assessments, correct?

22  A.   Yes, I am.

23  Q.   And isn't it true that, to this day, the regulations from

24  the Secretary of the Treasury require that a district director

25  issue all assessments?

BRIAN MILLER - CROSS BY MR. SPRINGER                      202

1              MR. O'REILLY:  Objection.  Calls for a conclusion of

2    law.

3              THE COURT:  If you know.

4              THE WITNESS:  I'm not familiar with that.

5    Q.   (BY MR. SPRINGER)  Okay.  Have you ever been familiar with

6    that?

7    A.   No.

8    Q.   So as far as delegation of authority right now, to be the

9    fraud person that you -- the title that you have, you get that

10   from the Secretary of the Treasury?

11   A.   I don't deal with -- nobody ever asks me what my

12   delegation is, to be honest.

13   Q.   So you've never had to answer that?

14   A.   I know I've -- I have delegation order number 2.  So if

15   you would like to look at number 2, feel free.

16   Q.   Number 2, that's what I was looking for.  Thank you.

17        Do you know when that order was issued?

18   A.   I do not.

19   Q.   Have you had an opportunity to read Mr. Gollihare's

20   report?

21   A.   No.  I think I have seen bits and pieces of it, but I have

22   not read it.

23   Q.   If you could turn to 1177, please.  And you are the person

24   who prepared this exhibit; is that correct?

25   A.   Yes.

```
1   Q.   Provided the information on it, anyway?

2   A.   Basically, I transferred the information from the

3   transcript to this summary.

4   Q.   Okay.  Now, you listed down here, for 2000, Eddy

5   Patterson, right?

6   A.   Yes.

7   Q.   And the rationale behind that was -- is that because

8   Mr. Patterson had not filed a tax return in 2000; is that the

9   reason why you did that?

10  A.   I'm not as familiar with the intricacies of this case, as

11  Mr. Shern was.  I relied on his testimony and the testimony of

12  Mr. Patterson during the trial.  And it's my recollection that

13  you were involved during the year 2000, that's why we put that

14  year on there, as opposed to other years.

15  Q.   Did you see the evidence when Mr. Shern was on the stand

16  about Mr. Patterson's transcript showing he filed for an

17  extension of time on April 15, 2001?

18  A.   I saw that, but it really had no significance.

19  Q.   He did file something, didn't he?

20  A.   Lots of taxpayers file a request for extension without

21  ever having any intent to file a tax return.

22  Q.   You don't know if that's what Mr. Patterson was doing,

23  right?

24  A.   You asked me if I know something, I'm telling you that it

25  had no significance to me based on my rationale.
```

BRIAN MILLER - CROSS BY MR. SPRINGER                    204

1    Q.   Okay.  So do you know when this $34,247 was calculated on

2    behalf of Mr. Patterson?

3    A.   It's in the transcript; I don't know off the top of my

4    head.

5    Q.   So basically this information is just something that the

6    government provided you, you've got no firsthand knowledge of

7    the information on Mr. Patterson?

8    A.   Someone with knowledge assessed that amount of tax on

9    Mr. Patterson.

10   Q.   Was that Mr. Shern?

11   A.   No.  Special agents typically, to my knowledge, never

12   assess a tax.  That's the job of a revenue agent or a tax

13   compliance officer.

14   Q.   So neither you nor Mr. Shern, the only two people

15   testifying for the government at this sentencing hearing, don't

16   know a thing about how this $34,000 was calculated?

17   A.   Correct.  Not specifically, no.  That job is assigned to

18   someone else after their case is concluded.

19   Q.   Would you turn to 1147, please, Government's Exhibit 1147.

20            THE COURT:  11 what?

21            MR. SPRINGER:  1147, Your Honor.  I'm sorry.  I was

22   away from the mic there.

23   Q.   (BY MR. SPRINGER)  Now, just a moment ago, you were

24   talking about the account transcripts on Lindsey Springer and

25   1147, apparently, is the same type of document but on Mr. and

BRIAN MILLER - CROSS BY MR. SPRINGER                    205

1  Mrs. Patterson.  And do you see at the bottom where it says

2  that Mr. Patterson filed his 2000 return on March 3, 2003?

3  A.   Yes.

4  Q.   Okay.  So is it the only reason why you put 34,247 plus

5  interest and penalty on Pattersons on my third -- you called it

6  third-party tax loss is because he knew me in 2000?

7  A.   Because that's the amount of tax that was on that tax

8  return that he filed after he became aware of you and when he

9  filed.  I guess during the course of this investigation he

10 probably -- I assume he became aware that he was being

11 investigated and he probably tried to maybe help himself out by

12 preparing a tax return.

13 Q.   Did you hear Mr. Shern testify that I'm the one that found

14 Cynthia Hess, the CPA who prepared those returns?

15 A.   Right.  But I'm not sure of the exact timing of that.

16 Q.   So do you dispute the transcript of March 3, 2003?

17 A.   No, I'm saying -- I'm saying that the tax return could

18 have been filed after Mr. Patterson was aware that he was being

19 criminally investigated.

20 Q.   So you don't know when Mr. Patterson was being criminally

21 investigated?

22 A.   I don't know when the investigation began.  I don't know

23 specifically when he became aware of it.  But I believe he was

24 indicted shortly after this date, which would lead me to

25 believe that he probably knew he was being investigated.  He

1   might have been trying to help himself out and do himself a

2   favor by preparing a tax return.

3   Q.   Okay.  Could you turn to Exhibit 1160, please.  Did you

4   prepare 1160?

5   A.   Yes, I did.

6   Q.   Do you see Eddy and Judith Patterson in the payor column

7   three times for the year 2000?

8   A.   Yes, I do.

9   Q.   Two in the middle and one almost at the end?

10  A.   Correct.

11  Q.   The first one says "10,000," the second one says "10,000,"

12  and then the third from the bottom one says "10,000."  Do you

13  see that?

14  A.   Yes.

15  Q.   Do you remember that coming up at trial?

16  A.   Yes.

17  Q.   Mr. Patterson sent a letter that said, "Please accept my

18  donation"?

19  A.   Yes.

20  Q.   And do you remember you testifying that you thought it was

21  for services rendered?

22  A.   Yes.

23  Q.   And do you remember what the services were that you said I

24  provided Mr. Patterson?

25  A.   I don't believe you specifically asked me if I was -- if I

BRIAN MILLER - CROSS BY MR. SPRINGER                                    207

1   thought it was for services rendered.

2   Q.   You just determined that it was.  I mean --

3   A.   It was either for services rendered or it was in pursuit

4   of your ministry.  And, to me, you know, it doesn't matter;

5   it's income either way.

6   Q.   Right.  I forgot about that with you.

7        If I was the person who convinced Mr. Patterson to file a

8   tax return, where, otherwise, he wouldn't, would that change

9   your mind on that $34,000 on Mr. Patterson in your chart -- I

10  think it was 1147 -- excuse me, I'm sorry, I'm wrong -- on the

11  third-party summary for Lindsey Springer you have listed

12  $34,000, I think it was 1177?

13  A.   Right.

14  Q.   Would that change your mind on that 34,000 if I'm the one

15  that caused Mr. Patterson to file a tax return?

16  A.   I don't think I have enough information.

17        MR. O'REILLY:  Objection, Your Honor.  Calls for

18  speculation.

19        MR. SPRINGER:  It's evidence in the record, Your

20  Honor.

21        THE COURT:  Overruled.

22        THE WITNESS:  Not necessarily.  If you had a

23  conversation with Mr. Patterson right before those tax returns

24  were filed and you said, Eddy, we're busted, you know, we might

25  be able to get off or we might -- they might drop some of the

BRIAN MILLER - CROSS BY MR. SPRINGER                      208

1  counts if you go ahead and file, so why don't you go ahead and

2  file those returns, maybe they'll go easy on us, under that

3  scenario, no, I would not change my opinion.

4  Q.   (BY MR. SPRINGER)  But you don't have any evidence that's

5  the scenario, do you?

6  A.   I don't have any evidence either way.

7  Q.   Okay.

8           THE COURT:  How much more do you have on cross?

9           MR. SPRINGER:  Probably 30 or 40 minutes.

10          THE COURT:  Very well.  We'll take our overnight

11  break at this time.

12      You may step down.

13      We'll resume at nine o'clock tomorrow morning.  We are

14  recessing, at least by my watch, just about exactly five

15  o'clock, because some people may have assumed that's what we

16  would do.  If we're still going at five o'clock tomorrow, don't

17  assume that we will stop at five o'clock, because we won't.  So

18  everyone involved should be conscious of that, but we will

19  resume at nine o'clock tomorrow morning.

20      Let me inquire as to what additional witnesses, if any,

21  the government has after Mr. Miller steps down.

22          MR. O'REILLY:  None, Your Honor.

23          THE COURT:  Very well.

24      I want both sides -- when all the evidence is in, I want

25  both sides to be ready to -- now that we have had the benefit

BRIAN MILLER - CROSS BY MR. SPRINGER                      209

1  of some testimony, in addition to the filings, in addition to
2  my recollection of the testimony at trial -- and there's good
3  news and bad news there.  The good news is I took 42 pages of
4  notes at the trial, the bad news is that those 42 pages of
5  notes come in a distant second to what's probably going to be a
6  couple thousand pages of transcript.  So I do have some
7  recollection, aided, to some degree, by my notes, what we heard
8  at trial, obviously, I have the benefit of testimony presented
9  by both the government and the defendants here.  After it's all
10 in, I'm going to want -- I will expect the parties to summarize
11 and pull together for me their -- especially their evidence as
12 to the assertions with respect to attribution of third-party
13 tax losses.
14      I have a thorough understanding, I think, of the
15 government's approach with respect to Mr. Turner.  I do want to
16 hear a clear articulation of the parties' positions one way or
17 the other with respect to Messrs Patterson and Lake.
18      And that is -- and that is not -- because those issues --
19 and by mentioning those issues as being very much live issues,
20 I don't mean to exclude other issues, obviously, as very much
21 live issues, but those issues are very much live issues.
22      And I want to -- first of all, by the time it's over, I
23 certainly hope and expect that I will have heard both sides'
24 best case for including or excluding the tax losses
25 attributable to those individuals.

1          Other areas that are certainly fair game for articulate

2     summaries from the parties, if you will, are the parties' final

3     analysis and the parties' final advocacy as to the

4     applicability of Guideline 2T1.1(b)(2) with respect to

5     sophisticated means, and at least as it relates to

6     Mr. Springer, the applicability of Guideline 3B1.3 with respect

7     to abuse of trust -- abuse of a position of trust.

8          So that's a word to the wise.  I want to hear more on

9     that.  I want to hear, first of all, the best evidence and then

10    the best articulated summary of that evidence before I reach my

11    conclusions.

12         But we will resume nine o'clock tomorrow morning and no

13    one -- let me repeat:  If we're still going at this hour

14    tomorrow, we will not stop.

15         Court will be in recess.

16         (COURT ADJOURNED FOR THE EVENING RECESS.  FOR FURTHER

17    SENTENCING PROCEEDINGS, SEE VOLUME II.)

18

19

20

21

22

23

24

25

```
 1                   IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE NORTHERN DISTRICT OF OKLAHOMA

 3

 4    UNITED STATES OF AMERICA,

 5           Plaintiff,

 6    vs.                             Case No. CR-09-43-SPF

 7    LINDSEY KENT SPRINGER and
      OSCAR AMOS STILLEY,
 8
             Defendants.
 9    _____

10

11

12

13

14

15              TRANSCRIPT OF SENTENCING PROCEEDINGS

16             BEFORE THE HONORABLE STEPHEN P. FRIOT

17                 UNITED STATES DISTRICT JUDGE

18                       APRIL 22, 2010

19                       VOLUME II OF III

20

21

22

23

24

25
```

212

```
 1   APPEARANCES:

 2   FOR THE GOVERNMENT:
                              Mr. Charles Anthony O'Reilly
 3                            U.S. Department of Justice
                              PO Box 972
 4                            Washington, DC 20044

 5                            Mr. Kenneth P. Snoke
                              U.S. Attorney's Office (Tulsa)
 6                            110 W. 7th Street, Ste. 300
                              Tulsa, OK 74119
 7

 8
     FOR DEFENDANT SPRINGER:
 9                            Mr. Lindsey Kent Springer
                              5147 S. Harvard Ave.
10                            Ste. 116
                              Tulsa, OK 74135
11
                              Mr. Robert Scott Williams
12                            Taylor Ryan Schmidt & Van Dalsem
                              1437 S. Boulder Ave., Ste. 850
13                            Tulsa, OK 74119

14   FOR DEFENDANT STILLEY:
                              Mr. Oscar Amos Stilley
15                            7103 Race Track Loop
                              Fort Smith, AR 72901
16
                              Mr. Charles Robert Burton, IV
17                            Burton Law Firm, PC
                              320 S. Boston, Ste. 2400
18                            Tulsa, OK 74103

19
                         EXAMINATION INDEX
20
     BRIAN MILLER
21        CONTINUED CROSS BY MR. SPRINGER        213
          CROSS BY MR. STILLEY                   231
22
     LINDSEY SPRINGER
23        DIRECT BY MR. STILLEY                  245
          CROSS BY MR. STILLEY                   289
24        CROSS BY MR. O'REILLY                  290

25
```

BRIAN MILLER - CONTINUED CROSS BY MR. SPRINGER                213

```
 1              THE COURT:  Good morning.  Mr. Stilley, I believe we
 2   were in your cross-examination -- cross-examination of
 3   Mr. Miller.
 4              MR. SPRINGER:  I think it was me, Your Honor, cross-
 5   examination of Mr. Miller.
 6              THE COURT:  Lori, which were we?
 7              THE CLERK:  It was Lindsey Springer.
 8              THE COURT:  Okay.  Mr. Springer, you may proceed.
 9                      BRIAN MILLER,
10   (PREVIOUSLY SWORN)
11                  CONTINUED CROSS-EXAMINATION
12   BY MR. SPRINGER:
13   Q.   Good morning, Mr. Miller.
14   A.   Good morning.
15   Q.   In this case before the Court, during trial, you were a
16   summary witness on the requirement to file a tax return and tax
17   liability, correct?
18   A.   I think I was an expert witness on the requirement to file
19   and the form and a summary witness of all the testimony that
20   had been provided earlier.
21   Q.   Did you make -- you were involved in the Swisher case,
22   right?
23   A.   Yes, I was.
24              MR. O'REILLY:  Your Honor, objection.  Irrelevance of
25   the Swisher case.
```

BRIAN MILLER - CONTINUED CROSS BY MR. SPRINGER                    214

1          THE COURT:  Well, I need to hear a little more before

2    I know that.  Overruled.

3    Q.   (BY MR. SPRINGER)  Were you aware -- I'll strike Swisher

4    for the moment.

5         You were the summary agent -- the case agent for the

6    Roberts case over in Arkansas; is that correct?

7    A.   I was an assisting summary witness, like I was in this

8    case, yes.

9    Q.   Okay.  And after Dr. Roberts got out of prison, you had

10   further contact specifically with him; isn't that true?

11   A.   Yes, it is.

12   Q.   Were you assigned to specifically obtain all of the tax

13   returns that Dr. Roberts had not filed while he was in prison?

14   A.   Generally, that is correct, yes.

15   Q.   Okay.  And as far as the -- do you remember Dr. Roberts

16   went to trial in June of 2000?

17   A.   That sounds about right.

18   Q.   And if he was required to file a 2000 tax return, it would

19   have been due somewhere around April 15th of 2001, correct?

20   A.   Sure.

21   Q.   And do you remember that Dr. Roberts was in prison after

22   his conviction for a period of about a year?

23   A.   That sounds correct, yes.

24   Q.   So is it safe to say that when he was required to file the

25   1040 form for the year 2000, it's more than likely that he was

1   in prison at that time?

2   A.    I do not know, but it's certainly possible.

3   Q.    And he had complicated tax returns that he had to do;

4   isn't that true?

5   A.    There were some significant issues involved, yes.

6   Q.    And one of those was Ortho/Neuro Medical and how you

7   treated Ortho/Neuro Medical; isn't that true?

8   A.    That was part of it.

9   Q.    Right.  So if Dr. Roberts was separated from all those

10  records, then it seems logical that he wouldn't be able to file

11  a tax return for the year 2000 until after he got out of jail;

12  isn't that true?

13          MR. O'REILLY:  Objection.  Calls for speculation and

14  is suitable for argument.

15          THE COURT:  Overruled.

16          THE WITNESS:  No, I wouldn't necessarily agree with

17  that.  It's not uncommon for a person in prison to be able to

18  file a tax return.  They have ways of -- they can have others

19  get those records, get those records to an accountant, they can

20  have correspondence with an accountant, so it would not be

21  difficult for Dr. Roberts to file his tax return while he was

22  in prison.

23  Q.    (BY MR. SPRINGER)  While he was in prison.  And

24  Dr. Roberts was charged for not filing tax returns in the

25  mid-nineties, correct?

1  A.   I believe that's correct.

2  Q.   And did you ever ask him why he didn't file his 2000 tax

3  return?

4  A.   I don't remember specifically asking him about that year.

5  Q.   Okay.  Did he ever tell you that it was because I told him

6  I didn't file a tax return?

7  A.   I don't remember.

8  Q.   Thank you.

9         THE COURT:  Mr. Springer, let me get some

10  clarification.  I'm sure you are well-aware that, first of all,

11  that the situation with Dr. Roberts is relevant in this case

12  overall for two purposes:  Number one is tax loss, but the tax

13  loss relating to Dr. Roberts is attributed under the

14  government's theory only to Mr. Stilley and not to you.

15         MR. SPRINGER:  Got that.

16         THE COURT:  Okay.  So I'm assuming that you are

17  focusing yourself on the situation with Dr. Roberts only as it

18  may relate to the potential application of the Guideline 2T1.9

19  relating to encouraging others to violate the tax law.

20         MR. SPRINGER:  Yes.

21         THE COURT:  Okay.  Now, is it your position -- and,

22  in fairness, this is against the backdrop not only of the

23  testimony we heard yesterday from Agent Shern about what was --

24  what the grand jury testimony was, but we had the testimony at

25  trial of Brenda Frederiksen -- do you recall that?

BRIAN MILLER - CONTINUED CROSS BY MR. SPRINGER                217

1          MR. SPRINGER:  Yes.

2          THE COURT:  She quoted you, as I recall, as having

3    said, I think in the context of the Roberts trial, whether it

4    was before, during or after, but it was 2000 or 2001, in the

5    general context of the Roberts trial, she quoted you as saying

6    the tax system was basically voluntary.  Then there's other

7    testimony that was given yesterday by Agent Shern.

8       Is it your position that for the application of Guideline

9    2T1.9 to be appropriate, that the encouragement to violate the

10   tax law must have been successful?

11         MR. SPRINGER:  No.  The actual statements are that

12   Dr. Roberts chose not to file a tax return on his own and that

13   it wasn't based upon me telling him it was voluntary.

14         THE COURT:  Well, is it your position for this

15   guideline to apply that you must have, in fact, caused someone

16   to violate the tax law?

17         MR. SPRINGER:  No, sir.  My understanding of that is

18   that if I encouraged them to violate the tax law -- I think

19   there is some division right now was found in Mr. Gollihare's

20   report, between what is acceptable and not acceptable speech in

21   that regard, and all I'm trying to make -- or lay the

22   foundation of for a preponderance of the evidence is that I did

23   not for the year 2000 or any other year after that -- now,

24   obviously, before that, the money is on Oscar Stilley's side,

25   not mine, but at no time did Dr. Roberts -- was he told or was

 1    there any evidence that he was specifically encouraged by me

 2    not to file a tax return.

 3            THE COURT:  Then to that extent, you urge me not to

 4    believe the testimony of Ms. Frederiksen.

 5            MR. SPRINGER:  Well, I believe what Ms. Frederiksen

 6    said was what she heard.  I don't believe she said what was

 7    told to Dr. Roberts.  I believe if we look at the transcript on

 8    that, she was specifically talking about conversations she had

 9    had.  And her tax requirements aren't at issue between myself

10    and the government with related to relevant conduct.

11            THE COURT:  Let's assume, then, that Ms. Frederiksen

12    was referring to something that you said to her.

13            MR. SPRINGER:  Okay.

14            THE COURT:  Are you urging me not to believe what she

15    said about what you said to her?

16            MR. SPRINGER:  I'd have to review her testimony to

17    say for sure.

18            THE COURT:  I don't want to break up your -- go

19    ahead.  Go ahead.

20            MR. SPRINGER:  I got you on that.

21        May I just have a second?  I'm trying to finish that

22    thought.

23            THE COURT:  Sure.  I'm sorry, I --

24            MR. SPRINGER:  No, no, no, it helps me, I'm just

25    trying to put that in perspective with what I want to do next

BRIAN MILLER - CONTINUED CROSS BY MR. SPRINGER                 219

```
 1   with Mr. Miller.

 2   Q.   (BY MR. SPRINGER)  Mr. Miller, you were also involved in

 3   the James Lake trial, were you not?

 4   A.   Yes, I was.

 5   Q.   In the tax loss calculations, there's $176,000 for the

 6   year 2000 that the government has claimed that I should have

 7   impugned to my tax loss calculation for the purpose of

 8   sentencing because of something that I did with Mr. Lake; do

 9   you remember that?

10   A.   Yes.

11   Q.   Now, Mr. Lake -- you were here during his testimony,

12   correct?

13   A.   Yes.

14   Q.   Okay.

15          MR. SPRINGER:  Your Honor, may I have a moment?  I

16   need to read something.

17          THE COURT:  Certainly.

18          MR. SPRINGER:  Your Honor, I believe to conclude what

19   I was saying a moment ago is that it is my understanding the

20   government is promoting Count 1 as the lead count, the one

21   that's going to have the highest possible guideline sentence,

22   and as a result of that, we get into what's referred to as

23   relevant conduct within the scope of the conspiracy, and so

24   whether I am asking questions related to Dr. Roberts or

25   Mr. Lake, I did not -- there's no evidence that I entered into
```

BRIAN MILLER - CONTINUED CROSS BY MR. SPRINGER          220

1  an agreement with them to further some illegal conduct which

2  was the object of the conspiracy, as alleged, and so the reason

3  why I'm asking those questions is based upon how it applies to

4  Count 1's relevant conduct and the unlawful agreement, and I

5  believe --

6          THE COURT:  Well, let me -- I don't want to interrupt

7  you, but under Guideline 1B1.3, relevant conduct for which

8  you're accountable is clearly not limited to matters occurring

9  within the conspiracy period charged in the indictment.

10     And there's another thing that you should bear in mind,

11 and I don't mean to lecture and it's certainly not my job to be

12 your advisor in any sense, but it's important, I think, for all

13 concerned not to lose sight of the fact that, even though we

14 talk a good deal about the defendants' accountability -- each

15 defendants' accountability for the other's conduct, to the

16 extent that it can be within the framework of jointly-conducted

17 criminal activity, which is Guideline 1B1.3(a)(1)(B), you are

18 still accountable for your own activity, in some sense, no

19 matter how far back it goes, regardless of whether it was

20 jointly-conducted activity.  That is Guideline 1B1.3(a)(1)(A).

21     And it's easy for all of us to kind of slide off in the

22 direction of thinking in terms of, well, what is within the

23 scope of the jointly-conducted activity?  And that's far from

24 the whole framework for the Court's analysis of relevant

25 conduct, because under Subsection (a)(1)(A), you are

BRIAN MILLER - CONTINUED CROSS BY MR. SPRINGER                221

 1  accountable for your activity, your personal activity,

 2  regardless of whether it was jointly-conducted.

 3      So bear that in mind, that in a temporal sense, the

 4  conspiracy period in the indictment, although perhaps of

 5  interest, is immaterial ultimately for the purpose of the

 6  Court's evaluation of your relevant conduct.

 7          MR. SPRINGER:  Is the relevant -- the question I'm on

 8  is:  Is the relevant conduct such as what Mrs. Gray said, does

 9  that reach over to an amount of money that the government

10  proposes would have been on or was on a return that was filed

11  by that person?  And I think that's where I got stuck.

12          THE COURT:  You're getting a little specific in your

13  questions to the Court.  You'll need to rely on your own

14  analysis and the assistance that your standby counsel may give.

15          MR. SPRINGER:  I'm good on that.  Okay.

16  Q.  (BY MR. SPRINGER)  Mr. Miller, are you suggesting that,

17  even if Mr. Lake had filed a tax return for the year 2000 on

18  time, that I would still be liable for tax loss that he -- that

19  his return shows if he filed?

20          MR. O'REILLY:  Objection, Your Honor.  Relevance

21  to -- the Court is the one that will be determining what he is

22  liable for and what he is not.

23          THE COURT:  Mr. O'Reilly, I'm going to ask you to

24  speak up a little, please.

25          MR. O'REILLY:  Your Honor, I object.  The question is

BRIAN MILLER - CONTINUED CROSS BY MR. SPRINGER                   222

```
1   not relevant as to what Revenue Agent Miller's view is on

2   whether he would be -- Mr. Springer should be held liable;

3   that's the Court's decision.  We're straying into argument

4   here, as opposed to questions of fact.

5           MR. SPRINGER:  He did propose the chart.  He did

6   testify that he's the one that proposed the chart with

7   Mr. Lake's money on that.

8           THE COURT:  I'm going to hear it.  Obviously, the

9   testimony of a witness, like Mr. Miller, can be in a gray area

10  in terms of whether it involves facts or legal conclusions, and

11  I'm also mindful, though, of the limitations on the purposes

12  for which Mr. Miller was presented on direct, but that said,

13  for now, I'm going to overrule that objection.  He may want you

14  to repeat the question.

15          THE WITNESS:  Certainly.  Please.

16  Q.   (BY MR. SPRINGER)  Testimony would be, for Mr. Lake, I

17  told him I didn't file tax returns?

18  A.   Right.

19  Q.   Mr. Lake still files a tax return, the very next time a

20  tax return is due to be filed by him on time, because I told

21  him I didn't file a tax return, is it your position that I

22  would be liable under tax loss for the $176,000 if he had filed

23  a tax return?

24  A.   To me, what he did has no bearing on what you advised him

25  to do, I guess.  I mean, his choice -- whether or not he relied
```

BRIAN MILLER - CONTINUED CROSS BY MR. SPRINGER                    223

1   on your advice, to me, doesn't change your behavior, I guess,

2   if that's what you're asking.

3   Q.   In other words, even if he had filed a tax return with the

4   176,000 on there, you would still be saying the 176,000 should

5   be a tax loss attributable to me?

6   A.   Off the top of my head, yes.

7   Q.   I'm trying to understand how you said that.  You heard

8   Mr. Shern yesterday talk about some people I told to file tax

9   returns and other people I told I didn't file tax returns;

10  remember that?

11  A.   Yes.

12  Q.   If I told somebody to file a tax return and they filed a

13  tax return, should I be held liable for the amount of money

14  that they owe on that tax return?

15  A.   Off the top of my head, I wouldn't think so.

16  Q.   Okay.  So the distinctive difference is whether or not I

17  told them I file a tax return or I don't, that's the difference

18  between whether the person I said anything to, their tax

19  liability becomes my tax loss; is that the best way we can

20  understand it?

21  A.   Uh-huh.  If you encourage someone to violate the law, then

22  it becomes your tax loss is my understanding.  If you

23  encouraged someone to comply with the law and they fail to

24  comply with the law, I would assume that that would be their

25  responsibility.

BRIAN MILLER - CONTINUED CROSS BY MR. SPRINGER                224

1  Q.   And if I tell somebody what I personally don't do, is that
2  encouraging them the way you've got it on the calculations?
3  A.   Yes, since you are in a position of being a tax expert and
4  people know that you have studied extensively the tax law and
5  people trust your opinion.
6  Q.   Isn't it true, though, that prior to this trial, the basis
7  of my claim was is that because I only received gifts?
8  A.   I don't know if that's what you told to everyone or not.
9  Q.   Do you have any evidence that I ever told anybody that I
10 received gross income and that I don't file tax returns?
11 A.   I have no evidence that the only people you told you
12 didn't file were the people who had a ministry.  It's my
13 understanding you told lots of people you didn't file, not that
14 you said I don't file because I have a ministry.
15 Q.   Well, okay.  Or because I only accept gifts, right?  That
16 was the key phrase in the trial that we were dealing with?
17 A.   Yes.
18 Q.   Okay.  So if I said -- if somebody testified I told them I
19 did not file tax return, that by no means limits what all I
20 said, that's just a phrase that has been taken out of a much
21 longer relationship, correct?
22 A.   Possibly so.
23 Q.   Right.  And wouldn't it also indicate that when people
24 would write "donation" or "gift," that there was probably some
25 conversation between them and I about that subject?

```
 1   A.   I would assume so, yes.

 2   Q.   So if I'm -- if we're having a discussion about whether

 3   this is a gift and I'm telling them I don't file a tax return,

 4   if those two were together, that the reason why I don't file

 5   tax returns is because I will only accept unconditional --

 6   condition of gift, at that time, not based upon beating a dead

 7   horse, would you still feel the same way about attributing the

 8   $176,000 or other tax liabilities of people that I told this

 9   to?

10            MR. O'REILLY:  Objection to the form of the

11   question.  I'm not -- I'm personally quite confused.

12            THE COURT:  Mr. Springer, there's two or three

13   problems:  Number one, you and the witness are hopping back and

14   forth between issues under Guideline 2T1.9(b)(2) and tax loss

15   under 2T1.1, and I'm not sure the witness is professing to be

16   an expert under -- at least under 2T1.9(b)(2).

17       Number two, what you're saying is pretty far afield from

18   anything for which he was presented as of yesterday.

19            MR. SPRINGER:  I'm sorry.

20            THE COURT:  Number three, I'm going to listen to what

21   you have to say by way of argument.

22            MR. SPRINGER:  Got you.

23            THE COURT:  Especially as -- for instance, I'll go so

24   far as to say I'm not -- I'm a little concerned about the

25   quality of the evidence as to whether you should be accountable
```

1   for the tax loss relating to Mr. Lake, and I'm looking forward

2   to hearing what the government has to say and what you have to

3   say.

4        Before we started yesterday, I had studied the record

5   pretty closely as to the individuals who were covered in the

6   government's sentencing memorandum, which does not include

7   Mr. Lake, and I'm going to listen very carefully to what both

8   you and the government have to say on that score.

9        But your question -- the pending question really addresses

10  matters that are more appropriate for argument rather than

11  debate with this witness.

12            MR. SPRINGER:  I apologize, Your Honor.

13  Q.  (BY MR. SPRINGER)  In addition to me telling Mr. Lake I

14  don't file a tax return, do you know of any other conduct, any

15  other action I took with regard to Mr. Lake regarding his tax

16  liabilities or his problems?

17  A.  I personally do not.

18  Q.  And would that be the same for Dr. Roberts?

19  A.  The best of my recollection, yes.

20  Q.  Okay.  Could you turn to 1177, please.

21  A.  Okay.

22  Q.  And do you see the entry for Exhibit 1152 where it says

23  "Patrick Turner"?

24  A.  Yes.

25  Q.  And you heard Mr. Shern testify yesterday with regard to

BRIAN MILLER - CONTINUED CROSS BY MR. SPRINGER                    227

1   why he believed Patrick Turner's money that he owed for '99,

2   2000, 2002, and 2003, should be within a third-party relevant

3   tax loss on Lindsey Springer; do you remember that?

4   A.   Yes.

5   Q.   Had you had discussions with him about that before he

6   testified?

7   A.   Maybe briefly.

8   Q.   Did you agree with his testimony?

9   A.   Yes.

10  Q.   Okay.  Now, did you know that the reason why Mr. Turner

11  filed these tax returns for '99, 2000, 2002, and 2003 was

12  because Lindsey Springer -- do you remember that testimony?

13  A.   I believe so.

14  Q.   So here we have a person who actually files the tax return

15  because Lindsey Springer tells him to do it and you still found

16  a way to put it under third-party relevant tax loss.  And just

17  a minute ago, didn't you just say if I told a person to file a

18  tax return, that that money would not be tax loss to Lindsey

19  Springer?

20          MR. O'REILLY:  Objection.  Argumentative, compound

21  question.

22          MR. SPRINGER:  I can rephrase, Your Honor.

23          THE COURT:  Let me inquire.  As I understand the

24  government's theory with respect to Mr. Turner -- well, first

25  of all -- and forgive me again, Mr. Springer, but I want to

BRIAN MILLER - CONTINUED CROSS BY MR. SPRINGER                228

1  make sure I understand very clearly what both sides have to

2  say.

3       The tax loss, as opposed -- as distinguished from

4  penalties and interest, attributable to Mr. Turner, which the

5  government, in turn, seeks to hold Mr. Springer accountable for

6  in Government's Exhibit 1177, comes out to $145,713, which to

7  the penny is the amount shown in the chart set forth on page 10

8  of the government's sentencing memorandum.

9       Now, the penalties and interest are another matter and are

10 apparently there for other purposes, so we'll disregard that.

11            MR. SPRINGER:  Okay.

12            THE COURT:  So that's for '99, 2000, '02 and '03.

13       My understanding is -- and this -- I'm just going to ask

14 Mr. O'Reilly to either very briefly say I'm right or wrong.  My

15 understanding is that the theory by which the government seeks

16 to attribute a loss relating to Mr. Turner to both defendants

17 is not so much as a result of any failure to file as it is a

18 result of what I will call the deposit of the money in the

19 IOLTA account with the effect that that had on the government's

20 ability to collect what was owed; is that correct?

21            MR. O'REILLY:  Yes, Your Honor.

22            THE COURT:  Okay.  With that understanding,

23 Mr. Springer, whatever the merits of Mr. O'Reilly's objection

24 may be, he didn't say "relevance," but I've got a relevance

25 problem, because I don't think the government seeks to hold you

BRIAN MILLER - CONTINUED CROSS BY MR. SPRINGER                    229

```
1   accountable for a tax loss relating to Mr. Turner as a result

2   of any failure on his part to file, as opposed to the fact that

3   his quarter-of-a-million dollars that he raised by mortgaging

4   his house was put beyond the reach of the government at your

5   instance and with the cooperation of Mr. Stilley, so the

6   objection is sustained but for a completely different reason

7   than what the government had to say about it.

8       Go ahead.

9           MR. SPRINGER:  Thank you, Your Honor.

10      May I have just one second?

11  Q.  (BY MR. SPRINGER)  The testimony you gave about Mr. Lake

12  and Mr. Roberts, other than I told them words with respect to

13  whether I file tax return or not, do you know of any action or

14  conduct that I took with Mr. Patterson or is the answer the

15  same as it was with the other two?

16  A.  To my knowledge, the answer would be the same.

17  Q.  Thank you.

18      Okay.  You're also aware of the claim that I should be

19  held liable for Oscar Stilley's tax loss?

20  A.  Yes, as part of the conspiracy.

21  Q.  Right.

22          MR. SPRINGER:  1179, could you pull that up,

23  Government's Exhibit 1179.

24          MR. O'REILLY:  Just for the record, I think it's

25  1179-A.
```

BRIAN MILLER - CONTINUED CROSS BY MR. SPRINGER                230

```
 1          MR. SPRINGER:  A, I'm sorry, you're right.
 2  Q.  (BY MR. SPRINGER)  What is it about Oscar Stilley's tax
 3  liability that is connected to Lindsey Springer by way of the
 4  conspiracy?  In other words, why did you decide to put his tax
 5  liability on me for tax loss purposes?
 6  A.  Because, as I think was very clearly presented during the
 7  trial, you both worked together and you both benefited from the
 8  actions of each other and you both made money as a result of
 9  your business dealings and your representation of various tax
10  things.
11  Q.  So just because we had business dealings, we're
12  responsible for each other's tax liabilities under the
13  conspiracy count; is that what you --
14  A.  You worked together to accomplish the object of the
15  conspiracy.
16  Q.  But the object of the conspiracy wasn't to represent
17  somebody, right?  That wasn't the object.  It was to defraud
18  the IRS's lawful functions, right?
19  A.  I guess so, to defraud the IRS and to make a lot of
20  money.
21  Q.  Is making a lot of money defrauding the IRS?
22  A.  If you make a lot of money by defrauding the IRS, I guess
23  it could be looked at that way.
24  Q.  Okay.  And is it -- is it your contention, then, that
25  because Oscar Stilley was a lawyer and he represented somebody
```

BRIAN MILLER - CROSS BY MR. STILLEY                          231

1  in a criminal tax case that that's what makes that part of the

2  criminal conduct in Count 1?

3          MR. O'REILLY:  Objection, Your Honor.  Relevance.

4  This, again, is argument for the Court.

5      Mr. Miller testified with respect to how the figures were

6  arrived at, how the computations were achieved in terms of what

7  is attributed to each defendant.  That's really something for

8  argument and for the Court to rule on, not for Mr. Miller to be

9  opining on.

10          THE COURT:  And aside from that, these are matters

11  that were fairly thoroughly explored at the trial, so that will

12  be sustained.

13          MR. SPRINGER:  Can I have a moment, Your Honor?  My

14  40 minutes is up, Your Honor.  Thank you.

15          THE COURT:  Mr. Stilley.

16                      CROSS-EXAMINATION

17  BY MR. STILLEY:

18  Q.   Much of your efforts were focused on a determination of

19  the -- what we would call the tax loss of Oscar Stilley,

20  correct?

21  A.   Yes.

22  Q.   Now, was the purpose of those efforts to get as close as

23  possible to the truth of what the tax loss would have been?

24  A.   There were two choices:  Option A or Option B.

25      Option A was compute the gross income and take 20 percent

BRIAN MILLER - CROSS BY MR. STILLEY                                232

1    of that.

2         Option B was to do our best, which would have been very

3    inadequate, at best, and then apply a 30 to 40 percent rate on

4    your net income.

5         I did not feel like we would get anywhere close to

6    accurate under Option B computing an accurate reflection of

7    your business income, so we went with Option A, which was to

8    just calculate your gross income, then apply 20 percent to it.

9    Q.   Okay.  But the question on the table here was the efforts

10   in furtherance of an attempt to get to the truth, was that the

11   paramount goal?  Was the paramount goal the truth?

12             MR. O'REILLY:  Objection.  It's an unclear question.

13   The truth about what?  Mr. Stilley provided no tax returns,

14   provided no business records, what is the -- the truth about

15   what is the objection.

16             THE COURT:  I'm assuming he means the truth about the

17   calculation of Mr. Stilley's tax liability as proposed by the

18   government.  On that assumption, the objection will be

19   overruled.

20             THE WITNESS:  The object is always the truth.  I did

21   not believe I could get to the truth by trying -- by computing

22   an actual tax liability for you based on the information that I

23   had and was able to get.

24   Q.   (BY MR. STILLEY)  There are multiple ways to ascertain tax

25   loss, correct?

```
 1  A.   Yes.
 2  Q.   If all of those are means to attain the truth, they should
 3  tend toward a single point, correct?
 4  A.   Yes.
 5  Q.   For the simple fact that the tax liability or tax loss,
 6  with small variances, should be a discrete figure, correct?
 7  A.   Yes.
 8  Q.   So it would help us, then, to determine whether we
 9  actually attained the truth by looking at other ways of
10  calculating tax loss or tax liability, correct?
11  A.   Yes.
12  Q.   There's another way called the "net worth method,"
13  correct?
14  A.   Yes.
15  Q.   Were you aware that the probation department has
16  determined that Oscar Stilley has a negative net worth of
17  50,000?
18  A.   No.
19  Q.   Okay.  I want you to assume that for the questions that
20  we've got involved here -- and I want to ask you some questions
21  about that.  Assuming a negative net worth of $50,000 on the
22  part of Oscar Stilley at this point in time, is it not fair to
23  assume that the tax losses -- well, scratch that.
24       What other pieces of information do you need to apply the
25  net worth method of determining tax loss?
```

BRIAN MILLER - CROSS BY MR. STILLEY                          234

1  A.   I would have to know all of your income and expenses,
2  which is something I don't know.  And your point isn't really
3  valid, because there are lots of people that "make a ton of
4  money," to put it in common vernacular, a lot of people that
5  make a lot of money that have a negative net worth that have to
6  file bankruptcy, so if you're suggesting that the fact that you
7  have negative net worth implies that you didn't have income,
8  that's certainly not a reasonable assumption.  You could have
9  made a ton of money and spent a ton and a little bit and had a
10 negative net worth.  So I think -- I'm not sure the
11 appropriateness of the question and if -- whether you had a
12 negative net worth --
13         THE COURT:  Let's have the next question.
14         THE WITNESS:  It doesn't matter to me whether you
15 have negative net worth, that's not a conclusive factor in
16 deciding whether or not you had income.
17 Q.   (BY MR. STILLEY)  You have used the net worth method on
18 various taxpayers, correct?
19 A.   I have a few times, yes.
20 Q.   So you do consider that a valid means of considering tax
21 liability or tax loss, correct?
22 A.   Certainly.
23 Q.   What I previously asked you is what other items of
24 information do you need to ascertain tax loss on the net worth
25 method of valuation?  Surely you would -- let's start with you

1  would need to know something about the lifestyle or the

2  expenditures -- personal expenditures of that individual,

3  correct?

4          MR. O'REILLY:  Objection.  Relevance and asked and

5  answered.

6          THE COURT:  Sustained.

7  Q.  (BY MR. STILLEY)  Okay.  Let me ask this just -- a little

8  different question.  You have to make a check list of things

9  that you need to determine in order to come up with the net

10 worth method of valuation, correct?

11 A.  Yes.

12         THE COURT:  Mr. Stilley, let me establish one thing,

13 and I suppose I'll be happy to hear you if you think I'm headed

14 in the wrong direction on this, but I certainly don't hold

15 myself out as an expert on methods of proof in tax evasion

16 cases, but it's -- I think it's fair to say, at least in

17 general terms, that the net worth method, which was not used in

18 this case, is to some degree, at least, a last-resort method

19 that the IRS can, in some appropriate cases, use, in essence,

20 to back in to what -- back in to evidence of a substantial

21 failure to report income.

22     It wasn't used in this case.  It is an undeniable fact

23 that a person can have tremendous gross income and have a

24 negative net worth.  The fact that you, so far as the probation

25 office is aware, may have a negative net worth is of no

1    persuasive value at all in my evaluation of the tax loss

2    attributable to you.

3        So, now, if -- and so unless you can give me some very

4    good reason for further examination on the question of negative

5    net worth, we're not going to continue down this line.

6            MR. STILLEY:  Could I explain to you my reasoning and

7    thinking on that?

8            THE COURT:  Very concisely.

9            MR. SPRINGER:  Certainly, Judge.  He's already said

10   that the various methods should all tend toward the truth, and

11   I'd like to make a record to show that the net worth method

12   will indicate a zero tax liability, and I can also show that

13   there's a judge in the Lake case who said that it was not gross

14   income but adjusted gross income that was the determinative

15   number as to determine whether or not a tax return was

16   required.  It's a little bit different, but it works into this

17   net worth.

18           THE COURT:  It's time to move on to another subject.

19           MR. STILLEY:  Will I be allowed to make a record on

20   this?

21           THE COURT:  It's time to move on to another subject.

22           MR. STILLEY:  Your Honor, could I have just a

23   moment?

24           THE COURT:  Surely.

25   Q.   (BY MR. STILLEY)  In your report, you -- when you were

1  adding up the deposits, you added up the deposits that went

2  into the IOLTA account, correct?

3  A.   That was included in the computation, yes, not restricted

4  to that account.

5  Q.   Not restricted?

6  A.   Right.

7  Q.   So you used what went into that account and also what went

8  into Oscar Stilley's personal account, correct?

9  A.   Yes.

10 Q.   Did you take efforts to make sure that you didn't double

11 count?

12 A.   Yes.

13 Q.   Were you aware when you did this that the IOLTA account is

14 actually not the property of Oscar Stilley?

15 A.   I understand theoretically that the IOLTA account is not

16 the property of the attorney, but I also understand in this

17 particular case your personal funds and your personal income

18 was deposited into that account, so it's not restricted to

19 funds of your clients.

20 Q.   You're saying that personal funds were deposited into the

21 IOLTA account?

22 A.   It was clear, based on the fact that funds going into the

23 IOLTA account were transferred to your personal account.  If

24 they -- if it wasn't your money, then I guess you stole from

25 somebody, because it very clearly went from the IOLTA account

1  to your personal account for your personal benefit.

2  Q.   Some of the money did, some of the money did not,

3  correct?

4  A.   Yes.

5  Q.   And the fact the money went into -- at the time the money

6  went into the IOLTA account, there is no presumption that it

7  belongs to Oscar Stilley at that time, correct?

8  A.   It depends on the nature of the payment.

9  Q.   And you didn't make any efforts to determine which was

10  which, did you?

11  A.   We did make an effort, yes, we did.  In fact, there are

12  some items that went into the IOLTA account that were not

13  included in our list of income for you.

14  Q.   Did you see occasions where Oscar Stilley wrote checks to

15  the IRS on behalf of his clients?

16  A.   Yes.

17  Q.   Did you exclude those?

18  A.   Yes.

19  Q.   There was nothing in the report -- in the exhibits for

20  this case that indicate when this was done; why not?

21  A.   We did not list the items of income that we did not

22  include.  We went through and used our best judgment and tried

23  to follow the money the best we could to see where it went.

24  And if we saw money that clearly was being used on behalf of a

25  client as an IOLTA account is supposed to be used, we did not

BRIAN MILLER - CROSS BY MR. STILLEY                    239

1   include that in the accounting.

2   Q.   You heard Mr. Shern testify that the documents that were

3   exhibits in this case were prepared about three months ago,

4   right?

5   A.   I heard him say that.

6   Q.   When did you become aware of their existence?

7   A.   Of the documents?

8   Q.   Yes.

9   A.   I don't know.

10          MR. O'REILLY:  Objection.  Just for clarification,

11  are we talking about the underlying documents or these

12  summaries?

13          MR. STILLEY:  The summaries.

14          THE WITNESS:  I assisted in the preparation of those

15  summaries a few months ago.

16  Q.   (BY MR. STILLEY)  So you knew about all those things

17  several months ago, correct?

18  A.   I wouldn't say several.  A couple of months ago.

19  Q.   Were you aware that Oscar Stilley was not given those

20  documents until a week and a day ago?

21  A.   I was not.

22  Q.   So did you have anything to do with keeping Oscar Stilley

23  from being informed of that when the government's sentencing

24  brief was filed?

25  A.   I made no attempt to withhold any information from you.

BRIAN MILLER - CROSS BY MR. STILLEY                                    240

1    Q.    You remember the Lake case, don't you?

2    A.    Vaguely.

3    Q.    And you remember the prosecutor, Vaughn Dunnigan, correct?

4    A.    Yes.

5    Q.    Do you remember the judge?

6    A.    It was a gentleman, but I don't remember his name.

7    Q.    Okay.  You testified in that trial, correct?

8    A.    Yes.

9    Q.    And you saw Oscar Stilley and Lindsey Springer in the back

10   of the courtroom, correct?

11   A.    I did.

12   Q.    You remember that the judge determined that the number

13   that -- the income number that would determine whether a person

14   was required to file a tax return or not was adjusted gross

15   income, correct?

16         MR. O'REILLY:  Objection as to relevance in the line

17   of questioning.

18         THE COURT:  Sustained.

19         MR. STILLEY:  Can I make a record for my reasoning on

20   this?

21         THE COURT:  When this witness steps down, I'm going

22   to give you an opportunity to make a concise offer of proof

23   both on this and on the matter we discussed a few minutes ago.

24      Next question.

25         MR. STILLEY:  Your Honor, may I inquire as to how you

*Tracy Washbourne, RDR, CRR*
United States Court Reporter
U.S. Courthouse, 200 N.W. 4th St.
Oklahoma City, OK 73102 * 405.609.5505

1  want that proffer done?

2            THE COURT:  We'll cover that when the witness steps

3  down.

4            MR. STILLEY:  Sure.  Could I have a moment, Your

5  Honor?

6            THE COURT:  Surely.

7            MR. STILLEY:  Thank you.  Pass the witness.

8        Your Honor, beg your pardon, my understanding was I was

9  supposed to do the offer of proof at a separate time.  Should I

10 do it now?

11           THE COURT:  When the witness steps down, I'll hear

12 your concise offer of proof on the two points that we've

13 covered.

14           MR. STILLEY:  Okay.  Just as an offer, then, from me,

15 correct?

16           THE COURT:  That's true.

17       Any redirect?

18           MR. O'REILLY:  No, Your Honor.

19           THE COURT:  You may step down.

20       Mr. Stilley, I'll hear your offer of proof first as to

21 what the application of the net worth method would have

22 established in this case with respect to your tax liability.

23           MR. STILLEY:  Thank you, Judge.  I think you already

24 see that I asked certain questions to establish that various

25 methods should arrive at a similar point if they're all valid

1  methods of arriving at the truth.

2      The net worth method would arrive at zero for Oscar

3  Stilley.  The reason I asked questions about Oscar Stilley's

4  style of living or living expenses was to establish certain

5  facts that Mr. Miller would need to ascertain the net worth

6  method.

7      And my position is that if I had been allowed to elicit

8  this testimony from Mr. Miller, he would have had to agree with

9  a low standard of living, the money not going to any place that

10  is -- would result in -- the expenditure of taxable monies

11  out.  He would have to conclude that the negative net worth

12  ensures that there was not any significant tax loss.

13          THE COURT:  Mr. Stilley, I'll hear your offer of

14  proof as to whether or not the judge in the Lake case

15  determined that the filing requirement depends on adjusted

16  gross income.

17          MR. STILLEY:  Thank you, Judge.  The -- as you heard

18  from the witness, all three, Oscar Stilley, Lindsey Springer,

19  and Mr. Miller, were all at the trial of Mr. Lake.

20      In that case, the judge determined that adjusted gross

21  income was the proper number to determine whether or not that a

22  tax return would be required to be filed.

23      There is the claim in this case that there is a failure to

24  file tax returns and that that has certain consequences.  Once

25  again, when you look at the negative net worth over a period of

```
 1  time, no other things, such as high lifestyle or gambling or
 2  anything like that, to indicate that the money has gone
 3  somewhere else that would tend to show that by anybody's theory
 4  that there was no tax return due under this Court's theory.
 5          THE COURT:  Thank you, Mr. Stilley.
 6      The Court determines that the matters encompassed by the
 7  offers of proof on both points are of no consequence for
 8  sentencing purposes.
 9      We'll have the government's next witness.
10          MR. O'REILLY:  The government has no more witnesses,
11  Your Honor.
12          THE COURT:  Very well.  That certainly brings us to
13  one significant milestone, if you will, in the sentencing
14  proceeding.  I want the defendants to understand that when I
15  call upon them now to present their evidence, I will hear --
16  what I expect to hear is their evidence, both in response to
17  the adjustments and -- the tax loss issue and the adjustments
18  urged by the government, and as to any other matters that the
19  defendants would want the Court to consider for sentencing
20  purposes, short of their allocution, which the Court will hear
21  at a later stage.
22      So now I'm speaking in terms of evidence, not argument,
23  but I am most assuredly speaking in terms of evidence relating
24  to any matter under Section 3553 or the application of the
25  guidelines.
```

244

```
 1      And, again, let me emphasize I will hear the defendants'
 2  final arguments or final comments, if you will, by way of
 3  allocution on their own behalf at a later stage.
 4      Mr. Springer, you may proceed.
 5          MR. SPRINGER:  May I have just a moment, Your Honor?
 6          THE COURT:  Surely.
 7          MR. SPRINGER:  Your Honor, could I have a brief
 8  moment with my standby outside of the courtroom for a second?
 9          THE COURT:  Surely.  As a matter of fact, we'll take
10  a ten-minute recess at this time.
11      (A RECESS WAS HAD.)
12          THE COURT:  Mr. Springer, you may proceed.
13          MR. SPRINGER:  Your Honor, I'm going to call myself.
14          THE COURT:  Very well.
15                      LINDSEY SPRINGER,
16  (WITNESS SWORN)
17          MR. SPRINGER:  Should I stand here or should I go
18  over there?
19          THE COURT:  As long as you don't lapse by virtue of
20  standing at the lectern, as long as you don't lapse into
21  argument, as opposed to factual matters, as long as you don't
22  also lapse into matters that are more appropriate for you to
23  cover in your allocution, then at least for the time being,
24  I'll be happy to hear you from the lectern if that is your
25  preference.
```

```
 1              MR. SPRINGER:  Thank you, Your Honor.

 2              THE COURT:  Although for cross-examination, I may

 3    well require you to sit at the witness stand.

 4                        DIRECT EXAMINATION

 5              MR. SPRINGER:  Okay.  The first things I'd like to do

 6    is enter Defendants' Exhibit Number 22, which I believe I

 7    presented this morning to the Court.  Did I give that?

 8         May I approach, Your Honor?

 9              THE COURT:  You may.

10              MR. SPRINGER:  Defendants' Exhibit Number 22 on the

11    first page --

12              THE COURT:  Have you given this to the government?

13              MR. O'REILLY:  Your Honor, we received a copy this

14    morning.

15              MR. SPRINGER:  Yes, I have, Your Honor.  And just for

16    the record, Your Honor, you asked yesterday for the UCC filing

17    on the Turner RV, I asked Mr. Turner yesterday evening to send

18    me that and this is what I received in response from

19    Mr. Turner, which is -- the front page is the e-mail where he

20    expresses how he repossessed the RV, and then underneath it is

21    the documents -- each of the documents that Mr. Turner received

22    in the mail from the Oklahoma Tax Commission from the tag

23    office that I actually registered the RV at, and that's

24    reflected on the last page of this five-page document.

25         I would note that there is a page 6 of 9, 7 of 9, 8 of 9,
```

1    and 9 of 9, but this is how I got it from Mr. Turner.  It would

2    only be speculation as to what the other documents are, but

3    they're not related to the Oklahoma Tax Commission and the UCC

4    lien filing.  There may be other documents that he had before

5    that, such as the loan agreement or whatever.

6         But what Defendants' Exhibit Number 22 is, again, is --

7    the front page is Mr. Turner expressing that he has exercised a

8    voluntary repossession of the 2001 Freightliner Columbia, and

9    he put the VIN number on there, the certificate of title

10   number, and he also voluntarily repossessed a 2005 cargo

11   trailer, which was purchased with the money that came out of

12   those proceeds from Mr. Turner.

13        And the second page is the first page he received in an

14   envelope from the Oklahoma Tax Commission that was sent to him

15   after I went to the Garnett tag office in Tulsa and registered

16   the vehicle and executed the lien onto the RV at the same

17   moment it was first registered in my name.

18        The third document is the actual instruction and

19   registration form and a lien entry form that Mr. Turner

20   received in the mail in the envelope with the second page

21   attached to Defense Exhibit Number 22.  And this is dated

22   12/23/05, which is exactly the same time in which I registered

23   the vehicle for the first time in my name.

24        The third page -- fourth page, excuse me, is the

25   registration document that in Oklahoma, I believe, you're

LINDSEY SPRINGER - DIRECT EXAMINATION                247

```
 1   required to put in our records -- and in this particular
 2   instance, this is the copy for the lienholder to issue what's
 3   called a lien release in the event that he is satisfied -- he
 4   is authorized to then sign this document and give it to the
 5   next owner of the vehicle, which is standard -- in my
 6   experience dealing with vehicles in the past, that's a standard
 7   three-part form that the tag office uses.  There are three
 8   different colors.  And the one that Mr. Turner would have
 9   received would have been the light-blue one and the green one.
10        And then the last page of this exhibit is the envelope
11   from the Garnett tag office, not from Lindsey Springer, but
12   from the Garnett tag office to Mr. Turner in Michigan.  And I
13   believe the date actually appears December 27th on the
14   envelope.  It's just very difficult with the copier that we had
15   this morning to bring that out.
16        And those are all within the time periods that were -- was
17   evidence at trial.  And I would move to enter Defendants'
18   Exhibit Number 22 at this time.
19             MR. O'REILLY:  Objection as to relevance, Your Honor.
20             THE COURT:  I want to hear more about it before I
21   conclude that it's probative of anything one way or the other.
22   So the objection is overruled.  Mr. Springer's Exhibit Number
23   22 is received.  It remains to be seen, obviously, what
24   significance it has, and to that extent, what relevance it has,
25   but it is received.
```

LINDSEY SPRINGER - DIRECT EXAMINATION                    248

1              MR. SPRINGER:  The reason why I've entered Exhibit

2    Number 22 is because the government has suggested, although not

3    to a finding of the jury --

4              THE COURT:  Now you're lapsing into argument.

5              MR. SPRINGER:  Oh, I thought you were asking for

6    that.

7              THE COURT:  I'm hearing your testimony.  You may

8    resume your testimony.

9              MR. SPRINGER:  Okay.  It is my testimony that I did

10   not steal $250,000 from Mr. Patrick Turner, nor did I ever have

11   any intention to steal $250,000 from Mr. Turner.

12       And it is my testimony that the lien interest that he

13   acquired in the RV and now the trailer demonstrates the

14   security by which I planned the transaction, that at all times

15   I intended to protect, at that time, a short term -- ended up

16   being a much longer term, but a short-term interest in the RV

17   for Mr. Turner and his wife.

18       And the name in which the lien was placed and the address

19   in which was used was information that Mr. Turner gave me,

20   which does indicate at that time or that -- scratch that, I

21   just went to argument.

22       And Mr. Turner has now possession of the RV, possession of

23   the trailer, and is marketing and trying to sell the RV to

24   recover as much of the $250,000 as the economy currently will

25   allow him to recover.

LINDSEY SPRINGER - DIRECT EXAMINATION                    249

1     At no time did I ever tell anybody that they should

2   violate the Internal Revenue laws, nor did I take action in

3   furtherance of telling anybody to violate the Internal Revenue

4   laws outside the scope of what has been resolved as the jury's

5   verdict, so I don't -- I'm not giving that testimony rehashing

6   jury trial, I'm specifically speaking about in relevant conduct

7   and in directing others to violate the Internal Revenue laws,

8   that -- that there's -- there's no act that I know of where

9   anyone has said I took steps with them outside the conduct of

10  the indictment to further act in violating any Internal Revenue

11  laws.

12     I was never, to my understanding and knowledge, ever

13  required to file any -- any type of report involving the Turner

14  money.

15     At the time the wire of Mr. Turner's money was sent to

16  Mr. Stilley's account, IOLTA account, there was an agreement to

17  allow me to use the money but there was no agreement paying me

18  the money, as reflected in Mr. Gollihare's report section by

19  section of the agreement.

20     Your Honor told me yesterday that you did not need to hear

21  the Paperwork Reduction Act argument again, however --

22          THE COURT:  I didn't foreclose you from arguing.  I

23  said then, and I'll repeat, that there's nothing you can say

24  today about the Paperwork Reduction Act that will improve your

25  position with respect to sentencing.

1          MR. SPRINGER:  Thank you.  However, having said that,

2    I -- at this point, I'm going to enter evidence on the years --

3    the other years that are not covered within the indictment so

4    that I can make a record for the Tenth Circuit that I am

5    claiming the protection of the Paperwork Reduction Act on those

6    years as they relate to penalties -- in tax loss calculations

7    which results in a penalty that the Court eventually hands

8    down.

9       And Mr. Gollihare and the government both allege or state

10   that from 1990 through 1999, and then also 2006, 2007, and I'm

11   still a little lost on whether 2008 is part of this or not, but

12   I'm going to include it out of an abundance of caution, that

13   the Form 1040 for 1990, 1991, 1992, 1993, 1994, 1995, 1996,

14   1997, 1998, 1999, 2001, 2005 -- excuse me -- 2006, 2007, and

15   2008, each do not comply with the Paperwork Reduction Act.

16   They neither list any of the requirements at 5 CFR

17   1320.8(b)(3).  They are not on the face of the form, nor does

18   the form itself tell the public, which includes me, that I

19   am --

20          MR. O'REILLY:  Your Honor, objection as to relevance

21   to this line of testimony.

22          THE COURT:  I told Mr. Springer yesterday that if he

23   wants to talk about the Paperwork Reduction Act, that he will

24   be permitted to do so, and I said that again today.

25       Mr. Springer, you may not have understood me when I said

1  there is nothing you can tell me about the Paperwork Reduction

2  Act that will improve your position with respect to

3  sentencing.  In fact -- well, I'll leave it at that.

4       And bear in mind, you've already briefed it to a fare-

5  thee-well.  You argued it at trial, well beyond the time limits

6  that I initially imposed, so whatever record you need for the

7  Tenth Circuit, I just can't imagine what record you might need

8  that is not there.

9           MR. SPRINGER:  The only thing -- and I'm not

10 testifying now, I'm representing myself over here in making

11 that response, the only thing I'm doing is I'm making certain,

12 since it's in each year claimed that for each year that I am

13 being asked to be penalized in addition to the penalties, that

14 I have made those claims, and I draw my reasoning from the

15 Chisholm decision in 2007 --

16          THE COURT:  Mr. Springer, now you're lapsing into

17 argument.  As a matter of fact, go ahead and take the stand.

18 Standing there at the lectern is just too tempting for you to

19 lapse into argument.  So you'll complete your testimony on the

20 witness stand, please.

21     (DEFENDANT SPRINGER COMPLIES.)

22          MR. SPRINGER:  In conclusion, the -- I claim the

23 protection of Title 44, Section 3512, 1995 -- for the years

24 after -- '95 and after, and 1980s code provision from 1990 to

25 1994, and my assertion of that defense is the form does not

 1  comply.  And I'll leave it at that.  Thank you, your Honor.

 2      On Government's Exhibit Number 1160, there are two items

 3  in addition to the items listed on government's original

 4  Exhibit 675 at the jury trial.  And one is the very first

 5  listing, a $5,000 check from Believers Broadcasting

 6  Corporation.  And the last notation on the same Exhibit 1160 is

 7  the $12,000 that I testified about at trial.

 8      At no time did I ever say that in receipt of that $12,000

 9  that I was estimating annually did I ever say that I did

10  anything for anybody or that anybody expected anything in

11  exchange for that $12,000.  And for the purpose of sentencing,

12  Your Honor, I'm going by the Court's instruction on "gift" for

13  that.

14      As far as the $5,000 entry for Ken Guisendorfer, I

15  absolutely think that that is in error, that that should say

16  Carl Guisendorfer on it, because Carl Guisendorfer had not had

17  his stroke at that time.  And that's Government's Exhibit

18  Number 3 they listed out there.

19          MR. O'REILLY:  Your Honor, objection.  This is not

20  testimony, it's argument.

21          THE COURT:  Say that again, please, sir,

22  Mr. O'Reilly.

23          MR. O'REILLY:  Apologize, Your Honor.  At this point,

24  this is argument, not testimony.

25          THE COURT:  Overruled.

1          MR. SPRINGER:  Thank you.

2      And for that $5,000 from Carl Guisendorfer, I know of

3  nothing that I was expected to do or asked to do or did do for

4  that $5,000, whatsoever.  In fact, that just came in the mail

5  to me one day.  And it just is the way it happened.

6      For Government's Exhibit 1161, there are three items on

7  that exhibit that were not originally listed in government's

8  original Exhibit 676 and -- excuse me, I'm sorry, there were

9  four items.  I'm sorry.

10      I take no issue, for tax loss purposes, of the first two

11  entries of James Lake on the top two.  For the purposes of

12  getting to appeal, I concede those two numbers.

13      However, the last two from Sam Palmer for $10,000 and

14  again the various for $12,000, and I believe -- I know what I

15  heard yesterday from Mr. Shern, which is that Mr. Palmer said

16  he neither expected me to do anything for him for that money

17  nor did I do anything for Mr. Palmer for that specific money.

18      Turning to Government's 1162, there are three items that

19  are not on government's original Number 677 that was at trial,

20  and that is the first entry from Sam Palmer for 10,000 and then

21  the Windhill Management Company Trust for 400, and then the

22  12,000 not -- under various, which is the same as it was for

23  the last two exhibits, although they -- the second entry was --

24  the second entry was not on the original Government's 677, for

25  the purposes of appeal sentencing, I concede to the Arkansas

1  IOLTA foundation of Ernest Swisher, $9,436.

2      So I take exception with the first entry of 10,000 of

3  which there is no evidence that I did anything or promised

4  anything or there was an expectation of anything in 2002 by

5  Mr. Sam Palmer or Midsummer Farms for $10,000.

6      And then the same holds true with Windhill Management

7  Company Trust for $400.  I know of nothing that they either

8  ever asked me to do or that I did for $400 or for any amount of

9  that $400.

10      And then, again, the 12,000, there's absolutely no

11  evidence, nor do I know of any evidence, for the $12,000 that I

12  estimated that people were expecting me to do anything in that

13  estimation.

14      I couldn't even begin to say what increments that thousand

15  dollars a month could come in, whether it be $50 or $25 or $75,

16  every once in a while, it would be 4 or 500, and in a very rare

17  occasion it could be up at 5,000, as Mr. Guisendorfer's check

18  once was.

19      For Government's Exhibit Number 1163, which is for the

20  gross income for 2003, there are four entries with an

21  accidental asterisks by the various listing, which I don't

22  believe was intended, although it is trial testimony.

23      I do concede to Guy Frances under the theory of the

24  government's case, because I did meet Guy Frances on an IFC

25  conference call.  So even though that wasn't a part of the

1    government's theory for tax loss calculations under the jury's

2    verdict, I concede that amount.

3         However, on Larry Simmons, which is CR Foundation, I do

4    not concede the $7,500 that was not part of Count 3.  And the

5    difference between Guy Frances and Larry Simmons is that I did

6    convince Guy Frances in conversation to file his tax returns,

7    and under the government's theory, that means I gave him advice

8    and that's what makes that, under the government's theory, a

9    taxable event.

10        With Larry Simmons, at this time, in August of 2003, I was

11   having no conversations with Mr. Simmons, other than he would

12   be on a conference call, but there was no him talking to me and

13   asking me questions about what he should do.

14        In fact, the only interest I ever remember Mr. Simmons

15   having in anything I was doing whatsoever was related to the

16   IFC case out in Phoenix, Arizona, and I remember him saying

17   that that money was for my ministry or my mission, but he never

18   said -- or there was never any conversation with me telling him

19   what you need to do and him doing it or him contacting me back

20   at that time.

21        And that's what I can remember and that's what I know.

22   Even though -- and then, again, the various for $12,000 is the

23   same testimony from the other.

24        For Government's Exhibit 1164, there is a difference

25   between original Number 679 and 1164, and out of those

1    differences, I concede to Guy Frances' $4,000, and I concede to

2    Charles Looney's $10,500, but there's absolutely no evidence

3    that I did anything or was expected to do anything for Windhill

4    Management Company Trust for $500, which was Exhibit Number 43,

5    nor at the time of May 28, 2004, with Larry Simmons was I

6    expected to do anything in receipt of the $10,000, which is

7    Government's Exhibit Number 39.

8         So out of 130,000 on that 1164, besides the 12,000 on the

9    bottom, the 10,000 to Simmons -- or from Simmons and the 500

10   from Windhill Management Company Trust, everything else for the

11   purpose of the tax loss for sentencing is conceded at this

12   point.

13        So that would remove -- off of the 130,050, that would

14   remove $22,500 off of that number, which would leave that at

15   107,550.

16        And on Government's Exhibit 1165, I concede the Charles

17   Looney check under the same theory that I was prosecuted

18   under.  However, I do not concede --

19             THE COURT:  I'm sorry.  I didn't stay up with you.

20             THE WITNESS:  I'm sorry, 1165, Your Honor.

21             THE COURT:  Right.

22             THE WITNESS:  It's the second entry.  It says --

23   which was not on original Government 680, the Charles --

24   original Government's 680, the Charles Looney check for 13,000

25   was not on that chart and was not part of the 2005 theory they

LINDSEY SPRINGER - DIRECT EXAMINATION                    257

1  presented, but I do concede to that amount of money for the

2  purposes of sentencing based upon what I know I did do, which

3  was something in relation to Charles Looney's lawyer under the

4  theory that I was prosecuted under.

5      But the AC&R Group, which is Exhibit Number 1005, for

6  $6,000, I'm at a loss as to even who that is.  And whether that

7  hurts me or helps me in that regard, I know of nothing that I

8  ever did for AC&R Group that I can recollect or remember, nor

9  do I remember promising to do anything or exchanging anything

10 for that $6,000 on August 3, 2005.

11     Now, the original 680 had 252,000, and Government's

12 Exhibit 1165 has 296,500, and I just reduced that number by the

13 6,000.  And for the purposes of getting to sentence, 290,500 is

14 conceded on that.

15     Government's Exhibit Number 1166, for the purpose of

16 uncharged conduct only, I concede to the first entry of Patrick

17 Turner under a theory that I did convince Mr. Turner to file

18 tax returns and only for that reason, and that -- I'm not

19 saying that in conceding for the point that the 250,000 of the

20 transactions from Turner was gross income, I'm specifically

21 referring only to this $1,000 check and based upon the

22 government's theory.  I did concede on 1165 to the 192,000 and

23 the 58,000 from Mr. Turner and I'm not conceding that that was

24 part of the jury's verdict.

25          THE COURT:  Excuse me.

LINDSEY SPRINGER - DIRECT EXAMINATION                          258

1               THE WITNESS:  That's on 1165.  I'm sorry about that,

2     Your Honor.  I needed to be clear on that.

3               THE COURT:  Okay.  Now --

4               THE WITNESS:  On Patrick Turner, on Exhibit 1165, the

5     government has listed the -- basically the $250,000 transaction

6     as gross income to me, and for the purposes of arriving at a

7     tax loss calculation, I'm only willing to concede that 250,000

8     for the purposes of getting to a sentence, but I'm not

9     conceding that that was gross income to me for purposes of the

10    jury's verdict, nor was it ever gross income.

11         And under intention -- I understand the jury's verdict can

12    be construed, as Mr. Shern testified, to include the 250,000,

13    although I think it could be construed otherwise.  And on

14    appeal I'm going to test that vehemently.

15         I do, however, take exception with double-dipping on that

16    250,000.  I don't think it should be -- both put on as gross

17    income for Lindsey for 2005 and then also income that

18    Mr. Turner could have paid his taxes with on top of that.  So

19    I'm making myself clear there, I do not concede the 250,000

20    gross income per the jury's verdict.

21              MR. O'REILLY:  Objection.  Repeatedly answered, if

22    not asked.

23              THE COURT:  Overruled.

24              MR. SPRINGER:  I'm just making the record clear, for

25    purposes of the jury verdict, I do not agree they found the

LINDSEY SPRINGER - DIRECT EXAMINATION                    259

1   $250,000 was gross income to me, as Mr. Shern testified.

2       But for the purpose of sentencing, I do agree that the

3   250,000 could be used one time, either Mr. Turner could have

4   paid his taxes or attributing it to me, but I do not concede to

5   both for the purpose of sentencing only.

6       And now I'm back to 1166, and I'm sorry for that, that I

7   missed that spot.

8           THE COURT:  Okay.  I'm making some notes,

9   Mr. Springer, so if you would, just pause for just a moment.

10          MR. SPRINGER:  Sure.

11          THE COURT:  Thank you.  You may proceed.

12          MR. SPRINGER:  Back on Government's Exhibit Number

13  1166.  I concede I did something on the Patrick Turner for

14  $1,000 based upon the government's theory and the Court's

15  definition of "gift," and that holds true with everything I've

16  said here so far and everything I'm getting ready to say.

17      On the second entry, Herbert and Charlene Mott, $10,000, I

18  concede that I did do something for Denny Patridge under the

19  government's theory, so I concede that 10,000 for purposes of

20  appeal and sentencing.

21      I concede the 5,000 on the third entry from Denny

22  Patridge.  I concede the fourth entry from Beach Fire

23  Corporation, Lawrence Logsdon, based upon the government's

24  theory and for the purposes of sentencing and appeal.

25      I do not concede Believers Broadcasting Corporation's

LINDSEY SPRINGER - DIRECT EXAMINATION                    260

1   20,000.  I know of nothing that I did for Ken Guisendorfer, and

2   at this time, I'm certain Carl Guisendorfer had his stroke.

3        It is true that Carl Guisendorfer, in 2004, he did run

4   into difficulties with the Sales Tax Commission of the State of

5   Illinois because he had a hotel where he rented rooms for

6   whatever anybody wanted to give, and as a result of that, he

7   did not charge sales tax, and, therefore, the State of Illinois

8   was taking him to court, but he had a stroke and I am not aware

9   of any of the outcome specifically in that regard.  And that

10  time period, which was right before he had his stroke, I had

11  not received any money from Carl Guisendorfer and there are

12  none listed during that time period.

13       Le Roy Peaslee, I know nothing I did for Le Roy Peaslee.

14  I don't even remember that name.  For $250; I do not concede

15  that.

16       I concede the seventh entry, Denny Patridge, of 5,000, for

17  purposes of sentencing and appeal only.

18       I do not concede Hamlet Bennett, and I'm sure Mr. Shern

19  just misspoke on how Hamlet Bennett was introduced to Oscar

20  Stilley, but it was not through Lindsey Springer.  What I

21  learned later was that Hamlet Bennett was represented in a

22  criminal indicted case by Robert Bernhoft out of Chicago,

23  Illinois -- or excuse me, Wisconsin.  He just practices in

24  Chicago, which is where he was -- had an office, I think.

25       And what happened was Oscar Stilley was representing a guy

 1  named Bob Lawrence who was indicted in 2006, and a couple of

 2  days before trial for Bob Lawrence, the United States filed a

 3  motion to withdraw the indictment with prejudice, and the only

 4  defense that Mr. Lawrence was raising was the Paperwork

 5  Reduction Act as a defense.

 6       And a day after the dismissal, Mr. Stilley told me that he

 7  got a phone call from the U.S. Assistant Attorney, who offered

 8  to pay all of Mr. Stilley's fees in relation to the prosecution

 9  of Mr. Lawrence.  And that news traveled fast.

10       And what Mr. Bennett told me was, when he heard about

11  that, he immediately jumped ship from Mr. Bernhoft and hired

12  Mr. Stilley.

13       At the time that I received that $25,000, I was not told I

14  was expected to do anything, say anything, write anything

15  whatsoever.  And at no time have I ever had a conversation with

16  Mr. Bennett where he asked me to do something.

17       I heard his testimony at trial.  I can understand the

18  confusion about that money.  If I had not received money at

19  that size before, I probably would have questioned it, but as

20  we soon see, Mr. Bennett sends me some more money independent

21  of Mr. Stilley.

22       And, again, there's nothing that I know of that

23  Mr. Bennett asked me to do.  I do know, from talking to

24  Mr. Bennett, that he did have expectations of Oscar Stilley,

25  but Oscar Stilley only was representing him for a short period

1  of time, because he couldn't get in as his lawyer in Hawaii,

2  and so it was Mr. Stilley who referred Mr. Bennett to Alan

3  Richey and not Lindsey Springer.

4      And so I gave that testimony for clarification on what

5  Mr. Shern had said when he thought I was the one that

6  introduced him to Mr. Stilley; that was not true.  But I don't

7  believe Mr. Shern did that intentionally.

8           THE COURT:  Now, you're saying you're thinking that

9  Mr. Shern was mistaken when he said that he thought you

10  introduced --

11          MR. SPRINGER:  Yes, Mr. Bennett to Mr. Stilley.

12          THE COURT:  Well, Mr. Bennett himself testified that

13  -- well, actually, what Mr. Bennett testified to was that

14  Stilley put him in touch with you, is that --

15          MR. SPRINGER:  The first thing I got was a check for

16  $25,000 and I had never even spoken to Mr. Bennett whatsoever.

17  And then, from there, Mr. Bennett did call me and asked me

18  about the Lawrence case and asked me about what I was doing

19  with PenaltyProtestor and Paperwork Reduction Act, and I

20  expressed to him what I was doing -- no one really understood

21  why the government dismissed the case with prejudice.

22          THE COURT:  Well --

23          MR. SPRINGER:  And so that's all I ever had a

24  conversation with him about.

25          THE COURT:  My recollection, aided certainly by my

LINDSEY SPRINGER - DIRECT EXAMINATION                    263

1  notes, is that Mr. Bennett testified that at least initially,

2  if not throughout, he only spoke with you on the telephone.

3  Mr. Stilley is the one who put Mr. Bennett in touch with you.

4          MR. SPRINGER:  That's true.

5          THE COURT:  And then he proceeded to testify about

6  his retainer, about the $25,000 purported donation, evidenced

7  by Plaintiff's Exhibit 135, and then he also testified about

8  some of the IOLTA money going to Mr. Richey, and then

9  ultimately, at least in part, back to him; is that consistent

10 with your recollection?

11         MR. SPRINGER:  Yes, it is, Your Honor.

12         THE COURT:  Okay.  Proceed.

13         MR. SPRINGER:  The same holds true about the next

14 entry on Hamlet Bennett for 45,000 that I just testified to

15 about the first one.

16     The $500 from Sam Palmer I do not concede to.

17     Todd Guthrie's I do concede to for $500.

18     I do concede the Kent Hovind, Kent Hovind and Region (sic)

19 Bank Kent Hovind, $10,000 transaction in 2006.

20     I do not concede the $5,000 from Hamlet Bennett, which is

21 Exhibit Number 57.

22     I concede the Todd Guthrie.

23     I concede the Turner at 900.

24     I do concede the Dale and Cheryl Phillips, 7,500, and I do

25 not concede this 12,000 under various.

LINDSEY SPRINGER - DIRECT EXAMINATION                    264

1     So there were one, two, three, four, five items there that

2  I do not concede to for purposes of sentencing if we get to

3  appeal.

4     And then 1167, Government's Exhibit 1167, which is 2007.

5     I do concede the $100,000 on Ken Guisendorfer for 2007.

6     I concede the $400.

7     I do not concede the $20,000 from Ken Guisendorfer, which

8  is Item Number 3 and 4.

9     I concede all three Turners, but I do not concede the

10  various for 12,000.

11     So I did not concede to two Guisendorfers and one various

12  on that page.

13     Your Honor, may I have a moment to go to my table to get

14  something that I was going to testify about?

15          THE COURT:  Surely.

16          MR. SPRINGER:  I did not begin Bondage Breakers

17  Ministries and its mission until 1992.

18     I was not an ardent tax protestor in the late 1980s, nor

19  had I at any time in the late 1980s implemented a scheme

20  designed to conceal income and evade the payment of personal

21  federal income taxes.

22     As I testified at trial, had I been aware of the

23  definition of "gift" that the Court gave the jury, had I been

24  able to read that in the Tax Code, I would have structured my

25  affairs through Bondage Breakers Ministries completely

1  different than I did.

2      It is true that my mission is to get rid of the Internal

3  Revenue Service.  I believe getting rid of district directors

4  accomplished that on its own.  However, by 2005, I had stopped

5  with that mission, had decided that I could do -- all I could

6  do, I had done.

7      I did keep records.  I did not keep ledgers.  And the

8  evidence in this case showed how many records I kept.

9      And my definition of "record" is a receipt or evidence of

10  a transaction.

11      When I cashed checks, I used one place.  I had the option

12  of using 50 different places.  I had no option of opening up a

13  bank account under my social security number, because, at that

14  time, the IRS, if they had a lien against you, then the banks

15  were not interested in opening up an account with you.  In

16  fact, I had had two accounts closed because the banks were made

17  aware that the IRS had placed a lien notice against me.

18      At all times, I knew Mr. Delozier kept accurate records of

19  every transaction that I participated in, every one of them.

20  Even when I knew he was being audited by the IRS in 1997, I

21  continued to use Mr. Delozier all the way up until he closed

22  his business.

23      At no time -- and he told me they were summoning records

24  about me, and for 10 more years or 11 more years I continued to

25  use the place the government knew I did my banking.

LINDSEY SPRINGER - DIRECT EXAMINATION                266

```
1              THE COURT:  Hold on for just a minute.  Proceed.
2              MR. SPRINGER:  At no time was the phrase "donation"
3  or "gift" designed to mislead the IRS in any way.  And in most
4  instances, a large number of the transactions did not have that
5  notation on them, and I always had the option of handwriting it
6  in in the memo and I chose not to do it, because it's not
7  something that by putting it on the check changed anything
8  about the transaction.
9         At the time, in 1995 and 1996, when I began to learn the
10 difference between "donation" and "gift," I had been involved
11 in a lawsuit with the United States and several plaintiffs, and
12 the United States had appointed Robert D. Metcalf to speak to
13 me on behalf of the government.  Judge Holmes was the judge.
14        And I developed a relationship of being able to call
15 Mr. Metcalf on the phone and ask him questions not only related
16 to me, but in other people's lives, to try to help get them and
17 their situation straightened out.  I took his advice seriously
18 and I passed it along every time.
19        Truth be known, Mr. Metcalf probably helped save the
20 government literally tens of millions of dollars in taxes by
21 what he told me to tell people to do.  Whether they were late
22 or not did not matter, it was how could we get this person back
23 to a place where -- that they could go on with their life.
24        And Mr. Shern testified about why sometimes I would say
25 one thing to one person and sometimes something to somebody
```

LINDSEY SPRINGER - DIRECT EXAMINATION                    267

1  else, it was because I wasn't to form -- and I guarded against

2  forming their beliefs.  Whether it be what I believed, if they

3  asked me, I would tell them.  But I was not a promoter of my

4  beliefs to be their beliefs.

5      And I would always tell people that if you had gross

6  income, as Mr. Stilley stated, "adjusted gross income" is the

7  phrase that appears on the 1040 form, and Judge Pannell was the

8  judge in the case in Atlanta, who pointed out to Mr. Miller

9  that it was not gross income, but adjusted gross income, which

10 a person will determine whether they're required to file.  I

11 believe that with all my heart that that's an accurate

12 statement by Judge Pannell.

13     I was never ever assessed by the IRS or the United States

14 for tax years 1990, 1991, 1992, 1993, 1994 or 1995.  In

15 discovery, I sought to get it, and the answers that I received

16 from Mr. Metcalf and Mr. Strong is they are still looking for

17 it.

18     To me, an assessment is what the law says an assessment

19 is, not what I think it is.  An assessment is a summary record

20 recorded in the Office of the Secretary under 26 CFR 301.6301,

21 '02, and '03.  It's most commonly referred to as a RAC 006, as

22 mentioned in the Tenth Circuit Court of Appeals cases on the

23 subject.

24     In order for a lien to arise as a matter of law, there is

25 supposed to be an assessment recorded in the Office of the

LINDSEY SPRINGER - DIRECT EXAMINATION                              268

1  Secretary.

2         MR. O'REILLY:  Your Honor, objection.  This appears

3  to be argument and I'm not clear how it's relevant at this

4  point.

5         THE COURT:  Sustained on relevance.

6         MR. SPRINGER:  Okay.  I never received any notice and

7  demand for payment for 1990 through 1995 at my last known

8  address, which was 5147 South Harvard, Number 116, Tulsa,

9  Oklahoma 74135.

10    Defendants' Exhibit Number 19, page 1, shows the address

11 that the IRS used to mail me a notice of deficiency for 1990

12 through 1995, but that is not the address they used after

13 that.  That is why I received a release of lien certified by

14 the Secretary of Treasury when I asked for it.

15    I do concede that the word "volunteer" early on in my

16 ministry in 1992 and '93 was a word that I did use when I spoke

17 publicly, but I derived that word from the Commissioner's words

18 in the instruction booklet for '92 and '3.  It wasn't my word.

19 I stopped using that word when the Commissioner stopped using

20 that word in 1994.  The word still appears at 26 CFR 601.107,

21 but because it's not publicly stated, I don't use that phrase.

22         THE COURT:  Let me interrupt there with a question.

23 You've testified that you used the word "volunteer" because you

24 picked it up -- I don't know if it's from that cover letter

25 that comes from the 1040 or what, back in '92 or '93, but in

LINDSEY SPRINGER - DIRECT EXAMINATION                269

```
1   any event, you picked it up because it was the Commissioner's
2   word.
3              MR. SPRINGER:  Right.
4              THE COURT:  On that basis, did you suggest to other
5   people that compliance with the tax laws was voluntary?
6              MR. SPRINGER:  No, sir, I did not.  But what we did
7   do, a large group of us -- and I, in the initial phase, was not
8   the leader of this group, but there was 71 of us and we took
9   that issue into federal court to former District Court Judge
10  Michael Burrage.  We brought it to his attention what it said
11  and many of us wanted to know what that meant.
12      And once we got our -- the first time we asked, we had to
13  go back and do something administrative, and so he dismissed
14  without prejudice, and so then we did what he told us we didn't
15  do.  We went back and asked again, he gave us a ruling, and we
16  all abided by that ruling.
17             THE COURT:  When you say back in '92 and '93 you used
18  the word "volunteer," then tell me how you used it.
19             MR. SPRINGER:  In a complaint in federal court on
20  April 8, 1994, 71 of us signed a complaint using the word
21  "voluntary" from the Commissioner's words and asking the Court
22  was that correct.
23             THE COURT:  Proceed.
24             MR. SPRINGER:  I have not placed any assets in
25  anybody else's name but my own.  There is a house that I lived
```

1  in for 14 years, but I never placed that from my name into a

2  trust.

3      That property was purchased by a trust from the beginning

4  with money that was given specifically for that purpose.  There

5  were two women who gave us the money to put down for that piece

6  of property, and the objective was -- is that no matter what

7  happened to me, my family would always have a place to live.

8      The money that I received that was the subject of this

9  trial, whether it be purchasing cars or the RV, every one of

10 those vehicles was put in my name.  The government could have

11 seized that property at any time.  There was nothing stopping

12 it.

13     Mr. Rice filled out a complete report on the subject

14 matter and said that there was over $250,000 worth of assets

15 that he could seize at any time that he wanted to.  Why he

16 didn't has nothing to do with me.  He had the green light from

17 the word go.

18     I do understand now under the Court's definition of "gift"

19 why the government treats the income that I received as gross

20 income.  I don't really think -- well, I know I didn't fully

21 understand it, even at the time that I met with Mr. Shern and

22 Mr. O'Reilly on January 15, 2009.  And it didn't take the trial

23 to change my opinion, it took the Court's instruction that

24 changed my opinion.  And from 2006 forward, how I've answered

25 the questions as to tax loss on those charts is based upon the

1    Court's definition.

2        Mr. Hedberg was indicted in, I believe, 1997.  He had

3    absolutely no money and did not know what to do.  And he was

4    truly the first case that I ever witnessed from a criminal

5    context.

6        I was sitting in the pews and Mr. Hedberg was shuffling

7    papers around and he didn't know what to do and he turned to

8    me -- and I'm just watching.  He turned to me and he asked the

9    judge, could he come up and help me shuffle papers.  And the

10   judge said yes.  And that was my first experience with sitting

11   at a counsel's table, and I shuffled papers for two days for

12   Mr. Hedberg.

13       At no time during that trial did I ever ask to be paid any

14   money or was there any suggestion I was going to be paid money

15   at some future event.

16       I did not know when Mr. Hedberg got out of jail and I did

17   not know when his father died.  But when he called me and told

18   me that he and his father were not -- they did not get along

19   and he had this 111,000 check and he asked me if I would use it

20   for purposes that I was using money for already, why would I

21   say, no, I won't?  I had to say, yes, I would.  I would be a

22   fool not to receive that money in the very rare occurrences

23   that it comes in like that.

24       Two or three years ago, which this is 1997 when he's

25   charged; 1998 when he goes to trial; and late 1999 when his dad

LINDSEY SPRINGER - DIRECT EXAMINATION                    272

1  dies, he gets out of jail and gives me this check for

2  $111,702.  It wasn't until six or seven years later that

3  Mr. Hedberg did call me and start asking me questions, because

4  the State of Illinois was after him for not filing tax

5  returns.  And he did not like the answer that I gave him, which

6  was he needs to go file his tax returns.  But at no time did I

7  tell him to go file tax returns as an exchange for the $111,000

8  check that he gave.

9      I did find out for the first time in March of 2000, when I

10  introduced Oscar Stilley to Eddy Patterson, I did find out that

11  day that Oscar Stilley did not file tax returns.  But as

12  Mr. Gollihare reports, how Mr. Stilley and I got where we were

13  was two different paths.

14      We were -- he came from the Irwin Schiff position, which I

15  totally rejected, and I came from the position where I was only

16  going to accept money as long as I could accept it under the

17  form of a gift.

18      Mr. Patterson did ask both of us if we filed tax returns.

19  I responded that the way I get money I'm not required to

20  because I treat it as a gift.  I never told Mr. Patterson that

21  I received gross income and that I don't file tax returns.

22      I don't remember everything Mr. Stilley said in response

23  to Mr. Patterson's question, but I do remember Mr. Patterson

24  making the statement later on during his trial where he said,

25  Well, if Oscar Stilley doesn't have to file, then why do I?

LINDSEY SPRINGER - DIRECT EXAMINATION                    273

1   And that is the only conversation I ever remember about filing

2   tax returns with Mr. Patterson.

3        I am the person who convinced him to file his tax

4   returns.  I had to get him past abortion first, because that's

5   why he didn't want to file his federal tax return.  And that's

6   not an easy task when I, myself, am against abortion.

7        And the reason why he filed an extension request was

8   because I asked him to at least file something until he figures

9   out what he's going to do so he doesn't have any more problems

10  with filing.

11       I had nothing to do with him actually filing an extension

12  request.  I believe his CPA did that.  And there was a

13  coordinated effort between myself and the CPA to convince him

14  to file his returns.

15       The reason why they weren't filed until 2003 is because

16  unfortunately or fortunately, the person that I went and found

17  to -- which I referred many people to, was Cynthia Hess from

18  TU.  She had health problems and I didn't know that.  And so

19  she would work for a week and then she would be bedridden for a

20  month.  And she had some illness.  I don't know what it was.

21       But Barbara Hodsden, who also was referred by me to

22  Cynthia Hess, also testified that that was the one problem she

23  had with Cynthia Hess was getting her tax returns completed

24  faster because of her health problems.

25       So Mr. Patterson not filing his returns until 2003 for the

LINDSEY SPRINGER - DIRECT EXAMINATION                    274

1  year 2000, which should have been filed at least by October of
2  2001, had nothing to do with any act or conduct of Lindsey
3  Springer.  In fact, the opposite is true.  I was pushing him to
4  actually do it.  If you wanted to say I provided any service to
5  Mr. Patterson in 2000 and 2001 and 2002, that's it.
6      I was not privy to any of the representations of Oscar
7  Stilley.  With Mr. Patterson, they were all sealed grand jury
8  stuff going on.  I was not given documents.  I was not told
9  about things.  In fact, I didn't know Mr. Patterson was getting
10 indicted until after he got indicted.
11     The statement that Mr. Patterson hired me in 2003 when he
12 was indicted is erroneous.  And that I -- the statement that I
13 introduced him to Mr. Stilley in 2003 is also erroneous for the
14 criminal case.
15     Mr. Stilley had been billing Mr. Patterson for three years
16 prior to that indictment.  Mr. Patterson had three years of
17 knowing whether he wanted Oscar Stilley to represent him in his
18 criminal matters.  Mr. Patterson is the one who hired
19 Mr. Stilley to represent him in his criminal case, not Lindsey
20 Springer.
21     Mr. Patterson never hired me when he was indicted.  And
22 the records show and the evidence shows that it wasn't until
23 late July, when Mr. Patterson had a transaction of $112,000 in
24 money that he had received from cashing in some royalties, I
25 think the testimony showed, I did receive $15,000 from that

LINDSEY SPRINGER - DIRECT EXAMINATION                    275

1   money initially.  But I was never told it was because I was

2   being hired.

3        It is true in October of 2000 -- September and October of

4   2003, when Judge Eagan was assigned when Judge Cook stepped

5   down, that I did take a very active role in Mr. Patterson and

6   Mrs. Patterson's case, and that's because I felt sorry for

7   them.

8        At the time I did that, I had no idea that their errors

9   and omissions insurance policy was going to be bought for

10  500-and-some-thousand dollars a month later.  I had no clue.

11       And this is my trial testimony, but Dick Clark and I

12  together were out trying to raise money to pay for the

13  Pattersons' lawyers because they didn't have any.

14       When you go through a three-year investigation and the

15  bank shuts you down on everything by the IRS, you have no place

16  to turn to get money, which is usually customarily what I ran

17  into in every case that I either watched, witnessed, or in the

18  government's theory, provided a service in.

19       I did provide service to James Lake under the government's

20  theory, but James Lake is a liar.  Mr. Shern testified

21  yesterday that Mr. Lake did go to trial, did hang a jury, and

22  did go back a few days later and plead guilty.  Mr. Lake

23  testified that that did not happen at his trial.

24            THE COURT:  Now, say that again that you're

25  attributing to Mr. Lake's testimony.

LINDSEY SPRINGER - DIRECT EXAMINATION                    276

1          MR. SPRINGER:  Mr. Lake testified that he pled guilty

2    to charges caused because of Oscar Stilley's representations

3    and my representations to the jury, and Mr. Lake actually fired

4    Oscar Stilley -- since he, in my understanding, never had hired

5    me, there's no evidence of him firing me -- but we sat in the

6    back of the room and watched the first trial and watched

7    Mr. Lake lie through his teeth over and over again about

8    evidence.

9      I have a videotape that I prepared to play at the jury

10   trial of Mr. Lake of which I decided not to, which is -- has me

11   on it cross-examining Mr. Lake on why he doesn't file tax

12   returns, and I was trying to show --

13         THE COURT:  Let me interrupt there for the sake of

14   clarification.

15         MR. SPRINGER:  Sure.

16         THE COURT:  When you characterize Mr. Lake as a liar,

17   then, and suggest that he gave false testimony under oath,

18   you're referring to his trial, then, as opposed --

19         THE WITNESS:  No, no, no.  He sat in this chair and

20   said he pled guilty -- he looked at that jury square in the eye

21   and said he pled guilty solely because of the

22   misrepresentations of Oscar Stilley and Lindsey Springer and

23   that is not what happened.  Oscar and I were sitting in the

24   elevator, the Department of Justice lawyer in the case was with

25   us and told us that he was coming back on Monday after he hung

LINDSEY SPRINGER - DIRECT EXAMINATION                    277

1    the jury and he was going to charge him with obstruction of

2    justice for lying in that jury trial.

3           THE COURT:  On the subject of Mr. Lake, then, let me

4    inquire as to one matter that he did testify to last fall in

5    this case.  He said that, among -- obviously, among other

6    things, that you prepared documents on his behalf and

7    Mr. Stilley filed them and that he paid about $38,000 to you

8    and $65 or $70,000 to Mr. Stilley.  Do you take issue with

9    Mr. Lake's testimony on those points?

10          MR. SPRINGER:  Yes, but only to a certain degree.  I

11   did prepare three documents in their very basic stage and I did

12   forward those to Mr. Stilley.  I do believe one of them with

13   Mr. Stilley's amendments did get filed with the court.  The

14   other two, I don't know what happened.  But after that, there

15   was nothing that got filed that was accepted or received by the

16   court.  My understanding was Mr. Stilley was having a very

17   difficult time getting in that case.

18          THE COURT:  Very well.  You may proceed.

19          MR. SPRINGER:  And I would add one thing to that.

20   When I first met Mr. Lake, he sent me a boxful of documents

21   that he had filed in his criminal case, and I forward those on

22   to Oscar Stilley, and they were not drafted by me.

23       I did sit at counsel's table in the Swisher trial and I

24   did, during breaks, as I customarily had done in every case I

25   had been in, gave my opinion about anything that I saw to

LINDSEY SPRINGER - DIRECT EXAMINATION                    278

1   whoever would listen.

2       I did help in the initial phases with Art Hawkins.

3   Mr. Hawkins did lie about two things:  One, that I represented

4   him at his sentencing hearing, which was clearly and

5   erroneously stated, as his wife clarified; and, two, that I

6   told him I was a lawyer.

7       And there are two memos that Mr. Shern -- or the

8   government turned over to us interviewing Mr. Hawkins.  In the

9   first one, he admitted that he thought I was in a ministry on a

10  mission and the second one he said I told him I was a lawyer.

11      The influence of the government in that situation, it begs

12  the question of what motivated him to do that.  But I've never

13  told anybody I was an attorney, licensed or otherwise.  In

14  fact, I always get scolded because I tell people I'm twelfth-

15  grade educated.  Why do you tell people that, they would say.

16  And I would say that's because that's the truth.

17          THE COURT:  Mr. Hawkins testified that in this case

18  that he received a typewritten memorandum that was in evidence

19  as Government's Exhibit 204 and that this was, in his words, a

20  joint letter from Oscar Stilley and Lindsey Springer.  Do you

21  recall that letter or that memorandum?

22          MR. SPRINGER:  Yes, I do.  Yes, I do.

23          THE COURT:  And was his -- did he accurately describe

24  it as a joint letter from Oscar Stilley and Lindsey Springer?

25          MR. SPRINGER:  No.  But, Your Honor, Oscar did that

LINDSEY SPRINGER - DIRECT EXAMINATION                    279

1  because he didn't know the Hawkins.  I'm the one that
2  introduced him to the Hawkins.  And that's why he put it on
3  there.
4       For a short period of time, when Oscar was representing
5  Mr. Hawkins, Mr. Stilley would call me and ask me questions.
6  In fact, it became so routine, if you look on his billing
7  statements, he constantly was calling me.  And Mr. Stilley just
8  recognized that I will answer any question asked upon me.  I
9  took his calls just like I took anybody else's.
10          THE COURT:  Were you aware of the contents of that
11  letter at or at any time near the time it was given to
12  Mr. Hawkins?
13          MR. SPRINGER:  No.  But I was made aware of it
14  several months later, and at that point, there was nothing that
15  I could say or do about it.  And I really didn't even consider
16  it to be an issue because of where I was and what I thought at
17  that time, but I had nothing to do with my name being on that
18  letter -- that document.
19          THE COURT:  Thank you.  Proceed.
20       While we have a pause, I'll say, Mr. Stilley, if you elect
21  to testify during this sentencing proceeding, I will -- I would
22  be curious as to whether you concur with Mr. Springer's denial
23  of contemporaneous knowledge of this letter.
24       You may proceed.
25          MR. SPRINGER:  There are times when I would receive

LINDSEY SPRINGER - DIRECT EXAMINATION                    280

1  e-mails from Oscar asking me to read something, and nine out of
2  ten times I would read it and then I would either e-mail him
3  back and say what I thought or I would call him on the phone.
4       And what I didn't know was every time I did that he was
5  billing his client.  I understand why he did because that's
6  what lawyers do, but had I known that, I would have acted quite
7  differently on the subject.
8       I thought he was taking advantage of the resource of
9  whatever he thought was in my head or my ability or my thoughts
10 and not that that was translating to he was on the clock for
11 his clients.
12      When I learned that, obviously, as you can see in the
13 notation in his records, things changed, because the numbers of
14 Oscar-talked-to-Lindsey went from almost four or five or ten
15 times a day, possibly, to once a week.
16      I do agree I possess a special skill.  I don't know how I
17 got it, I don't know why I got it, but I can read through that
18 tax code and those regulations and remember them like there's
19 nobody's business.  And it happened after I read the Bible.
20 It's just something that happened.  I can't explain it.  It's
21 definitely not in my schooling or my chart, and the poison is,
22 once I read it, I can't forget it.
23      At no time did I ever use that special skill, though, to
24 cause anyone or persuade anyone to violate the Internal Revenue
25 laws.  Nine times out of ten, I found them -- they were just

1  confused with no one to talk to about it.

2      When I testified at trial, I did not commit perjury on the

3  witness stand.  The word "income" and the word "gross income"

4  and the words "adjusted gross income" all have specific meaning

5  to me.

6      Most of the public uses the word "income" and "gross

7  income" and "taxable income" and "adjustable income" as all

8  meaning the same thing, but each one of them means something

9  totally different in the law.

10     And so when I read the term "gift" in 1996 or '7 for the

11 first time, before that, I was using the phrase "donation

12 only," I went to Section 102, after being made aware of it by

13 Robert D. Metcalf, and it said that all gifts bequeathed in

14 inheritance are not included within the calculation of gross

15 income.

16     So although I considered gifts and donations to be income,

17 I did not consider them to be gross income under my definition,

18 which was what I was left to, because Congress didn't define it

19 and the Secretary of the Treasury has not defined it by

20 regulation.  And that is how I found the Duberstein decision to

21 help guide me.

22     So when I told the jury that I did not treat the money

23 people gave me as gross income, that was not the same as what

24 is being said I said in written form, which is I said I had no

25 income, all I received was gifts and donations, because all

1  gifts and donations are income, they're just excluded from the

2  calculation of gross income, under my understanding prior to

3  this trial.

4      During the trial, Mr. Patterson testified about three

5  checks that he gave me for $10,000 apiece and that he said I'm

6  the one that told him to put "donation" on the check.  And, in

7  fact, in the conversation I asked him to make certain that any

8  money he gave me was a donation.  But what I did not do is ask

9  him to write the letter that accompanied the check.  He did

10 that on his own.  And that letter specifically stated, "Please

11 accept this donation for your suffering of" -- whatever.  I

12 forget the exact words.  But I had nothing to do with

13 Mr. Patterson's insistence on the letter of donation.

14     Every time anybody ever asked me any questions, whether it

15 be Donna Meadors, whether it be Brian Shern, even

16 Mr. O'Reilly, I answered their questions to the best of my

17 ability at that time.

18     I never denied any of the transactions of money that was

19 given to me.  Never.  In fact, just like the $12,000 and the

20 word "various" on the government's charts, it's me -- what I'm

21 saying is what's being used.

22     I always thought that after I learned in September '05 the

23 government's position on the criminal side, at least what I saw

24 them -- Mr. Shern saying to me when he was interviewing me, I

25 always thought that that was a legal point of contention

LINDSEY SPRINGER - DIRECT EXAMINATION                    283

1   whether or not something was or wasn't a gift.  I did not know

2   it wasn't a gift until proven otherwise.

3        And I also always thought after that day, as I did

4   research, because it was so compelling and shocking of what I

5   went through that day, that there was no quid pro quo, there

6   was no this-for-that.  Whether they had given me money or not,

7   I would always help anybody if they called and asked me with

8   anything that I could help them with.  Sometimes they just

9   didn't like what I had to say.

10       I did not ever enter into an agreement with Oscar Stilley

11   in 2000 to do anything, except I agreed to help Dr. Roberts in

12   any questions that Oscar Stilley had.

13       And although Oscar is one of the attorneys, in a week's

14   time I could get a call from ten different lawyers in the

15   country.  And they weren't all the same.  I still get calls to

16   this day, I just have to reject them because of my bond

17   conditions.

18       I'll be quite honest with you, the Sentencing Guidelines,

19   especially the difference between the report that Mr. Gollihare

20   wrote and the government's objections, have confused me to the

21   point of just complete chaos.

22       If I'm disputing what the government has to say, then I

23   still have to deal with what Mr. Gollihare had to say because

24   they don't agree.

25       And although I'm not dissatisfied that they don't agree,

1  I'm glad that Mr. Gollihare is not a rubber stamp for the

2  Department of Justice.  I think that's a great thing that the

3  country needs to know.

4      But whether something is inside or outside relevant

5  conduct, Your Honor, especially on the conspiracy charge, it

6  just -- I've read Mr. Gollihare's report, I read

7  Mr. O'Reilly's objections to his report, and I guess I walked

8  out thinking I could do better.

9      I never abused a position of public or private trust.  To

10 the degree that we have any definition for those phrases, I

11 would never intentionally do that.  Understanding what the

12 guidelines explain that to be, I don't fit within those

13 guidelines.

14     I'm not aware of a single penny that I ever gave to Oscar

15 Stilley that had already been classified as gross income to

16 Lindsey Springer under the government's theory for the purpose

17 of Oscar Stilley holding that money so the government could not

18 get it, seize it, find it.

19     And in every instance, except one for -- I think there

20 were six money orders for $350 that Mr. O'Reilly asked me about

21 at trial -- any of the money that came from Mr. Stilley's IOLTA

22 account was never considered to be even gross income to me

23 until that check was written to me, whether it be the money

24 that Mr. Patterson, as Mr. Gollihare puts in his report,

25 directed Mr. Stilley to give me -- and that statement that I

 1   just made is notwithstanding the loan agreement of Mr. Turner
 2   and the way that has been characterized.  I obviously don't
 3   agree that was gross income or income.
 4       It never became -- as Mr. Gollihare puts in his report,
 5   there were parts of that agreement that never took place, like
 6   the -- there's a gift part of the loan gift agreement, and
 7   because Mr. Turner was never indicted, I never received any of
 8   that money as something I could keep.  This is why he claimed
 9   and took the RV back.  And that was the gift side of the
10   agreement, which, by the way, that agreement was written by
11   both Mr. Turner and myself.  That was not just written by me.
12           THE COURT:  Let me make sure I understand a point you
13   made with respect to Mr. Turner earlier today.  When was the RV
14   actually repossessed?
15           MR. SPRINGER:  April 6th is when he and his son came
16   down and picked it up and drove it back to Michigan.
17           THE COURT:  So a little over two weeks ago?
18           MR. SPRINGER:  Yes, sir.  As I explained to him, it
19   was such a hot button for me, I could say or do nothing about
20   it.  And he called me one day and asked me would I stand in his
21   way and I said absolutely not.
22           THE COURT:  Bear with me just a minute.
23           MR. SPRINGER:  Sure.
24           THE COURT:  You may proceed.
25           MR. SPRINGER:  Thank you.

1          MR. O'REILLY:  Your Honor, has Mr. Springer finished

2    his --

3          MR. SPRINGER:  I'm sorry, just one more second.  I'm

4    just about done.

5          THE COURT:  Very well.

6          MR. SPRINGER:  I know that it is not something the

7    Court said it would consider as relevant conduct, but I -- for

8    whatever weight it has, if it has any, in Washington, D.C., in

9    the Department of Justice, there are at least one and possibly

10   two or more people that know I have helped collect literally

11   millions of dollars for the United States that they would not

12   have had an easy task at collecting otherwise.  I know it's not

13   to the relevant side, but it is something that I would like the

14   Court to -- in Mrs. Hodsden's testimony, for example, she paid

15   her taxes solely because of me.  Mr. Sal Pizzino, solely, it

16   was completely at the other end of the spectrum, he paid his

17   taxes, interest and penalty on both, because of me.

18        Those are just a couple of examples that made their way

19   into the court case because those were people who actually gave

20   me large sums of money in comparison to others who did the same

21   thing but gave me no money.

22        But there are, literally, an uncountable number of people

23   over the last ten years that have at some times got angry with

24   me over it, but still went ahead and did it anyway.  And I just

25   thought that was worth making a factual presentation on.

```
 1        Your Honor, may I have just a moment with standby

 2   counsel?

 3             THE COURT:  Surely.

 4             MR. SPRINGER:  No further questions of myself, Your

 5   Honor.

 6             THE COURT:  There's one matter I'm going to inquire

 7   about before we have cross-examination, then we're going to

 8   recess for lunch.

 9        I'm going to hand the clerk a copy of Government's Exhibit

10   204 and I'll ask the clerk to hand it to the witness.

11        And I'll ask you, Mr. Springer, to review that exhibit and

12   tell me concisely -- this really doesn't call for argument or

13   any great deal of elaboration -- of whether there's anything in

14   this exhibit that you attribute to Mr. Stilley.

15             MR. SPRINGER:  No.

16             THE COURT:  Now, you say no --

17             MR. SPRINGER:  I'm actually the author of this

18   letter.

19             THE COURT:  Okay.  Okay.  Of 204?

20             MR. SPRINGER:  Yes, sir.  Yes, sir.

21             THE COURT:  Okay.  Very well.

22             MR. SPRINGER:  If you were referring to this letter

23   before, I was unclear on that.

24             THE COURT:  Okay.  So this was written by you?

25             MR. SPRINGER:  Yes, sir.
```

LINDSEY SPRINGER - DIRECT EXAMINATION                    288

1           THE COURT:  Now, tell me -- that is helpful

2   clarification.  Now tell me, then, to what extent did

3   Mr. Stilley have knowledge of this letter or its contents?  It

4   shows a fax header of December 16, 2002.  To what extent did

5   Mr. Stilley have knowledge of this letter or its contents at

6   the time that it was provided to Mr. Hawkins?

7           MR. SPRINGER:  I would have sent a definitely

8   watered-down version in answering Mr. Hawkins' questions, which

9   he asked reasons why he could go to Tom McQueen with

10  substitution-of-counsel request, and I'm not aware of what the

11  initial language was, but I remember having one paragraph.

12          THE COURT:  Perhaps you didn't understand my

13  question.  My question was very simple:  To what extent did

14  Mr. Stilley have knowledge of this letter or its contents at

15  the time that it was provided to Mr. Hawkins?

16          MR. SPRINGER:  Fully aware of it.

17          THE COURT:  We'll take our midday recess at this

18  time.  We'll recess for one hour.

19      Again, my watch doesn't quite agree -- well, actually,

20  it's -- I think maybe the clock on the wall has been adjusted a

21  little bit.  My watch is pretty close to the clock on the wall,

22  so be guided by the clock on the wall.

23      We'll resume at a quarter after the hour.

24      Yes, Mr. O'Reilly?

25          MR. O'REILLY:  Just for sequence, will Mr. Stilley be

```
1    crossing before the government?
2            THE COURT:  I think perhaps it would help move things
3    along in an orderly way for Mr. Stilley's cross-examination to
4    be next, if you have any cross-examination at all for
5    Mr. Springer.
6        Court will be in recess for one hour.
7            MR. SPRINGER:  Judge, may I show this to
8    Mr. Stilley?
9            THE COURT:  Surely.
10       (RECESS HAD)
11           THE COURT:  Good afternoon.  Mr. Stilley, do you have
12   any cross-examination for Mr. Springer?
13           MR. STILLEY:  Briefly, Your Honor.
14           THE COURT:  Very well.  Mr. Springer, you'll please
15   come back to the stand.
16           MR. SPRINGER:  Yes, sir.
17                           CROSS-EXAMINATION
18   BY MR. STILLEY:
19   Q.   How did you meet Art Hawkins?
20   A.   Paul Stumpo and Michael Burt were in his prayer group and
21   they all three contacted me after Art Hawkins received a PSR in
22   his case that said they were going to be getting 10 to, I
23   think, 15 years in prison.  And so after his lawyer told him
24   that's what he was going to get, the three of them called me,
25   and then I referred them to you.
```

LINDSEY SPRINGER - CROSS BY MR. O'REILLY                    290

```
1   Q.   And how did you introduce Oscar Stilley to Art Hawkins?

2   A.    Initially, it was with a phone call, and then

3   Mr. Hawkins -- after the phone call, there were things that

4   were memorialized in writing by the phone call at his request

5   and that ended up being the letter that we spoke about, Exhibit

6   Number 204.

7   Q.   And why was Oscar Stilley's name on that letter?

8   A.    It was -- Mr. Hawkins had requested that in his initial --

9   basically explained to him what you're going to do for him when

10  you take a lead role with Tom McQueen in his case.

11  Q.   Now, Mr. Hawkins did put some money in IOLTA for Oscar

12  Stilley, correct?

13  A.   I believe the evidence in this case showed that.

14  Q.   Did any of that money from Hawkins flow out of IOLTA to

15  you?

16  A.   I never received a dime out of any IOLTA account regarding

17  Art Hawkins.

18          MR. STILLEY:  Your Honor, could I have a moment?

19          THE COURT:  You may.

20          MR. STILLEY:  Pass the witness.

21          THE COURT:  Mr. O'Reilly.

22          MR. O'REILLY:  Thank you, Your Honor.

23                    CROSS-EXAMINATION

24  BY MR. O'REILLY:

25  Q.   Mr. Springer, you've testified that you were never
```

1  assessed by the IRS for the years '90 through '95?

2  A.   That is true, I never received an assessment from the IRS

3  from 1990 through 1995.

4  Q.   Haven't you, in fact, lost your civil court case with

5  respect to that contention and, in fact, you have been found to

6  owe that money?

7  A.   There were incomplete 4340s and that's the point on appeal

8  that Judge Kearns did not address.

9  Q.   The question was:  Did you lose that in the civil case?

10 Were you found to owe the money to the IRS?

11 A.   Judge Kearns ordered that they could seize the house that

12 I live in.  That was what that case was about.

13 Q.   When was that final action taken?

14 A.   March 3rd -- no, March 16, 2010.

15 Q.   So just over a month ago?

16 A.   That's true.

17 Q.   With respect to the reclaiming of the RV -- or the

18 claiming of the RV by Mr. Turner, first of all, you purchased

19 that in August of 2005, correct?

20 A.   August 15 or 16, 2005, that is correct.

21 Q.   You did not create the lien interest with respect to

22 Mr. Turner until December of that year; is that correct?

23 A.   Until I could register it, that's correct.

24 Q.   And that was after you were aware that the IRS was looking

25 at you criminally?

1   A.    Three months after, actually.  Yeah, I was aware on

2   September 16, 2005, when they raided my home.

3   Q.    Mr. Turner never sought to collect or to make a claim on

4   that lien in all the time until two weeks ago?

5   A.    No, actually, at least a couple of years ago, and I could

6   not make the payments anymore, he actually asked me to try to

7   sell it.  I testified at trial to that.  We just did not get

8   enough money offered.  And then in 2008, the economy really

9   went downhill quick and so we just paused on it.

10  Q.    I'm just wondering why would you -- why would he and you

11  wait until April of 2010 for him to finally come and pick up

12  this RV?

13  A.    Well, I would say it has something to do with this

14  criminal case and he also knew I had to vacate the house.

15  Q.    With respect to his criminal case?  Does he have --

16  A.    No, this criminal case we're in.

17  Q.    On your criminal case.

18  A.    And then I was ordered to leave a 20-acre piece of

19  property and there was just nothing else -- I couldn't just

20  park it anymore, what else can I do with it?  So I told him, I

21  said, look, I'm either going to have to put it in an RV park or

22  something like that and he said he would just come down and get

23  it.

24  Q.    Now, you went through and identified all of the checks

25  with respect to -- they're attributing to you as income in the

1    government's exhibits --

2    A.    As gross income.

3    Q.    As gross income.  That were not put into evidence at

4    trial.  And you've identified those -- for purposes of

5    sentencing, I think you concede are gross income?

6    A.    The ones I did concede to, I did concede based upon the

7    government's, you know, theory at trial.  I would agree that

8    they are gross income.

9    Q.    Why the caveat about the "government's theory at trial"?

10   A.    Well, for purposes of appeal, I'm maintaining that it

11   should have been at least a quid pro quo proof or -- there's a

12   case at the Tenth Circuit that says that somebody could give

13   you a certain amount of money, you could do something for it

14   but not earn the whole amount of money, and then the rest of

15   the money could be considered to be a gift.  And it was the

16   Church of Scientology case from the Tenth Circuit.

17   Q.    So you're taking issue with the jury instruction that was

18   given in this case?

19   A.    I am.  I'm not saying I didn't do anything, but I'm just

20   saying if it's all or nothing, for the purposes of right now,

21   which is what the judge said we're doing is all or nothing,

22   then it has to be all.

23   Q.    Wasn't the point of the jury instruction that you were

24   running a business that -- and these were receipts of the

25   business that you were putting to your personal use?

```
 1  A.   Yes.  And I think his gift instruction did get into that
 2  on page 2 quite heavily.
 3            MR. O'REILLY:  If I may have a moment, Your Honor?
 4            THE COURT:  You may.
 5            MR. O'REILLY:  Nothing further, Your Honor.
 6            THE COURT:  You may step down.
 7       Mr. Springer, do you have any further witnesses?
 8            MR. SPRINGER:  No, I do not, Your Honor.
 9            THE COURT:  Very well.  Mr. Stilley.
10            MR. STILLEY:  No witnesses.
11            THE COURT:  No witnesses at all?
12            MR. STILLEY:  Correct.
13            THE COURT:  Very well.  And does the government have
14  any further evidence?
15            MR. O'REILLY:  No, Your Honor.
16            THE COURT:  Very well.  Let me review where we are.
17  Frankly, I had -- and I'm not complaining, but I had thought
18  that perhaps the -- we might be a little later in the day
19  before we got to this stage, so let me explain to you where we
20  are.
21       As I have said more than once, there are some issues --
22  and I don't mean to foreclose argument on any issue at all, but
23  there are some issues on which I may be and certainly am
24  especially curious and especially receptive to getting the
25  benefit of argument from both sides.
```

1          We have -- and let me just review where we stand, and this

2   is simply as a means of setting the stage, if you will, for

3   arguments.  I want to hear arguments on these guidelines

4   issues.  Because I'm going to have to -- obviously am going to

5   have to rule on these guidelines issues.

6          That is not the same as allocution.  That's not the same

7   as either the government's or the defendants' final comments

8   before sentencing is imposed.  As a matter of fact, I need to

9   hear arguments and rule on those guideline issues before we

10  even get to the stage that I hear the government's and then the

11  defendants' final comments before sentence is imposed.

12         And then I need to -- with the benefit of those arguments,

13  I'm going to have to do some fairly careful consideration of

14  some of these issues.  And they are important enough to both

15  sides that I do not want to rule on the fly or anything close

16  to ruling on the fly.

17         So my -- and I hate to unnecessarily delay the completion

18  of this proceeding, but after I outline the matters on which I

19  see the need for the Court to rule, with the benefit of the

20  evidence that's been received, with the benefit of the

21  sentencing memoranda, certainly with the benefit of the

22  presentence report, and with the benefit of the arguments that

23  I will receive, that I will hear, I think I will probably need

24  to recess either -- and I doubt that it would be prudent to say

25  that we will resume and finish up today.  At the latest, we

1  will finish up at nine o'clock tomorrow morning.  Let me assure

2  everyone of that.

3       But there are some issues that do deserve a very careful

4  look.  I want to hear arguments and then I want to retreat, if

5  you will, to chambers and very carefully consider some of these

6  issues.

7       And for that reason, even with the pleasant surprise of

8  being finished with the evidence here before 1:30, I seriously

9  doubt that I will feel comfortable in making my final rulings

10 on the guidelines issues today and pushing the matter through

11 to a conclusion this afternoon.  We'll see, but that seems

12 doubtful to me.

13      We do have issues as to tax loss.  That certainly does

14 embrace a whole "cluster," I guess would be one word for it, of

15 issues as to tax loss both with respect to the defendants'

16 personal liabilities and with respect to the extent to which

17 they can be charged with tax liabilities of other individuals

18 for guidelines purposes.

19      I've named a few names.  For the guidance of the parties,

20 I have not reached a final determination -- and that's putting

21 it mildly.  I have not reached a final determination as to the

22 extent to which the defendants are accountable for the tax loss

23 relating to Mr. Turner or Mr. Patterson or Dr. Roberts, but I

24 will say I'm farther down the road in my evaluation of the

25 issues as to those three individuals and the extent to which

1  their tax situation can be attributed to these defendants than

2  I am with the new names that I have -- obviously had not

3  thought about in that context before we had the government's

4  presentation.

5      Well, the new names are Mr. Lake -- those are obviously

6  not new names to this case, but they are new names from a

7  third-party tax loss standpoint.  That would be Mr. Lake, and I

8  guess he's the only new name, so I certainly want to hear more

9  about that.

10     We've got the issue as to the omission of a criminal

11 source income adjustment.  I want to hear from the parties on

12 that.

13     We have the issue as to the possibility of a four-level

14 adjustment for Mr. Springer based on his aggravating role.  I

15 want to hear about that.

16     Off the top of my head, I think the government objected to

17 the admission of an adjustment for use of a special skill as to

18 Mr. Springer.  That's not even available if he gets a four-

19 level adjustment for an aggravating role.  So I would

20 appreciate some clarification on that from the government.

21     The government has objected also to the omission of an

22 adjustment for use of a special skill as to Mr. Stilley.  I'll

23 certainly be receptive to argument on that, although I think

24 perhaps argument from Mr. Stilley on that score would be more

25 important at this point, because I'm inclined to at this point

1  to agree with the government's position on that.

2      And then the defendants have objected to the use of the

3  2009 Guidelines Manual and obviously they're -- to some degree,

4  their positions are mirror images of the government's positions

5  with respect to tax loss issues, but not entirely.

6      The defendants have objected to the sophisticated means

7  adjustment.  I certainly will welcome argument on that.

8      The defendants have both objected with respect to the

9  obstruction adjustment.

10     And that's not an exhaustive list of the matters that are

11 in issue.  For instance, Mr. Springer has objected with respect

12 to the denial of a downward adjustment for acceptance of

13 responsibility.  I'm not particularly inclined to dwell on that

14 for a long time.  I'll hear whatever anybody has to say on it,

15 but I'm not inclined to dwell on that for a long time.

16     So, anyway, that's just a brief summary of some of the

17 more prominent issues, and even within them some issues are

18 more prominent than others.

19     And, again, I'm especially interested in hearing what the

20 parties have to say about the third-party -- the attribution of

21 third-party tax liability for tax loss purposes.

22     So with that, is the government prepared to argue the

23 matter?

24         MR. O'REILLY:  Yes, Your Honor.

25         THE COURT:  Very well.  You may proceed.

1          MR. O'REILLY:  Your Honor, before we begin, I would

2    like to ask the Court excuse Revenue Agent Brian Miller, if

3    that's permissible.  He may have already stepped out.

4          THE COURT:  He stepped out, reconsidered, stepped

5    back in.  You are excused.

6          MR. O'REILLY:  Thank you, Your Honor.

7      May it please the Court, the United States presented

8    during -- in its sentencing memorandum and its objections that

9    were filed in this case our explanation of how the defendants'

10   tax loss was determined for purposes of sentencing.

11     The defendants had the opportunity to present evidence

12   that would support a more accurate way of determining the --

13   what income should be attributed as income, what expenses they

14   were entitled to; they have chosen not to do that.

15     So we are left with what we have, which are checks that

16   have the inherent appearance of income, a number of which have

17   either through testimony or through the defendants' admissions

18   been shown to be income.

19     And under the bank deposits method of proof, this is --

20   when a better method is not available is, you know, a very

21   adequate, ample way of calculating the gross income of the

22   defendants from which 20 percent under the United States

23   Sentencing Guidelines is how you reach the estimated tax loss.

24     With respect to Mr. Springer, there were assessments made

25   despite his, you know, denials of the fact.  I mean, it's been

1    resolved in a civil case for the '90 through '95 years and

2    those are in evidence presented to this Court, and that is from

3    where the calculation -- the numbers come from for those

4    years.

5          If I could have 1178-A on the screen.

6          Mr. Springer, during his direct examination, went through

7    and identified specific and discrete checks to which he took

8    exception that were included in those calculations.

9          And the Court obviously has not had a chance, but I did

10   ask Revenue Agent Miller to go through and take those out and

11   recalculate the tax loss, assuming, just taking Mr. Springer at

12   his word, that those should not have been included, and that is

13   not something we concede, even were the Court to take all of

14   the items out that Mr. Springer identified as shouldn't have

15   been attributed as income to him, and even if the Court were to

16   exclude 12,000 a month -- excuse me, 12,000 a year of cash

17   income, and even if the Court were to exclude third-party tax

18   losses of Mr. Patterson and Mr. Lake, Mr. Springer's tax loss

19   would still exceed a million dollars.

20         And I'll now, you know, explain why we think third-party

21   tax losses are attributable with respect to each of the

22   individuals.

23         I'll start with Dr. Roberts.  And, again, as the Court

24   noted, Dr. Roberts is only attributed to Mr. Stilley.  In the

25   early 1990s -- I believe the testimony at trial was, in 1990,

1    Dr. Roberts was one of a number of people who questioned the

2    validity of the tax laws.  And he went to who he understood to

3    be an expert on the tax laws, a lawyer by the name of Mr. Oscar

4    Stilley, and asked him if he was correct.  Hey, I don't want to

5    file a tax return.

6         And Mr. Stilley, instead of setting him straight,

7    Mr. Stilley told him, no, you don't -- you don't have to file.

8    He gave counsel that was followed by Dr. Roberts that led to

9    Dr. Roberts willfully failing to file tax returns for a series

10    of years.

11         And that is, under the guidelines, relevant conduct

12    because it is counsel that led to a tax loss.  And it wasn't

13    like Dr. Roberts went to his neighbor, the plumber, or his

14    neighbor, the mailman, he went to whom he understood to be a

15    professional, a lawyer, and, in fact, somebody who had a

16    proclaimed expertise in tax.

17         Unfortunately, Dr. Roberts went to Mr. Stilley.  But that

18    is why the government's position is that Dr. Roberts' tax loss

19    is absolutely attributable to Mr. Stilley under relevant

20    conduct rules under Sentencing Guidelines.

21              THE COURT:  Well, when -- when was this advice or

22    counsel given by Mr. Stilley to Dr. Roberts, vis-a-vis, the

23    years that the tax liability would have arisen?

24              MR. O'REILLY:  Before, Your Honor.  It was in 1990 or

25    1991, based on Dr. Roberts' testimony at trial.  The tax years

1  that we're talking about for Dr. Roberts are --

2       If I could have Government's Exhibit 1177, page 2.

3       The tax years with respect to Dr. Roberts are 1992, 1993,

4  1994, and 1995; all tax losses occurring after receiving the

5  advice and counsel of Mr. Stilley.

6       With respect to Mr. Patterson.  Together, Mr. Stilley and

7  Mr. Springer met with and spoke with Mr. Patterson, who was

8  already a non-filer.  He had not filed since the mid to -- the

9  mid-1990s.  That conduct is not attributable to the defendants;

10 they hadn't met him yet.

11      But in 2000, in the year 2000, they did meet with

12 Mr. Patterson.  I believe the cause of that meeting was

13 because, as Mr. Patterson said, he learned he was under

14 criminal investigation and he sought counsel.

15      Again, as Mr. Stilley had with Dr. Roberts and with

16 Mr. Springer at his side, these two gave criminal advice.

17 They, together, encouraged Mr. Patterson to continue not filing

18 tax returns.  And, unfortunately, Mr. Patterson followed that

19 advice.

20      He did file a request for extensions but the tax return

21 that was filed for Mr. Patterson did not get filed until the

22 year 2003, well after the statutory due date.

23          THE COURT:  Now, was that -- and this will show you

24 my -- the fact that there's always a potential for not keeping

25 these straight.  Mr. Patterson did request extensions, is that

1  the one where we had the transcript that shows two extensions

2  and then a return filed, and there's some question as to

3  whether that was a return prepared for him by the IRS or is

4  that somebody else?

5           MR. O'REILLY:  I don't think that there's any issue

6  about who prepared the return.

7           THE COURT:  Who prepared the Patterson returns?

8           MR. O'REILLY:  I believe the testimony in evidence

9  was it was Cynthia Hess.

10          THE COURT:  Okay, Hess.  That's somebody else, then,

11 where we had that.

12     So your argument, then, is based on the evidence

13 presumably that the defendants met with Mr. Patterson in 2000,

14 encouraged him to continue to not file; is that right?

15          MR. O'REILLY:  Yes, Your Honor.

16          THE COURT:  But he ultimately did file with the help

17 of Ms. Hess?

18          MR. O'REILLY:  He did, Your Honor, but, again, not

19 until 2003, and the crime of willful failure to file and the

20 tax loss would have occurred as of the expiration of the last

21 extension, which was in October of 2001.

22          THE COURT:  So -- and that raises a point that's

23 crossed my mind in one or two contexts, and that is, is there a

24 date as of which the Court should determine that a tax loss

25 occurred, even if for that tax year the taxpayer ultimately

1  made things right?

2          MR. O'REILLY:  Yes, Your Honor.  And that would be

3  the due date of the return, whether it's by extension or by,

4  you know, not filing of any return at all, which would be April

5  -- usually April 15th.

6      I do believe that under the law, technically, if you file

7  an extension, you're supposed to file your estimated payment at

8  that time, as well, but it's not the government's position that

9  if a return hadn't been prepared whether or not that could have

10  been done.

11      If Mr. Patterson had filed his return and paid his taxes

12  by October 15th of 2001, this would not be an issue.  It would

13  still be an issue with respect to counseling someone to violate

14  the law under a different section of the Sentencing Guidelines,

15  but it would not be tax loss attributable to either of the

16  defendants if, in fact, the taxes -- the tax return had been

17  filed and the taxes paid timely.

18          THE COURT:  So the government's position is that once

19  a tax liability becomes delinquent by virtue of the advice of a

20  defendant, once a third-party's tax liability becomes

21  delinquent, that perfects the tax loss, even though that tax

22  liability is ultimately satisfied?

23          MR. O'REILLY:  If it becomes willfully delinquent,

24  Your Honor.  For example, if Mr. Patterson had, you know, filed

25  an extension request in a letter saying, I have no money, I

1   will pay you as soon as I can, there was no evidence of willful

2   failure to file, that would be a different question.

3        But the evidence in this case was that Mr. Patterson

4   wasn't filing tax returns, and the only thing that got him

5   around to filing a tax return was the fact that he was being

6   criminally prosecuted, and that didn't happen until 2003.

7        If instead the situation -- if there was no evidence that

8   Mr. Patterson had willfully not filed his return and willfully

9   not paid, again, that would not be a tax loss, even if there

10  was a tax, because it -- it would be a criminal question.  Just

11  the mere existence of a tax liability is not -- it's not the

12  government's position that the mere existence of a tax

13  liability by itself --

14             THE COURT:  So if the defendants induced him to

15  willfully fail to file as of April 15 of any given year and --

16  or at least encouraged him to failure to file, and, in fact, he

17  did for whatever reason willfully fail to file, and for this

18  purpose we'll assume that that failure was at least in part due

19  to the counsel or advice from the defendants, then as long --

20  do I understand you to be arguing that as long as that

21  violation that we'll say occurred as of April 15th of the year

22  when the return was due -- as long as you have that willful

23  violation with a resultant tax loss as of that day, then it

24  makes no difference for the tax loss determination under the

25  tax loss guidelines that the tax liability was later satisfied

306

```
 1   for that year; is that right?
 2           MR. O'REILLY:  Absolutely, Your Honor.  In fact,
 3   under the guidelines, it speaks to that, that you cannot cure a
 4   tax deficiency by a subsequent payment.
 5           THE COURT:  Okay.  I need you to educate me on that,
 6   because I'll have to admit that I haven't really focused hard
 7   on that.
 8           MR. O'REILLY:  I apologize, Your Honor.  I should
 9   know this off the top of my head.  Your Honor, it is --
10           THE COURT:  2T1.1?
11           MR. O'REILLY:  Yes, under the Notes Number 5:  "The
12   tax loss is not reduced by any payment of the tax subsequent to
13   the commission of the offense."
14           THE COURT:  Okay.  I'm looking at application --
15           MR. O'REILLY:  It's before the commentary.  The last
16   item before the commentary under 2T1.1, Your Honor.
17      If it please the Court, if I get the ELMO, I can actually
18   put this on the screen.
19           THE COURT:  Okay.  That's -- hold on.  That's
20   actually guideline language, not an application note.
21           MR. O'REILLY:  I apologize, Your Honor.
22           THE COURT:  And that would be, "The tax loss is not
23   reduced by any payment of the tax subsequent to the commission
24   of the offense."
25           MR. O'REILLY:  Yes, Your Honor.
```

```
 1              THE COURT:  So your contention is, as long as you
 2   have that as of April 15th or whatever the due date might have
 3   been, then the tax loss is perfected and is not cured by later
 4   payment?
 5              MR. O'REILLY:  Correct, Your Honor.
 6              THE COURT:  Okay.  I understand your point.  Go
 7   ahead.
 8              MR. O'REILLY:  Thank you, Your Honor.
 9         I'll now move on to Mr. Lake.  And similarly to
10   Mr. Patterson, Mr. Lake testified, both before the grand jury
11   and in the trial, and he stated that the defendants together --
12   and, again, this was the person -- Mr. Stilley, who Mr. Lake
13   had hired to be his attorney, and a person who Mr. Lake
14   understood to be an expert in tax matters and other legal
15   matters in the person of Mr. Springer, and that, together, they
16   advised him that he had no legal obligation to file a tax
17   return.
18         Similarly, to Mr. Patterson --
19              THE COURT:  Okay.  Now, let's pay attention to timing
20   on that.  And let's start with Mr. Lake's testimony.  Okay.
21   Here is my beginning point, and if my beginning point is
22   apparently not correct, then you can set me straight on that.
23   But my beginning point is Mr. Lake's testimony that he called
24   Mr. Springer in October of 2000, he was charged with willful
25   failure to file for '94 through '96, and this is very spotty.
```

1   I mean, he gave pages and pages of testimony and my notes are

2   very spotty.

3        But Mr. Springer said he would hire either Mr. Stilley or

4   Mr. Barringer.  Mr. Springer said his fee would be $30,000 and

5   the attorney fee would be charged separately.

6        Then there was a conference call between Messrs. Springer,

7   Stilley and Lake.  $10,000 was sent to Mr. Springer in

8   November.  Maybe another $10,000 check.  Ultimately, about

9   38,000 was sent to Mr. Springer and 65 to 70,000 was sent to

10  Mr. Stilley.

11       So, anyway, the time frame is they didn't know each other

12  until the fall of 2000 and Mr. Lake was charged with the

13  willful failure to file in '94 through '96.

14       Now, if I'm wrong about that, then you need to correct me

15  on that, and then give me what else you might have to say on

16  that score.

17            MR. O'REILLY:  Your Honor, the tax loss with which we

18  have attributed Mr. Springer and Mr. Stilley as relates to

19  Mr. Lake is only for the year 2000, not his prior willful

20  failure to files.

21       Similarly, Mr. Patterson -- Mr. Lake was a chronic

22  non-filer.  He went to two individuals who he understood to be

23  professionals, experts in the tax law.  Unfortunately, Mr. Lake

24  received similar advice to Mr. Patterson, which is, you're

25  right, there's no legal obligation to file a tax return.

 1        And at least, in part, on that advice, he willfully failed

 2   to file a tax return for the year 2000.  That is the only tax

 3   loss that is exhibited in the government's exhibits, and that's

 4   under 1143, which is the assessment with respect to that year,

 5   the accounted transcript for that year for the IRS.

 6             THE COURT:  Speaking of transcripts, has Mr. Lake's

 7   trial testimony been transcribed?

 8             MR. O'REILLY:  No, Your Honor.

 9             THE COURT:  Go ahead.

10             MR. O'REILLY:  With respect to that, that occurred --

11   due date for that return upon which this tax loss would have

12   been due and payable was April 15th of 2001 or thereabouts.  I

13   don't know if it fell on a Saturday or what.  But that due date

14   was after his consultation and encouragement by the

15   defendants.

16        And that is why the government's position is that that tax

17   loss can be attributed for sentencing purposes to the

18   defendants under both the related conduct as a specific matter

19   to the defendants, but also as part of the conspiracy to

20   defraud the IRS, because together jointly they were encouraging

21   this type of criminal behavior.

22        Mr. Turner is a very different situation.  As was pointed

23   out in the direct exam of I think both the government's

24   witnesses, these are for early years, '99 through 2003, for

25   which there's no evidence that either defendant knew Mr. Turner

1  at that time.  Possibly in 2003, but I don't know that it was

2  that early.

3      But that's not why these are attributed to Mr. Turner.  I

4  mean, Mr. Turner --

5          THE COURT:  Tax liability -- I think this is

6  summarized in your exhibits, but just for the sake of

7  discussion, the tax liability that adds up to and comprises the

8  dollar amount involved here with respect to Mr. Turner is for

9  '99 through '03; is that right?

10         MR. O'REILLY:  Yes, Your Honor.  And the total amount

11  of that is $145,713.

12         THE COURT:  All right.

13         MR. O'REILLY:  But as was brought out both at trial

14  and here in the sentencing hearing, Mr. Turner sought to hide

15  that money and prevent the IRS from collecting on those taxes.

16  To that end, he borrowed -- he took mortgages against two

17  properties that he owed so that there would be no interest --

18  no equity interest for the IRS to be able to attach, and he

19  then took that money and put it where he thought -- he hid by

20  making it look like a payment to Mr. Stilley for legal

21  representation, and this was done at the encouragement and

22  urging of Mr. Springer.

23      It's just textbook evasion of payment.  There was a tax

24  due and owing, and in an attempt to evade the payment of that

25  tax, Mr. Turner hid the money by borrowing against two houses

1  and then taking that money and sending it to an attorney so it

2  looked like a legal payment.

3     And we think that's a clear-cut case of evasion of payment

4  and that's why these tax losses are attributable to both

5  defendants.

6          THE COURT:  Okay.  And those IOLTA transfers occurred

7  approximately when?

8          MR. O'REILLY:  Transfers into the IOLTA account for

9  Mr. Turner occurred in August of 2005, the first one I want to

10 say around August 11th and then the other one was about a week

11 later.

12    And as Mr. Turner testified, his understanding was that

13 they were going to keep it safe for him, that Mr. Springer was

14 going to keep this money safe, so that if he needed a lawyer --

15 because he was fearing that the IRS will come grab it -- that

16 it would be available for him.

17    Unbeknownst to Mr. Turner, Mr. Springer already had his

18 eye on a very expensive motor home which he purchased before

19 even receiving the second payment.  He also bought a Lexus upon

20 which Mr. Turner received no lien interest at any time.

21    With respect to the third-party tax loss, if the Court has

22 any further inquiry, I'm happy to address it, but that is the

23 government's theory on why those third-party's tax losses can

24 be attributed to the defendants.

25          THE COURT:  Now, Mr. Turner's testimony was, as of

1  last fall, when he testified that none of the quarter-

2  of-a-million dollars had been paid back by Mr. Springer, is

3  your recollection of his testimony any different?

4          MR. O'REILLY:  No, Your Honor.  Mr. Turner was quite

5  clear that none of the principal balance of the 250,000 had

6  been repaid.

7          THE COURT:  Okay.  Well, now, Mr. Springer says that

8  whatever might have been argued about the bona fides of that

9  transaction, based on the facts as they were, until earlier

10 this month, the bona fides are proved up by the repossession of

11 it, which shows that it was a bona fide lien and that it was

12 not a criminal source transaction at all, because the

13 repossession of it shows that it was intended to be just

14 exactly what Mr. Springer asserts that it was.  What do you say

15 to that?

16         MR. O'REILLY:  Your Honor, I think actually this is

17 the most recent act of the conspiracy.  The IRS is attempting

18 to collect on the debt of the tax liabilities for '90 through

19 '95; to that extent, they have actually foreclosed on his house

20 and likely would have been seeking to seize the RV.

21     This -- the fact that this occurred did not -- no transfer

22 occurred until April of this year, two weeks ago, immediately

23 before the IRS is attempting to seize property to satisfy

24 Mr. Springer's tax liabilities.  I think that's extremely

25 telling.  If this had been a bona fide loan or a bona fide

```
1   lien, Mr. Turner would have gotten that RV years ago.

2        The only reason --

3              THE COURT:  Now, this is apropos of nothing, but does

4   Mr. Turner still have some tax liability?

5              MR. O'REILLY:  Yes, he does, Your Honor.  In fact, he

6   recently, as I believe was noted in the government's sentencing

7   memorandum, he recently lost in tax court, and who knows, he

8   may use this to help pay that.

9              THE COURT:  That RV is kind of hard to miss, it's --

10             MR. O'REILLY:  I agree, Your Honor.

11             THE COURT:  It's not your average Winnebago.

12             MR. O'REILLY:  Certainly hope the IRS does their job

13  and does seize it; however, that would not change the fact that

14  as of 2005, when the monies were transferred, this was

15  attempting evasion of payment.  Any subsequent collection of

16  payment, either voluntary or involuntary, doesn't change that

17  fact.  And I think Mr. Springer would rather have Mr. Turner

18  have the RV than the IRS.

19             THE COURT:  I doubt that even Mr. Springer would

20  contest that.

21        Go ahead.

22             MR. O'REILLY:  And Your Honor is, I think, fully

23  conversant with the government's position on criminal source

24  income.  If you have any questions on that, I'm happy to

25  address them, but --
```

314

```
 1            THE COURT:  Well, you're hanging your hat on Section
 2  1343?
 3            MR. O'REILLY:  Yes.
 4            THE COURT:  Okay.  Very well.
 5            MR. O'REILLY:  Your Honor, with respect to role in
 6  the offense, I think the evidence at trial and as brought forth
 7  in the sentencing hearing has shown that this was an extensive
 8  scheme.
 9            THE COURT:  So you're not going to give up the four
10  points and take the two that might be available as to
11  Mr. Springer on special skill?
12            MR. O'REILLY:  Your Honor, actually, our position
13  with respect to Mr. Springer is it's abuse of position of
14  trust.
15            THE COURT:  Okay.
16            MR. O'REILLY:  More than a special skill.  Not that,
17  as he readily admitted, he has special skills, but we think
18  that the four points are appropriate.
19      We also think that, under the guidelines, an abuse-of-
20  position-of-trust enhancement is appropriate, and I'll get to
21  that in a moment.
22      But with respect to role in the offense, as the case law
23  is clear, and, again, we've detailed this in our sentencing
24  memorandum, even if there weren't five or more participants in
25  the conspiracy, I think the Court could find that there were.
```

1          THE COURT:  Well, I'm not with you on that.  So

2   there's those last three words, "or otherwise extensive."

3          MR. O'REILLY:  That's where I will go, Your Honor.

4   When you are telling people that you are a ministry and

5   encouraging -- and getting them to write checks to that effect

6   and to get them to pay you monies to denote "gift" or

7   "donation," when you are, in fact, performing services for

8   them, you are engaging people, albeit, quite likely,

9   unwittingly, in your scheme, and he had a lot of people that

10  were doing this.

11      As indicated at trial, there were people participating on

12  the telephone conference calls, there were people going to his

13  Web site.

14      And as indicated by the blog that has been following this

15  case, there is a great deal of interest in this matter, because

16  there are a lot of people who are -- who listen to

17  Mr. Springer.

18      And to the extent that Mr. Springer has told them to file

19  tax returns, great.  I am glad that he has, because he's helped

20  some people avoid either civil liabilities or criminal

21  prosecution.

22      But that's not what this case is about.  This is about

23  where he was willfully not paying his taxes, evading his taxes,

24  conspiring with Mr. Stilley.

25      As the jury has found -- and this isn't even -- it's not

 1  up for dispute, the jury has determined this:  It was income,

 2  gross income, or whatever you want to call it.  He had a tax

 3  liability, and as the government has indicated, for sentencing

 4  purposes, it appears it is well over a million dollars, with

 5  everything included.

 6       But this is not somebody who just did their -- you know,

 7  this is not Mr. Stilley and Mr. Springer acting on their own,

 8  it wasn't just a two-party conspiracy and nobody else

 9  involved.

10       Mr. Delozier was effectively roped in by allowing

11  Mr. Springer to cash checks that were not made payable to

12  Mr. Springer but to this entity, Bondage Breakers Ministry, and

13  he did that because he trusted Mr. Springer.

14       And as Mr. Delozier testified, these checks -- you know,

15  he had a very low bounce rate on these checks.  They tended to

16  be good.  So Mr. Springer was a very good customer for him.

17       But we do believe that the four-level increase is

18  warranted given the number of people that were either wittingly

19  or unwittingly brought into the scheme through the actions of

20  the defendant, Mr. Springer.

21       We don't think that the role in the offense with respect

22  to this case is appropriate with respect to Mr. Stilley, as

23  indicated in our sentencing memorandum.

24            THE COURT:  Now, you and the probation officer don't

25  see eye to eye as to the scope of the activity that is fair

1   game for treatment as relevant conduct under -- what is it --

2   3B1.1?

3          MR. O'REILLY:  Correct, Your Honor, Mr. Gollihare and

4   I, we disagree.

5          THE COURT:  And so on one hand, there is an approach

6   that would suggest that at the end of the day we have to bear

7   in mind that these are tax offenses and that the indictment

8   charges tax offenses relating to these individuals' own taxes,

9   and to some degree, obviously, as between the two of them, but

10  that the heart of the case certainly was not the tax liability

11  of third parties, and that for that reason, either under the --

12  an analysis of the defendants' own conduct, or for that matter,

13  the jointly-conducted criminal activity, we don't encompass, if

14  you will, the activities of these defendants in generating

15  income, however blame-worthy they might be for not paying tax

16  on it, we don't rope them in for -- with respect to what they

17  did to generate the income.  That was not part of the

18  conspiracy.  It's not part of any jointly-undertaken criminal

19  activity.

20       And for that reason, that -- the government's theory is

21  unsustainable insofar as it seeks to hold these defendants

22  accountable for the third party's tax liabilities, because,

23  after all, that was just income-generating activity.  They

24  should have paid taxes on it, but it was just income-generating

25  activity.  Or for that matter, with respect to the Court's

 1  assessment of the aggravating role, was it otherwise extensive,

 2  that we also cannot get outside the realm of what was truly

 3  their relevant conduct for determining whether the activity

 4  that Mr. Springer orchestrated was "otherwise extensive."

 5       I'd like you to address that.

 6            MR. O'REILLY:  Your Honor, actually, we do believe

 7  this is a conspiracy to defraud the Internal Revenue Service.

 8  At trial, the primary focus was directed at the tax liabilities

 9  with respect to Mr. Springer.

10       In part, Mr. Stilley's tax liabilities received only

11  cursory mention because he's from Arkansas, there was no venue

12  here with respect to Mr. Stilley's tax obligations.  He was not

13  charged in this district with his own tax evasion.

14       That does not change the fact that he and Mr. Springer

15  together, you know, were well-aware not only that they were

16  earning income, but that they were both not filing tax returns,

17  and their jury returned a verdict that this was a conspiracy to

18  defraud the IRS.

19       Part of how each of these defendants and the people they

20  coached or counseled, encouraged, one of the ways that they

21  defrauded the IRS and impeded and impaired the ability of the

22  IRS to assess and collect taxes was by not filing tax returns.

23       This does not mean that, you know, anybody that walked

24  into Mr. Stilley's door would thereby be attributable -- that

25  their conduct is not necessarily attributable to Mr. Stilley,

1  nor even if Mr. Springer was sitting in the office with him

2  would it be necessarily attributable to Mr. Springer.

3      However, the object of the conspiracy was to impede and

4  impair the IRS in its ability to assess, collect taxes.  Where

5  either of them were -- and especially were together, they were

6  counseling others to not file tax returns and to not pay taxes,

7  that absolutely indicates that it's within the scope of the

8  object of the conspiracy and any tax loss resulting from that

9  is reasonably foreseeable to each of them.

10      Where they are counseling individuals independently,

11  without knowledge of the others, then it would only be

12  relevant -- and I think it's 1(a) of the relevant conduct, as

13  opposed to 1(b), and that is how we treated Dr. Roberts, in

14  addition to the fact that it was well before this conspiracy

15  began.  As it was indicted, it was begun in or about 2000.

16      But it is the government's position -- and, again, this is

17  a broader reading than what the presentence investigation

18  reports assert.  We think this was a broader conspiracy to

19  impede and impair the ability of the IRS to assess and collect

20  taxes.

21      What the government chose to focus on in terms of

22  presenting this at trial does not change the fact that,

23  together, Mr. Springer and Mr. Stilley encouraged Patrick

24  Turner in his attempt to evade payment of taxes, and that is

25  certainly an act furthering a conspiracy to impede and impair

1 the ability of the IRS to collect taxes.

2          THE COURT:  Okay.  So if your -- if the indictment

3 with respect to the manner and means is silent as to causing

4 third parties to violate the law, then your contention would be

5 that, be that as it may, within the concept of -- the broader

6 concept of relevant conduct that the Court should take that

7 into account?

8          MR. O'REILLY:  Yes, Your Honor.

9          THE COURT:  Okay.

10          MR. O'REILLY:  With respect to the special skill

11 enhancement, and I'll focus on Mr. Stilley.  He was a lawyer.

12 He used his knowledge of how the IRS investigates cases, how

13 cases are developed and prosecuted and used that to his

14 advantage in furthering this scheme to defraud.

15     And the use of a special skill, being a lawyer, the legal

16 skills are specifically enumerated under the Sentencing

17 Guidelines.

18     With respect to -- and if you have any more questions on

19 that -- but with respect to the abuse of position of trust, I

20 will be candid with the Court, I'm having to go to a

21 resentencing in the Ninth District -- the Ninth Circuit because

22 we actually succeeded in getting an abuse of position of trust

23 for a trust promote, because under the Sentencing Guideline

24 language, his position enabled him to further the scheme.  The

25 Ninth Circuit, however, has stated it is quite clear in the

1  Ninth Circuit that you must hold a position of trust with

2  respect to the victim, and the victim in this case is the

3  United States Government and the Internal Revenue Service.  And

4  if that is the law of this circuit and it seems --

5        THE COURT:  There's a lot of Ninth Circuit law that's

6  not the law of this circuit.

7        MR. O'REILLY:  Yes, Your Honor.  The reason I

8  mentioned that is Mr. Gollihare had noted in the PSR one case

9  that did seem to suggest that, but that is the government's

10  sentencing memorandum in the case.  The Tenth Circuit does not

11  seem to take that narrow of a read of this enhancement.

12        THE COURT:  What Tenth Circuit case would you want me

13  to look at?

14        MR. O'REILLY:  Your Honor, that would be United

15  States v. Koehn, K-O-E-H-N, 74 F.3d 199.  It's a Tenth Circuit

16  case from 1996.  That was on page 17 of the United States'

17  sentencing memorandum.

18     There was also more recently a district court case out of

19  Utah where a member of my office got taken to task because they

20  did not include this particular enhancement, abuse of position

21  of trust, in a plea agreement, even though the defendant had no

22  position of trust, vis-a-vis, the IRS.  It was a trust

23  promoter, I believe, and that court was disappointed that we

24  had not included it.

25        THE COURT:  That you had not what?

1          MR. O'REILLY:  We did not include it in that plea

2    agreement.  It was not my case, Your Honor, but I remember a

3    certain very young attorney complaining about being the

4    whipping boy when it wasn't even his case to begin with.  And

5    that case is United States v. Mercer, 472 F.Supp.2d, 1319.

6          THE COURT:  Is that a Kansas case?

7          MR. O'REILLY:  That's a Utah case, Your Honor.

8          THE COURT:  Utah.  Okay.  So you want me to read the

9    Koehn case and the Mercer case?

10          MR. O'REILLY:  Yes, Your Honor.

11          THE COURT:  Okay.

12          MR. O'REILLY:  And our position is, is that with

13    respect to the individuals that were paying him money that were

14    writing checks payable to Bondage Breakers Ministry, that were

15    writing "gifts" or "donation," they trusted Mr. Springer, and

16    that position of trust he had with respect to them facilitated

17    his ability to commit this crime.

18          THE COURT:  Okay.  Well, I see Judge Cassell's

19    opinion in Mercer is mercifully short, so, yes, I will read

20    that one.  Thank you.

21      You may proceed.

22          MR. O'REILLY:  And, Your Honor, with respect to

23    sophisticated means and the obstruction enhancement that the

24    presentence investigation reports found, we've articulated our

25    positions in the sentencing memorandum; however, I am willing

1  to address any questions the Court may have.

2          THE COURT:  I need to hear from you on restitution.

3          MR. O'REILLY:  Your Honor, with respect to

4  restitution, we agree with the presentence report that under

5  the -- excuse me one second.

6      Under 18 USC Section 3663(a), the crime of conspiring to

7  defraud the United States is subject to mandatory restitution,

8  and restitution, when it's mandatory, is made without regard to

9  a defendants' ability to pay, unlike the -- where restitution

10 is something that's subject to the Court's discretion as to

11 whether or not to award restitution.

12         THE COURT:  I agree with you on that, and now the

13 defendants have an opportunity to persuade me that restitution

14 is not mandatory, but assuming it's mandatory, I still have to

15 arrive at an appropriate dollar amount.

16         MR. O'REILLY:  Yes, Your Honor.  And our position is,

17 is that given the lack of any other available information that

18 the calculations made by Revenue Agent Miller are reasonably

19 accurate assessments of the tax against them and they're just

20 -- the records that Mr. Springer spoke of were solely of some

21 expenses, and as Mr. Miller indicated in his cross-examination,

22 I think he spoke specifically with respect to Mr. Stilley, but

23 I think it would apply to both, if we had all the information,

24 the net taxes would actually likely be higher.  But this is

25 simply taking 20 percent of the gross income figure, which is

1    under the Sentencing Guidelines is where we need to be for

2    sentencing purposes, it's the best figure we've got.  And

3    restitution is mandatory.

4        The defendants had an opportunity to present evidence

5    supporting a tax loss figure that was different from what the

6    government has presented.

7            THE COURT:  The government's proposed restitution

8    number would include the penalties and interest?

9            MR. O'REILLY:  Yes, Your Honor, it should.

10           THE COURT:  So on 1177, then, which covers both

11   defendants, I would -- the government would urge that I adopt

12   the -- those third-party tax losses, plus the defendants' own

13   tax losses, including penalties and interest?

14           MR. O'REILLY:  I believe the presentence

15   investigation report only referenced the defendants' own tax

16   losses.  I think the Court could, but we are actually satisfied

17   with the presentence investigation report's recommendations,

18   Your Honor.  We did not object to them, and -- which is

19   significant.  That does not include the third-parties' tax

20   losses'.

21           THE COURT:  Okay.  Now, how about -- if you get that

22   sort of a number for restitution, then what I'm about to

23   mention is probably academic, but I have received no evidence

24   as to cost of prosecution.  The PSR number for cost of

25   prosecution is shockingly low.  I mean, I think whatever it

```
1   is -- what is it?  29,000?
2            MR. O'REILLY:  It's about $28,000, Your Honor.
3            THE COURT:  I think you got that invested in air
4   fare.
5            MR. O'REILLY:  Unfortunately, Your Honor, my costs
6   don't get included in that, which is possibly why the Court was
7   expecting a bigger figure.  We did supply the documentation, I
8   understood, but perhaps that was not supplied to the -- for the
9   presentence report in addition to just the raw figure.  We
10  certainly can supply the --
11           THE COURT:  Well, I'll hear from the defendants as to
12  whether they take issue with what looks to me to be an
13  incredibly low cost to prosecution number.  We'll look at it
14  one step at a time from there.
15           MR. O'REILLY:  Your Honor, we do try to be
16  efficient.  If there's no further questions --
17           THE COURT:  I may have more questions before we're
18  through here in court this afternoon, but none at this time.
19  Thank you.
20           MR. O'REILLY:  Thank you, Your Honor.
21           THE COURT:  Mr. Springer.
22      And I would urge you to bear in mind, Mr. Springer, that
23  you will have another opportunity to address the Court by way
24  of your final comments before sentence is imposed.  So the main
25  reason that -- or the main benefit to the Court from hearing
```

1  arguments at this point is to give the Court some clarity as to

2  the specific matters that have been at issue today and

3  yesterday.

4        MR. SPRINGER:  Thank you, Your Honor.  I'll try to

5  follow along the same line that the government did, so, first,

6  we can keep those parallel.

7        The evidence that the government tendered on Mr. Patterson

8  showed that he did file two extensions and they entered

9  absolutely no evidence of the $34,000 being owed on April 15,

10  2001, nor did they show with an extension that he owed that

11  money on August 15, 2001.

12        And with the second extension, they did not show that he

13  owed that money on October 15, 2001.

14        And the only evidence that they tendered was that he filed

15  his return on March 4, 2003, for the year 2000.  There is no

16  evidence before the Court that the reason why Mr. Patterson

17  filed two extensions, and then on March 4, 2003, filed a 2000

18  return, as the government's exhibit identifies, that that

19  reason was having to do anything with anything either I said to

20  Mr. Patterson or Mr. Stilley said to Mr. Patterson.

21        And, in fact, the evidence actually shows that what I told

22  Mr. Patterson to do, he was at least considering doing, which

23  was file returns.

24        The evidence that was presented to the Court today by my

25  unrebutted testimony was that the reason why Mr. Patterson's

1   2000 tax return did not get filed until 2003 was because

2   Cynthia Hess got sick.

3       And the experience in dealing with people who haven't

4   filed a series of tax returns is why I would recommend a person

5   like Cynthia Hess to help get those figured out, because

6   there's some hindsight to the advantage of filing five years in

7   a row, when you have losses, as in Mr. Patterson's case, that

8   he could carry over.

9       But the only evidence before the Court is that I told

10  Mr. Patterson to file the return, and because he could not do

11  it on his own, and because he went seeking help to get from --

12  I believe it was 1996, '97, '98, '99 and 2000 filed by Mrs.

13  Hess, that she was unwilling to do all the returns until all of

14  them were done.

15      And that is why, as I testified earlier, when she got

16  sick, there was nothing else anybody could do after the second

17  extension on Mr. Patterson.  There wasn't a third extension.

18      And also there's nothing reflected in the evidence of the

19  government's exhibit that shows that Mr. Patterson, when he

20  filed the extension, that he did not say here is an estimated

21  payment of tax.  We have no evidence of that.

22      I don't remember myself personally what actually happened,

23  because I believe he had a CPA who was helping him do that.

24  Obviously, if he owed $34,000 in March of 2003, from back in

25  April 15th of 2001, then the government would extensively be

1  asking for late penalties for late payment.  And there was

2  nothing reflected in the government's transcript that he had

3  been charged for late payment in regard to that filing as

4  well.

5      So to that -- for that score, I believe that

6  Mr. Patterson's $34,000 should not be considered as tax loss to

7  Lindsey Springer.

8          THE COURT:  Well, what -- if you agree with

9  Mr. Patterson's testimony that you and Mr. Stilley, in effect,

10  boasted to him that you and Mr. Stilley did not file returns,

11  then what was the context in which you said that to him?

12          MR. SPRINGER:  Well, it had to do with gifts.  As far

13  as I was concerned, that was Mr. Patterson, the only thing I

14  can receive is a gift or donation and those aren't taxable and

15  that's why I would not be required to file a return.

16      On Mr. Stilley's side, I don't know what he boasted in

17  that regard, other than what I heard him say the first meeting

18  when Mr. Patterson asked that question, and I just heard

19  Mr. Stilley say he doesn't file returns.  That's all that

20  anybody heard him say.  There was no other elaboration.

21      I did not even know at that point anything about

22  Mr. Stilley's business in that regard until Mr. Patterson

23  actually told me.

24      It was something that was quite unique when I sat down in

25  1999 with Mr. Roberts and Mr. Stilley.  We never had a

```
1    conversation about whether Mr. Stilley files tax returns.  And
2    I never heard Mr. Stilley tell Mr. Roberts he didn't have to
3    file tax returns.  Never one time.  If I had heard that, I
4    would have given the same response I've given every time, which
5    was they need to file those returns if they're earning gross
6    income.  And it was almost like I made them angry every time I
7    said it.  It wasn't something they wanted to hear.
8         And interestingly enough, with Mr. Patterson, as
9    Mr. Gollihare's report demonstrates, he -- he had not only not
10   filed '96, '97, '98, and '99, but he also had asked for refunds
11   for '95 and '97, which is what he was charged with.
12        And Mr. O'Reilly referred to Mr. Patterson's willful
13   failure to file the 2000 tax return.  And Mr. Patterson or Mrs.
14   Patterson were never charged for the year 2000.  There's never
15   been a finding they willfully failed to file a tax return for
16   the year 2000.  In fact, the extension filing would show
17   otherwise in that regard.
18        And keeping in mind, even though Mr. Patterson did not
19   file except the extension on April 15th, 2001, he was indicted,
20   the evidence shows, in April of 2003, and there was no 2000
21   charge in that indictment.  So even --
22             THE COURT:  Well, he blew right past April 15th of
23   '01, right?
24             MR. SPRINGER:  He filed an extension, and then he
25   filed another extension.
```

```
 1              THE COURT:  He blew right past October 15th.

 2              MR. SPRINGER:  He did.

 3              THE COURT:  And he felt the hot breath of the

 4   government on his neck and he ultimately filed in what?  '03?

 5              MR. SPRINGER:  Cynthia Hess was -- filed in '01 to do

 6   those returns.  It just took her a long time.  She had --

 7              MR. O'REILLY:  Objection.  There's no evidence of

 8   when Ms. Hess was hired.

 9              MR. SPRINGER:  I did testify that I'm the one that

10   went and found her, Your Honor, and it was unrebutted.

11        But the government had plenty of opportunity by April 15th

12   of 2003 to know whether Mr. Patterson had willfully failed to

13   file a 2000 tax return, and they did not charge him with that

14   willful failure to file that year.  They did, however, charge

15   him with '96, '97, '98, and '99, years that were beyond my

16   knowing and communicating with Mr. Patterson.

17        So under that score, I don't believe Mr. -- there's any

18   evidence Mr. Patterson willfully -- there's been a finding he

19   willfully failed to file a 2000 tax return having to do

20   anything with any statements made by me as to how my ministry

21   at that time operated, and I never heard him say he didn't file

22   the 2000 return because Mr. Stilley told him he didn't have to

23   file tax returns either.  I never heard Mr. Patterson say

24   that.  I may be mistaken, but I don't remember hearing him say

25   that.  I just remember him saying what he heard either of us
```

1  said, which was I said I don't have to file a tax return
2  because of gifts.
3      Now, on Mr. Lake, that's another interesting timeline.
4  Mr. Lake was indicted before he had even met myself or Oscar
5  Stilley for a series of failures to file, very similar in
6  connection like Mr. Patterson, only Mr. Patterson hadn't been
7  indicted at the time that he met Mr. Stilley or myself.
8      And Mr. Lake, as I testified today, and that Mr. Shern
9  confirmed yesterday, Mr. Lake actually, prior to his trial,
10 fired Mr. Stilley, hired another lawyer, went to trial, hung
11 the jury, and then pled guilty the following week, and still,
12 under the government's testimony, did not file a tax return for
13 the year 2000.
14     And the evidence shows that I never even knew the name
15 James Lake until December of 2000, and it -- as Mr. Gollihare
16 points out, I did not advocate -- well, strike that.
17     I did not tell Mr. Lake and there's no evidence that I
18 told Mr. Lake that he was not required to file a tax return for
19 the year 2000.
20     What there is evidence of is that Mr. Lake had already
21 stopped filing tax returns, and what he didn't like me telling
22 him is what caused him to go get other counsel.  There's a
23 reason why he fired Oscar Stilley, and he said it was because
24 he didn't like Oscar's advice.
25     And, of course, he went to trial and then eventually pled

1    and still did not file a tax return.  He was an airline pilot.

2            THE COURT:  Yeah, he was a Delta pilot.

3            MR. SPRINGER:  A Delta pilot.

4            THE COURT:  According to Mr. Shern, the grand jury

5    testimony was to the effect that both you and Mr. Stilley told

6    Mr. Lake that he had no legal obligation to file returns.

7            MR. SPRINGER:  I don't remember those exact words,

8    Your Honor.

9            THE COURT:  From Shern or from yourself?

10           MR. SPRINGER:  From Mr. Lake.  I don't remember

11   Mr. Lake saying those exact words.  I heard what Mr. Shern said

12   yesterday, and obviously I take exception to those exact

13   words.

14       The consistency of what Mr. Lake was saying had to do, in

15   my opinion, with what -- how I treated money that people gave

16   me, and this is where I got kind of crossways with him on the

17   witness stand, and this is the videotape that I chose not to

18   play, but I did testify about the videotape today and the

19   government did not cross-examine me on it whatsoever, and on it

20   I am -- I testified under oath that I am -- I'm showing

21   Mr. Lake why he's required to file a tax return, and it is --

22   it is this single event that caused him to fire Oscar Stilley,

23   and that was the point of me saying that the video showed --

24           THE COURT:  Well, was Mr. Stilley telling him to

25   hurry up and file?

 1            MR. SPRINGER:  Actually, Your Honor, I left that

 2    day.  I had -- probably had only two meetings with both

 3    Mr. Lake and Mr. Stilley, I never heard them ever talk about

 4    whether or not Mr. Lake was required to file a tax return.

 5        In fact, the one conversation would have been when the

 6    videotape was made and another one was out in California, where

 7    Mr. Stilley was trying to get into the case and telling

 8    Mr. Lake that his beliefs were not appropriate.

 9        But other than that, I am not privy to other conversations

10    between Mr. Lake and Mr. Stilley.

11            THE COURT:  Proceed.

12        Bear with me just a minute.

13            MR. SPRINGER:  Interestingly, as far as Dr. Roberts

14    goes, Mr. Gollihare, on his final report, points out that Oscar

15    Stilley became an attorney on April 15, 1991, and Mr. O'Reilly

16    suggests to the Court that the -- Dr. Roberts, who at that

17    point had been a doctor, goes to a person who is not even out

18    of law school yet and becomes convinced that Dr. Roberts'

19    theories are correct because of what Oscar Stilley tells him

20    what he learned in the Irwin Schiff book, and Mr. O'Reilly

21    turns that testimony into he went to an expert on the tax law,

22    and that's why --

23            MR. O'REILLY:  Objection.  Just for clarification,

24    someone he believed to be an expert on the tax law.

25            MR. SPRINGER:  And yet Oscar Stilley didn't even know

```
 1    anything about taxes at the time he was coming out of law
 2    school.  Most lawyers that I've met that have come out of law
 3    school are very green on the subject matter.
 4        And so it's disingenuous to even accept that Dr. Roberts,
 5    who, by the way, was Mrs. Gray at the time, was going to the
 6    same college that Oscar Stilley was going to, that somehow
 7    Dr. Roberts would have had a warm fuzzy feeling about something
 8    that a third-year law student at the University of Arkansas
 9    was, you know, saying to him.
10        So it's impossible to accept that Dr. Roberts, in 1990,
11    went to Oscar Stilley as an attorney because he wasn't one
12    yet.  And that's on page 17 --
13            MR. O'REILLY:  Your Honor, objection, simply as to
14    relevance with respect to Mr. Springer.  Dr. Roberts' tax loss
15    is not attributed to him, so this argument does not seem
16    appropriate for Mr. Springer to be making.
17            THE COURT:  Seems odd that you're -- your pro se
18    status means that you are here for yourself.
19            MR. SPRINGER:  Sure.
20            THE COURT:  I'm having a hard time squaring this with
21    anything that might logically be argued by you on your own
22    behalf.
23            MR. SPRINGER:  Mr. O'Reilly referred in a
24    conversation with Your Honor to the phrase "relevant conduct."
25    I wrote it down and put quotes around it, when he was
```

1  discussing with you Dr. Roberts and his reliance on

2  Mr. Stilley.

3        THE COURT:  Well, you're not going to be held

4  accountable for anything Mr. Stilley said to Dr. Roberts way

5  back in the 1990s.

6        MR. SPRINGER:  Thank you.  I was just making sure I

7  was on that point.

8     Okay.  With Mr. Turner -- and I've made notations of the

9  separation between the proposed tax liability that the

10  government has on the chart for 1999, 2000, 2002, and 2003.  I

11  think Mr. O'Reilly misspoke, unintentional, when you asked him

12  was it for 1999 through 2003, and the answer should have been

13  no, there's no 2001, it's only for four years, that is on the

14  chart.  And in that regard --

15        THE COURT:  Now, wait, wait, wait, wait.  Let's get

16  this cleared up.  My notes from Mr. O'Reilly's argument

17  indicate that his assertion by way of argument was that the

18  Turner tax liability that existed at the time of the IOLTA

19  transaction in August of '05 was Mr. Turner's tax liability for

20  '99 through '03, and you're saying that's -- that that must be

21  an oversight on Mr. O'Reilly's part?

22        MR. SPRINGER:  Well, yes, because the charts from

23  Mr. Miller on the third party for myself only have '99, 2000,

24  2002, and 2003.

25        THE COURT:  Do you take issue with the $145,713

1    amount that the government says was due from Mr. Turner as of

2    August of '05?

3              MR. SPRINGER:  Yes.  Absolutely.  In fact, they

4    testified just shortly ago that -- Mr. O'Reilly stated that

5    Mr. Turner just now lost in tax court over those years.

6              THE COURT:  So you're saying it should have been

7    higher?

8              MR. SPRINGER:  No.  I'm suggesting that these numbers

9    or amounts were in litigation by Mr. Turner at the time -- at

10   least up until whenever Mr. O'Reilly said -- I don't know

11   exactly the particulars about it, but he said that he lost in

12   tax court not too long ago, was the statement that

13   Mr. O'Reilly made.

14             THE COURT:  Proceed.

15             MR. SPRINGER:  I also do take exception with the

16   $145,713 as it relates to the wire transaction or the loan to

17   me.  That was certainly not any information that I was privy to

18   in 2005 with regard to Mr. Turner borrowing the money.  And

19   instead of paying $145,000 in taxes with a $250,000 loan, that,

20   instead, he wired it to me.  And there's been no evidence that

21   anybody ever said I was aware that Mr. Turner owed $145,000.

22   The only evidence is that I convinced Mr. Turner to go hire a

23   CPA and get his tax returns prepared.

24             THE COURT:  Well, you knew he -- as of the summer of

25   '05, you were well aware Mr. Turner was in hot water with the

1    IRS -- fair to say?

2           MR. SPRINGER:  Yes, fair game in that, yes, sir.

3    Yes, sir.  But did not know these amounts or these years, was

4    unaware of the specifics.

5        I met one time -- and I believe I testified about this, I

6    met one time with the Department of Justice in Michigan, and

7    Mr. Turner and I went in there together, and I was coming off

8    of the IFC conference calls and trying to convince them that I

9    believed I could convince thousands of people to file their tax

10   returns if they would just allow me a little opportunity to do

11   so.

12       And, ultimately, they did agree, although they didn't

13   express it at that time, and allowed me to continue on those

14   conference calls to convince people to file their returns.

15       I also was unaware that -- the evidence shows that I was

16   unaware that when Mr. Turner borrowed that money that he was

17   doing anything that related to the taxes itself.

18       My understanding was that he was -- from Paul Stumpo's

19   testimony, after they had witnessed a trial together, that

20   Mr. Stumpo told Mr. Turner to make sure he has enough money to

21   hire enough counsel to take on the Department of Justice if

22   he's not going to file his returns.

23       And I even believe Mr. Burt testified he was at the same

24   trial as Mr. Stumpo was and Mr. Turner was that then caused or

25   resulted in causing Mr. Turner to, I guess, go borrow that

1   money initially.

2        The government made a statement about Mr. Turner not

3   having a lien on the Lexus that was purchased with money that

4   came out of Mr. Stilley's IOLTA account from that $250,000 to

5   transaction, but what was also testified to about by me

6   directly during trial is that I spent $60 or $65,000 on that

7   RV, repairing it, bringing it up to the status it is now, and

8   including the purchase of a 22-foot trailer that I pulled

9   behind it.

10       And if you add the numbers up of all the money that was

11  spent on purchasing it, going and getting it, and all the

12  corrections -- or the repairs that I did, not including the

13  time I spent on it, which was just countless amounts of hours

14  from September until December of 2005, on my back, most days,

15  that those numbers are greater than $250,000.

16       It was just the way in which the money was positioned is

17  how it got used to buy the Lexus -- a portion of the Lexus.

18  There was a trade-in on top of that.

19       So because there was no lien on the Lexus does not mean

20  that Mr. Turner's interest wasn't secured by the money being

21  spent on the RV.

22       The government also suggests that I -- by not standing in

23  Mr. Turner's way in coming and picking up the RV that he has a

24  lien against that I've committed another act of tax evasion.

25       Now, presuming, from that angle, then that they suggest

1  that that money belonged to me and not to Mr. Turner, while at

2  the same time, Mr. Miller testifies that what I did is stole

3  the money, which none of that is true.  And you can't have a

4  lien on something that you have no control over if you stole

5  it.

6       And so here I was in this position and didn't do

7  anything.  I just sat frozen.  But if I kept it, then I stole

8  it.  If I let Mr. Turner come get it without my standing in his

9  way, committed an act of tax evasion, so says Mr. O'Reilly.

10      And the whole point was trying to get Mr. Turner back his

11  money.  And, in fact, my understanding is he is going to pay

12  the taxes that the tax court ordered he now owes when he sells

13  the RV, and that's what he told me.

14      But that had nothing to do with why I didn't stand in his

15  way to repossess it.  I hadn't been able to make a payment on

16  that RV in over two years.  And the market is coming up, the

17  economy is looking a little bit better, so he was ready to take

18  a chance with it, and that's why he came and got it.  And it is

19  hard to miss; it's quite a big monster.

20      Mr. O'Reilly mentioned the word "scheme" in reference to

21  these people who would write me checks and give -- with the

22  word "donation" on them, and the word "scheme" that he's

23  mentioning there is not the scheme in the theory of the

24  indictment, and it's not the scheme Mr. Gollihare refers to in

25  his report.  It's a different scheme.

1    And the scheme is that by merely somebody writing

2    "donation" or not on a check, that somehow that that single act

3    defrauds the IRS.

4        And that is just not true.  As Mr. O'Reilly then said, the

5    defrauding is by not filing the tax returns, which, of course,

6    willful failure to file tax return, we all know by this case,

7    is a misdemeanor.

8            THE COURT:  Now you're getting -- I've heard you and

9    I'm not going to cut you off, but -- let me assure you of that,

10   but I've heard you on the various specific adjustments and on

11   the loss issues, especially the third-party tax loss issues,

12   which are very legitimate issues, but now you've moved into

13   matters that were thoroughly aired at trial and resolved

14   against you, so I'm not sure how much you're going to be able

15   to gain by arguing -- re-arguing matters that were definitively

16   resolved against you by the verdict of the jury.

17           MR. SPRINGER:  I was only emphasizing the word

18   "scheme" outside of the charge in Count 1, which was coming

19   under I think -- I believe Mr. O'Reilly was coming under

20   relevant conduct with a scheme whereby which the scheme was to

21   have people write "donation" on a check prior to the 2000 year

22   in Count 1.  I believe that's what Mr. O'Reilly was referring

23   to, and I was just --

24           THE COURT:  Are you saying that I should look at that

25   differently if it's outside of the conspiracy period versus

1  inside the conspiracy period?

2          MR. SPRINGER:  I don't believe that the writing of a

3  check to Lindsey Springer in and of itself is an act of

4  defrauding the IRS.  I don't believe that that lone act of

5  somebody just writing a check to me and me receiving it is an

6  attempt by anybody to defraud the IRS.  What I don't do or do

7  with it obviously has become an issue in this case.

8          THE COURT:  Okay.  Go ahead.

9          MR. SPRINGER:  But Mr. O'Reilly said it was the act

10  of them writing that check, and that's why I was standing in

11  opposition to.

12      As far as restitution goes, that is one of the places

13  where I got hung up on Count 1 versus Count 2, 3, 4, 5, and 6,

14  and what I expressed when I was on the witness stand about the

15  confusion that Count 1 and relevant conduct has then caused --

16  for instance, I'm not certain about restitution being over and

17  above the amount of money that I would have said to have been

18  owing.

19      Mr. Gollihare, in his report, he suggests that because the

20  object of the conspiracy was to evade the payment of taxes,

21  that that then allows for interest and penalty to be included,

22  whereas Mr. O'Reilly -- he argues interest and penalty.  He's

23  not pushing for it in his objections.  And specifically stated

24  that Mr. Stilley and I were not charged with either willful

25  failure to pay taxes or committing the act of attempt to evade

1    the payment of taxes in the tax evasion charges.

2        And so, again, that's where I got -- I'm still confused on

3    the difference between what Mr. Gollihare is saying, because,

4    in his view, the object of the conspiracy is evading the

5    payment of taxes, but in the government's briefs that they

6    filed, they said the object of the conspiracy was a broader

7    defraud-the-IRS theory, and -- whereas evasion of payment comes

8    into a more narrow focus and would be actually a conspiracy to

9    commit an offense against the laws of the United States, a

10    separate charge than a conspiracy to defraud the United

11    States.

12        In either way, I don't believe that interest and penalty

13    are appropriate, because Mr. Stilley and I were not found

14    guilty of evading the payment of taxes specifically or willful

15    failure to pay taxes under 7203.

16        There are many crimes there and we were charged -- I was

17    charged with willful failure to file a U.S. Individual Income

18    Tax Return form for each of the years, with affirmative acts

19    for three of the years, and Mr. O'Reilly has admitted on more

20    than one occasion the assessment -- it was the evasion of

21    assessment, not the evasion of payment, that was the theory

22    behind the government's charging.

23        So I don't -- under anybody's analysis, I believe interest

24    and penalty should not be included per the Sentencing

25    Commission's report that they should not be included.

1          THE COURT:  Tell me specifically what you refer to by

2    way of the Sentencing Commission's report.

3          MR. SPRINGER:  May I have just a moment?

4          MR. O'REILLY:  Your Honor, I may be able to clarify

5    this.  I believe Mr. Springer is confusing the tax loss

6    computation, which does include it under 2T1.1, with

7    restitution, where penalties and interest are includable.

8          THE COURT:  Well, that -- that's what prompted me to

9    make my inquiry to Mr. Springer.  If the Sentencing Commission

10   has published anything that tells me that I should ignore the

11   interest and penalties for restitution purposes, now is the

12   time to tell me about that.

13         MR. SPRINGER:  In agreeing with Mr. O'Reilly, the

14   Sentencing Commission said it shouldn't be included in tax

15   loss, so if -- if restitution is a different amount than tax

16   loss, then that's the spot that I'm confused about, because my

17   understanding of restitution was to make the victim whole.  So

18   if penalties and interest can't be included in the tax loss

19   calculation, which is the -- making the victim whole, then it

20   would seem logical that restitution would also not include

21   interest and penalty, because they have the mechanisms the IRS

22   has within their own ability to know how to calculate interest

23   and penalty in those senses.

24       Now, the Commission did say if it was evasion of payment

25   or failure to pay taxes, then interest and penalty would apply,

1  but they gave that exclusion in the guideline.

2       Mr. O'Reilly mentioned I referred on the witness stand as

3  to a special skill, and I believe my testimony was my special

4  skill was something I obtained after reading the Bible, which

5  somehow allows me to remember everything that I read in the tax

6  code.  That was the extent of my admission to special skill.

7       And I also said on the witness stand that I have no idea

8  how to explain how I got that.  There was no training.  There's

9  no evidence of any schooling.

10      And that special skill is not an issue that has ever been

11  raised in this trial by anybody.  Nobody said, because of his

12  special skill of being able to remember what he reads, this is

13  what happened to me.

14      Your Honor, may I inquire, is there still need for

15  commentary -- or statements from me regarding public or private

16  trust?

17          THE COURT:  Certainly an issue.

18          MR. SPRINGER:  Okay.  If I might just have one more

19  moment, Your Honor.

20          THE COURT:  Surely.

21          MR. SPRINGER:  First, I'd like to address the

22  otherwise extensive argument that the government has made.

23  When I was referring to what they had stated about me having

24  people write a check to me and some noting on it "donation" or

25  "gift," but, obviously, through the evidence at trial, the

1  majority of them did not say anything on them, that there is no

2  evidence that I was an organizer or leader of criminal activity

3  that either involved five or more participants or was otherwise

4  extensive.

5      The -- and my understanding is we're referring only to

6  Count 1 as the lead count of the grouping, because it is the

7  one the government seeks to get to the highest level of the

8  Sentencing Guidelines.

9      And in Count 1, the criminal activity in Count 1 is an

10  agreement between Mr. Stilley and I to defraud the IRS, and

11  then there's a listing in the indictment of five manner and

12  means.

13          THE COURT:  First of all, do you understand that the

14  application of that aggravating role guideline is -- will be

15  determined on the basis of your relevant conduct and not on the

16  basis of the conduct underlying any one count of conviction?

17  That's the law.  So you would do well to put your argument in

18  the framework of the law.

19          MR. SPRINGER:  United States v. Griffin, the Tenth

20  Circuit, in 2009, found that for the district court to consider

21  relevant conduct, the government must prove by a preponderance

22  of the evidence that the defendant engaged in conduct related

23  to the offense of conviction pursuant to 1B1.3 and the conduct

24  constituted an offense under either federal or state law.  And

25  that's 584 F.3d 1004, Tenth Circuit, 2009.

1          An attempt to conceal gross income or failure to file a

2   tax return could be relied upon by the Court for the meaning of

3   the phrase "criminal activity."

4          But in my opinion, that is as far as that should be

5   allowed to go.  And the government has not established any

6   other offenses, other than the ones that are in the indictment,

7   without the -- in addition to that, there is, for 2001, 2006,

8   and 2007, evidence that I received gross income for those

9   years.

10          But as they went backwards past 2000, they did not point

11  to any offense that I committed outside of the years of the

12  indictment.

13          And as far as "otherwise extensive" goes, as the probation

14  office report reports, the factor was the "extent to which

15  other people are used even if they are not criminally

16  responsible for the conduct."

17          In the instant case, the majority of the people associated

18  with the defendant, fellow tax protestors, Mr. Gollihare wrote,

19  were not criminally responsible for defendants' crimes, but

20  received a service, whether it be information, advice, legal

21  research, and writing referrals or legal counsel for which they

22  compensated the defendant resulting in gross income.

23          And Mr. Gollihare cites to 3B1.1, Comment 1, and United

24  States v. Linney, 174 Fed. Appx. 142 at 144, West Virginia.

25  And I guess that's where I'm confused, when you said just a

 1  moment ago, it's all of the charges together, and I agree with

 2  Mr. Gollihare's report on page 12, which said -- which says,

 3  and finds, that the Count 1 offense only involved two

 4  participants:  me and Mr. Stilley.

 5      And for that basis, there is no evidence that the conduct

 6  was otherwise extensive or deserving of a four- or three-level

 7  increase.

 8      Under 3B1.3, Comment Note 1, for the adjustment under

 9  3B1.3 to apply, the position of public or private trust must

10  have contributed in some significant way to facilitate the

11  commission or concealment of the offense.

12      And, again, my reading of the word "offense" is all of

13  them that are related or grouped together and the lead offense

14  we billed as the one that gets the most points, and that

15  Mr. Gollihare found -- and I don't think the government objects

16  to -- is Count 1, and that's why the phrase "offense" is there,

17  under my understanding of the reading.

18      In the event that -- scratch that.

19      In United States v. Spear, Tenth Circuit, 2007, 491 F.3d

20  1150 at page 1153, the Tenth Circuit found:  "In order to apply

21  the enhancement for abuse of a position of trust, the

22  government must satisfy two elements establishing, one, that

23  the person occupied a position of trust, and, two, the position

24  of trust was used to facilitate significantly the commission

25  and concealment of the crime."

1          As to the first element, a quote in this circuit, the

2    Tenth Circuit, the question of whether an individual occupied a

3    position of trust is evaluated from the victim's perspective,

4    citing United States v. Chee, C-H-E-E, 514 F.3d 1106 at page

5    1118, Tenth Circuit, 2008.  See also United States v. Slaton

6    (ph), 2008 Westlaw District of Kansas at Number 3819836.

7          As Mr. Gollihare finds, the conduct in this case is viewed

8    in two parts:  The earning of income, a lawful undertaking; and

9    the conduct of concealing this income and failing to file tax

10   returns conduct, that is not lawful.

11         The defendant, in providing information, encouraged,

12   advised and represented to fellow tax protestors, may have

13   entered into a private-trust-type relationship; however, these

14   individuals are not victims.  They sought a service and

15   received what they paid for.

16         The victim is the United States, said Mr. Gollihare,

17   through its bureau, the Internal Revenue Service.  The

18   government acknowledges that neither Defendant Springer nor

19   Defendant Stilley had a position of trust with the United

20   States, end of quote, and that's from their sentencing

21   memorandum at page 17.

22         As to the second element --

23              THE COURT:  Mr. Springer, I have read and will reread

24   the presentence report.  Do you have any more argument?

25              MR. SPRINGER:  I did not occupy a fiduciary position

```
1    relative to the United States of public or private trust.  And

2    there has been no evidence otherwise.

3         As far as special skills go -- scratch that.  I'll leave

4    that one alone.

5         May I have one moment, Your Honor?

6              THE COURT:  Surely.

7              MR. SPRINGER:  Is there any questions you would have

8    of me at this time, Your Honor?

9              THE COURT:  I do not.

10             MR. SPRINGER:  Okay.  Thank you.

11             THE COURT:  We'll take a mid-afternoon recess before

12   we have any argument Mr. Stilley may care to present.  And so

13   we'll take a 15-minute break.

14        Court will be in recess.

15        (RECESS HAD)

16             THE COURT:  Mr. Stilley.

17        Bear with me just a minute.  I left my pen in the office.

18        Thank you.  You may proceed.

19             MR. STILLEY:  May it please the Court, I'd like to

20   start off by saying that I intend to try to keep things as

21   concise as possible.  I know the Court has ruled on a lot of

22   things, and I will presume that unless the Court indicates

23   otherwise the Court remembers those things, and if the Court

24   hears anything that causes it to think that those need to be

25   changed, that the Court will do that.
```

1    I'd like to start with tax loss.  That's the first thing

2 that the Court had directed our attention to.  But I want to

3 attack that from, perhaps, a slightly different angle.

4    I will start with the second PSR.  Actually, perhaps, I

5 think, on tax loss, it would be better to look at the

6 addendum.  That's where that the objections were considered.

7    But, really, before I even start in on that, I think we

8 need to consider what is properly before the Court upon which

9 the Court can base its decision, and that is evidence.  We have

10 to have evidence.  It has to be proven to the preponderance of

11 the evidence.

12    At this point in time, we've got one theory from the

13 probation department and one theory from the government.  Oscar

14 Stilley disagrees.  And now we have another theory from the

15 witness stand, from Mr. Shern.

16    Mr. Shern was asked about the scope of the conspiracy, and

17 there was a reason for that.  The United States v. Dazey case

18 out of the Tenth Circuit says that certain information has to

19 be obtained so that the Court can make particularized

20 findings.

21    In order to assist the Court in doing that, I asked

22 questions of the witness to find out what the witness would say

23 what the scope of the conspiracy was.

24    Mr. Shern said that the conspiracy was a conspiracy to

25 basically cheat certain persons in need of legal services out

1  of their money.

2      And the context and the way that this was stated indicates

3  that it really didn't have anything to do with taxes.  He said

4  that Mr. Hawkins was a victim, despite the fact that

5  Mr. Hawkins' case didn't have anything to do with taxes.

6      Now, he also said that basically all the people that put

7  money in were also conspirators.  That doesn't make a lot of

8  sense.  It doesn't make a lot of sense that the conspirators

9  were -- are alleged to be victims at the same time.

10      Nevertheless, we have testimony from the witness

11  concerning what the overall conspiracy was.  And just to nail

12  things down, I said -- I asked:  How many conspiracies?  One

13  conspiracy.  What was the conspiracy for?  He testified, as I

14  just told you.  And then I asked:  Anything else?  Mr. Shern

15  said no.

16      So that brings us to what the probation department --

17  actually, the probation department at page 5 of the PSR

18  addendum did cite United States v. Dazey and explained how that

19  that analysis was necessary, and how that that had to be

20  applied.

21      It says because a defendants' accountability only extends

22  to the criminal activity he agreed to undertake.  So,

23  therefore, it's necessary to determine the scope of the

24  conspiracy, because the Court couldn't go outside that scope of

25  the conspiracy.

1      And then it's necessary -- you can see as you read further

2  in the commentary of the probation department -- it's

3  necessary, then, to see the specific criminal activity the

4  particular defendant agreed to jointly undertake, i.e., the

5  scope of the specific conduct and objectives embraced by the

6  defendants' agreement.  And that's on -- at the top of page 6.

7          THE COURT:  Well, are you suggesting to me that the

8  scope of jointly-conducted criminal activity, within the

9  meaning of Guideline 1B1.3, I believe it is, is limited by the

10 scope of the conspiracy in a count of conviction?

11         MR. STILLEY:  Yes, Your Honor.  And the reason for

12 that, I very stringently objected to any proposed sentences or

13 the PSR unless it was made specific as to what -- where the

14 basis was at.

15     And the best basis that we've got to determine where the

16 government and the probation department started is at Count 1,

17 so I'm presuming that Count 1 is where that we start before we

18 go to 1B1.3 and either (1)(a) or (1)(b).

19     And the reason that I'm saying that that is essential is

20 because although that there may have been other testimony about

21 certain facts in the case, no other person has testified and

22 given evidence in the trial or in the sentencing phase from

23 which the Court can make the particularized findings required

24 by that case.

25         And I've got that -- there's -- in one of my filings,

1   actually, in Document 330 at page 2 in Dazey, the Court said:

2   "This means proper attribution at sentencing requires

3   particularized findings about the scope of the specific

4   agreement the individual defendant joined" --

5        Now, I understand that it doesn't really make sense that

6   Mr. Shern's testimony about the scope of the agreement is

7   totally inconsistent with what the charges were.  For the

8   purposes of this sentencing agreement, we have to have evidence

9   and it has to rise to the level of preponderance of the

10  evidence.

11       Mr. Shern's testimony is all that we have.  We don't have

12  anything else from which these particularized findings about

13  the scope of the specific agreement the individual joined could

14  be determined.

15       Now, one might think, well, doesn't that mean that we

16  would simply go to a little different route and try to

17  determine what the losses were of the people who were allegedly

18  harmed by the conduct of the defendants in allegedly having

19  cheated these individuals?

20       Due process would not allow the Court to take a theory

21  that was raised for the first time at a sentencing hearing and

22  expand that and flesh that out in order to make findings of

23  losses with which to enhance or to drive a sentence on that

24  defendant.

25       The defendant is entitled to have notice of this in a

354

1  reasonable time.  And as you've -- I'm sure you've noticed

2  there have been certain questions of the witnesses, in addition

3  to the pleadings that I have set forth, complaining about the

4  lack of information being given to Oscar Stilley.

5      On the 11th of March, I filed my objections to the

6  presentence report, provided all the necessary parties,

7  including the government, stated that I wanted copies of the

8  documents that were relied upon in the creation of this

9  report.  And I also asked for that in a separate e-mail,

10 despite having full knowledge of this and despite the fact, by

11 the witness's own testimony, that these documents had been

12 available for about at least two or three months.  These

13 documents were not provided.

14      MR. O'REILLY:  Your Honor, objection, confusing and

15 misleading.  If the Defendant Stilley is speaking of the

16 summaries, those were not provided until the Court directed

17 sometime in the last couple of weeks.  If he's talking about

18 the underlying documents, he has had those for quite some time.

19      THE COURT:  That's understood.

20      Proceed.

21      MR. STILLEY:  And the reason that I wanted those

22 specific summaries was for the purpose of being able to

23 understand the legal theories and the factual theories of both

24 the government and the probation department, because it's

25 important to have that information in order to effectively

1  defend yourself in this proceeding, as a sentencing proceeding,

2  and as this Court has said many times, the sentencing

3  proceeding is one of the most important of the entire case.

4      This being the case, I would simply respectfully urge the

5  Court to determine that the particularized findings cannot be

6  made in -- according to the law, in any manner that would allow

7  the attribution of any losses, tax losses or other losses to

8  the Defendant Oscar Stilley with respect to Count 1 of the

9  indictment.

10     And with respect to Counts 3 and 4, I would respectfully

11 request that the Court simply declare that because neither the

12 government nor the probation department indicated that they

13 would rely on those counts as the count from which to go to the

14 guideline, that they are -- this Court would not properly use

15 either of those counts to find either tax loss or a loss on the

16 basis of the theory by Mr. Shern.

17     Now, I want to start now on Turner, Patterson, Roberts,

18 and Lake, but before I do that, I think it would be instructive

19 to look and see what is -- what we are talking about as far as

20 1B1.3 relevant conduct.

21     It says that -- and I'll start at paragraph small Roman

22 iv -- "Adjustments in chapter 3 shall be determined on the

23 basis of the following:"  If you start with A, all acts and

24 omissions committed, aided, abetted, counseled, commanded,

25 induced, procured or willfully caused by the defendant and

 1  then -- if you skip B -- it says, that occurred during the

 2  commission of the offense of conviction in preparation for that

 3  offense or in the course of attempting to avoid detection or

 4  responsibility for that offense.

 5       Now, this provision, especially the subpart B here, that

 6  would be applicable to Count 1, the conspiracy count.  However,

 7  now we're looking, I presume, at least, that we are looking at

 8  the government claiming that Oscar Stilley personally committed

 9  acts during the commission of the offense of conviction or in

10  preparation or in an attempt to avoid, with respect to these

11  four individuals.  That is my assumption and that's where I

12  start.

13       When you look -- well, actually, even if you look at Count

14  1 or 3 or 4, none of those counts give a time frame that allows

15  us to make any sense at all of Sentencing Guideline 1B1.3.  It

16  simply doesn't make sense.

17       When you look at Roberts, the alleged statement to Roberts

18  was made in 1990 or perhaps 1991.  The presentence report --

19  and, of course, on these matters, the government certainly did

20  not object -- it says that Oscar Stilley graduated law school

21  in December of 1990 and was admitted April 15th of 1991.

22       So the allegation that Oscar was an expert at that point

23  in time and, therefore, some comment that he made is of great

24  significance now doesn't make any sense.

25       It was not said during the commission of the offense or in

1  the course of attempting to avoid detection or attempting to

2  avoid detection or responsibility in -- of that offense.  Those

3  -- trying to go back that far simply stretches the guideline

4  provision far beyond anything that its plain language could

5  possibly tolerate.

6       Your Honor, could I have a moment to get the exhibits?

7            THE COURT:  Surely.

8            MR. STILLEY:  Your Honor, as to Eddy Patterson for

9  the year 2000, there's one thing I think needs to be brought

10  out, and that is the government continually tries to take words

11  by Oscar Stilley or Lindsey Springer and just keep embellishing

12  them and making them get bigger and bigger.

13       The words that are generally first cited are that Oscar

14  Stilley said that he didn't file tax returns.  They take those

15  words, and then in their arguments, they begin to embellish and

16  say Oscar told him not to file, Oscar counseled him to do that,

17  Oscar counseled him to do something else, but it's not there.

18       Furthermore, as the probation department notes, there is a

19  First Amendment, and the First Amendment guarantees a freedom

20  of speech, it guarantees rights to speech, and certainly Oscar

21  Stilley was not put on notice that simply making a comment that

22  he believed in -- to be in confidence with his client, making a

23  comment about what he did, without further, could constitute an

24  act that could either be criminal or could be used to enhance

25  some other alleged offense.  It doesn't make any sense at all.

1       And there is no -- as far as I can tell, there is no

2    suggestion that there was any conduct to go with the words

3    suggesting that there was anything more than the basic comment

4    that was made either to Patterson or to Lake or to Roberts.

5       Furthermore -- and the evidence is not heavy on this, but

6    I think it's clear from trial testimony, as well as some of the

7    sentencing testimony, that the practice of Oscar Stilley was to

8    assist people and to do the things that they asked him to do,

9    and many times it's admitted that many times Oscar assisted --

10    Oscar Stilley assisted people in preparing and filing returns.

11       And the suggestion that -- for example, on Patterson, the

12    timing of a certain event could impute liability to Oscar

13    Stilley based on an offhand comment, it's not permitted for a

14    number of reasons, for the First Amendment and for general

15    principles of criminal liability.

16       Now, on the -- on Mr. Turner, there's obviously two sides

17    of that:  There's the $250,000, and I think that the Court is

18    -- is fairly well-briefed on that, that the $250,000 does not

19    represent materially a depletion of the assets of Mr. Turner.

20    It's still available for the IRS.  I think that that has been

21    adequately addressed.

22       Let's stop and think about the means of attribution of any

23    liability on Patrick Turner to Oscar Stilley.  The facts that

24    are shown in the evidence -- to the preponderance of the

25    evidence or more include the fact that money was sent to Oscar

1    Stilley's IOLTA account.  There's nothing wrong with that.

2        The fact that it was a large sum suggests that some --

3    there was at least some contemplation of using some of that

4    money to pay taxes.  There was apparently a decision on the

5    part of the client to litigate -- I think the testimony or

6    argument at least suggests that there was a tax court case, and

7    Mr. Turner transferred that money to someone else.

8        Your Honor, I don't really understand what the government

9    or the probation department relies on.  I presume that they are

10   relying on Count 1, and I've already demonstrated the reasons

11   that Count 1 doesn't work for this.

12       I don't see how that any other count could work for this,

13   partly to attribute liability to Oscar Stilley, partly because

14   of the reasons that I have already briefed this Court, I think

15   it was December 9 of 2009, in my post-trial motion for judgment

16   as a matter of law and for new trial.

17       The law in Arkansas, it's undisputable that a lawyer who

18   is directed by his client to disburse money to another person

19   has to disburse the money.  It's not an option.  It is an

20   ethical violation.  It is a tort of conversion.  It is probably

21   a crime for a lawyer to refuse to give money to the person who

22   is entitled to the money promptly.

23       And, Your Honor, I would respectfully contend that trying

24   to hold a lawyer liable because they did something that the law

25   and ethical rules require, would be a very bad idea.  It would

1  set a new precedent.  It would chill the activities of

2  attorneys.  It would put attorneys in the place of deciding

3  which rule or which law do I break.

4      I've not heard any testimony from anyone to the effect

5  that Oscar Stilley had some other reasonable option and could

6  have followed that reasonable option but he did not.

7      And for that reason, I would respectfully submit that

8  Patrick Turner's taxes, which are still -- apparently still

9  being litigated or perhaps that litigation is closed, but there

10 was a good-faith effort on the part of the client to do what he

11 thought he had a legal right to do.  There was no evidence that

12 Oscar Stilley, in his mind, had any evil knowledge or the basis

13 for doing anything differently or any basis for reporting the

14 client's conduct to any of the authorities.

15      We know, it's a well-established matter, that there's

16 attorney-client confidentiality.  It would have to be a really

17 egregious thing that would even authorize an attorney to breach

18 his own client's confidentiality and go to some other authority

19 and tell that authority that the information gained in

20 confidence from that client.

21      Allowing the government to pile on with this and use this

22 as tax loss would be in conflict and inconsistent with very

23 important legal principles in our society.

24      Mr. Lake presents a slightly different set of facts.

25          THE COURT:  Mr. Stilley, excuse me, before you get

1   into that.  I think analytically Dr. Roberts may be in a little

2   bit different category, but is -- do you understand the

3   government to be arguing with respect to the attribution of the

4   third-party tax loss as it relates to Mr. Patterson and

5   Mr. Lake, that the government is urging that that -- what we

6   call third-party tax loss be attributed on the basis of conduct

7   that, in fact, occurred after the beginning of the conspiracy

8   period as alleged in Count 1?

9          MR. STILLEY:  Well, that depends on whose story you

10  take.  If you take Mr. Shern's testimony of 1999, I think he

11  said was the start, then the timeline would fall in the --

12  within the time of the alleged conspiracy, yes.

13         THE COURT:  Proceed.

14         MR. STILLEY:  Okay.  And that brings up the idea in

15  my mind that I respectfully contend to this Court, it's

16  fundamentally unfair to Oscar Stilley that he has to defend on

17  these two gentlemen that you just mentioned without having it

18  told to him specifically we are relying on this count, for

19  example, Count 1, and then it's either A or B, it's your

20  individual acts or it is the agreement that you made, so that I

21  know which is which, going down that road, and then setting

22  forth in their argument the particularized facts or at least

23  their position of the particularized facts whereby that they

24  can link these things together.  I contend, respectfully, that

25  it's unfair to ask Oscar Stilley to defend at a sentencing

362

1    proceeding without this fundamental information.

2        Okay.  On Mr. Lake, we have an individual who is already

3    criminally charged before he meets Oscar Stilley.  Mr. Lake

4    says that he was told this little snippet.  There's no

5    suggestion that he changed his conduct in any way on the basis

6    of this snippet.  There's no suggestion that there was any act

7    performed by Oscar Stilley to go with the speech whereby that

8    it might be taken out of the category of free speech and put

9    into some other category.

10       We have actual evidence that Mr. Lake fired Oscar Stilley

11   and replaced Oscar Stilley with a new legal team and then he

12   did the trial, and shortly thereafter, pleaded guilty.

13       There's -- it just doesn't make sense to try to attribute

14   all the tax losses of James Lake to Oscar Stilley on the basis

15   of an alleged offhand remark made to James Lake.

16       Taken to its logical conclusion, suppose that an

17   individual, just a person, speaks at a conference and tell --

18   or let's say they just say to ten people I don't file tax

19   returns and those other people happen not to file tax returns,

20   based on the government's theory, that person can be held

21   liable for all ten of those persons' taxes if they didn't file

22   and pay.  Anybody they made this offhand comment to could be

23   held liable, even without any encouragement, any suggestion

24   that someone had said that not filing returns was advisable,

25   and without any evidence of anything that would suggest an

363

1  intent to cause imminent lawless activity.  It just doesn't

2  make sense.

3       It attacks one of the most foundational elements of our

4  constitutional republic:  The right to free speech, the right

5  to criticize the government.  And in this case, it's not even

6  criticizing the government, it's simply making a comment.

7       And I think you can see that the government is not

8  satisfied that such offhand comments or such statements -- even

9  if you just take it as a solemn statement, that such statements

10 are enough, because they continually try to say that it's a

11 little bit more, it's something else, when you -- if you look

12 back at the written record, you don't see any such things.

13      So the government seems to at least tacitly admit that

14 this is not enough evidence to charge the conduct to Oscar

15 Stilley.

16      And, once again, I can't tell you -- based on either the

17 presentence report or the government's sentencing memorandum, I

18 can't tell you where do they start, what particular count, and

19 then at 1B1.3, which particular provision that they went to and

20 then the facts that they've got.

21      I am forced to roam and try to figure out what they did.

22 And if I go down one path, then the government can get up here

23 afterwards and say, oh, he picked the wrong path, it's this

24 other path, and that is why Oscar Stilley should be held liable

25 or tagged with these amounts and that these should be claimed

1    as tax losses.

2        Your Honor, if I could set this aside and get back to my

3    paperwork.

4            THE COURT:  Surely.

5            MR. STILLEY:  Your Honor, the criminal -- the

6    criminal source question to me is rather confusing with various

7    different theories about how that might be.

8        The addendum at page 8 -- PSR addendum at page 8 addresses

9    this and says there is no evidence that the defendant defrauded

10   anyone but the IRS.

11       On the basis of my central argument, Mr. Shern has already

12   testified that the conspiracy was not to defraud the IRS, it

13   was to defraud the people who put money in, the people who gave

14   money to Lindsey Springer or Oscar Stilley.  That is who that

15   was.  And the -- and that's the evidence that we have to go

16   on.

17       The probation department is saying that this was an effort

18   to hide Turner's liquid assets from the IRS, and, secondly, to

19   fund Turner's defense.  The transaction was clearly a scam, but

20   its object was to defeat the IRS, not rip off Turner.

21       And I would respectfully contend -- well, I've already

22   stated the reasons that the lawyer should not be punished for

23   doing something he didn't have any other opportunity to -- he

24   didn't have an opportunity to change or do differently, and it

25   -- there's no evidence in the record that I can see from which

```
1    a finding could be made that Oscar Stilley would have had any

2    knowledge about such a plan even if it did exist.  And there

3    has to be some evidence.

4        As to the obstruction of justice, that seems to be a

5    contention that Oscar Stilley did not satisfactorily comply

6    with the subpoena from the government.  Now, actually, that's

7    not all of it.  There's two parts:  One, there is the

8    contention that Oscar Stilley testified that the money was not

9    gross income, that it was simply gifts or donations.  With

10   respect to that information, I would respectfully contend that

11   there's no basis for saying that that is perjury, because an

12   attorney could make that argument and might win.  I think this

13   Court would recognize that based on the evidence that we have

14   before us, that an attorney could argue this matter in tax

15   court, in the district court, at a circuit court or otherwise,

16   and have a possibility of winning.  And there's no evidence

17   that I can recall from anybody suggesting that Oscar Stilley

18   did not actually believe these facts and have at least a

19   reasonable basis for these facts.

20       For example, the words of Mr. Patterson, his conduct at

21   the time -- I'm not saying necessarily that there was evidence

22   that Oscar Stilley saw his letter saying that it was a

23   donation, but, nonetheless, the -- all the people who had

24   spoken to Oscar Stilley had said this is -- to say to give

25   money, had said this is a donation, and Oscar Stilley could
```

1  reasonably rely on the representations of his own clients to

2  say this money was actually a donation.  The people that told

3  me to give it said that it was a donation.

4      There would have to be some evidence to show that Oscar

5  Stilley could not reasonably rely upon the representations of

6  his own clients to tell the grand jury what he perceived and

7  what he believed.

8          THE COURT:  In responding to the grand jury subpoena,

9  is it your contention that, in so doing, you were acting as

10  attorney for Lindsey Springer?

11          MR. STILLEY:  Certainly not.  Certainly not.  I was

12  -- I was subpoenaed as a witness.

13          THE COURT:  Proceed.

14          MR. STILLEY:  Now, the second part of this, and once

15  again, I take great umbrage at this -- well, actually on this

16  one, I do understand what they're saying.  They're saying that

17  there's two ways that Oscar Stilley obstructed justice.  The

18  other way is to say that Oscar Stilley didn't give all the

19  documents that were responsive to the subpoena.

20      What they're really saying is that Oscar took too narrow

21  of the reading of the literal words of what they said and

22  literally complied with what they said.

23      However, there was another subpoena that was issued, there

24  was a date set, and between the time of the setting of that

25  date and the date -- and the date for performance, there was a

1  proceeding in the Northern District of Oklahoma in which

2  Mr. Snoke jumped up and said, Oscar Stilley is under criminal

3  investigation.

4      Well, now they have spilled the beans and told Oscar

5  Stilley that he is, in fact, under criminal investigation, when

6  Mr. Shern had previously said that wasn't the truth.

7      Subsequently, the government withdrew that subpoena.

8      It just doesn't make sense to tag Oscar Stilley with

9  obstruction of justice for not responding to a subpoena that

10 was withdrawn.

11     Now, they may say, well, it was for not responding to the

12 previous subpoena --

13         THE COURT:  Let me shorten this up a little bit.  I

14 have no inclination, unless you persuade me otherwise, to find

15 obstruction on the basis of any deficiency in document

16 production.

17         MR. STILLEY:  Okay.  Thank you, Judge.  That's all I

18 need to know.

19     Your Honor, could I have just a moment?

20         THE COURT:  Surely.

21         MR. STILLEY:  Thank you.

22     Your Honor, to the extent that there's any discussion of

23 sophisticated means, I am not speaking on any person's behalf

24 other than my own.  Of course, as a pro se person, that is the

25 general rule, but as to Oscar Stilley, this couldn't possibly

1   constitute sophisticated means.

2        I don't want to reiterate what I've already said before

3   about Count 1, but I think that's true here, but as to the

4   question of sophisticated means, we do have a situation where

5   Oscar Stilley had a legal duty to do what he did and simply did

6   the job that he was required to do, and nobody stated any other

7   way that Oscar could have handled his affairs so that he would

8   escape this conduct or this enhancement.

9        The Court did make a comment about the cost of prosecution

10  as that being shockingly low; however, I believe general legal

11  principles require the government to put on some proof.  And in

12  this case, Oscar Stilley objected to the costs of prosecution

13  partly for legal, as well as for factual reasons.

14       The government chose not to be specific about where that

15  they were going.  They chose not to say the -- I think it was

16  7206 or 7406.  I think it's 7206 -- which provision that they

17  were relying upon to get to the costs of prosecution.

18       They didn't put any evidence of it on.  And I'm not going

19  to speculate it was negligence as opposed to a conscious

20  decision.  It may well have been a conscious decision for the

21  simple fact, if they had put it on, then Oscar Stilley is going

22  to cross-examine on the basis of the facts as they might apply

23  to the law that the witness relied upon to say that costs of

24  prosecution were appropriate.

25       Now, when we go to the restitution, I think we have a

1   similar circumstance there, that the government is not being

2   sufficiently clear about the specific reasons that they should

3   be entitled to the restitution.

4         They -- if they chose to or if the probation department

5   chose to, they could go and specifically state here is the

6   restitution provision, here is the specific part of this law

7   that we're relying on, and here is the count that we're relying

8   upon to tag in to get the restitution, then we would have a

9   sort of chain of command so that I would have a means of

10  effectively rebutting that claim of restitution.  We didn't

11  have that.

12        I do appreciate the probation department setting forth the

13  fact that it would not be mandatory restitution, but I still

14  take the position that restitution is not proper in this case.

15        Now, there's a suggestion that Oscar Stilley should be

16  liable for Lindsey Springer's state tax and federal tax and

17  Oscar Stilley -- or Lindsey Springer, the converse.

18        Of course, I'm arguing on my own behalf, but I think it's

19  helpful for the Court in determining these general issues.

20  Let's stop and think about this.

21        If the government wanted to get this enhancement, or if

22  anybody wanted to promote this, surely they would say

23  specifically what state they're talking about.  And in my

24  initial presentence report, it didn't say what specific state

25  they were talking about, didn't give specificity about the

1 amounts, which, once again, left me, a week before the

2 sentencing hearing, before I had information, the summaries,

3 that would give me information from which that I could even

4 divine how they were going about this.

5      Now, as to these tax, and especially but not limited to

6 the state tax, we have to, once again, consider we have the

7 rule, we have the guideline, and the government or the

8 probation department had the power to say exactly how they were

9 doing this.

10     We are starting with, for example, Count 1.  That's where

11 we start.  And we also say that it was your individual conduct,

12 so we go to subpart A.  We're going to go there.  And here is

13 the facts that cause you to have a state tax liability.

14     None of those things were done.  There was -- nothing has

15 been done through the evidence or through the theory to hook up

16 a legal basis for holding Oscar Stilley liable for Lindsey

17 Springer's state taxes with Oscar Stilley's range of

18 punishment.  And I respectfully contend that that deprives due

19 process not to be given that information.

20     And, furthermore, even as to, for example, Oscar Stilley's

21 alleged liability, we have the same impediment, we have the --

22 nobody seems to want to say, okay, Mr. Stilley -- scratch

23 that.

24     We heard the government say there's no venue for Oscar

25 Stilley's personal taxes in this district.  There's no venue.

1    Now, we all understand that's not the end of the question.

2    That's really kind of the start of the question when you're at

3    the sentencing phase.  But it's not the end of the question.

4        And here is what has to be done.  Once again, the

5    government would have to say, okay -- for example, Count 1 --

6    and I'm presuming that if they had done their job, they would

7    have gone to Count 1, they would go to Count 1, and then they

8    would go to subpart B in the case of jointly undertaking

9    activity and show how that Oscar Stilley's alleged tax

10   liabilities can be brought into this sentencing phase -- how

11   that can be brought into this sentencing phase on the basis of

12   the facts.

13       And when we look at the facts, what we have to look at is

14   that this occurred during the commission of the offense of

15   conviction in preparation of that offense or in the course of

16   attempting to avoid detection or responsibility for that

17   offense.

18       We simply don't have that.  We cannot get there no matter

19   which choice is taken.  There is an insurmountable hurdle for

20   the government no matter what road they go down.

21       I would respectfully contend that the reason the

22   government was not specific in their legal theories and their

23   factual basis is because they didn't want to pin themselves

24   down.  They wanted to leave themselves open so that they could

25   put their witness on the stand and have him give a theory that

1   was totally inconsistent with matters stated previously.

2       Your Honor, could I have just a moment again?

3               THE COURT:  Surely.

4               MR. STILLEY:  Unless the Court has questions, I have

5   nothing further.

6               THE COURT:  Let me -- stand by just a moment,

7   Mr. Stilley.  Let me -- I may have a question.

8       I don't see in the addendum to the presentence report,

9   either with respect to you or with respect to Mr. Springer,

10  that there was any objection to the cost of -- with respect to

11  cost of prosecution.  Maybe -- let me make sure that was

12  covered in the first instance in the presentence report.

13              MR. STILLEY:  I think I can help you, Judge.  I think

14  that was paragraph 55 and just about at the last page.

15              THE COURT:  Paragraph 55 in the presentence report

16  with respect to you?

17              MR. STILLEY:  Yes.

18              THE COURT:  Okay.  Now -- and, again, I just went

19  back through the addendum, both with respect to you and with

20  respect to Mr. Springer, and I certainly could have missed it,

21  but is there any place in the addendum in your instance that

22  there is a statement to the effect that you did object to the

23  paragraph with respect to cost of prosecution?

24              MR. STILLEY:  Your Honor, I really don't think there

25  is, and I complained just a little bit.  I tried not to be too

1  strident or anything, but I complained that I didn't feel like

2  my objections were sufficiently addressed in certain cases.

3              THE COURT:  Well, did you, in fact, object with

4  respect to paragraph 55?

5              MR. STILLEY:  I, in fact, did and I can tell you

6  exactly where I did that too.  That would be in my objections

7  at page 14, and it says, "Stilley objects to paragraph 55 in

8  its entirety.  26 USC 7206 has nothing to do with this case."

9  Wait a minute.  No, wait a minute.  I think -- is it 56 --

10  okay.  Both of those -- you can see what I said there.

11             THE COURT:  This is what -- which pleading is it that

12  you're reading from now?

13             MR. STILLEY:  I am -- pardon me.  It is the

14  objections of Oscar Stilley, and, unfortunately, they don't

15  have a number on them.  I think -- well, I can tell you when it

16  was filed.  It was filed the 11th of March.  And I apologize.

17  I see the government has a good practice of putting the sealed

18  document notice of electronic filing on theirs.  I didn't do

19  that.  So I'm not sure what number that is.  I'm suspecting

20  314.

21             MR. O'REILLY:  Your Honor, I don't recall what the

22  number was, but Mr. Stilley had no objection to the factual

23  predicate of paragraph -- of the cost of prosecution.  It had

24  something to do with 26 USC Section 7206(2), having nothing to

25  do with the case --

Tracy Washbourne, RDR, CRR
United States Court Reporter
U.S. Courthouse, 200 N.W. 4th St.
Oklahoma City, OK 73102 * 405.609.5505

```
 1              THE COURT:  Let's not -- from either Mr. O'Reilly or
 2   Mr. Stilley, let me see what the objection --
 3              MR. O'REILLY:  May I approach, Your Honor?
 4              THE COURT:  You may.
 5              MR. O'REILLY:  Towards the back, Your Honor.
 6              THE COURT:  Okay.  I don't construe this as -- I
 7   mean, you say you object to paragraph 55 in its entirety, but
 8   then you say that simply that 26 USC Section 7206 has nothing
 9   to do with this case.  I'm hard-pressed to conclude that that
10   put the dollar amount in issue.  Nothing was -- to the extent
11   you chose to get specific, you got specific about a legal issue
12   under Section 7206.
13        Go ahead.
14              MR. STILLEY:  I think I can help you out on that,
15   because I did also incorporate Mr. Springer's objections, and
16   at page 14 of his objections, he was more specific and said --
17   he said that for purposes -- would you like me to take this and
18   let you read the document?
19              THE COURT:  If you would, give that to the clerk and
20   let me take a look at it.
21              MR. STILLEY:  Sure.
22              THE COURT:  Well, Mr. Springer's objections did take
23   issue with respect to the amount.  I'll give this back to the
24   clerk.
25              MR. O'REILLY:  Your Honor, if I may, what paragraph
```

1  are we addressing?  Because I am not finding that.

2          THE COURT:  Mr. Stilley, if you would let

3  Mr. O'Reilly take a look.  He said he would want -- I don't

4  know if he said for purposes of sentencing or appeal, but he

5  said he would want a complete accounting of it.  I think,

6  fairly construed, that means he is taking issue with the

7  amount.

8          MR. O'REILLY:  Thank you.

9          THE COURT:  Thank you, Mr. Stilley.

10         MR. STILLEY:  Thank you, Judge.

11         THE COURT:  I do have one question for

12 Mr. O'Reilly.  And I'm not inviting rebuttal argument, mind

13 you, but I do have one question.  I'm going to ask this

14 question and then I'll give the defendants an opportunity to

15 address it, if they so choose.

16     I'm concerned with the tax loss attribution among others,

17 with respect to Mr. Roberts.  That obviously applies only to

18 Mr. Stilley.

19     The tax loss is apparently attributed to the tax years '92

20 through '95 and the comments that the government relies on by

21 Mr. Stilley were apparently said back in 1990 or 1991.

22     That perhaps has some of its own factual issues, but then

23 I come to Application Note 2 under Guideline 2T1.1, and the way

24 I read Application Note 2 as it relates to individual conduct

25 as opposed to jointly-conducted activity, I have to find, in

 1  order to attribute a tax loss to Mr. Stilley relating to

 2  Mr. Roberts' tax liability from -- based on comments made by

 3  Mr. Stilley to Mr. Roberts back in the early nineties, I have

 4  to find that is part of the same course of conduct, unless the

 5  -- that that includes -- well, let me put it this way:

 6  Application Note 2 says, and I quote, "In determining the total

 7  tax loss attributable to the offense," and then it cites

 8  Guideline -- the relevant part of Guideline 1B1.1 -- "all

 9  conduct violating the tax laws should be considered as part of

10  the same course of conduct or common scheme or plan unless the

11  evidence demonstrates that the conduct is clearly unrelated."

12      Now, the people who wrote the guidelines, whatever else

13  might be said of them, they used words sometimes -- when they

14  intended to be vague, they were vague.

15      One of the best illustrations of that, not involved in

16  this case, is the guideline that provides for an enhancement if

17  a firearm was possessed, with no further guidance than that.  I

18  think that's intentionally vague.

19      Well, I think the language of Application Note Number 2 is

20  intentionally specific.  "Should be considered as part of the

21  same course of conduct or common scheme or plan unless the

22  evidence demonstrates that the conduct is clearly unrelated."

23      Well, that, I take it, as a rather pointed effort from a

24  drafting standpoint to cast the burden on the defendant to show

25  that any particular activity was unrelated, because it says,

1  "unless the evidence demonstrates that the conduct is clearly

2  unrelated."

3      Even with that rather pointed thrust, if you will, I'm

4  having some difficulty taking Mr. Stilley's statements to

5  Dr. Roberts in the early nineties and relating that in any way

6  to the matters of which these defendants stand convicted so as

7  to tack it on, if you will, from a relevant conduct

8  standpoint.

9      I need you to help me on that.

10         MR. O'REILLY:  Your Honor, I believe the Court would

11  have absolutely no problem -- in fact, I know -- I believe the

12  presentence investigation report concluded correctly that

13  Mr. Springer's failure to file in earlier years --

14         THE COURT:  You mean Mr. Stilley?

15         MR. O'REILLY:  No, Mr. Springer, his failure to files

16  are relevant conduct for the tax loss for Mr. Springer from

17  1990 to 1995.

18      Similarly, Mr. Stilley did not file returns, despite

19  earning income, throughout the 1990s.  If we were talking about

20  his income, I think the Court would be similarly easily

21  persuaded that that is part of the same course of conduct.

22  It's his willful violation of tax laws.  We don't have that

23  information, but we do have --

24         THE COURT:  We don't have what information?

25         MR. O'REILLY:  What Mr. Stilley was earning for the

1  1990s.  We just don't know.  If we had that information, if we

2  had a calculable tax loss with respect to Mr. Stilley's

3  failures to file through the nineties, that would be readily

4  and easily seen as part of the same course of conduct.

5       In the same vein, it's important, the United States

6  believes, that if he is counseling people to not file and

7  continues to conduct that same course of conduct up to and into

8  the conspiracy he joined with Mr. Springer in 2000, that

9  misconduct or -- is relevant conduct as to him.

10      And that's the government's theory upon which under 1B1.3

11 (a)(1)(A), all acts and omissions committed, aided, abetted,

12 counseled -- and it goes on -- or willfully caused by the

13 defendant are includable as relevant conduct.

14      If the evidence showed --

15           THE COURT:  Well, wait a second.  Well, (a)(1)(A) is

16 qualified also by the language "that occurred during the

17 commission of the offense of conviction in preparation for that

18 offense or in the course of attempting to avoid detection or

19 responsibility for that offense."

20      Now, it should also be pointed out that Subsection A goes

21 on, in (a)(2), to say, "solely with respect to offenses that

22 require grouping," which this -- which under 2T1.1 does --

23 "that were part of the same course of conduct or common scheme

24 or plan as the offense of conviction."

25      Okay.  Then that concept is transplanted over to Guideline

 1  2T1.1, when 2T1.1 talks about should be considered as "part of

 2  the same course of conduct or common scheme or plan unless the

 3  evidence demonstrates that the conduct is clearly unrelated."

 4       So for one thing, I think -- unless I'm missing something,

 5  I think you may actually have a little more wiggle room under

 6  2T1.1, Application Note 2, than under 1B1.1, but --

 7            MR. O'REILLY:  Your Honor, that is correct.  That is

 8  actually what I should have directed the attention of the Court

 9  to.  And it is our position that this was Mr. Stilley's common

10  scheme or plan throughout the 1990s and this century.

11            THE COURT:  There's no question but what he was a

12  non-filer throughout that time; I think the evidence

13  establishes that.

14            MR. O'REILLY:  Yes, Your Honor.  And based upon

15  Dr. Roberts' testimony, it appears that he was also counseling

16  others.  The fact that we only have Dr. Roberts as the one that

17  we have identified does not change the fact that it was part of

18  a common -- Mr. Stilley's common scheme.  The fact that he

19  didn't join forces and conspire with Mr. Springer until 2000

20  does not change that fact.

21            THE COURT:  Has Roberts' testimony been transcribed?

22            MR. O'REILLY:  No, Your Honor.

23            THE COURT:  Okay.  I appreciate your answer to that

24  question.

25       Mr. Stilley, do you have anything to say by way of

1  response on that?

2          MR. STILLEY:  Yes, sir.

3          THE COURT:  I'm just giving you an opportunity to

4  respond to the government's answer to my question.

5          MR. STILLEY:  Okay.  My position would be that,

6  before you can really address what the common scheme

7  encompasses, you would have to know what the scheme was, and

8  that takes us back to what Mr. Shern said, that the scheme

9  under Count 1, which I have to presume that's where we're at,

10  the scheme under Count 1 was to take money away from people who

11  needed legal services, regardless of whether it was tax or

12  otherwise.

13          THE COURT:  I think what Mr. O'Reilly is relying on

14  is the "same course of conduct" language from the Application

15  Note under 2T1.1, as opposed to a common scheme.  You were not

16  hooked up with Mr. Springer back in the early nineties.  So if

17  he -- if he's got anything to go on, it would be the same

18  "course of conduct" language from that Application Note.

19          MR. STILLEY:  Okay.

20          THE COURT:  You don't need to worry -- in other

21  words, you do not need to worry about -- for this purpose, the

22  application of the common scheme concept.

23          MR. STILLEY:  Okay.  As far as course of conduct, the

24  government concedes that they have no evidence of any

25  requirement to file, so -- and, really, that brings up another

1   point:  The fact that Oscar Stilley says -- he tells

2   Dr. Roberts -- if he says he doesn't file, that's irrelevant.

3   If he says that he can't find a basis for being required to

4   file, that is a little bit different situation.

5       But when you look at what was going on at that point in

6   time, the government is simply saying, well, he made a comment,

7   he didn't file returns.

8       They don't know how much money Oscar Stilley made.  I

9   don't see how that they could possibly get where they're going

10  under that different approach.

11          THE COURT:  Do you take issue with Dr. Roberts'

12  testimony in this courtroom that you told him that he had no

13  obligation to pay income taxes or file returns?

14          MR. STILLEY:  Your Honor, honestly, I would really

15  like to hear exactly what he said.  Is that a possibility?

16          THE COURT:  No.  What I just told you is pretty

17  close.

18          MR. STILLEY:  Well, Your Honor, I won't dispute what

19  he testified to from the stand.  I didn't think that it was

20  simply fair, and that's why I was really hoping I could get a

21  copy of the transcript at this point in time, but --

22          THE COURT:  We're past that.  Both sides have had

23  ample opportunity to order a transcript.

24      Do you take issue with Dr. Roberts' testimony in which he

25  characterized you as quite gifted in legal and constitutional

1  issues?

2          MR. STILLEY:  No, I don't contest that.  I don't

3  recall if he said what his time frame was.  As for today, I

4  would agree with him.

5          THE COURT:  Very well.  Thank you, sir.

6          MR. STILLEY:  Certainly.

7          THE COURT:  Just a couple more things I'd like to

8  cover before we recess.

9      First of all, Mr. Stilley asserted that his conviction on

10 Count 1 is not a felony.  I disagree with that and I have so

11 stated, and I don't really care to hear argument on that point,

12 but let me inquire first with respect to Mr. Springer:

13 Mr. Springer, you objected to a good many factual paragraphs of

14 the presentence report, and I hope you have sensed that I --

15 that even though you objected to most, if not all, of the

16 factual paragraphs, the Court has not in any sense and does not

17 in any sense have or express any sense of irritation at all.

18 This matter is very important to all concerned and I do hope

19 that you have sensed that I have been here and am here to hear

20 everything that either side has to present.

21      But lest there be any ambiguity, it's my understanding

22 from paragraph 43 that those counts would be -- would carry a

23 maximum of five years each and that paragraph -- that Counts 1

24 through 4 would carry a maximum of five years each, and Counts

25 5 and 6 a maximum of one year each.  Is that your

1  understanding?

2        MR. SPRINGER:  Yes, Your Honor.  The reason I

3  hesitate is one of my issues on appeal is about the meaning of

4  "defraud," and that would be the only hesitation I had in

5  answering that question.

6      But as it stands now, and as I stand convicted on the

7  Court's instructions, I believe that it is five years for Count

8  1 and five years for 2, 3, and 4, and then one year for 5 and

9  6.

10        THE COURT:  The misdemeanor counts one year?

11        MR. SPRINGER:  Yes.

12        THE COURT:  Okay.  Mr. Stilley, I have the same

13  question only with respect to paragraph 41, which is the

14  corresponding paragraph in your presentence report.  Consistent

15  with what I just said, and for that matter, what Mr. Springer

16  said just a moment ago, it is my understanding that the maximum

17  term as it relates to you on Counts 1, 3, and 4 would be five

18  years per count; is that correct?

19        MR. STILLEY:  Well, Your Honor, I would

20  respectfully -- most respectfully continue to urge that Count 1

21  is a misdemeanor on the grounds that the underlying offense was

22  also a misdemeanor, and I understand the complexities and I

23  respect this Court's decision.  That's why that I said, when I

24  started my argument, that I would not replow ground unless the

25  Court asked.

```
 1          THE COURT:  Okay.  Very well.  That's understood.
 2   Thank you.
 3      I'm going to inquire -- does -- and this is a matter that,
 4   again, relates to my desire to see to it that all parties are
 5   heard and understand that they have been heard on all matters
 6   they wish to assert.  I'll inquire first of the government and
 7   then of the defendants.
 8      Does the government or the defendants have any procedural
 9   objection to the manner in which the sentencing proceeding has
10   been conducted to this point?
11          MR. O'REILLY:  Not from the United States, Your
12   Honor.
13          THE COURT:  Mr. Springer?
14          MR. SPRINGER:  Your Honor, does that question begin
15   yesterday morning through today and nothing before that?
16          THE COURT:  That's true.  And if you would like to
17   consult with your standby counsel, feel free.
18          MR. SPRINGER:  Thank you, Your Honor.
19      (DISCUSSION OFF RECORD)
20          MR. SPRINGER:  I'm still thinking about what they
21   just told me, Your Honor.  Sorry.
22      Without -- just prefacing, Your Honor, all my objections
23   up to the sentencing hearing, I maintain those objections
24   through the sentencing hearing, but as to any particular
25   objections, starting from yesterday, not including my previous
```

1 objections, I do not have any new objections.

2          THE COURT:  Thank you.

3     Mr. Stilley.

4          MR. STILLEY:  With respect to the past two days, I

5 don't have objections with the following provisos:  Just as

6 Mr. Springer, I continue to urge all objections during this

7 proceeding and to maintain all arguments made in pleadings

8 prior to this proceeding, and specifically, but without

9 limitation, I continue to urge the lack of adequate notice to

10 prepare for the charges that I would have to meet -- or the

11 issues that I would have to meet today on the basis of what was

12 given to me by the probation department and the government,

13 and, number three, I would continue to urge -- or to argue that

14 my ability to order a complete record in this case for these

15 proceedings is not meaningful because of lack of funds.

16     Other than that, I have no objection to the procedure of

17 these proceedings.

18          THE COURT:  Very well.  On that last point, I urge

19 you to waste no time after we're through tomorrow with getting

20 the -- preparing the necessary paperwork, perhaps with the aid

21 of your standby counsel, to obtain a transcript at public

22 expense.

23          MR. STILLEY:  Thank you, Judge.

24          THE COURT:  Mr. Springer, I have one more question

25 for you, and then I'll be putting the same question to

 1  Mr. Stilley.

 2      Bearing in mind it's a quarter till five and this has --

 3  we've explored seemingly dozens of issues, but there's one

 4  matter that I don't want to determine and address without

 5  giving you an opportunity to concisely respond, and that is

 6  I'll be happy to hear concisely any comments or objections you

 7  may have with respect to the proposed special conditions of

 8  supervision set forth beginning in paragraph 49 of your

 9  presentence report.

10          MR. SPRINGER:  May I review that again for just a

11  moment?

12          THE COURT:  You surely may.

13          MR. SPRINGER:  No, I do not, Your Honor.  That

14  appears to be the exact same language as the bond conditions

15  that I'm on right now.  I believe that's where they came from.

16          THE COURT:  Mr. Stilley?

17          MR. STILLEY:  Your Honor, most respectfully, I would

18  ask that subparagraph A be removed.  I feel that's

19  unnecessary.  I feel that I have comported myself properly with

20  respect to any work that I might do without something of this

21  nature and it seems to me to be overbroad.

22      Obviously, there are laws against unauthorized practice of

23  law, so -- that I would not want to violate any of the laws,

24  obviously.

25      And as to other things, I just don't see any evidence that

1  any acts that I might perform would be either harmful to the

2  public or otherwise such that I should not be permitted to do

3  that.

4      I don't have any objection to the last two sentences of

5  that paragraph.

6      As to paragraph B, the -- it appears to me that the

7  efforts necessary to prepare a proper appeal would consume most

8  of my time, and I would respectfully request that I be allowed

9  to do simply the work that I'm capable of finding, and that I

10  be allowed to do any lawful work that I can find and not be

11  required to do a specific amount.

12      Really, I don't think that the electronic monitoring or

13  the curfew requirements or the travel restrictions are

14  necessary or that they should be so restrictive.  I would

15  prefer that that be removed.  I would think that it could be

16  without any threat of harm.

17      And based in part on the fact that the PSR has been

18  completed, I would respectfully submit that I think C, D, and E

19  could be removed.

20          THE COURT:  Okay.  Thank you, sir.

21      We have now completed all evidence and all argument, short

22  of the government's final comments and the defendants' final

23  comments by way of allocution, which the Court will hear before

24  it imposes the sentence.

25      At nine in the morning, I will make my Rule 32(i)(3)

1  findings as to the disputed portions of the presentence

2  report.  Those will be reduced to writing by way of the

3  transcript of that portion of this hearing in which I do make

4  those findings and that partial transcript will be appended to

5  the non-public statement of reasons portion of the judgment and

6  sentence, which will be distributed to all agencies which will

7  receive copies of the presentence report.

8      So the first order of business tomorrow morning at nine

9  will be my findings pursuant to Rule 32(i)(3) as to the

10  disputed portions of the presentence report.

11      In so doing, obviously, I will rule on all of the

12  objections to the presentence report, and -- which includes the

13  tax loss issue, as well as the various adjustment issues.

14      I will then state my conclusion as to the total offense

15  level and criminal history category under the advisory

16  guidelines.  In each instance, without any contest at all, the

17  criminal history category is 1.

18      And at that point, I will also make appropriate findings

19  with respect to restitution and conditions of supervised

20  release.

21      And I will then hear the final comments of the government

22  and of the defendants by way of allocution and will impose the

23  sentence.

24      So with that, unless either side, government or the

25  defendants, have anything further this afternoon, we will

1  recess, to resume at nine o'clock tomorrow morning, for those

2  purposes and only for those purposes.

3      What says the government?

4      MR. O'REILLY:  Nothing further from the government,

5  Your Honor.

6      THE COURT:  Mr. Springer?

7      MR. SPRINGER:  Yes, I have one request, Your Honor.

8  Is it the Court's intention to allow us to report once we're

9  sentenced?  And if so or if not, would we be able to have an

10 appeal bond hearing tomorrow for the purposes of appeal?

11     I have, like, four cases that I just had to move all those

12 boxes, all the electronic media in all these cases, and I just

13 need to understand how I need to prepare all of that, and I

14 would need a little time to do that if the Court was not going

15 to allow an appeal bond.

16     THE COURT:  I will hear you at the allocution stage

17 or even, if need be, thereafter on that score.

18     MR. SPRINGER:  Thank you.

19     THE COURT:  It is, again, subject to whatever you --

20 what you may have to say and what Mr. Stilley may have to say

21 and, for that matter, what the government may have to say.  It

22 is likely that you will be remanded to custody tomorrow.

23     MR. SPRINGER:  Okay.

24     THE COURT:  Anything further from Mr. Stilley?

25     MR. STILLEY:  No, Your Honor.

390

```
1              THE COURT:  Court will be in recess.

2        (COURT ADJOURNED FOR THE EVENING RECESS.  FOR FURTHER

3   SENTENCING PROCEEDINGS, SEE VOLUME III.)
```

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF OKLAHOMA

3

4    UNITED STATES OF AMERICA,

5              Plaintiff,

6    vs.                          Case No. CR-09-043-SPF

7    LINDSEY KENT SPRINGER and
     OSCAR AMOS STILLEY,
8
               Defendants.
9
     _____
10

11

12              SENTENCING PROCEEDINGS

13         BEFORE THE HONORABLE STEPHEN P. FRIOT

14            UNITED STATES DISTRICT JUDGE

15                APRIL 23, 2010

16              VOLUME III OF III

17

18

19

20

21

22

23

24

25

392

```
 1   APPEARANCES:
     FOR THE GOVERNMENT:
 2                             Mr. Charles Anthony O'Reilly
                               U.S. Dept. Of Justice (Box 972)
 3                             P.O. Box 972
                               Washington, DC 20044
 4
                               Mr. Kenneth P. Snoke
 5                             U.S. Attorney's Office (Tulsa)
                               110 W. 7th Street, Ste. 300
 6                             Tulsa, OK 74119

 7

 8   FOR DEFENDANT SPRINGER:
                               Mr. Lindsey Kent Springer
 9                             5147 S. Harvard Ave.
                               Ste. 116
10                             Tulsa, OK 74135

11                             Mr. Robert Scott Williams
                               Standby Counsel
12                             Taylor Ryan Schmidt
                               436 S. Boulder Ave., Ste.850
13                             Tulsa, OK 74119

14   FOR DEFENDANT STILLEY:
                               Mr. Oscar Amos Stilley
15                             7103 Race Track Loop
                               fort Smith, AR 73901
16
                               Mr. Robert Burton, IV
17                             Standby Counsel
                               Burton Law Firm, PC
18                             320 S. Boston, Ste. 2400
                               Tulsa, OK 74103
19

20

21

22

23

24

25
```

1            THE COURT:  I note the presence of all parties and

2    counsel as before.  I will now make my Rule 32(i)(3) findings

3    as to the disputed portions of the presentence report.  These

4    findings will be reduced to writing by way of the transcript of

5    this portion of the sentencing proceedings in which I make

6    findings pursuant to Rule 32(i)(3).  As I mentioned yesterday,

7    this partial transcript will be appended to the non-public

8    statement of reasons portion of the judgment and sentence which

9    will be distributed to all agencies which will receive copies

10   of the presentence report.

11           The first issue that I'll address is the issue of tax

12   loss.  In many ways, this is the most complex of the

13   guidelines-related issues as a review of the proceedings the

14   last two days will indicate.

15           In addressing tax loss, I refer first to Guideline 2T1.1,

16   in particular Application Note 2.  And, by the way, Lori,

17   there's one other set of materials that I need you to bring in.

18           Application Note 2 provides valuable guidance, as one

19   might expect, with the application of Guideline 2T1.1.

20   Application Note 2 states, and I quote, "In determining the

21   total tax loss attributable to the offense," and then it refers

22   to Guideline 1B1.3(a)(2), continuing the quote, "All conduct

23   violating the tax laws should be considered as part of the same

24   course of conduct or common scheme or plan unless the evidence

25   demonstrates that the conduct is clearly unrelated.  The

1   following examples are illustrative of conduct that is part of

2   the same course of conduct or common scheme or plan:  (a),

3   there is a continuing pattern of violations of the tax laws by

4   the defendant; (b,) the defendant uses a consistent method to

5   evade or camouflage income, e.g., backdating documents or using

6   offshore accounts; (c), the violations involve the same or a

7   related series of transactions; (d), the violation in each

8   instance involves a false or inflated claim of a similar

9   deduction or credit; and, (e), the violation in each instance

10  involves a failure to report or an understatement of a specific

11  source of income, e.g., interest from savings accounts or

12  income from a particular business activity.  These examples are

13  not intended to be exhaustive."

14       On this point, I do derive, also, substantial guidance

15  from the decision of the Court of Appeals in United States v.

16  Meek, 998 F.2d 776.  In that case, beginning on page 781, Judge

17  Ebel, writing for the court, said, and I quote, "In determining

18  the tax loss, a court is required to engage in a two-step

19  analysis.  First, the court must decide which tax deficiencies

20  to aggregate together.  Second, it must determine how to

21  calculate the amount of aggravated deficiencies."

22       Then on page -- continuing on page 781, a little farther

23  down the page, the court stated, and I quote, "For offenses

24  like tax evasion for which Section 3D1.2(d) would require

25  grouping of multiple convictions, Section 1B1.3(a)(2) defines

1  relevant conduct to include 'all acts or omissions that were

2  part of the same course of conduct or common scheme or plan as

3  the offense of conviction.'"  Citing Section 1B1.3(a)(2).  Now,

4  continuing in the quote, "The commentary makes clear that the

5  defendant need not have been charged or convicted of these

6  related acts or omissions in order for them to qualify as

7  relevant conduct."

8       And, obviously, that concept is central to

9  the guidelines and central to sentencing in this case because

10  the defendants' activities, in violation of the tax law, have

11  been shown to far exceed the matters -- both temporally and

12  otherwise to far exceed the matters alleged in the indictment.

13       Finally, in the Meek case, over on page 782, the court

14  reached its conclusions in that case.  And I quote, "In light

15  of Section 1B1.3(a)(2), it is clear that the district court had

16  authority to consider the defendant's failure to file tax

17  returns for the years 1984 through 1986 and 1989 through 1991,

18  even though not charged in the indictment as long as the

19  failure to file was part of the same course of conduct for

20  which the defendant was convicted.  We have no trouble

21  concluding that it was.  The commentary to Section 2T1.1 states

22  that, quote, and this is an internal quote, 'all conduct

23  violating the tax laws should be considered as part of the same

24  course of conduct or common scheme or plan unless the evidence

25  demonstrates that the conduct is clearly unrelated.'  The

1    commentary goes on to say that, 'a continuing pattern of

2    violations of the tax laws by the defendant is an example of

3    conduct that is to be considered related conduct.'

4         After citing Section 1B1.3, as I have indicated in

5    Guideline 2T1.1, the court in the Meek case then went on to

6    give its commentary as to how those ought to be applied in the

7    case then before it.  The court stated, and I quote, "This

8    commentary indicates that the government may prove that the

9    defendant's non-charged conduct was part of the same course of

10   conduct as the offense of conviction either directly by

11   establishing that this conduct was part of a continuing pattern

12   of tax violations or indirectly by establishing simply that all

13   the conduct to be aggregated constituted violations of the tax

14   code.  In the latter situation, the government is entitled only

15   to a rebuttable presumption that the defendant's non-charged

16   conduct was part of the same course of conduct as the offense

17   of conviction and the defendant may defeat this presumption by

18   coming forward with evidence that his non-charged conduct was

19   clearly unrelated to his conviction."

20        Obviously, as one might conclude from those passages from

21   the Meek case, the Court of Appeals certainly has provided

22   valuable guidance with respect to the application for Guideline

23   2T1.1.

24        The course of conduct for both of these defendants, as

25   relevant for purposes of Guideline 2T1.1, is, under the Meek

1  case and under the terms of the guideline itself, not

2  necessarily co-extensive with the conspiracy period alleged in

3  the indictment or, for that matter, with the period of

4  individual or joint tax evasion activity actually shown by the

5  evidence at trial.  Under Guideline 2T1.1, I look to all

6  conduct violating the tax laws unless the evidence demonstrates

7  that the conduct is clearly unrelated.  The consistent pattern

8  of non-compliance with the tax laws goes back before 1990 for

9  each of these two defendants.  By their own admission, they met

10 and made common cause when they met at the Pizza Hut with

11 Phillip Roberts in 1999.

12     For the years before that, each defendant is accountable,

13 under the guidelines, for tax losses attributable to his own

14 acts and omissions if there was a continuing course of criminal

15 conduct to the period of time encompassed by the indictment.

16 After that, each defendant is at least potentially accountable

17 under the guidelines for tax losses attributable to the acts of

18 the other defendant to the extent that those losses are rooted

19 in their jointly-undertaken criminal activity.

20     I will now make my findings as to tax losses with respect

21 to both defendants as to all matters other than Mr. Turner and

22 then I will make my findings with respect to Mr. Turner.

23     As to Mr. Springer, for 1990 through 1995, I find his tax

24 losses to have been established by credible evidence with

25 respect to the assessments against him and those assessment

1   amounts will be adopted for sentencing purposes.  For 1999

2   through 2007, the matter is a bit more complicated.  I have

3   eliminated the $12,000 per year in miscellaneous small

4   payments.  Now, I have no doubt that some of those payments

5   were income to Mr. Springer and under the law as articulated in

6   the jury instruction with the heading "gift minister" an

7   instruction, which I am persuaded does accurately state the

8   law, perhaps all or virtually all of those receipts did, in

9   fact, constitute income to Mr. Springer.

10       However, for the purpose of specific tax loss findings,

11  which the jury was not required to make, I do not have evidence

12  of a quality which would enable me to evaluate those relatively

13  small payments that probably amounted to thousands of

14  individual remittances.

15       As to the other receipts for the years 1999 through 2007,

16  I have relied on the evidence admitted at trial and in this

17  sentencing proceeding and have eliminated those payments as to

18  which I am not persuaded that the requisite showing has been

19  made.  Both defendants received numerous checks that in

20  Mr. O'Reilly's words had the inherent appearance of income.

21       When I make my specific year-by-year findings, which I

22  will do shortly, the amounts that I will state for each year

23  will reflect the payments which I am persuaded amounted to

24  gross income to Mr. Springer and the same will certainly apply

25  to Mr. Stilley, although the factual situation as to the

1  payments received by Mr. Stilley is somewhat less complicated

2  than it is with respect to Mr. Springer.

3      This brings me to Dr. Roberts and Messrs Lake, Turner, and

4  Patterson.  I find that Mr. Springer is accountable for the

5  loss attributable to Mr. Turner but not for the loss

6  attributable to Mr. Patterson or Mr. Lake.  As I have said, I

7  will address Mr. Turner momentarily.

8      With respect to Mr. Lake, I have reviewed the trial

9  testimony as taken by the reporter.  The testimony of Mr. Lake

10 as it relates to Mr. Stilley is strong and convincing.  The

11 testimony of Mr. Lake vis-a-vis Mr. Springer is noticeably

12 weaker.  At trial, Mr. Lake quoted Mr. Stilley as telling him,

13 in substance, I'm an attorney, I haven't paid taxes in ten

14 years, you don't understand, you don't have to file taxes.  And

15 Mr. Stilley used those assurances in order to convince Mr. Lake

16 that Mr. Stilley could handle his problem and that he was in

17 good hands.

18      After Mr. Lake gave that testimony, he was asked

19 approximately when did that conversation happen, and Mr. Lake

20 said, it was numerous times, it was reinforced numerous times.

21 But the testimony of Mr. Lake with respect to Mr. Springer, as

22 I have said, is noticeably weaker.  Mr. Lake would only go so

23 far as to say, in substance, that Mr. Springer had referred to

24 a case that they were handling for a dentist and that

25 Mr. Springer told Mr. Lake that we have won cases in Illinois.

1          Now, Mr. Lake did quote Mr. Springer as saying, in

2     substance, you don't have to pay taxes and that's the law.  But

3     in the overall context of Mr. Lake's testimony, and bearing in

4     mind that causation must be found for a tax loss conclusion as

5     distinguished from the issue as to whether the defendants

6     encouraged others to violate the tax law, I am unable to find

7     that the testimony with respect to Mr. Springer's comments to

8     Mr. Lake is sufficiently specific, especially as compared to

9     the testimony about what Mr. Stilley said to Mr. Lake to enable

10    me to find that the tax loss attributable to Mr. Lake should be

11    likewise attributed to Mr. Springer.

12         As I have said, bearing in mind that for tax loss

13    purposes, causation is required, even though causation is not

14    required with respect to the adjustment for encouragement to

15    violate the law, I simply do not find a casual connection

16    between Mr. Springer's statements to Mr. Lake and his failure

17    to comply with the tax law.

18         With respect to Mr. Stilley, it is much easier.  He was

19    quoted, and I believe this was essentially unrebutted and if it

20    was attempted to be rebutted, it would not have been credible,

21    from Mr. Stilley, that Mr. Stilley repeatedly assured Mr. Lake

22    not only that he had not paid taxes in ten years, but you

23    simply do not have to file taxes.  And, as Mr. Lake said, this

24    was reinforced numerous times.

25         Now, as to Dr. Roberts, there is quite properly no

1  contention that Mr. Springer should be held accountable for the

2  tax loss attributed to Dr. Roberts.  I conclude that

3  Mr. Stilley is accountable for the tax loss attributable to

4  Dr. Roberts, even though those losses occurred in the early and

5  mid-1990s.  Under Guideline 2T1.1, Mr. Stilley is accountable

6  for all conduct violating the tax laws as part of the same

7  course of criminal conduct regardless of whether it took place

8  in the context of jointly-conducted criminal activity unless

9  the evidence demonstrates that the conduct is clearly

10 unrelated.

11      Criminal tax violations were Mr. Stilley's way of life,

12 starting before the earliest year of the tax losses relating to

13 Dr. Roberts.  Criminal tax violations are Mr. Stilley's way of

14 life to this day.  Early in his career as an unrepentant tax

15 cheat, Mr. Stilley began espousing the view, which he espoused

16 to Dr. Roberts, that Dr. Roberts had no obligation to pay

17 incomes taxes or to file a tax return.

18      Dr. Roberts' testimony at trial persuades me that he found

19 Mr. Stilley to be a convincing source of tax counsel.  Advice

20 to an individual earning significant income that he is not

21 obligated to comply with the tax laws is certainly

22 counterintuitive to any reasonably intelligent person, but that

23 sort of advice can nevertheless be attractive to a person who,

24 although intelligent, is at the same time fool enough to let

25 his beliefs be dictated by financial convenience rather than

1  logic.  This is especially so when the advice is coming from an

2  individual who expresses himself with the vehemence that

3  characterizes Mr. Stilley's expression of his professed beliefs

4  about the law.

5      I am convinced that Mr. Stilley was persuasive enough and

6  Dr. Roberts was gullible enough that Mr. Stilley's professed

7  views carried the day with Dr. Roberts leading directly to a

8  substantial loss of revenue to the taxing authorities.  The

9  profession of these views, together with the persistent willful

10 failure to file returns, amounts to an unbroken course of

11 conduct for Mr. Stilley from those days in the early 1990s to

12 and through the periods directly involved in the counts of

13 conviction in this case.  Mr. Stilley is accountable for the

14 tax loss, penalties, and interest attributed to Dr. Roberts.

15     In contrast, Mr. Eddy Patterson's testimony is weak as to

16 both defendants.  He ventured only that both defendants told

17 him that they did not file returns.  He said that he hoped that

18 this demonstrated that they were sincere in their

19 representation of him, which is about as logical as a crack

20 dealer wanting to make sure that his lawyer is also a crack

21 dealer.

22     In any event, I do not find the persuasive evidence of

23 inducement or causation as between the defendants and

24 Mr. Patterson that I would need to have in order to hold either

25 of the defendants accountable for the tax loss relating to

1    Mr. Patterson that I am urged to attribute to the defendants.

2        This brings me to Patrick Turner.  The transaction between

3    the defendants and Mr. Patrick Turner is, as we all know,

4    relevant both on the issue of tax loss and on the question of

5    whether there should be an enhancement under Guideline

6    2T1.1(b)(1) for failure to report income exceeding $10,000

7    derived from criminal activity.

8        Mr. Springer teamed up with Mr. Turner and Mr. Stilley to

9    defraud the United States, or at least to impede and impair the

10   collection of taxes, by parking Mr. Turner's money in

11   Mr. Stilley's IOLTA account.  And then Mr. Springer and

12   Mr. Stilley wasted no time teaming up to defraud Mr. Turner.

13   Because I am convinced that from the minute that Mr. Turner was

14   induced to mortgage his two houses, I say mortgage his two

15   houses, and to wire that money to Mr. Stilley's IOLTA account,

16   it was fully the intent of Mr. Springer that Mr. Turner would

17   never again see a penny of that money.  And it was fully the

18   intent of Mr. Stilley to cooperate in every way with

19   Mr. Springer to bring about that result if that was

20   Mr. Springer's desire.

21       At the time Messrs Springer and Stilley took Mr. Turner's

22   $250,000, their recollection of their merciless fleecing of

23   Mr. Art Hawkins of $256,000 was still relatively fresh in their

24   minds, and they knew a vulnerable target when they saw one.  So

25   Mr. Springer's $250,000 transaction with Mr. Turner was

404

1    fraudulent in its inception.

2        From Mr. Springer's perspective, it was fraudulent in two

3    ways.  It was fraudulent in that by parking this money in

4    Mr. Stilley's IOLTA account, Mr. Springer's and Mr. Stilley's

5    intent was to obstruct the enforcement of the tax laws of the

6    United States as to Mr. Turner.  This transaction was also

7    fraudulent in that the evidence convincingly demonstrated that

8    one way or the other, and contrary to Mr. Turner's intent,

9    Mr. Springer's intent was that Mr. Turner would never see that

10   $250,000 ever again.

11       Mr. Springer wasted no time turning that money into a

12   motor home and a Lexus.  Mr. Turner thought he was parking his

13   money, but, as I have said, as far as Mr. Springer is

14   concerned, it was gone forever the day that it hit

15   Mr. Stilley's IOLTA account.

16       The evidence as to the Uniform Commercial Code security

17   interest and the recent and very convenient repossession of the

18   motor home is entirely unpersuasive.  The motor home was

19   repossessed virtually on the eve of this sentencing and very

20   shortly after Mr. Springer saw the government's sentencing

21   memorandum.  After Mr. Springer read page 14 of the

22   government's sentencing memorandum and considered those

23   contentions in combination with the fact that the government

24   was in the process of seizing all of his property that it could

25   find, it made perfect sense for Mr. Springer to seek to

1  legitimize an intrinsically fraudulent transaction by getting

2  the motor home repossessed.

3      I should add that I am certainly mindful that it is not

4  enough for the government to show that Messrs Springer and

5  Stilley defrauded or impeded the IRS by taking Mr. Turner's

6  money and putting it in the IOLTA account and it is not enough

7  to show that this had the effect, which it certainly did have,

8  of impairing the ability of the IRS to collect what Mr. Turner

9  owed for 1999 through 2003 by helping him to evade payment and

10 collection.

11     The tax loss with respect to Mr. Turner's taxes cannot be

12 aggregated with the other tax losses for guidelines purposes if

13 the conduct leading to the tax loss on Mr. Turner was, in the

14 words of the Application Note to Guideline 2T1.1, "clearly

15 unrelated" to the defendants' common scheme or plan for

16 impeding and obstructing the IRS in the ascertainment,

17 assessment, and collection of revenue.

18     The episodes in these defendants' common scheme do not

19 have to be directly related to each other as long as they are

20 related to these defendants' common scheme or plan for impeding

21 and obstructing the IRS in the ascertainment, assessment, and

22 collection of revenue.  The transaction with Mr. Turner does

23 not have to be interrelated with the other episodes by which

24 this scheme played out, but it has to be related in some way to

25 the overall scheme.  I find that it was.

1    By August of 2005, Mr. Stilley's IOLTA account was well-
2  established as an invaluable tax evasion tool available for use
3  by Messrs Stilley and Springer in any way that it might be
4  needed for that purpose.  In the words of Application Note 9 to
5  Guideline 1B1.3, the use of the IOLTA account establishes a,
6  "similarity of modus operandi" between the Turner transaction
7  and the other instances in which defendants used the IOLTA
8  account to facilitate their common scheme.
9    It is not necessary to take an expansive view of the scope
10  of the common scheme of these defendants to conclude, as I
11  quite easily do, that the transaction with Mr. Turner by which
12  Mr. Turner's money was parked in the IOLTA account for what
13  Mr. Turner thought was safekeeping for the purpose of
14  frustrating the IRS in the performance of its legitimate
15  statutory functions was simply another episode in what
16  Application Note 2 to Guideline 2T1.1 refers to as "a
17  continuing pattern of violations of the tax laws" by these
18  defendants.
19    My findings, per year, as to the tax losses are derived
20  both from the evidence received at trial and from the evidence
21  received in this sentencing proceeding.  As I have said, the
22  situation with respect to Mr. Springer is somewhat more
23  complicated than it is with respect to Mr. Stilley.
24  Mr. Stilley's situation is just about the purest and most
25  consistent example of non-reporting of substantial income that

 1  could be imagined.  And by saying that about Mr. Stilley, I

 2  don't mean to put Mr. Springer in a favorable light, but,

 3  nevertheless, the situation with respect to Mr. Springer is a

 4  bit more complicated.

 5      I will first cover the tax loss which I conclude for

 6  guidelines purposes is attributable Mr. Springer.  For 1990

 7  through 1995, the assessed amount of tax was $91,196.

 8      Now, I'm going to read the gross income from my notes with

 9  respect to '99 through 2007, it's a simple mathematical

10  proposition to take 20 percent of this, but I won't read the 20

11  percent calculation into the record other than when I get to

12  the total.

13      The gross income that I attribute to Mr. Springer for 1999

14  is $111,702; for 2000, it is $160,000; for 2001, it is $63,000;

15  for 2002, it is $48,986; for 2003, it is $391,171; for 2004, it

16  is $117,550; for 2005, it is $278,500; for 2006, it is

17  $185,650; for 2007, it is $141,400; for a total gross income of

18  $1,497,959.  At 20 percent, the tax loss attributable to that

19  is $390,787.  I also attribute to Mr. Springer the state tax

20  loss --

21          MR. O'REILLY:  Your Honor, I apologize for

22  interjecting, but you say the tax loss was 390,000?

23          THE COURT:  That's --

24          MR. O'REILLY:  That's 20 percent?  Because I believe

25  that would be an overstatement of the tax loss for --

```
 1              THE COURT:  Well, that adds the 91,000 --
 2              MR. O'REILLY:  I apologize, Your Honor.
 3              THE COURT:  That adds the 91,196 from 1990 through
 4   1995.
 5              MR. O'REILLY:  I apologize.
 6              THE COURT:  I have proportionately reduced
 7   Mr. Springer's state tax loss based on the proportion by which
 8   I have reduced the federal tax loss.  The state tax loss
 9   accordingly is $80,186, to which I add the federal tax loss
10   attributable to Mr. Stilley, which I will cover in a minute,
11   but which amounts to $377,161, and Mr. Stilley's state tax
12   loss, which is $91,627.  So the total for Mr. Springer,
13   including his state tax loss and Mr. Stilley's state and
14   federal tax loss is $548,974.  Adding Mr. Springer's federal
15   tax loss, but ignoring for the moment the tax loss attributable
16   to Mr. Turner, Mr. Springer's state and federal tax loss,
17   including his own and Mr. Stilley's, is $939,761.80, to which I
18   add $145,713 attributable to Mr. Turner for a total tax loss
19   under Guideline 2T1.1 attributable to Mr. Springer in the
20   amount of $1,085,474.80.  The penalties and interest
21   attributable to that amount to $431,801.
22       With respect to Mr. Stilley, his gross income for 2000 was
23   $131,533; for 2001, it was $73,598; for 2002, it was $117,653;
24   for 2003, it was $466,774; for 2004, it was $96,600; for 2005,
25   it was $106,984; for 2006, it was $433,368; for 2007, it was
```

1  $354,093; for 2008, it was $105,202; for a total of $1,885,805,

2  for which the tax loss at 20 percent is $377,161.

3       His state tax loss -- when I say "his," I'm referring now

4  to Mr. Stilley -- is $91,627.  I also include the federal tax

5  loss attributable to Mr. Springer but only for returns due in

6  or after 2000 in the amount of $299,591 and Mr. Springer's

7  state tax loss in the amount of $80,186, for a total for

8  Mr. Stilley in terms of his state tax loss and Mr. Springer's

9  state and federal tax loss in the amount of $471,404.  That's

10 $471,404.  Adding in Mr. Stilley's federal tax loss, the total,

11 not including the third-party tax loss attribution with respect

12 to Mr. Stilley is $848,565.  Adding in the tax loss with

13 respect to Mr. Lake, that is an additional $145,713 -- I'm

14 sorry, with respect to Mr. Turner, I should say, that is an

15 additional $145,713.  With respect to James Lake, we have an

16 additional tax loss of $176,000.  And with respect to

17 Dr. Phillip Roberts, we have an additional tax loss in the

18 amount of $129,818, for a total tax loss under Guideline 2T1.1

19 with respect to Mr. Stilley in the amount of $1,303,096.

20      Now, as we have discussed more than once over the last two

21 days and as is discussed time and again in the briefs, we have

22 numerous issues that hinge, one way or the other, on this

23 concept of jointly-conducted criminal activity.  That's

24 relevant both for tax loss purposes and for purposes of

25 application of several other guidelines.  And there has been a

1    good deal of controversy in the case, especially for sentencing

2    purposes, as to just what should be included in the Court's

3    approach to determining the scope of the defendants' jointly-

4    conducted criminal activity.

5         Under the guidelines, of course, the government is not

6    confined for sentencing purposes to the criminal activity

7    charged in the indictment, either in terms of specific acts or

8    in a temporal sense, but, obviously, the matters charged in the

9    indictment are relevant.  And, in that regard, the indictment

10   clearly does not confine its allegations as to the objectives

11   of the conspiracy to simply a purpose of avoiding these

12   defendants' personal tax liabilities.

13        The indictment charged the defendants with a conspiracy

14   that began in 2000 and ended in January 2009 to defraud the

15   United States with respect to income taxes.  That obviously

16   includes the statutory language "collection, ascertainment,

17   assessment," and so forth, but the point is that the indictment

18   charged these defendants with a conspiracy, and that conspiracy

19   was proven by overwhelming evidence, to defraud the United

20   States with respect to income taxes.  And that statement of the

21   object of the conspiracy in paragraph 9 of the indictment was

22   most assuredly not confined to these defendants' own individual

23   income taxes.

24        With respect to the defendants' personal criminal

25   liability, the evidence understandably did focus on their

1  personal income and their resulting personal tax obligations,

2  but in a truly exceptional way, the jointly-conducted criminal

3  activity that is relevant in this case includes the defendants'

4  criminally fraudulent course of dealings with their clients.

5      The defendants' conducts with their clients was fraudulent

6  both vis-a-vis the clients and with respect to the United

7  States.  At the same time, it should be noted that some of the

8  conduct shown by the evidence is not relevant conduct for

9  guidelines purposes but is clearly relevant for other reasons

10 under Section 3553.

11     And the parties may wonder why I singled out Government

12 Exhibit 204 for some questions from the Court yesterday.  The

13 reason very simply is that although the Hawkins' case was not a

14 tax case and so far as I recall, the defendants did not give

15 Mr. Hawkins or Mrs. Hawkins tax advice, and for that reason

16 they're certainly not chargeable with encouraging Art Hawkins

17 or Mrs. Hawkins to violate the tax law, I am also required

18 under Section 3553 to consider the history and characteristics

19 of the defendants.  I hesitate to make harsh findings without

20 very satisfactory evidence.  And Government Exhibit Number 204

21 is very satisfactory evidence of the fraudulent and predatory

22 ways of the Defendant Lindsey Springer.  And I don't -- I'm

23 tempted to read it into the record, but it is a document that

24 is just devastating and it speaks for itself.

25     It should be noted that the Hawkins' case did generate

1  substantial unreported income and, for that reason, the

2  Hawkins' case, for tax purposes, is certainly relevant because

3  the $256,000 that these defendants obtained from Mr. and

4  Mrs. Hawkins was unreported and is part of the tax loss.  But I

5  do not consider the Hawkins' case for other guidelines purposes

6  because there is no evidence in this case, at least that I

7  recall, that these defendants offered any tax advice or

8  encouragement to violate the tax laws to Mr. and Mrs. Hawkins.

9       The letter that I have referred to, Government Exhibit

10 Number 204, shows beyond any imaginable doubt, however, the

11 audacity of Mr. Springer's fraudulent conduct.

12      This brings me to the issue of the application of the

13 guideline for criminal source income, Guideline 2T1.1(b)(1).

14 Guideline 2T1.1(b)(1) states that there is a two-level

15 enhancement, "if the defendant failed to report or correctly

16 identify the source of income exceeding $10,000 in any year

17 from criminal activity."

18      Now, as to Turner, I won't repeat my previous findings.

19 The activities of these defendants with respect to Mr. Turner

20 certainly was wire fraud under 18 United States Code, Section

21 1343.  The wiring of those funds was an integral piece of the

22 fraudulent course of conduct by which Mr. Turner was defrauded

23 of his quarter of a million dollars.

24      The findings with Mr. Turner did generate criminal source

25 -- I'm sorry, the transactions with Mr. Turner did generate

    1  criminal source income.  The transactions and dealings with Art

    2  Hawkins and Mrs. Hawkins also generated criminal source

    3  income.  The defendants' joint representation of Arthur Hawkins

    4  was, from its inception, an exercise in fraud and obtaining

    5  money under false pretenses.  The defendants enriched

    6  themselves at the expense of Mr. and Mrs. Hawkins in the amount

    7  of approximately $250,000, and, as I recall, it was $256,000,

    8  with false promises that they knew how to and would quickly

    9  gain the release of Mr. Hawkins.

   10       They went so far as to say, for purposes of getting money

   11  from Mr. and Mrs. Hawkins, that they would get the charges

   12  dismissed.  This was after he was convicted.  At each stage

   13  when the court ruled against Mr. Hawkins, the defendants would

   14  come up with another fraudulent but convincing assurance that

   15  he would soon be a free man.  They made those assurances and

   16  they got more money.

   17       When Mr. Hawkins was in jail as an important family event

   18  approached and for the purpose of getting still more money from

   19  Mr. and Mrs. Hawkins, Messrs Springer and Stilley told

   20  Mrs. Hawkins to make sure that Mr. Hawkins' tuxedo was ready to

   21  go because he would soon need it.

   22       Although the Hawkins' case was, as I have said and as we

   23  all know, not a tax case and therefore is not an instance of

   24  tax fraud or evasion, other than with respect to the

   25  defendants' failure to report a quarter of a million dollars of

414

```
 1   income from that case, the Hawkins' case is perhaps the most
 2   poignant instance of the defendants' predation and their
 3   willingness to perpetrate a peculiarly cruel variety of
 4   financial fraud.  The income that the defendants derived from
 5   their representation of Mr. Hawkins was criminally-derived
 6   income.  This adjustment will be applied to both defendants.
 7        This brings me to Guideline 2T1.1(b)(2), relating to the
 8   use of sophisticated means.  In relevant part, Guideline
 9   2T1.1(b)(2) states, "If the offense involved sophisticated
10   means, increase by two levels."
11        Application Note 4 under that guideline states, and I
12   quote, "Sophisticated means enhancement.  For purposes of
13   Section (b)(2), "sophisticated means" means especially complex
14   or especially intricate offense conduct pertaining to the
15   execution or concealment of an offense.  Conduct such as hiding
16   assets or transactions or both through the use of fictitious
17   entities, corporate shells or offshore financial accounts
18   ordinarily indicates sophisticated means."
19        The sophisticated means adjustment fits the facts of this
20   case as to both defendants quite well.  The most obvious
21   example of that, but certainly not the only example of that, is
22   the using of Mr. Stilley's IOLTA account.  Lawyers use their
23   trust accounts for the purpose of serving their clients.  Those
24   trust accounts are treated as custodial accounts and in, I
25   venture to say, in every state, there are very detailed rules
```

 1    that apply to the maintenance of lawyers' trust accounts, such

 2    as Mr. Stilley's IOLTA account.

 3         In this case, though, Mr. Stilley's IOLTA account was an

 4    instrument of fraud pure and simple, and it was an instrument

 5    of fraud pure and simple for the use and benefit both of

 6    Mr. Stilley and of Mr. Springer.  It was very effectively used

 7    and it was used in a way that makes a mockery of the purposes

 8    for which lawyers are authorized to maintain trust accounts.

 9         We also have Mr. Springer's use of this non-existent

10    ministry called Bondage Breakers Ministry.  It existed in name

11    only.  It was not a corporate entity or any other sort of a

12    legal entity.  It was not a 501(c)(3) organization; although, I

13    would think probably a good many people thought that it was.

14    Bondage Breakers Ministry was just a convenient name for

15    Mr. Springer to use in order to solicit money under the guise

16    that he might present to the taxing authorities that these

17    remittances were donations.

18         Hand in hand with that, of course, was Mr. Springer's use

19    of the check cashing service.  That was integral to his, not

20    only to his financial way of life, but apparently to his entire

21    way of life.  He dealt only in cash.  He wanted to avoid any

22    reachable assets being held in his name.  And he made extensive

23    use of that check cashing service which went, of course, hand

24    in hand with his fraudulent use of both the IOLTA account

25    remittances and Bondage Breakers Ministry.

416

1          Hand in hand with all of that, of course, was these

2     defendants' consistent course of dispensing fraudulent advice

3     to vulnerable individuals, as I have already described.  Taking

4     all of these features of these defendants' joint criminal

5     activities together, it is quite clear that they did use

6     sophisticated means within the meaning of Guideline

7     2T1.1(b)(2).  The source of the funds that these defendants had

8     the benefit of was effectively concealed, especially as to

9     Mr. Springer.  The intent with which those funds were received

10    by Mr. Springer was effectively obfuscated by Mr. Springer

11    through the use of Bondage Breakers Ministry.  The ability to

12    trace any of those funds for any lawful purpose, including

13    administration of the tax laws was frustrated by the use of a

14    check cashing service, and all of this resulted, in substantial

15    part, from the defendants' receipt of very substantial proceeds

16    over a goodly number of years as a result of dispensing

17    fraudulent advice, mostly tax-related fraudulent advice to very

18    vulnerable individuals.  This adjustment clearly applies,

19    2T1.1(b)(2), to both defendants.

20         This brings me to Guideline 2T1.9, the proposed adjustment

21    for encouraging others to violate the tax law.  Under Guideline

22    2T1.9(b)(2), "If the conduct was intended to encourage persons

23    other than or in addition to co-conspirators to violate the

24    Internal Revenue laws or impede, impair, obstruct, or defeat

25    the ascertainment, computation, assessment, or collection of

1  revenue," there is a two-level increase.

2      It's important to note with respect to Guideline 2T1.9

3  with respect to encouraging others to violate the tax law that

4  an actual tax loss resulting from the encouragement need not be

5  shown.  Now, this is a specific offense characteristic under

6  the guidelines, so the conduct involved must be relevant

7  conduct within the meaning of Guideline 1B1.3.  But any

8  particular instance of encouragement to violate the tax law

9  does not have to be shown to have been an activity that was

10 jointly conducted by the defendants, their individual acts are

11 sufficient.

12     I also hasten to add that evidence that a defendant

13 encouraged some individuals to violate the law is not vitiated

14 by evidence that the defendant advised others to comply with

15 the law any more than a drug dealer would get credit for

16 telling his sister to stay away from drugs.

17     I credit the trial testimony of Brenda Frederiksen, who

18 testified that at a meeting in Tulsa in 2001 in the context of

19 Dr. Roberts' trial, Mr. Springer stated that the tax system is

20 basically voluntary.  As to Dr. Roberts, we also have grand

21 jury testimony.  Agent Shern testified on direct that according

22 to the grand jury testimony, Mr. Stilley told Dr. Roberts that

23 he was not required to file a return.  On cross-examination by

24 Mr. Springer, Mr. Springer elicited that this advice was given

25 by Mr. Springer as well as by Mr. Stilley.  And on cross-

1  examination by Mr. Stilley, it was brought out that these

2  statements also included the statement that there is no

3  liability to pay taxes, which is a slightly different assertion

4  than the assertion that the law does not require the filing of

5  returns.

6       I also credit the testimony of Martin Dingman, who

7  testified that he met Mr. Springer in mid to late 1996.  His

8  contact with Mr. Springer at that point was at one or more

9  seminars relating to the tax laws.  He quoted Mr. Springer as

10  saying according to the Constitution, we are not required to

11  file personal tax returns.

12       As for Mr. Dingman and Mr. Grady, I also find that

13  Mr. Springer assisted both of these defendants in the

14  preparation of abusive trust documents and encouraged them to

15  unvolunteer from the system.

16       In 2000, both Mr. Springer and Mr. Stilley told James Lake

17  that he had no legal obligation to file tax returns.  The

18  evidence on that point is strong enough to persuade me that the

19  defendants' -- and I refer to both of them now -- the

20  defendants' conduct amounted to encouragement, even though I

21  have found that Mr. Springer's comments, at least insofar as

22  they are substantiated by the evidence, were not sufficient to

23  have caused Mr. Lake's tax violations.

24       As to Mr. and Mrs. Patterson, the testimony is that

25  Mr. Springer and Mr. Stilley told them that they, Messrs

1    Springer and Stilley, do not file tax returns.  That is

2    certainly of interest.  But in my view, at least without a more

3    compelling showing of the context for that statement, that

4    falls short of encouragement to violate the tax law.  I am

5    also, at least on this issue, unimpressed with the testimony

6    about the penaltyprotestor.com Web site and the Innovative

7    Financial Services conference calls.  The testimony falls short

8    of supporting a finding that these two modes of communication

9    were, in fact, used to encourage the violation of the tax

10   laws.  And at least as to the penaltyprotestor Web site, the

11   main thrust of the evidence is that this was more of a forum

12   for advocacy of change in the law and the system, which would

13   be constitutionally protected speech, than it was a forum for

14   advocacy of violation of the tax laws.

15        Also, at least arguably protected, and in any event not

16   persuasive under Guideline 2T1.9(b)(2), is Mr. Stilley's trial

17   testimony that after he read Mr. Schiff's book he formed and

18   expressed the belief that the claims of the IRS that the law

19   required the filing of tax return was not good enough for him.

20        Now, the fact that some of the evidence offered to support

21   an adjustment under Guideline 2T1.9(b)(2) falls short does not

22   detract one whit from the fact that some of the evidence is

23   quite persuasive.  In the context of this case, at least, it is

24   sufficient to say, and I quite easily find, that both

25   defendants have engaged in conduct during the course of their

1  jointly-conducted criminal activity that was intended to

2  encourage persons other than or in addition to co-conspirators

3  to violate the Internal Revenue laws or impede, impair,

4  obstruct, or defeat the ascertainment, computation, assessment,

5  or collection of revenue.  The two-level adjustment under

6  Guideline 2T1.9 will be applied to both defendants.

7      We'll take a 15-minute recess.

8      (RECESS HAD)

9      THE COURT:  I will now address the proposed

10  adjustment under Guideline 3B1.1(a) applicable to organizers or

11  leaders of criminal activity.  The guideline states quite

12  simply that, and I quote, "If the defendant was an organizer or

13  leader of a criminal activity that involved five or more

14  participants or was otherwise extensive," then there is a four-

15  level upward adjustment.  I derive substantial guidance with

16  respect to the application of this guideline from the Tenth

17  Circuit's decision in United States v. Yarnell, 129 F.3d 1127,

18  a decision from our Court of Appeals in 1997.  I reviewed other

19  authorities, including other quite helpful Tenth Circuit cases,

20  but I believe that Yarnell is the most instructive case from

21  our circuit with respect to the criteria for meeting the

22  "otherwise extensive" language in Guideline 3B1.1(a).

23      Yarnell surveyed cases from other circuits and adopted a

24  test articulated by the First Circuit, which is a totality of

25  the circumstances test and which holds that the extensiveness

1   of the criminal activity is not necessarily a function of the
2   precise number of persons involved whether they be culpable or
3   not, but that the court must look at not only the number of
4   participants but also the "width, breadth, scope, complexity,
5   and duration of the scheme."  That is from page 1139 of the
6   Yarnell decision.  Cases from other jurisdictions are cited in
7   Yarnell which involved these same criteria.
8       In these cases, the courts affirmed the application of
9   sentence enhancements under Section 3B1.1(a) for extensive
10  conduct involving less than five criminally culpable
11  participants.  And that is also discussed on page 1139.
12      I find and conclude that the Defendant Lindsey Springer
13  was the organizer or leader of a criminal activity, that it was
14  otherwise extensive within the meaning of Guideline 3B1.1(a).
15  It was extensive in its scope, it was extensive in its duration
16  and it was extensive in its complexity.  Numerous individuals
17  were involved, some of them wittingly and some of them
18  unwittingly.  One of the ones who is interesting in terms of
19  whether his involvement was witting or unwitting was
20  Mr. Delozier, but suffice it to say for present purposes that
21  numerous individuals were involved both wittingly and
22  unwittingly.
23      The activity indeed was extensive.  It was Mr. Lindsey
24  Springer's way of life for a goodly number of years.  It
25  involved, as I have said, his use of this fictitious entity,

422

1    the Bondage Breakers Ministry.  It involved individuals who

2    were both victims as well as knowing participants and

3    participants who might not have been knowing participants.  And

4    it called upon Mr. Springer to organize these activities in

5    such a way that he could delay for as long as possible being

6    called to account for his personal tax crimes.

7        I find that this case, especially as it relates to the

8    Defendant Lindsey Springer squarely falls within the scope of

9    Guideline 3B1.1(a) relating to otherwise extensive criminal

10   activity.  And I should say that perhaps one of the most cogent

11   factors to consider is the period of time.

12       Now, I'm not holding Mr. Springer for this purpose

13   accountable for the fact that, as he was proud to proclaim, he

14   hadn't filed tax returns since the 1980s, but one doesn't

15   really need to go back behind the 1990s or even the mid to late

16   1990s in order to get some concept of the extensiveness of

17   Mr. Lindsey Springer's criminal activity.

18       I now turn to the application of Guideline 3B1.3, abuse of

19   position of trust or special skill.  This guideline states as

20   relevant here, "If the defendant abused a position of public or

21   private trust or used a special skill in a manner that

22   significantly facilitated the commission or concealment of the

23   offense, increase by two levels.  This adjustment may not be

24   employed if an abuse of trust or skill is included in the base

25   offense level or specific offense characteristic."

 1          That latter exception is not applicable here because the
 2     base offense level and the specific offense characteristics do
 3     not already incorporate the concept of abuse of trust or a
 4     special skill.  The guideline goes on to say, "If this
 5     adjustment is based on an abuse of a position of trust, it may
 6     be employed in addition to an adjustment under Guideline 3B1.1,
 7     aggravating role.  If this adjustment is based solely on the
 8     use of a special skill, it may not be employed in addition to
 9     an adjustment under Section 3B1.1 aggravating role."
10          I'm also guided, of course, by Application Note 1 where
11     the guideline provides further guidance as to the concept of
12     public or private trust.  It says, "Public or private trust
13     refers to a position of public or private trust characterized
14     by professional or managerial discretion, i.e., substantial
15     discretionary judgment that is ordinarily given considerable
16     deference.  Persons holding such positions ordinarily are
17     subject to significantly less supervision than employees whose
18     responsibilities are primarily non-discretionary in nature.
19     For this adjustment to apply, the position of public or private
20     trust must have contributed in some significant way to
21     facilitating the commission or concealment of the offense,
22     e.g., by making the detection of the offense or the defendant's
23     responsibility for the offense more difficult.  This
24     adjustment, for example, applies in the case of an embezzlement
25     of a client's funds by an attorney serving as a guardian, a

1 bank executive's fraudulent loan scheme, or the criminal sexual

2 abuse of a patient by a physician under the guise of an

3 examination.  This adjustment does not apply in the case of an

4 embezzlement or theft by an ordinary bank teller or hotel clerk

5 because such positions are not characterized by the above

6 described factors."

7      The guideline also goes on in Application Note 4 to

8 provide guidance as to the concept of a special skill.  It

9 states, and I quote, "Special skill refers to a skill not

10 possessed by members of the general public and usually

11 requiring substantial education, training, or licensing.

12 Examples would include pilots, lawyers, doctors, accountants,

13 chemists, and demolition experts."

14      Now, it's true that Mr. Stilley's status as a lawyer was

15 not, strictly speaking, indispensable to his commission of the

16 crimes of which he stands convicted, but his status as a lawyer

17 and his use of the prerogatives of a lawyer were, in fact,

18 central to his role in the conspiracy and more broadly in the

19 relevant conduct as it relates to the jointly-undertaken

20 criminal activities of the defendants.

21      By way of example, it was because Mr. Stilley was a lawyer

22 that he had an IOLTA account.  His status as a lawyer

23 facilitated his function which he performed without fail as a

24 financial conduit to Mr. Springer.  It is fair to say, although

25 admittedly a bit harsh to say, that without his license to

 1  practice law Mr. Stilley was worthless to Mr. Springer in

 2  Mr. Springer's role as the charismatic and intellectual force

 3  behind the joint criminal endeavors of these two defendants.

 4      Mr. Stilley's status as a lawyer and his ability to hold

 5  himself out at a criminal tax defense attorney furthered these

 6  defendants' joint objective of committing tax fraud directly

 7  and in counseling and advising their clients and significantly

 8  facilitated the commission and concealment of these defendants'

 9  offenses.  This adjustment will be applied to Mr. Stilley.

10      As to Mr. Springer, I have carefully considered the case

11  law, including the Tenth Circuit case law, and I do conclude in

12  light of the prevailing case law with respect to the

13  application of Guideline 3B1.3 that the adjustment for abuse of

14  a position of trust is not applicable to Mr. Springer in this

15  case.  Because the aggravating role adjustment will be applied

16  to Mr. Springer, the question of the use of a special skill is

17  moot as to Mr. Springer under the express terms of Guideline

18  3B1.3.

19      This brings me to consideration of the proposed

20  application of Guideline 3C1.1 relating to obstruction of

21  justice.  I listened very carefully to these defendants'

22  testimony at the trial, and I took careful notes.  Mr. Stilley

23  testified under oath that no statute says that anyone is liable

24  for income tax.  He testified under oath that no statute

25  defines income.  Now, it might be tempting to think of these as

1    just ludicrous statements made for some theatrical effect, but

2    bear in mind that he was looking at a jury when he made those

3    statements under oath, and both defendants had placed their

4    intent and their willfulness squarely in issue. So it is not

5    -- I'm not inclined at all to dismiss those statements as

6    reckless hyperbole or otherwise to relieve Mr. Stilley of the

7    natural effect which flows from making false statements like

8    those under oath.

9        He also said that the law -- under oath, looking at the

10   jury, that the law does not command anyone to file a tax

11   return. He also said, under oath, that Mr. Lindsey Springer

12   did not charge for or receive compensation for services

13   rendered. He also said, under oath, that he never allowed

14   Mr. Springer to use his, Mr. Stilley's, IOLTA account as a

15   parking place for money. He also said, under oath, that he and

16   Mr. Springer have never discussed attempting to defraud the

17   United States of income taxes. All of those statements were

18   material, they were made under oath, and they were

19   categorically false. They amounted to perjury. They certainly

20   did amount to obstruction of justice on Mr. Stilley's part.

21       As for Mr. Springer, at trial, he looked at the jury and

22   testified under oath that he never had an agreement with

23   Mr. Stilley or anyone else to defraud the United States. He

24   testified that he did not willfully fail to file Form 1040 for

25   the years 2000 through 2005. He stated that he did not

1  willfully fail to report substantial tax liability.  And he

2  stated that he believed that he did not receive gross income.

3  He also said under oath that receiving money with no

4  expectation for anything from anybody "was a guideline that I

5  had before I would have ever received any money."  And he has

6  testified that there never was any quid pro quo for the money

7  that the Hawkins paid to him.  These statements are

8  categorically false.  They were made under oath.  They were

9  made for the purpose of deceiving the jury, and they amounted

10  to obstruction of justice, Mr. Springer.

11      In addition, in March of 2006, Mr. Stilley told the grand

12  jury in writing that "Lindsey Springer does not charge for his

13  services."  A statement that Mr. Stilley well knew was

14  absolutely false and highly material to the grand jury's

15  investigation.  The defendants' testimony on these points was

16  unequivocal, it was false, it related to material matters that

17  were in issue in the trial of this case or before the grand

18  jury and the false testimony was willfully and intentionally

19  given as false testimony rather than as a result of confusion,

20  mistake, or faulty memory.

21      Accordingly, I rule on the government's objections to the

22  presentence report as follows:  To the extent that I have found

23  a tax loss that exceeds that found in the presentence report,

24  the government's objection to the scope of the relevant conduct

25  conclusions in the presentence reports and with respect to the

1  tax loss found in the presentence report is sustained as to

2  both defendants.

3       The government's objection to the omission of a criminal

4  source income adjustment from the presentence report is

5  sustained as to both defendants.

6       The government's objection to the omission of a four-level

7  adjustment for Mr. Springer for his aggravating role in the

8  offense is sustained.

9       The government's objection to the omission of an

10 adjustment for use of a special skill or abuse of a position of

11 trust as to Mr. Springer is overruled.

12      The government's objection to the omission of an

13 adjustment for use of a special skill as to Mr. Stilley is

14 sustained.

15      Now, with respect to the defendants' objections, the

16 defendants' objections to the use of the 2009 Guidelines Manual

17 are overruled.

18      The defendants' objections with respect to the scope and

19 accuracy of the relevant conducts of the presentence report are

20 overruled.  This is paragraphs 5 through 16 in both of the

21 presentence reports.

22      The defendants' objections with respect to the amount of

23 the tax loss are sustained in part and overruled in part, all

24 as was stated in my specific findings as to the amounts of the

25 tax losses.

```
 1        Mr. Springer's objection with respect to paragraph 22

 2   relating to grouping is overruled.

 3        The defendants' objections with respect to paragraph 16

 4   relating to the use of sophisticated means are overruled.

 5        Mr. Springer's objection with respect to paragraph 6

 6   relating to encouraging others to violate the law is overruled.

 7        Mr. Stilley's objection with respect to paragraph 7

 8   relating to encouraging others to violate the law is overruled.

 9        Mr. Springer's objection with respect to his aggravating

10   role in the offense is overruled.

11        The defendants' objections with respect to the obstruction

12   of justice adjustment in paragraph 19 of both reports are

13   overruled.

14        Mr. Springer's objection with respect to denial of a

15   downward adjustment for acceptance of responsibility is

16   overruled.

17        And it is not necessary for the Court to address

18   Mr. Springer's objection to the reference to his previous

19   federal conviction for odometer fraud because that objection

20   has no impact on the guidelines calculation and paragraph 32

21   will be disregarded for all sentencing-related purposes.

22        Mr. Stilley's objection to the characterization of his

23   Count 1 conviction as a felony is overruled.

24        That concludes my Rule 32(i)(3) findings on the disputed

25   portions of the presentence report.
```

*Tracy Washbourne, RDR, CRR*
United States Court Reporter
U.S. Courthouse, 200 N.W. 4th St.
Oklahoma City, OK 73102 * 405.609.5505

430

1     The criminal history category for both defendants is I.  I
2  conclude that Mr. Springer's total offense level under the
3  advisory guidelines is 34 determined as follows:  I begin with
4  a base offense level based on tax loss of 22.  There is a
5  two-level adjustment for criminal source income under Guideline
6  2T1.1(b)(1).  There is a two-level adjustment for sophisticated
7  concealment under Guideline 2T1.1(b)(2).  There is a two-level
8  adjustment for encouraging others to violate the Internal
9  Revenue laws under Guideline 2T1.9(b)(2).  There's a four-level
10 adjustment for his aggravating role under Guideline 3B1.1(a).
11 There is a two-level adjustment for obstruction of justice
12 under Guideline 3C1.1 resulting in both an adjusted offense
13 level and a total offense level of 34 resulting in a guideline
14 range of incarceration of 151 to 188 months.
15     With respect to Mr. Stilley, I arrive at a base offense
16 level of 22 based on tax loss, with a -- because the tax loss
17 exceeded a million dollars as to both defendants, a two-level
18 adjustment for criminal source income, a two-level adjustment
19 for sophisticated concealment, a two-level adjustment for
20 encouraging others to violate the Internal Revenue laws, a
21 two-level adjustment for abuse of a position of trust or use of
22 a special skill -- in this case, use of a special skill -- and
23 a two-level adjustment for obstruction of justice resulting in
24 an adjusted and a total offense level for Mr. Stilley of 32,
25 which results in a guideline range of incarceration under the

431

1  advisory guidelines of 121 to 151 months.

2      I will now address restitution.  I must admit that I was a

3  bit limited, I guess is one way to say it, in my ability to

4  thoroughly evaluate restitution because there were some

5  adjustments to the tax loss amounts and then there is obviously

6  penalty and interest applicable to some items and not to others

7  and the parties, perhaps understandably, from both standpoints

8  did not devote a great deal of attention in their briefs to the

9  issue of what items are fair game for restitution, what the

10  legal basis for the restitution might be, whether there's any

11  difference among the various counts with respect to restitution

12  and even whether and to what extent there should be joint and

13  several liability for restitution.

14      I'm not critical of either side for not focusing any

15  harder than they did on that from the government's standpoint.

16  These defendants are likely to be buried in restitution

17  obligations for the rest of their lives.  And under any

18  reasonable assessment of restitution, it is likely that these

19  defendants will never see the end of their restitution

20  obligation.  These tax liabilities continue to bear interest.

21  The interest payments alone, which I do not waive and will not

22  waive, will be substantial.

23      So from that standpoint, it's probably understandable that

24  the government did not spend a great deal of time on the issue

25  of restitution.  From the defendant's standpoint, the issue of

1  restitution is certainly, by any measure, quite secondary to

2  considerations relating to their incarceration and those

3  guidelines and other sentencing-related matters that have a

4  more direct bearing on whether and how long they would be

5  incarcerated.

6      So I'm not critical either of the defendants for not

7  spending a great deal of time on restitution.  But the net

8  effect of all of that was that I was just a little bit at sea,

9  if you will, in my ability to determine what the outcome should

10  be with respect to restitution.

11      I have gone back through the numbers.  I have adjusted the

12  numbers and selected the ones that it appears to me are

13  appropriate for restitution.  To some degree, especially in the

14  case of Mr. Springer, I adjusted the numbers to reflect my

15  revision of the conclusions and findings with respect to tax

16  loss, although I have not modified the numbers as to the

17  assessed amounts.

18      And I'm also cognizant that Mr. Springer's and

19  Mr. Stilley's restitution obligation is an independent

20  freestanding obligation under the judgment and sentence of this

21  Court.  And there may well be and I suspect are other

22  independent legal means of proceeding against these defendants

23  for any amounts that are not embraced by my restitution order.

24      That said, my conclusion is that Mr. Springer's federal

25  restitution obligation is $691,343 and that his state

1  restitution obligation is $80,186.  I conclude that

2  Mr. Stilley's federal restitution obligation is $684,653 and

3  that his state restitution obligation is $91,627.

4      Does either defendant have any procedural objection to the

5  sentencing proceedings to this point?  Mr. Springer?

6          MR. SPRINGER:  May I have just a moment, Your Honor?

7  None other than the same objections I made yesterday with

8  reference to prior to the sentencing hearing objections I had,

9  Your Honor.

10          THE COURT:  Thank you, Mr. Springer.  Mr. Stilley?

11          MR. STILLEY:  I would likewise continue to maintain

12  all the objections that I have previously made and state that I

13  do not see that my due process complaints have been remedied by

14  anything that has taken place up to now.

15          THE COURT:  Thank you, Mr. Stilley.  I will now give

16  you -- for all concerned, I'll give you some understanding of

17  how we will proceed from here.

18      The defendants have a right, and it goes back hundreds of

19  years, to have what is called "allocution."  That is their

20  statements to the Court of anything, and I truly mean anything,

21  that they would want the Court to consider by way of mitigation

22  or with respect to any other matter relating to sentencing.

23  That's a very valuable right and I certainly intend to afford

24  the defendants a full opportunity to exercise their rights of

25  allocution.

434

1      Under Rule 32, the Court also must permit the government
2  to make its comments with respect to sentencing before sentence
3  is imposed, and I intend to do that.  In my view, in fairness,
4  given the nature of the proceeding and the possible
5  consequences to the defendants, it is fair that the defendants
6  have the last word.  For that reason, I will now invite the
7  government to offer any comments it may choose to make with
8  respect to sentencing.  Mr. O'Reilly.

9          MR. O'REILLY:  Your Honor, before I begin, just a
10  brief procedural matter.  Special Agent Shern may need to be
11  leaving here shortly.  I would ask the Court's indulgence in
12  allowing him to do so.

13          THE COURT:  Very well.

14          MR. O'REILLY:  And, Your Honor, we have said
15  everything we need to say in our sentencing memorandum.  We do
16  ask the Court to sentence high into the guidelines, as stated
17  in the sentencing memorandum, the guideline range you have
18  found based upon each defendant's absolute, long standing, and
19  continued disregard for the laws and their predatory practices
20  obtaining the income upon which they failed -- willfully failed
21  to pay and evaded their taxes.  And that's all the government
22  has, Your Honor.

23          THE COURT:  Thank you, Mr. O'Reilly.  Mr. Springer, I
24  will now hear anything you have to say relating to any aspect
25  of sentencing or in mitigation.

```
 1            MR. SPRINGER:  Mr. O'Reilly, Mr. Shern, Mr. Snoke,
 2    Mr. Burton, Mr. Williams, Mr. Stilley.  The reason, Your Honor,
 3    that I defended myself in this case instead of accepting a plea
 4    of guilty from Mr. O'Reilly was because -- solely because of
 5    the Paperwork Reduction Act defense that I had raised four
 6    times in the Tenth Circuit Court of Appeals.  Four times they
 7    had found a way to avoid the merits of my claims.  The most
 8    recent one was August 31, 2009, where I got a lot closer, where
 9    they said I raised difficult issues.  But because the only
10    issues before the Court in that case was failure to pay
11    penalties and interest as a penalty and not failure to file
12    penalties, they decided not to get into the merits of my
13    claims.
14         The commissioner of the IRS's lawyer, Nathan Hochman, he
15    asked for sanctions against me for being frivolous in raising
16    those claims.  And he actually even told the Tenth Circuit,
17    quoting that they had found my claims were frivolous in Judge
18    Anderson's order of May 1, 2007.  And the Tenth Circuit on
19    August 31, 2009, they told the commissioner that they were
20    frivolous for making that argument because they had never ruled
21    in the two cases I had had before your Court or in the one I
22    had before Judge Eagan where I had raised the protection of the
23    Paperwork Reduction Act.
24         I had claimed on the offense in front of Judge Eagan and
25    they said I can only claim it as a defense, I claimed it as a
```

1    defense in the case that was on August 31, 2009, before the
2    Tenth Circuit.  But because, again, it wasn't failure to file
3    penalties, they wouldn't reach the merits.  And as Your Honor
4    noted earlier today, my Web site has been fully dedicated to
5    the Paperwork Reduction Act and the penalties, not the taxes.
6         Had I been -- had a ruling on the merits, even to the
7    point that I had been told I was frivolous by the Tenth
8    Circuit, I would have stopped with my claims and I would have
9    accepted a deal from Mr. O'Reilly.  But because they had not
10   ruled on the merits and because Mr. Hochman and others from the
11   Department of Justice were mischaracterizing what the Tenth
12   Circuit had said by saying they were saying on their Web site,
13   public Web site, the Department of Justice was saying I was
14   found to be frivolous with my Paperwork Reduction Act claims.
15   And that was not true, as the Tenth Circuit found on August 31,
16   2009.
17        I did, in 2005, if you take away the Turner transaction,
18   you do not see any more cases referred to Mr. Stilley that came
19   along or crossed my path.  I didn't quite see it the way the
20   Court saw it today, but I understand how the Court arrived at
21   its conclusions with the Turner transaction.  As I said
22   yesterday, I concede to one or the other based upon the way the
23   transaction was handled.
24        I did not contact Mr. Turner because I knew the sentencing
25   hearing was coming up or that I knew that Judge Kearn had

1    ordered me to vacate the home that the RV was parked on.

2    Mr. Turner actually called me first.  And after hearing

3    Mr. Miller's testimony about it appears as though I had stole

4    the money, I did not want to stand in Mr. Turner's way, no

5    matter what, anymore.

6        I understand that other than that transaction, I believe

7    the last transaction or last transactions were in 2004 with

8    Mr. Stilley.  And, in actuality, I had stopped.  This is why I

9    didn't oppose the Court's supervised release conditions because

10   I am not and have not been going towards any type of defense

11   for anybody in tax-related cases that are brought to the

12   Court.  I actually was trying to go down a different road

13   entirely.

14       And I do apologize to the public in general and to

15   Mr. Hawkins.  I wish he was here and I could do it.  I even

16   would apologize to Mr. Patterson, even though the Court's

17   ruling did not find tax loss associated with me and

18   Mr. Patterson or his wife.  I would also apologize to

19   Mr. Dingman and Mrs. Dingman and Mr. Grady and Mrs. Grady.  And

20   it's not just limited to what the Court said with the Dingmans

21   in 1996 that it found, but what happened to the Dingmans after

22   that, which I did have a role in trying to stop, but at the

23   time in 1996, I didn't recognize how difficult it is to stop

24   once those things start.  And this is how I went from where I

25   was in 1996 or '95 before Judge Holmes' order, which I accepted

```
1   in full --
2           THE COURT:  On the subject of apologies, and this is
3   for both defendants, I hope on your own time in your own way
4   you will apologize to your families.
5           MR. SPRINGER:  I will.
6           THE COURT:  They deserve better than this.
7           MR. SPRINGER:  I understand.
8           THE COURT:  And I don't call upon you to do so here,
9   but I hope and trust that in your own time in your own way you
10  will apologize to your families.
11          MR. SPRINGER:  In the last two days I have done that
12  to my mother.
13          THE COURT:  They deserve better.
14          MR. SPRINGER:  I agree.
15          THE COURT:  Proceed.
16          MR. SPRINGER:  And my father and my children.
17  Sometimes I rationalize that taking the experience I learned
18  from 1996, '97, '98, that when those circumstances came around
19  again and I saw them I would not go down that same road, and
20  that is why people were told to file tax returns and people
21  were told to pay their taxes by me.  And I would use the
22  examples of those things I learned in '96 and '97 to persuade
23  them to listen to what I had to say.
24      I believe this time in this case and on this appeal that
25  comes from this case that I am going to get a ruling on the
```

1 merits of my claims.

2      The problem that I noted yesterday on the witness stand

3 that I have is that I see words with specific meaning and I --

4 it's just something I've been working on to stop, to try to get

5 a more ambiguous view.  And when I -- when I learned to write

6 an ambiguous language, to not be so focused on August 31, 2009,

7 the Tenth Circuit told me I was too ambiguous in my writing.

8 And so I'm trying to find a balance in what I have -- how I

9 speak or what I say or how I say it so that I can not cause the

10 extremes on both sides.  I do believe I've gotten better.  I

11 don't believe it's easy.  If it was, I think we'd all be able

12 to do it.

13      And as I did after the jury's verdict, I apologized to

14 Mr. Shern for having to follow the trail that was left by me.

15 Every time the government did ask me for information,

16 personally, I did to the best of my knowledge and ability.

17 Other than those exceptions that were placed at issue in this

18 trial, I always presented what they asked to whatever degree

19 they asked and I did not require them to force me to give it to

20 them.  I even agreed to go under oath for my perspective in

21 January of 2009.

22      And Mr. Miller, I've witnessed several cases with, and

23 he's a fine man.  And if he were here, I would also, as I did

24 yesterday, apologize to him for having to spend the time he had

25 to take as well.

1      Had I, again, received any ruling on the merits in 2007 or

2  2009 on my claims under the Paperwork Reduction Act, I tell

3  you, I would not be here before you today.  This would have

4  happened a long time ago in a plea agreement.  But there was no

5  other way to claim a defense but as a defense.  I tried to do

6  it as a plaintiff and they said I couldn't do it.  So it is by

7  that mode that I find myself here.

8      I do accept full responsibility for all the transactions

9  that took place.  And although I do agree with the Court that

10  the restitution order will basically be a life sentence

11  economically against me, it can be a lesson to others not to

12  ever follow down that road that I have stopped on but not soon

13  enough.

14      When my case with Mr. Dingman was dismissed by the Eighth

15  Circuit in a one-paragraph ruling, I did not appeal that

16  decision.  I tell you now, that was one of the most difficult

17  decisions that I've had to make, and I did it, which proved to

18  me that I can do it.  I don't always have to go all the way to

19  the top to satisfy the question of whether or not I waived my

20  right to something by not appealing it.  Which is something

21  that in the mid-'90s that's all the Department of Justice when

22  they would oppose anything I was doing, that's what they would

23  use against me.

24      In the August 31st order in the Tenth Circuit, they would

25  not address the question of assessment.  They said I did not

1  include it in my opening brief.  They haven't ruled on the

2  merits yet, they wouldn't address it at that time.

3      Now, I have another case back before the Tenth Circuit on

4  assessment that came out of Judge Kearn's courtroom on March

5  16th.  So I should be able to conclude that there and then I

6  should be able to conclude my Paperwork Reduction Act claims in

7  this case.  And then that should conclude anything that I have

8  to do in respect to what I believe in protecting my rights.

9      May I have just a moment, Your Honor?

10          THE COURT:  Surely.

11          MR. SPRINGER:  I'd also apologize to the United

12  States Government.  That's a difficult one for me.  And

13  although we are trying to change as people in accepting some of

14  the things we have to change, one of the things that I got from

15  not only this case, as many objections as I have, is that I

16  live in the greatest country ever seen on the planet.  Thank

17  you.

18          THE COURT:  Thank you, Mr. Springer.  Mr. Stilley.

19          MR. STILLEY:  May it please the Court, counsel,

20  parties.  I'd like to inquire about a procedural matter first

21  and that has to do with if incarceration results.  I'd like to

22  find out if I am to be allowed access to my computer files and

23  hard files for the purposes of a -- of doing my appeal.

24          THE COURT:  That's not a matter that I'm going to

25  address today.  That will be, first of all, a matter between

1   you and the marshal and between you and the Bureau of Prisons.

2   If there are any difficulties that you wish to place before the

3   Court relating to your access to any materials, then you will

4   certainly have the opportunity to file a motion.  If you can't

5   get access to a computer for the purpose of filing a motion,

6   then, as you're probably well aware, pro se litigants are

7   entitled to file pleadings in handwriting.  In any event, that

8   aspect of your probable incarceration and your activities after

9   you are remanded is not a matter that I'm going to address

10  today.

11          MR. STILLEY:  Your Honor, as you well know from the

12  proceedings, this is not the first time that I've been in a

13  court.  This is the first time that I've been in a court of

14  this nature on a proceeding in which Oscar Stilley was a party

15  defendant as opposed to counsel.  So there's a little bit of a

16  difference between Oscar Stilley and the typical person who

17  comes before you.  I understand what the proceedings mean.  I

18  understand what your rulings mean that you've made.  I

19  understand the import of those.  My primary consideration, and

20  I think that it will be satisfied based on what you've just

21  told me, but my primary consideration would be my ability to be

22  heard in a reasonable time and a reasonable manner with respect

23  to the process that I am due.

24      I don't wish to rehash anything because I don't think

25  that's appropriate or necessary.  I don't think it's necessary

 1  to waste any time on that.  You have mentioned something about

 2  families.  Truly, I do love my family.  I care for them.  You

 3  can see from the presentence report that my wife and I have two

 4  biological children, small children, and we have two that we

 5  adopted from Russia, we care very much about those.  I

 6  certainly care about those children and I intend to do the very

 7  best by them that I can.  The principal thing that I want to

 8  make sure that I do for them right now is the absolute best

 9  work that I can possibly do in defending my interests.

10      Your Honor, that's all the comments that I have to say.

11  Thank you, Judge.

12          THE COURT:  Thank you, Mr. Stilley.

13          MR. SPRINGER:  Your Honor, may I on one point on --

14          THE COURT:  Surely.  Come forward, please.

15          MR. SPRINGER:  Yesterday, I asked about the

16  possibility of an appeal bond or a short amount of time and you

17  made mention, I believe, that I could raise something in my

18  allocution, and I didn't say anything in my allocution about

19  that.  Do I need to say that?  Or the other option you said was

20  after you pronounced sentence that you would consider --

21          THE COURT:  We will address that before we recess,

22  but not at this point.

23          MR. SPRINGER:  Thank you, Your Honor.

24          THE COURT:  Very well.  The Court expresses, first of

25  all, and this should have been said before, should have been

1  said before more than once but will emphatically be said now,

2  the Court expresses its sincere appreciation to the defendants'

3  standby counsel.

4     Mr. Burton and Mr. Williams, your assignment has been one

5  of the most thankless tasks that a court could ever ask a

6  member of the Bar to perform and you have persevered beyond any

7  reasonable expectation.  It seems inadequate to say simply, but

8  I say, quite simply, that your work is sincerely appreciated.

9     I hope that the defendants have some understanding on some

10 level of how well they have been served by their standby

11 counsel.  The defendants have been served exceedingly well by

12 their standby counsel under very difficult circumstances.

13    In the Court's view, it is unlikely that the defendants

14 will ever fully understand or fully appreciate how beneficial

15 the services of their standby counsel have been, but I have no

16 doubt that to the extent that the defendants have followed the

17 advice of their standby counsel, the standby counsel have been

18 instrumental in shortening the list of things that the

19 defendants would want the Court to disregard for sentencing

20 purposes.

21    I also express my sincere appreciation to the probation

22 officer, Todd Gollihare.  I must say, Mr. Gollihare, it has

23 been a long time, if ever, since I have seen a pair of

24 presentence reports that required the extent of very, very

25 careful review and analysis that the presentence reports and

1  the addenda required in this case.  As far as I'm concerned,

2  your services have been above and beyond any reasonable

3  expectation and any reasonable call of duty.  I, obviously,

4  have not in all respects concurred with the conclusions that

5  you have suggested in your presentence reports and the addenda,

6  but I fully respect the quality and intensity and care of the

7  work that you put into those presentence reports and the

8  addenda and it is sincerely appreciated.

9      The Court has made its sentencing determinations with due

10  regard for the advisory sentencing guidelines.  The advisory

11  sentencing guidelines have aided and indeed channeled the

12  Court's evaluation of this case for sentencing purposes in many

13  important respects.

14      As valuable as the sentencing guidelines have been, it is

15  also true that the sentences that I am about to impose would be

16  the same even with the higher total offense levels advocated by

17  the government or with the lower total offense levels advocated

18  by the defendants.  This is true because to a truly exceptional

19  degree in this case, matters that are at least arguably outside

20  the scope of the matters that may be considered in the

21  application of the advisory guidelines are, nevertheless,

22  highly relevant to the Court's evaluation of other factors

23  under Section 3553.

24      In imposing the sentence in this case, I am mindful of my

25  statutory duty to impose a sentence that is sufficient but not

```
 1  greater than necessary to fulfill the objectives of sentencing
 2  under the Sentencing Reform Act and I will take into account
 3  the factors mandated by 18 United States Code, Section 3553.
 4  Now, in any particular case, obviously, some of those factors
 5  assume more importance, more relevance, more impact than
 6  others, and that is certainly true in this case.
 7       In this case, the factors that are most relevant to the
 8  Court's determination of the sentences to impose are the need
 9  for the sentences to reflect the seriousness of the offense.
10  The offenses of these defendants are by any measure
11  extraordinarily serious and they have been committed in ways
12  that probably by any reasonable measure are atypical even of
13  the manner and means by which individuals violate these
14  statutory provisions.
15       I also consider the need to promote respect for the law
16  and to provide just punishment as being especially relevant in
17  this case.  Certainly, the first among equals, if not the
18  predominant consideration in sentencing, is the need to afford
19  adequate deterrence to criminal conduct.
20       After these proceedings are concluded, it is the Court's
21  open desire, and this is by statute an explicitly-recognized
22  sentencing consideration, it is the Court's hope and desire
23  that others who would be tempted to walk the path and life that
24  these defendants have walked, the consistently criminal,
25  predatory, fraudulent path in life that these defendants have
```

1  walked, will think of what happened to Lindsey Springer and

2  Oscar Stilley and reconsider.  That is what deterrence is all

3  about.  That is an important consideration for sentencing.

4      I also consider the need to protect the public from

5  further crimes of these defendants.  I will acknowledge, quite

6  readily, that the need to provide the defendants with needed

7  educational or vocational training or medical care or other

8  matters relating to rehabilitation are not significant,

9  although they are obviously statutory sentencing

10  considerations, they are not significant for sentencing

11  purposes in this case.

12      I don't think that there is any real possibility that

13  either one of these defendants will change their ways as a

14  result of incarceration.  Incarceration and possibly supervised

15  release will essentially be an interruption, albeit a lengthy

16  interruption, in your criminal way of life.

17      I have also been substantially influenced by the nature

18  and circumstances of the offenses and the history and

19  characteristics of the defendants, the kinds of sentences

20  available, and the need to avoid unwarranted sentencing

21  disparities among defendants with similar records who have been

22  found guilty of similar conduct.  And I'll comment further on

23  that momentarily.

24      I have also been influenced by the advisory sentencing

25  guideline calculation and the relevant guidelines policy

1  statements as well as the need to provide restitution.  All of

2  which I have carefully considered in this case.

3      As for the nature and circumstances of the offenses and

4  the history and characteristics of the defendants, I have tried

5  to find even a thin strand of truth or integrity to your

6  conduct or your way of life.  It is not there.  Not even a

7  speck.  There is not even a plausible basis upon which you

8  might have deluded yourself into thinking that you are anything

9  but complete frauds and predators.

10     Your scams have cheated the United States.  And that is a

11 serious matter in and of itself.  But the United States can

12 print money.  If anyone ever had any lingering doubt as to

13 whether you are frauds and predators, that doubt would be

14 removed by the fact that the two of you have also merciless

15 fleeced some very vulnerable people.  You are predators, pure

16 and simple.

17     In evaluating your culpability, one thing I should

18 consider in fairness to you is the possibility that you have

19 convinced yourselves to believe, in good faith, in the truth of

20 some things that would not be believable to a reasonable man.

21 That would not be fraud as we commonly understand fraud.  So if

22 you are among those who are exceptionally likely to believe

23 whatever you are told, especially if it is you who are doing

24 the telling, that might tend to diminish your culpability.  I

25 have carefully considered that possibility and I have rejected

1   it.

2        As for Mr. Stilley, my sentencing decision is

3   significantly influenced by two matters.  The first is the need

4   to avoid unwarranted sentencing disparities among defendants

5   with similar records who have been found guilty of similar

6   conduct, as you have been in this case.  The facts that

7   contribute to my evaluation of your culpability are a bit

8   different for you than for Mr. Springer.  But in terms of your

9   overall culpability, Mr. Stilley, there is no daylight between

10  you and Mr. Springer, even though his advisory guideline range

11  is higher than yours is.

12       For that reason, taking into account all of the statutory

13  sentencing factors, including the advisory sentencing

14  guidelines, the sentence in your case will include an upward

15  variance from the guideline range.  If I failed to do that in

16  your case, Mr. Stilley, your sentence would reflect a

17  completely unjustifiable and unwarranted sentencing disparity

18  as between you and Mr. Springer.

19       I must say, Mr. Stilley, that my evaluation of your

20  history and characteristics is also influenced by the fact that

21  you have, to a truly astonishing extent, used your license to

22  practice law as an instrument of fraud and a license to steal.

23  Your victims have included both the United States and the

24  individuals who have been persuaded to their everlasting sorrow

25  that you had the competence and integrity to make legitimate

1    arguments on their behalf.  This is an aspect of your history

2    and characteristics that I cannot ignore and that I conclude is

3    not addressed in anything close to a meaningful way by the

4    adjustment under Guideline 3B1.3 for use of a special skill.

5        It is painful to think that you went as long as you did

6    before you were called to account by the disciplinary

7    proceedings in Arkansas.  Mr. Stilley, you are not a lawyer in

8    any normal sense of that word.  You are a thief with a law

9    degree.

10        One other matter should be mentioned before sentence is

11   imposed.  Both of you are going to have some time, considerable

12   time to perfect your self-image as tax protestors who have been

13   persecuted and victimized by the Internal Revenue Service.

14   Before you get too far down that road, let me remind you that

15   you were indicted by a grand jury consisting of your fellow

16   citizens and not by the IRS.  You were convicted by a trial

17   jury sitting in this courtroom consisting of your fellow

18   citizens and not by the IRS.

19        The criminal statutes under which you have been convicted

20   were enacted by our elected representatives and not by the

21   IRS.  You are being sentenced by the Court and not by the IRS.

22   Most importantly, the facts that will result in your

23   considerable terms of imprisonment were created by you and not

24   by the IRS.

25        The defendants will please come to the lectern, both of

1   them.

2       One matter that I'm going to address before I impose

3   sentence, because I will consider this in the imposition of

4   sentence, does the Defendant Springer have any request as to

5   place of designation by the Bureau of Prisons?

6           MR. SPRINGER:  Yes, Your Honor.  Because of the cases

7   that I have pending and because of my family and my children, I

8   would like to be as close to Tulsa, Oklahoma, as I could be.

9   Also readily accessible to the Court for those other cases that

10  are pending.

11          THE COURT:  Mr. Stilley.

12          MR. STILLEY:  Your Honor, I think it would be

13  satisfactory to allow the Bureau of Prisons to make an

14  appropriate designation.

15          THE COURT:  Very well.  The judgment and sentence in

16  this case will also state that the Court strongly recommends

17  that the Defendants Springer and Stilley not, in any event, be

18  designated to or incarcerated in the same institution.

19      Do either of you have any reason that the sentences ought

20  not to be imposed at this time?  Mr. Springer?

21          MR. SPRINGER:  No, Your Honor.

22          THE COURT:  Mr. Stilley?

23          MR. STILLEY:  I'd reserve all the complaints and

24  objections in the entire record.  Otherwise, no.

25          THE COURT:  It is the order and judgment of the Court

1    that the Defendant Lindsey Kent Springer is hereby committed to

2    the custody of the Bureau of Prisons to be imprisoned for a

3    term of 180 months consisting of:  60 months on Count 1, 60

4    months on Count 2, and 60 months on Count 3, each such term to

5    run consecutively.  And 60 months on Count 4, 12 months on

6    Count 5, and 12 months on Count 6; the sentences on Counts 4,

7    5, and 6 to run concurrently with each other and with the

8    sentence on Count 1; for a total sentence as to all counts of

9    180 months.  And you deserve every day of it.

10        Based on the defendant's financial profile as outlined in

11   the presentence report, the Court finds that the Defendant

12   Springer does not have the ability to pay both restitution and

13   a fine; therefore, no fine is imposed.  The defendant shall

14   make restitution in the amount of $691,343 to the Internal

15   Revenue Service and in the amount of $80,186 to the Oklahoma

16   Tax Commission at the addresses which shall be set forth in the

17   judgment and sentence.

18        The cost of prosecution has not been substantiated by

19   evidence and consequently will not be addressed.  Any monetary

20   penalty is due in full immediately but payable on a schedule of

21   the greater of $25 quarterly or 50 percent of income pursuant

22   to the Federal Bureau of Prisons Inmate Financial

23   Responsibility Program while in prison.

24        If a monetary balance remains, payment is to commence not

25   later than 60 days following release from imprisonment to a

1  term of supervised release in equal monthly payments of at

2  least $100 or 10 percent of net income, whichever is greater,

3  over the duration of the term of supervised release and

4  thereafter as prescribed by law for as long as any debt

5  remains.

6      Notwithstanding the establishment of a payment schedule,

7  nothing shall prohibit the United States from executing or

8  levying upon property of the defendant discovered before or

9  after the date of this judgment.

10      Upon release from imprisonment, the defendant shall be

11  placed on a term of supervised release for a period of three

12  years as to Counts 1, 2, 3, and 4 and one year as to Counts 5

13  and 6, all such terms to run concurrently with each other.

14      Immediately upon release from custody but not later than

15  72 hours, the defendant shall report in person to the probation

16  office in the district to which he is released.  While on

17  supervised release the defendant shall not commit another

18  federal, state, or local crime.  He is prohibited during the

19  period of supervised release or afterward from possessing a

20  firearm, ammunition, destructive device, or other dangerous

21  weapon.

22      The defendant shall, at the direction of the probation

23  officer, cooperate in the collection of DNA as provided by law

24  and shall not illegally possess a controlled substance.

25      The defendant shall comply with the standard conditions of

1    supervision that have been adopted by this Court and the

2    following special conditions as set forth in the relevant

3    paragraphs of the presentence report.  The defendant shall

4    abide by the special search and seizure condition as referenced

5    in the presentence report and as found at the Court's Web

6    site.  Likewise, the defendant shall abide by the special

7    financial conditions and he shall abide by the special computer

8    restriction and monitoring conditions.

9        While on supervision, the defendant shall cooperate with

10   the Internal Revenue Service in preparing and filing a true and

11   correct income tax return for any tax years since 1987 for

12   which he has not filed a return.  You shall cooperate with the

13   IRS in civil proceedings to determine accurately your tax

14   liability for the same years, establish a payment schedule with

15   the Internal Revenue Service, and pay all taxes, interest, and

16   penalties owed in connection with your tax debt according to

17   the payment schedule set by the IRS.

18       You shall not engage in any activity that would constitute

19   the unauthorized or unlicensed practice of law or provide

20   representation or services of any kind, advice, suggestions, or

21   recommendations, whether paid or not, to any person or entity,

22   public or private, other than immediate family members with

23   respect to any matter relating to federal or state taxation.

24       The defendant will maintain no Web site that refers to any

25   matter relating to federal or state taxation.  The defendant

1  will post no material of any kind on any Web site that refers

2  to any matter relating to federal or state taxation.

3      The defendant will not file without the express written

4  permission of the probation office any civil action relating to

5  federal income tax.  Further, the defendant is prohibited from

6  engaging in any activities in or under the name of Bondage

7  Breakers Ministry.

8      The defendant will not work directly or indirectly in any

9  business, profession, or self-employment engaged in the offer,

10  sale, purchase, trade, brokering, solicitation, or similar

11  transactions with respect to any real property, securities, or

12  negotiable instruments.  You will not engage in telemarketing

13  activities, to include telephone sales and other such business,

14  campaign, venture, or transaction.

15      You shall maintain employment.  All employment must be

16  approved in advance by the probation officer.

17      You shall abide by electronic monitoring, curfew

18  requirements, and travel restrictions as and to the extent as

19  may be determined by the probation officer.

20      If instructed by the probation officer, you shall provide

21  originals or copies of all personal and business telephone

22  records and all credit card checking account and PayPal

23  statements to the U.S. probation officer.  The defendant will

24  report to the probation officer the particulars as specified by

25  the probation officer of all transactions consummated with a

1   check cashing service.  These reports shall be made within ten

2   days after the completion of any such transaction.  You shall

3   refrain from transacting business with any check cashing

4   service if so directed by the probation officer.

5        You shall disclose all e-mail accounts, PayPal accounts,

6   Internet connections, and communication devices, to include all

7   screen names and passwords.  Your use of e-mail, Internet

8   connections, or an Internet connection service will be

9   restricted and/or monitored by monitoring software and

10  otherwise with the costs of remote computer monitoring to be

11  paid by the defendant.

12       You will be prohibited from accessing any on-line service

13  using an alias or the Internet account name or designation of

14  another person or entity.  You will be prohibited from altering

15  or using any form of encryption or other methods that limit

16  access to or change the appearance of data or images.  You will

17  be prohibited from altering or destroying records of computer

18  use.

19       It is further ordered that a $600 special monetary

20  assessment, $100 per count of conviction, be paid immediately

21  to the U.S. Court Clerk for the Northern District of Oklahoma.

22       Let's see, is that correct as to the misdemeanors?  Is

23  that still 100?

24            MR. O'REILLY:  No, Your Honor.

25            PROBATION OFFICER:  No, Your Honor.  It would be

1    $50 --

2          THE COURT:  Fifty dollars, okay.  Very well.  That

3    will be adjusted accordingly.

4        The judgment and sentence will state that the Court

5    recommends that the defendant be designated to the federal

6    penal facility closest to Tulsa, Oklahoma, for which his

7    security designation qualifies him -- or his security

8    classification qualifies him.

9        Mr. Springer, you are advised that you do have a right of

10   appeal the sentence that is imposed and the judgment of the

11   Court.  Any such appeal must be filed within 14 days of the

12   date the judgment is entered.  If you wish to appeal and cannot

13   afford an appeal, there are forms available for your use to

14   request an appeal without payment of cost.

15       As I mentioned yesterday, I urge you to move without delay

16   in preparing the necessary paperwork to get a transcript at

17   public expense.  And it's my assumption -- you can work with

18   the clerk on this.  It is my assumption that you do desire to

19   appeal and to notify the Court of that intent without delay.

20   We'll address matters relating to remand momentarily.

21       Oscar Amos Stilley.  It is the order and judgment of the

22   Court that the Defendant Oscar Amos Stilley is hereby committed

23   to the custody of the Bureau of Prisons to be imprisoned for a

24   term of 180 months consisting of:  60 months on Count 1, 60

25   months on Count 3, and 60 months on Count 4, all such terms to

1  run consecutively, for a total sentence as to all counts of 180

2  months.  And you deserve every day of it.

3      Based on your financial profile as outlined in the

4  presentence report, the Court finds that you do not have the

5  ability to pay both restitution and a fine; therefore, no fine

6  is imposed.

7      You shall make restitution in the amount of $684,653 to

8  the Internal Revenue Service and the amount of $91,627 to the

9  Arkansas Department of Finance and Administration at the

10  addresses that shall be set forth in the judgment and sentence.

11      The cost of prosecution has not been substantiated by

12  evidence and, consequently, will not be assessed.

13      Any monetary penalty is due in full immediately but

14  payable on a schedule of the greater of $25 quarterly or 50

15  percent of income pursuant to the Bureau of Prisons Inmate

16  Financial Responsibility Program.  This provision in your

17  judgment and sentence will be identical to the corresponding

18  provision in Mr. Springer's judgment and sentence.

19      By the way, if -- I should also -- however, this is the

20  release from -- the supervised release, obviously, is a bit

21  different because of the different counts of conviction.  Upon

22  release from imprisonment, you shall be placed on a term of

23  supervised release for a period of three years as to Counts 1,

24  3, and 4.  All terms of supervised release shall run

25  concurrently with each other.  Should the terms of supervised

1  release be revoked, an additional term of imprisonment may be

2  imposed.  Which is true with respect to both defendants.

3      Your judgment and sentence provisions with respect to

4  reporting after release from custody, with respect to DNA, with

5  respect to possession of a controlled substance, with respect

6  to the standard conditions, with respect to the special

7  conditions will be identical to those that were imposed with

8  respect to Mr. Springer.

9      While on supervision, you shall cooperate with the

10  Internal Revenue Service in preparing and filing a true and

11  correct income tax return for any tax years since 1987 for

12  which you have not filed a return.  That will be identical for

13  you as with respect to Mr. Springer.  And the same, of course,

14  is true of the special search and seizure condition, the

15  special financial conditions, and the special computer

16  restriction and monitoring conditions.

17      Likewise, the unauthorized practice of law restriction,

18  the Web site restriction, the posting of material relating to

19  federal or state taxation, and the civil action restriction

20  will be the same for you as with respect to Mr. Springer.

21      You will not work directly or indirectly in any business,

22  profession, or self-employment engaged in the offer, sale,

23  purchase, trade, brokering, solicitation, or similar

24  transactions with respect to any real property, securities, or

25  negotiable instruments.  And the remainder of that provision

1  will be identical with respect to Mr. Springer.

2      You shall provide, if instructed by the probation officer,

3  with originals or copies of all personal and business telephone

4  records and all credit card checking account and PayPal

5  statements to the U.S. probation officer.

6      Your condition of supervised release with respect to

7  transactions with check cashing services will be identical as

8  with respect to Mr. Springer.  And the provision with respect

9  to disclosure of e-mail accounts, screen names, passwords, and

10  remote monitoring and prohibition on access of on-line services

11  in false names or aliases and the prohibition of any use of any

12  method of encryption and the prohibition of altering or

13  destroying records of computer use will be identical as with

14  the conditions applicable to Mr. Springer.

15      It is further ordered that you are assessed a $300 special

16  monetary assessment, $100 per count of conviction, to be paid

17  immediately to the U.S. Court Clerk for the Northern District

18  of Oklahoma.

19      You do have a right of appeal of this judgment and

20  sentence.  Any such appeal must be filed within 14 days of the

21  date judgment is entered.  If you wish to appeal and cannot

22  afford an appeal, there are forms available for your use and

23  the clerk is ready to work with you on perfecting your appeal.

24  As is the case with Mr. Springer, I urge you to move without

25  delay to secure a transcript of the record at public expense.

1          Mr. Springer and Mr. Stilley, you may be seated for the

2     moment.

3               MR. SPRINGER:  May I ask one question about

4     restitution?

5               THE COURT:  Surely.

6               MR. SPRINGER:  When I cooperate with the IRS to file

7     the back tax returns, is it the Court's order that the

8     restitution amount would be credited towards the amount that

9     would be shown on those returns?

10              THE COURT:  That's an accounting matter that's

11    probably more complicated than we need to get into.

12              MR. SPRINGER:  Thank you, Your Honor.

13              THE COURT:  You bet.  I now inquire as to the

14    government's position with respect to remand.

15              MR. O'REILLY:  Each defendant should be remanded,

16    Your Honor, under 3143.

17              THE COURT:  Mr. Springer, I'll be happy to hear

18    anything you have to say to the Court on the subject of remand

19    to custody.

20              MR. SPRINGER:  First of all, Your Honor, under 3143,

21    I don't think anybody is saying I'm a flight risk.  I've been

22    released on bond for over a year now.  I've been under some

23    very strict bond conditions and I have kept them, as the

24    probation report states.

25         The only real question under 3143 is whether I raise

1  issues that, if decided in my favor, would result in either a

2  reversal, a reduction, or exoneration of the charges.  In that

3  regard, the issues that I spelled out a moment ago with regard

4  to my claims that the Tenth Circuit said on August 31, 2009,

5  that I raised difficult issues that they weren't going to

6  address in that decision because of the failure to pay penalty

7  and interest penalty instead of failure to file penalty, and --

8  if I may, Your Honor.

9      In relation to whether I raised difficult issues, I would

10  direct the Court's attention to -- which is, I believe, under

11  3143(b)(2), it's about law or facts, 3143(b)(1)(B) and (A) and

12  (B).  And under the decision that the Tenth Circuit published

13  in 2007, they stated in Mr. Chisum's case, because he was not

14  charged, they said, "The PRA precludes the imposition of any

15  penalty against a person for 'failing to comply with a

16  collection of information' if either it 'does not display a

17  valid control number' or the agency fails to alert the person

18  that he or she 'is not required to respond to the collection of

19  information unless it displays a valid control number.'  A

20  3512(a) defense may be raised at any time.  Tax forms are

21  covered by the PRA.  See Dole v. United Steelworkers, 108

22  L.Ed.2d 23 (1990), Supreme Court.  Mr. Chisum contends that

23  'since there was no proof that Form 1040 was a lawful form

24  under the PRA, the trial court erred in failing to grant his

25  request to dismiss the indictment.'  But the PRA protects a

1  person only 'for failing to file information.  It does not

2  protect one who files information which is false.'"

3      And the Tenth Circuit also said in the U.S. v. Collins

4  decision in 1990, which was written by Justice Baldock, and I

5  specifically refer to footnote 13 where it says, "In United

6  States v. Weiss, the Second Circuit held that the Paperwork

7  Reduction Act did not preclude prosecution for filing false

8  Medicare and Medicaid claims, despite the fact that the forms

9  in question did not contain OMB control numbers."  Which is not

10  my issue.  "Distinguishing Smith, where defendants were

11  prosecuted for failure to file a Plan of Operations with the

12  Forest Service, the Second Circuit reasoned that the Act 'only

13  protects a person from penalties for failing to file

14  information.  It does not protect one who files information

15  which is false.'"

16      They went on to say, "We recognize that because defendant

17  was charged with tax evasion and not failure to file tax

18  returns, he technically was not being prosecuted for failure to

19  provide information.  Had defendant's tax evasion been

20  effectuated through the filing of falsified tax returns, Weiss

21  would dictate that no Paperwork Reduction Act defense would be

22  available to him.  But because the provision of information in

23  1040 forms is inexorably linked to the statutory requirement to

24  pay taxes, and defendant failed to file such forms, the

25  Paperwork Reduction Act was applicable to such conduct."

464

```
 1        In United States v. Dawes, which the Court cited on a
 2   January 2010 order, which is laying out -- I'm laying out in
 3   the record the basis by which I believe I have an excellent
 4   chance of having the Tenth Circuit rule on the merits of my
 5   claims and rule in my favor is pointing to page 1193 where the
 6   Tenth Circuit said, "We would be inclined to follow the general
 7   analysis" --
 8             THE COURT:  Excuse me, Mr. Springer.  We covered all
 9   of this at trial.  I am emphatically not persuaded by your
10   arguments under the Paperwork Reduction Act.  That will
11   certainly not inform my judgment as to whether you should be
12   remanded under the criteria set forth in Section 3143(b)(1)(A)
13   and (B).
14             MR. SPRINGER:  Okay, Your Honor.  I also believe that
15   the Tenth Circuit will overturn the Court's direction to the
16   jury during my testimony about the Paperwork Reduction Act
17   because of the good faith defense position that I presented.
18   Today, the Supreme Court is meeting on my writ of mandamus
19   that's presented at the Supreme Court on its second conference,
20   which I anticipate at some point in time the Tenth Circuit is
21   going to render a decision on that case, even though it's in
22   the Supreme Court, regardless of what the Supreme Court does.
23   Because on December 4th, the Tenth Circuit said they would
24   address the issues on that when I got to the Tenth Circuit on
25   appeal.  I also have --
```

1          THE COURT:  Excuse me just a moment.  Mr. O'Reilly.

2          MR. O'REILLY:  With the Court's indulgence, may I

3  take a short break?

4          THE COURT:  We'll take a ten-minute recess.

5          MR. SPRINGER:  Thank you, Your Honor.

6      (RECESS HAD)

7          THE COURT:  Mr. Springer, I'll hear any concluding

8  remarks you have on the subject of remand.

9          MR. SPRINGER:  Your Honor, if I can simply just have

10  a few days to get all of my affairs in order, to get the

11  documents filed that you suggested earlier about the

12  transcripts done, spend a couple of days with my family, say my

13  goodbyes, and then I will report to wherever you tell me, as

14  I've done every time you've ordered me to do something.

15          THE COURT:  Thank you, Mr. Springer.

16          MR. SPRINGER:  Thank you.

17          THE COURT:  Mr. Stilley.

18          MR. STILLEY:  Your Honor, I would certainly adopt but

19  not repeat -- waste time repeating what Mr. Springer has said.

20  There is a matter that I feel that I should state in fairness

21  to the Court and that is that I do take objection to an upward

22  departure without previous notice the reasons and the

23  possibility of that upward departure.

24      And I would also say that my principal concern, I think

25  reflected in the pleadings, is that I be heard in a reasonable

466

1   time and in a reasonable manner, which is the fundamental

2   essence of due process.  I'm not persuaded that I can do that

3   reasonably in jail and certainly not to the level that I could

4   at home with all the computer, printers, and other things, the

5   Internet, that I would have access to.

6        And I would most respectfully request that I be allowed,

7   first, release pending appeal.  If that's not done, that I be

8   given time to surrender that would extend past the preparation

9   and filing of the reply.  And if that's not allowed, then

10  whatever the Court would grant as far as giving time to self-

11  surrender.

12            THE COURT:  Thank you.

13            MR. STILLEY:  Certainly.

14            THE COURT:  On the matter initially raised by

15  Mr. Stilley, the above guideline sentence is as a result of a

16  variance and not a departure.  The United States Supreme Court

17  has made it clear and in so doing effectively overruled the

18  Tenth Circuit's Atencio decision and has made clear that the

19  Court's application of the Section 3553 factors, even though it

20  may result in an above-guideline sentence, is a variance as to

21  which notice is not required, as distinguished from the notice

22  requirements that do apply to a guidelines departure.  So that

23  objection is overruled.

24        On the issue of remand, let me first say, gentlemen, that

25  I am fully cognizant of the seriousness of this question,

1  especially as it applies in your situation having invoked your

2  right, as you have, and it's an important right, to represent

3  yourselves.  And I am fully cognizant of the fact that

4  incarceration may well have some impact on your ability to

5  proceed representing yourselves.  To the extent that the Court

6  can within the bounds of the law and common sense ameliorate

7  that, then I will be happy to consider anything that the Court

8  might properly address in that regard.

9      My remand decision, however, is controlled by the relevant

10  subsections of 18 United States Code, Section 3143.  And it is

11  my conclusion that there is no basis, statutory or otherwise,

12  upon which to continue the defendants on bond.  And that

13  finding, I must say, is made both with respect to Section

14  3143(b)(1)(A) and Section 3143(b)(1)(B).

15      My decision not to remand the defendants after trial was

16  not an easy one.  And as might be suggested by the conditions

17  that I imposed at that time, it took a little work, I guess is

18  perhaps one way to say it, it took a little work for me to

19  arrive at the conclusion that the defendants should not be

20  remanded immediately after the verdict was in last fall.  But I

21  was able to craft conditions that gave me the satisfaction,

22  albeit perhaps barely, that the statutory criteria for

23  continuing the defendants on bond with the matter in that

24  posture could be satisfied and were satisfied.

25      That is not the case today.  I am no longer satisfied,

```
 1   much less by clear and convincing evidence, that the defendants
 2   are not flight risks.  We are now at a day on which the reality
 3   of the defendants' situations has become more -- certainly more
 4   unmistakably apparent and more unavoidable than it has been at
 5   any stage of these proceedings.
 6        I had to work hard, as I have said, to avoid remand at the
 7   conclusion of the trial.  I no longer have the comfort level,
 8   as I have said, much less by clear and convincing evidence,
 9   that the defendants are not flight risks at this point.
10        In this regard, I must say that I'm also influenced by my
11   evaluation of your entire criminal history and your entire long
12   history of lawless conduct.  You managed to keep yourself, in
13   the vernacular, between the fences during the pendency of these
14   proceedings.  And I think you did so because your balancing of
15   the benefits and disadvantages of doing that convinced you that
16   it was likely to your benefit to continue to comply with the
17   Court's requirements to the extent necessary to remain free.
18   I'm no longer satisfied that you would calculate the matter in
19   the same way.  And I do not find, much less by clear and
20   convincing evidence, that you are not flight risks.
21        With respect to Section 3143(b)(1)(B), I do not find that
22   there is any substantial question of law or fact likely to
23   result in reversal or any of the other relief referred to in
24   Section (b)(1)(B).  And bear in mind, gentlemen, that those are
25   conjunctive requirements.  (b)(1)(A) and (b)(1)(B) are
```

1   conjunctive, not alternative.

2       The defendants are both remanded to the custody of the

3   marshal to begin serving their sentences immediately.

4       Court will be in recess.  And I will direct that the

5   exhibits be withdrawn.  Court will be in recess.

6       (COURT ADJOURNED)

7                       REPORTER'S CERTIFICATE

8

9       I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND

10  CORRECT TRANSCRIPT OF PROCEEDINGS:

11

12                      S/Tracy Washbourne
                        Tracy Washbourne, RDR, CRR
13                      United States Court Reporter
                        Western District of Oklahoma
14

15

16

17

18

19

20

21

22

23

24

25

# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-respondent, | ) | |
| | ) | |
| -vs- | ) | Case No. 09-cr-0043-2-SPF |
| | ) | |
| OSCAR AMOS STILLEY, | ) | |
| | ) | |
| Defendant-movant. | ) | |

## ORDER
(ruling on motions at doc. nos. 701, 702, 705, 707)

Defendant Oscar Stilley moves the court to vacate his sentence pursuant to 28 U.S.C. § 2255.  Doc. no. 701.  In response, the government moves to dismiss Stilley's motion.  Doc. no. 705.  Stilley filed a response to the government's motion to dismiss.  Doc. no. 713.  The government did not file a reply brief.

Stilley's second motion seeks a stay of these proceedings pending disclosure of his co-defendant's (Lindsey Springer's) contact information, which Stilley asks the government to provide.  Doc. no. 702.  This motion asks for an order allowing Stilley and Springer to collaborate.  It also asks the court to specify by what legal authority it continues to preside over this case.  This motion seeks other relief as well.  In response, the government moves to dismiss Stilley's second motion.  Doc. no. 707.  Stilley filed a response to the government's motion to dismiss.  Doc. no. 714.  The government did not file a reply brief.

<u>Doc. nos. 701, 705</u>

Stilley and co-defendant Springer appealed their convictions and sentences. Their convictions and sentences were affirmed in <u>United States v. Springer et al.</u>, 444 Fed. Appx. 256 (10th Cir. 2011). As to Stilley, mandate issued on December 20, 2011. Doc. no. 463. Stilley did not petition for a writ of certiorari. Accordingly, Stilley's judgment of conviction became final on December 20, 20<u>11</u>. Stilley's motion to vacate his sentence was not filed until September 1, 20<u>21</u>.

Section 2255 includes a one-year statute of limitations. 28 U.S.C. § 2255(f). Stilley devotes ten pages of his motion (doc. no. 701, pp. 70-80) to arguments intended to show the one-year limitations period should not bar his request for relief under § 2255.[1]

Stilley argues the Department of Justice has participated in a years' long scorched earth campaign against him, ruining his ability to defend the criminal charges against him. He argues the court kept him from filing an appeal by delaying the production of trial transcripts. He argues the clerk of the court of appeals never called anything he filed an opening appellate brief, and that he was required to adopt his co-defendant's appellate brief to avoid waiver. In support of arguments that he has been denied "the keys to the courthouse" all these years, Stilley relies on matters pertinent to <u>Stilley v. Garland, et al.</u>, Case No. 21-60022, pending in the Fifth Circuit Court of Appeals. These and other arguments appear to be aimed at showing that Stilley has not yet had an adequate opportunity to file a proper appeal and that the conduct of the government, as well as the court, entitles him to a tolling of the

---

[1] All of Stilley's arguments related to timeliness have been considered, including those not addressed in this order.

limitations period.   In addition, Stilley asserts actual innocence.   He argues the government never believed he was guilty of the crimes of conviction and that he is innocent of all counts of conviction.   Stilley also argues that § 2255's one-year limitations period is a scam intended to cheat innocent people out of due process and that he should not be bound by it.

Stilley's arguments are rejected.   Stilley pursued a direct appeal and lost, and his conviction and sentence became final almost ten years ago.   (December 20, 2011, when conviction became final, to September 1, 2021, when motion to vacate filed = almost ten years.)   A petitioner must diligently pursue his federal habeas claims; furthermore, a claim of insufficient access to relevant law or legal materials (such as the transcripts Stilley argues were delayed) is not enough to support equitable tolling of the limitations period.   *See* Gibson v. Klinger, 232 F.3d 799, 808 (10th Cir. 2000) (one-year period is subject to equitable tolling only in rare and exceptional circumstances; claim of insufficient access to the law is not enough to support tolling); Porter v. Allbaugh, 672 Fed. Appx. 851, 857 (10th Cir. 2016) (difficulty in obtaining trial transcripts is insufficient to constitute extraordinary circumstances, describing holding in United States v. Williams, 219 Fed. Appx. 778, 779 (10th Cir. 2007).[2]   Stilley has not shown extraordinary circumstances as a basis for tolling.   As for Stilley's claim of actual innocence, this type of claim is only a basis for tolling if founded on new evidence.   Foust v. Jones, 261 Fed. Appx. 131, 133 (10th Cir. 2008),[3] citing Sellers v. Ward, 135 F.3d 1333, 1338-39 (10th Cir. 1998).   Stilley identifies no new evidence to support an actual innocence claim.   Accordingly, this

---

[2] Porter and Williams are unpublished.  These and other unpublished decisions are cited for their persuasive value only.

[3] Foust is unpublished.

argument is rejected.  The court also rejects Stilley's argument that § 2255's one-year limitations period is a scam and should not apply to him.

Stilley's conviction and sentence became final on December 20, 2011, when the mandate issued on the court of appeals' decision affirming Stilley's conviction and sentence.  That triggered the one-year limitations period, which expired on December 20, 2012.  Stilley's § 2255 motion was not filed until September 1, 2021, almost nine years late.  (December 20, 2012, when one-year limitations period expired, to September 1, 2021, when motion to vacate filed = almost nine years.)  No basis for tolling the limitations period has been shown.  Accordingly, the court will grant the government's motion to dismiss Stilley's § 2255 motion as untimely.

Doc. Nos. 702, 707

Stilley's second motion seeks a stay in order to obtain Springer's contact information, so that the two of them may collaborate regarding the prosecution of Stilley's § 2255 motion.  The court has now determined that Stilley's § 2255 motion is untimely and should be dismissed.  Consequently, § 2255 cannot provide even an arguable premise for obtaining Springer's contact information or for staying this matter to permit these co-defendants to collaborate.  Other than this motion's connection to Stilley's § 2255 motion, no statutory basis for this post-judgment motion has been identified.  The court concludes it has no jurisdiction over Stilley's second motion and that the government's motion to dismiss it should be granted. *See generally*, United States v. Patterson, 253 Fed. Appx. 748, 750 (10th Cir. 2007) (district court does not have inherent authority to modify a previously imposed sentence and may do so only pursuant to statutory authorization; where motion was

4

not a motion to vacate under § 2255, district court lacked jurisdiction to hear the motion).[4]

Conclusion

After careful consideration, the government's motions to dismiss are **GRANTED** (doc. nos. 705, 707), and Stilley's motions are **DISMISSED** (doc. nos. 701, 702).  A certificate of appealability is **DENIED**.

IT IS SO ORDERED this 4th day of November, 2021.


STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE


09-0043p170 (Stilley).docx

---

[4] Patterson is unpublished.



# IN THE UNITED STATES DISTRICT COURT FOR NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,   )
                               )

     Plaintiff-respondent,   )
                               )

-vs-                      )   Case No. 09-cr-0043-2-SPF
                               )

OSCAR AMOS STILLEY,   )
                               )

     Defendant-movant.    )

## JUDGMENT

Judgment is entered in accordance with the court's order of today's date dismissing as untimely defendant Oscar Amos Stilley's motion seeking to vacate his sentence pursuant to 28 U.S.C. § 2255.

Dated this 4th day of November, 2021.

                                                                  STEPHEN P. FRIOT
                                                                   UNITED STATES DISTRICT JUDGE

09-0043p171 (Stilley).docx

FILED
United States Court of Appeals
Tenth Circuit

June 6, 2022

Christopher M. Wolpert
Clerk of Court

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

———————————————————

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

OSCAR AMOS STILLEY,

     Defendant - Appellant.

No. 22-5000
(D.C. Nos. 4:09-CR-00043-SPF-2 &
4:21-CV-00361-SPF-CDL)
(N.D. Okla.)

———————————————————

## ORDER DENYING CERTIFICATE OF APPEALABILITY[*]
———————————————————

Before **PHILLIPS**, **MURPHY**, and **EID**, Circuit Judges.
———————————————————

Oscar Stilley was convicted by a jury in the Northern District of Oklahoma of one

count of conspiracy to defraud the United States and two counts of aiding and abetting

tax evasion. He appealed his conviction and we affirmed in an order consolidating related

cases. *See United States v. Springer*, 444 F. App'x 256 (10th Cir. 2011). His conviction

became final on December 20, 2011, when the deadline to file a writ of certiorari had

passed.

Almost ten years later, on September 1, 2021, Stilley filed a petition in the district

court under 28 U.S.C. § 2255. His petition raised thirteen claims for relief. The district

———————————————————

[*] This order is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

court dismissed the § 2255 petition as untimely, rejecting his proposed excuses based on equitable tolling, actual innocence, and the inapplicability of § 2255's one-year limitations period. The district court also denied Stilley's request for a certificate of appealability ("COA"), a prerequisite to appealing the merits of a § 2255 petition. Stilley appealed the dismissal of his petition and now seeks a COA from our court.

A COA may be issued only if the appellant "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this showing, the appellant must establish "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotations omitted).

The district court noted that Stilley was nearly nine years too late in filing his § 2255 petition. The district court applied our circuit's case law and held that Stilley's § 2255 petition fell outside the one-year limitations period under § 2255(f), and that Stilley hadn't offered a persuasive reason to toll the limitations period.

At bottom, Stilley must have diligently pursued his federal habeas claim but didn't. His brief points to no errors in the district court's statute-of-limitations or tolling analyses. Even if we were to accept Stilley's representations about, for example, the government's conduct with respect to his previous direct appeal, Stilley's brief still fails to explain why he waited almost nine years after the limitations period expired to file his petition. Thus, having reviewed the record before us, we find that reasonable jurists

wouldn't disagree with the district court's thorough order. We therefore deny a COA and dismiss the appeal.[1]

Entered for the Court

Gregory A. Phillips
Circuit Judge

---

[1] On May 23, 2022, Stilley filed a document styled as a "Motion to Recall the Mandate in 10-5057." As we understand the filing, Stilley is requesting that we withdraw the mandate from his previously affirmed criminal conviction. We decline to consider this motion as it is unrelated to the COA issue in this case.

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157
Clerk@ca10.uscourts.gov

Christopher M. Wolpert
Clerk of Court

Jane K. Castro
Chief Deputy Clerk

June 06, 2022

Oscar A. Stilley
10600 North Highway 59
Cedarville, AR 72932

**RE:** **22-5000, United States v. Stilley**
Dist/Ag docket: 4:09-CR-00043-SPF-2, 4:21-CV-00361-SPF-CDL

Dear Appellant:

Enclosed is a copy the court's final order issued today in this matter.

Please contact this office if you have questions.

Sincerely,

Christopher M. Wolpert
Clerk of Court

cc:     Katie Bagley
        Gregory Victor Davis

CMW/mlb

## Lynn Tiefenthaler

| | |
|---|---|
| **From:** | ca10_cmecf_notify@ca10.uscourts.gov |
| **Sent:** | Monday, June 6, 2022 9:14 AM |
| **To:** | CM-ECF Intake OKND |
| **Subject:** | 22-5000 United States v. Stilley "Case termination for COA" (4:09-CR-00043-SPF-2, Lead: 4:21-CV-00361-SPF-CDL) |

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing.

**Tenth Circuit Court of Appeals**

**Notice of Docket Activity**

The following transaction was entered on 06/06/2022 at 8:04:27 AM Mountain Daylight Time and filed on 06/06/2022

| | |
|---|---|
| **Case Name:** | United States v. Stilley |
| **Case Number:** | 22-5000 |
| **Document(s):** | Document(s) |

**Docket Text:**
[10917850] COA Denial; Terminated on the merits after submissions without oral hearing; Written, signed, unpublished. Judges Phillips (authoring), Murphy and Eid. [22-5000]

**Notice will be electronically mailed to:**

Ms. Katie Bagley: katie.s.bagley@usdoj.gov, cateps.taxcriminal@usdoj.gov
Mr. Gregory Victor Davis: Gregory.V.Davis@usdoj.gov, cateps.taxcriminal@usdoj.gov, joseph.b.syverson@usdoj.gov
Oscar A. Stilley: oscarstilley@gmail.com

The following document(s) are associated with this transaction:
**Document Description:** COA Denial
**Original Filename:** 22-5000.pdf
**Electronic Document Stamp:**
[STAMP acecfStamp_ID=1104938855 [Date=06/06/2022] [FileNumber=10917850-0]
[e1f6db07834fb595106d8f7703c61b1a12a9f171a96566e839788dde1821482ed892747b9f4fff708f971de500899f0568c6
8627aa15bffc5c422f1e877fec81]]

**Document Description:** COA Order Cover Letter
**Original Filename:** /opt/ACECF/live/forms/MichaelBarajas_225000_10917850_135.pdf
**Electronic Document Stamp:**
[STAMP acecfStamp_ID=1104938855 [Date=06/06/2022] [FileNumber=10917850-1]
[d0894d5106c734694d5e721b5570b69749fec97554c37a60a134baed4ae4e746734b1e72f2094cff31562dbab2d0413345

3046d22a2e9401f489dc1d83aebade]]

**Recipients:**

- [Ms. Katie Bagley](#)
- [Mr. Gregory Victor Davis](#)
- [Oscar A. Stilley](#)



# FILED

AUG 2 4 2022

Mark C. McCartt, Clerk
U.S. DISTRICT COURT

| Prob 22 (12/2018) TRANSFER OF JURISDICTION | DOCKET NUMBER (Tran Court) CR-043-002-SPF |
|---|---|
| | DOCKET NUMBER (Rec Court) CR-22-357-001-F |

| NAME AND ADDRESS OF PROBATIONER RELEASEE: OSCAR AMOS STILLEY | DISTRICT Northern District of Oklahoma | DIVISION United States Probation Office |
|---|---|---|
| | NAME OF SENTENCING JUDGE The Honorable Stephen P. Friot, | |

| | DATES OF: ☐ PROBATION ☒ SUPERVISED RELEASE | From Date 8/10/2022 | To Date 8/9/2025 |
|---|---|---|---|

**OFFENSE**

18 U.S.C. § 371          Conspiracy to Defraud the United States
26 U.S.C. § 7201 and 18 U.S.C. § 2   Tax Evasion and Aiding and Abetting
26 U.S.C. § 7201 and 18 U.S.C. § 2   Tax Evasion and Aiding and Abetting

**PART 1 - ORDER TRANSFERRING JURISDICTION**

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OKLAHOMA

   IT IS HEREBY ORDERED that pursuant to 18 U.S.C. § 3605 the jurisdiction of the probationer releasee named above be transferred with the records of the Court to the United States District Court for the WESTERN DISTRICT OF OKLAHOMA upon that Court's order of acceptance of jurisdiction.  This Court hereby expressly consents that the period of probation release may be changed by the District Court to which this transfer is made without further inquiry of this Court.*

___August 24, 2022___
Date

_____
Stephen P. Friot, United States District Judge

* This sentence may be deleted in the discretion of the transferring Court.

**PART 2 - ORDER ACCEPTING JURISDICTION**

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

   IT IS HEREBY ORDERED that jurisdiction over the above-named probationer releasee be accepted and assumed by this Court from and after the entry of this order.

___August 24, 2022___
Effective Date

_____
United States District Judge

GARN,LC−1,RELEASED,TRANSF,VJASSIGN

# U.S. District Court
## U.S. District Court for the Northern District of Oklahoma (Tulsa)
## CRIMINAL DOCKET FOR CASE #: <u>4:09−cr−00043−SPF−2</u>

Case title: USA v. Springer et al                 Date Filed: 03/10/2009
Related Case: 4:21−cv−00361−SPF−CDL        Date Terminated: 04/28/2010

Assigned to: Judge Stephen P
Friot

Appeals court case numbers:
'10−5057 (#348)' '10th Circuit',
22−5000 (#725) 10th Circuit

**<u>Defendant (2)</u>**

| | | |
|---|---|---|
| **Oscar Amos Stilley**<br>*TERMINATED: 04/28/2010* | represented by | **Oscar Amos Stilley**<br>#10579−062<br>Oscar A. Stilley<br>Arkansas<br>10600 N Highway 59<br>Cedarville, AR 72932<br>479−384−2303<br>Email: oscarstilley@gmail.com<br>PRO SE |

**Charles Robert Burton , IV**
Burton Law Firm PC
15 E 5TH ST STE 4022
TULSA, OK 74103−4347
918−607−4891
Email: RobtBurton@aol.com
*TERMINATED: 04/27/2010*
*LEAD ATTORNEY*
*Designation: Public Defender or Community*
*Defender Appointment*

**Terry Lee Weber**
Weber & Assoc PC
320 S BOSTON STE 825
TULSA, OK 74103
918−582−1910
Fax: 918−582−2015
Email: Terry.Weber@morelaw.com
*TERMINATED: 04/03/2009*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA or Other Appointment*

| **Pending Counts** | **Disposition** |
|---|---|
| 18 USC 371: Conspiracy to Defraud the United States (1) | BOP 60 months; SR 3 years; Restitution $776,280; SMA $100 |
| 26 USC 7201: Tax Evasion and 18 USC 2 (3–4) | BOP 60 months consecutive to Ct 1 and each other; SR 3 years; SMA $100 |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| None | |

---

**Plaintiff**

| USA | represented by | **Charles Anthony O'Reilly** |
|---|---|---|

DOJ–Tax
150 M Street N.E.
Room 2–404
Washington, DC 20002
202–616–0115
Fax: 202–514–9623
Email: charles.a.o'reilly@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Government Attorney (local,state,federal)*

**Jeffrey Andrew Gallant**
United States Attorney's Office (Tulsa)
110 W 7TH ST STE 300
TULSA, OK 74119–1013
918–382–2715
Fax: 918–560–7938
Email: Jeff.Gallant@usdoj.gov
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*
*Designation: Government Attorney*
*(local,state,federal)*

**Kenneth P Snoke**
United States Attorney's Office (Tulsa)
110 W 7TH ST STE 300
TULSA, OK 74119−1013
918−382−2700
Fax: 918−560−7946
Email: ken.snoke@usdoj.gov
*TERMINATED: 06/08/2010*
*LEAD ATTORNEY*
*Designation: Government Attorney*
*(local,state,federal)*

**Vani Singhal**
U.S. Attorney's Office
110 W. 7th Street
Suite 300
Tulsa, OK 74119
918−382−2700
Email: vani.singhal@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Government Attorney*
*(local,state,federal)*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 03/10/2009 | 1 | | DEFENDANT INFORMATION SHEET(S) by USA as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 03/10/2009) Contains One or More Restricted PDFs |
| 03/10/2009 | 2 | | INDICTMENT by USA as to Lindsey Kent Springer (1) count(s) 1, 2, 3−4, 5−6, Oscar Amos Stilley (2) count(s) 1, 3−4 (pll, Dpty Clk) (Entered: 03/10/2009) |
| 03/10/2009 | 4 | | SUMMONS Issued by Court Clerk as to Oscar Amos Stilley (pll, Dpty Clk) (Entered: 03/10/2009) Contains One or More Restricted PDFs |
| 03/10/2009 | 665 | | SEALED UNREDACTED VERSION of Dkt # 2 per Local Rule 5.3(b) (pll, Dpty Clk) (Entered: 01/11/2019) Contains One or More Restricted PDFs |
| 03/18/2009 | 5 | | MOTION for Electronic Access by Lindsey Kent Springer as to Lindsey Kent Springer (sjm, Dpty Clk) (Entered: 03/18/2009) |
| 03/18/2009 | 9 | | MINUTE ORDER *by Judge Payne, due to Court conflict*, recusing Judge James H Payne, *this case is hereby returned to the Court Clerk for further reassignment,* Court Clerk reassigned to case as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 03/18/2009) |
| 03/18/2009 | 14 | | MINUTES of Proceedings – held before Magistrate Judge Paul J Cleary: Initial Appearance held on 3/18/2009, Arraignment held on 3/18/2009, |

| | | | |
|---|---|---|---|
| | | | appointing CJA attorney Terry Lee Weber for Oscar Amos Stilley, setting/resetting bond as to Oscar Amos Stilley (Court Reporter: C1) (kjp, Dpty Clk) (Entered: 03/18/2009) |
| 03/18/2009 | 15 | | ORDER by Magistrate Judge Paul J Cleary *(for purposes of initial appearance only)*, appointing CJA attorney as to Oscar Amos Stilley (kjp, Dpty Clk) (Entered: 03/18/2009) |
| 03/18/2009 | 16 | | ORDER by Magistrate Judge Paul J Cleary, setting conditions of release as to Oscar Amos Stilley (kjp, Dpty Clk) (Entered: 03/18/2009) |
| 03/18/2009 | 17 | | BOND approved by Magistrate Judge Paul J Cleary as to Oscar Amos Stilley (kjp, Dpty Clk) (Entered: 03/18/2009) |
| 03/19/2009 | 18 | | ORDER by Magistrate Judge Paul J Cleary *directing defendants regarding representation*, setting deadline(s)/hearing(s): *(copy of Order mailed to both defendants on 3/19/09)* ( Miscellaneous Deadline set for 3/30/2009) as to Lindsey Kent Springer, Oscar Amos Stilley (kjp, Dpty Clk) (Entered: 03/19/2009) |
| 03/23/2009 | 19 | | RESPONSE (Re: 8 MOTION for Bill of Particulars, 5 MOTION for Electronic Access, 7 Brief in Support of Motion, 6 MOTION for In Camera Review of Fifth Amendment Proffer ) by USA as to Lindsey Kent Springer, Oscar Amos Stilley (Snoke, Kenneth) (Entered: 03/23/2009) |
| 03/24/2009 | 20 | | MOTION to Withdraw Attorney(s) *R. Scott Williams* by Lindsey Kent Springer as to Lindsey Kent Springer (Williams, Robert) Modified on 3/25/2009 to reference to Oscar Stilley (tjc, Dpty Clk). (Entered: 03/24/2009) |
| 03/24/2009 | 21 | | MOTION for Hearing (Re: 20 MOTION to Withdraw Attorney(s) ) by Lindsey Kent Springer as to Lindsey Kent Springer (Williams, Robert) Modified on 3/25/2009 to remove reference to Oscar Stilley (tjc, Dpty Clk). (Entered: 03/24/2009) |
| 03/25/2009 | | | NOTICE of Docket Entry Modification; Error: During e–filing the attorney was prompted to select a case, all defendants were selected; Correction: Edited docket text to remove Oscar Stilley as these pleadings did not name him (Re: 20 MOTION to Withdraw Attorney(s), 21 MOTION for Hearing ) as to Lindsey Kent Springer, Oscar Amos Stilley (tjc, Dpty Clk) (Entered: 03/25/2009) |
| 03/25/2009 | 22 | | MINUTE ORDER by Magistrate Judge Paul J Cleary, setting/resetting deadline(s)/hearing(s): ( Miscellaneous Hearing set for 3/30/2009 at 02:30 PM before Magistrate Judge Paul J Cleary) as to Lindsey Kent Springer, Oscar Amos Stilley (kjp, Dpty Clk) (Entered: 03/25/2009) |
| 03/30/2009 | 23 | | MINUTES of Proceedings – held before Magistrate Judge Paul J Cleary: Miscellaneous Hearing held on 3/30/2009 *re Representation; Defendants Waive Counsel*, ruling on motion(s)/document(s): #5 granted, striking/terminating deadline(s)/hearing(s) as to Lindsey Kent Springer, Oscar Amos Stilley (Re: 5 MOTION for Electronic Access ) (Court Reporter: C1) (kjp, Dpty Clk) (Entered: 03/31/2009) |
| 03/31/2009 | 24 | | MINUTE ORDER *by Court Clerk at the direction of Chief Judge Claire V. Eagan*, reassigning case to Judge Stephen P Friot. Court Clerk no longer assigned to case, changing case number to 09–CR–43–SPF as to Lindsey Kent |

4

| | | | |
|---|---|---|---|
| | | | Springer, Oscar Amos Stilley (a–hc, Dpty Clk) (Entered: 03/31/2009) |
| 04/01/2009 | 25 | | MOTION for Protective Order by USA as to Lindsey Kent Springer, Oscar Amos Stilley (O'Reilly, Charles) (Entered: 04/01/2009) |
| 04/02/2009 | 26 | | ORDER by Judge Stephen P Friot *(Protective Order)*, ruling on motion(s)/document(s): #25 Granted (Re: 25 MOTION for Protective Order ) as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 04/02/2009) |
| 04/03/2009 | 27 | | ORDER by Magistrate Judge Paul J Cleary *Appointing Standby Counsel*, adding attorney Robert Scott Williams for Lindsey Kent Springer, Charles Robert Burton, IV for Oscar Amos Stilley, ruling on motion(s)/document(s): #20 and #21 moot (Re: 20 MOTION to Withdraw Attorney(s) *R. Scott Williams*, 21 MOTION for Hearing ) as to Lindsey Kent Springer, Oscar Amos Stilley (kjp, Dpty Clk) (Entered: 04/03/2009) |
| 04/06/2009 | 28 | | MOTION to Permit Oscar Stilley to File by CM/ECF by Oscar Amos Stilley (s–srb, Dpty Clk) (Entered: 04/07/2009) |
| 04/07/2009 | 29 | | ORDER by Judge Stephen P Friot, setting/resetting deadline(s)/hearing(s): ( Motion Hearing set for 4/22/2009 at 10:00 AM before Judge Stephen P Friot, Scheduling Conference set for 4/22/2009 at 10:00 AM before Judge Stephen P Friot) (Re: 8 MOTION for Bill of Particulars, 6 MOTION for In Camera Review of Fifth Amendment Proffer ) as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 04/07/2009) |
| 04/08/2009 | 31 | | ORDER by Judge Stephen P Friot, ruling on motion(s)/document(s): #28 Granted (Re: 28 MOTION to Permit Oscar Stilley to File by CM/ECF ) as to Oscar Amos Stilley (pll, Dpty Clk) (Entered: 04/08/2009) |
| 04/10/2009 | 33 | | MOTION for Bill of Particulars by Oscar Amos Stilley as to Lindsey Kent Springer, Oscar Amos Stilley (Stilley, Oscar) (Entered: 04/10/2009) |
| 04/10/2009 | 34 | | ORDER by Judge Stephen P Friot *: setting Motion for hearing on 4/22/09* (Re: 33 MOTION for Bill of Particulars, 29 Order,,,, Setting/Resetting Deadline(s)/Hearing(s), Setting/Resetting Deadline(s)/Hearing(s) ) as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 04/10/2009) |
| 04/15/2009 | 39 | | MOTION Unopposed Motion for Limited Unsealing of Search Warrant and Affidavit and Materials from Case 03–CR–055–CVE by USA as to Lindsey Kent Springer, Oscar Amos Stilley (Snoke, Kenneth) (Entered: 04/15/2009) |
| 04/15/2009 | 40 | | NOTICE NOTICE RE GOVERNMENT MOTION FOR LIMITED UNSEALING OF SEARCH WARRANT AFFIDAVIT AND MATERIALS FROM CASE 03–CR–043–CVE (Re: 39 MOTION Unopposed Motion for Limited Unsealing of Search Warrant and Affidavit and Materials from Case 03–CR–055–CVE ) by USA as to Lindsey Kent Springer, Oscar Amos Stilley (With attachments) (O'Reilly, Charles) (Entered: 04/15/2009) |
| 04/16/2009 | 41 | | ORDER by Judge Stephen P Friot *setting Motion for Hearing on 4/22/09* (Re: 39 MOTION Unopposed Motion for Limited Unsealing of Search Warrant and Affidavit and Materials from Case 03–CR–055–CVE ) as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 04/16/2009) |

| 04/16/2009 | [42](#) | | RESPONSE in Opposition to Motion *Consolidated* (Re: 37 MOTION Request for Release of Affidavit and Transcript surrounding issuance of Search Warrant dated 9.15.05, [33](#) MOTION for Bill of Particulars, 8 MOTION for Bill of Particulars, 35 MOTION for Protective Order *Pending Prospective Franks Hearing*, 30 MOTION to Clarify *appointment of Honorable Judge Stephen P. Friot*, 6 MOTION for In Camera Review of Fifth Amendment Proffer, 36 MOTION to Unseal Document(s) *in 03−CR−55E* ) by USA as to Lindsey Kent Springer, Oscar Amos Stilley (With attachments) (O'Reilly, Charles) (Entered: 04/16/2009) |
|---|---|---|---|
| 04/22/2009 | [43](#) | | MINUTES of Proceedings – held before Judge Stephen P Friot: Motion Hearing held on 4/22/2009, Scheduling Conference held on 4/22/2009, ruling on motion(s)/document(s): #30 Granted, #6, 8, 33 Denied, #36, 37, 39 Granted in Part, Denied in part, taking motion(s) under advisement, setting/resetting deadline(s)/hearing(s): ( Motions due by 6/1/2009, Responses due by 6/15/2009, Motion Hearing set for 7/9/2009 at 09:00 AM before Judge Stephen P Friot, Jury Instructions, Voir Dire & Trial Briefs due by 8/3/2009, Pretrial Conference set for 10/21/2009 at 10:00 AM before Judge Stephen P Friot, Jury Trial set for 10/26/2009 at 09:30 AM before Judge Stephen P Friot) as to Lindsey Kent Springer, Oscar Amos Stilley (Re: 37 MOTION Request for Release of Affidavit and Transcript surrounding issuance of Search Warrant dated 9.15.05, [33](#) MOTION for Bill of Particulars, 8 MOTION for Bill of Particulars, [39](#) MOTION Unopposed Motion for Limited Unsealing of Search Warrant and Affidavit and Materials from Case 03−CR−055−CVE, 35 MOTION for Protective Order *Pending Prospective Franks Hearing*, 30 MOTION to Clarify *appointment of Honorable Judge Stephen P. Friot*, 6 MOTION for In Camera Review of Fifth Amendment Proffer, 36 MOTION to Unseal Document(s) *in 03−CR−55E* ) (Court Reporter: Tracy Washbourne) (pll, Dpty Clk) (Entered: 04/22/2009) |
| 04/29/2009 | [46](#) | | ORDER by Judge Stephen P Friot, setting/resetting deadline(s)/hearing(s): ( Responses due by 5/11/2009) (Re: 44 Reply to Response to Motion ) as to Lindsey Kent Springer, Oscar Amos Stilley (sjm, Dpty Clk) Modified on 5/1/2009 to seal PDF, as ENTERED IN ERROR; duplicate entry see Doc # 45 for correct entry (tjc, Dpty Clk). (Entered: 04/30/2009) Contains One or More Restricted PDFs |
| 05/01/2009 | | | NOTICE of Docket Entry Modification; Error: Duplicate entry, ENTERED IN ERROR; Correction: Sealed PDF as this was a duplicate entry; see Doc # 45 for correct entry (Re: [46](#) Order,, Setting/Resetting Deadline(s)/Hearing(s), Setting/Resetting Deadline(s)/Hearing(s),, ) as to Lindsey Kent Springer, Oscar Amos Stilley (tjc, Dpty Clk) (Entered: 05/01/2009) |
| 05/08/2009 | [49](#) | | MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) *July 9, 2009, Hearing on Motion for Franks Issue and/or Suppress* (Re: [43](#) Minutes of Motion Hearing,,,,,, Minutes of Scheduling Conference,,,,,, Ruling on Motion(s)/Document(s), Ruling on Motion(s)/Document(s), Ruling on Motion(s)/Document(s), Ruling on Motion(s)/Document(s), Ruling on Motion(s)/Document(s), Taking Motion(s) Under Advisement, Taking Motion(s) Under Advisement, Taking Motion(s) Under Advisement, Taking Motion(s) Under Advisement, Taking Motion(s) Under Advisement, Taking Motion(s) Under Advisement, Setting/Resetting Deadline(s)/Hearing(s), Setting/Resetting Deadline(s)/Hearing(s), |

6

| | | | |
|---|---|---|---|
| | | | Setting/Resetting Deadline(s)/Hearing(s), Setting/Resetting Deadline(s)/Hearing(s), Setting/Resetting Deadline(s)/Hearing(s), Setting/Resetting Deadline(s)/Hearing(s) ) by USA as to Lindsey Kent Springer, Oscar Amos Stilley (With attachments) (O'Reilly, Charles) (Entered: 05/08/2009) |
| 05/12/2009 | 50 | | ORDER by Judge Stephen P Friot, ruling on motion(s)/document(s): #49 Granted in Part, setting/resetting deadline(s)/hearing(s): ( Motion Hearing set for 7/2/2009 at 09:00 AM before Judge Stephen P Friot) (Re: 49 MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) ) as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 05/12/2009) |
| 05/15/2009 | 67 | | MOTION to Dismiss Indictment/Information/Complaint *for fraud and violation of the 5th Amendment* (Re: 2 Indictment ) by Oscar Amos Stilley as to Oscar Amos Stilley (Stilley, Oscar) Modified on 5/18/2009 to remove defendant Lindsey Springer from text (lml, Dpty Clk). (Entered: 05/15/2009) |
| 05/15/2009 | 68 | | BRIEF in Support of Motion *to dismiss for fraud and violation of the 5th Amendment* (Re: 67 MOTION to Dismiss Indictment/Information/Complaint ) by Oscar Amos Stilley as to Oscar Amos Stilley (Stilley, Oscar) Modified on 5/18/2009 to remove Lindsey Springer from text (lml, Dpty Clk). (Entered: 05/15/2009) |
| 05/15/2009 | 69 | | JOINDER *of motions filed by Lindsey Springer* (in [51−66] Generally dispositive filed on May 15, 2009) by Oscar Amos Stilley as to Oscar Amos Stilley (Stilley, Oscar) Modified on 5/18/2009 to remove Lindsey Springer from text (lml, Dpty Clk). (Entered: 05/15/2009) |
| 05/18/2009 | | | NOTICE of Docket Entry Modification; Error: These documents were filed as to both defendants in error; Correction: Edited docket text and removed Lindsey Kent Springer from text (Re: 67 MOTION to Dismiss Indictment/Information/Complaint *for fraud and violation of the 5th Amendment*, 69 JOINDER (in [51−66] Generally dispositive filed on May 15, 2009), 68 Brief in Support of Motion ) as to Lindsey Kent Springer, Oscar Amos Stilley (lml, Dpty Clk) (Entered: 05/18/2009) |
| 05/26/2009 | 70 | | ORDER by Judge Stephen P Friot *vacating the stay entered by the court on 4/22/2009 & directing government to turn over materials to defendant Stilley*, ruling on motion(s)/document(s): #35 denied (Re: 35 MOTION for Protective Order *Pending Prospective Franks Hearing*, 42 Response in Opposition to Motion,, 43 Minutes of Motion Hearing,,,,,, Minutes of Scheduling Conference,,,,,, Ruling on Motion(s)/Document(s), Ruling on Motion(s)/Document(s), Ruling on Motion(s)/Document(s), Ruling on Motion(s)/Document(s), Ruling on Motion(s)/Document(s), Taking Motion(s) Under Advisement, Taking Motion(s) Under Advisement, Taking Motion(s) Under Advisement, Taking Motion(s) Under Advisement, Taking Motion(s) Under Advisement, Setting/Resetting Deadline(s)/Hearing(s), Setting/Resetting Deadline(s)/Hearing(s), Setting/Resetting Deadline(s)/Hearing(s), Setting/Resetting Deadline(s)/Hearing(s), Setting/Resetting Deadline(s)/Hearing(s), Setting/Resetting |

7

| | | | |
|---|---|---|---|
| | | | Deadline(s)/Hearing(s), 44 Reply to Response to Motion, 48 Surreply to Motion ) as to Lindsey Kent Springer, Oscar Amos Stilley (djh, Dpty Clk) (Entered: 05/26/2009) |
| 05/29/2009 | 71 | | RESPONSE in Opposition to Motion *Fifty−one through Sixty−seven* (Re: 67 MOTION to Dismiss Indictment/Information/Complaint *for fraud and violation of the 5th Amendment*, 59 Fifth MOTION to Dismiss Indictment/Information/Complaint *on Fifth Amendment Grounds*, 63 Seventh MOTION to Dismiss Indictment/Information/Complaint *for failure to allege certain specific provisions*, 69 JOINDER (in [51−66] Generally dispositive filed on May 15, 2009), 55 Third MOTION to Dismiss Indictment/Information/Complaint *pursuant to CIR v. Duberstein*, 51 First MOTION to Dismiss Indictment/Information/Complaint *for lack of venue*, 53 Second MOTION to Dismiss Indictment/Information/Complaint *for violations of Paperwork Reduction Act of 1995*, 65 Eighth MOTION to Dismiss Indictment/Information/Complaint *violation of Fourth/Fifth Amendment and Selective Prosecution*, 57 Fourth MOTION to Dismiss Indictment/Information/Complaint *for failure to allege tax deficiency element*, 61 Sixth MOTION to Dismiss Count(s) One, Two, Three and Four ) by USA as to Lindsey Kent Springer, Oscar Amos Stilley (O'Reilly, Charles) (Entered: 05/29/2009) |
| 06/01/2009 | 72 | | MOTION to Suppress *Grand Jury testimony and evidence* by Oscar Amos Stilley (Stilley, Oscar) (Entered: 06/01/2009) |
| 06/01/2009 | 73 | | BRIEF in Support of Motion (Re: 72 MOTION to Suppress *Grand Jury testimony and evidence* ) by Oscar Amos Stilley (With attachments) (Stilley, Oscar) (Entered: 06/01/2009) |
| 06/02/2009 | 78 | | SEALED MOTION (O'Reilly, Charles) (Entered: 06/02/2009) Contains One or More Restricted PDFs |
| 06/15/2009 | 80 | | RESPONSE in Opposition to Motion *Consolidated* (Re: 77 MOTION for Hearing *(submitted as part of Doc # 74 )*, 72 MOTION to Suppress *Grand Jury testimony and evidence*, 74 MOTION to Suppress ) by USA as to Lindsey Kent Springer, Oscar Amos Stilley (With attachments) (O'Reilly, Charles) (Entered: 06/15/2009) |
| 06/15/2009 | 83 | | MOTION to Accelerate/Extend/Reset Hearings/Deadlines for filing of motion for bill of particulars by Oscar Amos Stilley (Stilley, Oscar) Modified on 6/16/2009; this is a two−event document and combined documents are not allowed with CM/ECF; also changed text to reflect correct motion event (sac, Dpty Clk). (Entered: 06/15/2009) |
| 06/16/2009 | 84 | | MINUTE ORDER by Court Clerk, Having reviewed the docket entry and/or PDF for Dkt # *83*, the Court has determined that *this document contains two events and combined documents are not allowed with CM/ECF*. Attorney *Oscar Stilley* is hereby directed to re−file *his Adoption, using that event*. (Re: 83 MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s)MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) ) as to Oscar Amos Stilley (sac, Dpty Clk) (Entered: 06/16/2009) |
| 06/17/2009 | 85 | | MINUTE ORDER by Judge Stephen P Friot, setting/resetting deadline(s)/hearing(s): ( Motion Hearing set for 7/2/2009 at 09:00 AM before Judge Stephen P Friot), ruling on motion(s)/motion(s): #83 Denied (Re: 82 |

| | | |
|---|---|---|
| | | MOTION for Bill of Particulars, 83 MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s)MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) ) as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 06/17/2009) |
| 06/18/2009 | 87 | ORDER by Judge Stephen P Friot , *directing Sur−Reply*, ruling on motion(s)/document(s): #86 Denied (Re: 86 MOTION to Strike Document(s), 67 MOTION to Dismiss Indictment/Information/Complaint *for fraud and violation of the 5th Amendment*, 59 Fifth MOTION to Dismiss Indictment/Information/Complaint *on Fifth Amendment Grounds*, 63 Seventh MOTION to Dismiss Indictment/Information/Complaint *for failure to allege certain specific provisions*, 55 Third MOTION to Dismiss Indictment/Information/Complaint *pursuant to CIR v. Duberstein*, 51 First MOTION to Dismiss Indictment/Information/Complaint *for lack of venue*, 53 Second MOTION to Dismiss Indictment/Information/Complaint *for violations of Paperwork Reduction Act of 1995*, 65 Eighth MOTION to Dismiss Indictment/Information/Complaint *violation of Fourth/Fifth Amendment and Selective Prosecution*, 57 Fourth MOTION to Dismiss Indictment/Information/Complaint *for failure to allege tax deficiency element*, 69 JOINDER *of motions filed by Lindsey Springer* (in [51−66] Generally dispositive filed on May 15, 2009), 61 Sixth MOTION to Dismiss Count(s) One, Two, Three and Four ) as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 06/18/2009) |
| 06/23/2009 | 91 | ORDER by Judge Stephen P Friot, ruling on motion(s)/document(s): #90 Granted (Re: 90 MOTION for Leave to Exceed Page Limitation, 67 MOTION to Dismiss Indictment/Information/Complaint *for fraud and violation of the 5th Amendment*, 59 Fifth MOTION to Dismiss Indictment/Information/Complaint *on Fifth Amendment Grounds*, 63 Seventh MOTION to Dismiss Indictment/Information/Complaint *for failure to allege certain specific provisions*, 55 Third MOTION to Dismiss Indictment/Information/Complaint *pursuant to CIR v. Duberstein*, 51 First MOTION to Dismiss Indictment/Information/Complaint *for lack of venue*, 53 Second MOTION to Dismiss Indictment/Information/Complaint *for violations of Paperwork Reduction Act of 1995*, 65 Eighth MOTION to Dismiss Indictment/Information/Complaint *violation of Fourth/Fifth Amendment and Selective Prosecution*, 57 Fourth MOTION to Dismiss Indictment/Information/Complaint *for failure to allege tax deficiency element*, 61 Sixth MOTION to Dismiss Count(s) One, Two, Three and Four ) as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 06/23/2009) |
| 06/23/2009 | 92 | JOINDER (in [81; 82] Springer's Reply Regarding Opposition to Springer's Motion to Dismiss; Motion for Bill of Particulars filed on 6/15/2009; 6/15/2009) as to Oscar Amos Stilley (Stilley, Oscar) (Entered: 06/23/2009) |
| 06/25/2009 | 93 | SURREPLY (Re: 51 First MOTION to Dismiss, 53 Second MOTION to Dismiss, 55 Third MOTION to Dismiss, 57 Fourth MOTION to Dismiss, 59 Fifth MOTION to Dismiss, 61 Sixth MOTION to Dismiss, 63 Seventh MOTION to Dismiss, 65 Eighth MOTION to Dismiss) by USA as to Lindsey Kent Springer, Oscar Amos Stilley (Snoke, Kenneth) Modified on 6/29/2009 to change text to reflect correct event and to change links to reflect base motions (sac, Dpty Clk). (Entered: 06/25/2009) |

| 06/29/2009 | | | NOTICE of Docket Entry Modification; Error: wrong event selected (Reply); wrong links made; Correction: changed text to reflect correct event (Surreply); created links to base motions (Re: 93 Reply, ) as to Lindsey Kent Springer, Oscar Amos Stilley (sac, Dpty Clk) (Entered: 06/29/2009) |
|---|---|---|---|
| 06/30/2009 | 94 | | MOTION to Quash *Subpoenas* by USA as to Lindsey Kent Springer, Oscar Amos Stilley (With attachments) (O'Reilly, Charles) (Entered: 06/30/2009) |
| 07/01/2009 | 97 | | RESPONSE in Opposition to Motion (Re: 82 MOTION for Bill of Particulars ) by USA as to Lindsey Kent Springer, Oscar Amos Stilley (O'Reilly, Charles) (Entered: 07/01/2009) |
| 07/01/2009 | 98 | | Clarification of (Re: 94 MOTION to Quash ) by USA as to Lindsey Kent Springer, Oscar Amos Stilley (O'Reilly, Charles) Modified on 7/2/2009 to correct title of event (pll, Dpty Clk). Modified on 7/2/2009 (pll, Dpty Clk). (Entered: 07/01/2009) |
| 07/01/2009 | 99 | | MOTION to Quash *subpoena* by Eddy Lynn Patterson as to Lindsey Kent Springer, Oscar Amos Stilley (sjm, Dpty Clk) Modified on 7/6/2009 to correct file date (lml, Dpty Clk). (Entered: 07/02/2009) |
| 07/02/2009 | 100 | | MINUTES of Proceedings – held before Judge Stephen P Friot: Motion Hearing held on 7/2/2009, ruling on motion(s)/document(s): #51,53,55,57,59,61,63,65,67,69,72,74,77,92 Denied, #82 Granted in Part, Denied in part, #94 Moot, striking/terminating deadline(s)/hearing(s) as to Lindsey Kent Springer, Oscar Amos Stilley (Re: 67 MOTION to Dismiss Indictment/Information/Complaint *for fraud and violation of the 5th Amendment*, 59 Fifth MOTION to Dismiss Indictment/Information/Complaint *on Fifth Amendment Grounds*, 63 Seventh MOTION to Dismiss Indictment/Information/Complaint *for failure to allege certain specific provisions*, 77 MOTION for Hearing *(submitted as part of Doc # 74 )*, 92 JOINDER (in [81; 82] Springer's Reply Regarding Opposition to Springer's Motion to Dismiss; Motion for Bill of Particulars filed on 6/15/2009; 6/15/2009), 69 JOINDER (in [51−66] Generally dispositive filed on May 15, 2009), 55 Third MOTION to Dismiss Indictment/Information/Complaint *pursuant to CIR v. Duberstein*, 94 MOTION to Quash, 51 First MOTION to Dismiss Indictment/Information/Complaint *for lack of venue*, 53 Second MOTION to Dismiss Indictment/Information/Complaint *for violations of Paperwork Reduction Act of 1995*, 65 Eighth MOTION to Dismiss Indictment/Information/Complaint *violation of Fourth/Fifth Amendment and Selective Prosecution*, 57 Fourth MOTION to Dismiss Indictment/Information/Complaint *for failure to allege tax deficiency element*, 72 MOTION to Suppress *Grand Jury testimony and evidence*, 82 MOTION for Bill of Particulars, 61 Sixth MOTION to Dismiss Count(s) One, Two, Three and Four, 74 MOTION to Suppress ) (Court Reporter: Tracy Washbourne) (pll, Dpty Clk) Modified on 7/8/2009 to indicate attached PDF has incorrect hearing date. Date hearing held was 7/2/2009 (pll, Dpty Clk). (Entered: 07/02/2009) |
| 07/02/2009 | 101 | | MINUTE ORDER by Judge Stephen P Friot *: Following the hearing held this date, the Motion to Quash filed by Eddy Lynn Patterson is hereby moot*, ruling on motion(s)/document(s): #99 Moot (Re: 99 MOTION to Quash *subpoena* ) as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 07/02/2009) |

| 07/02/2009 | 103 | SEALED EXHIBIT(S) to Order/Minutes (Re: 100 Minutes of Motion Hearing,,,,,,,, Ruling on Motion(s)/Document(s), Ruling on Motion(s)/Document(s), Ruling on Motion(s)/Document(s), Ruling on Motion(s)/Document(s), Ruling on Motion(s)/Document(s), Ruling on Motion(s)/Document(s), Ruling on Motion(s)/Document(s), Striking/Terminating Deadline(s)/Hearing(s), Striking/Terminating Deadline(s)/Hearing(s), Striking/Terminating Deadline(s)/Hearing(s), Striking/Terminating Deadline(s)/Hearing(s), Striking/Terminating Deadline(s)/Hearing(s), Striking/Terminating Deadline(s)/Hearing(s), Striking/Terminating Deadline(s)/Hearing(s), Striking/Terminating Deadline(s)/Hearing(s) ) (pll, Dpty Clk) (Entered: 07/14/2009) Contains One or More Restricted PDFs |
|---|---|---|
| 07/08/2009 | 102 | ORDER by Judge Stephen P Friot *re: jury instructions* as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 07/08/2009) |
| 07/14/2009 | 104 | BILL OF PARTICULARS (Re: 82 MOTION for Bill of Particulars ) by USA as to Lindsey Kent Springer, Oscar Amos Stilley (O'Reilly, Charles) (Entered: 07/14/2009) |
| 08/03/2009 | 107 | PROPOSED JURY INSTRUCTIONS by USA as to Lindsey Kent Springer, Oscar Amos Stilley (O'Reilly, Charles) (Entered: 08/03/2009) |
| 08/03/2009 | 108 | First PROPOSED JURY INSTRUCTIONS as to Oscar Amos Stilley (Stilley, Oscar) (Entered: 08/03/2009) |
| 08/03/2009 | 109 | First MOTION to Dismiss Count(s) 1 *Conspiracy charge* (Re: 2 Indictment ) by Oscar Amos Stilley (Stilley, Oscar) (Entered: 08/03/2009) |
| 08/03/2009 | 110 | BRIEF in Support of Motion (Re: 109 First MOTION to Dismiss Count(s) 1 *Conspiracy charge* ) by Oscar Amos Stilley (Stilley, Oscar) (Entered: 08/03/2009) |
| 08/04/2009 | 111 | ORDER by Judge Stephen P Friot, ruling on motion(s)/document(s): #106 Denied (Re: 106 MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) ) as to Lindsey Kent Springer, Oscar Amos Stilley (cds, Dpty Clk) (Entered: 08/04/2009) |
| 08/05/2009 | 112 | RESPONSE in Opposition to Motion (Re: 109 First MOTION to Dismiss Count(s) 1 *Conspiracy charge* ) by USA as to Oscar Amos Stilley (O'Reilly, Charles) Modified on 8/6/2009 to delete "as to" defendant Springer (sac, Dpty Clk). (Entered: 08/05/2009) |
| 08/06/2009 | 114 | TRANSCRIPT of Proceedings (Unredacted) of Motion Hearing held on 04/22/2009 before Judge Stephen P Friot (Court Reporter: Tracy Washbourne) (Pages: 132). NOTICE RE REDACTION OF TRANSCRIPTS: A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may view the transcript at the court public terminal at no charge or may purchase a copy from the court reporter. (Re: 43 Minutes of Motion Hearing, Minutes of Scheduling Conference, Ruling on Motion(s)/Document(s), Taking Motion(s) Under Advisement, Setting/Resetting Deadline(s)/Hearing(s)) as to Lindsey Kent Springer, Oscar Amos Stilley (sam, Dpty Clk) Modified on 11/5/2009 to |

| | | | remove transcript access restriction (a–hc, Dpty Clk). (Entered: 08/06/2009) |
|---|---|---|---|
| 08/06/2009 | 115 | | TRANSCRIPT of Proceedings (Unredacted) of Motions Hearing held on 7/2/09 before Judge Stephen P Friot (Court Reporter: Tracy Washbourne) (Pages: 159). NOTICE RE REDACTION OF TRANSCRIPTS: A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may view the transcript at the court public terminal at no charge or may purchase a copy from the court reporter. (Re: 100 Minutes of Motion Hearing, Ruling on Motion(s)/Document(s), Striking/Terminating Deadline(s)/Hearing(s)) as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) Modified on 11/5/2009 to remove transcript access restriction (a–hc, Dpty Clk). (Entered: 08/06/2009) |
| 08/06/2009 | 116 | | RESPONSE in Opposition to Motion (Re: 105 Second MOTION for Bill of Particulars ) by USA as to Lindsey Kent Springer (O'Reilly, Charles) Modified on 8/7/2009 to delete "as to Oscar Amos Stilley" as this document states it is as to defendant Springer only (sac, Dpty Clk). (Entered: 08/06/2009) |
| 08/12/2009 | 120 | | OBJECTION to Proposed Jury Instructions (Re: 108 Proposed Jury Instructions ) by USA as to Oscar Amos Stilley (With attachments) (O'Reilly, Charles) (Entered: 08/12/2009) |
| 08/13/2009 | 126 | | NOTICE of Intent to Use Expert Witness Testimony by USA as to Lindsey Kent Springer, Oscar Amos Stilley (O'Reilly, Charles) (Entered: 08/13/2009) |
| 08/17/2009 | 129 | | OBJECTION to Proposed Jury Instructions *Of the government* (Re: 108 Proposed Jury Instructions ) as to Oscar Amos Stilley (Stilley, Oscar) (Entered: 08/17/2009) |
| 08/19/2009 | 131 | | REPLY to Response to Motion (Re: 109 First MOTION to Dismiss Count(s) 1 *Conspiracy charge* ) by Oscar Amos Stilley (With attachments) (Stilley, Oscar) (Entered: 08/19/2009) |
| 08/19/2009 | 132 | | JOINDER (SUBMITTED AS DOC # 131 )(in 123 Eighth Motion to Dismiss Count(s) filed on 8/12/09) as to Oscar Amos Stilley (lml, Dpty Clk) (Entered: 08/20/2009) |
| 08/19/2009 | 133 | | ADOPTION *(SUBMITTED AS DOC # 131 )* (of [124, 130] Eighth Brief in Support of Motion, Reply to Response to Motion filed on 8/12/09, 8/19/09) as to Oscar Amos Stilley (lml, Dpty Clk) (Entered: 08/20/2009) |
| 08/20/2009 | | | NOTICE of Docket Entry Modification; Error: Document No. 131 is a multi–event document and only one event was e–filed; Correction: Filed the remaining events (Joinder in Motion) and (Adoption) as Document Nos. 132 & 133 (Re: 131 Reply to Response to Motion ) as to Oscar Amos Stilley (lml, Dpty Clk) (Entered: 08/20/2009) |
| 09/10/2009 | 134 | | NOTICE Pursuant to Federal Rule of Evidence 404(b) by USA as to Lindsey Kent Springer, Oscar Amos Stilley (O'Reilly, Charles) (Entered: 09/10/2009) |
| 09/16/2009 | 135 | | ORDER by Judge Stephen P Friot *re: Pretrial Conference* as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 09/16/2009) |

| 09/18/2009 | 136 | ORDER by Judge Stephen P Friot, ruling on motion(s)/document(s): #105 denied; 109 denied; #123 denied (Re: 105 Second MOTION for Bill of Particulars, 109 First MOTION to Dismiss Count(s) 1 *Conspiracy charge*, 123 Eighth MOTION to Dismiss Count(s) One, Two, Three, Four, Five and Six ) as to Lindsey Kent Springer, Oscar Amos Stilley (sjm, Dpty Clk) (Entered: 09/18/2009) |
| 09/21/2009 | 137 | MOTION in Limine by USA as to Lindsey Kent Springer, Oscar Amos Stilley (O'Reilly, Charles) (Entered: 09/21/2009) |
| 09/21/2009 | 138 | TRIAL BRIEF by USA as to Lindsey Kent Springer, Oscar Amos Stilley (Snoke, Kenneth) (Entered: 09/21/2009) |
| 09/21/2009 | 139 | NOTICE of Government's Proposed Summary of Indictment by USA as to Lindsey Kent Springer, Oscar Amos Stilley (Snoke, Kenneth) Modified on 9/22/2009 to reflect correct event (tjc, Dpty Clk). (Entered: 09/21/2009) |
| 09/21/2009 | 140 | NOTICE of Summary of Indictment by Oscar Amos Stilley (Stilley, Oscar) Modified on 9/22/2009 to reflect correct event (tjc, Dpty Clk). (Entered: 09/21/2009) |
| 09/21/2009 | 149 | MOTION in Limine *regarding hearsay and confrontation issues* by Oscar Amos Stilley (Stilley, Oscar) (Entered: 09/21/2009) |
| 09/21/2009 | 152 | MOTION for Subpoena(s) *pursuant to Rule 17(b)* by Oscar Amos Stilley (Stilley, Oscar) (Entered: 09/21/2009) |
| 09/21/2009 | 153 | BRIEF in Support of Motion (Re: 152 MOTION for Subpoena(s) *pursuant to Rule 17(b)* ) by Oscar Amos Stilley (Stilley, Oscar) (Entered: 09/21/2009) |
| 09/21/2009 | 155 | JOINDER (in [141, 142, 144, 145, 146, 147, 148, 150, and 151] Motions in Limine, for subpoenas pursuant to Rule 17(b), and trial brief filed on 9–21–09 as to Oscar Amos Stilley (Stilley, Oscar) (Entered: 09/22/2009) |
| 09/22/2009 | | NOTICE of Docket Entry Modification; Error: This was filed using the incorrect event (Motion for Miscellaneous Relief); Correction: Edited docket text to reflect correct event *(Notice)* (Re: 139 MOTION Government's Proposed Summary of Indictment ) as to Lindsey Kent Springer, Oscar Amos Stilley (tjc, Dpty Clk) (Entered: 09/22/2009) |
| 09/22/2009 | | NOTICE of Docket Entry Modification; Error: This was filed using the incorrect event (Motion for Miscellaneous Relief); Correction: Edited docket text to reflect correct event (Notice) (Re: 140 MOTION Summary of Indictment ) as to Oscar Amos Stilley (tjc, Dpty Clk) (Entered: 09/22/2009) |
| 09/22/2009 | 156 | ORDER by Judge Stephen P Friot *: setting ex parte hearing*, setting/resetting deadline(s)/hearing(s): ( Motion Hearing set for 10/9/2009 at 01:30 PM before Judge Stephen P Friot) (Re: 152 MOTION for Subpoena(s) *pursuant to Rule 17(b)*, 141 MOTION for Subpoena(s) *under Rule 17* ) as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 09/22/2009) |
| 09/22/2009 | 157 | ORDER by Judge Stephen P Friot *re: 10/9/09 ex parte hearing* (Re: 152 MOTION for Subpoena(s) *pursuant to Rule 17(b)*, 156 Order,, Setting/Resetting Deadline(s)/Hearing(s), Setting/Resetting Deadline(s)/Hearing(s),, 141 MOTION for Subpoena(s) *under Rule 17* ) as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: |

| | | | |
|---|---|---|---|
| | | | 09/22/2009) |
| 09/23/2009 | 158 | | ORDER by Judge Stephen P Friot, setting/resetting deadline(s)/hearing(s): ( Motion Hearing set for 10/21/2009 at 09:00 AM before Judge Stephen P Friot) (Re: 145 Second MOTION in Limine, 150 Sixth MOTION in Limine, 137 MOTION in Limine, 146 Third MOTION in Limine, 149 MOTION in Limine *regarding hearsay and confrontation issues*, 148 Fifth MOTION in Limine, 144 First MOTION in Limine, 151 Seventh MOTION in Limine, 147 Fourth MOTION in Limine ) as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 09/23/2009) |
| 09/25/2009 | 160 | | SEALED MOTION (O'Reilly, Charles) Modified on 10/9/2009; this document is STRICKEN per 183 (sac, Dpty Clk). (Entered: 09/25/2009) Contains One or More Restricted PDFs |
| 09/25/2009 | 162 | | MOTION TAKE RULE 15 DEPOSITION by USA as to Lindsey Kent Springer, Oscar Amos Stilley (With attachments) (O'Reilly, Charles) (Entered: 09/25/2009) |
| 09/30/2009 | 165 | | MINUTE ORDER by Judge Stephen P Friot *: Until further notice, all hearings in this case will be held at the Boulder Courthouse, 224 S Boulder, 3rd Floor Courtroom, Tulsa, OK* as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 09/30/2009) |
| 10/01/2009 | 170 | | SEALED DOCUMENT (O'Reilly, Charles) Modified on 10/2/2009 to correct title of event (lml, Dpty Clk). (Entered: 10/01/2009) Contains One or More Restricted PDFs |
| 10/05/2009 | 173 | | RESPONSE in Opposition to Motion (Re: 145 Second MOTION in Limine, 150 Sixth MOTION in Limine, 146 Third MOTION in Limine, 149 MOTION in Limine *regarding hearsay and confrontation issues*, 155 JOINDER (in [141, 142, 144, 145, 146, 147, 148, 150, and 151] Motions in Limine, for subpoenas pursuant to Rule 17(b), and trial brief filed on 9–21–09), 148 Fifth MOTION in Limine, 144 First MOTION in Limine, 151 Seventh MOTION in Limine, 147 Fourth MOTION in Limine ) by USA as to Lindsey Kent Springer, Oscar Amos Stilley (O'Reilly, Charles) (Entered: 10/05/2009) |
| 10/05/2009 | 174 | | SEALED MOTION (O'Reilly, Charles) (Entered: 10/05/2009) Contains One or More Restricted PDFs |
| 10/05/2009 | 175 | | RESPONSE in Opposition to Motion (Re: 152 MOTION for Subpoena(s) *pursuant to Rule 17(b)*, 155 JOINDER (in [141, 142, 144, 145, 146, 147, 148, 150, and 151] Motions in Limine, for subpoenas pursuant to Rule 17(b), and trial brief filed on 9–21–09), 141 MOTION for Subpoena(s) *under Rule 17* ) by USA as to Lindsey Kent Springer, Oscar Amos Stilley (O'Reilly, Charles) (Entered: 10/05/2009) |
| 10/05/2009 | 176 | | RESPONSE in Opposition to Motion (Re: 162 MOTION TAKE RULE 15 DEPOSITION ) by Oscar Amos Stilley (Stilley, Oscar) (Entered: 10/05/2009) |
| 10/06/2009 | 178 | | ORDER by Judge Stephen P Friot, ruling on motion(s)/document(s): #162 Granted (Re: 162 MOTION TAKE RULE 15 DEPOSITION ) as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 10/06/2009) |
| 10/07/2009 | 181 | | SEALED MOTION (O'Reilly, Charles) Modified on 6/4/2010 to unseal per Order # 370 (lml, Dpty Clk). (Entered: 10/07/2009) |

| 10/07/2009 | 182 | | SEALED DOCUMENT (O'Reilly, Charles) Modified on 6/4/2010 to unseal per Order # 370 (lml, Dpty Clk). (Entered: 10/07/2009) |
| 10/08/2009 | 183 | | ORDER by Judge Stephen P Friot, striking/withdrawing document(s) (Re: 160 SEALED MOTION ) (Documents Terminated: 160 SEALED MOTION ) as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 10/08/2009) |
| 10/08/2009 | 186 | | SEALED ORDER (s–srb, Dpty Clk) Modified on 6/4/2010 to unseal per Order # 370 (lml, Dpty Clk). (Entered: 10/08/2009) |
| 10/09/2009 | 189 | | NOTICE with Respect to Court's Order (Dkt#178) by USA as to Lindsey Kent Springer, Oscar Amos Stilley (Snoke, Kenneth) (Entered: 10/09/2009) |
| 10/09/2009 | 190 | | ERRATA/CORRECTION (Re: 189 Notice (Other) ) by USA as to Lindsey Kent Springer, Oscar Amos Stilley (Snoke, Kenneth) Modified on 10/13/2009 to correct title of event (lml, Dpty Clk). (Entered: 10/09/2009) |
| 10/09/2009 | 191 | | SEALED MINUTES (pll, Dpty Clk) (Entered: 10/13/2009) Contains One or More Restricted PDFs |
| 10/13/2009 | | | NOTICE of Docket Entry Modification; Error: This was filed using the incorrect event (Notice–Other); Correction: Edited docket text to reflect correct event (Errata/Correction to Document) (Re: 190 Notice (Other) ) as to Lindsey Kent Springer, Oscar Amos Stilley (lml, Dpty Clk) (Entered: 10/13/2009) |
| 10/13/2009 | 195 | | ***Remark: *arrest warrant issued for material witness* as to Lindsey Kent Springer, Oscar Amos Stilley (sjm, Dpty Clk) Modified on 10/14/2009 to unseal docket entry (sjm, Dpty Clk). (Entered: 10/14/2009) Contains One or More Restricted PDFs |
| 10/14/2009 | 198 | | RESPONSE in Opposition to Motion (Re: 179 MOTION Compel Clerk of Court to Comply with 28 U.S.C. Section 1867(f) and Test v. U.S. ) by USA as to Lindsey Kent Springer (Snoke, Kenneth) Modified on 10/15/2009 to delete "as to" Oscar Stilley since this document is only as to Lindsey Kent Springer (sac, Dpty Clk). (Entered: 10/14/2009) |
| 10/14/2009 | 199 | | RESPONSE (Re: 134 NOTICE ) by Oscar Amos Stilley (With attachments) (Stilley, Oscar) Modified on 10/15/2009 to change text to reflect correct event and change link (sac, Dpty Clk). (Entered: 10/14/2009) |
| 10/15/2009 | | | NOTICE of Docket Entry Modification; Error: all defendants were selected as to, but document only pertains to Lindsey Springer; Correction: deleted as to defendant Oscar Stilley (Re: 198 Response in Opposition to Motion, ) as to Lindsey Kent Springer, Oscar Amos Stilley (sac, Dpty Clk) (Entered: 10/15/2009) |
| 10/15/2009 | | | NOTICE of Docket Entry Modification; Error: wrong event selected (Response in Opposition to Motion); wrong link made; Correction: changed text to reflect correct event (Response); changed link (Re: 199 Response in Opposition to Motion ) as to Oscar Amos Stilley (sac, Dpty Clk) (Entered: 10/15/2009) |
| 10/16/2009 | 200 | | ORDER by Judge Stephen P Friot, ruling on motion(s)/document(s): #179 granted with specific limitations (Re: 179 MOTION Compel Clerk of Court to |

| | | | |
|---|---|---|---|
| | | | Comply with 28 U.S.C. Section 1867(f) and Test v. U.S. ) as to Lindsey Kent Springer(djh, Dpty Clk) (Entered: 10/16/2009) |
| 10/20/2009 | 202 | | SEALED MOTION (Snoke, Kenneth) Modified on 6/4/2010 to unseal per Order # 370 (lml, Dpty Clk). (Entered: 10/20/2009) |
| 10/20/2009 | 203 | | SEALED ORDER (pll, Dpty Clk) Modified on 6/4/2010 to unseal per Order # 370 (lml, Dpty Clk). (Entered: 10/20/2009) |
| 10/20/2009 | 204 | | SEALED MOTION (O'Reilly, Charles) (Entered: 10/20/2009) Contains One or More Restricted PDFs |
| 10/20/2009 | 205 | | SEALED MOTION (O'Reilly, Charles) (Entered: 10/20/2009) Contains One or More Restricted PDFs |
| 10/20/2009 | 206 | | MOTION to Exclude MENTION OF THE TESTIMONY OF VIKKI WIGGINS PRIOR TO A REASONABLE TIME AFTER PRODUCTION OF THE TRANSCRIPT OF HER TESTIMONY by Oscar Amos Stilley (Stilley, Oscar) (Entered: 10/20/2009) |
| 10/21/2009 | 207 | | MINUTES of Proceedings – held before Judge Stephen P Friot: Motion Hearing held on 10/21/2009, Pretrial Conference held on 10/21/2009, ruling on motion(s)/document(s): #137,155 grant in part, deny in part; 144,146,147,150,151,159 denied; 148, 204, 205, 206 granted, striking/terminating deadline(s)/hearing(s) as to Lindsey Kent Springer, Oscar Amos Stilley (Re: 204 SEALED MOTION, 145 Second MOTION in Limine, 150 Sixth MOTION in Limine, 137 MOTION in Limine, 146 Third MOTION in Limine, 149 MOTION in Limine *regarding hearsay and confrontation issues*, 155 JOINDER (in [141, 142, 144, 145, 146, 147, 148, 150, and 151] Motions in Limine, for subpoenas pursuant to Rule 17(b), and trial brief filed on 9–21–09), 148 Fifth MOTION in Limine, 159 MOTION Emergency Motion Regarding Denny Patridge, 144 First MOTION in Limine, 205 SEALED MOTION, 206 MOTION to Exclude MENTION OF THE TESTIMONY OF VIKKI WIGGINS PRIOR TO A REASONABLE TIME AFTER PRODUCTION OF THE TRANSCRIPT OF HER TESTIMONY, 151 Seventh MOTION in Limine, 147 Fourth MOTION in Limine ) (Court Reporter: Tracy Washbourne) (pll, Dpty Clk) (Entered: 10/22/2009) |
| 10/21/2009 | 208 | | ***Remark: *Deposition Transcript of Vikki Lynn Wiggins received by court* as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 10/22/2009) |
| 10/24/2009 | 209 | | PROPOSED VOIR DIRE by USA as to Lindsey Kent Springer, Oscar Amos Stilley (O'Reilly, Charles) (Entered: 10/24/2009) |
| 10/24/2009 | 210 | | MOTION to Quash *Testimony of Vikki Wiggins* by Oscar Amos Stilley (Stilley, Oscar) (Entered: 10/24/2009) |
| 10/24/2009 | 211 | | BRIEF in Support of Motion (Re: 210 MOTION to Quash *Testimony of Vikki Wiggins* ) by Oscar Amos Stilley (Stilley, Oscar) (Entered: 10/24/2009) |
| 10/26/2009 | 212 | | RESPONSE in Opposition to Motion (Re: 210 MOTION to Quash *Testimony of Vikki Wiggins* ) by USA as to Oscar Amos Stilley (O'Reilly, Charles) Modified on 10/27/2009 to remove Lindsey Kent Springer name from text, as his name should not have been selected, as this pleading does not pertain to him (tjc, Dpty Clk). (Entered: 10/26/2009) |

| 10/26/2009 | 213 | | NOTICE Regarding Defendants' Discovery by USA as to Lindsey Kent Springer, Oscar Amos Stilley (O'Reilly, Charles) (Entered: 10/26/2009) |
|---|---|---|---|
| 10/26/2009 | 214 | | SEALED DOCUMENT (s−srb, Dpty Clk) (Entered: 10/26/2009) Contains One or More Restricted PDFs |
| 10/26/2009 | 215 | | MINUTES of Proceedings – held before Judge Stephen P Friot: Voir Dire/Jury Selection began as to Lindsey Kent Springer, Oscar Amos Stilley (Court Reporter: Tracy Washbourne) (pll, Dpty Clk) (Entered: 10/26/2009) |
| 10/26/2009 | 216 | | MINUTES of Proceedings – held before Judge Stephen P Friot: Voir Dire/Jury Selection held on 10/26/2009 as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 10/26/2009) |
| 10/26/2009 | 217 | | MINUTES of Proceedings – held before Judge Stephen P Friot: Jury Trial began as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 10/26/2009) |
| 10/26/2009 | 218 | | MINUTES of Proceedings – held before Judge Stephen P Friot: Jury Trial held *, continued to following day*, setting/resetting scheduling order date(s): ( Jury Trial set for 10/27/2009 at 09:00 AM before Judge Stephen P Friot) as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 10/26/2009) |
| 10/27/2009 | 220 | | ORDER by Judge Stephen P Friot *ruling on Government's Oral Motion re: witness Philip Roberts* as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) Modified on 10/27/2009 to correct title(pll, Dpty Clk). (Entered: 10/27/2009) |
| 10/27/2009 | 221 | | MINUTES of Proceedings – held before Judge Stephen P Friot: Jury Trial held, ruling on motion(s)/document(s): #210 and 219 denied as to Lindsey Kent Springer, Oscar Amos Stilley (Re: 210 MOTION to Quash *Testimony of Vikki Wiggins*, 219 JOINDER (in 210 Motion to Quash filed on 10/24/09) ) (cds, Dpty Clk) (Entered: 10/27/2009) |
| 10/28/2009 | 222 | | MINUTES of Proceedings – held before Judge Stephen P Friot: Jury Trial held, setting/resetting deadline(s)/hearing(s): ( Jury Trial set for 10/29/2009 at 09:00 AM before Judge Stephen P Friot, Motion Hearing set for 11/3/2009 at 05:30 PM before Judge Stephen P Friot) as to Lindsey Kent Springer, Oscar Amos Stilley (cds, Dpty Clk) (Entered: 10/28/2009) |
| 10/29/2009 | 223 | | MINUTES of Proceedings – held before Judge Stephen P Friot: Jury Trial held, ruling on motion(s)/document(s): #145 and 149 Denied, setting/resetting scheduling order date(s): ( Jury Trial set for 10/30/2009 at 09:00 AM before Judge Stephen P Friot) as to Lindsey Kent Springer, Oscar Amos Stilley (Re: 145 Second MOTION in Limine, 149 MOTION in Limine *regarding hearsay and confrontation issues* ) (cds, Dpty Clk) (Entered: 10/30/2009) |
| 10/30/2009 | 229 | | MINUTES of Proceedings – held before Judge Stephen P Friot: Jury Trial held, setting/resetting scheduling order date(s): ( Jury Trial set for 11/2/2009 at 09:00 AM before Judge Stephen P Friot) as to Lindsey Kent Springer, Oscar Amos Stilley (cds, Dpty Clk) (Entered: 11/03/2009) |
| 11/02/2009 | 230 | | MINUTES of Proceedings – held before Judge Stephen P Friot: Jury Trial held, setting/resetting scheduling order date(s): *continued to following day* ( Jury Trial set for 11/3/2009 at 09:00 AM before Judge Stephen P Friot) as to |

| | | | |
|---|---|---|---|
| | | | Lindsey Kent Springer, Oscar Amos Stilley (Court Reporter: Tracy Washbourne) (pll, Dpty Clk) (Entered: 11/03/2009) |
| 11/03/2009 | 228 | | NOTICE re: Proposed Jury Instructions by USA as to Lindsey Kent Springer, Oscar Amos Stilley (O'Reilly, Charles) Modified on 11/4/2009 to correct event (tjc, Dpty Clk). (Entered: 11/03/2009) |
| 11/03/2009 | 231 | | MINUTES of Proceedings – held before Judge Stephen P Friot: Jury Trial held, setting/resetting scheduling order date(s): *continued to following day* ( Jury Trial set for 11/4/2009 at 09:00 AM before Judge Stephen P Friot) as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 11/03/2009) |
| 11/03/2009 | 232 | | JOINDER *in Springer's motion for reconsideration, dismissal, or mistrial* (in 224 ) as to Oscar Amos Stilley (Stilley, Oscar) (Entered: 11/03/2009) |
| 11/04/2009 | | | NOTICE of Docket Entry Modification; Error: This was filed using the incorrect event (Proposed Jury Instructions); Correction: Edited docket text to reflect the correct event (Notice) (Re: 228 Proposed Jury Instructions ) as to Lindsey Kent Springer, Oscar Amos Stilley (tjc, Dpty Clk) (Entered: 11/04/2009) |
| 11/04/2009 | 233 | | MINUTES of Proceedings – held before Judge Stephen P Friot: Jury Trial held, setting/resetting scheduling order date(s): *(continued to following day)* ( Jury Trial set for 11/5/2009 at 08:15 AM before Judge Stephen P Friot) as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 11/04/2009) |
| 11/05/2009 | 234 | | MINUTES of Proceedings – held before Judge Stephen P Friot: Jury Trial held *continued to following Monday*, setting/resetting scheduling order date(s): ( Jury Trial set for 11/9/2009 at 09:00 AM before Judge Stephen P Friot) as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 11/05/2009) |
| 11/05/2009 | 235 | | ORDER by Judge Stephen P Friot *re: USM and witnesses* as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 11/06/2009) |
| 11/08/2009 | 237 | | PROPOSED JURY INSTRUCTIONS *as to Venue* by USA as to Lindsey Kent Springer, Oscar Amos Stilley (Snoke, Kenneth) (Entered: 11/08/2009) |
| 11/08/2009 | 238 | | ADOPTION *of Springer's requested jury instructions* (of 236 ) as to Oscar Amos Stilley (Stilley, Oscar) (Entered: 11/08/2009) |
| 11/09/2009 | 239 | | MINUTES of Proceedings – held before Judge Stephen P Friot: Jury Trial held *, continued to following day*, setting/resetting scheduling order date(s): ( Jury Trial set for 11/10/2009 at 09:00 AM before Judge Stephen P Friot) as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 11/09/2009) |
| 11/10/2009 | 240 | | MINUTES of Proceedings – held before Judge Stephen P Friot: Jury Trial held, setting/resetting scheduling order date(s): *continued to Thursday* ( Jury Trial set for 11/12/2009 at 09:00 AM before Judge Stephen P Friot) as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 11/10/2009) |
| 11/12/2009 | 241 | | |

| | | | |
|---|---|---|---|
| | | | MINUTES of Proceedings – held before Judge Stephen P Friot: Jury Trial held, setting/resetting scheduling order date(s): *continued to following day* ( Jury Trial set for 11/13/2009 at 09:00 AM before Judge Stephen P Friot) as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 11/12/2009) |
| 11/13/2009 | 242 | | MINUTES of Proceedings – held before Judge Stephen P Friot: Jury Trial held, setting/resetting scheduling order date(s): *continued to following Monday* ( Jury Trial set for 11/16/2009 at 09:00 AM before Judge Stephen P Friot) as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 11/13/2009) |
| 11/16/2009 | 243 | | MINUTES of Proceedings – held before Judge Stephen P Friot: Jury Trial completed, striking/terminating deadline(s)/hearing(s) as to Lindsey Kent Springer, Oscar Amos Stilley (Court Reporter: Tracy Washbourne) (With attachments) (pll, Dpty Clk) (Entered: 11/17/2009) |
| 11/16/2009 | 244 | | JURY INSTRUCTIONS by Judge Stephen P Friot as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 11/17/2009) |
| 11/16/2009 | 245 | | JURY VERDICT as to Lindsey Kent Springer (1) Guilty on Count 1,2,3–4,5–6 and Oscar Amos Stilley (2) Guilty on Count 1,3–4 (pll, Dpty Clk) (Entered: 11/17/2009) |
| 11/16/2009 | 246 | | SEALED EXHIBIT(S) to Order/Minutes (Re: 243 Minutes of Jury Trial Completed, Striking/Terminating Deadline(s)/Hearing(s) ) (pll, Dpty Clk) (Entered: 11/17/2009) Contains One or More Restricted PDFs |
| 11/17/2009 | 247 | | ORDER by Judge Stephen P Friot *setting supplemental conditions following trial,* ruling re: modification of conditions of pretrial release as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 11/17/2009) |
| 11/20/2009 | 251 | | MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) *Extending time to file for judgment of acquittal or new trial,* by Oscar Amos Stilley (Stilley, Oscar) (Entered: 11/20/2009) |
| 11/20/2009 | 252 | | RESPONSE in Opposition to Motion (Re: 232 JOINDER *in Springer's motion for reconsideration, dismissal, or mistrial* (in 224 ), 224 MOTION to Reconsider ) by USA as to Lindsey Kent Springer, Oscar Amos Stilley (With attachments) (O'Reilly, Charles) (Entered: 11/20/2009) |
| 11/23/2009 | 253 | | ORDER by Judge Stephen P Friot, ruling on motion(s)/document(s): #251 Granted (Re: 251 MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) *Extending time to file for judgment of acquittal or new trial,* ) as to Oscar Amos Stilley (pll, Dpty Clk) (Entered: 11/23/2009) |
| 12/01/2009 | 254 | | MOTION To provide transcript at public expense by Oscar Amos Stilley (Stilley, Oscar) (Entered: 12/01/2009) |
| 12/01/2009 | 255 | | BRIEF in Support of Motion (Re: 254 MOTION To provide transcript at public expense ) by Oscar Amos Stilley (Stilley, Oscar) (Entered: 12/01/2009) |
| 12/07/2009 | 258 | | REPLY to Response to Motion (Re: 232 JOINDER *in Springer's motion for reconsideration, dismissal, or mistrial* (in 224 ) ) by Oscar Amos Stilley (Stilley, Oscar) Modified on 12/10/2009 to seal PDF; Document STRICKEN per Order # 264 (tjc, Dpty Clk). (Entered: 12/08/2009) Contains One or More |

| | | | |
|---|---|---|---|
| | | | Restricted PDFs |
| 12/08/2009 | <u>259</u> | | MOTION to Strike Document(s) (Re: 257 Reply to Response to Motion, <u>258</u> Reply to Response to Motion ) by USA as to Lindsey Kent Springer, Oscar Amos Stilley (O'Reilly, Charles) (Entered: 12/08/2009) |
| 12/08/2009 | <u>261</u> | | MOTION for Judgment of Acquittal *and*, MOTION for New Trial by Oscar Amos Stilley (With attachments) (Stilley, Oscar) Modified on 12/10/2009 to seal PDF; Document STRICKEN per Order # <u>264</u> (tjc, Dpty Clk). (Entered: 12/08/2009) Contains One or More Restricted PDFs |
| 12/08/2009 | <u>263</u> | | BRIEF in Support of Motion (Re: <u>261</u> MOTION for Judgment of Acquittal *and* MOTION for New Trial) by Oscar Amos Stilley (Stilley, Oscar) Modified on 12/10/2009 to seal PDF; Document STRICKEN per Order # <u>264</u> (tjc, Dpty Clk). (Entered: 12/08/2009) Contains One or More Restricted PDFs |
| 12/09/2009 | <u>264</u> | | ORDER by Judge Stephen P Friot, ruling on motion(s)/document(s): #259 Granted, striking/withdrawing document(s) (Re: <u>259</u> MOTION to Strike Document(s), <u>261</u> MOTION for Judgment of Acquittal *and* MOTION for New Trial, 257 Reply to Response to Motion, <u>258</u> Reply to Response to Motion, 260 MOTION for Judgment of Acquittal, 262 MOTION for New Trial ) (Documents Terminated: 257 Reply to Response to Motion, <u>261</u> MOTION for Judgment of Acquittal *and* MOTION for New Trial, <u>258</u> Reply to Response to Motion, 260 MOTION for Judgment of Acquittal ) as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 12/09/2009) |
| 12/14/2009 | <u>267</u> | | MOTION to Reconsider (Re: <u>264</u> Order,,, Ruling on Motion(s)/Document(s), Ruling on Motion(s)/Document(s), Ruling on Motion(s)/Document(s), Striking/Withdrawing Document(s), Striking/Withdrawing Document(s), Striking/Withdrawing Document(s),,, ) by Oscar Amos Stilley (Stilley, Oscar) (Entered: 12/14/2009) |
| 12/14/2009 | <u>268</u> | | BRIEF in Support of Motion (Re: <u>267</u> MOTION to Reconsider ) by Oscar Amos Stilley (Stilley, Oscar) (Entered: 12/14/2009) |
| 12/15/2009 | <u>269</u> | | RESPONSE in Opposition to Motion (Re: <u>267</u> MOTION to Reconsider ) by USA as to Oscar Amos Stilley (O'Reilly, Charles) (Entered: 12/15/2009) |
| 01/12/2010 | <u>278</u> | | ORDER by Judge Stephen P Friot, ruling on motion(s)/document(s): #254 Denied (Re: <u>254</u> MOTION To provide transcript at public expense ) as to Oscar Amos Stilley (pll, Dpty Clk) (Entered: 01/12/2010) |
| 01/22/2010 | <u>290</u> | | SCHEDULING ORDER by Judge Stephen P Friot, setting/resetting deadline(s)/hearing(s): ( Sentencing set for 4/19/2010 at 10:00 AM before Judge Stephen P Friot) as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 01/22/2010) |
| 01/25/2010 | <u>291</u> | | ORDER by Judge Stephen P Friot, setting/resetting deadline(s)/hearing(s): ( Sentencing set for 4/21/2010 at 10:00 AM before Judge Stephen P Friot) (Re: <u>290</u> Scheduling Order, Setting/Resetting Deadline(s)/Hearing(s) ) as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 01/25/2010) |
| 01/28/2010 | <u>293</u> | | OPINION AND ORDER by Judge Stephen P Friot, ruling on motion(s)/document(s): #224,232,262,265,267,271,273,285 Denied (Re: 265 MOTION to Vacate/Set Aside *Order dated December 9, 2009* MOTION |

| | | | |
|---|---|---|---|
| | | | Reinstate Docket # 257 and # 260 as properly filed under Local Criminal Rules 12.1 MOTION 10 days from date of order to refile docket # 257 and # 260 in accordance with Local Civil Rule 7.2 including extended page number therein, 267 MOTION to Reconsider, 232 JOINDER *in Springer's motion for reconsideration, dismissal, or mistrial* (in 224 ), 262 MOTION for New Trial, 224 MOTION to Reconsider, 273 MOTION to Strike Document(s), 271 MOTION Disqualify, Recuse, Removal and for Random Reassignment, 285 MOTION to Strike Document(s) *276 and 277* ) as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 01/28/2010) |
| 02/01/2010 | 294 | | JOINDER (in [262, 265, 271, 272, 273, 274, 280, 281, 282, 283, 284, 285, 286, and 288] Multiple motions filed on 12/28/09 mostly) as to Oscar Amos Stilley (Stilley, Oscar) (Entered: 02/01/2010) |
| 02/01/2010 | 296 | | MOTION to Modify Conditions of Pretrial Release by Oscar Amos Stilley (Stilley, Oscar) (Entered: 02/01/2010) |
| 02/01/2010 | 297 | | First MOTION to Strike Document(s) *by Stephen P. Friot or Claire V. Eagan, particularly* (Re: 278 Order, Ruling on Motion(s)/Document(s), 290 Scheduling Order, Setting/Resetting Deadline(s)/Hearing(s), 291 Order,, Setting/Resetting Deadline(s)/Hearing(s), Setting/Resetting Deadline(s)/Hearing(s),, 293 Opinion and Order,,,, Ruling on Motion(s)/Document(s), Ruling on Motion(s)/Document(s), Ruling on Motion(s)/Document(s), Ruling on Motion(s)/Document(s), 24 Order,, Reassigning Case,, Changing Case Number, 264 Order,,, Ruling on Motion(s)/Document(s), Ruling on Motion(s)/Document(s), Ruling on Motion(s)/Document(s), Striking/Withdrawing Document(s), Striking/Withdrawing Document(s), Striking/Withdrawing Document(s),,, 247 Order, Ruling Re: Modification of Conditions of Pretrial Release ) by Oscar Amos Stilley (Stilley, Oscar) (Entered: 02/01/2010) |
| 02/02/2010 | 298 | | BRIEF in Support of Motion (Re: 297 First MOTION to Strike Document(s) *by Stephen P. Friot or Claire V. Eagan, particularly*First MOTION to Strike Document(s) *by Stephen P. Friot or Claire V. Eagan, particularly*First MOTION to Strike Document(s) *by Stephen P. Friot or Claire V. Eagan, particularly*First MOTION to Strike Document(s) *by Stephen P. Friot or Claire V. Eagan, particularly*, 296 MOTION to Modify Conditions of Pretrial Release ) by Oscar Amos Stilley (Stilley, Oscar) (Entered: 02/02/2010) |
| 02/03/2010 | 299 | | ORDER by Judge Stephen P Friot, ruling on motion(s)/document(s): #296 denied (Re: 296 MOTION to Modify Conditions of Pretrial Release ) as to Oscar Amos Stilley (sjm, Dpty Clk) Modified on 2/4/2010 to remove Lindsey Kent Springer from text (lml, Dpty Clk). (Entered: 02/03/2010) |
| 02/03/2010 | 300 | | ORDER by Judge Stephen P Friot, ruling on motion(s)/document(s): #297 denied (Re: 297 First MOTION to Strike Document(s) *by Stephen P. Friot or Claire V. Eagan, particularly*First MOTION to Strike Document(s) *by Stephen P. Friot or Claire V. Eagan, particularly*First MOTION to Strike Document(s) *by Stephen P. Friot or Claire V. Eagan, particularly*First MOTION to Strike Document(s) *by Stephen P. Friot or Claire V. Eagan, particularly* #294 granted) as to Oscar Amos Stilley; (sjm, Dpty Clk) Modified on 2/3/2010 to correct entry ruling on #294 also(sjm, Dpty Clk). (Entered: 02/03/2010) |
| 02/03/2010 | 301 | | |

| | | | |
|---|---|---|---|
| | | | NOTICE of Docket Entry Modification; Error: omitted ruling on docket #294; Correction: corrected entry to include ruling on docket #294 (Re: Ruling on Joinder in Motion ) as to Oscar Amos Stilley (sjm, Dpty Clk) (Entered: 02/03/2010) |
| 02/11/2010 | 309 | | JOINDER (in [295, 306, 308] Motion to dismiss...., Motion for Stay..., Reply filed on 2/1/10, 2/8/10, 2/10/10) as to Oscar Amos Stilley (Stilley, Oscar) (Entered: 02/11/2010) |
| 02/12/2010 | 310 | | RESPONSE in Opposition to Motion (Re: 306 MOTION Stay all Orders by Judge Friot pending determination by Surpeme Court in 09−8701, 309 JOINDER (in [295, 306, 308] Motion to dismiss...., Motion for Stay..., Reply filed on 2/1/10, 2/8/10, 2/10/10) ) by USA as to Lindsey Kent Springer, Oscar Amos Stilley (With attachments) (O'Reilly, Charles) (Entered: 02/12/2010) |
| 02/22/2010 | 312 | | ORDER by Judge Stephen P Friot, ruling on motion(s)/document(s): #280, 282, 284, 306 Denied, #309 Granted (Re: 282 MOTION to Dismiss Count(s) Two, Three, Four, Five and Six *for Lack of Article III Subject Matter Jurisdiction, Article III Jurisdiction of the Facts and Article III Venue*, 306 MOTION Stay all Orders by Judge Friot pending determination by Surpeme Court in 09−8701, 280 MOTION to Dismiss Count(s) ONE *for lack of Article III Subject Matter Jurisdiction, Article III Jurisdiction of the Facts and Article III Venue*, 309 JOINDER (in [295, 306, 308] Motion to dismiss...., Motion for Stay..., Reply filed on 2/1/10, 2/8/10, 2/10/10), 284 MOTION to Dismiss Indictment/Information/Complaint *for lack of Article III Standing of United States of America, (2) lack of Article III Case or Controversy, (3) for violation of Title 28, United States Code, Section 547, and accompanying brief in MOTION to Dismiss Indictment/Information/Complaint for lack of Article III Standing of United States of America, (2) lack of Article III Case or Controversy, (3) for violation of Title 28, United States Code, Section 547, and accompanying brief in* ) as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 02/22/2010) |
| 02/23/2010 | 313 | | ORDER by Judge Stephen P Friot *re: consideration of non−standard conditions of supervised release* as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 02/23/2010) |
| 02/25/2010 | 314 | | ORDER by Judge Stephen P Friot, ruling on motion(s)/document(s): #295 Denied (Re: 295 MOTION to Dismiss Count(s) One, Two, Three, Four, Five and Six *regarding regulations not in compliance with APA* ) as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 02/25/2010) |
| 03/16/2010 | 315 | | SEALED DOCUMENT (O'Reilly, Charles) (Entered: 03/16/2010) Contains One or More Restricted PDFs |
| 03/25/2010 | 316 | | ORDER by Judge Stephen P Friot, ruling re: modification of conditions of pretrial release as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) Modified on 3/25/2010 to add PDF (pll, Dpty Clk). (Entered: 03/25/2010) |
| 03/25/2010 | 317 | | NOTICE of Docket Entry Modification; Error: Document not attached; Correction: Attached document and included here (Re: 316 Order, Ruling Re: Modification of Conditions of Pretrial Release ) as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 03/25/2010) |
| 03/30/2010 | 318 | | |

| | | | |
|---|---|---|---|
| | | | NOTICE *Regarding Defendants'* Reference to Variance in Objections to PSIR by USA as to Lindsey Kent Springer, Oscar Amos Stilley (O'Reilly, Charles) (Entered: 03/30/2010) |
| 03/30/2010 | 319 | | EXHIBIT LIST *and Witness List for Sentencing* by USA as to Lindsey Kent Springer, Oscar Amos Stilley (With attachments) (O'Reilly, Charles) (Entered: 03/30/2010) |
| 03/30/2010 | 320 | | SEALED DOCUMENT (Stilley, Oscar) (Entered: 03/30/2010) Contains One or More Restricted PDFs |
| 04/06/2010 | 326 | | MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) *to continue sentencing until proper notice has been given* by Oscar Amos Stilley (Stilley, Oscar) (Entered: 04/06/2010) |
| 04/07/2010 | 328 | | RESPONSE in Opposition to Motion (Re: 326 MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) *to continue sentencing until proper notice has been given* ) by USA as to Oscar Amos Stilley (O'Reilly, Charles) (Entered: 04/07/2010) |
| 04/07/2010 | 329 | | ORDER by Judge Stephen P Friot, setting/resetting deadline(s)/hearing(s): *(Government's response deadline to Stilley's Motion to Continue Sentencing [Dkt. #326])* ( Miscellaneous Deadline set for 4/13/2010) as to Oscar Amos Stilley (djh, Dpty Clk) (Entered: 04/07/2010) |
| 04/08/2010 | 330 | | REPLY to Response to Motion (Re: 326 MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) *to continue sentencing until proper notice has been given* ) by Oscar Amos Stilley (Stilley, Oscar) (Entered: 04/08/2010) |
| 04/09/2010 | 331 | | ORDER by Judge Stephen P Friot, ruling on motion(s)/document(s): #326 Denied (Re: 326 MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) *to continue sentencing until proper notice has been given* ) as to Oscar Amos Stilley Modified on 4/23/2010 to show Oscar Amos Stilley as single filer(cds, Dpty Clk). (Entered: 04/09/2010) |
| 04/16/2010 | 333 | | SEALED DOCUMENT (O'Reilly, Charles) (Entered: 04/16/2010) Contains One or More Restricted PDFs |
| 04/23/2010 | 336 | | MINUTES of Proceedings – held before Judge Stephen P Friot: Sentencing held on 4/23/2010, striking/terminating deadline(s)/hearing(s) as to Lindsey Kent Springer, Oscar Amos Stilley (Court Reporter: Tracy Washbourne) (With attachments) (pll, Dpty Clk) (Entered: 04/28/2010) |
| 04/23/2010 | 348 | | NOTICE OF APPEAL to Circuit Court (Re: 338 Judgment and Commitment, Entering Judgment ) as to Oscar Amos Stilley (s–srl, Dpty Clk) Modified on 4/30/2010 to correct file date (s–srl, Dpty Clk). (Entered: 04/30/2010) |
| 04/27/2010 | 334 | | ORDER by Judge Stephen P Friot *entered without prejudice to the right of standby counsel to apply for compensation for their services,* terminating attorney Charles Robert Burton, IV and Robert Scott Williams as to Lindsey Kent Springer, Oscar Amos Stilley (djh, Dpty Clk) (Entered: 04/27/2010) |
| 04/27/2010 | 335 | | ***Remark: *Order [Dkt. #334] mailed to each defendant c/o David L. Moss Correctional Center, 300 N. Denver Ave., Tulsa, OK 74103* (Re: 334 Order,, Adding/Terminating Attorney(s), Adding/Terminating Attorney(s) ) as to Lindsey Kent Springer, Oscar Amos Stilley (djh, Dpty Clk) (Entered: |

23

| | | | |
|---|---|---|---|
| | | | 04/27/2010) |
| 04/28/2010 | 338 | | JUDGMENT AND COMMITMENT by Judge Stephen P Friot, entering judgment as to Oscar Amos Stilley (pll, Dpty Clk) (Entered: 04/28/2010) |
| 04/30/2010 | 346 | | ORDER by Judge Stephen P Friot *re: mailing addresses* as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 04/30/2010) |
| 04/30/2010 | 349 | | PRELIMINARY RECORD Sent to Circuit Court (Re: 348 Notice of Appeal to Circuit Court ) as to Oscar Amos Stilley (With attachments) (s−srl, Dpty Clk) (Entered: 04/30/2010) |
| 04/30/2010 | | | NOTICE of Docket Entry Modification; Error: incorrect file date; Correction: corrected file date (Re: 348 Notice of Appeal to Circuit Court ) as to Oscar Amos Stilley (s−srl, Dpty Clk) (Entered: 04/30/2010) |
| 04/30/2010 | 353 | | Amended PRELIMINARY RECORD Sent to Circuit Court (Re: 348 Notice of Appeal to Circuit Court, 349 Preliminary Record Sent ) as to Oscar Amos Stilley (With attachments) (s−srl, Dpty Clk) (Entered: 04/30/2010) |
| 04/30/2010 | 355 | | APPEAL NUMBER INFORMATION from Circuit Court assigning Case Number 10−5057 (#348) (Re: 348 Notice of Appeal to Circuit Court ) as to Oscar Amos Stilley (sam, Dpty Clk) (Entered: 05/03/2010) |
| 05/06/2010 | 362 | | ORDER from Circuit Court *partially consolidating appeals* (Re: 348 Notice of Appeal to Circuit Court, 340 Notice of Appeal to Circuit Court ) as to Lindsey Kent Springer, Oscar Amos Stilley (sam, Dpty Clk) (Entered: 05/06/2010) |
| 05/28/2010 | 366 | | MOTION to Unseal Document(s) (Re: 203 Sealed Order, 186 Sealed Order, 181 SEALED MOTION, 182 Sealed Document, 202 SEALED MOTION ) by USA as to Lindsey Kent Springer, Oscar Amos Stilley (O'Reilly, Charles) (Entered: 05/28/2010) |
| 06/03/2010 | 370 | | ORDER by Judge Stephen P Friot, ruling on motion(s)/document(s): #366 Granted, unsealing document(s) (Re: 366 MOTION to Unseal Document(s), 182 Sealed Document, 186 Sealed Order, 203 Sealed Order, 181 SEALED MOTION, 202 SEALED MOTION ) as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 06/03/2010) |
| 06/08/2010 | 373 | | MOTION to Withdraw Attorney(s) *Kenneth P. Snoke* by USA as to Lindsey Kent Springer, Oscar Amos Stilley (O'Reilly, Charles) (Entered: 06/08/2010) |
| 06/08/2010 | 374 | | ORDER by Judge Stephen P Friot, terminating attorney Kenneth P Snoke, ruling on motion(s)/document(s): #373 Granted (Re: 373 MOTION to Withdraw Attorney(s) ) as to Lindsey Kent Springer, Oscar Amos Stilley (pll, Dpty Clk) (Entered: 06/08/2010) |
| 06/10/2010 | 379 | | MINUTE ORDER by Court Clerk, directing Jerold W. Barringer to file by July 1, 2010 a Motion for Admission Pro Hac Vice per Local Civil Rule 83.2. Additionally, if you intend to practice in this district in the future and want to become a member of this district, please submit an application for attorney admission. as to Lindsey Kent Springer, Oscar Amos Stilley (lal, Dpty Clk) (Entered: 06/10/2010) |
| 06/11/2010 | | | MAIL to Oscar Amos Stilley Returned − marked return to sender − not in custody. Remailed on 6/14/10 to FCI Forrest Low, P O BOX 9000, FORREST |

| | | | |
|---|---|---|---|
| | | | CITY, AR 72336 – new address obtained from BOP website. (Re: <u>370</u> Order,, Ruling on Motion(s)/Document(s), Ruling on Motion(s)/Document(s), Unsealing Document(s), Unsealing Document(s) ) as to Oscar Amos Stilley (s–srl, Dpty Clk) (Entered: 06/14/2010) |
| 06/16/2010 | <u>380</u> | | Supplemental CERTIFICATE of Service *Due to Returned Mail* (Re: 375 Response in Opposition to Motion, <u>373</u> MOTION to Withdraw Attorney(s), <u>366</u> MOTION to Unseal Document(s) ) by USA as to Lindsey Kent Springer, Oscar Amos Stilley (O'Reilly, Charles) (Entered: 06/16/2010) |
| 06/16/2010 | | | MAIL to Oscar Amos Stilley, David L. Moss Criminal Justice Center, 300 N Denver, Tulsa, OK 74103 Returned – marked Return to Sender – not in custody. Remailed on 06/17/10 to FCI Forrest City Low, PO Box 9000, Forrest City, AR 72336 – New address obtained from BOP website. (Re: 376 Order, Ruling on Motion(s)/Document(s), 377 Order,, Ruling on Motion(s)/Document(s), Ruling on Motion(s)/Document(s), <u>374</u> Order, Adding/Terminating Attorney(s), Ruling on Motion(s)/Document(s) ) as to Oscar Amos Stilley (sdc, Dpty Clk) Modified on 6/18/2010 to remove additional Defendant (sdc, Dpty Clk). (Entered: 06/17/2010) |
| 07/12/2010 | <u>382</u> | | TRANSCRIPT of Proceedings (Unredacted) of Motion Hearing held on 04/22/2009 before Judge Stephen P Friot (Court Reporter: Tracy Washbourne) (Pages: 132). <span style="color:red">NOTICE RE REDACTION OF TRANSCRIPTS: A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may view the transcript at the court public terminal at no charge or may purchase a copy from the court reporter.</span> (Re: 340 Notice of Appeal <u>43</u> Minutes of Motion Hearing, Minutes of Scheduling Conference, Ruling on Motion(s)/Document(s), Taking Motion(s) Under Advisement, Setting/Resetting Deadline(s)/Hearing(s)) as to Lindsey Kent Springer, Oscar Amos Stilley (sam, Dpty Clk). Modified on 7/13/2010 to create link to 340 (sac, Dpty Clk). Modified on 10/14/2010 to remove transcript access restriction (a–hc, Dpty Clk). (Entered: 07/12/2010) |
| 07/12/2010 | <u>383</u> | | TRANSCRIPT of Proceedings (Unredacted) of Motion Hearing held on 07/02/2009 before Judge Stephen P Friot (Court Reporter: Tracy Washbourne) (Pages: 159). <span style="color:red">NOTICE RE REDACTION OF TRANSCRIPTS: A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may view the transcript at the court public terminal at no charge or may purchase a copy from the court reporter.</span> (Re: 340 Notice of Appeal to Circuit Court, <u>100</u> Minutes of Motion Hearing, Ruling on Motion(s)/Document(s), Striking/Terminating Deadline(s)/Hearing(s)) as to Lindsey Kent Springer, Oscar Amos Stilley (sam, Dpty Clk) Modified on 10/15/2010 to remove transcript access restriction (a–hc, Dpty Clk). (Entered: 07/12/2010) |
| 07/12/2010 | <u>384</u> | | TRANSCRIPT of Proceedings (Unredacted) of Pretrial Hearing held on 10/21/2009 before Judge Stephen P Friot (Court Reporter: Tracy Washbourne) (Pages: 139). <span style="color:red">NOTICE RE REDACTION OF TRANSCRIPTS: A party must</span> |

| | | | |
|---|---|---|---|
| | | | file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may view the transcript at the court public terminal at no charge or may purchase a copy from the court reporter. (Re: 340 Notice of Appeal to Circuit Court, <u>207</u> Minutes of Motion Hearing, Minutes of Pretrial Conference, Ruling on Motion(s)/Document(s), Striking/Terminating Deadline(s)/Hearing(s)) as to Lindsey Kent Springer, Oscar Amos Stilley (sam, Dpty Clk) Modified on 10/15/2010 to remove transcript access restriction (a–hc, Dpty Clk). (Entered: 07/12/2010) |
| 07/12/2010 | <u>385</u> | | TRANSCRIPT of Proceedings (Unredacted) of Voir Dire and Jury Trial held on 10/26/2009 before Judge Stephen P Friot (Court Reporter: Tracy Washbourne)(Pages: 1 to 242)(Re: 217 Minutes of Jury Trial Begun, 340 Notice of Appeal to Circuit Court, 218 Minutes of Jury Trial Held, Setting/Resetting Scheduling Order Date(s), 216 Minutes of Voir Dire/Jury Selection Held) as to Lindsey Kent Springer, Oscar Amos Stilley (sam, Dpty Clk)(See Court Clerk to view this transcript) Modified on 7/13/2010 to include that Voir Dire is included in this transcript (sac, Dpty Clk). (Entered: 07/12/2010) Contains One or More Restricted PDFs |
| 07/12/2010 | <u>386</u> | | TRANSCRIPT of Proceedings (Unredacted) of Jury Trial held on 10/27/2009 before Judge Stephen P Friot (Court Reporter: Tracy Washbourne) (Pages: 243 to 515). NOTICE RE REDACTION OF TRANSCRIPTS: A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may view the transcript at the court public terminal at no charge or may purchase a copy from the court reporter. (Re: 340 Notice of Appeal to Circuit Court, 221 Minutes of Jury Trial Held, Ruling on Motion(s)/Document(s)) as to Lindsey Kent Springer, Oscar Amos Stilley (sam, Dpty Clk) Modified on 10/15/2010 to remove transcript access restriction (a–hc, Dpty Clk). (Entered: 07/12/2010) |
| 07/12/2010 | <u>387</u> | | TRANSCRIPT of Proceedings (Unredacted) of Jury Trial held on 10/28/2009 before Judge Stephen P Friot (Court Reporter: Tracy Washbourne) (Pages: 516 to 640). NOTICE RE REDACTION OF TRANSCRIPTS: A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may view the transcript at the court public terminal at no charge or may purchase a copy from the court reporter. (Re: 222 Minutes of Jury Trial Held, Setting/Resetting Deadline(s)/Hearing(s), 340 Notice of Appeal to Circuit Court) as to Lindsey Kent Springer, Oscar Amos Stilley (sam, Dpty Clk) Modified on 10/15/2010 to remove transcript access restriction (a–hc, Dpty Clk). (Entered: 07/12/2010) |
| 07/12/2010 | <u>388</u> | | TRANSCRIPT of Proceedings (Unredacted) of Jury Trial held on 10/29/2009 before Judge Stephen P Friot (Court Reporter: Tracy Washbourne) (Pages: 641 to 880). NOTICE RE REDACTION OF TRANSCRIPTS: A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically |

| | | |
|---|---|---|
| | | available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may view the transcript at the court public terminal at no charge or may purchase a copy from the court reporter. (Re: 340 Notice of Appeal to Circuit Court, 223 Minutes of Jury Trial Held, Ruling on Motion(s)/Document(s), Setting/Resetting Scheduling Order Date(s)) as to Lindsey Kent Springer, Oscar Amos Stilley (sam, Dpty Clk) Modified on 10/15/2010 to remove transcript access restriction (a–hc, Dpty Clk). (Entered: 07/12/2010) |
| 07/12/2010 | 389 | TRANSCRIPT of Proceedings (Unredacted) of Jury Trial held on 10/30/2009 before Judge Stephen P Friot (Court Reporter: Tracy Washbourne) (Pages: 881 to 1130). NOTICE RE REDACTION OF TRANSCRIPTS: A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may view the transcript at the court public terminal at no charge or may purchase a copy from the court reporter. (Re: 229 Minutes of Jury Trial Held, Setting/Resetting Scheduling Order Date(s) 340 Notice of Appeal to Circuit Court) as to Lindsey Kent Springer, Oscar Amos Stilley (sam, Dpty Clk) Modified on 10/15/2010 to remove transcript access restriction (a–hc, Dpty Clk). (Entered: 07/12/2010) |
| 07/12/2010 | 390 | TRANSCRIPT of Proceedings (Unredacted) of Jury Trial held on 11/02/2009 before Judge Stephen P Friot (Court Reporter: Tracy Washbourne) (Pages: 1131 to 1327). NOTICE RE REDACTION OF TRANSCRIPTS: A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may view the transcript at the court public terminal at no charge or may purchase a copy from the court reporter. (Re: 230 Minutes of Jury Trial Held, Setting/Resetting Scheduling Order Date(s), 340 Notice of Appeal to Circuit Court ) as to Lindsey Kent Springer, Oscar Amos Stilley (sam, Dpty Clk) Modified on 10/15/2010 to remove transcript access restriction (a–hc, Dpty Clk). (Entered: 07/12/2010) |
| 07/12/2010 | 391 | TRANSCRIPT of Proceedings (Unredacted) of Jury Trial held on 11/03/2009 before Judge Stephen P Friot (Court Reporter: Tracy Washbourne) (Pages: 1328 to 1608). NOTICE RE REDACTION OF TRANSCRIPTS: A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may view the transcript at the court public terminal at no charge or may purchase a copy from the court reporter. (Re: 340 Notice of Appeal to Circuit Court, 231 Minutes of Jury Trial Held, Setting/Resetting Scheduling Order Date(s)) as to Lindsey Kent Springer, Oscar Amos Stilley (sam, Dpty Clk) Modified on 10/15/2010 to remove transcript access restriction (a–hc, Dpty Clk). (Entered: 07/12/2010) |
| 07/12/2010 | 392 | TRANSCRIPT of Proceedings (Unredacted) of Jury Trial held on 11/04/2009 before Judge Stephen P Friot (Court Reporter: Tracy Washbourne) (Pages: 1609 to 1934). NOTICE RE REDACTION OF TRANSCRIPTS: A party must |

| | | | |
|---|---|---|---|
| | | | file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may view the transcript at the court public terminal at no charge or may purchase a copy from the court reporter. (Re: 233 Minutes of Jury Trial Held, Setting/Resetting Scheduling Order Date(s), 340 Notice of Appeal to Circuit Court) as to Lindsey Kent Springer, Oscar Amos Stilley (sam, Dpty Clk) Modified on 10/15/2010 to remove transcript access restriction (a–hc, Dpty Clk). (Entered: 07/12/2010) |
| 07/12/2010 | 393 | | TRANSCRIPT of Proceedings (Unredacted) of Jury Trial held on 11/05/2009 before Judge Stephen P Friot (Court Reporter: Tracy Washbourne) (Pages: 1935 to 2202). NOTICE RE REDACTION OF TRANSCRIPTS: A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may view the transcript at the court public terminal at no charge or may purchase a copy from the court reporter. (Re: 340 Notice of Appeal to Circuit Court, 234 Minutes of Jury Trial Held, Setting/Resetting Scheduling Order Date(s)) as to Lindsey Kent Springer, Oscar Amos Stilley (sam, Dpty Clk) Modified on 10/15/2010 to remove transcript access restriction (a–hc, Dpty Clk). (Entered: 07/12/2010) |
| 07/12/2010 | 394 | | TRANSCRIPT of Proceedings (Unredacted) of Jury Trial held on 11/09/2009 before Judge Stephen P Friot (Court Reporter: Tracy Washbourne) (Pages: 2203 to 2454). NOTICE RE REDACTION OF TRANSCRIPTS: A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may view the transcript at the court public terminal at no charge or may purchase a copy from the court reporter. (Re: 239 Minutes of Jury Trial Held, Setting/Resetting Scheduling Order Date(s), 340 Notice of Appeal to Circuit Court) as to Lindsey Kent Springer, Oscar Amos Stilley (sam, Dpty Clk) Modified on 10/15/2010 to remove transcript access restriction (a–hc, Dpty Clk). (Entered: 07/12/2010) |
| 07/12/2010 | 395 | | TRANSCRIPT of Proceedings (Unredacted) of Jury Trial held on 11/10/2009 before Judge Stephen P Friot (Court Reporter: Tracy Washbourne) (Pages: 2455 to 2669). NOTICE RE REDACTION OF TRANSCRIPTS: A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may view the transcript at the court public terminal at no charge or may purchase a copy from the court reporter. (Re: 240 Minutes of Jury Trial Held, Setting/Resetting Scheduling Order Date(s), 340 Notice of Appeal to Circuit Court) as to Lindsey Kent Springer, Oscar Amos Stilley (sam, Dpty Clk) Modified on 10/15/2010 to remove transcript access restriction (a–hc, Dpty Clk). (Entered: 07/12/2010) |

| 07/12/2010 | 396 | | TRANSCRIPT of Proceedings (Unredacted) of Jury Trial held on 11/12/2009 before Judge Stephen P Friot (Court Reporter: Tracy Washbourne) (Pages: 2670 to 2949). NOTICE RE REDACTION OF TRANSCRIPTS: A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may view the transcript at the court public terminal at no charge or may purchase a copy from the court reporter. (Re: 241 Minutes of Jury Trial Held, Setting/Resetting Scheduling Order Date(s), 340 Notice of Appeal to Circuit Court) as to Lindsey Kent Springer, Oscar Amos Stilley (sam, Dpty Clk) Modified on 10/15/2010 to remove transcript access restriction (a–hc, Dpty Clk). (Entered: 07/12/2010) |
|---|---|---|---|
| 07/12/2010 | 397 | | TRANSCRIPT of Proceedings (Unredacted) of Jury Trial held on 11/13/2009 before Judge Stephen P Friot (Court Reporter: Tracy Washbourne) (Pages: 2950 to 3056). NOTICE RE REDACTION OF TRANSCRIPTS: A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may view the transcript at the court public terminal at no charge or may purchase a copy from the court reporter. (Re: 340 Notice of Appeal to Circuit Court, 242 Minutes of Jury Trial Held, Setting/Resetting Scheduling Order Date(s)) as to Lindsey Kent Springer, Oscar Amos Stilley (sam, Dpty Clk) Modified on 10/15/2010 to remove transcript access restriction (a–hc, Dpty Clk). (Entered: 07/12/2010) |
| 07/12/2010 | 398 | | TRANSCRIPT of Proceedings (Unredacted) of Jury Trial held on 11/16/2009 before Judge Stephen P Friot (Court Reporter: Tracy Washbourne) (Pages: 3057 to 3090). NOTICE RE REDACTION OF TRANSCRIPTS: A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may view the transcript at the court public terminal at no charge or may purchase a copy from the court reporter. (Re: 340 Notice of Appeal to Circuit Court, 243 Minutes of Jury Trial Completed, Striking/Terminating Deadline(s)/Hearing(s)) as to Lindsey Kent Springer, Oscar Amos Stilley (sam, Dpty Clk) Modified on 10/15/2010 to remove transcript access restriction (a–hc, Dpty Clk). (Entered: 07/12/2010) |
| 07/12/2010 | 399 | | TRANSCRIPT of Proceedings (Unredacted) of Sentencing held on 04/21/2010 before Judge Stephen P Friot (Court Reporter: Tracy Washbourne) (Pages: 1 to 210). NOTICE RE REDACTION OF TRANSCRIPTS: A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may view the transcript at the court public terminal at no charge or may purchase a copy from the court reporter. (Re: 336 Minutes of Sentencing, Striking/Terminating Deadline(s)/Hearing(s), 340 Notice of Appeal to Circuit Court) as to Lindsey Kent Springer, Oscar Amos Stilley (sam, Dpty Clk) Modified on 10/15/2010 |

| | | | |
|---|---|---|---|
| | | | to remove transcript access restriction (a−hc, Dpty Clk). (Entered: 07/12/2010) |
| 07/12/2010 | 400 | | TRANSCRIPT of Proceedings (Unredacted) of Sentencing held on 04/22/2010 before Judge Stephen P Friot (Court Reporter: Tracy Washbourne) (Pages: 211 to 390). NOTICE RE REDACTION OF TRANSCRIPTS: A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may view the transcript at the court public terminal at no charge or may purchase a copy from the court reporter. (Re: 336 Minutes of Sentencing, Striking/Terminating Deadline(s)/Hearing(s), 340 Notice of Appeal to Circuit Court) as to Lindsey Kent Springer, Oscar Amos Stilley (sam, Dpty Clk) Modified on 10/15/2010 to remove transcript access restriction (a−hc, Dpty Clk). (Entered: 07/12/2010) |
| 07/12/2010 | 401 | | TRANSCRIPT of Proceedings (Unredacted) of Sentencing held on 04/23/2010 before Judge Stephen P Friot (Court Reporter: Tracy Washbourne) (Pages: 391 to 469). NOTICE RE REDACTION OF TRANSCRIPTS: A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may view the transcript at the court public terminal at no charge or may purchase a copy from the court reporter. (Re: 336 Minutes of Sentencing, Striking/Terminating Deadline(s)/Hearing(s), 340 Notice of Appeal to Circuit Court) as to Lindsey Kent Springer, Oscar Amos Stilley (sam, Dpty Clk) Modified on 10/15/2010 to remove transcript access restriction (a−hc, Dpty Clk). (Entered: 07/12/2010) |
| 07/15/2010 | | | MAIL to Oscar Amos Stilley, David L. Moss Criminal Justic Center, 300 N Denver, Tulsa OK 74103 Returned − marked return to sender − not in custody. Remailed on 7/15/10 − FCI Forrest City Low, PO Box 9000, Forrest City, AR 72336. (Re: 379 Order, Directing Attorney to File PHV Motion,, ) as to Oscar Amos Stilley (sdc, Dpty Clk) Modified on 7/16/2010 ro remove reference to Lindsey Springer (sdc, Dpty Clk). (Entered: 07/15/2010) |
| 07/26/2010 | 412 | | RECORD on Appeal Sent to Circuit Court (Record includes: 4 volumes) (Re: 348 Notice of Appeal to Circuit Court, 340 Notice of Appeal to Circuit Court ) as to Lindsey Kent Springer, Oscar Amos Stilley (With attachments) (s−srt, Dpty Clk) (Entered: 07/26/2010) |
| 08/17/2010 | 418 | | ORDER by Judge Stephen P Friot *titled: Memorandum of approval, with modification, of claim for professional services* as to Oscar Amos Stilley (pll, Dpty Clk) (Entered: 08/17/2010) |
| 09/09/2010 | 421 | | ATTORNEY APPEARANCE by Jeffrey Andrew Gallant on behalf of USA (Gallant, Jeffrey) (Entered: 09/09/2010) |
| 09/13/2010 | 422 | | TRANSCRIPT of Proceedings (Unredacted) of Miscellaneous Hearing held on 03/30/2009 before Magistrate Judge Paul J Cleary (Court Reporter: Tracy Washbourne) (Pages: 1−36). NOTICE RE REDACTION OF TRANSCRIPTS: A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for |

| | | | |
|---|---|---|---|
| | | | redaction purposes may view the transcript at the court public terminal at no charge or may purchase a copy from the court reporter. (Re: 23 Minutes of Miscellaneous Hearing, Ruling on Motion(s)/Document(s), Striking/Terminating Deadline(s)/Hearing(s)) as to Lindsey Kent Springer, Oscar Amos Stilley (sam, Dpty Clk) Modified on 12/20/2010 to remove transcript access restriction (a–hc, Dpty Clk). (Entered: 09/13/2010) |
| 02/24/2011 | 443 | | MOTION for Order Prohibiting Government from Interference with Stilley's Receipt and Use of Computers, Peripherals, Internet Access, Tax Addresses, Forms and Other Items Useful for Peacefully Petitioning for the Redress of Grievances by Oscar Amos Stilley (s–srl, Dpty Clk) (Entered: 02/24/2011) |
| 03/14/2011 | 444 | | RESPONSE in Opposition to Motion (Re: 443 MOTION for Order Prohibiting Government from Interference with Stilley's Receipt and Use of Computers, Peripherals, Internet Access, Tax Addresses, Forms and Other Items Useful for Peacefully Petitioning for the Redress of Grievances ) by USA as to Oscar Amos Stilley (O'Reilly, Charles) (Entered: 03/14/2011) |
| 03/29/2011 | 450 | | MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) *Extension of Time to Reply to Response* (Re: 444 Response in Opposition to Motion, 443 MOTION for Order Prohibiting Government from Interference with Stilley's Receipt and Use of Computers, Peripherals, Internet Access, Tax Addresses, Forms and Other Items Useful for Peacefully Petitioning for the Redress of Grievances ) by Oscar Amos Stilley (sdc, Dpty Clk) (Entered: 03/29/2011) |
| 03/30/2011 | 451 | | ORDER by Judge Stephen P Friot, ruling on motion(s)/document(s): #450 Granted (Re: 450 MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) *Extension of Time to Reply to Response* MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) *Extension of Time to Reply to Response*, 443 MOTION for Order Prohibiting Government from Interference with Stilley's Receipt and Use of Computers, Peripherals, Internet Access, Tax Addresses, Forms and Other Items Useful for Peacefully Petitioning for the Redress of Grievances ) as to Oscar Amos Stilley (pll, Dpty Clk) (Entered: 03/30/2011) |
| 04/15/2011 | 453 | | ***Remark: *received copy of Docket 443 that was mailed to 10th Circuit and forwarded to USDC WD/OK* as to Oscar Amos Stilley (sdc, Dpty Clk). (Entered: 04/18/2011) |
| 04/18/2011 | 454 | | REPLY to Response to Motion (Re: 443 MOTION for Order Prohibiting Government from Interference with Stilley's Receipt and Use of Computers, Peripherals, Internet Access, Tax Addresses, Forms and Other Items Useful for Peacefully Petitioning for the Redress of Grievances ) by Oscar Amos Stilley (s–srl, Dpty Clk) (Entered: 04/18/2011) |
| 04/20/2011 | 455 | | ORDER by Judge Stephen P Friot, ruling on motion(s)/document(s): #443 Denied (Re: 443 MOTION for Order Prohibiting Government from Interference with Stilley's Receipt and Use of Computers, Peripherals, Internet Access, Tax Addresses, Forms and Other Items Useful for Peacefully Petitioning for the Redress of Grievances ) as to Oscar Amos Stilley (pll, Dpty Clk) (Entered: 04/20/2011) |
| 10/26/2011 | 460 | | DECISION from Circuit Court affirming the Decision of the District Court (awaiting mandate) (Re: 348 Notice of Appeal to Circuit Court, 428 Notice of Appeal to Circuit Court, 447 Notice of Appeal to Circuit Court, 340 Notice of |

| | | | |
|---|---|---|---|
| | | | Appeal to Circuit Court ) as to Lindsey Kent Springer, Oscar Amos Stilley (sdc, Dpty Clk) (Entered: 10/26/2011) |
| 12/20/2011 | 463 | | MANDATE from Circuit Court (Re: 348 Notice of Appeal to Circuit Court, 460 Decision from Circuit Court, ) as to Oscar Amos Stilley (sdc, Dpty Clk) (Entered: 12/20/2011) |
| 05/22/2012 | 465 | | MOTION for Release of Oscar Amos Stilley by Martha Durossette as to Oscar Amos Stilley (sdc, Dpty Clk) Modified on 5/25/2012 – **STRICKEN per 466** (tjc, Dpty Clk). (Entered: 05/23/2012) |
| 05/24/2012 | 466 | | ORDER by Judge Stephen P Friot, striking/withdrawing document(s) (Re: 465 MOTION for Release of Oscar Amos Stilley ) (Documents Terminated: 465 MOTION for Release of Oscar Amos Stilley ) as to Oscar Amos Stilley (cds, Dpty Clk) (Entered: 05/24/2012) |
| 05/29/2012 | 467 | | MAIL to Martha Durossette Returned – address was changed to address unknown. (Re: 466 Order, Striking/Withdrawing Document(s) ) as to Oscar Amos Stilley (s–srt, Dpty Clk) (Entered: 05/31/2012) |
| 06/01/2012 | | | MAIL Resent to Martha Durossette at 506 S Caddo, Muldrow, OK 74948 (Re: 466 Order, Striking/Withdrawing Document(s) ) as to Oscar Amos Stilley (s–srt, Dpty Clk) (Entered: 06/01/2012) |
| 05/03/2016 | 617 | | MOTION regarding visitation rights of Oscar Stilley by Martha Durossette as to Oscar Amos Stilley (jln, Dpty Clk) Modified on 5/6/2016– **STRICKEN per 618** (sac, Dpty Clk). (Entered: 05/04/2016) |
| 05/05/2016 | 618 | | ORDER by Judge Stephen P Friot , striking/withdrawing document(s) (Re: 617 MOTION regarding visitation rights of Oscar Stilley ) (Documents Terminated: 617 MOTION regarding visitation rights of Oscar Stilley ) as to Oscar Amos Stilley (kjp, Dpty Clk) (Entered: 05/05/2016) |
| 05/06/2016 | | | ***Remark: *Copy of Order #618 mailed to Oscar Amos Stilley* (Re: 618 Order,, Striking/Withdrawing Document(s), ) as to Oscar Amos Stilley (jln, Dpty Clk) (Entered: 05/06/2016) |
| 05/16/2016 | 619 | | MAIL to Oscar Amos Stilley Returned – remailed on 5/17/16 to FCI Oakdale I, PO BOX 5000, OAKDALE, LA 71463 – new address obtained from BOP website. (Re: 618 Order, Striking/Withdrawing Document(s),, ) as to Oscar Amos Stilley (jln, Dpty Clk) (Entered: 05/17/2016) |
| 12/11/2017 | 624 | | MAIL to Oscar Amos Stilley Returned – remailed on 12/11/17 to FCI Beaumont Low, PO BOX 26020, BEAUMONT, TX 77720 – new address obtained from BOP website. (Re: #622 and #623) as to Oscar Amos Stilley (2) (jln, Dpty Clk) (Entered: 12/11/2017) |
| 01/29/2018 | 631 | | MOTION for Hearing by Martha Durossette as to Oscar Amos Stilley (2) (sc, Dpty Clk) Modified on 2/1/2018– **STRICKEN per 633** (srt, Dpty Clk). (Entered: 01/29/2018) |
| 01/31/2018 | 633 | | ORDER by Judge Stephen P Friot , striking/withdrawing document(s) (Re: 631 MOTION for Hearing ) (Documents Terminated: 631 MOTION for Hearing ) as to Oscar Amos Stilley (2) (kjp, Dpty Clk) (Entered: 01/31/2018) |
| 07/12/2018 | 651 | | |

| | | | |
|---|---|---|---|
| | | | MAIL to Oscar Amos Stilley Returned – remailed on 1/16/18 – FCI Yazoo City Low, PO BOX 5000, YAZOO CITY, MS 39194 – new address obtained from BOP website. (Re: #645 and #646) as to Oscar Amos Stilley (2) (jln, Dpty Clk) (Entered: 07/16/2018) |
| 07/23/2018 | 652 | | MAIL to Oscar Amos Stilley Returned – remailed on 7/23/2018 to FCI Yazoo City Low, PO BOX 5000, YAZOO CITY, MS 39194 – new address obtained form previous entry. (Re: #648) as to Oscar Amos Stilley (2) (jln, Dpty Clk) (Entered: 07/23/2018) |
| 05/11/2021 | 693 | | NOTICE of Change of Address as to Oscar Amos Stilley (Stilley, Oscar) (Entered: 05/11/2021) |
| 05/12/2021 | 694 | | MOTION for Reduction of Sentence *Pursuant to 18 USC 3582(c)* by Oscar Amos Stilley (With attachments) (Stilley, Oscar) (Entered: 05/12/2021) |
| 05/12/2021 | 695 | | BRIEF in Support of Motion (Re: 694 MOTION for Reduction of Sentence *Pursuant to 18 USC 3582(c)* ) by Oscar Amos Stilley (Stilley, Oscar) (Entered: 05/12/2021) |
| 05/12/2021 | 696 | | ORDER by Judge Stephen P Friot , setting/resetting deadline(s)/hearing(s): ( Responses due by 7/16/2021) (Re: 694 MOTION for Reduction of Sentence *Pursuant to 18 USC 3582(c)* ) as to Oscar Amos Stilley (kjp, Dpty Clk) (Entered: 05/12/2021) |
| 07/07/2021 | 698 | | RESPONSE in Opposition to Motion (Re: 694 MOTION for Reduction of Sentence *Pursuant to 18 USC 3582(c)* ) by USA as to Oscar Amos Stilley (O'Reilly, Charles) (Entered: 07/07/2021) |
| 07/21/2021 | 699 | | REPLY to Response to Motion (Re: 694 MOTION for Reduction of Sentence *Pursuant to 18 USC 3582(c)* ) by Oscar Amos Stilley (Stilley, Oscar) (Entered: 07/21/2021) |
| 07/26/2021 | 700 | | ORDER by Judge Stephen P Friot *denying defendants Motion for Reduction of Sentence (Doc. 694)*, ruling on motion(s)/document(s): #694 denied (Re: 694 MOTION for Reduction of Sentence *Pursuant to 18 USC 3582(c)* ) as to Oscar Amos Stilley (alg, Dpty Clk) (Entered: 07/26/2021) |
| 09/01/2021 | 701 | | MOTION to Vacate/Set Aside/Correct Sentence under 28 U.S.C. 2255 by Oscar Amos Stilley (Stilley, Oscar) Civil case 4:21–cv–00361 opened. (Entered: 09/01/2021) |
| 09/02/2021 | 702 | | MOTION Disclose co–defendant's address, show authority for Friot to preside, 30 day stay of proceedings by Oscar Amos Stilley (Stilley, Oscar) (Entered: 09/02/2021) |
| 09/02/2021 | 703 | | MINUTE ORDER by Judge Stephen P Friot (Re: 701 MOTION to Vacate/Set Aside/Correct Sentence under 28 U.S.C. 2255 ) as to Oscar Amos Stilley (sc, Dpty Clk) (Entered: 09/02/2021) |
| 09/02/2021 | 704 | | ORDER by Judge Stephen P Friot , setting/resetting deadline(s)/hearing(s): ( Responses due by 9/30/2021) (Re: 702 MOTION Disclose co–defendant's address, show authority for Friot to preside, 30 day stay of proceedings , 701 MOTION to Vacate/Set Aside/Correct Sentence under 28 U.S.C. 2255 ) as to Oscar Amos Stilley (alg, Dpty Clk) (Entered: 09/02/2021) |

| 09/07/2021 | 705 | | MOTION to Dismiss Defendants Verified Motion under 28 U.S.C. § 2255 as Untimely and in Violation of Local Rules (Re: 701 MOTION to Vacate/Set Aside/Correct Sentence under 28 U.S.C. 2255 ) by USA as to Oscar Amos Stilley (O'Reilly, Charles) Modified on 9/8/2021 to create link to doc 701 (sc, Dpty Clk). (Entered: 09/07/2021) |
|---|---|---|---|
| 09/07/2021 | 706 | | ORDER by Judge Stephen P Friot , setting/resetting deadline(s)/hearing(s): ( Responses due by 10/5/2021) (Re: 705 MOTION to Dismiss Defendants Verified Motion under 28 U.S.C. § 2255 as Untimely and in Violation of Local Rules ) as to Oscar Amos Stilley (alg, Dpty Clk) (Entered: 09/07/2021) |
| 09/08/2021 | 707 | | MOTION to Dismiss Defendant Oscar Stilley's Motion to Stay Proceedings and for Determination of Who is the Lawfully Authorized Judge on this Case (Re: 702 MOTION Disclose co–defendant's address, show authority for Friot to preside, 30 day stay of proceedings ) by USA as to Oscar Amos Stilley (O'Reilly, Charles) (Entered: 09/08/2021) |
| 09/14/2021 | 708 | | MOTION to Clarify *Whether or Not Response to Motion is Required Absent Scheduling Order*, MOTION for Extension of Time to Respond to Motion (Re: 707 MOTION to Dismiss Defendant Oscar Stilley's Motion to Stay Proceedings and for Determination of Who is the Lawfully Authorized Judge on this Case ) by Oscar Amos Stilley (Stilley, Oscar) (Entered: 09/14/2021) |
| 09/16/2021 | 709 | | ORDER by Judge Stephen P Friot , ruling on motion(s)/document(s): Motion #708 Granted, setting/resetting deadline(s)/hearing(s): ( Responses due by 10/14/2021) (Re: 708 MOTION to Clarify *Whether or Not Response to Motion is Required Absent Scheduling Order* MOTION for Extension of Time to Respond to Motion , 707 MOTION to Dismiss Defendant Oscar Stilley's Motion to Stay Proceedings and for Determination of Who is the Lawfully Authorized Judge on this Case ) as to Oscar Amos Stilley (kjp, Dpty Clk) (Entered: 09/16/2021) |
| 10/04/2021 | 710 | | MOTION for Extension of Time to Respond to Motion *up through and including 11–30–2021* (Re: 707 MOTION to Dismiss Defendant Oscar Stilley's Motion to Stay Proceedings and for Determination of Who is the Lawfully Authorized Judge on this Case , 705 MOTION to Dismiss Defendants Verified Motion under 28 U.S.C. § 2255 as Untimely and in Violation of Local Rules ) by Oscar Amos Stilley (Stilley, Oscar) (Entered: 10/04/2021) |
| 10/05/2021 | 711 | | RESPONSE in Opposition to Motion (Re: 710 MOTION for Extension of Time to Respond to Motion *up through and including 11–30–2021* ) by USA as to Oscar Amos Stilley (With attachments) (O'Reilly, Charles) (Entered: 10/05/2021) |
| 10/05/2021 | 712 | | ORDER by Judge Stephen P Friot , ruling on motion(s)/document(s): #710 granted in part and denied in part, setting/resetting deadline(s)/hearing(s): ( Responses due by 10/20/2021) (Re: 710 MOTION for Extension of Time to Respond to Motion *up through and including 11–30–2021*, 705 MOTION to Dismiss Defendants Verified Motion under 28 U.S.C. § 2255 as Untimely and in Violation of Local Rules ) as to Oscar Amos Stilley (alg, Dpty Clk) (Entered: 10/05/2021) |
| 10/20/2021 | 713 | | RESPONSE in Opposition to Motion (Re: 705 MOTION to Dismiss Defendants Verified Motion under 28 U.S.C. § 2255 as Untimely and in |

| | | | |
|---|---|---|---|
| | | | Violation of Local Rules ) by Oscar Amos Stilley (Stilley, Oscar) (Entered: 10/20/2021) |
| 10/20/2021 | 714 | | RESPONSE in Opposition to Motion (Re: 707 MOTION to Dismiss Defendant Oscar Stilley's Motion to Stay Proceedings and for Determination of Who is the Lawfully Authorized Judge on this Case ) by Oscar Amos Stilley (Stilley, Oscar) (Entered: 10/20/2021) |
| 10/25/2021 | 715 | | MOTION for Writ of Garnishment as to Cornerstone Structural Engineering, Inc. by USA as to Oscar Amos Stilley [Note: Attorney Vani Singhal added to party USA(pty:pla).] (Singhal, Vani) (Entered: 10/25/2021) |
| 10/25/2021 | | | ***Motion(s) Referred to Magistrate Judge Christine D Little (Re: 715 MOTION for Writ of Garnishment as to Cornerstone Structural Engineering, Inc. ) as to Oscar Amos Stilley (sc, Dpty Clk) (Entered: 10/26/2021) |
| 10/26/2021 | 716 | | MINUTE ORDER by Magistrate Judge Christine D Little , ruling on motion(s)/document(s): #715 granted (Re: 715 MOTION for Writ of Garnishment as to Cornerstone Structural Engineering, Inc. ) as to Oscar Amos Stilley  (This entry is the Official Order of the Court. No document is attached.) (tjc, Dpty Clk) (Entered: 10/26/2021) |
| 10/26/2021 | 717 | | WRIT of Garnishment Issued by Magistrate Judge Christine D Little as to Cornerstone Structural Engineering, Inc. as to Oscar Amos Stilley (tjc, Dpty Clk) (Entered: 10/26/2021) |
| 11/04/2021 | 718 | | GARNISHEE'S ANSWER by Cornerstone Structural Engineering, Inc. as to Oscar Amos Stilley (lmt, Dpty Clk) (Entered: 11/04/2021) |
| 11/04/2021 | 719 | | ORDER by Judge Stephen P Friot , ruling on motion(s)/document(s): #701 dismissed, #702 dismissed, #705 granted, #707 granted, denying certificate of appealability (Re: 707 MOTION to Dismiss Defendant Oscar Stilley's Motion to Stay Proceedings and for Determination of Who is the Lawfully Authorized Judge on this Case , 705 MOTION to Dismiss Defendants Verified Motion under 28 U.S.C. § 2255 as Untimely and in Violation of Local Rules , 701 MOTION to Vacate/Set Aside/Correct Sentence under 28 U.S.C. 2255 , 702 MOTION Disclose co−defendant's address, show authority for Friot to preside, 30 day stay of proceedings ) as to Oscar Amos Stilley (alg, Dpty Clk) (Entered: 11/04/2021) |
| 11/04/2021 | 720 | | JUDGMENT by Judge Stephen P Friot *dismissing defendant Oscar Amos Stilley's Motion to Vacate Sentence*, entering judgment as to Oscar Amos Stilley (alg, Dpty Clk) (Entered: 11/04/2021) |
| 11/14/2021 | 721 | | MOTION Transfer garnishment to district of residence by Oscar Amos Stilley (Stilley, Oscar) (Entered: 11/14/2021) |
| 11/24/2021 | 722 | | MOTION to Quash *Garnishment* by Oscar Amos Stilley (Stilley, Oscar) (Entered: 11/24/2021) |
| 11/24/2021 | 723 | | BRIEF in Support of Motion (Re: 722 MOTION to Quash *Garnishment* ) by Oscar Amos Stilley (Stilley, Oscar) (Entered: 11/24/2021) |
| 11/24/2021 | | | ***Motion(s) Referred to Magistrate Judge Christine D Little (Re: 722 MOTION to Quash *Garnishment* ) as to Oscar Amos Stilley (sc, Dpty Clk) (Entered: 12/01/2021) |

| | | |
|---|---|---|
| 12/08/2021 | 724 | ORDER by Judge Stephen P Friot *granting defendant's Motion for Transfer of Garnishment Proceedings (Doc. 721). The Clerk of the Court is directed to effect the transfer of garnishment proceedings to the Western District of Arkansas*, ruling on motion(s)/document(s): #721 granted, directing court clerk to take action (Re: 721 MOTION Transfer garnishment to district of residence ) as to Oscar Amos Stilley (alg, Dpty Clk) (Entered: 12/08/2021) |
| 12/09/2021 | | ***Remark: *garnishment proceedings transferred to USDC WD/AR and opened as case #2:21−mc−00107−PKH* (Re: 724 Order, Ruling on Motion(s)/Document(s), Directing Court Clerk to Take Action,,, ) as to Oscar Amos Stilley (srt, Dpty Clk) (Entered: 12/09/2021) |
| 01/01/2022 | 725 | NOTICE OF APPEAL to Circuit Court (Re: 720 Judgment, Entering Judgment, 719 Order, Ruling on Motion(s)/Document(s), Denying Certificate of Appealability as to Oscar Amos Stilley (Stilley, Oscar) Modified on 1/3/2022 to remove links to doc #'s 278, 136, 43, 455, 111, 100, 293, 338, 24, 264, 207 and 331 (sc, Dpty Clk). (Entered: 01/01/2022) |
| 01/03/2022 | | NOTICE of Docket Entry Modification; Error: Linked to the incorrect documents; Correction: Removed link to Doc #'s 278, 136, 43, 455, 111, 100, 293, 338, 24, 264, 207 and 331 (Re: 725 Notice of Appeal to Circuit Court, ) as to Oscar Amos Stilley (sc, Dpty Clk) (Entered: 01/03/2022) |
| 01/03/2022 | 726 | PRELIMINARY RECORD Sent to Circuit Court (Re: 725 Notice of Appeal to Circuit Court, ) as to Oscar Amos Stilley (With attachments) (sc, Dpty Clk) (Entered: 01/03/2022) |
| 01/03/2022 | 727 | APPEAL NUMBER INFORMATION from Circuit Court assigning Case Number 22−5000 (#725) (Re: 725 Notice of Appeal to Circuit Court, ) as to Oscar Amos Stilley (sc, Dpty Clk) (Entered: 01/04/2022) |
| 01/05/2022 | 728 | APPEAL FEES Paid in Full (Re: 725 Notice of Appeal to Circuit Court, ) as to Oscar Amos Stilley (lmt, Dpty Clk) (Entered: 01/05/2022) |
| 01/05/2022 | | ***Remark: *copy of receipt emailed to 10th Circuit* (Re: 728 Appeal Fee Paid in Full ) as to Oscar Amos Stilley (lmt, Dpty Clk) (Entered: 01/06/2022) |
| 01/21/2022 | 729 | CERTIFICATE of Service (Re: 715 MOTION for Writ of Garnishment as to Cornerstone Structural Engineering, Inc. , 717 Writ of Garnishment Issued ) by USA as to Oscar Amos Stilley (Singhal, Vani) (Entered: 01/21/2022) |
| 02/02/2022 | 730 | MOTION for Disbursement by USA as to Oscar Amos Stilley (Singhal, Vani) (Entered: 02/02/2022) |
| 02/10/2022 | 731 | ORDER by Magistrate Judge Susan E Huntsman , ruling on motion(s)/document(s): #730 granted (Re: 730 MOTION for Disbursement ) as to Oscar Amos Stilley (dlg, Dpty Clk) (Entered: 02/10/2022) |
| 06/06/2022 | 732 | DECISION from Circuit Court dismissing the Appeal (Re: 725 Notice of Appeal to Circuit Court, ) as to Oscar Amos Stilley (lmt, Dpty Clk) (Entered: 06/06/2022) |
| 08/24/2022 | 733 | TRANSFER by Judge Stephen P Friot of Jurisdiction of Probationer or Supervised Releasee to District of OKWD as to Oscar Amos Stilley (blc, Dpty Clk) Modified on 8/24/2022 to edit docket text to remove additional Order event language (blc, Dpty Clk). (Entered: 08/24/2022) |

*FILED*

MAR 1 0 2009

Phil Lombardi, Clerk
U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

Case No. **09 CR 043 JHP**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| LINDSEY KENT SPRINGER, | ) |
| OSCAR AMOS STILLEY, | ) |
| | ) |
| Defendants. | ) |

**INDICTMENT**
[18 U.S.C. § 371, Conspiracy to
Defraud the United States;
26 U.S.C. § 7201, Tax Evasion;
26 U.S.C. § 7203, Failure to File
Tax Return]

**THE GRAND JURY CHARGES:**

### GENERAL ALLEGATIONS

At all times relevant to this Indictment:

1.     **LINDSEY KENT SPRINGER** ("Defendant **SPRINGER**") was a resident of
the City of Kellyville, in the Northern District of Oklahoma.

2.     Defendant **SPRINGER** used the name Bondage Breakers Ministry to solicit
and receive money. Defendant **SPRINGER**'s stated purpose for Bondage Breakers Ministry
was "to get rid of the Internal Revenue Service."

3.     **OSCAR AMOS STILLEY** ("Defendant **STILLEY**") was an attorney residing
in Fort Smith, Arkansas.

1

37

4.      Defendant **STILLEY** maintained an Arkansas IOLTA Foundation Trust Account ("IOLTA account") at Arvest Bank; an IOLTA account is an interest-bearing account used to hold client funds.

5.      Defendants **SPRINGER** and **STILLEY** each earned income in various ways, including assisting individuals being investigated and prosecuted for federal tax violations. Defendant **SPRINGER** referred individuals to Defendant **STILLEY**, and provided assistance on many of these cases.

6.      Defendant **SPRINGER** last filed an individual income tax return with the Internal Revenue Service in the late 1980's.

7.      Defendant **STILLEY** last filed an individual income tax return with the Internal Revenue Service in the late 1980's.

## COUNT ONE
### [18 U.S.C. § 371]

8.      General Allegations paragraphs 1 through 7  are incorporated as if fully set forth herein.

### OBJECT OF THE CONSPIRACY

9.      Beginning in or about 2000, and continuing until on or about January 15, 2009, within the Northern District of Oklahoma, and elsewhere, Defendants **SPRINGER** and **STILLEY**, and others, both known and unknown to the Grand Jury, unlawfully and knowingly combined, conspired, confederated, and agreed together to defraud the United States by impeding, impairing, obstructing, and defeating the lawful government functions

2

of the Internal Revenue Service, an agency of the United States, in the ascertainment, computation, assessment, and collection of revenue, that is, federal individual income taxes.

## MANNER AND MEANS OF THE CONSPIRACY

The object of the conspiracy was to be accomplished, and was accomplished, through the following manner and means:

10.     Defendants **SPRINGER** and **STILLEY** would and did use Defendant **STILLEY**'s IOLTA account to conceal Defendant **SPRINGER**'s income, assets, and personal expenses;

11.     Defendant **SPRINGER** would and did use Defendant **STILLEY**'s credit card to pay Defendant **SPRINGER**'s personal expenses;

12.     Defendants **SPRINGER** and **STILLEY** would and did use cashier's checks, money orders, cash, and other means to avoid creating the usual records of financial transactions and to conceal Defendant **SPRINGER**'s income;

13.     Defendants **SPRINGER** and **STILLEY** would and did knowingly misrepresent the source and nature of Defendant **SPRINGER**'s income to Internal Revenue Service employees, the Grand Jury, and the Department of Justice; and

14.     Defendants **SPRINGER** and **STILLEY** would and did refrain from filing forms with the Internal Revenue Service, including Forms 1040 and 1099.

3

## OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY

In furtherance of the conspiracy and to effect the object thereof, Defendants **SPRINGER** and **STILLEY**, and others known and unknown to the Grand Jury, committed the following overt acts, among others, in the Northern District of Oklahoma and elsewhere:

15.    On or about September 16, 2005, Defendant **SPRINGER** told Internal Revenue Service employees that all funds he receives are gifts and donations, that he does not have any income, and that he does not provide any services for payment.

16.    On or about January 20, 2006, Defendant **STILLEY** stated to Internal Revenue Service employees that people give money to Defendant **SPRINGER** for his ministry, and expect no services in return.

17.    On or about March 9, 2006, Defendant **STILLEY** provided the Grand Jury with a document titled "RESPONSE TO SUBPOENA" stating that "LINDSEY SPRINGER does not charge for his services," and purporting to list "any money paid, given, transferred, or provided to LINDSEY SPRINGER for any purpose."

18.    On or about June 24, 2003, Defendant **STILLEY** caused to be deposited a check for $112,500 into his IOLTA account.

19.    On or about June 30, 2003, Defendant **STILLEY** caused to be written a check for $14,359 from his IOLTA account to Defendant **SPRINGER**.

20.    On or about July 21, 2003, Defendant **STILLEY** caused to be written a check for $35,000 from his IOLTA account to Defendant **SPRINGER**.

4

21.     On or about July 31, 2003, Defendant **STILLEY**, using funds from his IOLTA account,  purchased a $37,000 cashier's check for Defendant **SPRINGER**.

22.     On or about July 31, 2003, Defendant **SPRINGER** used the $37,000 cashier's check to purchase a Chevrolet Corvette.

23.     On or about November 6, 2003, Defendant **STILLEY** caused $375,059.90 to be transmitted to his IOLTA account.

24.     On or about November 7, 2003, Defendant **STILLEY** caused three cashier's checks payable to Defendant **SPRINGER** in the amount of $20,000 each to be issued from his IOLTA account.

25.     On or about  November 7, 2003, Defendant **STILLEY** purchased $18,000 in money orders for Defendant **SPRINGER** using funds from his IOLTA account.

26.     On or about August 8, 2005, Defendant **SPRINGER** sent an email to a third person containing the account number, routing number, and name of Defendant **STILLEY**'s IOLTA account.

27.     On or about August 11, 2005, Defendants **SPRINGER** and **STILLEY** caused $192,000 to be transmitted to Defendant **STILLEY**'s IOLTA account for Defendant **SPRINGER**.

28.     On or about August 15, 2005, Defendant **STILLEY** caused $166,000 to be transmitted from his IOLTA account for the purchase of a motor home titled in the name of Defendant **SPRINGER** and his wife.

5

29.     On or about August 18, 2005, Defendants **SPRINGER** and **STILLEY** caused $58,000 to be transmitted to Defendant **STILLEY**'s IOLTA account for Defendant **SPRINGER**.

30.     On or about August 26, 2005, Defendant **STILLEY** caused $5,560 to be transmitted from his IOLTA account to Oklahoma Truck and Trailer Sales for the purchase of a trailer titled in the name of Defendant **SPRINGER**.

31.     On or about September 1, 2005, Defendant **STILLEY** caused $25,813 to be transmitted from his IOLTA account to Lexus of Tulsa for the purchase of a Lexus titled in the name of Defendant **SPRINGER** and his wife.

32.     On or about September 19, 2005, Defendant **STILLEY** purchased two $10,000 cashier's checks payable to Defendant **SPRINGER** with funds from Defendant **STILLEY**'s IOLTA account.

33.     On or about November 9, 2005, Defendant **STILLEY** purchased a $10,000 cashier's check payable to Defendant **SPRINGER** with funds from Defendant **STILLEY**'s IOLTA account.

34.     On or about November 29, 2005, Defendant **STILLEY** purchased a $9,000 cashier's check payable to Defendant **SPRINGER** with funds from Defendant **STILLEY**'s IOLTA account.

35.    On or about December 9, 2005, Defendant **SPRINGER** caused $50,000 he earned from the sale of a motor home to be transmitted to Defendant **STILLEY**'s IOLTA account.

36.    On or about May 2, 2006, Defendant **STILLEY** caused to be written a $1,993.56 check from his IOLTA account to Defendant **SPRINGER**.

37.    On or about July 25, 2006, Defendant **STILLEY** caused to be deposited a $175,000 check in his IOLTA account.

38.    On or about August 3, 2006, Defendant **STILLEY** caused to be written a $25,000 check from his IOLTA account to Bondage Breakers Ministry.

39.    On or about January 15, 2009, Defendant **SPRINGER** represented that he earned no income and that the  money he received was given "without any expectation for anything from anybody."

All in violation of Title 18, United States Code, Section 371.

43

## COUNT TWO
### [26 U.S.C. § 7201]

40.   General Allegations paragraphs 1, 2, 5, and 6 are incorporated as if fully set forth herein.

41.   From on or about January 1, 2000, and continuing to on or about January 15, 2009, within the Northern District of Oklahoma and elsewhere, Defendant **SPRINGER** had and received taxable income, and upon that taxable income there was a substantial income tax due and owing.  Well knowing and believing the foregoing facts, Defendant **SPRINGER** did willfully attempt to evade and defeat the individual income taxes due and owing by him to the United States of America for the calendar year 2000, by failing to file a United States Individual Income Tax Return as required by law, and by committing various affirmative acts of evasion, including:  receiving income in a fictitious name; directing individuals to write "donation" or "gift" on checks that were payment for services; directing individuals to pay for services by cashier's check; using a check-cashing business to cash checks; using money orders, cash, and other means to avoid creating the usual records of financial transactions and to conceal his income;  making false statements to agents and employees of the Internal Revenue Service; and, otherwise concealing and attempting to conceal from all proper officers of the United States of America his true and correct income.

All in violation of Title 26, United States Code, Section 7201.

8

44

## COUNT THREE
### [26 U.S.C. § 7201 and 18 U.S.C. § 2]

42.     General Allegations paragraphs 1 through 7 are incorporated as if fully set forth herein.

43.     From on or about January 1, 2003, and continuing to on or about January 15, 2009, within the Northern District of Oklahoma and elsewhere, Defendant **SPRINGER** had and received taxable income, and upon that taxable income there was a substantial income tax due and owing.   Well knowing and believing the foregoing facts, Defendants **SPRINGER** and **STILLEY** did willfully attempt to evade and defeat the individual income taxes due and owing by Defendant **SPRINGER** to the United States of America for the calendar year 2003, by failing to file a United States Individual Income Tax Return as required by law, and by committing various affirmative acts of evasion.   Defendant **SPRINGER** committed the following affirmative acts of evasion:   directing individuals to make checks payable to Bondage Breakers Ministry; using a check-cashing business to cash checks; and accepting collectible coins as payment for services.   Defendants **SPRINGER** and **STILLEY** committed, and aided and abetted the commission of, the following affirmative acts of evasion: using Defendant **STILLEY**'s IOLTA account; using Defendant **STILLEY**'s credit card to pay Defendant **SPRINGER**'s personal expenses; using cashier's checks, money orders, cash, and other means to avoid usual records and to conceal income; making false statements to agents and employees of the Internal Revenue Service; and,

otherwise concealing and attempting to conceal from all proper officers of the United States

of America Defendant **SPRINGER**'s true and correct income.

All in violation of Title 26, United States Code, Section 7201 and Title 18, United

States Code Section 2.

10

## COUNT FOUR
### [26 U.S.C. § 7201 and 18 U.S.C. § 2]

44.   General Allegations paragraphs 1 through 7 are incorporated as if fully set forth herein.

45.   From on or about January 1, 2005, and continuing to on or about January 15, 2009, within the Northern District of Oklahoma and elsewhere, Defendant **SPRINGER** had and received taxable income, and upon that taxable income there was a substantial income tax due and owing.   Well knowing and believing the foregoing facts, Defendants **SPRINGER** and **STILLEY** did willfully attempt to evade and defeat the individual income taxes due and owing by Defendant **SPRINGER** to the United States of America for the calendar year 2005, by failing to file a United States Individual Income Tax Return despite earning income of sufficient amount to require the filing of an individual income tax return, and by committing various affirmative acts of evasion.   Defendant **SPRINGER** committed the following affirmative acts of evasion:   directing individuals to make checks payable to Bondage Breakers Ministry; and using a check-cashing business to cash checks.   Defendants **SPRINGER** and **STILLEY** committed, and aided and abetted the commission of, the following affirmative acts of evasion:   using Defendant **STILLEY**'s IOLTA account; using Defendant **STILLEY**'s credit card to pay Defendant **SPRINGER**'s personal expenses; using cashier's checks, money orders, cash, and other means of payment to avoid usual records and to conceal income; making false statements to agents and employees of the Internal Revenue

47

Service; and, otherwise concealing and attempting to conceal from all proper officers of the

United States of America Defendant **SPRINGER**'s true and correct income.

All in violation of Title 26, United States Code, Section 7201, and Title 18, United

States Code Section 2.

12

## COUNT FIVE
### [26 U.S.C. § 7203]

46.     General Allegations paragraphs 1, 2, 5, and 6 are incorporated as if fully set forth herein.

47.     During the calendar year 2002, Defendant **SPRINGER** had and received gross income in excess of $7,700.  By reason of such gross income, he was required by law, following the close of the calendar year 2002 and on or before April 15, 2003 to make an income tax return to the Internal Revenue Service Center, at Austin, Texas, to a person assigned to receive returns at the local office of the Internal Revenue Service at Tulsa, Oklahoma, or to another Internal Revenue Service office permitted by the Commissioner of Internal Revenue, stating specifically the items of his gross income and any deductions and credits to which he was entitled. Well knowing and believing all of the foregoing, he did willfully fail, on or about April 15, 2003, in the Northern District of Oklahoma and elsewhere, to make and file an income tax return.

All in violation of Title 26, United States Code, Section 7203.

13

## COUNT SIX
### [26 U.S.C. § 7203]

48.    General Allegations paragraphs 1, 2, 5 and 6 are incorporated as if fully set forth herein.

49.    During the calendar year 2004, Defendant **SPRINGER** had and received gross income totaling in excess of $15,900.  By reason of that gross income, he was required by law, following the close of the calendar year 2004 and on or before April 15, 2005 to make an income tax return to the Internal Revenue Service Center, at Austin, Texas, to a person assigned to receive returns at the local office of the Internal Revenue Service at Tulsa, Oklahoma, or to another Internal Revenue Service office permitted by the Commissioner of Internal Revenue, stating specifically the items of his gross income and any deductions and credits to which he was entitled.  Well knowing and believing all of the foregoing, he did willfully fail, on or about April 15, 2005, in the Northern District of Oklahoma and elsewhere, to make and file an income tax return.

All in violation of Title 26, United States Code, Section 7203.

DAVID E. O'MEILIA
UNITED STATES ATTORNEY

CHARLES A. O'REILLY
Trial Attorney, Tax Division
United States Department of Justice

KENNETH P. SNOKE
Assistant United States Attorney

A TRUE BILL

*/s/ Grand Jury Foreperson*
Grand Jury Foreperson

14

AO 245B (Rev. 09/08) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

| NORTHERN | District of | OKLA. |
|---|---|---|

FILED
Apr 28 2010
Mark C. McCartt, Clerk

| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL** |
|---|---|
| **V.** | |
| OSCAR AMOS STILLEY | Case Number: 09-CR-043-002-SPF |
| | USM Number: 10579-062 |
| | Oscar Amos Stilley, Pro Se |
| | Charles Robert Burton, IV, Standby Counsel |
| | Defendant's Attorney |

## THE DEFENDANT:

[] pleaded guilty to count(s) _____

[] pleaded nolo contendere to count(s) _____
   which was accepted by the court.

[x] was found guilty on counts     One, Three, and Four of the Indictment
    after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 371 | Conspiracy to Defraud the United States | 1/15/09 | 1 |
| 26 U.S.C. § 7201 and 18 U.S.C. § 2 | Tax Evasion and Aiding and Abetting | 1/15/09 | 3 |
| 26 U.S.C. § 7201 and 18 U.S.C. § 2 | Tax Evasion and Aiding and Abetting | 1/15/09 | 4 |

The defendant is sentenced as provided in pages 2 through ___6___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

[] The defendant has been found not guilty on count(s) _____

[] Count(s) _____ [] is  [] are  dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the Court and United States Attorney of material changes in economic circumstances.

April 23, 2010
Date of Imposition of Judgment

Signature of Judge

The Honorable Stephen P. Friot, U.S. District Judge
Name and Title of Judge

April 28, 2010
Date

51

AO 245B    (Rev. 09/08) Judgment in Criminal Case
           Sheet 2 — Imprisonment

Judgment — Page __2__ of __6__

DEFENDANT:        Oscar Amos Stilley
CASE NUMBER:      09-CR-043-002-SPF

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:    180 months.  Sixty months as to each of Counts One, Three, and Four, all such terms to run consecutively to each other.

[x]    The court makes the following recommendations to the Bureau of Prisons:

    The Court directs the Bureau of Prisons not to incarcerate the defendant with his co-defendant, Lindsey Kent Springer (USM Number 02580-063).

[x]    The defendant is remanded to the custody of the United States Marshal.

[]    The defendant shall surrender to the United States Marshal for this district:

    []    at _____    []  a.m.   []  p.m.   on  _____ .

    []    as notified by the United States Marshal.

[]    The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    []    before 12 noon on  _____ .

    []    as notified by the United States Marshal.

    []    as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:




Defendant delivered on  _____    to  _____

at  _____ , with a certified copy of this judgment.


          _____
          UNITED STATES MARSHAL


    By  _____
          DEPUTY UNITED STATES MARSHAL

AO 245B    (Rev. 09/08) Judgment in a Criminal Case
Sheet 3 — Supervised Release

Case 4:09-cr-00043-SPF   Document 338   Filed 04/28/10   Page 3 of 6
Appellate Case: 11-5123   Document: 27-1   Date Filed: 01/06/2012   Page: 688

Judgment—Page ___3___ of ___6___

DEFENDANT:      Oscar Amos Stilley
CASE NUMBER:    09-CR-043-002-SPF

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of : Three years.  Said term consists of three years as to each of Counts One, Three, and Four.  These terms of supervised release shall run concurrently, each with the others.

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance.  The defendant shall refrain from any unlawful use of a controlled substance.  The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

[]   The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse, but authority to administer drug testing for cause is retained. (Check, if applicable.)

[x]   The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

[x]   The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

[]   The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prison, or any state sex offender registration agency in which he or she resides, works, or is a student, or was convicted of a qualifying offense. (Check, if applicable.)

[]   The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

     If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

     The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

# STANDARD CONDITIONS OF SUPERVISION

1.   The defendant shall not leave the judicial district or other specified geographic area without the permission of the court or probation officer.
2.   The defendant shall report to the probation officer as directed by the court or probation officer and shall submit a truthful and complete written report within the first five days of each month.
3.   The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer.
4.   The defendant shall support the defendant's dependents and meet other family responsibilities (including, but not limited to, complying with the terms of any court order or administrative process pursuant to the law of a state, the District of Columbia, or any other possession or territory of the United States requiring payments by the defendant for the support and maintenance of any child or of a child and the parent with whom the child is living).
5.   The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons.
6.   The defendant shall notify the probation officer at least ten days prior to any change of residence or employment.
7.   The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance, or any paraphernalia related to any controlled substance, except as prescribed by a physician.
8.   The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered, or other places specified by the court.
9.   The defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer.
10.  The defendant shall permit a probation officer to visit the defendant at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer.
11.  The defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer.
12.  The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court.
13.  As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement  (any objection to such notification shall be decided by the district court).
14.  The defendant shall pay the special assessment imposed or adhere to a court-ordered installment schedule for the payment of the special assessment.
15.  The defendant shall notify the probation officer of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay any unpaid amount of restitution, fines, or special assessments.

DEFENDANT:      Oscar Amos Stilley
CASE NUMBER:    09-CR-043-002-SPF

## SPECIAL CONDITIONS OF SUPERVISION

1.  The defendant shall submit his person, residence, office or vehicle to a search, conducted by the United States Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release; failure to submit to a search may be grounds for revocation; the defendant shall warn any other residents that the premises may be subject to searches pursuant to this condition.

2.  The defendant shall abide by the "Special Financial Conditions" previously adopted by the Court, as follows:

    1.  The defendant shall maintain a checking account in the defendant's name and deposit into this account all income, monetary gains or other pecuniary proceeds, and make use of this account for payment of all personal expenses. All other bank accounts must be disclosed to the probation officer.

    2.  The defendant shall not make application for any loan or enter into any credit arrangement, without first consulting with the probation officer.

    3.  The defendant shall disclose all assets and liabilities to the probation officer. The defendant shall not transfer, sell, give-away, or otherwise convey any asset, without first consulting with the probation officer.

    4.  If the defendant owns or maintains interest in any profit or nonprofit entity, you shall, upon request, surrender and/or make available for review, any and all documents and records of said profit or nonprofit entity to the probation officer.

    5.  The defendant shall, upon request of the probation officer, complete a personal financial affidavit and authorize release of any and all financial information, to include income and tax return records, by execution of a Release of Financial Information form, or by any other appropriate means.

3.  The defendant shall abide by the "Special Computer Restriction Conditions" previously adopted by the Court, as follows:

    1.  The defendant shall disclose all e-mail accounts, Internet connections and Internet connection devices, including screen names and passwords, to the probation officer; and shall immediately advise the probation officer of any changes in his or her e-mail accounts, connections, devices, or passwords.

    2.  The probation officer shall have authority to monitor all computer activity, to include all e-mail or Internet connections, to include but not limited to installation of remote monitoring software. Unless waived by the probation officer, the cost of remote monitoring software shall be paid by the defendant.

    3.  The defendant shall not access any on-line service using an alias, or access any on-line service using the Internet account, name, or designation of another person or entity; and report immediately to the probation officer access to any Internet site containing prohibited material.

    4.  The defendant is prohibited from using any form of encryption, cryptography, stenography, compression, password-protected files or other methods that limit access to, or change the appearance of, data and/or images.

    5.  The defendant is prohibited from altering or destroying records of computer use, including the use of software or functions designed to alter, clean or "wipe"computer media, block monitoring software, or restore a computer to a previous state.

    6.  If instructed, the defendant shall provide all personal and business telephone records and credit card statements to the probation officer

4.  While on supervision, the defendant shall cooperate with the IRS in preparing and filing true and correct income tax returns for any tax years since 1987 for which the defendant has not filed a tax return; cooperate with the IRS in civil proceedings to determine accurately his tax liabilities for the same years; establish a payment schedule with the IRS and pay all taxes, interest, and penalties owed in connection with his tax debt according to the payment schedule set by the IRS.

5.  The defendant shall not engage in any activity that would constitute the unauthorized or unlicensed practice of law, nor provide representation or services of any kind, advice, suggestions, or recommendations, whether paid or not, to any person or entity, public or private, other than immediate family members, with respect to any matter relating to federal or state taxation. The defendant will maintain no website that refers to any matter relating to federal or state taxation. The defendant will post no material of any kind on any website that refers to any matter relating to federal or state taxation. The defendant will not file, without the expressed written permission of the Probation Office, any civil action relating to federal income tax.

6.  The defendant shall not work directly or indirectly in any business, profession, or self-employment engaged in the offer, sale, purchase, trade, brokering, solicitation, or similar transactions with respect to any real property, securities or negotiable instruments. The defendant will not engage in telemarketing activities, to include any telephone sales or other such business, campaign, venture, or transaction. The defendant shall maintain employment. All employment must be approved in advance by the Probation Officer. The defendant shall abide by electronic monitoring, curfew requirements, and travel restrictions.

7.  If instructed by the Probation Officer, the defendant shall provide originals or copies of all personal and business telephone phone records and all credit card, checking account and PayPal statements to the U.S. Probation Officer.

8.  The defendant shall report to the Probation Officer the particulars, as specified by the Probation Officer, of all transactions consummated with a check cashing service. These reports shall be made within 10 calendar days after completion of any such transaction. The defendant shall refrain from transacting business with any check cashing service if so directed by the Probation Officer.

9.  The defendant shall disclose all email accounts, Pay Pal accounts, internet connections and communication devises, to include all screen names and passwords. Your use of email, internet connections, or an internet connection service will be restricted and/or monitored by monitoring software and otherwise, with the costs of remote computer monitoring to be paid by the defendant. The defendant will be prohibited from accessing any on-line service using an alias or the internet account, name or designation or another person or entity. The defendant will be prohibited from altering or using any form of encryption or other methods that limit access to, or change, the appearance of data or images. The defendant will be prohibited from altering or destroying records of computer use.

54

DEFENDANT:           Oscar Amos Stilley
CASE NUMBER:         09-CR-043-002-SPF

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Fine | Restitution |
|---|---|---|---|
| TOTALS | $ 300<br>($100 as to each of Counts<br>One, Three, and Four) | $ N/A | $ 776,280 |

[ ]  The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

[x]  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| IRS-RACS<br>Attention: Mail Stop 6261<br>Restitution<br>333 West Pershing Ave.<br>Kansas City, Missouri 64108 | | $ 684,653 | |
| Arkansas Department<br>of Finance<br>and Administration Income<br>Tax Administration<br>P.O. Box 3628<br>Little Rock, Arkansas 72203 | | $ 91,627 | |
| TOTALS | $            0 | $        776,280 | |

[ ]  Restitution amount ordered pursuant to plea agreement  $  _____

[ ]  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

[ ]  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    [ ]  the interest requirement is waived for the        [ ]  fine   [ ]  restitution.

    [ ]  the interest requirement for the        [ ]  fine   [ ]  restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

DEFENDANT:    Oscar Amos Stilley
CASE NUMBER:    09-CR-043-002-SPF

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

**A**    []    Lump sum payment of $ _____ due immediately, balance due

     []   not later than _____ , or
     []   in accordance with   []   C,   []   D,   []   E, or   [] F below; or

**B**    []    Payment to begin immediately (may be combined with   []   C,   []   D, or   [] F below); or

**C**    []    Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
     _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D**    []    Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
     _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
     term of supervision; or

**E**    []    Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
     imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**    [x]    Special instructions regarding the payment of criminal monetary penalties:

     Any criminal monetary penalty is due in full immediately, but payable on a schedule of the greater of $25 quarterly or 50% of income
     pursuant to the Federal Bureau of Prisons' Inmate Financial Responsibility Program while in prison. If a monetary balance remains,
     payment is to commence no later than 60 days following release from imprisonment to a term of supervised release in equal monthly
     payments of $100 or 10% of net income (take home pay), whichever is greater, over the duration of the term of supervised release
     and thereafter as prescribed by law for as long as some debt remains. Notwithstanding establishment of a payment schedule, nothing
     shall prohibit the United States from executing or levying upon property of the defendant discovered before or after the date of this
     Judgment.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

[]    Joint and Several

     Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount,
     and corresponding payee, if appropriate.

[]    The defendant shall pay the cost of prosecution.
[]    The defendant shall pay the following court cost(s):
[]    The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.



# FILED

AUG 2 4 2022

Mark C. McCartt, Clerk
U.S. DISTRICT COURT

| Prob 22 (12/2018)           | TRANSFER OF JURISDICTION | DOCKET NUMBER (Tran Court)<br>09-CR-043-002-SPF |
|---|---|---|
| | | DOCKET NUMBER (Rec Court)<br>CR-22-357-001-F |

| NAME AND ADDRESS OF PROBATIONER RELEASEE:<br><br>OSCAR AMOS STILLEY | DISTRICT<br>Northern District of Oklahoma | DIVISION<br>United States Probation Office |
|---|---|---|
| | NAME OF SENTENCING JUDGE<br><br>The Honorable Stephen P. Friot | |

| | DATES OF:<br><br>☐ PROBATION<br>☒ SUPERVISED RELEASE | From Date<br>8/10/2022 | To Date<br>8/9/2025 |
|---|---|---|---|

**OFFENSE**

| 18 U.S.C. § 371 | Conspiracy to Defraud the United States |
|---|---|
| 26 U.S.C. § 7201 and 18 U.S.C. § 2 | Tax Evasion and Aiding and Abetting |
| 26 U.S.C. § 7201 and 18 U.S.C. § 2 | Tax Evasion and Aiding and Abetting |

**PART 1 - ORDER TRANSFERRING JURISDICTION**

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OKLAHOMA

   IT IS HEREBY ORDERED that pursuant to 18 U.S.C. § 3605 the jurisdiction of the probationer releasee named above be transferred with the records of the Court to the United States District Court for the WESTERN DISTRICT OF OKLAHOMA upon that Court's order of acceptance of jurisdiction.   This Court hereby expressly consents that the period of probation release may be changed by the District Court to which this transfer is made without further inquiry of this Court.*

| _____August 24, 2022_____<br>Date | _____<br>Stephen P. Friot, United States District Judge |
|---|---|

* This sentence may be deleted in the discretion of the transferring Court.

**PART 2 - ORDER ACCEPTING JURISDICTION**

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

   IT IS HEREBY ORDERED that jurisdiction over the above-named probationer releasee be accepted and assumed by this Court from and after the entry of this order.

| _____August 24, 2022_____<br>Effective Date | _____<br>United States District Judge |
|---|---|

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA                                    PLAINTIFF

v.                              Case No. 4:09-CR-043 SPF

OSCAR AMOS STILLEY                                          DEFENDANT


DEFENDANT OSCAR STILLEY'S MOTION FOR DISCLOSURE OF LEGAL
AUTHORITY FOR STEPHEN P. FRIOT TO PRESIDE IN THIS CASE

Comes now Defendant Oscar Stilley (Stilley) and for his motion states:

1.      Stephen P. Friot is a duly authorized district court judge for the Western

District of Oklahoma.

2.      Judge Friot is not a duly authorized district court judge for the Northern

District of Oklahoma.  He has never been nominated by the president, or confirmed

by the senate, for any judicial office in the Northern District of Oklahoma.

3.      Judge Friot apparently was assigned to this case on the authority of an order

called "Misc. #23."

4.      Misc. #23 by its terms expired on the last day of 2009.

5.      The District Court, in the person of Stephen P. Friot, was divested of

jurisdiction by the appeals of the defendants.

6.      On information and belief, neither "Misc. #23," nor any subsequent similar

version of same, has been in effect since this District Court was divested of

jurisdiction by the notices of appeal of Defendants.

7.      Stilley respectfully inquired of this court's jurisdiction in Docket 702.  Judge

Friot acknowledged this request in the order disposing of this motion.  Dkt. 719, pg.

1.

8.      Judge Friot at page 4 of Docket 719 said he didn't have jurisdiction, and

"dismissed" Docket 702.

9.      However, Judge Friot never answered the question about whether or not he

had any lawful authorization to preside, whether statutory or otherwise.

10.     Nobody has ever explained how Stephen P. Friot could be re-vested with

jurisdiction, after the conclusion of the appeal and the return of mandates, without

a current and valid authorization similar to that set forth in Misc. #23.

11.     On information and belief, Stephen P. Friot was never given authorization to

preside over this case after jurisdiction returned to the district court, when the

mandate was sent to district court from the 10th Circuit Court Clerk.

12.     On information and belief, Judge Friot, as a judge of the Western District of

Oklahoma but not of the Northern District of Oklahoma, does not have

authorization to preside over this case, at the present time.

13.     On information and belief, no order or official document authorized Judge

Friot to perform any official act in this case after the mandate was filed in this case

12/06/2011, Dkt. 462, and 12-20-2011, Dkt. 463.

14.     Stilley has called the clerks of both the Northern District of Oklahoma, and

the 10th Circuit, about these issues.

15.    Neither Stilley nor the clerk's office personnel to whom Stilley spoke are able to find a successor version of Misc. #23, in the court clerk files.

16.    Stilley is not able to find a successor version of Mis. #23 on the websites of the clerk's office of the Northern District of Oklahoma or the 10th Circuit.

17.    Neither Stilley nor the clerk's office personnel to whom Stilley spoke are able to determine whether or not any statute authorized the vesting of judicial authority in Judge Friot, subsequent to the filing of the mandates from the 10th Circuit Court.

18.    Therefore it appears that Judge Friot has not been legally authorized to preside or act in the captioned case, since the filing of the aforementioned mandates from the 10th Circuit Court.

WHEREFORE, Stilley respectfully requests a prompt and full rendition of all statutes or authorities whatsoever, providing Stephen P. Friot legal authorization to preside over this case after the expiration date of Misc. #23, December 31, 2009, and furthermore after the return of mandates from the 10th Circuit; and for such other and further relief as may be appropriate whether or not specifically requested.

Respectfully submitted.

3

By: /s/ Oscar Stilley                      September 11, 2022
Oscar Stilley                              Date
10600 N Highway 59
Cedarville, AR 72932-9246
479.384.2303 mobile
479.401.2615 fax
oscarstilley@gmail.com


CERTIFICATE OF SERVICE

Defendant Stilley hereby certifies that on the date stated above he electronically
filed the foregoing with the Clerk of the Court by using the CM/ECF system,
thereby serving all persons having ECF privileges and entitled to service in this
case.  Stilley does not have access to Lindsey Springer's physical address, email,
and phone number, and thus cannot serve him.

4

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **-vs-** ) | **Case No. 09-cr-0043-2-SPF** |
| ) | |
| **OSCAR AMOS STILLEY,** ) | |
| ) | |
| **Defendant.** ) | |

## <u>ORDER</u>

Before the court is a motion filed by defendant Oscar Amos Stilley, doc. no.
735.  The motion inquires as to the authority of the undersigned to preside in this
case.  The government need not respond to the motion.  The arguments set forth in
the motion are without merit.  And, although the court ordinarily does not answer
legal questions posed more or less in the abstract by litigants, the court sees no harm
in informing Mr. Stilley that the authority of the undersigned to preside in this matter
is (and has been, since the inception of this case) established by the cross-designation
order entered annually by the Chief Judge of the United States Court of Appeals for
the Tenth Circuit.   The most recent such order was entered by Chief Judge
Timothy M. Tymkovich on December 9, 2021.   The completion of appellate
proceedings in this case eliminated any possible issues as to the authority of the
District Court to proceed.[1]  Thus, although the arguments set forth in the motion are
rejected, the motion is **GRANTED** to the extent set forth above, and otherwise

---

[1] The extent to which the pendency of appellate proceedings divests the District Court of jurisdiction to
address matters pending before it is, in any event, a matter as to which there can be great variation,
depending on the circumstances and status of the proceedings in the trial court and the appellate court.

**DENIED**.  As Mr. Stilley is aware, his supervision on supervised release has been transferred to the Western District of Oklahoma.  There is a possible issue as to whether that transfer was authorized by statute or otherwise.  It is anticipated that that matter will be addressed and promptly resolved in the Western District proceedings.

The clerk of this court is **DIRECTED** to provide a copy of this order to the assigned (or previously assigned) probation officers in the Western District and the Northern District.

DATED this 20ᵗʰ day of September, 2022.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

09-0043p174 (Stilley) .docx

# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**      ) | |
| ) | |
| **Plaintiff,**      ) | |
| ) | |
| -vs-      ) | **Case No. 09-cr-0043-2-SPF** |
| ) | |
| **OSCAR AMOS STILLEY,**      ) | |
| ) | |
| **Defendant.**      ) | |

## ORDER

The defendant, Oscar Amos Stilley (herein: defendant), commenced his term of supervised release on August 10, 2022. Thereafter, jurisdiction over the defendant, as a releasee, was transferred to the Western District of Oklahoma. The Western District of Oklahoma has now re-transferred jurisdiction to this court.

IT IS HEREBY ORDERED that jurisdiction over the defendant releasee is accepted and assumed by this court from and after the date of entry of this order. This order shall have the same effect as a Probation form 22 transfer ("Transfer of Jurisdiction").

DATED this 3rd day of November, 2022.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

09-0043p175 (Stilley) .docx

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA                                    PLAINTIFF

v.                              Case No. 4:09-CR-043 SPF

OSCAR AMOS STILLEY                                          DEFENDANT

### DEFENDANT OSCAR STILLEY'S MOTION FOR AN INITIAL APPEARANCE, WITH INCLUDED SUPPORTING BRIEF

Comes now Defendant Oscar Stilley (Stilley) and for his motion states:

1.      This Court on November 4, 2022 set a hearing for revocation and sentencing, to be held November 21, 2022 at 10:30 AM.  No specific mention was made of an initial appearance within the contemplation of applicable rules.

2.      FRCrP 32.1(a)(2) requires an initial appearance before a magistrate judge.

3.      Various constitutional, statutory, and rule-based protections require as a practical matter that an initial appearance be conducted.

4.      An initial appearance must be set and conducted a reasonable time prior to any revocation hearing, in order to make the underlying constitutional rights meaningful.

5.      Stilley works for a non-profit organization at low pay.

6.      The trip to Tulsa takes about 2 hours.  Stilley drives an old car.  In case of any trip in which immediate remand is a possibility, however remote, prudence dictates bringing a driver, to ensure that the car doesn't go to impound.

7.      Early afternoon settings will allow Stilley to reasonably make the trip without overnight accommodations, the cost of which Stilley can ill afford.

8.    Stilley has inquired of counsel for the government as to their position.  They don't object to an initial appearance because it is required by the rules.  They object to any continuance, explaining that "[A]ny change to a later date or time would be a continuance in my view; however, I defer to the Court's calendar and discretion as to scheduling this matter."

**BRIEF IN SUPPORT OF MOTION**

FRCrP 32.1(a)(2) requires an initial appearance for persons summoned to answer for an alleged violation of the terms of supervised release.  Other provisions of the rule set forth requirements that demonstrate clearly that the purposes of the rule require an initial hearing a reasonable time prior to any revocation or sentencing hearing.

The rule calls for a hearing before a magistrate.  This will contribute to judicial economy, since a magistrate of the Northern District of Oklahoma will be in the courthouse, and won't have to travel from Oklahoma City.

Counsel for the government say that they agree to the initial appearance but oppose any continuance.  However, an initial appearance renders a continuance *of the currently set hearing* inescapable.  This Court set a revocation and sentencing hearing for November 21, 2022.  It is impossible to lawfully conduct such a hearing without *first* conducting an initial appearance.  Indeed, the most logical time and place to discuss a subsequent setting, of whatever kind and character, would be at the initial appearance.  In such case, all parties can be heard as to their schedules and legal positions with respect to upcoming hearings.

2

This sounds like a preference that the Court will set the initial appearance at the same time as the currently scheduled proceedings. At the present time, the place of the hearing hasn't been determined. There is no reason to believe that the current date and time for the hearing would necessarily be convenient for the randomly assigned magistrate judge.

The holiday season is upon us. Stilley needs a reasonable amount of time to prepare for an initial appearance. Stilley would respectfully propose that the initial appearance before a magistrate judge be set some time in early to mid-December, 2022.

WHEREFORE, Stilley respectfully requests an order directing the Clerk to randomly select a magistrate judge of the Northern District of Oklahoma, and set or cause to be set an initial appearance in early to mid-December 2022, for early afternoon; and for such other and further relief as may be appropriate whether or not specifically requested.

Respectfully submitted,

By: /s/ Oscar Stilley                    November 16, 2022
Oscar Stilley                            Date
10600 N Highway 59
Cedarville, AR 72932-9246
479.384.2303 mobile
479.401.2615 fax
oscarstilley@gmail.com

CERTIFICATE OF SERVICE

3

Defendant Stilley hereby certifies that on the date stated above he electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, thereby serving all persons having ECF privileges and entitled to service in this case. Stilley does not have access to Lindsey Springer's physical address, email, and phone number, and thus cannot serve him.

# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| -vs- ) | **Case No. 09-cr-0043-2-SPF** |
| ) | |
| **OSCAR AMOS STILLEY,** ) | |
| ) | |
| **Defendant.** ) | |

## <u>ORDER</u>

Before the court is Defendant Oscar Stilley's Motion for an Initial Appearance, doc. no. 741, filed on November 16, 2022.

For the reasons set forth below, the motion will be denied.

Rule 32.1 of the Federal Rules of Criminal Procedure states, in relevant part, as follows:

> **(2) Upon a Summons.** When a person appears in response to a summons for violating probation or supervised release, a magistrate judge must proceed under this rule.

> **(3) Advice.** The judge must inform the person of the following:

> **(A)** the alleged violation of probation or supervised release;

> **(B)** the person's right to retain counsel or to request that counsel be appointed if the person cannot obtain counsel; and

> **(C)** the person's right, if held in custody, to a preliminary hearing under Rule 32.1(b)(1).

The purposes of the rule are satisfied where the defendant "possessed all the information that would have been provided to him at an initial appearance." <u>United States v. Griggs</u>, 130 Fed. Appx. 303, at 305 (11th Cir. 2005).

The Ninth Circuit reached the same conclusion under similar circumstances in <u>United States v. Vasquez-Perez</u>, 742 F.3d 896, at 900 (9th Cir. 2014):

> The petition alleged that he violated the terms of his supervised release by committing a crime. Specifically, it contended that Vasquez-Perez violated 8 U.S.C. § 1326 by illegally reentering the United States near Quijota, Arizona on or before August 21, 2011. The revocation petition properly identified the statute Vasquez-Perez was charged with violating and alleged the underlying facts. Accordingly, we are persuaded that Vasquez-Perez was provided proper notice of the alleged violation of his supervised release.

*See also*, <u>United States v. Wimberly</u>, 368 Fed. Appx. 556, at 557 (5th Cir. 2010) (The rule is satisfied where the offender was either "aware of or was granted the Rule 32.1 protections of which he would have been admonished at an initial appearance.").

In the case at bar, Mr. Stilley, who once was a practicing lawyer, is well aware of the factual circumstances asserted to provide a basis for revocation of his supervised release. He has long since been provided the documents from which he is well able to discern the precise nature of the asserted violations. He is also obviously aware, by his mere citation to Rule 32.1 (if nothing else), of his right to retain counsel or to request that counsel be appointed.

Accordingly, the court quite readily concludes that the purposes of Rule 32.1(a) have been fully satisfied. For that reason, the motion, doc. no. 741, is **DENIED**.

DATED this 16th day of November, 2022.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

09-0043p176 (Stilley) .docx

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA                                        PLAINTIFF

v.                                    Case No. 4:09-CR-043 SPF

OSCAR AMOS STILLEY                                              DEFENDANT

**DEFENDANT OSCAR STILLEY'S MOTION TO REAPPOINT ROBERT BURTON IV AS STANDBY COUNSEL, WITH INCLUDED SUPPORTING BRIEF**

Comes now Defendant Oscar Stilley (Stilley) and for his motion states:

1.    This Court appointed Robert Burton, IV as standby counsel for Stilley before, after, and during trial.

2.    Stilley requests that Mr. Burton be appointed as standby counsel for the revocation proceedings.

3.    Stilley does not agree to any other attorney without prior consultation.

4.    Stilley does not agree to any capacity, save standby, without prior consultation.

5.    If Mr. Burton is for any reason unavailable or unwilling to serve as standby counsel, Stilley requests that this Court inform Stilley of the options that he has, if any, with respect to the question of counsel.

6.    To the extent not contrary to law or rule or Stilley's legal interests, Stilley incorporates all other motions and briefs filed on the same day as this pleading, as if set forth herein word for word.  Stilley reserves and claims the right to rely on any other part of the official record in the captioned case, from the filing of the first

docket item forward, as defined by Federal Rule of Appellate Procedure (FRAP) 10(a), in support of his claims and arguments.

WHEREFORE, Stilley respectfully requests an order appointing Robert Burton, IV, as standby counsel for the duration of these revocation proceedings; that if this request is denied for any reason, Stilley be informed of the options available to him with respect to the issue of counsel; and for such other and further relief as may be appropriate whether or not specifically requested.

### BRIEF IN SUPPORT OF MOTION

FRCrP 32.1 (a)(3)(B) suggests that persons facing revocation are entitled to retained or appointed counsel.  Otherwise it would seem very odd that the rule requires the supervisee to be so informed.  Caselaw says that revocation of supervised release is part of the punishment for the original crime.  If that is the case, it makes sense the supervisee would be entitled to 6th Amendment counsel, or perhaps to counsel under some other legal provision.

This Court seemed to be very pleased with the performance of Mr. Burton, and allowed over $90,000 of legal fees.  Mr. Burton has familiarity with the proceedings before, during, and after jury trial. Mr. Burton should have an advantage over a lawyer with no prior knowledge of the case.

Stilley has very little experience with revocation of supervised release.

Therefore, if for whatever reason Stilley cannot have Robert Burton IV as standby

counsel, he requests that he be informed of the options available to him.


Respectfully submitted,

By: /s/ Oscar Stilley                    November 20, 2022
Oscar Stilley                            Date
10600 N Highway 59
Cedarville, AR 72932-9246
479.384.2303 mobile
479.401.2615 fax
oscarstilley@gmail.com

## CERTIFICATE OF SERVICE

Defendant Stilley hereby certifies that on the date stated above he electronically
filed the foregoing with the Clerk of the Court by using the CM/ECF system,
thereby serving all persons having ECF privileges and entitled to service in this
case.  Stilley does not have access to Lindsey Springer's physical address, email,
and phone number, and thus cannot serve him.

3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA                                    PLAINTIFF

v.                              Case No. 4:09-CR-043 SPF

OSCAR AMOS STILLEY                                          DEFENDANT

**DEFENDANT OSCAR STILLEY'S MOTION TO QUASH THE
SUMMONS AND STRIKE ALL OTHER DOCUMENTS FROM THE
WESTERN DISTRICT OF OKLAHOMA AND DISMISS FOR LACK OF
JURISDICTION, WITH INCLUDED SUPPORTING BRIEF**

Comes now Defendant Oscar Stilley (Stilley) and for his motion states:

1.      This Court on 8-24-2022 without notice or opportunity to be heard entered

an order purporting to transfer jurisdiction over this case to the Western District of

Oklahoma (OKWD).  Dkt. 733.

2.      This Court on 9-20-2022 entered an order fixing a briefing schedule for any

challenge to jurisdiction in the OKWD.  OKWD 5:22-cr-357-F, Dkt. 13.

3.      This Court on page 1 of that order stated that "[I]f the court concludes that

the transfer was not authorized by statute, the transfer will be vacated and the

matter will proceed in the Northern District (with the undersigned presiding

pursuant to cross-designation.) "

4.      Stilley filed a challenge jurisdiction in the OKWD.  OKWD 5:22-cr-357-F,

Dkt. 14, a motion to vacate docket #1, the transfer order.  A supporting brief was

filed.  OKWD 5:22-cr-357-F Dkt. 15.

5.      Stephen P. Friot, in his capacity as an OKWD district judge, on 11-3-2022

stated that he was "…not sufficiently satisfied that the transfer from the Northern

District to the Western District was statutorily authorized. …"  Id., OKWD 5:22-cr-357-F Dkt. 20, page 2.

6.      Stephen P. Friot did not vacate the transfer order, as promised less than 2 months previously.

7.      Rather, Stephen P. Friot entered an order purporting to transfer the entire record in OKWD 5:22-cr-357-F. *Id.*

8.      Since the OKWD had no jurisdiction, by the admission of the sitting district court, the OKWD had nothing to transfer.

9.      The purported transfer of jurisdiction is a legal nullity.  There was no jurisdiction to transfer.

10.     The petition and amended petition for summons, the summons, and the violation report are all legal nullities.

11.     The District Court in the OKND case captioned above is not relying on any claim of statutorily authorized jurisdiction in the OKWD.

12.     All the papers accusing Stilley were prepared and filed in the OKWD, by OKWD personnel, whether personnel of the US Probation Office or of the US Attorney's Office.

13.     The OKWD summons (OKWD 5:22-cr-357, Dkt. 4) upon which Stilley is commanded to come to courtroom 3 on the 4th floor of the federal courthouse in Tulsa, Oklahoma, answer certain allegations of wrongful conduct, etc., was and is altogether *ultra vires* and void.  Said summons is a legal nullity.

14.     No person acting in the capacity of an officer of the OKWD had authority to summon Stilley anywhere, on the basis of the purportedly transferred case.

15.     No personnel of OKWD US Probation had any *de jure* authority to file any petition for warrant or summons, any violation report, or any other accusatory document whatsoever, on the basis of the purported transfer of jurisdiction or otherwise.

16.     Stilley has made diligent inquiry, and has found no official or employee of the OKND US Probation office who claims any responsibility whatsoever, for the issuance of summons or other criminal process against Stilley.

17.     The government will not be prejudiced by the relief sought.

18.     The government is free to file a new petition for warrant or summons in the OKND.

19.     Any such new petition would be totally frivolous and wholly without merit, for a veritable litany of reasons not the least of which being the fact that all the claims made are wholly repugnant to the 4th and 5th Amendments.

20.     Plus, Stilley as of even date has his own motion to modify and clarify. Stilley's pleading is at least one step ahead of anything the government might file.

21.     To the extent not contrary to law or rule or Stilley's legal interests, Stilley incorporates all other motions and briefs filed on the same day as this pleading, as if set forth herein word for word.  Stilley reserves and claims the right to rely on any other part of the official record in the captioned case, from the filing of the first

docket item forward, as defined by Federal Rule of Appellate Procedure (FRAP) 10(a), in support of his claims and arguments.

WHEREFORE, Stilley respectfully requests an order quashing the summons and striking all other documents from the Western District of Oklahoma, and dismissing the petition to revoke Stilley's supervised release; and for such other and further relief as may be appropriate whether or not specifically requested.

### BRIEF IN SUPPORT OF MOTION

"Courts created by statute can have no jurisdiction but such as the statute confers." *Sheldon* v. *Sill*, 8 How. 441, 449 (1850). This principle is aptly explained in *United States v. Dao* (N.D. Cal. 2015), where the Court said:

> Here, the Northern District of California accepted jurisdiction over Defendants' supervision on August 25, 2014. Jurisdiction to modify or terminate supervised release was therefore vested **exclusively** with the Northern District on that date. When the Eastern District of California issued orders nearly a year later purporting to terminate Defendants' terms of release, it did so without jurisdiction. Those orders are, unfortunately, void. See *In re Establishment Inspection of Hern Iron Works*, 881 F.2d 722, 726-27 (9th Cir. 1989) (stating that any court order issued without jurisdiction is a nullity or "nothing at all"). As a result, Defendants' supervisorial status remains unchanged.
> (Emphasis added)

Same problem here. The District Court entered an order of transfer. An OKWD Probation Officer named Jay Mauldin signed a "petition for warrant or summons…," on August 24, 2022. Dkt. 3. Another OKWD Probation Officer named

4

Aric Holloway filed an amended petition for warrant or summons…," on September 7, 2022. Dkt 6. Mr. Holloway filed a violation report on September 8, 2022. Dkt. 8.

The District Court doesn't even claim the transfer was statutorily authorized. The order says he was "not sufficiently satisfied that the transfer…was statutorily authorized." An affirmative statement that one is "not sufficiently satisfied" does not state or imply that the speaker has *any* level of confidence that the transfer *was* statutorily authorized.

Stilley requested vacatur. The District Court ***did not*** grant vacatur, despite having promised so to do, in OKWD 5:22-cr-357-F, Docket #13. Rather, the District Court purported to transfer all the official acts of the OKWD back to the OKND.

The District Court in OKWD 5:22-cr-357-F, Docket #20 said "…the relief sought by defendant in his motion, doc., no. 14, is granted to the following extent: …" Thereupon the order purported to transfer both jurisdiction over Stilley, and all the prosecutorial pleadings against Stilley, back to OKND.

Stilley never sought such relief. That "relief" is not a subset of the relief sought by Stilley. Stilley requested "…that Docket #1 be vacated; that proceedings in the OKWD be terminated." OKWD 5:22-cr-357-F, Docket #14, page 11.

If the OKWD didn't have jurisdiction, all the official acts of officers of OKWD are legal nullities. When a court lacks jurisdiction, the only thing left to do is to state the fact and dismiss the case. This principle was well explained in *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83 (1998), as follows:

> We decline to endorse such an approach because it carries the courts beyond the bounds of authorized judicial action and thus offends

5

fundamental principles of separation of powers. This conclusion should come as no surprise, since it is reflected in a long and venerable line of our cases. "Without jurisdiction the court cannot proceed at all in any cause. **Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.**" *Ex parte McCardle*, 7 Wall. 506, 514 (1869). "On every writ of error or appeal, the first and fundamental question is that of jurisdiction, first, of this court, and then of the court from which the record comes. This question the court is bound to ask and answer for itself, even when not otherwise suggested, and without respect to the relation of the parties to it." *Great Southern Fire Proof Hotel Co.* v. *Jones*, *supra*, at 453. The requirement that jurisdiction be established as a threshold matter "spring[s] from the nature and limits of the judicial power of the United States" and is "inflexible and without exception." *Mansfield, C. L.M.R. Co.* v. *Swan*, 111 U.S. 379, 382 (1884).
(Emphasis added)

This District Court does not *believe* that the transfer order, filed on the dockets of both cases, was done pursuant to statutory authorization. No judicial officer claims that the original order of transfer was done on the basis of statutory authorization or jurisdiction.

The original transfer order transferred nothing. It amounts to a legal nullity. The OKWD never had jurisdiction. All the acts of OKWD officers are legal nullities. OKWD 5:22-cr-357, Dkt. 20, transferred nothing because it had nothing to transfer.

The summons is a special case. A criminal summons commands an alleged offender to appear and defend against allegations of misconduct. The OKWD had no jurisdiction and thus no power to issue this summons. It must be quashed and held for naught.

Given the lack of jurisdiction, no further explanation is required. Stilley will provide some additional information, for his own good reasons.

Take a look at [Federal Probation and Supervised Release Violations, page 24](#). This is an official document of the US Sentencing Commission.  It says that 28% of supervisees of OKWD violate the conditions of their supervised release, whereas only 14% of those in OKND do the same.

Should Americans believe that people are twice as bad and twice as deserving of a double shot of prison simply because they live on the wrong side of a political boundary?  Or should we acknowledge that political boundaries, political subdivisions, and political appointments to judicial office have life-changing consequences?

Stilley has made diligent inquiry.  Nobody in the Western District of Arkansas (ARWD) or the OKND acknowledges the slightest responsibility for the *decision* to attack Stilley criminally. That question is separate from questions about *effectuating* such a decision once made.

Stilley respectfully requested a reasonable time to seek clarification and modification of his conditions of supervised release.  This request was denied, but by whom, and in what capacity? Nobody is willing to answer that question.


Respectfully submitted,

By: /s/ Oscar Stilley                                    November 20, 2022
Oscar Stilley                                               Date
10600 N Highway 59
Cedarville, AR 72932-9246
479.384.2303 mobile
479.401.2615 fax
oscarstilley@gmail.com

CERTIFICATE OF SERVICE

Defendant Stilley hereby certifies that on the date stated above he electronically
filed the foregoing with the Clerk of the Court by using the CM/ECF system,
thereby serving all persons having ECF privileges and entitled to service in this
case. Stilley does not have access to Lindsey Springer's physical address, email,
and phone number, and thus cannot serve him.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA                                        PLAINTIFF

v.                                    Case No. 4:09-CR-043 SPF

OSCAR AMOS STILLEY                                              DEFENDANT

## DEFENDANT OSCAR STILLEY'S MOTION FOR EARLY PSR, WITH INCLUDED SUPPORTING BRIEF

Comes now Defendant Oscar Stilley (Stilley) and for his motion states:

1.      Stilley has been informed of the existence of pending criminal charges in the captioned case, in the form of revocation proceedings.

2.      Stilley has been informed, pursuant to the US Supreme Court case *Class v. US*, 200 L. Ed. 2d 37 (2018) that "[T]he plea of guilty is, of course, a confession of all the facts charged in the indictment, and also of the evil intent imputed to the defendant."  (Citing to *Commonwealth v. Hinds*, 101 Mass. 209, 210 (1869).)

3.      Stilley is entitled, at the least, to enter either a plea of "guilty" or "not guilty" as he may choose on the basis of a fair and reasonably complete understanding of the nature and cause of the accusations against him.  This is true no matter the nomenclature, for example pleas of "true" or "not true."

4.      Stilley firmly stands upon his right to enter an informed and voluntary plea at initial appearance, either personally or by and through counsel.  Even if initial appearance within the meaning of FRCrP 32.1(a)(2) is denied, the basic principle remains the same.

5.      Stilley cannot upon the bare reading of the amended petition to revoke now pending before the bar of the court understand the charges.

6.      Stilley cannot reasonably know and comprehend the facts that will be for all practical purposes deemed  "admitted" by a guilty plea, or the evil intent to be relied upon by the Court in consideration of punishment.

7.      Apparently counsel for the government can't either.  They refuse to say what specific wrongful conduct Stilley would admit to, if he chose to "take a knee."

8.      Stilley is reasonably certain that he will be able to understand the charges, sufficient to enter an informed and voluntary plea, if he is given a chance to promptly and fairly confer with the appropriate US Probation Officer, in the preparation and submission to the Court, of a Presentence Investigation Report (PSR).  It matters not that such report may be denominated a "violation report." For purposes of this pleading, the term "PSR" should be construed to include a "violation report."  Any PSR, by whatever name, should include all information necessary for the statutory and rule based purposes of a PSR.

9.      More than 95% of all federal defendants ultimately plead guilty.

10.    Furthermore, statistically speaking more than 90% of all federal criminal defendants electing a trial, whether by jury or to the court, will be convicted of one or more counts of the indictment.

11.    Neither the government nor the US Probation nor the administration of justice will be prejudiced or disadvantaged in any material way, by the early production of a PSR, since a PSR is virtually always eventually required.

12.    An early PSR will contribute to judicial economy, inasmuch as it gives the defendant a better understanding of the true nature and cause of the accusation, the consequences of various findings of fact, and the government's theories of the case and their factual support.

13.    Stilley is statutorily and constitutionally entitled to a fair and speedy trial.

14.    The federal Speedy Trial chapter, in 18 USC 3161(h)(3)(A), excludes from speedy trial calculations "any period of delay resulting from the absence or unavailability of the defendant or an essential witness."

15.    The same chapter, in 18 USC 3162(b), provides punishment for counsel who knowingly allow a case to be set for trial without disclosing the fact that a "necessary" witness would be unavailable for trial.

16.    Stilley, and also the American public generally, are all beneficiaries of the right to speedy trial.   Stilley claims all such rights (whether statutory or constitutional) for himself.

17.    Stilley needs to know the identity of all witnesses known to or reasonably ascertainable by the government, so that neither Stilley nor his counsel (if any, and whether standby or not) will be liable for punishment for allowing a trial to be set despite the unavailability of any "essential" or "necessary" witness.

18.    Stilley respectfully claims and stands upon his constitutional right of compulsory process for witnesses favorable to the defense.

19.    Stilley has legal and equitable rights to evaluate witnesses known to the government, and their relevant personal knowledge, so as to determine for himself

3

whether are not such witnesses may have knowledge such that Stilley would need in order to fairly and effectively exercise his 6th Amendment constitutional right of compulsory process for witnesses in a criminal case.

20.    Stilley cannot well exercise his constitutional rights, and discharge his statutory obligations, without knowing the identity of witnesses known to the government, and the substance of their knowledge of facts material to this case, prior to the time that this court sets this case for trial.

21.    Federal criminal cases are routinely set for trial at the arraignment, or within a few days thereafter.  This case seems to be running faster than normal, with an attempt to cram everything into one hearing.

22.    Therefore, Stilley is constitutionally and statutorily entitled to knowledge of all witnesses known or believed by the government to have knowledge of facts material to the issues in this case, including but not limited to basic facts, facts establishing jurisdiction or venue, etc.

23.    Stilley is constitutionally entitled to plead according to his choice and informed decision making, whether "guilty" or "not guilty," without the threat of retaliation of any kind, including but not limited to threats of additional charges, more severe punishment, novel theories of prosecution, "plumping" of the facts, etc.

24.    Therefore Stilley respectfully requests that this Honorable District Court order the production of the PSR, with all deliberate speed, fairly and honestly upon the accusations in the indictment purportedly returned by the grand jury as well as the alleged violations of supervised release, and not otherwise.

4

25.    Stilley by signature below (whether personally or by and through counsel) agrees to such production of a PSR, and to its early disclosure to the District Court and other authorized persons.

26.    Stilley respectfully requests that the PSR be divided into parts that contain sensitive information about Stilley, and those that merely set forth the alleged offense conduct, etc.  Stilley requests that nothing be sealed except that which is required to protect the personal information of Stilley.

27.    Stilley respectfully requests that the District Court order and direct that the government refrain from any retaliation or adverse consequence whatsoever, based upon Stilley's election(s) with respect to any claims of constitutional right.

28.    Alternatively, Stilley respectfully requests an order commanding the government to disclose, within 5 days of the Court's order, the sum and substance of all threats, retaliation, or adverse consequences whatsoever, that the government may or will utilize in order to "incentivize" the Defendant's "waiver" or other surrender, relinquishment, or diminution of any constitutional right.

29.    Stilley needs this information in order to make an informed decision concerning his legal acts, including but not limited to his entry of a legally authorized plea, or later change of plea, in this criminal case, either personally or by and through counsel.  This request should not be construed to include any criticism of the open and honest rules providing for a 2 or 3 point reduction for acceptance of responsibility, assessed against fair, honest, evenhanded, and

disinterested calculations in the PSR. Stilley can review these rules in various publicly available legal resources.

30.    Stilley has procured information presumably useful in the preparation of a PSR, based on his understanding of the general outline and the facts normally set forth in a PSR, in order to streamline the process and reduce the time and effort necessary to produce an early PSR. Stilley stands ready and willing to expedite the process, reduce the burden on US Probation, etc., to the extent not unduly prejudicial to Stilley's constitutional and statutory rights.

31.    Stilley respectfully requests advance notice, at the earliest practicable time, of any unagreed facts for which the Defendant will not be permitted a determination by jury verdict, special verdict, interrogatories, or other findings of fact by the jury.

32.    Stilley claims the right to a jury trial, but only to the extent stated herein.

33.    Stilley claims a jury trial if he faces a potential *aggregate* incarceration in excess of the statutory maximum, with allowances for all vested good time.

34.    Stilley claims the right to know at the outset whether he faces potential aggregate incarceration in excess of the statutory maximum for the three counts of the purported indictment.

35.    Stilley also claims the right to a jury trial if the government proceeds on any theory except the theory stated not less than 6 times in various pretrial pleadings. Specifically, that theory is that Lindsey Springer earned money, and Stilley paid those earnings to him out of client funds.

36.     The pretrial theory is diametrically opposed to the "stealing" theory relied upon at sentencing, which should make it easy to prove Stilley's right to a judgment of acquittal, at any sentencing.

37.     Stilley respectfully requests guidance concerning the process and procedure for litigating disputes, should any arise, concerning findings of the PSR.

38.     Stilley respectfully requests formal advance notice of any intention by the Court to consider a potential upward variance or departure, and the reasons for same.  See *Irizarry v. US*, 553 US 708 (2008), which suggests that such a request is a suitable method of addressing the "distinction without a difference" between a "variance" and a "departure."  All the opinions in that case are important, including concurrences or dissents.

39.     Stilley hereby agrees to waive speedy trial as to those days necessary and proper for the expeditious preparation of an early PSR, including such time as the Court may deem appropriate for either resolving, or setting the framework for resolving, disputes with respect to fair characterization of the accusations of the indictment and any petition for warrant or summons.

40.     Stilley has a pending request for certiorari, 22A334.  Stilley was given a 60 day cure period by letter dated October 20, 2022. Stilley respectfully requests written assurances that he will not be incarcerated contrary to the language and intent of Supreme Court rule 36, which prohibits transferring the custody of a habeas litigant to his disadvantage.

41.    The government amended its petition for warrant or summons to allege a violation of supervised release for pleading the 5th Amendment.

42.    Stilley invited the government to produce citations showing that Stilley's 5th Amendment plea was not legally sound.  No such authorities were provided.

43.    In fact, the allegations of the amended petition for warrant or summons are totally frivolous and wholly without merit, to the extent that they claim a 5th amendment plea violates the terms of supervised release.

44.    Nothing within the standard or special conditions arrogates to the government the right to punish for exercise of a constitutional right.

45.    Stilley believes that upon being confronted with the case law, the government will have to concede that the 5th Amendment allegations are legally frivolous and unsupportable.  The best place to hash these things out is with an honorable US Probation officer preparing a PSR.

46.    To the extent not contrary to law or rule or Stilley's legal interests, Stilley incorporates all other motions and briefs filed on the same day as this pleading, as if set forth herein word for word.  Stilley reserves and claims the right to rely on any other part of the official record in the captioned case, from the filing of the first docket item forward, as defined by Federal Rule of Appellate Procedure (FRAP) 10(a), in support of his claims and arguments.

    WHEREFORE, Stilley respectfully requests that this Court order an early PSR, to be prepared as soon as reasonably practicable, conformably to the statutory and constitutional rights of Stilley as outlined herein, and otherwise; for an order

prohibiting the government from any retaliation or adverse consequence whatsoever, for the claim and exercise of any constitutional or statutory right; alternatively for prompt disclosure of all threats, retaliation, or adverse consequences that the government will or may use to "incentivize" the waiver of one or more constitutional or other legal rights whatsoever; for notice of the maximum punishment he faces under this or any subsequent petition for warrant or summons; for written notice of any potential upward variance or departure, and the reasons for same, as contemplated by the opinions in *Irizarry*, including but not limited to the dissent; for notice of the procedure and means for challenging findings of the PSR; for assurances that Stilley's access to the wherewithal to competently prosecute an appeal will not be diminished; and for such other and further relief as may be appropriate whether or not specifically requested.

### BRIEF IN SUPPORT OF MOTION

Stilley has made diligent efforts to ascertain the nature and cause of the accusation. Aric Holloway refuses to make further findings or clarifications. He claims the court has the right to impose a sentence which will, in the aggregate, exceed the maximum sentence for all three counts of conviction. Indeed he claims the Court could sentence Stilley to 2 years on each of three counts, to run consecutively for 6 years total incarceration. He provides no authority for this extravagant claim.

Prison time due to revocation proceedings is punishment **for the original crime**. *United States v. Haymond*, 869 F.3d 1153, 1165 (10th Cir. 2017)  Stilley can't see any legal way to exceed the statutory maximum sentence without a jury trial.  If the government and/or this Court see things differently, Stilley needs to know before making a plea or response.  Stilley at least needs a starting place, some case law that would arguably support the government's position.

The government has inquired about the possibility of a guilty plea (however denominated) but can't provide the slightest clarification of what a guilty plea means, or the max punishment.  They apparently plan to stand silent if Stilley pleads guilty.  The plan if Stilley doesn't plead is less clear, but Stilley assumes they'd have some arguments, and some case law to back up the arguments.

Stilley needs to know the possible consequences of a guilty plea.  Stilley is entitled to enter an *informed* plea, out of whatever choices the Court may offer.

This Court at the original sentencing found a Guideline Range of 121-151 months, then sentenced Stilley to 180 months.  When Stilley complained, the Court said that it was a variance, not a departure.

The US Supreme Court has suggested the process used here, to prevent unfair surprise, denial of constitutionally required notice, etc.  The dissent in *Irizarry v. United States*, 553 U.S. 708, 722 (2008) suggested as follows:

> … " If a presentence report includes a section on whether a variance would be appropriate under § 3553(a), that would likely eliminate the possibility that the district court would wind up imposing a non-Guidelines sentence for some reason *not previously identified*."
> (Emphasis in original)

Stilley doesn't know the Court's intentions.  The refusal to grant an unopposed motion for initial appearance does not bode well.

Stilley doesn't know what this Court perceives to be the statutory maximum. Stilley got exactly a year off his sentence, after accounting for vested Good Conduct Time from the Department of Justice-Federal Bureau of Prisons (DOJ-FBOP).

Stilley takes the position that the statutory maximum sentence in this case, without a jury, is one year.  "Statutory" must be taken in the light of all relevant statutes, not just one statute stating a general rule.

Stilley takes the position that if the government seeks to rely upon any theory of criminal liability save the pretrial theory, Stilley is entitled to a jury trial. Of course, even the government admitted that the pretrial theory couldn't possibly support a conviction.

Stilley would like to know the position of the government and the Court before entering a plea.  The best place for that is on a PSR.

Stilley has a pending petition for certiorari case at the US Supreme Court, 22A334. Rule 36(1.) of that Court states in pertinent part:

> Pending review in this Court of a decision in a habeas corpus proceeding commenced before a court, Justice, or judge of the United States, the person having custody of the prisoner may not transfer custody to another person unless the transfer is authorized under this Rule.

The gravamen of this rule is that a habeas petitioner generally is not to be subjected to conditions less favorable for the prosecution of the proceedings.  Stilley has inquired of the government about their intentions.

11

Stilley has asked if the government is willing to commit to either a stay pending appeal or home confinement. Stilley spent two years on home confinement, and got along fine after he got away from an individual who withheld phone bills. Stilley has no doubt that his case manager at City of Faith halfway house in Little Rock, AR, would give him a good recommendation.

Stilley needs to know if he will be *assured* of access to common office software, internet access, competent legal resources, etc. If that's under attack, Stilley needs to know up front, before he enters a plea.

At the original sentencing, this Court said at 466-467:

24 On the issue of remand, let me first say, gentlemen, that
25 I am fully cognizant of the seriousness of this question,

466
1 especially as it applies in your situation having invoked your
2 right, as you have, and it's an important right, to represent
3 yourselves. And I am fully cognizant of the fact that
4 incarceration may well have some impact on your ability to
5 proceed representing yourselves. **To the extent that the Court
6 can within the bounds of the law and common sense ameliorate
7 that, then I will be happy to consider anything that the Court
8 might properly address in that regard**.
(Emphasis added)

Stilley spent some 2 years on home confinement, without any damage to society. Stilley wants assurance of a stay pending appeal. However, if incarceration is imposed and that is denied, Stilley wants ***up front*** assurances that he will be allowed to return to home confinement so as to effectively pursue legal remedies at the 10th Circuit.

Stilley is asking the Court to keep its word.  The statutory scheme makes it really easy to do that.  Consider 18 USC 3583 (e)(4), which provides as one option on sentencing for a violation of supervised release:

> (4)  order the defendant to remain at his place of residence during nonworking hours and, if the court so directs, to have compliance monitored by telephone or electronic signaling devices, except that an order under this paragraph may be imposed only as an alternative to incarceration.

Stilley requests this early binding commitment for the three reasons.  One, without this commitment the District Court could intimidate Stilley into a less vigorous defense, lest he offend the District Court and bring down retaliation on himself.  Overt threats aren't required.  Everybody knows the fear in the back of Stilley's mind.

Two, without such an early commitment, the District Court *de facto* gives the government a nice big billy club useful primarily for extorting a false guilty plea.  Without assurances that his litigation capabilities will not be diminished, the ***relative*** appeal of a guilty plea is greatly enhanced.  The government gets an unlawful benefit pretrial.

Three, an order of incarceration in jail or prison simply devastates Stilley's ability to defend himself on appeal or in other proceedings, including but not limited to his 2255 petition.  Even if Stilley walks on eggshells, Stilley faces the possibility that his litigation capabilities will be utterly devastated.

The government amended the petition for warrant or summons to include allegations that Stilley violated supervised release by pleading the 5th Amendment. The government's own exhibits will show that Stilley invited the government to

show any authority supporting their position.  Government Exhibits 2 and 4, in

each case at continuation page 2.

The government cited no authority because it can't.  The government's theory

is legally frivolous.  Consider the following extensive quotation from *United States*

*v. Richards*, 958 F.3d 961, 966-68 (10th Cir. 2020).

> … Here, neither the Government nor any other entity has threatened—
> explicitly or by implication—to revoke Defendant's supervised release if he
> refuses to answer a question during a polygraph examination on valid Fifth
> Amendment grounds. **Nothing in the record suggests the Government
> has attempted or intends "to take the extra, impermissible step" of
> compelling Defendant to incriminate himself.** *See Murphy*, 465 U.S. at
> 436. To the contrary, the Government affirms in its brief that "Defendant
> faces no risk of revocation based on validly asserting his privilege[ ] because
> such a revocation would be unlawful."
>
> Nor does the polygraph condition, on its face, spell out that forbidden
> penalty. The condition provides "[t]he results of [Defendant's] polygraph
> testing . . . can be used in a violation proceeding in this criminal case." **It
> does not follow from this language, however, that the condition
> permits revocation of Defendant's supervised release based on his
> refusal to answer polygraph questions on valid Fifth
> Amendment grounds.** We do not read the district court's order to allow—
> much less endorse—the imposition of such a **plainly unconstitutional**
> penalty. *Cf. United States v. Mike*, 632 F.3d 686, 696 (10th Cir.
> 2011) (interpreting conditions of supervised release narrowly so as not to
> implicate significant liberty interests); *see also United States v. Davis*, 242
> F.3d 49, 52 (1st Cir. 2001) (per curiam) (construing special condition
> of supervised release to avoid Fifth Amendment concerns).
>
> While Defendant would have preferred the polygraph condition to
> include language ensuring the implementation of this requirement will
> comply with the Fifth Amendment, the absence of such limiting language
> does not render the condition unconstitutional or otherwise
> infirm. *See United States v. Pabon*, 819 F.3d 26, 29, 34 (1st Cir.
> 2016) (concluding polygraph-testing condition without limiting language did
> not violate the Fifth Amendment because it did not require the defendant to
> answer incriminating questions); *United States v. Lee*, 315 F.3d 206, 212 (3d
> Cir. 2003) (same). ***The Fifth Amendment—not the terms of a special
> condition—guarantees Defendant's privilege against self-
> incrimination.*** Accordingly, Defendant remains free to legitimately exercise
> his Fifth Amendment right without facing the risk that a valid assertion of

his privilege and refusal to incriminate himself during a polygraph
examination will result in revocation of his supervised release.

  If, at a later date, the Government changes its position and threatens
to revoke Defendant's supervised release based on his valid invocation of his
privilege against self-incrimination during a polygraph examination,
Defendant may raise a Fifth Amendment challenge at that time. *See United
States v. Zinn*, 321 F.3d 1084, 1089 (11th Cir. 2003) ("By determining a
challenge to the polygraph testing requirement to be generally ripe, however,
we do not imply that all specific challenges to the *implementation* of this
condition are necessarily ripe."). But until such an eventuality occurs (**and
hopefully it never does**), we can only decide whether the challenged
polygraph condition facially violates the Fifth Amendment. We conclude it
does not.

(Emphases added)

Stilley made diligent effort, both orally and in writing, to explain his

quandary and offer performance consistent with the government's interests and his

own constitutional rights.  The government has offered no brief or citations to

authority for its position.

  Nor could it.  The government's position with respect to the 5th Amendment is

*laughably* frivolous.  *Of course* they want a guilty plea to their trick bag.  *Of course*

they don't want to explain or elucidate on anything.  Explanation and legal support

are contrary to their purposes.

  Then in the future, rather than citing any legal authority, they would simply

wave Stilley's false confession in his face, and threaten further consequences.  They

would say that "law of the case" requires Stilley to answer any and all questions, no

matter how repugnant to the 5th Amendment.

  For all these reasons the Court should order a qualified US Probation Officer

of the OKND US Probation Office to prepare a PSR.

Respectfully submitted,


By: /s/ Oscar Stilley                              November 20, 2022
Oscar Stilley                                           Date
10600 N Highway 59
Cedarville, AR 72932-9246
479.384.2303 mobile
479.401.2615 fax
oscarstilley@gmail.com


## CERTIFICATE OF SERVICE

Defendant Stilley hereby certifies that on the date stated above he electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, thereby serving all persons having ECF privileges and entitled to service in this case. Stilley does not have access to Lindsey Springer's physical address, email, and phone number, and thus cannot serve him.

16

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA                                    PLAINTIFF

v.                              Case No. 4:09-CR-043 SPF

OSCAR AMOS STILLEY                                          DEFENDANT

**DEFENDANT OSCAR STILLEY'S MOTION FOR DISCOVERY AND EVIDENCE, WITH INCLUDED SUPPORTING BRIEF**

Comes now Defendant Oscar Stilley (Stilley) and for his motion states:

1.      Stilley in written conversation with opposing counsel has asked for evidence.

2.      The government has turned over their witness and exhibit list, four exhibits to be admitted into evidence by the government, and a letter from Ryan Forsyth, Stilley's Supervising Probation Officer, to the Kory McClintock, a supervisory employee of Northern District of Oklahoma (OKND) US Probation.

3.      The government identified Ryan Forsyth as their only witness, in an email November 8, 2022, stating that if this changed Stilley would be notified.

4.      Ryan Forsyth has repeatedly denied that he even has the authority to decide whether or not to seek revocation proceedings against Stilley.

5.      Indeed Mr. Forsyth, in a letter to Kory McClintock dated 8-18-2022, asked her to ask "…whether Court action is appropriate at this time, or if Mr. Stilley should be granted 30 days to file a motion requesting to remove the electronic monitoring condition."

6.      No US Probation officer with authority to make such a decision has ever told Stilley that they actually decided to pursue revocation proceedings.

7.    The constitution guarantees Stilley the right to know the nature and cause of the accusation, to confront his accuser(s), to have compulsory process for the production of witnesses in his favor, etc.

8.    Stilley does not at the present time know the name of his accuser, or the names of persons with information about this case.  Without this information, Stilley cannot reasonably and effectively exercise his right to compulsory process.

9.    On information and belief, Stephen P. Friot is actually Stilley's accuser, within the meaning of the law.

10.    Stilley seeks the following discovery and evidence.

　　1)   All memos or other writings reasonably falling within the ambit of FRCrP 26.2, concerning potential testimony at any revocation proceeding, or the hearsay sources of same.  Stilley requests this early, not after the witness has testified.
　　2)   Any communications between the Court and the personnel of US Probation, (any office) concerning Stilley.
　　3)   All evidence against Stilley. This should include but not be limited to copies of all memos  from any employee of US Probation, to the Court, counsel, or another employee of US Probation, of and concerning Oscar Stilley and/or this prosecution.
　　4)   The source code for the computer monitoring software (IPPC Technologies, AKA NCPTC).  I request the complete source code for the software that you use on your machines, as well as the code put on the devices of supervisees.  I want to find out why it hogs resources and gives users the "blue screen of death."  I furthermore want to determine what this software can access and what it can't.
　　5)   Documents showing the full contact information of Lindsey Kent Springer, plus any documentation evidencing threats or inducements of any kind, against him attempting to contact me or communicate with me.

11.    During the underlying criminal investigation, federal agents lied to Stilley about whether or not he was under criminal investigation.

12.    Based upon those lies, Stilley talked to government agents, and later testified to a grand jury.

13.    Had Stilley known he was under criminal investigation, he would have moved to quash the summons, pleaded the 5th Amendment, etc.

14.    Government agents lied to Stilley and got away with it.  Government agents stole money from Lindsey Springer and got to keep it.  The government has denied Stilley any good faith reason to believe uncorroborated claims by government agents.

15.    To the extent not contrary to law or rule or Stilley's legal interests, Stilley incorporates all other motions and briefs filed on the same day as this pleading, as if set forth herein word for word.  Stilley reserves and claims the right to rely on any other part of the official record in the captioned case, from the filing of the first docket item forward, as defined by Federal Rule of Appellate Procedure (FRAP) 10(a), in support of his claims and arguments.


## BRIEF IN SUPPORT OF MOTION

The Federal Rules of Criminal Procedure (FRCrP) require the government to provide the supervisee with "the evidence against the person."  See e.g. FRCrP 32.1 (b)(2(B).

Revocations of supervised release are construed as punishments for the original crime.  This was done because any other theory would render proceedings to revoke supervised release flagrantly unconstitutional.

Stilley was told pretrial that the evil he committed consisted of paying Lindsey Springer for work done, out of client funds, at the directive of the clients. The work was constitutionally protected work, assisting the clients with due process, peaceful petition, and other constitutional rights.

At sentencing, Stilley was denounced as a thief, and sentenced on the theory that he helped Springer steal money from Stilley's clients.

Since we're here for yet another round of punishment for the original crime, Stilley needs to know which crime we're talking about. All have fatal flaws. The government abandoned its pretrial theories, under the purported indictment, because any conviction and punishment under said theories would be unlawful.

The theory of sentencing had not so much as a fig leaf pretense of compliance with the 5th Amendment right to indictment. The sentencing theory made a mockery out of just about everything the constitution says about the rights of a criminal defendant.

Stilley requests all the evidence listed above. It is Stilley's prerogative to decide what persons with knowledge he should call as a witness. It is his prerogative to make those decisions **_after_** getting all the government's evidence and carefully reviewing it.

WHEREFORE, Stilley respectfully requests an order commanding the government to turn over all evidence, records, computer files, and information sought herein;

4

and for such other and further relief as may be appropriate whether or not

specifically requested.


Respectfully submitted,


By: /s/ Oscar Stilley                          November 20, 2022
Oscar Stilley                                       Date
10600 N Highway 59
Cedarville, AR 72932-9246
479.384.2303 mobile
479.401.2615 fax
oscarstilley@gmail.com


## CERTIFICATE OF SERVICE

Defendant Stilley hereby certifies that on the date stated above he electronically
filed the foregoing with the Clerk of the Court by using the CM/ECF system,
thereby serving all persons having ECF privileges and entitled to service in this
case. Stilley does not have access to Lindsey Springer's physical address, email,
and phone number, and thus cannot serve him.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA                                    PLAINTIFF

v.                              Case No. 4:09-CR-043 SPF

OSCAR AMOS STILLEY                                          DEFENDANT

**DEFENDANT OSCAR STILLEY'S MOTION FOR A TRUE AND CORRECT RECORD, WITH INCLUDED SUPPORTING BRIEF**

Comes now Defendant Oscar Stilley (Stilley) and for his motion states:

1.    The record in this case is not true and correct.

2.    Stilley has in the past sought a correction of the record, prior to a ruling on a motion.  See e.g. Dkt. 694 and 695.

3.    The aforementioned pleadings were a motion and brief seeking a reduction under 18 USC 3582(c).

4.    Stilley made it clear that he wanted an accurate record first, then a ruling on the motion, no matter the tenor of the ultimate ruling on the underlying motion.

5.    This Court did not issue the order sought by Stilley.

6.    The correction of records with known falsehoods is required by the oath of office of Oklahoma attorneys, applicable attorney ethics rules, federal criminal statutes, etc.

7.    If Stilley is truly guilty, an accurate record will not be harmful to the government.

8.    To the extent not contrary to law or rule or Stilley's legal interests, Stilley incorporates all other motions and briefs filed on the same day as this pleading, as

if set forth herein word for word.  Stilley reserves and claims the right to rely on any other part of the official record in the captioned case, from the filing of the first docket item forward, as defined by Federal Rule of Appellate Procedure (FRAP) 10(a), in support of his claims and arguments.

WHEREFORE, Stilley respectfully requests an order directing the government to cooperate with Stilley to correct known or reasonably ascertainable material falsehoods in the official record or any part thereof; and for such other and further relief as may be appropriate whether or not specifically requested.

### BRIEF IN SUPPORT OF MOTION

Consider the oath of office taken by the Oklahoma bar licensed attorneys involved in this case.  Specifically, the Oath of Office of Oklahoma Attorneys reads as follows:

> You do solemnly swear that you will support, protect and defend the Constitution of the United States, and the Constitution of the State of Oklahoma; **that you will do no falsehood or consent that any be done in court,** and ***if you know of any you will give knowledge thereof to the judges of the court, or some one of them, that it may be reformed***; you will not wittingly, willingly or **knowingly promote**, sue, or procure to be sued, **any false or unlawful suit, or give aid or consent to the same**; you will delay no man for lucre or malice, but will act in the office of attorney in this court according to your best learning and discretion, with all good fidelity as well to the court as to your client, so help you God.
> (Emphases added)

2

It doesn't matter whether the falsity was intentional. It doesn't matter if the source of the falsehood had the whitest heart and the emptiest head in the history of mankind. Mere knowledge imposes legal duties.

All the lawyers on this case, save perhaps Mr. O'Reilly, made oath to give knowledge of falsehoods to one or more judges "that it may be reformed." Therefore it hardly seems an extravagant proposition that a court would order lawyers to keep their oaths as attorneys at law.

What kind of falsehoods? Pretrial, the government repeatedly stated their theory that Springer **earned** the money but didn't pay taxes on it. After trial, they said that if the jury hadn't concluded that Springer & Stilley stole Turner's $250,000, they would have acquitted.

In other words, the government admits that Stilley **could not possibly be guilty** of the charges **of the indictment**. That means when the District Court – any District Court – does the analysis required by the Sentencing Guidelines, the only lawful outcome is a judgment of acquittal.

Stilley has proven beyond reasonable doubt that his restitution includes $7,901 arising from a math error. Dkt. 723, pg. 32-33 I have asked US Probation for an accurate statement of account, of any lawful restitution. They won't do it. This Court and the world at large should know why.

Not one line item of restitution is factually correct. Every line item can be proven factually and/or legally false from the record itself. The government would **love** to correct the math error, save for this fact. Correction of that one factual error

3

is a slippery slope.  If the government does the honorably and legally required thing, the government won't stop until it hits rock bottom, with every single economic claim against Stilley reduced to rubble.  Correction of this falsehood will lead to the loss of the government's fraudulent judgment and commitment order.

A district court abuses its discretion when it ***bases a decision*** on a clearly erroneous finding of fact or an erroneous conclusion of law, or when its ruling manifests a clear error of judgment. See *Kilgore v. Attorney Gen. of Co.*, 519 F.3d 1084, 1086 (10th Cir.2008).  Therefore, correction of the record is *indispensable*, prior to any further proceedings.

Criminal law is in accord.  See 18 USC 1001, which provides in pertinent part:

> 18 U.S. Code § 1001 - Statements or entries generally
>
> **(a)**  Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—
>> **(1)** falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
>> **(2)** makes any materially false, fictitious, or fraudulent statement or representation; or
>> **(3)** makes **or uses** any false writing or document knowing the same to contain **any materially false, fictitious, or fraudulent statement or entry**;
>> shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both. If the matter relates to an offense under chapter 109A, 109B, 110, or 117, or section 1591, then the term of imprisonment imposed under this section shall be not more than 8 years.
>
> **(b)** Subsection (a) does not apply to a party to a judicial proceeding, or that party's counsel, for statements, representations, writings or documents submitted by such party or counsel to a judge or magistrate in that proceeding.
> (Emphases added)

4

The limitation as to judicial pleadings to a judge or magistrate is a good one. Nobody should be in fear of criminal liability for a court filing, even a truly bad one. That would chill 1st Amendment peaceful petition.

Nothing in that limitation exonerates anyone for knowingly ***enforcing*** a judgment based on falsehoods. When the holder of a judgment becomes aware of falsity infecting the judgment, the mere *use* of that judgment is a federal felony.

Thus we can see that federal criminal law is in accord with the Oklahoma oath of office of attorney's at law. But this is not the only federal statute that criminalizes the government's actions in this case. See for example 18 U.S. Code § 4 - Misprision of felony. This statute provides that:

> Whoever, ***having knowledge*** of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both.
> (Emphasis added)

Once again, criminal liability is independent of the whiteness of the heart or the emptiness of the head. Criminal liability is predicated upon knowledge. Considering the places this case has been, and the personalities involved, this imposes legal duties on a lot of persons, to include a lot of attorneys.

Joseph Sullivan, the former chief security officer of Uber, learned on or about October 5, 2022 that the archaic and much maligned offense of "misprision of a felony" still has some pretty nasty teeth. He was convicted of the offense as well as obstruction of justice, by a jury in the Northern District of California. The US

Department of Justice still prosecutes such charges. They should give serious

consideration to obeying the laws they enforce against others.

This case directly or indirectly involves many lawyers, including supervisory

lawyers. Consider the following ethical rules, all from the Oklahoma Rules of

Professional Conduct (ORPC).

> **Rule 3.1. Meritorious Claims and Contentions**
> A lawyer shall not bring or defend a proceeding, or assert or controvert
> an issue **therein, unless there is a basis in law and fact for doing so
> that is not frivolous, which includes a good faith argument for an
> extension, modification or reversal of existing law**. A lawyer for the
> defendant in a criminal proceeding, or the respondent in a proceeding that
> could result in incarceration, may nevertheless so defend the proceeding as to
> require that every element of the case be established.
> (Emphasis added)

There is no arguable basis on law and fact for opposing a true and correct

record.

Rule 3.3 provides in pertinent part. If the government wishes to add

additional, they should feel free.

> **Rule 3.3. Candor Toward The Tribunal**
> (a) A lawyer shall not knowingly:
> (1) make a false statement of fact or law to a tribunal or **fail to correct a
> false statement of material fact or law previously made to the
> tribunal by the lawyer**;
> (2) fail to disclose to the tribunal legal authority in the controlling jurisdiction
> known to the lawyer to be directly adverse to the position of the client and
> not disclosed by opposing counsel; or
> (3) offer evidence that the lawyer knows to be false. If a lawyer, the lawyer's
> client, or a witness called by the lawyer, has offered material evidence and
> the lawyer comes to know of its falsity, the lawyer shall take reasonable
> remedial measures, including, if necessary, disclosure to the tribunal. A
> lawyer may refuse to offer evidence that the lawyer reasonably believes is
> false.

(4) fail to disclose a fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client.
(b) A lawyer who represents a client in an adjudicative proceeding and who knows that a person intends to engage, is engaging or has engaged in criminal or fraudulent conduct related to the proceeding shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal.
(Emphasis added)

Prosecutors have special responsibilities.  Stilley will reproduce the rule and then comment upon it.  Bear in mind that the lack of highlighting doesn't mean the government has not violated that portion of the rule in this case.

**RULE 3.8 SPECIAL RESPONSIBILITIES OF A PROSECUTOR**
The prosecutor in a criminal case shall:
(a) **refrain from prosecuting a charge that the prosecutor knows is not supported by probable cause**;
(b) **make reasonable efforts to assure that the accused has been advised of the right to, and the procedure for obtaining, counsel and has been given reasonable opportunity to obtain counsel**;
(c) *not seek to obtain from an unrepresented accused a waiver of important pretrial rights*, such as the right to a preliminary hearing;
(d) **make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor,** except when the prosecutor is relieved of this responsibility by a protective order of the tribunal;
(e) not subpoena a lawyer in a grand jury or other criminal proceeding to present evidence about a past or present client unless the prosecutor reasonably believes:
(1) the information sought is not protected from disclosure by any applicable privilege;
(2) the evidence sought is essential to the successful completion of an ongoing investigation or prosecution; and
(3) there is no other feasible alternative to obtain the information;
(f) except for statements that are necessary to inform the public of the nature and extent of the prosecutor's action and that serve a legitimate law enforcement purpose, refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused

7

and exercise reasonable care to prevent investigators, law enforcement personnel, employees or other persons assisting or associated with the prosecutor in a criminal case from making an extrajudicial statement that the prosecutor would be prohibited from making under Rule 3.6 or this Rule;

(g) The lawyer upon whom a subpoena is served shall be afforded a reasonable time to file a motion to quash compulsory process of his/her attendance. Whenever a subpoena is issued for a lawyer who then moves to quash it by invoking attorney/client privilege, the prosecutor may not press further in any proceeding for the subpoenaed lawyer's appearance as a witness until an adversary in camera hearing has resulted in a judicial ruling which resolves all the challenges advanced in the lawyer's motion to quash.

**(h) When a prosecutor knows of new, credible, and material evidence creating a reasonable likelihood that a convicted defendant did not commit an offense of which the defendant was convicted, the prosecutor shall within a reasonable time:**

**(1) disclose that evidence to an appropriate court and prosecutorial authority in the jurisdiction where the conviction occurred, and**

**(2) if the judgment of conviction was entered by a court in which the prosecutor exercises prosecutorial authority,**

**(i) unless a court authorizes delay, make reasonable efforts to disclose that evidence to the defendant's attorney or if the defendant is not represented by counsel to the defendant, and**

**(ii) if the defendant is not represented by counsel, move the court in which the defendant was convicted to appoint counsel to assist the defendant concerning the evidence, and**

**(iii) <u>request an appropriate authority to investigate whether the defendant was convicted of an offense that the defendant did not commit.</u>**

**(i) When a prosecutor learns of clear and convincing evidence establishing that a defendant was convicted in a court <u>in which the prosecutor exercises prosecutorial authority of an offense that the defendant did not commit, the prosecutor shall promptly notify the appropriate court and make reasonable efforts to notify the defendant's counsel and the defendant.</u>**

(j) A prosecutor's judgment, made in good faith, that the new evidence is not of such nature as to trigger the obligations of sections (h) and (i) of this rule, though subsequently determined to have been erroneous, does not constitute a violation of this rule.

(Emphases added)

The sum and substance of much of this rule is that a criminal defendant is

entitled to a true and correct record, even if it means the prosecutorial team has to

eat crow years after the initial jury trial proceedings. This is a continuing obligation. It doesn't go away until the government lawyer performs his ethical duties.

Jeff Gallant, the face of the government's legal team, is probably exclaiming words to the effect "Wait a minute, I didn't oppose Stilley's request for an initial appearance. In fact I agreed to it! Plus, I'm not the one doing these other things, either. I'm just caught in the middle, betwixt and between the belligerent parties."

Years ago, Scott County, Arkansas had a prosecutor nicknamed "Blue Jean." He got the tag because he routinely wore blue jeans to court. He was eccentric, but he had some good ideas.

Certain Arkansas state laws inhibited his discretion to dismiss DWI charges just because he thought they were bogus or unwarranted or otherwise in need of dismissal. He had a solution for that. When the judge called the case and told the prosecutor to call his first witness, Blue Jean would stand up and say "no witnesses." With no witnesses and no evidence, the judge had no choice but to dismiss the charges.

Supervisory lawyers have their own obligations. See

**Rule 5.1. Responsibilities of Partners, Managers, and Supervisory Lawyers**
(a) A partner in a law firm, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm, shall make reasonable efforts to ensure that the firm **has in effect measures giving reasonable assurance that all lawyers in the firm conform to the Rules of Professional Conduct.**
(b) A lawyer having direct supervisory authority over another lawyer **shall make reasonable efforts to ensure that the other lawyer conforms to the Rules of Professional Conduct.**

9

(c) *A lawyer shall be responsible for another lawyer's violation of the Rules of Professional Conduct if*:
(1) the lawyer orders or, with knowledge of the specific conduct, ratifies the conduct involved; or
(2**) the lawyer is a partner or has comparable managerial authority in the law firm in which the other lawyer practices, or has direct supervisory authority over the other lawyer, and knows of the conduct <u>at a time when its consequences can be avoided or mitigated</u> but fails to take reasonable remedial action.**
(Emphases added)

Once again, this rule calls for some finesse.  Mr. Gallant probably doesn't want a quarrel with Clinton J. Johnson.  Mr. Gallant depends on his goodwill of Mr. Johnson for continued employment, raises, promotions, etc.

Mr. Gallant probably isn't mad at Oscar either.  Why should he be mad at Oscar?  Why should he tie one on with Oscar?  What does he have to gain from that?  *Nothing!  Nothing at all!!!*

The solution is to agree to a true and correct record.  Then let's follow the truth where it leads us.  As John Lennon said in a song by the same title, "gimme some truth."  That's how Stilley feels about the situation right now.  *Gimme some truth!!!*

More authorities could be cited, but additional effort is hardly necessary.  The authorities cited decisively demonstrate that this Court has a duty to cause the record to conform to the truth.


Respectfully submitted,

By: /s/ Oscar Stilley                    November 20, 2022
Oscar Stilley                                   Date
10600 N Highway 59

10

Cedarville, AR 72932-9246
479.384.2303 mobile
479.401.2615 fax
oscarstilley@gmail.com


## CERTIFICATE OF SERVICE

Defendant Stilley hereby certifies that on the date stated above he electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, thereby serving all persons having ECF privileges and entitled to service in this case.  Stilley does not have access to Lindsey Springer's physical address, email, and phone number, and thus cannot serve him.

AO 245D    (Rev. 10/17) Judgment in a Criminal Case for Revocations
Sheet 1

FILED

Nov 23 2022

Mark C. McCartt, Clerk

# UNITED STATES DISTRICT COURT

### Northern District of Oklahoma

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| | ) | (For **Revocation** of Probation or Supervised Release) |
| **v.** | ) | |
| | ) | |
| OSCAR AMOS STILLEY | ) | Case Number:     09-CR-043-002-SPF |
| | ) | |
| | ) | USM Number:     10579-062 |
| | ) | |

Oscar Amos Stilley, Pro Se
Defendants Attorney

## THE DEFENDANT:

☐ admitted guilt to violation of condition (s) _____ of the term of supervision.

☒ was found in violation of condition(s) Special Conditions after denial of guilt.

The defendant is adjudicated guilty of these violations:

| Violation Number | Nature of Violation | Violation  Ended |
|---|---|---|
| Special Condition 3 | Failed to comply with Special Computer Restrictions Conditions | 08/10/2022 |
| Special Condition 9 | Failed to provide email account password or login and password information regarding Pay Pal account. | 11/21/2022 |

    The defendant is sentenced as provided in pages 2 through 8 of this Judgment.  The sentence is imposed
pursuant to the Sentencing Act of 1984.

☐ The defendant has not violated condition(s) _____ and is discharged as to such violation(s) condition.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name,
residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this Judgment are fully paid. If ordered
to pay restitution, the defendant must notify the Court and United States attorney of material changes in economic circumstances.

November 21, 2022
Date of Imposition of Judgment

_SP Friot_
Signature of Judge

Stephen P. Friot, United States District Judge
Name and Title of Judge

November 23, 2022
Date

AO 245D    (Rev. 10/17) Judgment in Criminal Case for Revocations
Sheet 2 — Imprisonment

DEFENDANT:          Oscar Amos Stilley Generation
CASE NUMBER:        4:09CR00043-2

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:    Three months.

☐  The Court makes the following recommendations to the Bureau of Prisons:

☒  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

    ☐  at _____   ☐  a.m.   ☐  p.m.   on _____ .

    ☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐  before 2 p.m. on _____ .

    ☐  as notified by the United States Marshal.

    ☐  as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this Judgment as follows:

Defendant delivered on _____ to _____

at _____ ,with a certified copy of this Judgment.

_____
UNITED STATES MARSHAL

By _____

_____
DEPUTY UNITED STATES MARSHAL

AO 245D   (Rev. 10/17) Judgment in a Criminal Case for Revocations
   Sheet 3 — Supervised Release

| | |
|---|---|
| DEFENDANT: | OSCAR AMOS STILLEY |
| CASE NUMBER: | 09-CR-043-002-SPF |

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :  Thirty-three months.

## MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   - ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☐ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245D    (Rev. 10/17) Judgment in a Criminal Case for Revocations
Sheet 3A — Supervised Release

DEFENDANT:          OSCAR AMOS STILLEY
CASE NUMBER:        09-CR-043-002-SPF

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervision, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when to report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by the probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so.  If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity.  If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person, such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may, after obtaining Court approval, notify the person about the risk or require you to notify the person about the risk and you must comply with that instruction.  The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

AO 245D    (Rev. 10/17) Judgment in a Criminal Case for Revocations
Sheet 3B — Supervised Release

DEFENDANT:          OSCAR AMOS STILLEY
CASE NUMBER:        09-CR-043-002-SPF

## SPECIAL CONDITIONS OF SUPERVISION

1.    The defendant shall submit his person, residence, office or vehicle to a search, conducted by the United States Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release; failure to submit to a search may be grounds for revocation; the defendant shall warn any other residents that the premises may be subject to searches pursuant to this condition.

2.    The defendant shall abide by the "Special Financial Conditions" previously adopted by the Court, as follows:

   a.    The defendant shall maintain a checking account in the defendant's name and deposit into this account all income, monetary gains or other pecuniary proceeds, and make use of this account for payment of all personal expenses. All other bank accounts must be disclosed to the probation officer.
   b.    The defendant shall not make application for any loan or enter into any credit arrangement, without first consulting with the probation officer.
   c.    The defendant shall disclose all assets and liabilities to the probation officer. The defendant shall not transfer, sell, give-away, or otherwise convey any asset, without first consulting with the probation officer.
   d.    If the defendant owns or maintains interest in any profit or nonprofit entity, you shall, upon request, surrender and/or make available for review, any and all documents and records of said profit or nonprofit entity to the probation officer.
   e.    The defendant shall, upon request of the probation officer, complete a personal financial affidavit and        authorize release of any and all financial information, to include income and tax return records, by execution of a Release of Financial Information form, or by any other appropriate means.

3.    The defendant shall abide by the "Special Computer Restriction Conditions" previously adopted by the Court,        as follows:

   a.    The defendant shall disclose all e-mail accounts, Internet connections and Internet connection devices, including screen names and passwords, to the probation officer; and shall immediately advise the probation officer of any changes in his or her e-mail accounts, connections, devices, or passwords.

   b.    The probation officer shall have authority to monitor all computer activity, to include all e-mail or Internet connections, to include but not limited to installation of remote monitoring software. Unless waived by the probation officer, the cost of remote monitoring software shall be paid by the defendant.

   c.    The defendant shall not access any on-line service using an alias, or access any on-line service using the Internet account, name, or designation of another person or entity; and report immediately to the probation officer access to any Internet site containing prohibited material.

   d.    The defendant is prohibited from using any form of encryption, cryptography, stenography, compression, password-protected files or other methods that limit access to, or change the appearance of, data and/or images.

   e.    The defendant is prohibited from altering or destroying records of computer use, including the use of software or functions designed to alter, clean or "wipe" computer media, block monitoring software, or restore a computer to a previous state.

   f.    If instructed, the defendant shall provide all personal and business telephone  records and credit card statements to the probation officer.

4.    While on supervision, the defendant shall cooperate with the IRS in preparing and filing true and correct income tax returns for any tax years since 1987 for which the defendant has not filed a tax return; cooperate with the IRS in civil proceedings to determine accurately his tax liabilities for the same years; establish a payment schedule with the IRS and pay all taxes, interest, and penalties owed in connection with his tax debt according to the payment schedule set by the IRS.

AO 245D    (Rev. 10/17) Judgment in a Criminal Case for Revocations
Sheet 3B — Supervised Release

DEFENDANT:        OSCAR AMOS STILLEY
CASE NUMBER:      09-CR-043-002-SPF

5.    The defendant shall not engage in any activity that would constitute the unauthorized or unlicensed practice of law, nor provide representation or services of any kind, advice, suggestions, or recommendations, whether paid or not, to any person or entity, public or private, other than immediate family members, with respect to any matter relating to federal or state taxation. The defendant will maintain no website that refers to any matter relating to federal or state taxation. The defendant will post no material of any kind on any website that refers to any matter relating to federal or state taxation.  The defendant will not file, without the expressed written permission of the Probation Office, any civil action relating to federal income tax.

6.    The defendant shall not work directly or indirectly in any business, profession, or self-employment engaged in the offer, sale, purchase, trade, brokering, solicitation, or similar transactions with respect to any real property, securities or negotiable instruments.  The defendant will not engage in telemarketing activities, to include any telephone sales or other such business, campaign, venture, or transaction.  The defendant shall maintain employment.  All employment must be approved in advance by the Probation Officer.  The defendant shall abide by electronic monitoring, curfew requirements, and travel restrictions.

7.    If instructed by the Probation Officer, the defendant shall provide originals or copies of all personal and business telephone phone records and all credit card, checking account and PayPal statements to the U.S. Probation Officer.

8.    The defendant shall report to the Probation Officer the particulars, as specified by the Probation Officer, of all transactions consummated with a check cashing service. These reports shall be made within 10 calendar days after completion of any such transaction. The defendant shall refrain from transacting business with any check cashing service if so directed by the Probation Officer.

9.    The defendant shall disclose all email accounts, Pay Pal accounts, internet connections and communication devises, to include all screen names and passwords.  Your use of email, internet connections, or an internet connection service will be restricted and/or monitored by monitoring software and otherwise, with the costs of remote computer monitoring to be paid by the defendant.  The defendant will be prohibited from accessing any on-line service using an alias or the internet account, name or designation or another person or entity.  The defendant will be prohibited from altering or using any form of encryption or other methods that limit access to, or change, the appearance of data or images.  The defendant will be prohibited from altering or destroying records of computer use.

## U.S. Probation Officer Use Only

A U.S Probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this Judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions,* available at: www.uscourts.gov.

Defendant's Signature _____        Date _____

AO 245D    (Rev. 10/17) Judgment in a Criminal Case for Revocations
    Sheet 4 — Criminal Monetary Penalties

DEFENDANT:   OSCAR AMOS STILLEY
CASE NUMBER:  09-CR-043-002-SPF

# CRIMINAL MONETARY PENALTIES

The defendant must pay the following total criminal monetary penalties under the Schedule of Payments set forth on Sheet 8.

| | Assessment | JVTA Assessment* | Fine | Restitution |
|---|---|---|---|---|
| **TOTALS** | | | | $815,874.93 |

☐ The determination of restitution is deferred until _____.
  An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

 If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss** | Restitution | Priority or Percentage |
|---|---|---|---|
| As entered in the Judgment imposed April 23, 2010 | | | |

| | | | | | |
|---|---|---|---|---|---|
| **TOTALS** | | $ _____ | | $ 815,874,93 | |

☐ Restitution ordered pursuant to Plea Agreement  $ _____

☒ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the Judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The Court determined that the defendant does not have the ability to pay interest and it is ordered that:

  ☐ the interest requirement is waived for the   ☐ fine ☐ restitution.

  ☐ the interest requirement for the   ☐ fine ☐ restitution is modified as follows:

* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
**Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245D    (Rev. 10/17) Judgment in a Criminal Case for Revocations
        Sheet 5 — Schedule of Payments

DEFENDANT:      OSCAR AMOS STILLEY
CASE NUMBER:   09-CR-043-002-SPF

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☒   Lump sum payment of $  _815,874.93_  due immediately, balance due

      ☐   not later than _____ , or

      ☒   in accordance with    ☐  C,   ☐  D,   ☐  E, or  ☒  F below; or

**B** ☐   Payment to begin immediately (may be combined with    ☐  C,   ☐  D, or   ☐  F below); or

**C** ☐   Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this Judgment; or

**D** ☐   Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

**E** ☐   Payment during the term of supervised release will commence within _____ , (e.g. 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay.

**F** ☒   Special instructions regarding the payment of criminal monetary penalties:

      Any monetary payment is due in full immediately, but payable on a schedule to be determined pursuant to the policy provision of the Federal Bureau of Prisons' Inmate Financial Responsibility Program if the defendant voluntarily participates in this program. If a monetary balance remains, payment is to commence no later than 60 days following release from imprisonment to a term of supervised release in equal monthly payments of $50 or 10% of net income (take home pay), whichever is greater, over the duration of the term of supervised release and thereafter as prescribed by law for as long as some debt remains. Notwithstanding establishment of a payment schedule, nothing shall prohibit the United States from executing or levying upon property of the defendant discovered before or after the date of this Judgment.

Unless the Court has expressly ordered otherwise, if this Judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the Clerk of the Court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

      Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Joint and Several Amount, and corresponding payee, if appropriate.

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☐   The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal,
(5) fine interest, (6) community restitution, (7) JVTA Assessments, (8) penalties, and (9) costs, including cost of prosecution and court costs.





FILED

DEC 08 2022

Mark C. McCartt, Clerk
U.S. DISTRICT COURT

IN THE US DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES                                          PLAINTIFF

V.                    CASE NO. 4:09-CR-43 SPF

OSCAR STILLEY                                          DEFENDANT

## NOTICE OF CHANGE OF ADDRESS

Defendant Oscar Stilley (Stilley) hereby gives notice that he is incarcerated at the address set

forth below.  Sentence was 90 days and he plans to request a stay.  Stilley requests that for the time

being pleadings and papers be mailed to him at the address below, in addition to service via CM/ECF.

Stilley will give further notice when hard copy service to the jail is no longer required.

By: _____                    Monday, December 5, 2022

Oscar Stilley, Inmate # 1189798
David L. Moss Correctional Center
300 North Denver
Tulsa, OK 74103

### PRISON MAILBOX RULE CERTIFICATE OF SERVICE

Stilley by his signature above pursuant to 28 USC 1746 declares under penalty of perjury that on the
date stated above he placed a copy of this pleading in the prison outgoing mail receptacle, with
sufficient US postage attached, addressed to the Clerk of the Court for filing and service via CM/ECF.

____ Mail     |  ___ No Cert Svc     ___ No Orig Sign

___ C/J       ___ C/MJ     ___ C/Ret'd     ___ No Env

___ No Cpys   ___ No Env/Cpys     ___ O/J     ___ O/MJ

Oscar Stilley #11897-93
David L. Moss Correctional Center
300 N. Denver
Tulsa, OK 74103

TULSA OK 740

6 DEC 2022  PM 3  L

Postage Moved 12/6/2024

09-08-43-SAF

RECEIVED

DEC 08 2022

Mark C. McCartt, Clerk
U.S. DISTRICT COURT

US District Court Clerk
333 W. 4th Street
Suite 411
Tulsa, OK 74103

74103-388159





**FILED**

DEC **08** 2022

Mark C. McCartt, Clerk
U.S. DISTRICT COURT

IN THE US DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES                                                              PLAINTIFF

V.                          CASE NO. 4:09-CR-43

OSCAR STILLEY                                                          DEFENDANT

## NOTICE OF APPEAL

Oscar Stilley (Stilley) hereby gives notice that he appeals to the 10th Circuit Court of Appeals the

Judgment and Commitment order dated 11-23-2022. By this notice of appeal Stilley brings up to the

10th Circuit Court of Appeals all prior adverse orders, judgments, and rulings, to the extent authorized by

law and rule.

By: _____                                   Monday, December 5, 2022

Oscar Stilley, Inmate # 1189798
David L. Moss Correctional Center
300 North Denver
Tulsa, OK 74103

## PRISON MAILBOX RULE CERTIFICATE OF SERVICE

Stilley by his signature above pursuant to 28 USC 1746 declares under penalty of perjury that on the
date stated above he placed a copy of this pleading in the prison outgoing mail receptacle, with
sufficient US postage attached, addressed to the Clerk of the Court for filing and service via CM/ECF.

Mail | No Cert Svc | No Orig Sign
C/J | C/MJ | C/Ret'd | No Env
No Cpys | No Env/Cpys | O/J | O/MJ



**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| -vs- | ) | **Case No. 09-cr-0043-2-SPF** |
| | ) | |
| **OSCAR AMOS STILLEY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>ORDER</u>

On November 20, 2022, the defendant, Oscar Amos Stilley, filed a motion to clarify and modify his conditions of supervised release, doc. no. 750, asserting, among other things, that his special conditions "amount to an extortion racket." *Id.* at 1.

At the revocation hearing which was held at the next day, the motion was briefly discussed, and the defendant was given 21 days to supplement the motion. The court directed that the supplement "include exact proposed modified conditions." Doc. no. 751 (minute sheet), at 2. Defendant has failed to supplement the motion. The motion, as filed, does not show a good reason to modify the defendant's conditions of supervision. However, at the hearing held on November 21, 2022, the court stated its intent to consider modification of the defendant's conditions of supervision to conform to his situation. In so stating, the court assumed that it would have the benefit of a proposed modified set of conditions from the defendant, which would educate the court as to just what the defendant thought would be appropriate to his situation. The court does not have the benefit of that input. The motion, doc. no. 750, is accordingly **DENIED**.

This denial of defendant's motion is without prejudice to consideration of a properly-supported motion (including a statement of the exact proposed modified conditions) if defendant chooses to file one.

DATED this 13th day of December, 2022.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

09-0043p178 (Stilley) .docx

2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA                                                    PLAINTIFF

v.                                            Case No. 4:09-CR-043

OSCAR AMOS STILLEY                                                          DEFENDANT

**DEFENDANT OSCAR STILLEY'S MOTION TO REAPPOINT ROBERT BURTON IV AS STANDBY COUNSEL FOR SECOND REVOCATION PETITION, WITH INCLUDED SUPPORTING BRIEF**

Comes now Defendant Oscar Stilley (Stilley) and for his motion states:

1.      Charles O'Reilly has stated a blanket opposition to all of Stilley's planned motions.

2.      This Court appointed Charles Robert Burton, IV as standby counsel for Stilley before, after, and during trial.

3.      Stilley requests that Mr. Burton be appointed as standby counsel for the revocation proceedings in the Northern District of Oklahoma (OKND).

4.      Stilley does not agree to any other attorney without prior consultation and formal agreement on the record.

5.      Stilley does not agree to any capacity, save standby, without prior consultation and formal agreement on the record, either during a hearing with a certified court reporter, or in a signed and filed pleading.

6.      Stilley waives nothing but will give fair and reasonable consideration to any requests that he waive legal rights.

7.      If Mr. Burton is for any reason unavailable or unwilling to serve as standby counsel, Stilley requests that the lawfully assigned magistrate judge inform Stilley of the options that he has, if any, with respect to the question of counsel.

8.      If the reappointment of Mr. Burton is denied on grounds of disbarment, Stilley respectfully requests an explanation of why Mr. Burton was disbarred for *inter alia* conversion, yet the personnel of the OKND US Attorney's Office **convert** funds held ***in trust for their clients***, and Stilley cannot even get the evidence necessary to show the extent of their peculations.

9.      To the extent Mr. O'Reilly denies the veracity of such claims of conversion and freelance theft by personnel of certain US Attorney's Offices including that of the OKND, Stilley requests a reasonable amount of time to show evidence of what he alleges, with assurances that 1) all ill-gotten gains will be disgorged and the victims made completely whole, and 2) Stilley will not suffer retaliation for proving the relevant facts.

WHEREFORE, Stilley respectfully requests an order appointing Robert Burton, IV, as standby counsel for the duration of these revocation proceedings; that if this request is denied for any reason, Stilley be informed of the options available to him with respect to the issue of 6th Amendment assistance of counsel; and for such other and further relief as may be appropriate whether or not specifically requested.

Respectfully submitted,

By: /s/ Oscar Stilley                      November 4, 2024
Oscar Stilley                              Date
10600 N Highway 59
Cedarville, AR 72932-9246

2

479.384.2303 mobile
oscarstilley@gmail.com

**BRIEF IN SUPPORT OF MOTION**

Persons facing revocation of supervised release are entitled to retained or

appointed counsel. Fed. R. Crim. P. 32.1 (a)(2-3). Subsection (a) is entitled "Initial

Appearance." This provision is reproduced below:

> (2) *Upon a Summons*. When a person appears in response to a summons for
> violating probation or supervised release, a ***magistrate judge*** must proceed
> under this rule.
> (3) *Advice*. The judge ***must inform the person*** of the following:
> (A) the alleged violation of probation or supervised release;
> (B) the person's right to retain counsel or to request that counsel be
> appointed if the person cannot obtain counsel; and
> (C) the person's right, if held in custody, to a preliminary hearing under Rule
> 32.1(b)(1).
> (Emphases added)

See also Fed. R. Crim. P. 32.1 (b)(1)(B)(i) & Fed. R. Crim. P. 32.1 (b)(2)(D).

Sometimes the defendant is entitled to a right. Sometimes a defendant is

entitled to be ***advised*** of a right. Subsection (a) gives the defendant the right to be

***formally informed*** of a ***constitutional*** right, by ***a magistrate judge***. *Id*. That's a

layer of protection to which Stilley is entitled ***by rule having the force of law***.

This cannot be glossed over with the real or imagined competence of Oscar

Stilley. It is a ***legal right***. Until that right is discharged as provided by the rule, no

district judge has any right to preside over the case.

Furthermore, this right must be examined in light of a real and serious

challenge to venue. It is absurd to ask a defendant to search for counsel without

3

knowing where counsel needs to have a valid license.[1] Consider now Fed. R. Crim. P. 32.1 (a)(5), reproduced in its entirety:

> (5) *Appearance in a District Lacking Jurisdiction*. If the person is arrested or appears ***in a district that does not have jurisdiction*** to conduct a revocation hearing, **the <u>magistrate judge</u> must**:
> (A) **if the alleged violation occurred in the district of arrest**, conduct a preliminary hearing under <u>Rule 32.1(b)</u> and either:
> (i) **transfer the person to the district that has jurisdiction**, if the judge finds **probable cause to believe that <u>a violation occurred</u>**; or
> (ii) **dismiss the proceedings** and so notify the court that has jurisdiction, <u>if the judge finds no probable cause</u> to believe that a violation occurred; or
>   (Emphases added)

That provision is instructions to a ***magistrate judge***. No District Judge qualifies for that role.

It is impossible to violate a void judgment. A void judgment has all the force and effect of a blank piece of paper.

Stilley claims entitlement to the 6th Amendment assistance of counsel somewhere, (unless validly waived) even if only to prove to a magistrate judge that Stilley could not possibly have committed any of the alleged offenses, or that he could not have committed them *within the OKND*.

Consider these words of this Court <u>at page 5-6 of the transcript of a hearing</u> <u>April 22, 2009</u>, concerning the issue of standby counsel:

> 24      Both of you have standby counsel. There's one thing
> 25 that -- and ***I wholeheartedly agree*** with Judge Cleary's
> 1 decision to appoint standby counsel. Not only do you
> 2 have standby counsel, you have very capable standby
> 3 counsel. I do agree with Judge Cleary's decision to
> 4 appoint standby counsel.

---

[1]      Assuming arguendo that a valid bar license is necessary.

4

5       The Court of Appeals has not made appointment of
6 standby counsel absolutely mandatory, but **the Court of**
**7 Appeals has made it clear that the appointment of standby**
**8 counsel is desirable**, and so I certainly wholeheartedly
9 agree with Judge Cleary's decision to appoint standby
10 counsel.
(Emphasis added)

Stilley is at present no more enthused about a prison term than he was on April 22, 2009. For any possible appearances to the contrary, Stilley would most profusely apologize. Stilley hopes to argue his points and authorities to a judicial officer seated in full compliance with applicable rules. Hopefully the assigned magistrate will agree to do what the [Tenth Circuit] Court of Appeals deems desirable, by appointing standby counsel. Whatever the outcome, Stilley wants his **process due**. Stilley respectfully requests to be **informed of his options**.

This Court seemed to be very pleased with the performance of Mr. Burton and allowed over $90,000 of legal fees. Mr. Burton has familiarity with the proceedings before, during, and after jury trial. Mr. Burton should have an advantage over a lawyer with no prior knowledge of the case.

At the last revocation, Stilley asked for the reappointment of Mr. Burton, in the same standby capacity as before. Stilley is virtually certain that this Court knew that Mr. Burton was disbarred – amongst other reasons for civil conversion of the money of his clients. This Court didn't offer that explanation as a reason for denying the assistance of counsel. The Court suggested that Mr. Burton was no longer on the CJA (Criminal Justice Act, private lawyers assigned for indigent federal defendants) panel.

5

On information and belief, this Court didn't bring up the disbarment because it would be exceedingly embarrassing to the government. How would the government explain why Stilley should be sent to prison for **not** converting client money, while Mr. Burton was disbarred *inter alia* **for** converting client money?

Stilley will waive the lack of a bar license, if the duly appointed and authorized magistrate judge is willing to do likewise. Mr. Burton swore out the oath of an Oklahoma attorney, and that's good enough for Stilley.

If Stilley is to be deprived of the standby assistance of Mr. Burton, he intends to call Mr. Burton as a witness. One of the chief topics of questioning will be whether or not the disbarment order excused Mr. Burton from compliance with his attorney's oath. If his oath is still binding, he will be asked questions designed to give him an opportunity to discharge the duties of his oath – from a witness stand.

Stilley has very little experience with revocation of supervised release. Therefore, if for whatever reason Stilley cannot have Charles Robert Burton IV as standby counsel, he requests that he be informed of the options available to him – by the magistrate judge lawfully assigned to this proceeding, and *not by any unauthorized judicial officer*.

Respectfully submitted,

By: /s/ Oscar Stilley                                    November 4, 2024
Oscar Stilley                                                 Date
10600 N Highway 59
Cedarville, AR 72932-9246
479.384.2303 mobile
oscarstilley@gmail.com

## CERTIFICATE OF SERVICE

Defendant Stilley hereby certifies that on the date stated above he electronically filed the foregoing with the Clerk of the Court by using the electronic filing system, thereby serving all persons having electronic filing privileges and entitled to service in this case.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA                                        PLAINTIFF

v.                                    Case No. 4:09-CR-043

OSCAR AMOS STILLEY                                              DEFENDANT

### MOTION TO VACATE DOCKET # 752

Comes now Defendant Oscar Stilley (Stilley) and for his motion to vacate judgment and commitment order #752 and states:

1.      Counsel for the government has stated blanket opposition to Stilley's motions.

2.      Stilley is currently in supervised release custody pursuant to a revocation hearing 11-21-2022 in *US v. Stilley*, Northern District of Oklahoma (OKND) 4:09-cr-43. See Judgment and Commitment Order entered 11-23-2022, Dkt. 752.

3.      Said judgment and commitment order is void, amongst other reasons because it was entered in violation of Stilley's 6th Amendment right to the assistance of counsel.

4.      Without prejudice to any other claims or defenses, Stilley moves the Court to vacate Docket #752, such that no person or entity may rely upon it as a *valid* judgment or attempt to enforce it whatsoever.

5.      Stilley is also filing a motion for an initial appearance before a properly selected and seated magistrate judge.

6.      After the seating of the magistrate, this motion should be promptly read and studied by the magistrate, since 1) it will greatly uncomplicate the magistrate's task of deciding probable cause, and 2) Stilley faces jeopardy in the Circuit Court of Crawford County, Arkansas, based upon his good faith, honorable challenge to a ***void judgment***. It is manifestly unjust for Stilley to remain in jeopardy and forced to defend, on the theory of violating a judgment that has no more lawful force and effect than a blank sheet of 8.5" X 11" 20-pound 92 brightness Hammermill paper.

7.    Stilley most respectfully submits that a discussion of the contours of the assigned magistrate's powers, beyond those expressly set forth in Fed. R. Crim. P. 32.1, would best be conducted at the initial appearance.

8.    Stilley submits herewith an included brief in support.

WHEREFORE, Stilley respectfully requests an order vacating docket #752; and for such other and further relief as may be appropriate.


Respectfully submitted,

By: /s/ Oscar Stilley                          November 4, 2024
Oscar Stilley                                         Date
10600 N Highway 59
Cedarville, AR 72932-9246
479.384.2303 mobile
oscarstilley@gmail.com


### BRIEF IN SUPPORT OF MOTION

There are two sides to a revocation of supervision in the federal system. First, the court revokes supervision, which pleases the defendant. Defendants are rarely happy about what comes next, when the district court enters a new judgment and commitment order. The old judgment is history, the new judgment is the operative document. If the new one falls, the other one does not magically spring back to life.

If Judge Stephen P. Friot was so inclined, he could have sentenced Stilley to supervision from the moment sentence was pronounced until such time Stilley could get his things packed and get out the courtroom door. He did not have to max Stilley out on supervision. He made it very clear that he didn't have to order any supervision or incarceration *at all*. Rev. TR. 104.[1] He acted like he hadn't even made his mind up yet.

---

[1]        https://bustingthefeds.com/wp-content/uploads/2023/04/TranscriptRevocation.pdf

Judge Friot sentenced Stilley to 3 months incarceration plus another 33 months of supervision, the max he could impose after a 3-month sentence of incarceration. The basic max supervised release term for Stilley's pretended offense is 3 years.

Let's have a basic rundown of what took place. Upon meeting with Probation Officer Ryan Forsyth, Stilley sought thirty days to file a motion to lift the requirement of monitoring software on his computer and phone. In addition to his law degree, Stilley has a BSBA in Administrative Management from the University of Arkansas, with high honors. Those requirements render his degree nearly worthless. Who wants an employee who can't touch a computer unless the employer pays $43.26 per month for software that gives federal prosecutorial authorities a straight shot into their computers? Who wants an employee required to maintain hidden software that literally makes legitimate software *quit working*? Who wants an employee when US Probation reserves the right to walk into the office and literally carry the computers out of the building?

Judge Friot *sua sponte* transferred the criminal case to the Western District of Oklahoma (OKWD) where he actually has a lawful judgeship. OKWD US Probation employees immediately pressed charges against Stilley for not having monitoring software on his phone and computer, pleading the 5th Amendment, etc. Stilley challenged jurisdiction. Judge Friot said he'd vacate his transfer order if Stilley proved that jurisdiction and venue didn't lie in the OKWD.[2] ARWD 5:22-cr-357, Dkt. 13, pg. 1. "Vacate" according to dictionary.com, definition 3, means "to render inoperative; deprive of validity; void; annul: *to vacate a legal judgment."*

Exactly! Stilley is filing this motion to vacate the *void* judgment #752. It's void now and it *always was.*

---

[2]    The pleadings (sans OKND record which is voluminous) are at

https://bustingthefeds.com/wp-content/uploads/2022/11/1-20Less2.pdf

Judge Friot conceded that he wasn't "sufficiently satisfied" that he lawful authority to transfer the case to the OKND. However, instead of *vacating* the transfer, he transferred the entire case, charges and all, back to the OKND, over Stilley's vehement objections.

Stilley was satisfied that he'd be able to persuade OKND US Probation personnel to allow him reasonable opportunity to move to modify the conditions sufficiently to eliminate any requirement of computer and phone monitoring.

The case was transferred from OKWD to OKND on 11-3-2024. Stephen P. Friot magically followed the case back, inserted himself as judge, and accepted the transfer, despite OKND 4:21-go-00001-JED Doc. 14,[3] which requires a random assignment of the judge. On November 4, 2022, Judge Friot set a revocation hearing November 21, 2022. Stilley's assumptions thus crumbled into the dust. Stilley worked feverishly to prepare the pleadings necessary to put up some semblance of a defense.

On 11-16-2024, Stilley filed an unopposed motion for an initial hearing.[4] Dkt. 741.[5] Judge Friot denied the motion the same day, saying that Stilley was a former lawyer, and amongst other things knew how to request assignment of counsel.

On 11-20-2024, Stilley requested that his original standby counsel, Robert Burton, IV, be appointed as standby counsel, and if that was not allowed, that Stilley be informed of his options. Dkt. 744. (*Id*. at 82. Other references to docket items 732-779 inclusive may be found in this set.)

---

[3] https://storage.courtlistener.com/recap/gov.uscourts.oknd.56205/gov.uscourts.oknd.56205.14.0.pdf Older or newer orders are also available on PACER or Courtlistener.

[4] The government opposed any delay, which is peculiar in light of the timing requirements of the applicable rule.

[5] https://bustingthefeds.com/wp-content/uploads/2023/04/732-779.pdf page 74.

On the day of the hearing, Judge Friot asked a CJA (Criminal Justice Act, or a private attorney on the list for appointment for indigent criminal defendants) lawyer named John Campbell to "remain and confer with Mr. Stilley during this brief recess." Rev. TR. 14. Judge Friot emphasized that he wasn't sure Stilley was entitled to counsel, and that he wasn't appointing Mr. Campbell to anything. *Id*. Stilley scarcely had time for a personal introduction to Mr. Campbell.

As soon as the first witness was called, at page 22 of a 123-page revocation transcript, Mr. Campbell was told that he was free to go. Rev. TR. 22. From that point on, there was not the slightest pretense that Stilley was accorded his 6th Amendment right to the assistance of counsel.

Stilley asked for at least 15 days and preferably 30 days to try to find his own counsel. Rev. TR. 21-22. This request was denied. Judge Friot said he would proceed with the revocation hearing. Stilley would have 15 days to look for counsel. The first 7 of those days were in solitary confinement, in the guise of Covid-19 quarantine. The remainder of that time was in general population of the Tulsa County Jail.[6] Any such lawyer would be for prospective matters, not for the revocation proceeding then before the court. In other words, this concession was a cruel joke and a mockery of the 6th Amendment. Stilley was denied so much as a pretense of 6th Amendment guaranteed assistance of counsel – during the hearing, while his liberty was at stake.

This Court may ask why Stilley didn't raise the issue on his one direct appeal. That's a fair question – even though a party has no duty to appeal a void order. Stilley filed an opposed motion

---

[6]      Formally the David L. Moss Criminal Justice Center.

asking that the 13,000-word limit at the 10th Circuit be increased to 18,000 words. 10th Cir. 22-5113 [Dkt. 010110844408](#).[7] That request was denied the same day. 10th Cir. 22-5113 [Dkt. 010110844616](#).

Stilley filed an [opening brief](#)[8] of 12,986 words, just 14 words shy of the limit. 10th Cir. 22-5113, and a [reply brief](#)[9] of 6,459 words, just 41 under the limit.  Despite Stilley's best efforts, the 10th Circuit panel faulted Stilley's briefing on the issue of "fraud upon the court," saying in its [decision](#)[10] that the argument had not been sufficiently developed. Stilley was effectively denied the opportunity to raise the 6th Amendment counsel issue on direct appeal, and by logical extension on certiorari. [US Sup. Ct. #23-966](#).[11]

Consider the case of *Burgett v. Texas*, 389 U.S. 109, 114-15 (1967):

> The same result must follow here. *Gideon* v. *Wainwright* established the rule that the right to counsel guaranteed by the Sixth Amendment was applicable to the States by virtue of the Fourteenth, making it unconstitutional to try a person for a felony in a state court unless he had a lawyer or had validly waived one. And that ruling was not limited to prospective applications. See *Doughty* v. *Maxwell*, 376 U.S. 202; *Pickelsimer* v. *Wainwright*, 375 U.S. 2. In this case the certified records of the Tennessee conviction on their face *raise a presumption that petitioner was denied his right to counsel in the Tennessee proceeding*, and therefore that his conviction was ***void***. Presuming waiver of counsel from a silent record is impermissible. *Carnley* v. *Cochran*, 369 U.S. 506. To permit a conviction obtained in violation of *Gideon* v. *Wainwright* to be used against a person either to support guilt or enhance punishment for another offense (see *Greer* v. *Beto*, 384 U.S. 269) is to erode the principle of that case. Worse yet, since the

---

[7]     Part of the reason for including the docket numbers is to highlight the absurdity of 12-digit docket numbers. More enlightened circuits use numbers that the human mind can comprehend and use effectively.

[8]     https://bustingthefeds.com/wp-content/uploads/2023/05/38_OpeningBrf.pdf

[9]     https://bustingthefeds.com/wp-content/uploads/2023/07/42_ReplyBrf.pdf

[10]https://storage.courtlistener.com/recap/gov.uscourts.ca10.85862/gov.uscourts.ca10.85862.1001093 6490.1.pdf

[11]     https://bustingthefeds.com/wp-content/uploads/2024/03/PetCertFinalLinks1.pdf

defect in the prior conviction was denial of the right to counsel, the accused in effect suffers anew from the deprivation of that Sixth Amendment right.

The **admission of a prior criminal conviction which is constitutionally infirm under the standards of *Gideon* v. *Wainwright* is inherently prejudicial** and we are unable to say that the instructions to disregard it made the constitutional error "harmless beyond a reasonable doubt" within the meaning of *Chapman* v. *California*, 386 U.S. 18. (Emphases added)

Consider now the case of *Lewis v. United States*, 445 U.S. 55, 59-60 (1980):

Four cases decided by this Court provide the focus for petitioner's attack upon his conviction. The first, and pivotal one, is *Gideon* v. *Wainwright, supra*, where the Court held that a state felony conviction without counsel, and without a valid waiver of counsel, was unconstitutional under the Sixth and Fourteenth Amendments. That ruling is fully retroactive. *Kitchens* v. *Smith*, 401 U.S. 847 (1971).

The second case is *Burgett* v. *Texas*, 389 U.S. 109 (1967). There the Court held that a conviction invalid under *Gideon* **could not be used for enhancement of punishment under a State's recidivist statute**. The third is *United States* v. *Tucker*, 404 U.S. 443 (1972), where it was held that such a conviction **could not be considered by a court in sentencing a defendant after a subsequent conviction.** And the fourth is *Loper* v. *Beto*, 405 U.S. 473 (1972), where the Court **disallowed the use of the conviction to impeach the general credibility of the defendant.** The prior conviction, the plurality opinion said, "lacked reliability." *Id.*, at 484, quoting *Linkletter* v. *Walker*, 381 U.S. 618, 639, and n. 20 (1965). (Emphases added)

Finally, consider *Parke v. Raley*, 506 U.S. 20, 24 (1992)

When a defendant challenges a previous conviction through a suppression motion, the Commonwealth must prove the existence of the judgment on which it intends to rely. Once this is done, a presumption of regularity attaches, and the burden shifts to the defendant to produce evidence that his rights were infringed or some procedural irregularity occurred in the earlier proceeding. **If the defendant refutes the presumption of regularity, the burden shifts back to the government affirmatively to show that the underlying judgment was entered in a manner that did, in fact, protect the defendant's rights.** 703 S.W.2d, at 876.

Stilley will spot Plaintiff the *existence* of a judgment. It's [Docket #752](#). It says plain as day, near the top of page 1, "Oscar Stilley, Pro Se." Charles Robert Burton, IV, for all his faults, is smart and sophisticated on procedure, rules, and customs of the court. Mr. Burton earned over $90,000 taxpayer dollars sitting through the jury trial proceedings in 2009 and the sentencing proceedings in 2010, as standby counsel. Stilley wouldn't have to do so much to "bring him up to speed." He was

Stilley's first choice.[12]

Stilley tried his best to either 1) get Charles Robert Burton, IV, in the same standby counsel role Judge Friot originally approved without the slightest inquiry into Stilley's financial resources or lack thereof, or 2) get some other suitable attorney to serve in a role mutually acceptable to the Court and Stilley, with the understanding that a familiarization process would take some time, or 3) get at least some time for Stilley to try to find assistance of legal counsel through his own efforts and his own pathetically meager resources, rather than be denied the 6th Amendment right of assistance of counsel altogether.

This Court needs to know just a bit more about *Lewis v. United States*, 445 U.S. 55, 71-72 (1980). The majority held that an admittedly void conviction could be used as the sole predicate felony conviction for "felon in possession of a firearm." Justices Brennan, Marshall, and Powell wrote a powerful dissent, stating in pertinent part:

> *Burgett* and its progeny appear to control the result in this case. The clear teaching of those decisions is ***that an uncounseled felony conviction can never be used*** "to support guilt or enhance punishment for another offense." Here, petitioner could not have been tried and convicted for violating § 1202(a)(1) in the absence of his previous felony conviction. It could not be plainer that his ***constitutionally <u>void</u> conviction*** was therefore used "to support guilt" for the current offense. The Court's bald assertion to the contrary is ***simply inexplicable***.
> (Emphases added)

Oscar Stilley filed an original action petition with the Arkansas Supreme Court, (*Oscar Stilley v. John Thurston et al*, Ark. Sup. Ct. CV-24-453) seeking to compel Respondent Thurston (the Arkansas Secretary of State) to count the signatures on the Arkansas Abortion Amendment of 2024. Respondent Thurston filed a motion to dismiss. Stilley responded and utterly smashed the

---

[12]    It now appears probable that both Jeffrey Gallant and Judge Friot were aware that Burton was disbarred and didn't want Stilley to know that he was disbarred for conversion, whereas Stilley went to prison because he ***would not*** convert the funds of his clients.

Attorney General's bogus claims. (This version has working links, which the Luddites of Arkansas refuse to allow in filed pleadings.)

The Arkansas Supreme Court not only dismissed the petition without consideration of the merits, it also referred Stilley to the Crawford County Prosecutor for criminal prosecution. The prosecutor filed a criminal "information" (charging instrument) charging perjury as a Class C felony, which carries a minimum 3-years and maximum 10-years in prison. The sole count in this information contains not a solitary complete sentence, except those he copied verbatim from the Arkansas code. The charge is laughable gibberish and fails to allege a crime. The Crawford County Circuit Court denied Stilley's motion to dismiss without prejudice at the arraignment without asking the prosecutor for a response, whether written or oral.

This Court is piling on, seeking to revoke Stilley's supervised release and incarcerate him yet again for up to two years. *Let's see how well Stilley defends frivolous state felony charges from a jail cell!* If this Court truly thought Stilley committed a felony, and would go to Arkansas state prison after his jury trial scheduled for May 2025, why bother with this revocation proceeding?

Stilley's registration to vote was condition precedent to filing the original action petition against Secretary of State John Thurston. The Arkansas Attorney General claimed that Stilley wasn't qualified to register to vote. Stilley claimed he was entitled to register *inter alia* because his revocation judgment was taken in defiance of the 6th Amendment right to counsel. Stilley made no attempt to conceal his registration papers. The application and voter registration were Exhibits "1" and "2" to his response to motion to dismiss.

The Arkansas Secretary of State defaulted on three motions in CV-24-453, as follows:

1) An 8-7-2024 motion to suppress the criminal judgment on revocation (Dkt. 752);

2) An 8-12-2024 motion to suppress the original criminal judgment (Dkt. 338);

3) An 8-9-2024 motion to expedite responses to discovery which had been served 8-6-2024.

The Arkansas Supreme Court on 9-5-2024 in a *per curiam* (by the court, signed by no one) order dismissed the original action petition despite the defaulted motions. The *per curiam* also referred Stilley for criminal prosecution. The *per curiam* did not rule on any of Stilley's three motions. In fact, it is impossible to divine, from the face of the dismissal order, that Stilley even filed the motions. The order of dismissal was (quite suspiciously) entered **one day prior** to the day upon which Stilley's requests for admissions would have been **deemed admitted** by operation of law. Appointing a Special Master for fact finding, and compelling Stilley to put up $5,000 to pay for it, was essentially a confession that factual disputes existed, which in turn implies that Stilley is **entitled to reasonable discovery**.

Stilley wishes to **petition the US Supreme Court for certiorari**. This could put the Arkansas Abortion Amendment of 2024 on the ballot, (albeit after the November 2024 election) for the consideration of the voters. If this Court locks up Stilley on the claimed violation of a plainly void judgment, based on US Supreme Court caselaw, it has injected itself into one of the most divisive hot-button issues in this country. If this Court denies a stay pending appeal, it doesn't just deliver a blow to its own credibility. It strikes at the very core of the credibility of the federal bench and bar.

**Nobody** honestly believes Stilley committed perjury on the voter registration form. **Nobody** honestly believes that Stilley isn't a validly registered voter. The Arkansas Attorney General assigned five lawyers to Stilley's case – more than the four defense lawyers assigned to the original action petition filed by Arkansans for Limited Government. With five lawyers against one disbarred and disgraced former lawyer, they **defaulted** on three motions, two of which were dispositive.

They didn't answer because *they had no answer*. Ditto for the Arkansas Supreme Court. They didn't rule upon any of these three defaulted motions – because they **had no rebuttal** to

Stilley's meritorious arguments. Look at their *per curiam*.[13] They studiously avoided the very issues for which they had ordered a Special Master to "make findings of fact regarding the validity of Oscar Stilley's Voter Registration." The Special Master declared the issues, then nimbly danced his way around them. He said what Stilley was "vigorously" contending, then refused to opine as to whether or not Stilley's contentions were meritorious.

The Arkansas Supreme Court's *per curiam* hangs solely on the slender thread of ***legal standing***. Stilley in his motion to suppress the revocation judgment utterly dismantled the standing defense on the basis of US Supreme Court case law on the 6th Amendment Right to Assistance of Counsel. What should we expect the US Supreme Court to do when their well-established legal precedents are brushed off by a state supreme court *without so much as an explanation*? A well drafted, professionally printed petition for certiorari has a **serious chance of success**.

According to the voter registration application form that Stilley signed, Stilley faces up to a $10,000 fine and 10 years in prison under state and federal laws, for registering to vote based upon *false* information. But none of the lawyers and judges involved in this legal battle even ***think*** Stilley's statements were false. By their actions they telegraph an ***unshakable belief*** that Stilley ***told the truth*** on his voter registration application.

Look at the form. Ex. 1, Stilley's Response to Motion to Dismiss dated July 25, 2024. Stilley claimed that "I have not been lawfully convicted of a felony by a lawful court." The caselaw makes it clear that a criminal judgment taken against a defendant who is pleading for his experienced and knowledgeable standby counsel, and if that's not acceptable asking for his options, and if that's not acceptable practically begging for a little time to try to get at least some assistance of counsel, and yet is forced to proceed pro se with no assistance of counsel, is ***void***. It's not

---

[13]    Justice Baker did not participate in this order.

*void**able***. It's ***void*** in the strictest sense of the word. It's pure unadulterated constitutional ***garbage***.

Let us not forget the precise words of the Arkansas Supreme Court in its [formal order July 26, 2024](#);

> Gary Arnold Appointed as Special Master to conduct a hearing and ***make findings of fact*** regarding the validity of Oscar Stilley's voter registration. Special Master is ordered to report his findings to this Court by August 26, 2024.
> (Emphasis added)

Stilley challenged Arkansas Secretary of State John Thurston and his five lawyers to come up with case law that says that registering to vote despite an **incontrovertibly void** federal judgment and commitment order is somehow illegal. What five lawyers? Let me list them and their lofty titles:

1) Justin Brascher, Senior Assistant Attorney General for Intergovernmental Affairs

2) Nicholas Bronni, Arkansas Solicitor General

3) Asher Steinberg, Senior Assistant Solicitor General

4) Dylan Jacobs, Deputy Solicitor General

5) Christine Cryer, Senior Assistant Attorney General, Chief, Special Litigation Section

Bronni, Jacobs, and Steinberg were awarded a **2024 U.S. Supreme Court Best Brief Award** by the National Association of Attorneys General of Washington D.C.

Five hotshot lawyers not only failed to come up with any such caselaw, ***they defaulted altogether***. What happened? Did the cat get their tongue?

Arkansas Supreme Court Rule 2-1(d) provides the time frame for the filing of responses to motions:

> *Response*. A response may be filed within 10 calendar days of the filing of a motion or petition. Evidence of service is required.

Stilley has prepared a home-made docket[14] that's much more user friendly than the official docket. Take your pick. Stilley's telling this Court, his adversaries, and the world the truth. Stilley's arguments are unassailable. Stilley's adversaries tacitly admit that Stilley is right, and that Dkt. 752 is **void**.

We've already established that the US Supreme Court considers Dkt. #752 to be a void judgment. So what is meant by that term? A void judgment is one which, from its inception, was a complete nullity and without legal effect. *Lubben v. Selective Service System Local Bd. No. 27*, 453 F.2d 645, 649, 14 A.L.R. Fed. 298 (C.A. 1 Mass. 1972); *Hobbs v. U.S. Office of Personnel Management*, 485 F. Supp. 456 (M.D. Fla. 1980). A void judgment has the same legal effect as a blank piece of paper. It does not have to be overturned or reversed on appeal to "become void." See *Valley v. Northern Fire and Marine Ins. Co.*, 254 U.S. 348, 353-354, 41 S. Ct. 116 (1920), where the Court explained:

> …Courts are constituted by authority and they can not go beyond the power delegated to them. If they act beyond that authority, and certainly in contravention of it, their judgments and orders are regarded as **nullities**. They are 354*354 not voidable, but simply void, **and this even prior to reversal**. *Elliott* v. *Peirsol,* 1 Pet. 328, 344; *Old Wayne Mutual Life Association* v. *McDonough,* 204 U.S. 8.
> (Emphases added)

## CONCLUSION

A proper officer of this court should promptly enter an order vacating the Judgment and Commitment Order at Docket 752.

Respectfully submitted.

By: /s/ Oscar Stilley                          November 4, 2024

---

[14]    This docket includes the order of dismissal but isn't current. Use the official docket to see what has been added since this was uploaded to the web.

Oscar Stilley
10600 N Highway 59
Cedarville, AR 72932-9246
479.384.2303 cell phone
oscarstilley@gmail.com

### CERTIFICATE OF SERVICE

Defendant Stilley hereby certifies that on the date stated above he electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, thereby serving all persons having ECF privileges and entitled to service in this case.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA                                    PLAINTIFF

v.                              Case No. 4:09-CR-043 SPF

OSCAR AMOS STILLEY                                          DEFENDANT

### DEFENDANT OSCAR STILLEY'S MOTION FOR A TRUE AND CORRECT RECORD, WITH INCLUDED SUPPORTING BRIEF

Comes now Defendant Oscar Stilley (Stilley) and for his motion states:

1.     The prosecutor in this case, Charles Anthony O'Reilly, has stated his opposition to a true and correct record. He can't win on the basis of truth. He is utterly reliant upon falsehoods, to impose punishment on Stilley.

2.     The record in this case is not true and correct.

3.     Stilley has in the past sought a correction of the record, prior to a ruling on a motion.  See e.g. Dkt. 694 and 695.

4.     The aforementioned pleadings were a motion and brief seeking a reduction under 18 USC 3582(c).

5.     Stilley made it clear that he wanted an accurate record first, then a ruling on the motion, no matter the tenor of the ultimate ruling on the underlying motion.

6.     This Court did not issue the order sought by Stilley.

7.     The correction of records with known falsehoods is required by the oath of office of Oklahoma attorneys, applicable attorney ethics rules, federal criminal statutes, etc.

8.    If Stilley is truly guilty, an accurate record will not be harmful to the government.

9.    To the extent not contrary to law or rule or Stilley's legal interests, Stilley incorporates all other motions and briefs filed on the same day as this pleading, as if set forth herein word for word.  Stilley reserves and claims the right to rely on any other part of the official record in the captioned case, from the filing of the first docket item forward, as defined by Federal Rule of Appellate Procedure (FRAP) 10(a), in support of his claims and arguments.

10.    Stilley claims and relies upon the right to rely upon any part of this record in support of any motion filed with respect to the pending petition/criminal complaint.

11.    Stilley claims and relies upon the right to judicial notice as to any matters that meet the standards of the federal rules, laws, and other authorities with respect to judicial notice of facts.

12.    Stilley vehemently objects to a ruling by the Court prior to a response by the government.

13.    Stilley includes herewith a brief in support.


WHEREFORE, Stilley respectfully requests an order directing the government to cooperate with Stilley to correct known or reasonably ascertainable material falsehoods in the official record or any part thereof; and for such other and further relief as may be appropriate whether or not specifically requested.

 Respectfully submitted,

By: /s/ Oscar Stilley                 November 5, 2024
Oscar Stilley                          Date
10600 N Highway 59
Cedarville, AR 72932-9246
479.384.2303 mobile
479.401.2615 fax
oscarstilley@gmail.com


**BRIEF IN SUPPORT OF MOTION**

Consider the oath of office taken by the Oklahoma bar licensed attorneys

involved in this case.  Specifically, the Oath of Office of Oklahoma Attorneys reads

as follows:

> You do solemnly swear that you will support, protect and defend the
> Constitution of the United States, and the Constitution of the State of
> Oklahoma; **that you will do no falsehood or consent that any be done
> in court,** and ***if you know of any you will give knowledge thereof to the
> judges of the court, or some one of them, that it may be reformed***; you
> will not wittingly, willingly or **knowingly promote**, sue, or procure to be
> sued, **any false or unlawful suit, or give aid or consent to the same**;
> you will delay no man for lucre or malice, but will act in the office of attorney
> in this court according to your best learning and discretion, with all good
> fidelity as well to the court as to your client, so help you God.
> (Emphases added)

It doesn't matter whether the falsity was intentional.  It doesn't matter if the

source of the falsehood had the whitest heart and the emptiest head in the history

of mankind.  Mere knowledge imposes legal duties.

All the lawyers on this case, save perhaps Mr. O'Reilly, made oath to give

knowledge of falsehoods to one or more judges "that it may be reformed."  Therefore

it hardly seems an extravagant proposition that a court would order lawyers to keep

their oaths as attorneys at law.

3

What kind of falsehoods?  Pretrial, the government repeatedly stated their theory that Springer **earned** the money but didn't pay taxes on it.  After trial, they said <u>that if the jury hadn't concluded that Springer & Stilley stole Turner's $250,000, they would have acquitted</u>.

In other words, the government admits that Stilley **could not possibly be guilty** of the charges **<u>of the indictment</u>**.  That means when the District Court – any District Court – does the analysis required by the Sentencing Guidelines, the only lawful outcome is a judgment of acquittal.

Stilley has proven beyond reasonable doubt that his restitution includes $7,901 arising from a math error.   <u>Dkt. 723, pg. 32-33</u>   I have asked US Probation for an accurate statement of account, of any lawful restitution.  They won't do it.  This Court and the world at large should know why.

Not one line item of restitution is factually correct.  Every line item can be proven factually and/or legally false from the record itself.  The government would **love** to correct the math error, save for this fact.  Correction of that one factual error is a slippery slope.  If the government does the honorably and legally required thing, the government won't stop until it hits rock bottom, with every single economic claim against Stilley reduced to rubble.  Correction of this falsehood will lead to the loss of the government's fraudulent judgment and commitment order.

A district court abuses its discretion when it **bases a decision** on a clearly erroneous finding of fact or an erroneous conclusion of law, or when its ruling manifests a clear error of judgment. See *Kilgore v. Attorney Gen. of Co.*, 519 F.3d

4

1084, 1086 (10th Cir.2008).  Therefore, correction of the record is *indispensable*,

prior to any further proceedings.

Criminal law is in accord.  See 18 USC 1001, which provides in pertinent

part:

18 U.S. Code § 1001 - Statements or entries generally

**(a)**  Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—
**(1)** falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
**(2)** makes any materially false, fictitious, or fraudulent statement or representation; or
**(3)** makes **or uses** any false writing or document knowing the same to contain **any materially false, fictitious, or fraudulent statement or entry**;
shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both. If the matter relates to an offense under chapter 109A, 109B, 110, or 117, or section 1591, then the term of imprisonment imposed under this section shall be not more than 8 years.
**(b)** Subsection (a) does not apply to a party to a judicial proceeding, or that party's counsel, for statements, representations, writings or documents submitted by such party or counsel to a judge or magistrate in that proceeding.
(Emphases added)

The limitation as to judicial pleadings to a judge or magistrate is a good one.

Nobody should be in fear of criminal liability for a court filing, even a truly bad one.

That would chill 1ˢᵗ Amendment peaceful petition.

Nothing in that limitation exonerates anyone for knowingly ***enforcing*** a

judgment based on falsehoods.  When the holder of a judgment becomes aware of

falsity infecting the judgment, the mere *use* of that judgment is a federal felony.

5

Thus we can see that federal criminal law is in accord with the Oklahoma oath of office of attorney's at law. But this is not the only federal statute that criminalizes the government's actions in this case. See for example 18 U.S. Code § 4 - Misprision of felony. This statute provides that:

> Whoever, ***having knowledge*** of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both.
> (Emphasis added)

Once again, criminal liability is independent of the whiteness of the heart or the emptiness of the head. Criminal liability is predicated upon knowledge. Considering the places this case has been, and the personalities involved, this imposes legal duties on a lot of persons, to include a lot of attorneys.

Joseph Sullivan, the former chief security officer of Uber, learned on or about October 5, 2022 that the archaic and much maligned offense of "misprision of a felony" still has some pretty nasty teeth. He was convicted of the offense as well as obstruction of justice, by a jury in the Northern District of California. The US Department of Justice still prosecutes such charges. They should give serious consideration to obeying the laws they enforce against others.

This case directly or indirectly involves many lawyers, including supervisory lawyers. Consider the following ethical rules, all from the Oklahoma Rules of Professional Conduct (ORPC).

### Rule 3.1. Meritorious Claims and Contentions
A lawyer shall not bring or defend a proceeding, or assert or controvert an issue **therein, unless there is a basis in law and fact for doing so**

6

**that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law**. A lawyer for the defendant in a criminal proceeding, or the respondent in a proceeding that could result in incarceration, may nevertheless so defend the proceeding as to require that every element of the case be established.
(Emphasis added)

There is no arguable basis on law and fact for opposing a true and correct record.

Rule 3.3 provides in pertinent part.  If the government wishes to add additional, they should feel free.

**Rule 3.3. Candor Toward The Tribunal**
(a) A lawyer shall not knowingly:
(1) make a false statement of fact or law to a tribunal or **fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer**;
(2) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel; or
(3) offer evidence that the lawyer knows to be false. If a lawyer, the lawyer's client, or a witness called by the lawyer, has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal. A lawyer may refuse to offer evidence that the lawyer reasonably believes is false.
(4) fail to disclose a fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client.
(b) A lawyer who represents a client in an adjudicative proceeding and who knows that a person intends to engage, is engaging or has engaged in criminal or fraudulent conduct related to the proceeding shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal.
(Emphasis added)

Prosecutors have special responsibilities.  Stilley will reproduce the rule and then comment upon it.  Bear in mind that the lack of highlighting doesn't mean the government has not violated that portion of the rule in this case.

**RULE 3.8 SPECIAL RESPONSIBILITIES OF A PROSECUTOR**

The prosecutor in a criminal case shall:

(a) **refrain from prosecuting a charge that the prosecutor knows is not supported by probable cause**;

(b) **make reasonable efforts to assure that the accused has been advised of the right to, and the procedure for obtaining, counsel and has been given reasonable opportunity to obtain counsel**;

(c) *not seek to obtain from an unrepresented accused a waiver of important pretrial rights*, such as the right to a preliminary hearing;

(d) **make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor,** except when the prosecutor is relieved of this responsibility by a protective order of the tribunal;

(e) not subpoena a lawyer in a grand jury or other criminal proceeding to present evidence about a past or present client unless the prosecutor reasonably believes:

(1) the information sought is not protected from disclosure by any applicable privilege;

(2) the evidence sought is essential to the successful completion of an ongoing investigation or prosecution; and

(3) there is no other feasible alternative to obtain the information;

(f) except for statements that are necessary to inform the public of the nature and extent of the prosecutor's action and that serve a legitimate law enforcement purpose, refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused and exercise reasonable care to prevent investigators, law enforcement personnel, employees or other persons assisting or associated with the prosecutor in a criminal case from making an extrajudicial statement that the prosecutor would be prohibited from making under Rule 3.6 or this Rule;

(g) The lawyer upon whom a subpoena is served shall be afforded a reasonable time to file a motion to quash compulsory process of his/her attendance. Whenever a subpoena is issued for a lawyer who then moves to quash it by invoking attorney/client privilege, the prosecutor may not press further in any proceeding for the subpoenaed lawyer's appearance as a witness until an adversary in camera hearing has resulted in a judicial ruling which resolves all the challenges advanced in the lawyer's motion to quash.

(h) **When a prosecutor knows of new, credible, and material evidence creating a reasonable likelihood that a convicted defendant did not commit an offense of which the defendant was convicted, the prosecutor shall within a reasonable time:**

8

**(1) disclose that evidence to an appropriate court and prosecutorial authority in the jurisdiction where the conviction occurred, and
(2) if the judgment of conviction was entered by a court in which the prosecutor exercises prosecutorial authority,
(i) unless a court authorizes delay, make reasonable efforts to disclose that evidence to the defendant's attorney or if the defendant is not represented by counsel to the defendant, and
(ii) if the defendant is not represented by counsel, move the court in which the defendant was convicted to appoint counsel to assist the defendant concerning the evidence, and
(iii) <u>request an appropriate authority to investigate whether the defendant was convicted of an offense that the defendant did not commit.</u>
(i) When a prosecutor learns of clear and convincing evidence establishing that a defendant was convicted in a court <u>in which the prosecutor exercises prosecutorial authority of an offense that the defendant did not commit, the prosecutor shall promptly notify the appropriate court and make reasonable efforts to notify the defendant's counsel and the defendant.</u>**
(j) A prosecutor's judgment, made in good faith, that the new evidence is not of such nature as to trigger the obligations of sections (h) and (i) of this rule, though subsequently determined to have been erroneous, does not constitute a violation of this rule.
(Emphases added)

The sum and substance of much of this rule is that a criminal defendant is entitled to a true and correct record, even if it means the prosecutorial team has to eat crow years after the initial jury trial proceedings. This is a continuing obligation. It doesn't go away until the government lawyer performs his ethical duties.

Jeff Gallant, the face of the government's legal team for the last revocation prosecution, didn't oppose Stilley's request for an initial appearance. In fact he agreed to it. Now the Court has denied a much better supported request for initial appearance *without so much as a response from the government*. What is one of the

9

key functions of an initial appearance? To determine whether or not probable cause exists for the prosecution. Why?

Years ago, Scott County, Arkansas had a prosecutor nicknamed "Blue Jean." He got the tag because he routinely wore blue jeans to court. He was eccentric, but he had some good ideas.

Certain Arkansas state laws inhibited his discretion to dismiss DWI charges just because he thought they were bogus or unwarranted or otherwise in need of dismissal. He had a solution for that. When the judge called the case and told the prosecutor to call his first witness, Blue Jean would stand up and say "no witnesses." With no witnesses and no evidence, the judge had no choice but to dismiss the charges.

Supervisory lawyers have their own obligations. See

**Rule 5.1. Responsibilities of Partners, Managers, and Supervisory Lawyers**
(a) A partner in a law firm, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm, shall make reasonable efforts to ensure that the firm **has in effect measures giving reasonable assurance that all lawyers in the firm conform to the Rules of Professional Conduct.**
(b) A lawyer having direct supervisory authority over another lawyer **shall make reasonable efforts to ensure that the other lawyer conforms to the Rules of Professional Conduct.**
(c) *A lawyer shall be responsible for another lawyer's violation of the Rules of Professional Conduct if*:
(1) the lawyer orders or, with knowledge of the specific conduct, ratifies the conduct involved; or
(2**) the lawyer is a partner or has comparable managerial authority in the law firm in which the other lawyer practices, or has direct supervisory authority over the other lawyer, and knows of the conduct <u>at a time when its consequences can be avoided or mitigated</u> but fails to take reasonable remedial action.**
(Emphases added)

10

All parties to this proceeding, **_and the judge_**, should agree to a true and correct record. Then let's follow the truth where it leads us. As John Lennon said in a song by the same title, "gimme some truth." That's how Stilley feels about the situation right now. _Gimme some truth!!!_

More authorities could be cited, but additional effort is hardly necessary. The authorities cited decisively demonstrate that this Court has a duty to cause the record to conform to the truth.

Respectfully submitted,

By: /s/ Oscar Stilley                     November 5, 2024
Oscar Stilley                             Date
10600 N Highway 59
Cedarville, AR 72932-9246
479.384.2303 mobile
479.401.2615 fax
oscarstilley@gmail.com

CERTIFICATE OF SERVICE

Defendant Stilley hereby certifies that on the date stated above he electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, thereby serving all persons having ECF privileges and entitled to service in this case. Stilley does not have access to Lindsey Springer's physical address, email, and phone number, and thus cannot serve him.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA                                    PLAINTIFF

v.                              Case No. 4:09-CR-043

OSCAR AMOS STILLEY                                          DEFENDANT

**MOTION TO VACATE DOCKET #338**

Comes now Petitioner Oscar Stilley (Stilley) and for his motion to vacate

judgment and commitment order #338 and states:

1.      Charles Anthony O'Reilly, perhaps sensing that the Court would excuse him

from responding to motions, interposed a blanket objection to requests for relief sought

by Stilley.

2.      Stilley at 6:11 PM on 11-4-2024 filed a motion for initial appearance before a

magistrate judge, *inter alia* for the purpose of seeking an arguably disinterested

arbiter of at least parts of this dispute.

3.      This Court denied the motion without awaiting any response, at 3:42 PM on 11-

5-2024.

4.      Such rulings without awaiting a response call into question the Court's

complaint that Stilley's motions in the last revocation were filed too late to

accommodate a reasonable response.

5.      Stilley was sentenced in *US v. Stilley*, Northern District of Oklahoma (OKND)

4:09-cr-43. See Judgment and Commitment Order entered 4-28-2010, Dkt. 338.

6.      Said judgment and commitment order is void, amongst other reasons because it

was procured by perjury, fraud, and falsehoods.

7.    Said judgment and commitment order is void, amongst other reasons because it was procured by frauds upon the court, within the meaning of applicable case law.

8.    Said judgment and commitment order is void, amongst other reasons because it was entered contrary to the requirements of the doctrine of judicial estoppel.

9.    Said judgment and commitment order is void, amongst other reasons because that order is predicated on a theory in irreconcilable conflict with the government's pretrial theory.

10.    Said judgment and commitment order is void, amongst other reasons because the "theft theory" upon which #338 is predicated, was raised after a *sua sponte* deadline for the filing of dispositive motions.

11.    Said judgment and commitment order is void, amongst other reasons because Stilley's adversaries stomped out his ability to prosecute the one direct appeal to which he was entitled by law and rule.

12.    Stilley filed two separate motions to recall the mandate in 10th Circuit 10-5057, in which Stilley attempted to get the one direct appeal to which he was entitled. One was under that appeal number, the other was under appeal 10th Circuit 22-5000, an attempt to appeal the denial of his petition under 28 USC 2255, in which he was denied a certificate of appealability.

13.    In neither case did the 10th Circuit assign as a reason for denial any claim that Stilley had already prosecuted the one direct appeal to which he was entitled.

14.    Such a claim, if true, would be the most logical reason for denying the motion to recall the mandate.

15.    Nothing on the docket of 10th Circuit 10-5057 indicates that the clerk of that court thought Stilley filed an opening brief for a direct appeal.

16.    Stilley was denied due process because Stephen P. Friot struck Stilley's motion for judgment as a matter of law, based on theories that he himself repudiated in writing, both before and after that decision. Dkt. 695, pg. 15-19.

17.    There is no evidence in the record of OKND 4:09-cr-43 to support Judge Stephen P. Friot's findings of Stilley's wrongdoing at the revocation sentencing.

18.    There is no evidence in the record of OKND 4:09-cr-43 to support Judge Stephen P. Friot's findings of Stilley's wrongdoing made during the original sentencing in 2010.

19.    The testimony presented in OKND 4:09-cr-43 affirmatively proved that Stilley did not steal anything, either as to Count 3 (2003) or Count (4) 2005.

20.    The evidence as to both substantive counts proved that Stilley merely followed the lawful directives of his clients, with respect to money held in trust for the use and benefit of said clients.

21.    Failure to follow said instructions of clients would have been at minimum a civil conversion of client funds and an ethical violation, presumptively worthy of 3 months actual suspension from the practice of law under applicable California rules.

22.    Stilley's purported indictment was not returned in open court, which means its authenticity has not been satisfactorily proven, and that the judgment must be set aside. Dkt. 695 pg. 21-25.

23.    If the attorneys who prosecuted Stilley criminally told the truth to the proper tribunals, Stilley would be promptly exonerated of any guilt and set free, with no felony criminal record.

24.     Not less than three attorneys involved in the criminal prosecution of Stilley

have taken the oath of Oklahoma attorneys, which requires such attorneys to inform

appropriate judicial personnel of falsehoods of which they are aware.

25.     Stilley is by law entitled to legal process that would set him free if the lawyers

who sent him to prison told the truth in conformity with their oaths of office.

26.     Stilley made extensive factual statements under oath, particularly in Dockets

694 (motion for sentence reduction) and 701 (motion under 28 USC 2255) but also in

other pleadings.

27.     Without prejudice to any other defenses, Stilley moves this Court to vacate

Docket #338, such that all parties are forbidden to rely upon it as a *lawful* order or to

rely upon it as a *valid* judgment.

28.     Stilley most respectfully requests that the Court order the government to timely

respond to this motion.

29.     Stilley most respectfully requests a ruling based upon the 1) competing

arguments of the parties after both have been given a fair chance to be heard, and 2)

the official record in this case.

30.     Stilley submits herewith an included brief in support.

WHEREFORE, Stilley respectfully requests an order vacating OKND 4:09-cr-43

docket #338, as a valid and lawful judgment; and for such other and further relief as

may be appropriate.


Respectfully submitted,

By: /s/ Oscar Stilley                      November 5, 2024
Oscar Stilley                                   Date
10600 N Highway 59

Cedarville, AR 72932-9246
479.384.2303 mobile
oscarstilley@gmail.com

## BRIEF IN SUPPORT OF MOTION

Stilley filed his petition in *Oscar Stilley v. John Thurston et al*, Ark. Sup. Ct. 24-CV-453 on July 16, 2024.[1] The Arkansas Supreme Court expedited the matter, ordering a response by the 18th of July at 3:00 PM. The first sentence of their motion to dismiss described Stilley as "a convicted felon, disbarred lawyer, and fraudulently registered voter."

The Arkansas Supreme Court expedited Stilley's response. Stilley responded Thursday, July 25, 2024, along with a set of exhibits,[2] explaining how Stilley's current judgment and commitment order (Dkt. 752) ***could not possibly be valid***. The Supreme Court referred the matter to the Special Master Friday the 26th of July, 2024. On Monday the 29th, two additional Assistant Attorney Generals entered their appearances in this case.

Respondent Thurston's answer was filed July 31, 2024. Respondent Thurston persisted in denying that Stilley is a lawfully registered voter, and perhaps more tellingly persisted in the false claim that Stilley is a "convicted felon."

---

[1]    A more user friendly homemade docket, and the docket items in this case up through dismissal, may be found here.

[2]    These versions have operable links. The Luddites of Arkansas do not allow working links in their pleadings.

Stilley is not a convicted *felon*. He is a convicted *innocent person*. Stilley went to prison for doing what was an *ethical duty*, based on the government's pretrial theories in their criminal case. Both Oscar Stilley and Evan Gershkovich have facially valid criminal judgments in their background. Neither are the product of looking at the relevant facts in a different way. In each case, the judgments are the product of *fiction*. Stilley is no more a *felon* than Evan Gershkovich.

"To warrant the impeaching of a foreign judgment because procured by fraud, fraud must be distinctly alleged and charged. *Ritchie v. McMullen*, 159 U.S. 235, 242 (1895)

By the admission of government counsel in the criminal case, Stilley could not *possibly* be guilty based upon the pretrial theories of the government. The post-trial "theft theory" was raised only after the expiration of a deadline for the filing of dispositive motions.

So why wouldn't the Arkansas Attorney General formally take the pretrial theories off the table? Because he ***couldn't*** – if he wanted an order dismissing Stilley's petition in Ark. Sup. Ct. 24-CV-453.

Respondent John Thurston, Arkansas Secretary of State had five bar licensed attorneys, all officers of the court. In addition to their duty to represent their client zealously, they had numerous ethical duties to the tribunal and *to the people*. Rule 1 of the Arkansas Rules of Civil Procedure says that those rules "shall be construed and administered to secure the just, speedy and inexpensive determination of every action."

Would that not include at the very minimum an early stipulation to at least which of three contradictory theories of criminal liability these five lawyers plan to urge the Arkansas Supreme Court to accept?

Stilley pushed his chips to the middle of the table. What chips? How about 1) a [$5,000 bond for expenses for the Special Master proceedings](#),[3] 2) a potential fine, in the [warning on the face of the application for voter registration](#), of up to $10,000, and 3) incarceration in state and/or federal prison, for up to ten years, also set forth on the face of the voter registration application. *Id.*

Stilley paid $165 to file his petition into one of the most hotly contested initiative petition contests of the election cycle. The first sentence of the first paragraph was "Stilley is a registered voter of the State of Arkansas." Nobody does that, with both eyes open, unless they are utterly convinced of the merits of their position – *and ready to defend it*. Nobody does that unless they have **supreme confidence** that they are right.

The Arkansas Attorney General has enormous resources. The US Attorney for OKND doubtless armed Arkansas Attorney General Tim Griffin and his team of 5 elite lawyers with all the information at his command. Both officials had every incentive to defend Judgment and Commitment Orders 338 and 752 against Stilley's assaults. Both offices are doubtless endowed with the best artificial intelligence, to scour the records of the various court proceedings, looking for chinks in Stilley's armor.

---

[3]     See Stilley's docket number 20. This order may also be reviewed on the [official docket](#).

Stilley offered Thurston's counsel a set of the links he uses in his pleadings, in support of his arguments, for the asking. He also offered frank discussion, with answers to questions about the proceedings. They didn't ask for any of these things. They doubtless got their information elsewhere, almost certainly from the US Attorney's Office for the OKND.

Stilley's already made his arguments elsewhere. Five of the best lawyers in the office of the Arkansas Attorney General ***defaulted*** on the [motion to suppress Docket #338](#).[4] Why? Because there are no words in the English language to justify Docket #338, or to warrant allowing it to maintain the appearance of validity for another day.

Five of the best lawyers in the office of the Arkansas Attorney General tacitly admit that Docket #338 is a pure unadulterated fraud. Five lawyers by their actions demonstrated a ***sincere belief of the invalidity of Docket #338***, with a confidence no less than that of Oscar Stilley when he filed into a white-hot election contest, in which the first sentence of his first pleading was "Stilley is a registered voter of the State of Arkansas."

Docket #338 is utterly indefensible. It is inexcusable evil, on par with the jailing, prosecution, and conviction of Evan Gershkovich. The time has come for it to be dumped into the dustbin of history.

**CONCLUSION**

This Court should enter an order vacating the Judgment and Commitment Order at Docket 338.

Respectfully submitted.

---

[4]     The [official docket](#) likewise confirms Stilley's assertions.

By: /s/ Oscar Stilley                                      November 5, 2024
Oscar Stilley
10600 N Highway 59
Cedarville, AR 72932-9246
479.384.2303 cell phone
oscarstilley@gmail.com

## CERTIFICATE OF SERVICE

Defendant Stilley hereby certifies that on the date stated above he electronically filed
the foregoing with the Clerk of the Court by using the CM/ECF system, thereby
serving all persons having ECF privileges and entitled to service in this case.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA                                    PLAINTIFF

v.                                   Case No. 4:09-CR-043

OSCAR AMOS STILLEY                                          DEFENDANT

**MOTION TO DISMISS FOR LACK OF VENUE, WITH INCLUDED BRIEF**

Comes now Petitioner Oscar Stilley (Stilley) and for his motion to dismiss for lack of venue, and states:

1.      Plaintiff attorney Charles Anthony O'Reilly has cut off effective communications with Stilley.

2.      While communications were still active, Mr. O'Reilly said that he opposed everything Stilley requested.

3.      This Court has previously made rulings without waiting for a response from the government.

4.      Stilley respectfully requests that the Court wait for a response before entering an order or ruling.

5.      The entry of rulings less than a day after the filing of the motion gives the public (and Stilley) the impression that Stephen P. Friot is Stilley's adversary as well as his judge and decider.

6.      None of the things alleged against Stilley allegedly occurred in the Northern District of Oklahoma (OKND).

7.      The infamous crimes alleged against Stilley occurred, if at all, outside the OKND.

8.      None of Stilley's accusers have a good faith belief that the charged crimes occurred in the OKND.

9.      Stilley is entitled to dismissal, on the basis of constitutional and statutory provisions concerning the venue of criminal charges.

10.     Stilley submits herewith an included brief in support.

WHEREFORE, Stilley respectfully requests an order dismissing the Petition/criminal complaint for lack of venue; and for such other and further relief as may be appropriate.

Respectfully submitted,

By: /s/ Oscar Stilley                      November 5, 2024
Oscar Stilley                                   Date
10600 N Highway 59
Cedarville, AR 72932-9246
479.384.2303 mobile
oscarstilley@gmail.com

## BRIEF IN SUPPORT OF MOTION

Stilley is in possession of the "Petition," which is in effect a criminal complaint lodged in utter defiance of the 5th and 6th Amendments. Stilley has read the 9 counts repeatedly.

Not one of these counts contains any allegations that Stilley committed any crimes at any place in the OKND. These allegations of infamous crimes, if true, claim that Stilley committed those crimes in some other state and district.

US Constitution Article 3 § 2 in the third paragraph provides as follows:

> The Trial of *all Crimes*, except in Cases of Impeachment, shall be *by Jury*; and such Trial shall be held in the State *where the said Crimes shall have been committed*; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed. (Emphases added)

The 6th Amendment to the US Constitution provides as follows:

> In **all** criminal prosecutions, the accused shall enjoy the right to a speedy and public ***trial, by an impartial jury of the State and district wherein the crime shall have been committed***, which district shall have been previously ascertained by law, and to ***be informed of the nature and cause of the accusation***; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.
> (Emphases added)

Stilley is entitled to freedom from trial in any state and district except the one where the alleged crimes allegedly occurred. Stilley's crimes, if they occurred at all, occurred outside the geographic confines of the OKND. Stilley is of course innocent of any crimes. However, he is entitled to a trial where these imagined crimes were committed.

Consider *U.S. v. Medina-Ramos*, 834 F.2d 874, 875-76 (10th Cir. 1987), where the Court opined:

> The Constitution contains two overlapping provisions on venue in criminal cases. Article III, § 2, cl. 3 requires that the trial of any crime be held in the state in which the crime was committed, while the Sixth Amendment requires that trial be by a jury of the state and district in which the crime was committed. These directives are the product of the Framers' concern over "the unfairness and hardship to which trial in an environment alien to the accused exposes him." *United States v. Johnson,* 323 U.S. 273, 275, 65 S.Ct. 249, 250, 89 L.Ed. 236 (1944). The Supreme Court has pointed out that an expansive interpretation of venue can impose "needless hardship to an accused by prosecution remote from home and from appropriate facilities for defense" and can also lead "to the appearance of abuses, ***if not to abuses***, in the selection of what may be deemed ***a tribunal favorable to the prosecution***." *Id.* Determining venue thus raises
>
> > "matters that touch closely the fair administration of criminal justice and public confidence in it, on which it ultimately rests. These are important factors in any consideration of the effective enforcement of the criminal law . . . . Questions of venue in criminal cases, therefore, are not merely matters of formal legal procedure. ***They raise deep issues of public policy*** in the light of which legislation must be construed."

(Emphases added)

Stilley at 6:11 PM on 11-4-2024 filed a motion for an initial appearance before a magistrate judge, which is without any controversy is a ***matter of right*** under the Federal Rules of Criminal Procedure, which have the force of law. The OKND Local Criminal Rules say the same thing.

Judge Friot denied the motion less than 22 hours later, at 3:42 PM on 11-5-2024, based on his own arguments. The government didn't file a response, and wasn't ordered to file a response. Stilley requests that this Court wait for a response from Stilley's adversary before making a ruling. Anything less gives the appearance that Stephen P. Friot is Stilley's adversary, and furthermore unwilling to comply with established constitutional provisions, laws, and rules favorable to Stilley.

**CONCLUSION**

This Court should enter an order dismissing the criminal complaint entitled a "Petition" for lack of venue.

Respectfully submitted.

By: /s/ Oscar Stilley                    November 5, 2024
Oscar Stilley
10600 N Highway 59
Cedarville, AR 72932-9246
479.384.2303 cell phone
oscarstilley@gmail.com

**CERTIFICATE OF SERVICE**

Defendant Stilley hereby certifies that on the date stated above he electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, thereby serving all persons having ECF privileges and entitled to service in this case.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| United States of America, | | |
| | Plaintiff, | Case No.:      09-CR-043-SPF-2 |
| vs. | | Date:         10/13/2024 |
| | | Court Time:   9:05-10:25,   10:35-12:00 |
| | |                12:45-2:30,   2:40-4:25 |
| Oscar Amos Stilley, | | **MINUTE SHEET FINAL REVOCATION OF** |
| | Defendant(s). | **SR HEARING & SENTENCING** |

Stephen P Friot, U.S. District Judge       P. Lynn, Deputy Clerk       J Golemboski, L Griffin, Reporter

Counsel for Plaintiff:    Charles O'Reilly       Counsel for Defendant:    Oscar Stilley, pro se,
                                                                  Trevor Reynolds, stand-by

Probation Officer:     Kory McClintock, Ryan Forsyth

☒ Defendant appears in person with counsel     ☐ Counsel waived     ☒ Evidentiary
☒ 18:3553 Findings re: Prob/SR Revocation Sentencing Options made;
☒ Revocation Sentence re: Guideline; ☒ Findings made; ☐ Departure: ☐ Variance:     ☐ Upward     ☐ Downward
☒ Defendant and counsel asked if they care to say anything before sentence is pronounced, and no cause to the contrary being shown
☒ Motion Dkt.   815, 805, 804, 808, 809, 810 ☒   Denied
☒ Court makes findings on violations     ☒ Defendant's term of Prob/SR is revoked
     Violation #1 – acquitted, Violation #2 – violated, Violation #3 – violated, Violation #4 – violated, Violation #5 – violated
     Violation #6 – violated, Violation #7 – violated, Violation #8 – acquitted, Violation #9 - violated

**REVOCATION OF PROB/SR SENTENCE:**

☒ Bureau of Prison for a term of   24 months       ☐ Concurrent     ☐ Consecutive     ☐ Not Imposed
☒ NO Supervised Release
☒ Remainder of Restitution:      $   Payable to IRS      ☐ With Interest     ☐ Interest Waived ☐ Not Applicable
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
☒ Defendant advised of right to appeal         Court recommends to BOP:
                                        ☒ Designate a facility located in or near:      FCI Yazoo City
☒ Defendant remanded to custody of U.S. Marshal

**Additional Minutes:**
  Defendant requests court appointed.    CJA attorney Trevor Reynolds present and appointed as stand-by counsel.
  Motion to stay sentence is denied.    Motion to self surrender is denied.

  Govt Witnesses:
  Patti Rush
  Ryan Forsyth

  Govt Exhibits admitted and returned:
  1 – Dkt #792
  2 – Dkt #802
  3 – Arkansas Special Master Transcript and Documents re: voter registration

FILED

NOV 1 3 2024

Heidi D. Campbell, Clerk
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA                                    PLAINTIFF

v.                              Case No. 4:09-CR-043

OSCAR AMOS STILLEY                                          DEFENDANT

## NOTICE OF APPEAL

Comes now Petitioner Oscar Stilley (Stilley) and for notice of appeal states:

1.     Oscar Stilley hereby gives notice that he appeals the judgment entered in this case, revoking Stilley's supervised release and sentencing him to incarceration.

2.     Stilley appeals to the Tenth Circuit Court of Appeals.

3.     Stilley claims the right to raise all errors including but not limited to those raised in pleadings in this case or at any hearing, including the hearing at this criminal prosecution, sometimes referred to as a "revocation hearing." Stilley also claims the right to raise errors not appearing on the record, such as *ex parte* communications with prosecutors.

Respectfully submitted,

By: /s/ Oscar Stilley                        November 13, 2024
Oscar Stilley
10600 N Highway 59
Cedarville, AR 72932-9246
479.384.2303 cell phone
oscarstilley@gmail.com

## CERTIFICATE OF SERVICE

Defendant Stilley hereby certifies that on the date stated above he electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, thereby serving all persons having ECF privileges and entitled to service in this case.

Fees due
Forms sent